# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Miami Division

MDL No. 1334
Master File No. 00-1334-MD-Moreno

| | | |
|---|---|---|
| IN RE HUMANA, INC. MANAGED CARE LITIGATION | ) ) | |
| RODNEY J. LANDRY, ELIZABETH KEMPT, JO ANN O'NEILL, LYDIA K. ROUSE, DANNY E. WALDROP, BOBBY PICKNEY, KERRIE PAY, DEBBIE HITSMAN, HARRELL E. MCRANEY, MARILYN MCRANEY, KATHY HARTWELL, QUITMAN WARE, DANIEL P. HIGGINBOTHAM, CATHY HIGGINBOTHAM, and RAYMOND WILLIAMSON III, | ) ) ) ) ) ) ) ) ) ) | CLASS ACTION<br><br>Rule 23, Fed.R.Civ.P.<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. 1961, *ET SEQ.* AND THE EMPLOYEE |
| Plaintiffs,<br>vs. | ) ) ) ) | RETIREMENT INCOME SECURITY ACT ("ERISA") 29 U.S.C. §1001, *ET SEQ.* |
| HUMANA INC.; HUMANA HEALTH PLAN INC.; AETNA, INC.; AETNA-US HEALTHCARE, INC.; RICHARD L. HUBER; UNNAMED MEMBERS OF THE BOARD OF DIRECTORS OF AETNA, INC.; CIGNA CORPORATION; CIGNA HEALTH CORPORATION; FOUNDATION HEALTH SYSTEMS INC.; PACIFICARE HEALTH SYSTEMS, INC.; THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; UNITED HEALTHCARE; and UNITED HEALTH GROUP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Statutory Damages<br>Injunctive Relief<br>Imposition of *Cy Pres* Trust<br>Attorneys' Fees<br>Costs of Suit |
| Defendants. | ) ) ) ) | |

Plaintiffs, by and through their undersigned attorneys, bring this First Amended Class Action Complaint pursuant to Rule 23 of the Federal Rules of Civil Procedure against all of the following Defendants: (1) Aetna, Inc. and (2) Aetna-USHC, Inc. (collectively "Aetna"); (3) Richard L. Huber ("Huber"); (4) unnamed members of the Board of Directors of Aetna, Inc.; (5) Cigna Corporation and (6) Cigna Health Corporation (collectively "Cigna"); (7) Foundation Health Systems ("FHS"); (8) Humana Inc. and (9) Humana Health Plan Inc. (collectively "Humana"); (10) PacifiCare Health Systems Inc. ("PHS"); and (11) The Prudential Insurance Company of America ("Prudential"); (12) UnitedHealthcare and (13) United Health Group (collectively "United").

These Defendants each operate (or in Prudential's case, operated) different types of health maintenance groups, including, but not limited to, health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point-of-service ("POS") health plans in various states across the United States (collectively referred to as "Health Plans"). The Plaintiffs bring this nationwide class action on behalf of themselves and all others similarly situated. The named Plaintiffs and the members of the Class and the Subclass (as defined below) have been similarly subjected to and wronged by the each Defendant's misrepresentations and omissions of material fact and unlawful, nefarious, fraudulent, and extortionate conduct discussed herein.

The Plaintiffs allege the following factual and legal allegations upon information and belief.  Paragraphs pertaining to the Plaintiffs' own actions, however, are alleged upon personal knowledge. The allegations of this First amended Complaint are organized pursuant to the following outline.

-i-

# Consolidated MDL Complaint
## Table of Contents

| **Description** | **Paragraph Nos.** | **Page Nos.** |
|---|---|---|
| I.    Summary Of Factual And Legal Allegations | 1-15 | 1-5 |
| II.   Jurisdiction | 16 | 5 |
| III. Parties | | |
|     A.    Plaintiffs | 17-32 | 5-8 |
|     B.    Defendants | 33-64 | 8-26 |
| IV. Non-Party Co-Conspirators | 65-73 | 26-28 |
| V.   Appropriateness of Class Action Treatment | 74-89 | 28-36 |
|      Class Definition | 74 | 28-29 |
| VI. General Factual Allegations Common To All Counts | | |
|     A.    Each Defendant's Health Plans and How They Operate | 90-98 | 36-39 |
|     B.    Each Defendant's Common Fraudulent & Extortionate Schemes | 99-106 | 39-42 |
|     C.    Each Defendant Has Failed To Disclose Material Facts Concerning Its Internal Systemic Policies & Practices | 107 | 42-44 |
|     D.    Each Defendant's Extortionate Conduct | 109-113 | 44-46 |
|     E.    Each Defendant's Use Of Unregulated Guidelines To Make Medical Decisions | 114-117 | 46-47 |
|     F.    Defendants' Heavy-Handed Policies Interfere With The Delivery Of Honest Healthcare Services | 118-130 | 47-60 |

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

| **Description** | **Paragraph Nos.** | **Page Nos.** |
|---|---|---|
| G. Each Defendant Has A Duty To Refrain From Making Materially False Statements and Disclose Material Facts | 131-132 | 60-61 |
| H. The Defendants' Collusive Practices, Including Collusion With Non-MCO Co-Conspirators | 133-145 | 61-67 |
| VII. Defendant-Specific Allegations Common To All Counts | | |
| 1. Aetna's False And Misleading Advertising, Marketing, and Member Materials | 146-170 | 67-81 |
| 2. Cigna's False And Misleading Advertising, Marketing, And Member Materials | 171-175 | 82-84 |
| 3. FHS's False and Misleading Advertising, Marketing, and Member Materials | 176-181 | 84-86 |
| 4. Humana's False and Misleading Advertising, Marketing, and Member Materials | 183-184 | 87-88 |
| 5. PHS' False and Misleading Advertising, Marketing, and Member Materials | 185-193 | 89-92 |
| 6. Prudential's False and Misleading Advertising, Marketing, and Member Materials | 194-208 | 92-101 |
| 7. United's False and Misleading Advertising, Marketing, and Member Materials | 209-223 | 101-108 |

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET · SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

| **Description** | **Paragraph Nos.** | **Page Nos.** |
|---|---|---|
| First Claim For Relief | | |
| RICO VIOLATIONS (For All Class Members) | | |
| A.  General Allegations | 224-232 | 108-111 |
| B.  Each Defendant's Racketeering Activities Violate 18 U.S.C. §1961(a) | 233-235 | 111-112 |
| 1.  Defendants Violated 18 U.S.C. §§1341 and 1343, 18 U.S.C. §§1341 and 1346, and 18 U.S.C. §§1343 and 1346 | 236-242 | 112-114 |
| 2.  Defendants Violated of 18 U.S.C. §1951(b)(2) | 243-246 | 114-115 |
| 3.  Defendants Violated 18 U.S.C. §1952(a) | 247-249 | 116 |
| 4.  Defendants Violated 18 U.S.C. §1954 | 250-251 | 116-117 |
| C.  Defendants Have Engaged In A Pattern Of Racketeering Activity and Therefore Violated 18 §U.S.C. §1962(c) | 252-259 | 117-119 |
| D.  Defendants Have Violated 18 U.S.C. §1962(d) | 260-277 | 119-125 |
| E.  Defendants Violated 18 U.S.C. §2 By Seeking To Aid and Abet and Aiding and Abetting A Scheme To Violate 18 U.S.C. §§1962(a) & (c) | 278-285 | 125-127 |

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

| Description | Paragraph Nos. | Page Nos. |
|---|---|---|
| Second Claim For Relief<br>BREACHES OF ERISA<br>(For the Subclass Only) | 286-298 | 127-131 |
| Prayer For Relief<br>    First Claim for Relief | | 131 |
|     Second Claim for Relief | | 132-133 |
| Demand For Trial By Jury | | 134 |
| Date of Complaint | | 134 |
| Attorney Signature Block | | 134-138 |

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

## I.   SUMMARY OF FACTUAL AND LEGAL ALLEGATIONS.

1.     This First Amended Class Action Complaint seeks relief pursuant to Title IX of the Organized Crime Control Act of 1970, Public Law 91-452, 84 Stat. 922, commonly known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), codified at 18 U.S.C. §§1961-68, and in particular for violations of 18 U.S.C. §1962(c), and (d).  The Plaintiffs and the Class seek monetary damages as restitution and treble damages for each Defendant's and their co-conspirators' violations as alleged herein pursuant to 18 U.S.C. §1964(c).  This action is also brought pursuant 29 U.S.C. §1001 *et seq.*, commonly known and referred to as the Employee Retirement Income Security Act ("ERISA").

2.     This nationwide class action complaint asserts violations of RICO and ERISA.  The Plaintiffs hereby reserve all rights to file further appropriate amendments to add additional parties and causes of action.

3.     The Plaintiffs bring this action individually and, pursuant to Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide Class of all persons enrolled in each Defendant's HMOs, PPOs, or POS Health Plans.

4.     During the relevant time herein alleged, Defendants were providers of healthcare services to approximately tens of millions of subscribers nationwide.  The Class consists of the millions of past members of each Defendant's Health Plans who were targeted by each Defendant and induced into enrolling in Defendants' respective Health Plan and were induced to make payments for their enrollment as a result of each Defendant's standardized and uniform misrepresentations and omissions of material facts in its advertising, marketing, and member materials.

-1-

5.      During the relevant time herein alleged, Defendants offered their Health Plans to prospective and existing members in exchange for payment of premiums.  Through the publication and issuance of marketing materials, including certificates of coverage, member handbooks, member information, provider directories, and other documents, Defendants induced members to enroll in its plans while inducing existing members to continue enrolling in its plans.

6.      To provide healthcare services coverage through their respective Health Plans, Defendants entered into contractual arrangements with hundreds of thousands of physicians and manipulated the Health Plans' physicians to effectuate each Defendant's policies and practices.

7.      During the relevant period, Defendants engaged in a nationwide fraudulent scheme designed to induce the Plaintiffs and the Class to enroll in or continue their memberships in each Defendant's respective Health Plans.  During the relevant period, each of the Defendants, through misleading and deceptive misrepresentations and omissions, engaged in a fraudulent scheme misrepresenting that its primary commitment was to maintain and improve the quality of the healthcare services provided its members and that each Defendant's healthcare policies and practices were specifically designed for that purpose.  This scheme also included misrepresenting to the Plaintiffs and the Class that its coverage and treatment decisions were made on the basis of "medical necessity" when, in fact, each of the Defendants aggressively engaged in implementing systemic internal policies and practices designed to deny claims and medical services or limit such claims and medical services even when the claims

-2-

and medical services met the criteria for medical necessity as represented to the Plaintiffs and the Class.

        8.     In furtherance of each Defendant's fraudulent scheme, each misrepresented for example, that its plan members were provided the highest quality healthcare services by physicians exercising independent medical judgment based upon a patient's needs, free from fiscal and administrative policies and practices.  Nothing could be further from the truth.

        9.     Each of the Defendants during the relevant period aggressively engaged in implementing covert systematic internal policies and practices that resulted in the reduction of the quality of healthcare services provided the Plaintiffs and the Class, rather than maintaining and improving the quality of their healthcare.  These covert systematic internal policies and practices were designed, *inter alia,* to discourage each Defendant's healthcare providers from delivering medical services and intrude on the medical judgment of those healthcare providers by substituting the judgment of claims reviewers—who had neither the appropriate medical training nor the medical specialization to determine the medical needs of each Defendant's enrollees—for the medical judgment of physicians.

        10.     Each Defendant's misrepresentations were published with the intent to induce enrollees to rely upon them and resulted in the Class members and Plaintiffs enrolling in each Defendant's Health Plan or continuing to pay for membership.  Each Defendant's overt and/or predicate acts were the direct and proximate cause of loss to the Plaintiffs' and Class members' business or property.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

11.     By this action, Plaintiffs and Class members are not seeking to remedy claims of personal injury, medical malpractice, and/or wrongful death.

12.     During the relevant period, the Plaintiffs, the Class, and the Subclass (as defined below) did not receive the healthcare services plans that were presented to them by the Defendant managed care organizations ("MCOs") and marketed to them through those MCOs' respective advertising, marketing, and member materials.  Defendants exploited physicians' fear of economic loss or loss of business in attempts to manipulate and deprive the physicians, the Plaintiffs and the Class of their intangible property interests inherent in the physician-patient fiduciary relationship and inherent in the Plaintiffs' and the Class' intangible property rights to the delivery of honest medical services.

13.     Every Defendant exhibited a pattern of conduct constituting mail and wire fraud that damaged and caused legally cognizable loss to the business or property of the Plaintiffs and the Class.  Defendants utilized the United States Postal Service mail and other interstate means of communications, including wire services and the internet, to carry out and further the fraudulent scheme alleged herein.

14.     Each Defendant's secret policies and practices deterred physicians from fulfilling their fiduciary duty owed their patients and encouraged physicians to place unreasonable, and often unsafe, restrictions on the level of medical services that were delivered to their patients.  Through its financial arrangements, risk-sharing agreements, and "gag" provisions imposed on its physicians and other internal policies and practices, each Defendant violated its fiduciary duty owed to its enrollees pursuant to 29 U.S.C. §§1021, 1022 and 1024,

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

as well as the fiduciary duty with respect to the Plaintiffs' Subclass imposed upon Defendants pursuant to 29 U.S.C. §1109(a) and authoritative case law.

15.    Each Defendant's covert financial incentive arrangements, risk-sharing agreements, and "gag" orders, *inter alia*, imposed on its healthcare providers were material facts that each Defendant, acting as an arranger of medical services, should have disclosed to Plaintiffs and Class members because these arrangements and agreements resulted in a reduction in the quality of healthcare provided to Plaintiffs and Class members. This reduction in the quality of the healthcare provided was directly contrary to each Defendant's representations mentioned herein.

## II.    JURISDICTION.

16.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962(a), 1962(c), 1962(d), and §1964(a), 28 U.S.C. §§1331 and 1337, and 29 U.S.C. §1132(e)(1). The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§1965 (b), (d). Venue is proper in this district pursuant to 18 U.S.C. §1965(a) and 28 U.S.C. §1391(b), since Defendants are either found, have an agent, or transact business in this district.

## III.    PARTIES.

### A.    Plaintiffs.

17.    Plaintiff Jo Ann O'Neill is, *sui juris*, an enrollee in one of Aetna's HMO plans. She is a resident of Lufkin, Texas and is a citizen of the United States of America. Ms. O'Neill is enrolled in an Aetna HMO plan as a part of her employer's health benefit plan.

-5-

18.     Plaintiff Danny E. Waldrop is, *sui juris*, an enrollee in one of Aetna's HMO/POS plans. He is a resident of Mt. Olive, Mississippi and is a citizen of the United States of America. Mr. Waldrop is enrolled in an Aetna HMO/POS plan as a part of his employer's health benefit plan.

19.     Plaintiff Lydia K. Rouse is, *sui juris*, an enrollee in one of Aetna's PPO plans. She is a resident of Lumberton, Mississippi and is a citizen of the United States of America. Ms. Rouse is enrolled in an Aetna PPO plan (under her former married name, Lydia R. Kukuk) as a part of her ex-husband's employer's health benefit plan.

20.     Plaintiff Bobby Pickney is, *sui juris*, an enrollee or subscriber to one of Cigna's plans through his employer and is a resident of Port Arthur, Texas and a citizen of the United States of America.

21.     Plaintiff Kerrie Pay was, *sui juris*, an enrollee in one of FHS' HMO plans (Health Net) during the relevant period.  She is a resident of Martinez, California and is a citizen of the United States of America.

22.     Plaintiff Debbie Hitsman is, *sui juris*, an enrollee in one of PHS' HMO plans through her employer.  She is a resident of Tulsa, Oklahoma, and is a citizen of the United States of America.

23.     Plaintiff Rodney J. Landry is, *sui juris*, an enrollee in one of Humana's HMO plans through his employer and is a resident of Beaumont, Texas and a citizen of the United States of America.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

24.     Plaintiff Elizabeth Kempt is, *sui juris*, an enrollee in one of Humana's PPO plans through her employer and is a resident of Laguna Niguel, California and a citizen of the Unites States of America.

25.     Plaintiff Harrell E. McRaney is, *sui juris*, an enrollee in one of United's PPO plans.  Mr. McRaney is a resident of Collins, Mississippi and is a citizen of the United States of America.  He is enrolled in a United PPO plan as a part of his employer's health benefit plan.

26.     Plaintiff Marilyn McRaney is, *sui juris*, an enrollee in one of United's PPO plans.  Ms. McRaney is a resident of Collins, Mississippi and is a citizen of the United States of America.  She is enrolled in a United PPO plan as a part of her husband health benefit plan.

27.     Plaintiff Daniel P. Higginbotham is, *sui juris*, an enrollee in one of United's PPO plans.  He is a resident of Collins, Mississippi and is a citizen of the United States of America.  Mr. Higginbotham is enrolled in a United PPO plan as part of his employer's health benefit plan.

28.     Plaintiff Kathy Hartwell is, *sui juris*, an enrollee in one of United's HMO plans. She is a resident of Austin, Texas and is a citizen of the United States of America. Ms. Hartwell is enrolled in a United HMO plan as part of her employer's benefit health plan.

29.     Plaintiff Cathy Higginbotham is, *sui juris*, an enrollee in one of United's PPO plans.  She is a resident of Collins, Mississippi and is a citizen of the United States of

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

America. Ms. Higginbotham is enrolled in a United PPO through her husband's health benefit plan.

30.    Plaintiff Quitman Ware is, *sui juris*, an enrollee in one of United's HMO plans. He is a resident of Jackson, Mississippi and is a citizen of the United States of America. He is enrolled in a United HMO plan as part of his employer's health benefit plan.

31.    Plaintiff Raymond D. Williamson III is, *sui juris*, a dependent enrollee or subscriber to one of the Prudential's HMO plans through his wife's employer and is a resident of San Francisco, California and a citizen of the United States of America.

32.    As used herein, the term "Plaintiffs" will refer to some or all of the named Plaintiffs, depending on the appropriate context.

B.    Defendants.

33.    Defendant Aetna, Inc. is a Connecticut corporation and the parent corporation of Aetna-USHC Inc.  Aetna, Inc.'s corporate headquarters is located at 151 Farmington Avenue, Hartford, Connecticut 06156.  Aetna, Inc. conducts business in the State of Florida.

34.    Defendant Aetna-USHC, Inc. ("Aetna-USHC") is a Pennsylvania corporation located at 980 Jolly Road, P. O. Box 1109, Blue Bell, Pennsylvania 19422-0770. Aetna-USHC is the wholly-owned subsidiary of Aetna, Inc.  Aetna-USHC provides health services to the public through four individual health products:  HMOs, PPOs, POS plans, and indemnity Plans.  Aetna-USHC conducts business in the State of Florida and is the parent corporation of the following Aetna Health Plans:  Aetna-U.S. Healthcare of Arizona, Inc.; Aetna U.S. Healthcare of California Inc.; Aetna-U.S. Healthcare, Inc. (Colorado); Aetna Health

-8-

Plans of Southern New England, Inc.; Aetna-U.S. Healthcare, Inc. (Delaware); Aetna-U.S.
Healthcare Inc. (Florida); Aetna U.S. Healthcare of Georgia, Inc.; Aetna-U.S. Healthcare of
Illinois; Aetna-U.S. Healthcare Inc. (Kentucky); Aetna-U.S. Healthcare Inc. (Louisiana); Aetna-
U.S. Healthcare Inc. (Massachusetts); Aetna-U.S. Healthcare Inc. (Michigan); Aetna U.S.
Healthcare Inc. (New Jersey); Aetna U.S. Healthcare, Inc. (New York); Aetna Health Plans of
New York, Inc.; Aetna-U.S. Healthcare of the Carolinas; Aetna-U.S. Healthcare Inc. (Ohio);
Aetna-U.S. Healthcare Inc. (Pennsylvania); Aetna Health Plans of Central and Eastern
Pennsylvania, Inc.; Gateway Health Plan, Inc.,  formerly Aetna Health Plans of Western
Pennsylvania, Inc.; Aetna-U.S. Healthcare Inc. (Texas); Aetna-U.S. Healthcare of North Texas
Inc.; Aetna-U.S. Healthcare Inc. (Virginia); Aetna-U.S. Healthcare of Washington Inc.  The
Aetna healthcare plans are collectively referred to as the "Aetna Health Plans."  Aetna-USHC
operates HMOs, POS plans, and PPOs nationwide through such plans.

   35. Defendant Huber is an individual of the full age of majority who, during
the relevant Class Period as herein alleged, was the Chairman, President, and Chief Executive
Officer of Aetna, Inc.

   36. Unnamed members of the Board of Directors of Aetna, Inc., and Aetna-
USHC are also made defendants herein. They reside at the corporate headquarters of Aetna,
Inc., and Aetna-USHC as indicated above.

   37. Aetna, Inc., Aetna-USHC, and the Aetna Health Plans are responsible
for the distribution of the advertising, marketing, and membership materials described herein
for all the defendants' HMOs, POS plans, and PPOs. Additionally, Aetna, Inc., Aetna-USHC,
and the Aetna Health Plans are responsible for the preparation and distribution of the provider

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

agreements entered into between Aetna Health Plans and Aetna's healthcare providers, for all the defendants' HMOs, POS plans, and PPOs.

38.    Defendant Cigna Corporation is a Delaware corporation with corporate headquarters at One Liberty Place, Philadelphia, Pennsylvania, 19192. Cigna is publicly traded on the New York Stock Exchange under the stock symbol "CI."

39.    Defendant Cigna Health Corporation is a Delaware corporation with corporate headquarters at One Liberty Place, Philadelphia, Pennsylvania.

40.    Cigna's healthcare products are marketed in all 50 states. It has managed care networks serving 45 states and the District of Columbia. Cigna does business in the State of Florida.

41.    Cigna operates HMOs, PPOs, and POS plans through the following entities, which will be referred to herein as the "Cigna Health Plans": Arizona Health Plan, Inc., CIGNA HealthCare of Arizona, Inc., CIGNA HealthCare of California, Inc. CIGNA HealthCare of Colorado, Inc., CIGNA HealthCare of Connecticut, Inc., CIGNA HealthCare of Delaware, Inc., CIGNA HealthCare of Florida, Inc., CIGNA HealthCare of Illinois, Inc., CIGNA Healthplan of Louisiana, Inc., CIGNA HealthCare of Massachusetts, Inc., CIGNA HealthCare Mid-Atlantic, Inc., CIGNA HealthCare of New Jersey, Inc., CIGNA HealthCare of New York, Inc., CIGNA HealthCare of Northern New Jersey, Inc., CIGNA HealthCare of Ohio, Inc., CIGNA HealthCare of Oklahoma, Inc., CIGNA HealthCare of Pennsylvania, Inc., CIGNA HealthCare of St. Louis, Inc. , CIGNA HealthCare of Utah, Inc., CIGNA HealthCare of Virginia, Inc., Employee Benefit Plan Administration, Inc., Healthsource Connecticut, Inc., Healthsource Corporate Services, Inc. , Healthsource Health Plans, Inc., Healthsource

-10-

Indiana, Inc., Healthsource Insurance Group, Inc., Healthsource Kentucky, Inc., Healthsource Maine, Inc., Healthsource Maine Preferred, Inc., Healthsource Management, Inc., Healthsource Massachusetts, Inc., Healthsource Metropolitan New York Holding Company, Inc., CIGNA Community Choice, Inc., Healthsource Innovative Medical Management, Inc., CIGNA HealthCare of North Carolina, Inc., Healthsource North Carolina, Inc., Healthsource North Carolina Administrators, Inc., Healthsource Indiana Insurance Company, Healthsource Indiana Managed Care Plan, Inc., Healthsource Syracuse, Inc., Healthsource New York, Inc., Healthsource HMO of New York, Inc., Healthsource Preferred of New York, Inc.,  CIGNA HealthCare of Tennessee, Inc., Healthsource Tennessee Preferred, Inc., CIGNA Holdings, Inc., Connecticut General Corporation, CG Trust Company, CIGNA Dental Health, Inc., CIGNA Dental Health of California, Inc., CIGNA Dental Health of Colorado, Inc., CIGNA Dental Health of Delaware, Inc.,  CIGNA Dental Health of Florida, Inc., CIGNA Dental Health of Illinois, Inc., CIGNA Dental Health of Kansas, Inc., CIGNA Dental Health of Kentucky, Inc., CIGNA Dental Health of Maryland, Inc., CIGNA Dental Health of New Jersey, Inc., CIGNA Dental Health of New Mexico, Inc., CIGNA Dental Health of North Carolina, Inc., CIGNA Dental Health of Ohio, Inc., CIGNA Dental Health of Pennsylvania, Inc., CIGNA Dental Health of Texas, Inc., CIGNA Dental Health Plan of Arizona, Inc., CIGNA Financial Services, Inc., CIGNA Health Corporation,  Healthsource, Inc., Healthsource New York/New Jersey, Inc., Healthsource New Hampshire, Inc., Healthsource Ohio, Inc.,  Healthsource Ohio Preferred, Inc., Healthsource Preferred, Inc., Healthsource Rhode Island, Inc., Healthsource RX, Inc., Healthsource South, Inc., Healthsource Arkansas Ventures, Inc., Healthsource Arkansas, Inc., Healthsource Arkansas Preferred, Inc.,

-11-

Healthsource Insurance Company Healthsource Physicians Group of South Carolina, Inc.,
CIGNA HealthCare of Texas, Inc., HS North Texas Ventures, Inc., Provident Health Care
Plans, Inc., CIGNA HealthCare of Georgia, Inc., Lovelace Health Systems, Inc., Physicians'
Health Systems, Inc., Healthsource Insurance Services, Inc., and Healthsource South Carolina,
Inc.

      42.    Defendant FHS is a Delaware corporation and the parent corporation of
the entities that operate its health plans throughout the United States. FHS's headquarters are
located at 33120 Lake Center Drive, in Santa Ana, California. FHS does business in the State
of Florida.

      43.    FHS is, or was, during the relevant period, the parent company of all of
the following entities:

        a.    Physician Health Services;

        b.    Foundation Health Corporation;

        c.    Foundation Health Systems Group;

        d.    Health Net;

        e.    Qualmed, Inc (DE);

        f.    Qualmed of Washington;

        g.    Qualmed of Colorado;

        h.    Qualmed of Connecticut;

        i.    Preferred Health Network, Inc. (IL);

        j.    Qualmed Plan Plans for Health of Colorado, Inc. (CO);

        k.    San Luis Valley Physicians Service Corp., Limited (CO);

-12-

l.      Qualmed Health & Life Insurance Company (CO);

m.      Qualmed Plans for Health, Inc. (NM);

n.      Qualmed Oregon Health Plan, Inc. (OR);

o.      Qualmed Washington Health Plan. (WA);

p.      HIS Eastern Holdings Inc. (PA);

q.      Greater Atlantic Health Service, Inc. (DE);

r.      Qualmed Plans for Health, Inc. (PA);

s.      Greater Atlantic Preferred Plus, Inc. (PA);

t.      HIS Advantage Health Holdings, Inc. (DE);

u.      Qualmed Plans for Health of Ohio and West Virginia
        (OH);

v.      Qualmed Plans for Health of Western Pennsylvania (PA);

w.      Pennsylvania Health Care Plan, Inc. (PA);

x.      Foundation Health Corporation (DE);

y.      Foundation Health Preferred Administrators (CA);

z.      FH-Arizona Surgery Centers, Inc. (AZ);

aa.     FH Surgery Limited, Inc. (CA);

bb.     FH Surgery Centers, Inc. (CA);

cc.     Foundation Health Facilities, Inc. (CA);

dd.     Memorial Hospital of Gardena, Inc. (CA);

ee.     East Los Angeles Doctors Hospital, Inc. (CA);

ff.     FHC International, Inc (DE);

-13-

gg.   Foundation Health, a Florida Health Plan, Inc;

hh.   Foundation Health, a California Health Plan, Inc.;

ii.   Foundation Health, a Colorado Health Plan, Inc.;

jj.   Foundation Health, a Louisiana Health Plan, Inc;

kk.   Foundation Health, a Texas Health Plan, Inc;

ll.   Foundation Health, a Alabama Health Plan, Inc.;

mm.   Foundation Health, a Oklahoma Health Plan, Inc;

nn.   Preferred Health Providers, Inc. (FL);

oo.   Foundation Health Psychcare Services, Inc. (CA);

pp.   Intercare, Inc. (AZ);

qq.   Intergroup Health Plan, Inc., d/b/a Intergroup Select (AZ);

rr.   Intergroup Prepaid Health Services of Arizona, Inc. d/b/a Intergroup of Arizona, Inc. (AZ);

ss.   Intergroup Healthcare Corporation of Utah (UT);

tt.   Intergroup of Utah, Inc. (UT);

uu.   Managed Health Network, Inc. (DE);

vv.   HIS Advantage Health Holdings, Inc.;

ww.   Health Management Center West, Inc. (MA);

xx.   Health Management Center, Inc. (MA);

yy.   Health Management Center, Inc. (MA);

zz.   Health Management Center, Inc. of Wisconsin (WI)

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

aaa.   HMC PPO, Inc. (MA);

bbb.   Managed Health Network (CA)

ccc.   National Pharmacy Services, Inc. (DE)

ddd.   Integrated Pharmacy Systems, Inc. (PA)

eee.   Qualmed Plans for Health of Pennsylvania, Inc. (PA);

fff.   MD Health Services;

ggg.   First Option Health Plan; and

hhh.   M.D. Health Plan, Inc. (CT)

44.   Through these entities (also collectively referred to as the "Foundation Health Plans," unless otherwise specified), FHS operates HMOs, PPOs, and POS plans nationwide.

45.   Defendant, Humana Inc., is a Delaware corporation with corporate headquarters at 500 W. Main Street, Louisville, Kentucky 40202. Humana is publicly traded on the New York Stock Exchange under the stock symbol "HUM."

46.   Defendant Humana Health Plan Inc. ("HHP") is a Delaware corporation with corporate headquarters at 500 W. Main Street, Louisville, Kentucky 40202.

47.   Humana Inc. and HHP do business in the State of Florida.

48.   The overwhelming majority of Humana's health plan membership is located in 15 states: Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin, and Wyoming. Humana offers health plans and other employee benefit products in at least 37 states, including (in addition to the 15 states listed above): Alaska, California, Nevada, Idaho, North Dakota,

-15-

South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas.

49.     Humana Inc. is the parent corporation of the following subsidiaries that provide health care services, including without limitation:

a.     Humana Health Plans of Alabama, Inc.;

b.     QuestCare. Inc.;

c.     Centerstone Insurance and Financial Services Inc. and West Coast Multiple Servs, Inc.;

d.     Centerstone Holding Corporation;

e.     EMPHESYS Financial Group, Inc.;

f.     Health Value Management, Inc.;

g.     Humana HealthChicago, Inc;

h.     Humana Inc. d/b/a H.A.C. Inc. and Humana of Delaware, Inc.;

i.     Humana Military Healthcare Services, Inc., d/b/a Humana Military Health Services, Inc.;

j.     Medstep, Inc.;

k.     Physician Corporation of America;

l.     Delray Beach Health Management Associates, Inc., d/b/a Humana Health Care Plans - Delray;

m.     Family Health Plan Administrators, Inc.;

-16-

n.   Health Inclusive Plan of Florida, Inc., d/b/a Humana
Health Care Plans -  Century Village Palm Beach;

o.   Humana Health Care Plans - Davie. Inc., f/k/a Coastal
Physician Group of South Davie, Inc.;

p.   Humana Health Care Plans - Palm Springs, Inc., f/k/a
Coastal Managed Care of Lake Worth, Inc.;

q.   Humana Health Care Plans - Rolling Hills, Inc., f/k/a
Coastal Physician Group of North Davie, Inc.;

r.   Humana Health Care Plans - South Pembroke Pines, Inc.
f/k/a Coastal Physician Group of Pembroke Pines, Inc.;

s.   Humana Health Care Plans - West Palm Beach, Inc., f/k/a
Coastal Managed Cam of West Palm Beach. Inc.;

t.   Humana Internal Medicine Associates, Inc., f/k/a Coastal
Internal Medicine Associates of Dade, Inc., d/b/a: (1)
Humana Health Care Plans Hialeah f/k/a Coastal Internal
Medicine Associates of Hialeah; (2) Humana Health Care
Plans - South Miami, f/k/a Coastal Internal Medicine
Associates of Larkin; (3) Humana Health Care Plans-
Miami, f/k/a Coastal Internal Medicine Associates of
Miami; (4) Humana Health Care Plans–Miami Beach,
f/k/a Coastal Internal Medicine Associates of Miami
Beach; (5) Humana Health Care Plans - Royal Oaks, f/k/a

-17-

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

Coastal Internal Medicine Associates of Miami Lakes; (6)
Humana Health Care Plans - Miami Springs, d/b/a
Coastal Internal Medicine Associates of Miami Springs,
(7) Humana Health Care Plans – Midway, f/k/a Coastal
Internal Medicine Associates of Midway; (8) Humana
Health Care Plans – Boca Raton; (9) Humana Health Care
Plans - Delray Harbor; (10) Humana Health Care Plans -
Lantana; (11) Humana Health Care Plan - Palm Beach
Gardens,, (12) Humana Health Care Plan Tamarac; and
(13)  Humana Health Care Plans - West Boca;

u.     Humana Internal Medicine Associates of the Palm
Beaches, Inc., f/k/a Coastal Internal Medicine Associates
of the Palm Beaches. Inc., d/b/a: (1) Humana Health Care
Plans - Lake Worth f/k/a Coastal Internal Medicine
Associates of JFK Circle; (2) Humana Health Care Plans
– Flagler, f/k/a Coastal Internal Medicine Associates of
Northern Dixie Highway;   (3) Humana Health Care Plans
– Riverbridge, f/k/a Coastal Internal Medicine Associates
at Riverbridge; (4) Humana Health Care Plans - Palm
Beach, f/k/a  Coastal Internal Medicine Associates of
South Dixie Highway; (5) Humana Health Care Plans -
Boynton Beach;

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

v.    Humana Health Insurance Company of Florida, Inc.;

w.    Humana Medical Plan, Inc., d/b/a: (1) Coastal Pediatrics

      – Daytona: (2) Coastal Pediatrics - Port Orange; (3)

      Coastal Pediatric - Ormond; (4) Daytona

      Gastroenterology; (5) Flagler Family Practice; (6) Florida

      Dermatology Center; (7) Humana Medical Plan - West

      Palm Beach; (8) Internal Medicine of Daytona; (9) Orange

      Park Family Health Care; (10) St. Augustine Family

      Health Center; and (11)  Suncoast Medical Associates;

x.    Lakeside Medical Center Management Inc., d/b/a

      University Medical Center;

y.    PCA Options. Inc.;

z.    Humana Employers Health Plan of Georgia, Inc., f/k/a

      EMPHASES;

aa.   Healthcare of Georgia, Inc.;

bb.   Humana Health Direct, Inc., d/b/a Behavioral Health

      Direct;

cc.   Humana HealthChicago Insurance Company, d/b/a

      Goldcare 65;

dd.   HMPK, Inc.;

ee.   HPLAN, Inc.;

-19-

ff.    Humana Health Plan Inc., d/b/a (1) Central Kentucky
Family Practice; (2) Franklin Medical Center; (3) Humana
Health Care Plans of Indiana; (4) Madison Family and
Industrial Medicine (KY); and (5) Humana Health Care
Plans - Somerset (KY);

gg.    Humana Kansas City, Inc., d/b/a Humana Prime Health
Plan;

hh.    Humana Health Insurance of Nevada, Inc.;

ii.    Humana Health Plan of Ohio, Inc., f/k/a ChoiceCare
Health Plans, Inc., d/b/a ChoiceCare/Humana (IL, IN,
KY, OH);

jj.    Humana Insurance of Puerto Rico, Inc.;

kk.    Humana HMO Texas, Inc.;

ll.    Humana Health Plan of Texas. Inc., d/b/a: (1) Humana
Health Plan of San Antonio; (2) Humana Regional Service
Center; (3) Leon Valley HealthCenter; (4) Lincoln
Heights Medical Center; (5) MedCentre Plaza
HealthCenter; (6) Perrin Oaks Health Center; (7) Val
Verde Health Center; (8) West Lakes Health Center; and
(9) Wurzbach Family Medical Center;

-20-

50.     Through these entities (also collectively referred to as the "Humana Health Plans," unless otherwise specified), Humana Inc. and HHP operate HMOs, PPOs and POS plans nationwide. Humana Inc. and HHP conduct business in the State of Florida.

51.     Unless otherwise specified, Humana Inc., HHP, and the Humana Health Plans, as well as Humana-owned, Humana-operated, Humana-controlled entities that offer health insurance, are collectively referred to herein as "Humana."

52.     Defendant PHS is a Delaware corporation with its headquarters located at 33120 Lake Center Drive, in Santa Ana, California.

53.     PHS is the parent company of all of the following entities:

        a.      PacifiCare of Arizona, Inc;

        b.      PacifiCare-Cal;

        c.      PacifiCare of Colorado, Inc;

        d.      FHP International Inc.;

        e.      PacifiCare of Nevada, Inc.;

        f.      PacifiCare of Oklahoma, Inc;

        g.      PacifiCare of Oregon;

        h.      PacifiCare of Texas, Inc.;

        i.      PacifiCare of Washington, Inc.; and

        j.      PacifiCare of Ohio

54.     Through these entities (also collectively referred to as the "PacifiCare Health Plans" unless otherwise specified), PHS operates HMOs, PPOs, POS plans, and indemnity health plans nationwide.  PHS does business in the State of Florida.

-21-

55.     Defendant Prudential is a Delaware corporation and is the parent corporation of Prudential Health Care Plan, Inc.  Prudential's corporate headquarters are located at Newark, New Jersey.  Prudential conducts business in the State of Florida.

56.     During part of the relevant period, Prudential was the parent corporation of the following health plans:

    a.      Prudential Health Care Plan of Connecticut, Inc.;

    b.      Prudential Health Care Plan of Georgia;

    c.      Prudential Health Care Plan of New York;

    d.      Prudential Health Care Plan of San Francisco;

    e.      Prudential HealthCare – Arkansas, Inc.;

    f.      Prudential Health CA;

    g.      Prudential HealthCare Systems;

    h.      Prudential HealthCare of Tampa Bay;

    i.      Prudential HealthCare Southeast;

    j.      Prudential HealthCare Systems;

    k.      Prudential HealthCare of Kansas;

    l.      Prudential HealthCare-Oklahoma City;

    m.      Prudential Health Care Plan of Oklahoma, Inc.;

    n.      Prudential Health Care of El Paso;

    o.      Prudential Health Care Systems.

57.     Through these entities (also collectively referred to as the "Prudential Health Plans," unless otherwise specified), Prudential operated HMOs, PPOs, and POS plans

-22-

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

nationwide during the relevant period herein alleged and conducted, and conducts, business in the State of Florida.

58.     Defendant United Health Group ("UHG") is a Minnesota corporation and the parent corporation of the entities that operate the United health plans. UHG's headquarters are located at 300 Opus Center, 9900 Bren Road East, in Minnetonka, Minnesota. UHG conducts business in the State of Florida. In its 1998 Form 10K/A filed with the Securities and Exchange Commission ("SEC"), UHG also refers to itself as United HealthCare Corporation.

59.     Defendant United Healthcare ("UHC") is the subsidiary of UHG that operates organized health systems. According to the aforementioned SEC filing, it has majority ownership of health plans operating in approximately 40 markets nationwide and in Puerto Rico. UHC conducts business in the State of Florida.

60.     UHC is the parent company of all of the following entities:

       a.     UnitedHealthcare, Inc.;

       b.     UnitedHealth Capital, Inc.;

       c.     United HealthCare Insurance Company;

       d.     MetraHealth Care Management;

       e.     United HealthCare of California, Inc.;

       f.     United HealthCare of Colorado, Inc.;

       g.     United HealthCare of New Jersey, Inc.;

       h.     United HealthCare of New York, Inc.;

       i.     United HealthCare Insurance Company;

-23-

j.      The MetraHealth Employee Benefits Company;

k.      United HealthCare Services;

l.      United HealthCare of Alabama, Inc.;

m.      United HealthCare of Arizona, Inc.;

n.      United HealthCare of Arkansas;

o.      United HealthCare of California, Inc.;

p.      United HealthCare of Colorado, Inc.;

q.      United HealthCare of Florida, Inc.;

r.      United HealthCare of Georgia, Inc.;

s.      United HealthCare of Illinois, Inc.;

t.      United HealthCare of Kentucky, Ltd.;

u.      United HealthCare of Louisiana, Inc.;

v.      United HealthCare of Mississippi, Inc.;

w.      United HealthCare of Nevada, Inc.;

x.      United HealthCare of New England, Inc.;

y.      United HealthCare of New Jersey, Inc.;

z.      United HealthCare of New York, Inc.;

aa.      United HealthCare of North Carolina, Inc.;

bb.      United HealthCare of Ohio, Inc.;

cc.      United HealthCare of Oregon, Inc.;

dd.      United HealthCare of Tennessee, Inc.;

ee.      United HealthCare of Texas, Inc.;

ff.    United HealthCare of Utah;

gg.   United HealthCare of Virginia, Inc.;

hh.   United HealthCare of Washington, Inc.;

ii.    United HealthCare of the Mid Atlantic, Inc.;

jj.    United HealthCare of the Midlands;

kk.   Network, Inc.;

ll.    United HealthCare of the Midlands,  Inc.;

mm.  CAC Medical Centers, Inc.;

nn.   Commonwealth Physicians Services, Inc;

oo.   Coordinated Vision Care, Inc.;

pp.   GenCare Dental Plan, Inc.;

qq.   HealthPartners of Arizona, Inc.;

rr.    HealthWise of Arkansas, Inc.;

ss.   MetraComp, Inc.;

tt.    PrimeCare Health Plan, Inc.;

uu.   United Behavioral Health; and

vv.   United HealthCare Service Corp.

61.    All of the aforementioned subsidiaries are herein referred to as "United Health Plans."

62.    UHC is responsible for the distribution of the advertising, marketing, and membership materials described herein for all of UHC's HMOs, POS plans, and PPOs plans.  Additionally, UHC and the United Health Plans are responsible for the preparation and

-25-

distribution of the provider agreements entered into between the United Health Plans and United's healthcare providers for all the defendants' HMOs, POS plans, and PPOs.

63.     Each Defendant is responsible for the distribution of the advertising, marketing, and membership materials described herein for its respective Health Plans. Additionally, each Defendant is responsible for the preparation and distribution of its provider agreements entered into between itself and its healthcare providers, for all the its Health Plans.

64.     Whenever this Complaint alleges that any Defendant did any act or thing, it is meant that it or its directors of said entities, and/or its subsidiaries, affiliates, directors, officers, agents, or employees performed or participated in such act or thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of Defendant performed or participated in such act or thing, they were authorized to and did in fact act on behalf of the Defendant.

IV.     NON-PARTY CO-CONSPIRATORS.

65.     The following entities, while not named as defendants, are alleged to have participated in the conspiracy and collusion described herein and/or aided and abetted defendants' unlawful conduct.

66.     Milliman & Robertson, Inc. ("M&R") is a firm of actuaries and consultants that provides a variety of services to MCOs, including the development of clinical practice guidelines, the structuring of physician provider incentive programs, the review of utilization management programs, and the development of managed care management information systems.  M&R disseminates, among other publications:  (a) *Health Cost Guidelines*; (b) *Healthcare Management Guidelines*; (c) the *Health Cost Index Report*;  (d) the

-26-

*Health Cost Index Database*, which measures national and regional monthly rates of increase in healthcare provider net revenues; and (e) the *HMO Intercompany Rate Survey*. Founded in 1947, M&R has 28 offices throughout the United States; its revenues exceeded $270 million in 1999. Its principal office is at 1301 Fifth Ave., Seattle, Washington 98101-2605.

67.     McKesson HBOC, Inc. ("McKesson") has as a wholly-owned subsidiary the InterQual Products Group ("InterQual") originally founded in 1976. InterQual develops utilization review criteria for the healthcare industry. McKesson has its corporate headquarters at One Post St., San Francisco, CA 94104-5296.

68.     Protocare Sciences, Inc. ("Protocare") has its corporate offices at 2400 Broadway, Suite 100, Santa Monica, CA 90404. It is the successor to Value Health Sciences, Inc. ("Value Health"), a company developed to help MCOs contain healthcare costs. Protocare has as its stated purpose the goal of assisting MCOs in improving profitability and generating a higher return on their investments.

69.     The American Association of Health Plans ("AAHP") was created in 1996 by the merger of the Group Health Association of America and the American Managed Care and Review Association. It represents more than 1,000 HMOs, PPOs, and other network-based plans. Its headquarters are located at 1129 20th St., N.W., Suite 600, Washington, D.C. 20036-3421.

70.     The Coalition for Affordable Quality Healthcare ("CAQH") is a trade association that includes among its members the AAHP, Aetna-USHC, Cigna Health, PHS, and UHC. CAQH has as its mailing address P.O. Box 65038, Washington, D.C. 20035.

-27-

71.     The National Committee for Quality Assurance ("NCQA") is a private, nonprofit organization located at 2000 L St., N.W., Suite 500, Washington, D.C. 20036. Since 1991, NCQA has accredited MCOs.  Its accreditation program is voluntary, but is used by almost half the MCOs in the United States, covering three quarters of all HMO enrollees. NCQA has released HEDIS (Health Plan Employer Data and Information Set), which measures MCO performance.

72.     National Health Information, L.L.C. ("NHI") is an industry-sponsored body that operates as an information conduit about managed care practices through its various publications.  Its mailing address is P.O. Box 15429, Atlanta, Georgia 30333-0429.

73.     The entities identified in the foregoing seven paragraphs will be referred to herein as the "Non-MCO co-conspirators."  That term is not meant to refer only to these entities; it covers as well other, similar types of organizations not identified by name.

## V.     APPROPRIATENESS OF CLASS ACTION TREATMENT.

74.     Plaintiffs Jo Ann O'Neill, Lydia K. Rouse, Danny E. Waldrop, Raymond Williamson III, Bobby Pickney, Kerrie Pay, Rodney Landry, Elizabeth Kempt, Debbie Hitsman, Harrell E. McRaney, Marilyn McRaney, Kathy Hartwell, Quitman Ware, Daniel P. Higginbotham, and Cathy Higginbotham bring this action on their own behalf and, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons defined as consisting the following:

> **"The class consists of individuals who paid premiums or subscription payments, or on whose behalf such payments had been made, and are or were named enrollees in any of defendants' HMOs, PPOs, and POS plans at anytime during the period from: (a) November 22, 1995 to the date on which the Class is certified for Cigna, FHS, PHS, United, and Humana; (b) July 19, 1996 to the date on which the class is**

-28-

certified for Aetna; and (c) November 22, 1995 to August 6,
1999 for Prudential (the 'Plaintiff Class' or 'Class'). The
Class does not include persons insured by Medicare or
Medicaid and also does not include defendants' directors,
officers and employees.  Within this overall Class, there is
further defined a Subclass consisting of all persons who had
been participants or beneficiaries of an employee welfare plan
(as defined in 29 U.S.C. §1002(1)) that was administered
and/or underwritten by defendants from: (a) November 22,
1993 to the date on which this Subclass is certified for Cigna,
FHS, PHS, United, and Humana; (b) July 19, 1996 to the date
on which the Subclass is certified for Aetna; and (c) November
22, 1993 to August 6, 1999 for Prudential (the 'Plaintiff
Subclass' or 'Subclass')."

75.     Each of the named Plaintiffs and each member of the alleged Class have

tangible interests (their money) at stake in this action. The named Plaintiffs and each Class and

Subclass member, as a past enrollee in one of each Defendant's HMOs, PPOs or POS plans,

were entitled to healthcare services commensurate with each Defendant's representations and

with the physician-patient relationship.  The named Plaintiffs and each member of the alleged

Class also had a legally cognizable expectation that his/her plan-provided healthcare services

would be honestly provided.  Each Subclass member also had additional intangible interests

(their property rights as beneficiaries of the fiduciary duties of plan administrators) at stake in

this action.  Each Subclass member also had cognizable expectations that his/her fiduciary

would not breach the duty imposed by law, 29 U.S.C. §1002(21)(A)(i), and that Defendants

would provide honest services without attempts to deprive the delivery of honest and quality

medical services through the physician-patient relationship.

76.     The claims of the named Class and Subclass representative and the

absent Class members have a common origin and share a common basis.  The claims of all

Class and Subclass members originate from each Defendant's deceitful practices, each

-29-

Defendant's conspiracy to commit such practices, and each Defendant's acts of aiding and abetting each other.

77.     The proposed Class and Subclass representatives' claims are typical of those advanced by each Class and Subclass member and, if brought and prosecuted individually, each such member would necessarily be required to prove the instant claim upon the same material and substantive facts upon the same remedial theories and seeking the same relief.

78.     The similarity between and among the claims and remedial theories pursued by the named Class and Subclass representatives and those of the absent Class and Subclass members ensures that the universal claims of the Class and Subclass will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class and Subclass.

79.     The members of the Class and the Subclass are so numerous that joinder of all members is impracticable.  Defendants offer managed care services to tens of millions of such Class members nationwide.  The Class and Subclass, however, are ascertainable, as the names and addresses of all Class and Subclass members can be identified in each Defendant's business records.

80.     There are questions of law and fact common to the Class and the Subclass that predominate over any questions affecting only individual class or Subclass members.  Such common questions include, *inter alia*, whether during the period herein alleged:

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

a.  Defendants concealed and failed to disclose material facts from the Plaintiffs, the Class, and the Subclass in connection with the advertising, marketing and member materials soliciting membership in its plans;

b.  Each Defendant's advertisements and materials contained untrue and misleading statements of fact that would mislead the average, literate person and/or had a tendency to deceive the Class and Subclass;

c.  Defendants intentionally and fraudulently damaged the Plaintiffs, the Class, and the Subclass by the conduct described herein;

d.  Each Defendant's misrepresented facts that were material to the Plaintiffs, the Class, and the Subclass;

e.  Defendants fraudulently, by a scheme of material misrepresentations and omissions through their advertising, marketing, and member materials, attempted to induce and/or did induce the Plaintiffs, the Class, and the Subclass into subscribing to and enrolling in each Defendant's HMOs, PPOs, or POS plans or into remaining enrolled;

f.  Defendants, through misleading and deceptive advertising and marketing practices, engaged in a fraudulent scheme designed to induce the Plaintiffs, the Class, and the Subclass to enroll in Defendants' respective Health Plans by misrepresenting to an average, literate layperson that the amount and extent of the healthcare services provided to its members would be based solely upon grounds of medical need and/or a

-31-

physician's independent medical judgment, free from each Defendant's fiscal and administrative considerations;

g.  Each Defendant's representations exceeded mere puffing and generalized advertisements that would lead an average person of reasonable literacy and understanding to be misled in reliance upon them;

h.  Each Defendant's representations were false, misleading or otherwise deceitful;

i.  Each Defendant's acts and practices constitute violations of applicable law for which Plaintiffs and members of the Class and/or Subclass are entitled to recover restitution and damages, or for which disgorgement of ill-gotten monies is appropriate;

j.  Defendants, through a scheme or artifice, unlawfully attempted to and/or did influence, interfere with, and deprive the Plaintiffs, the Class, and the Subclass of their intangible right to the delivery of honest medical services by, *inter alia*, having implemented undisclosed systemic policies and practices intended to delay or deny payment for medically necessary services for plan enrollees;

k.  Defendants attempted to exploit and/or did exploit physicians' fear of economic loss and/or loss of business in attempting to and/or influencing, interfering with, and depriving the Plaintiffs, the Class, and the Subclass of their intangible right to honest services inherent in the physician-patient relationship;

-32-

l.   The Plaintiffs, the Class, and the Subclass had an intangible right to honest services from Defendants;

m.   Defendants engaged in a pattern of racketeering activity in violation of RICO;

n.   Each Defendant participated in the operation and management of its health care networks as an enterprise, including its Health Plans and various affiliated and contracted for medical services providers;

o.   The Plaintiffs' and Class members' business and property were proximately injured within the meaning of §1964 of RICO;

p.   Defendants intentionally and recklessly damaged Plaintiffs, the Class, and the Subclass;

q.   Each Defendant's and its HMOs', PPOs' or POS plans' overt and/or predicate acts in furtherance of their conspiracy and/or aiding and abetting proximately caused, and continue to cause, injury to the Plaintiffs' and the Class members' business or property or irreparably harmed the Plaintiffs and the Class and if so, what is the appropriate relief to which they are entitled;

r.   With respect to the Subclass, whether Defendants owed a disclosure and fiduciary duties to the Plaintiffs and the Subclass pursuant to ERISA and whether it breached those duties;

s.   Whether each Defendant conspired with other Defendants and/or non-MCO co-conspirators to commit the acts herein alleged; and

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

t.    With respect to the Subclass, whether each Defendant's undisclosed financial arrangements with its participating healthcare providers constituted a prohibited transaction within the meaning of 29 U.S.C §1106.

81.    The common questions predominate over questions, if any, that may affect only individual Class or Subclass members.

82.    The prosecution of separate actions by individual members of the Plaintiff Class or Subclass against Defendants would create a risk of inconsistent or varying adjudications on the common issues of law or fact material to this action.  The same would be true if there were separate class actions by multiple Plaintiff classes against localized or regional Health Plans.  The claims by tens of millions of each Defendant's enrollees would, except for this cause being permitted to proceed as a class, necessitate separate actions across the United States to obtain similar relief based upon the same legal theories.  Such separate actions would present a risk of the establishment of incompatible standards of conduct for the Defendants.  For these reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

83.    Adjudications with respect to individual members of the Class or Subclass would, as a practical matter, be dispositive of the interests of the other members of the Class who were not parties to the action or could substantially impair or impede their ability to protect their interests.

84.    Defendants acted or refused to act on grounds generally applicable to the Class and Subclass, making appropriate final injunctive relief with respect to the Class as a

-34-

whole.  Furthermore, the failure to permit this cause to proceed as a class action under Rule

23(b)(1)(A) and Rule 23(b)(3) would be contrary to the beneficial and salutary public policy of

judicial economy in avoiding a multiplicity of similar actions and to the public policy

encouraging the economies of attorney and litigant time and resources.  In addition, public

policy and the authorities under Rule 23 favor class actions for the purpose of, *inter alia*,

deterring wrongdoing and providing judicial relief for individually small, commonly based

claims.

        85.    The named Plaintiffs allege that they are willing and prepared to serve

this Court and the proposed Classes and Subclass in a representative capacity with all of the

obligations and duties material thereto.

        86.    The self-interests of the named Class and Subclass representatives are co-

extensive with and not antagonistic to those of the absent Class or Subclass members.  The

proposed representatives will undertake to truly protect the interests of the absent Class and

Subclass members.

        87.    The named Plaintiffs have engaged the services of counsel indicated

below.  This counsel represents to the court that they are experienced in complex class

litigation and will vigorously prosecute this action and will assert, protect and otherwise

represent well the named Class and Subclass representatives and absent Class and Subclass

members.

        88.    A class action is superior to other available methods for the fair and

efficient adjudication of this controversy since joinder of all members of the Class or Subclass

is impracticable.  There will be no difficulty in the management of this action as a class action.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

89.     The Plaintiffs will fairly and adequately protect the interests of the Class and Subclass and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class or the Subclass.

## VI.     GENERAL FACTUAL ALLEGATIONS COMMON TO ALL COUNTS.

### A. Each Defendant's Health Plans And How They Operate.

90.     A subscriber can join one of each Defendant's Health Plans through an application and enrollment form. Each Defendant's Health Plans membership fees are paid on a periodic basis, and membership is renewed on an annual basis.

91.     Each Defendant's HMO managed care structures revolve around the concept of a "primary care physician," generally referred by Defendants as a "PCP." Under each of each Defendant's HMO plans, every member typically chooses a PCP from a list of such physicians in each Defendant's provider directory.

92.     Once a PCP is chosen, that physician acts as a "gatekeeper" who provides the basic medical services for the member, while coordinating any additional medical services that might be needed. This PCP ostensibly is responsible, for example, for deciding, *inter alia*: (i) whether a member should be referred to a specialist, (ii) whether a member should be hospitalized or released from the hospital, (iii) whether certain medical procedures or diagnostic tests will be provided the member, (iv) whether a member is in need of certain prescription medication, and (v) whether the patient has any needs in general which require further medical attention and services. However, the profit-driven attempts to deceive as well as institutionalized and universal internal policies and practices not disclosed to the Plaintiffs

-36-

and the Class give lie to that representation and evidence the detrimental effects and legally cognizable injuries asserted herein.

93.     Plaintiffs and the Class and Subclass members have accepted the respective Defendants as their provider of healthcare services in reliance upon representations relevant to each Defendant's Health Plans. Each Defendant represents, for example, that its members will receive a high quality of healthcare services through physicians whose primary interest is in their medical needs, and that the Defendant's primary interest in providing its members' healthcare services through the HMO plan is in maintaining or improving the quality of such care. Such representations go beyond mere "puffing" or generalized advertisement; they purport to state facts upon which a subscriber or enrollee can rely.

94.     Each Defendant enters into contractual arrangements, including compensation arrangements, with physicians and interfaces with the plan's physicians to effectuate Defendants' respective policy regarding the provision of healthcare services to the Plaintiffs, Class, and Subclass.

95.     The advertising, marketing, and member materials provided by each Defendant are intended to and do lead the Plaintiffs and the Class to believe, as reasonable, literate persons, that each Defendant's physicians are independent practitioners whose medical judgment will not be manipulated, influenced, or interfered with by each Defendant at the corporate or coverage level. These representations are clearly designed to induce Plaintiffs, the Class, and the Subclass to believe that each Defendant's network of physicians will serve as the patient's representative, making medical decisions and providing medical advice and

-37-

services based solely on the patient's medical needs without regard to financial considerations material to each Defendant's "bottom line."

96.     Just like each Defendant's HMO plans, each Defendant's PPO plans also operate on an application basis and involves the payment of periodic premiums. Under these PPO plans, an enrollee can utilize any physician in each Defendants' respective healthcare network without a referral. However, these network physicians are still controlled by each Defendant's undisclosed profit-driven treatment policies, and each Defendant requires pre-certification of various types of medical procedures, a process also affected adversely by such policies. An enrollee in each Defendant's PPO plans can also utilize out-of-network physicians, but at a cost: out-of-pocket payments are more, claim forms may need to be filed, personal pre-certification of certain types of medical expenses may be needed, and enrollees may receive balance bills.

97.     Each Defendant's POS plans typically require enrollees to select a PCP, as in the HMO model described above. However, such enrollees also typically have the option of accessing any recognized provider in or outside of each Defendant's physician network without a referral from a PCP. When self-referring, enrollees share the cost of healthcare through a deductible and coinsurance.

98.     Thus, while each Defendant's HMO, PPO, and POS plans have some differences, all of them operate pursuant to concealed cost policies designed to improve the company's bottom line at the expense of quality medical treatment for enrollees. Moreover, Plaintiffs' legal theories are the same for all three types of plans. Indeed, this case arises from each Defendant's systematic and intentional concealment from members in each Defendant's

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

Health Plans of accurate information about when health care will be provided, when claims will be approved or disapproved, and what criteria and procedures are actually used to determine the extent and type of their coverage.

   B.  Each Defendant's Common Fraudulent And Extortionate Schemes.

   99.  In the course of seeking to induce new and continued membership in their Health Plans, each Defendant advertises its Health Plans, solicits new members to join its Health Plans, and issues marketing materials, issues certificates of coverage, member handbooks, and provider directories to potential and existing members. These materials are deceptive and misleading to potential and existing enrollees, as reasonable persons, because such materials misrepresent the quality and quantity of healthcare services provided by each Defendant's Health Plans and fail to disclose material information concerning, *inter alia*, each Defendant's financial arrangements, risk-sharing agreements, and "gag" provisions or conditions imposed on its physicians.

   100.  During the relevant periods, each Defendant has and continues to advertise, market, and distribute member materials throughout the United States. The common and uniform message from the misrepresentations and omissions contained in the uniform advertising, marketing, and member materials directed to the Plaintiffs, the Class, and the Subclass is that each Defendant's primary commitment to its Health Plan members is to maintain and improve the quality of the healthcare services provided its members and that each Defendant's healthcare policies and practices are specifically designed to maintain and improve the quality of healthcare services provided its Health Plan members irrespective of the nature, extent or expense of medically indicated treatments or procedures and the cost thereof.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

101.    Each Defendant's misrepresentations and omissions fail to disclose that each Defendant's internal systemic policies and practices and fraudulent and extortionate practices are in fact specifically designed to reduce the quality of healthcare services provided its members in order to maximize its profits. Likewise, for example, each Defendant's misrepresentations and omissions fail to disclose that each Defendant's internal systemic policies and practices and fraudulent and extortionate practices are in fact specifically designed to: (1) discourage physicians from delivering honest medical services; (2) limit or deny the delivery of honest medical services based upon cost criteria or other arbitrary criteria that are different from or more restrictive than medical necessity criteria; (3) interfere with the medical judgment of physicians by substituting the judgment of claims reviewers without appropriate medical training and specialization and without regard to medical needs of the plaintiffs, the Class, and the Subclass; and (4) interfere with the physician's ability to exercise his or her ethical duty to place his or her patients' medical needs over cost considerations.

102.    From 1993 on, each Defendant has spent tens of millions of dollars around the country on advertisements designed to induce new and continued membership in its respective Health Plans.

103.    In the course of seeking to induce new and continued membership in its Health Plans, each Defendant advertises its plans, issues marketing materials, and issues certificates of coverage, member handbooks, member information, and provider directories to potential and existing members that are misleading and deceiving to persons of reasonable intelligence and literacy.  These materials are false, misleading, and fraudulent in that they misrepresent the quality of healthcare services provided by each Defendant's plans to be better

-40-

than it is and fail to disclose material information and mislead potential and current members as to the quality and delivery of healthcare services provided by its Health Plans.

104.    During the Class and Subclass periods, each Defendant has advertised, marketed, and distributed member materials throughout the United States and continues to do so today. The common and uniform message from the misrepresentations and omissions contained in Defendants' advertising, marketing, and member materials directed to the Plaintiffs, the Class, and the Subclass is that each Defendant's primary commitment to its Health Plan members is to maintain and improve the quality of the healthcare services provided its members and that each Defendant's healthcare policies and practices are specifically designed to maintain and improve the quality of healthcare services provided its plan members irrespective of the nature, extent or expense of medically indicated treatment or procedure and the cost thereof. Each Defendant's misrepresentations and omissions fail to disclose that each Defendant's internal systemic policies and practices and fraudulent and extortionate practices are in fact specifically designed to reduce the quantity and quality of healthcare services provided its members in order to maximize its profits.

105.    In furtherance of each Defendant's fraudulent scheme, each Defendant has also misrepresented and continues to misrepresent, that each Defendant's HMO, PPO, and POS plan members are provided high quality healthcare services by physicians exercising independent medical judgment based upon a patient's needs, free from fiscal and administrative policies and practices influencing or interfering with the physician-patient relationship and the provision of medical services.

-41-

106.   Each Defendant's undisclosed systemic policies and practices have been and are primarily driven by fiscal and administrative initiatives that place profits over maintaining and improving quality healthcare services and over the delivery of honest medical services needed by the Plaintiffs and the Class.   Each Defendant has failed to disclose that it has centered its approach to healthcare plans around a strategy of fraudulently inducing increased membership (through fraudulently inducing new as well as continued membership) to obtain increased revenues, while actually aggressively and deceitfully seeking to reduce the quality and delivery of honest healthcare services provided its members to maximize its profits.

C.   <u>Each Defendant Has Failed To Disclose Material Facts Concerning Its Internal Systemic Policies and Practices</u>.

107.   During the relevant time herein alleged, each Defendant failed to disclose material facts concerning its internal systemic policies and practices including, *inter alia*:

a.   Physician financial arrangements that included incentives and disincentives that induced each Defendant's physicians to limit treatment to the Plaintiffs and the Class in order to maximize that Defendant's profits;

b.    Physician financial arrangements that included incentives and disincentives that created an undisclosed conflict of interest for each Defendant's physicians to either: (i) provide all medical services they deem medically necessary for that Defendant's members at the risk of reducing their compensation, or (ii) limit the quality of healthcare

-42-

services provided in order to avoid facing financial penalties or to take advantage of available bonus compensation;

c.      Physician financial arrangements that included incentives and disincentives to cause each Defendant's claim reviewers to limit treatment to the Plaintiffs and the Class, even where the denied benefits satisfied the stated definition of "medical necessity" provided to members and potential members in that Defendant's advertising, marketing, and member materials directed to the Plaintiffs and the Class;

d.      "Gag" clause provisions (or similar provisions) to contracts imposed on each Defendant's physicians whereby they would suffer penalties for communicating to members certain information regarding that Defendant's financial arrangements with its physicians or alternative treatment not covered by each Defendant's Health Plan;

e.      Each Defendant controlled "medical necessity" decisions that differed from such decisions made by the member's PCP or, in emergency situations, the member's attending physician.  In fact, each Defendant based its coverage decisions upon its own fiscal determinations which were not bound by the medical necessity decisions of the physicians or the standard of care established by governmental agencies or the American Medical Association ("AMA");

f.      Each Defendant controlled "medical necessity" decisions made to advance that Defendant's interests in limiting the quality of care services

-43-

provided its enrollees, contrary to that Defendant's representations that its enrollees received all healthcare that is medically necessary;

g.   Each Defendant controlled access to specialist physicians that was misrepresented, for example, in physician directories that created the impression for the reasonable knowledgeable member that medical services were available from any of the specialists listed, when in fact that was not the case under that Defendant's internal policies and practices;

h.   Each Defendant controlled access to prescription drugs listed on that Defendant's formulary, where the list of covered drugs was subject to change at the Defendant's discretion. Each Defendant arbitrarily removed drugs from the formulary and mandated that all plan physicians use another drug when that drug's acquisition costs became too high. Thus, under each Defendant's internal policy, Class members were switched off a drug that in their physician's medical judgment was the best drug for the member's condition.

D.   <u>Each Defendant's Extortionate Conduct</u>.

108.   Defendants conspired with and were aided and abetted by the non-MCO co-conspirators and others in attempting to extort and actually extorting property interests—including intangible property interests associated with the physician-patient fiduciary relationship—from physicians during the period herein alleged. This extortionate conduct

-44-

resulted in multiple unlawful acts of extortion under 18 U.S.C. §1951(b)(2) that were damaging the Plaintiffs and the Class in their business or property.

109.    In obtaining money from the Plaintiffs and the Class, as well as in seeking to deprive and interfere with their intangible rights to the delivery of honest healthcare services, Defendants committed multiple acts of mail and wire fraud in violation of 18 U.S.C. §§1341, 1343, and 1346 that damaged Plaintiffs and the Class in their business or property.

110.    In committing multiple acts of extortion under 18 U.S.C. §1951(b)(2) and mail and wire fraud under 18 U.S.C. §§1341, 1343, and 1346, Defendants traveled in interstate commerce for the purpose of and committing illegal acts through advertising, marketing, member materials, seminars, training, contract negotiations, audits, inspection visits, and thereby committed multiple violations of the Travel Act, 18 U.S.C. §1952(a) that damaged Plaintiffs and the Class in their business or property.  Defendants also committed multiple violations of 18 U.S.C. §1954 by giving and receiving undisclosed payments for the purpose of influencing the operations of employee benefit plans.

111.    In engaging in this unlawful scheme, Defendants violated 18 U.S.C. §1962(c) and violated 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §§1962(a) and (c).  Defendants likewise violated 18 U.S.C. §2 by seeking to aid and abet and aiding and abetting an unlawful scheme to violate 18 U.S.C. §§1962(a) and (c).

112.    Each Defendant's fraudulent scheme deprived the Plaintiffs, the Class, and Subclass of money and honest healthcare services by trick, deceit, chicanery and rapacious overreaching.

-45-

113.    The relief the Plaintiffs, the Class, and/or the Subclass seek for injury to their business or property includes actual damages, treble damages, punitive damages, pre- and post-judgment interest, restitution, and establishment of a constructive trust, costs of suit, attorneys' fees, and such other relief as this Honorable Court deems just and appropriate. The Plaintiffs and the Class were egregiously injured in their business or property interests by each Defendant's unlawful, nefarious, overt, fraudulent, and extortionate conduct.

E.    Each Defendant's Use Of Unregulated Guidelines To Make Medical Decisions.

114.    Contrary to each Defendant's contractual undertaking and the acceptable standard of care, Defendants do not in fact provide care that was generally accepted in the medical community as being medically necessary. First, Defendants inappropriately allowed personnel who were neither medically trained nor educated to make decisions as to what was medical necessity. Second, in lieu of independent clinical judgments by trained and experienced physicians, Defendants relied on the specifications of undisclosed and unregulated guidelines created by third parties such as M&R, InterQual, and Protocare. These guidelines were not based on proper clinical standards and did not reflect what was generally accepted in the medical community as the appropriate standard of care, but instead merely identified the minimum possible level of care that was adequate in a limited sample of "best case" situations. The resulting guidelines, which Defendants applied to all patients, were almost universally inconsistent with and substantially less than the prevailing recommendations in the medical community.

-46-

115.    In addition to using such guidelines to limit medical care, Defendants also relied on undisclosed financial incentives it paid to its participating physicians to discourage them from referring patients to specialists, undertaking tests, and authorizing hospitalization for their patients.  These financial incentives rewarded those physicians who minimized medical treatment and penalized those who provided a full range of care to their patients.  By imposing such financial incentives, Defendants caused PCPs to have an inherent conflict of interest that prevented them from making medical decisions unsullied by financial concerns.

116.    The result of each Defendant's financial incentives that encouraged their PCPs to minimize medical care and each Defendant's demand that the PCPs comply with the guidelines described above was to place tremendous pressure on PCPs to assume a large responsibility for treating patients, even when it exceeded their level of expertise.

117.    Defendants' undisclosed systemic policies and practices were primarily driven by fiscal and administrative initiatives that placed profits over maintaining and improving quality healthcare services and over the delivery of honest medical services needed by the Plaintiffs, the Class, and the Subclass.  Defendants concealed that they had centered their respective approaches to healthcare delivery around a strategy of fraudulently inducing increased membership to obtain increased revenues, while actually aggressively and deceitfully seeking to reduce the quality and delivery of honest healthcare services provided to their respective members to maximize their profits.

F.    <u>Defendants' Heavy-Handed Policies Interfere With The Delivery Of Honest Healthcare Services</u>.

-47-

118.    During the relevant periods herein alleged, each Defendant undertook undisclosed heavy-handed policies and practices with its physicians and aggressively attempted to influence and interfere, and did influence and interfere, with the delivery of healthcare services through the physician-patient fiduciary relationship in an attempt to maximize their corporate profits.  Such interference with the delivery of healthcare services constitutes fraudulent and extortionate conduct.

119.    Each Defendant, through its undisclosed heavy-handed policies and practices with physicians and its attempts to influence and interfere with the delivery of healthcare services through the physician-patient fiduciary relationship, attempted to and did reduce the quality of healthcare services provided to and needed by its respective members. These acts constitute overt, fraudulent and extortionate conduct and a fraudulent and extortionate scheme unlawfully utilized by each Defendant in its overly aggressive attempts to maximize its profits.

120.    At all times relevant herein, each Defendant has engaged, and continues to engage, in a common nationwide fraudulent scheme designed to unlawfully induce the Plaintiffs and the Class to subscribe to and enroll in that Defendant's Health Plans.  Moreover, each Defendant likewise has engaged in and continues to engage in overt, fraudulent and extortionate acts to unlawfully limit the delivery of medical services and reduce the quality of healthcare services provided its members to maximize its profits.

121.    Contrary to each Defendant's false, misleading, deceptive, and fraudulent misrepresentations and non-disclosed material facts, the level of healthcare services provided to the Plaintiffs, the Class, and the Subclass was primarily centered around

-48-

undisclosed internal profit maximizing policies and practices which include: (i) agreements with medical providers which limit the delivery of medical services and each Defendant's physicians' ability to deliver high quality healthcare according to the patients' needs; (ii) financial incentives and disincentives designed to reduce the level of healthcare services delivered to the Plaintiffs, the Class, and the Subclass; and (iii) heavy-handed extortionate conduct designed to reduce the level of healthcare services delivered to the Plaintiffs and the Class.

122.   In effectuating their overly aggressive approach pursuing its profit-oriented goals, each Defendant failed to disclose numerous material facts to the Plaintiffs and the Class. For example, each Defendant failed to disclose, *inter alia*, that:

    a.    It followed a strategy of inducing increased membership to obtain increased revenues, while actually reducing the quality of healthcare services provided its members to maximize its profits;

    b.    It fraudulently attempted to influence and interfere and did in fact interfere with the physician-patient fiduciary relationship through its financial arrangements, risk-sharing agreements, and "gag" orders (or similar clauses) with its physicians;

    c.    It engaged in extortionate conduct against its physicians in its quest to increase its profits by lowering its medical expenses; and

    d.    Its unlawful internal policies and practices were primarily focused upon reducing and limiting the medical services and treatment provided its members in order to maximize profits.

-49-

123.    Defendants' undisclosed aggressive tactics were designed to induce and hold plan enrollees in its healthcare plan and place profits over maintaining and improving healthcare services provided to their enrollees.  These undisclosed aggressive tactics constituted a pattern of fraudulent and extortionate conduct for which the Plaintiffs, the Class, and/or the Subclass, are entitled to relief under RICO, as well as ERISA.

124.    Each Defendant's undisclosed internal and systemic policies and practices designed to reduce the level of healthcare services delivered the Plaintiffs and the Class and which restrict the ability of defendants' physicians to deliver quality and needed healthcare services include, but are not limited to, the following:

a.    Physician financial arrangements that include incentives and disincentives designed to reduce and limit healthcare services such as specialist, emergency room, and hospitalization services;

b.    Physician financial arrangements that include incentives and disincentives designed to achieve large patient/member ratios;

c.    Physician financial arrangements that include incentives and disincentives designed to reduce healthcare services including each Defendant's budgets for certain institutional and ancillary sources such as inpatient hospital admissions.  Under these financial arrangements, if the cost of such services to plan members exceeds the budget, the physicians are penalized and must pay a percentage of the deficit.  However, if the cost of such services to plan members is below the budget, the physicians receive part of the surplus as a bonus;

-50-

d.  Physician financial arrangements that include incentives and disincentives designed to reduce healthcare services include so-called shared risk funds for the cost of certain services, such as inpatient hospital admissions.  Under these arrangements, the cost of services provided plan members is calculated at the end of the time period.  If the costs for the services are below the funded amount, the physicians receive a bonus of a percentage of the surplus difference between the funded amount and the costs of healthcare services.  If the costs of healthcare services for the period of time exceeds the funded amount, the physicians are penalized and must pay some or all of the deficit;

e.  Physician financial arrangements that include incentives and disincentives designed to reduce healthcare services include a variable utilization component in which additional compensation is available based upon the physicians' utilization of healthcare services, such as: (i) withheld amounts which are paid or not depending upon the physicians' utilization of healthcare services; and (ii) "Incentive Compensation Plans" which incorporate a cost/utilization component in which additional compensation is available based upon the physicians' ability to achieve low utilization of healthcare services;

f.  "Gag Clauses" or similar provisions that penalize physicians for communicating (or otherwise deter them from communicating) to the

-51-

Plaintiffs and the Class certain information regarding financial arrangements with its physicians and other material information;

g.     Limited access to specialist physicians as a result of the coerced conspiracy described above;

h.     Restricting access to emergency healthcare services as a result of the coerced conspiracy described above;

i.     Providing an open-ended designation of "appropriate" emergency care because, regardless of whether the plan member or his or her physician thought there was need for emergency services;

j.     Removing or restricting physicians from the medical decision-making process and allowing medical decisions to made by referring to sources such as published guidelines and claims personnel who never met the member and were unfamiliar with the member's specific healthcare needs. Each Defendant failed to disclose its internal processes for authorizing medical services, hospitalizations, evaluating claims, and making coverage decisions and, in particular, that such evaluation and coverage decisions were based upon only that Defendant's assessment of its costs rather than the patient's medical needs;

k.     Contrary to misrepresentations that physicians were solely responsible for all medical services provided, each Defendant's intended policies and practices allowed it to override its physicians' decisions regarding medical necessity;

-52-

l.      Defining "medical necessity" in an extremely narrow manner that provides only minimal healthcare services and medicine and in a manner primarily focused on each Defendant's cost and administrative concerns rather than the patient's medical needs;

m.      Heavy-handed policies and practices with physicians, including: (i) refusing to negotiate contract provisions with physicians even if healthcare services concerns were raised by the physician; (ii) retaining unilateral power to amend contracts with physicians without notice, even where the contract provisions encompass clinical protocols and procedures; and (iii) using physician profiles concerning what each Defendant deems excessive use of referrals, diagnostic tests, and/or other medical services to exploit threats and fear of economic loss or loss of business for the purpose of interfering with the delivery of honest medical services; and

n.      Each Defendant's misrepresentations as to the drugs listed on that Defendant's formulary and failure to disclose that the list of covered drugs was subject to arbitrary change.  A member might lose coverage for a drug even in the middle of a contract year, and each Defendant's decisions were based upon financial considerations and incentives from pharmaceutical manufacturers rather than the members' healthcare needs.

125.    On October 28, 1997, Dr. Linda Peeno, a former medical director for Humana, now a whistle-blower for the deceptive, unlawful, abusive, and dangerous practices

-53-

of many MCOs, including Defendants, testified before the United States House of

Representatives, Committee on Commerce, Subcommittee on Health and Environment as

follows:

> "Exactly seventeen months ago, I came here, as a physician and former medical director, to tell you that the unnecessary death of even one patient is unconscionable to me.  By informing you of my participation in acts of patient harm, I, in effect, shared my moral responsibility. I return today aware that very little has been done to effectively and uniformly protect other patients from needless suffering and possible death.  So my message is the same, but more urgent: the *American public needs your help.*

> *"My written testimony gives you details about how the health care industry systemically causes patient harm.*  What we call 'managed care' is an organized system of limitation and denial—an unprecedented market driven system of rationing medical resources.

> "Let me demonstrate this first by revealing some things to you I have never before made public.  I have here with me four copies of personal reports from my previous days as a company doctor.  The first is a denial for admission to a hospital, for which my supervisor marked 'Linda, good work.'

> "The second is a sample of one of my monthly denial profiles.  The third is a memo from a fellow medical director advising me about the euphemisms to use when denying care.  The last is a report I submitted projecting my expected 'savings' based on targeted amounts of denials of inpatient admissions, referrals, outpatient services, emergency room use, etc.

> "Let me note quickly that this is representative of all my work and not isolated to any particular company.  Also, before someone attempts to dismiss my experience as too outdated or narrow to be of value, let me assure you that I continue to have inside knowledge of how managed care works.  *In my teaching and consulting, I see thousands of documents—handbooks, marketing materials, contracts, policy and procedure manuals, denials, patient complaints, internal memos, etc., that substantiate all of this.  I am a witness to the rapid growth of a monstrous business whose economic success is based upon the*

-54-

*micro management of medicine through avoidance, denial and control.*

"How does this happen?  Let's imagine that you are starting a new managed care organization and you have hired me to help you put it together.  What do we do?

"First, I exchange my traditional doctor's bag for a health executive's box of tricks.  Second, we agree that we do not want just any group of patients.  *We will use all the sophistication of modern advertising and marketing to ensure that we avoid those persons who cost money.*  We have many ways to eliminate the old, the sick, the disabled, the malignant, the chronic, the risky lifestyles, and any other who may be a drain on our premium pool.

"Presuming we get a pool of healthy, prepaid members, what do we do now to ensure our maximum economic return, i.e., that we succeed in our business of health management?

"First, we LIMIT THE NETWORK.  We justify this based on costs and business necessity.  It will be of no concern to us that we may create something that requires parents to travel 42 miles in the middle of the night with a sick child.

"Second, we LIMIT BENEFITS, MAKE EXCLUSIONS and CREATE AMBIGUOUS LANGUAGE to *give us the maximum power to deny services based on coverage issues.  It will not worry us that we may eventually cause the death of some persons when they are told that they do not have coverage for necessary treatments.  We are doing business, not welfare.*

"Third, we create COMPLEX, INEXPLICABLE RULES AND PROCEDURES for navigating our managed care maze.  This will be some of the simplest, least questionable 'denials,' because we can just refer to our requirements for payment.  We make the rules.

*"Fourth, we have our most versatile, authoritative, and profitable tool: our ability to make MEDICAL NECESSITY DETERMINATIONS.  Empowered with physicians employed by us, we become the final medical authority.  Regardless of what any treating physician may want to do, we assume control and practice medicine our way.*

"Fifth, we cannot do everything directly, *so we ensure that our physicians become our agents.  We create FINANCIAL*

-55-

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

*ARRANGEMENTS that will encourage them to limit or deny directly without our intervention.*

"Sixth, we supplement this with extensive contracts devised to control physician's power and authority. *We PROFILE THEM ECONOMICALLY;* we lure them with SELECTION and threaten *DESELECTION once hooked; we usurp their power and authority with CONTRACTS FULL OF CLAUSES EXTRACTING PERFORMANCE, COMPLIANCE, GAG CONDITIONS, CONFIDENTIALITY, GOOD MANAGED CARE BEHAVIOR. We make them our agents of denial.*

*"Seventh, for good measure, we add a TERMINATION-*WITHOUT-CAUSE clause to give us the ultimate power of ridding ourselves of inappropriate physicians.

"Eighth, should anyone challenge our decisions, we ensure that THE GRIEVANCE AND APPEAL PROCESS is closed and weighted against the member and in our favor.

"Ninth, we add MANDATORY ARBITRATION, in which there is no record of issue or outcome, giving no benefit to other members, case law, or public/legislative action.

"Tenth, even if all this fails, and someone should suffer from our tactics, nearly everything we do will be SHIELDED FROM ANY LIABILITY thanks to our ERISA PREEMPTION.

"Finally, *we work to CHANGE MEDICAL EDUCATION, creating from the beginning manageable doctors to suit our purposes. Also, by not paying for things, and excluding everything we can under the designation of 'investigational' we can DIMINISH RESEARCH, and slowly eliminate the availability of new treatments, prolonging of life, and added expense of the care of persons.*

"Now this is what is left. . . and if we work smart, we will think of ways to deny this as well. Then we will have achieved the ideal health care business: money coming in and none going out— a 'medical loss ratio' of ZERO.

"Is this fair? I leave it to you to decide. You have the means to intervene and protect the public. I encourage you to use every opportunity to do so.

\* \* \* \* \*

-56-

"Whether through a gatekeeper system, or a structured system in which physicians must make each request for their patients, the result is the continuous, micromanagement of decisions regarding the care of a patient at hand. *Physicians have varying responses to this: some are intimidated easily into submission to the plan's requirements, easily done by physicians from a distance, often anonymous, and with unknown power over the practicing physician's professional future; some physicians are 'hassled' into submission*, simply giving in to plan's requirements because other patients and practice demands prevent them from battling it out with numerous individual patients and plans; and/or some physicians are rebellious and confrontational, but plans soon identify these physicians as 'noncompliant,' as noted above.

"Whatever the response, *eventually physicians understand that they do not practice medicine alone.* Despite claims that a plan does not practice medicine, the final medical determination, as every plan states in their coverage booklet, is the prerogative of the plan. Medical reviewers and medical directors, employed or contracted by the plan, operating under no ethical codes for their hybrid positions, and monitored themselves by no one, make decisions based on little information, and from a distance, without ever seeing or touching the patients. Few physicians can afford, professionally or economically, to advocate for their patients against these decisions.

"The power to influence decisions about care during the diagnosis and/or treatment phase is underestimated by the public. *Strong financial concerns drive virtually every decision.* Real quality and outcomes monitors are still too primitive, superficial, labor-intensive and/or costly to pick up the consequences of '*medical necessity' determinations made for the best interest of the plan at the expense of the patient. In the meantime, physicians are increasingly walking a tightrope between allegiance to the system which makes it possible for them to practice and advocacy of the patients for whom they have primary professional, ethical and legal responsibility. It should be no shock that more and more physicians are just accepting the medical criteria and decisions of the plans. To do otherwise is professional suicide. Meanwhile, the unsuspecting public continues to believe that their physician is their trusted advocate.* Once again, the managed care industry banks on remnants from the fee-for-service system to achieve its surreptitious goal of physician control.

\* \* \* \* \*

-57-

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET · SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

> *"Pre-care processes are those mechanisms by which professional decision making is influenced and constrained so completely that a physician essentially becomes a 'dual agent,' with some other interests competing equally with any commitment to patients.* In the worst cases, these other interests—a plan, success in the managed care market, *professional viability, economic survival, etc., become preeminent. The effect of 'pre-care' controls is to change the very way a physician thinks before any patient enters his or her domain of care.* If the physician begins to think as a 'medical director' of the plan, then he or she will no longer need to have medical decisions overturned by another physician. The physician has 'learned' to practice a new kind of medicine—that defined by the managed care plan or the industry as a whole.*"* (Emphasis added.)

126.    The AMA has also expressed concern over the adverse impact that financial incentive arrangements between MCOs and PCPs have on the quality of medical care provided to patients.   In a January 25, 1995 report on "Ethics in Managed Care" reported in the *Journal of the American Medical Society*, the AMA's Council on Ethical and Judicial Affairs called for full disclosure to patients of any financial incentives received by doctors to reduce treatment:

> *"Managed care plans must adhere to the requirement of informed consent that patients be given full disclosure of material information.  Full disclosure requires that managed care plans inform potential subscribers of limitations or restrictions on the benefits package when they are considering entering the plan.*
>
>     *   *   *   *   *
>
> "When physicians are employed or reimbursed by managed care plans that offer financial incentives to limit care, serious potential conflicts are created between the physicians' personal financial interests and the needs of the patients.  Efforts to contain health care costs should not place patient welfare at risk. . . . *Any incentives to limit care must be disclosed fully to patients by plan administrators on enrollment and at least annually thereafter. . . .*"  (Emphasis added.)

-58-

127.    The AMA has also challenged the use of "gag clauses" of the type herein described.  On July 30, 1998, the AMA issued a press release expressing the concerns of AMA Trustee Dr. John C. Nelson regarding the interference of gag clauses with the physician-patient relationship.  The press release recounted Dr. Nelson's testimony before the Health Subcommittee of the Ways and Means Committee of the Prudential States House of Representatives as follows:

> "'*Gag clauses strike at the heart of the patient-physician relationship because they present an inherent ethical conflict of interest,*' AMA Trustee John C. Nelson, MD, told the Health Subcommittee of the Ways and Means Committee today.

> "'The patient has the right to receive information from physicians and to discuss the benefits, risk, and costs of appropriate treatment alternatives.' Dr. Nelson said, 'Patients should receive guidance from their physicians as to the optimal course of action.'

> "'The AMA staunchly believes that the *patients must be able to trust and rely on the information their physicians provide them regarding appropriate medical treatment and care,*' Dr. Nelson stressed. 'In short, physicians, as providers of health care, have an ethical and legal duty to ensure that their patients were fully informed of their options regardless of cost or potential treatment limitations.

> "Unfortunately, for patients, gag clauses create a real or perceived potential *conflict of interest* for physicians by placing a wedge between patients and their physician,' Dr. Nelson said. '*Gag clauses and gag practices wear away at a most fundamental element of the healing process—trust.*'" (Emphasis added.)

128.    Each Defendant's undisclosed financial arrangements, risk-sharing agreements imposed on its physicians and other undisclosed internal policies and practices clearly evidence each Defendant's intent to:

-59-

a. fraudulently induce the Plaintiffs and the Class to subscribe to and pay monies for a level and quality of healthcare services under false pretenses that the Defendant never intended to provide;

b. influence, interfere with, and deprive the Plaintiffs and the Class of their intangible right of honest delivery of healthcare services; and

c. extort intangible property rights and interests inherent in the physician-patient relationship from its physicians as well as the Plaintiffs and the Class to which the Defendant is not entitled.

129. Each Defendant's physicians were entitled to practice their profession and honor their duties inherent in the physician-patient relationship without each Defendant's attempts to coerce or intimidate them into lowering patient care in the quest for higher profits. Similarly, through each Defendant's financial arrangements, risk-sharing agreements, and "gag" orders imposed on its physicians, that Defendant blatantly attempted to secure tangible or intangible property interests to which it is not lawfully entitled, including the intangible property right of honest services belonging to the Plaintiff, the Class, and the Subclass.

130. During the relevant time herein alleged, each Defendant provided enrollees in its Health Plans healthcare services that were worth substantially less than actually charged. That diminution in value and the deprivation of intangible property rights to the delivery of honest healthcare services resulted in legally cognizable injury to the Plaintiffs and the Class for which relief is appropriate.

G. Each Defendant Has A Duty To Refrain From Making Materially False Statements and Disclose Material Facts.

-60-

131.   By statutory mandate, each Defendant has a duty to refrain from making materially false or misleading statements to the Plaintiffs and Subclass and from engendering undisclosed conflicts of interest regarding the matters described above.  Every Defendant has failed to comply with its statutory mandate and in doing so has breached the fiduciary obligations owed to the Plaintiffs and Subclass.

132.   Each Defendant is similarly required by law to disclose material facts of which the Plaintiffs and Class, as plan participants, are unaware but properly should know in order to protect their interests in obtaining healthcare services.  The factors described above are such material factors as would properly be required by plan participants (the Class) to protect their interests in obtaining healthcare services.  In failing to comply with the legally mandated duty to disclose such material facts, each Defendant has breached its statutorily imposed fiduciary obligation to the Plaintiffs and Class.

H.   The Defendants' Collusive Practices, Including Collusion With Non-MCO Co-Conspirators.

133.   As explained above, each of the Defendants engages in fraudulent and deceptive healthcare and health management practices that are unlawful pursuant to the provisions of RICO and ERISA.  Plaintiffs allege that those practices are not undertaken in isolation by each Defendant, but are instead undertaken in adherence to an agreed-upon industry-wide approach to managed care, developed and perpetuated in conjunction with the non-MCO co-conspirators.  This conspiracy involved, *inter alia*:  (1) the development and adoption of clinical practice guidelines and related healthcare review criteria and (2) the joint development of accreditation standards by the managed healthcare industry.

-61-

134.   The leading developer of costing and clinical practice guidelines jointly used by many of the Defendants is M&R.  M&R's *Health Cost Guidelines* have, according to its website, "become an industry standard" and "managed care organizations use this information in product pricing.  It also provides utilization benchmarks for managed risk arrangers."  The *Health Cost Guidelines* were introduced in 1954 and have been updated and expanded annually.  They are used, *inter alia*, to determine claim costs, both generally and on an area-specific basis.

135.   M&R's Healthcare Management Guidelines now run to nine volumes.  The first, on Inpatient & Surgical Care, was introduced in 1990 and has been updated regularly ever since.  Other publications in the series are Primary & Pharmaceutical Care, Pediatric HSIM, Return-to-Work Planning, Ambulatory Surgery Guidelines, Case Management Home Care, Case Management Recovery Facility Care, and Workers Compensation.

136.   M&R has in place an instructional support system for its *Healthcare Management Guidelines* that allows executives from MCOs to meet together, exchange information, and assure themselves that rivals are using the same basic clinical practice guidelines as each of their companies is using.  M&R describes this system on its website as follows:

> "M&R conducts seminars for nurses, physicians, and utilization management staff on the implementation of managed care principles and procedures.  Often, this involves instruction on how the firm's *Healthcare Management Guidelines*™ help providers achieve improved quality and efficiency for both inpatient and ambulatory services.  M&R's nurse and physician consultants demonstrate practical approaches to reducing inappropriate resource consumption through the efficient delivery of care across the healthcare continuum.  M&R sponsors an annual *Healthcare Management Guidelines*™ *User Group Forum*, which lets guideline users learn how others are successfully

-62-

implementing medical management techniques while enhancing quality of care."

137.   The next User Group Forum is scheduled to take place from November 30 to December 2, 2000 in Scottsdale, Arizona.  M&R promises that "[s]easoned users" will give advice at the forum, which "will deepen your understanding of the HMGs, allowing you to come away with practical ideas that you can implement immediately."  M&R also has its consultants give presentations at various managed care fora across the county at which MCO executives are likely to be in attendance.  Subjects of such presentations in the year 2000 include "Cost Avoidance Estimate Tool," "Useful and Useless Activities," "Valuation Issues for Managed Care Actuaries," "The Quality Compass Model—Balancing Employer/Consumer Concerns," "Implementing Disease Management," and "The Keys To Successful Clinical Guideline Implementation."

138.   Since 1992, M&R has also conducted an annual <u>HMO Intercompany Rate Survey</u>.  According to its website, "[t]he survey is used by managed care organizations across the United States to compare their rate levels and experience with those of their competitors."

139.   Other companies also provide data services to MCOs on a common basis.  For example, InterQual touts itself on its website as the "worldwide leader in the development of utilization review criteria for the healthcare industry."  It has developed Intensity/Severity/Discharge Criteria for acute, subacute, and rehabilitation levels of care, as well as home and behavioral health levels of care.  It also markets a complete range of preauthorization, profiling, and clinical management products.  In addition, it sells Automated Criteria to be used in managed care decision-making.  According to InterQual's website, its

-63-

criteria are used by more than 900 licensed health plans and help avoid overutilization that

"depletes or misallocates available resources." Similar to M&R, it provides "refresher

training" seminars for its clients across the country. InterQual has also recently introduced

Decision Management Conferences for MCO executives. Its website describes these

conferences as follows:

> "This Decision Management Conference has been recently
> developed and is geared toward senior level management with
> administrative and/or fiscal responsibilities, such as but not
> limited to:
>
> - Medical Directors
> - Director of Utilization/Quality/Case Management
> - Physicians
> - Medical Management
>
> "Each conference focuses on the challenges and issues faced by
> healthcare organizations in today's marketplace such as:
>
> - Unreliable and limited data collection
> - Inconsistent decision making
> - Over utilization and practice variation
> - The effectiveness of UM/QM programs
> - Compliance with outside accrediting agencies
>
> "These new conferences are free half day programs that will be
> held in 8 different locations throughout the spring." (Emphasis in
> original.)

140.    Likewise, Protocare employs experienced clinical, analytical, technical,

and business development teams that enable MCOs to shift care or drug use in order to reduce

costs. It has developed "Best Practice Guidelines" and health management programs for the

managed care industry, including capitation management systems and clinical practice

guidelines.

-64-

141.    Common industry action has also taken the form of private standard-setting, principally through NCQA.  NCQA originated in 1979 as a joint undertaking by the American Managed Care and Review Association and the Group Health Association of America, two organizations that merged in 1995 to form the AAHP.  In 1990, when it ostensibly became "independent", NCQA was financed by foundation grants and matching funds from MCOs.  NCQA's accreditation program for MCOs began in 1991 and now covers almost half the MCOs in the nation, accounting for three-quarters of all HMO enrollees.

142.    Of particular interest are NCQA's HEDIS standardized measures for health plan performance, measures that MCOs use to promote themselves to enrollees.  HEDIS 1.0, work on which began in 1989, was the product of collaborative efforts between a group of large corporations and the HMO Group, a coalition of group and staff model HMOs.  A broader group of MCOs worked on HEDIS 2.0, released in late 1993.  There followed HEDIS 3.0 (released in late 1996) and HEDIS 2000 (released in June of 1999).  NCQA points out at its website that HEDIS 2.0 "quickly became the standardized performance measurement system of choice among managed care plans, many of whom report HEDIS data to employer clients or use HEDIS data to inform their quality improvement efforts."

143.    In short, the chief standard-setting and accreditation body for MCOs in this nation is one founded and funded in part by the industry, and the standards it has promulgated are ones that industry members collaborated in developing.  Those standards are premised on the assumption that capitation and other techniques designed to aggressively limit the delivery of managed health care are a desirable given that should not be changed.  Performance criteria developed by NCQA therefore perpetuate and solidify the industry-wide

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

use of such techniques and are intended to have that effect.  Consequently, the NCQA's quality assurance standards are, in large part, a sham.  The MCO industry has, in effect, sought to protect itself from criticism by erecting and subsidizing a putatively "independent" organization that is in fact a shill for that industry's members.

144.     Another industry-sponsored organization is NHI, which acts as an information exchange for MCO executives.  It disseminates such newsletters as the *Capitation Management Report, Capitation Rates & Data, Clinical Resource Management, Data Strategies & Benchmarks, Healthcare Demand & Disease Management, Hospitalist & Inpatient Management, Physician Profiling, Postacute Payment Report*, and *Senior Care Management*.  It has also published special reports that facilitate collusion by industry members on managed care practices, such as the 1997 volume on *Capitation Rates & Data*, the 1996 *Capitation Sourcebook*, the 1997 *Healthcare Price, Cost & Utilization Benchmarks*, the 1998 *Physician Compensation & Incentives Under Capitation*, the 1998 *Physician Profiling & Performance*, the 1998 *Managed Care Provider's Toolbox*, and the 1998 *Utilization Management & Capitation Strategies*, as well as various books on clinical guidelines.

145.     In addition, trade associations like the AAHP and CAQH have provided their MCO members with a venue to collude and jointly use or promote common healthcare cost containment policies on an industry-wide basis. For instance, AAHP has sponsored events such as the upcoming 2000 Managed Care Institute & Display Forum, to be held on June 4-7, 2000, at which, according to AAHP's website, "over 3000 professionals working with HMOs, PPOs, and other network healthcare organizations" will "share experiences and insights, and formulate both clinical and business plans for the coming months and years." At meetings like

-66-

this over the years, AAHP's members have forged or perpetuated the industry-wide agreement referred to previously. Likewise, AAHP has promulgated a "Code of Conduct" for its members that specifically supports their use of such techniques as clinical guidelines and utilization review. Likewise, CAQH is an industry coalition (which includes Aetna, Cigna, PHS, Prudential, United and AAHP among its members) that was formed to spread disinformation to consumers through television and print advertisements, as well as other publications, about the alleged benefits of managed care.

VII.   DEFENDANT-SPECIFIC ALLEGATIONS COMMON TO ALL COUNTS.

1.   Aetna's False And Misleading Advertising, Marketing, and Member Materials.

146.   During the time period alleged herein, Aetna advertised in newsprint, and/or on television, and/or the Internet, that it provided high "quality" healthcare, was "Raising the Health Care in America," provided "full disclosure" to potential members on how Aetna's physicians are paid, and "encourage[d] participating physicians to discuss their financial arrangements with their patients."

147.   Moreover, by way of example, Aetna assured its members in its California HMO Member Handbook that members had the right to "[b]e referred to participating specialists," and "[o]btain necessary care from participating specialists, hospitals, and other providers." These statements have created the impression in the average, literate layperson that medical services are available from any of the specialists listed. In fact, this is not the case under Aetna's internal policies and practices.

-67-

148. Numerous examples of Aetna's advertisements during the class period that uniformly misrepresent its HMO, POS, and/or PPO plans, mislead the plaintiffs and the class, and fraudulently induce them to join or maintain their membership in Aetna's plans are as follows:[1]

> *"But perhaps most important is our commitment to quality.* U. S. Healthcare has a sophisticated system of quality assessment programs that measure and tract the performance of participating doctors, hospitals, even laboratories."
>
> *The Post and Courier* (South Carolina), March 31, 1996. (Emphasis added.)
>
> "While we work to complete the merger [with USHC], we want to assure you that there will be no change in your benefits or in the quality of care you receive. After [the merger], we intend to work to expand the choices available to you and to improve your health care. We'll do this by giving you access to a network of well-trained providers and state-of-the-art health care information. We will encourage strong patient/physician relationships in which all health care information - including treatment options - is freely shared. Most importantly, we will deliver programs to help our members get well and keep them healthy."
>
> *The Columbus Dispatch* (Ohio), April 3, 1996. (Emphasis added.)
>
> *"At every level of health care coverage, we emphasize quality.* We carefully screen and review members' participating primary care physicians. And we have a sophisticated system of quality assessment programs that measure the quality of care delivered by

---

[1]   These examples of Aetna's and other Each Defendant's advertisements contained herein, are included to illustrate the nature and extent of the deception as alleged; Aetna's and other Each Defendant's invitation to rely on its representations; that these solicitations and self-promoting declarations exceed mere "puffing" and generalized advertisements and, that they are false and intentionally misleading. These constitute specific examples of the challenged conduct in which the Defendants calls upon ordinary and reasonable persons of average intelligence and literacy to believe, and act on the belief, that Defendants will place the purchased healthcare above any corporate, fiscal or administrative concern if, and when, the subscriber's healthcare decisions are made by the treating physician.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

providers like laboratories, imaging centers and hospitals. *Because when you entrust us with your family's health care coverage, we take that responsibility very seriously."*

*Providence Business News* (Rhode Island), October 14, 1996. (Emphasis added.)

"I'm Arthur Leibowitz and I'm chief medical officer for Aetna-U.S. Healthcare. People should expect that their healthcare company will give them the opportunity to get the care that they need. When somebody has an Aetna-U.S. Healthcare membership card in their wallet, they should feel secure. They should know that behind them is a company absolutely committed to make sure they get the best care. Quality of care is the most important thing to us."

Television Advertisement (New York City Television Market) April 9, 1997. (Emphasis added.)

"Aetna-U.S. Healthcare has a long-standing commitment to protecting the health of our members. As America's largest managed care company, our mission is to provide members with access to the highest level of medical care available at a low out-of-pocket cost to members. From the nation's most renowned medical centers to our informed patient programs, *we are committed to setting a new standard in the health care industry."*

*The Plain Dealer* (Ohio), July 6, 1997. (Emphasis added.)

"At Aetna-U.S. Healthcare, we believe that the best health care coverage is the coverage that you'll actually use. So this year when you choose Aetna-U. S. Healthcare, you'll find more of the benefits you want.

"Of course, you can also expect the comprehensive coverage that Aetna-U.S. Healthcare is known for.

"This open season, choose Aetna-U.S. Healthcare. "Because when you've got our membership card, you're covered."

*The Times Picayune* (Louisiana), October 10, 1997. (Emphasis added.)

"As an affiliate of one of the country's largest and most experienced managed health care companies, we are in a unique position to provide a level of quality coverage that many other companies, frankly, cannot match. The Aetna-U.S. Healthcare companies are recognized throughout the industry as pioneers in the development of early detection screenings and preventive care programs designed to keep our members in good health. But despite our national prominence, we are a new name to you. And

-69-

we realize our first job is to earn your confidence."

*Las Vegas Review-Journal* and *Las Vegas Sun* (Nevada), October 19, 1997.

"At Aetna-U.S. Healthcare, we believe that the best health care coverage is the coverage that you'll actually use. So this year when you choose Aetna-U.S. Healthcare, you'll find more of the benefits you want."

*The Orange County Register* (California), November 10, 1997.

"First of all, the paramount focus of health care must be quality. It should be the only reason we're in the business - to help raise the quality of care not just for our members, but for all Americans. Which is why we're working to enable a level of health care never available under the old fee-for-service system."

*The Providence Journal* (Rhode Island), November 12, 1997; *The Wall Street Journal*, October 29, 1997. (Emphasis added.)

"Aetna-U.S. Healthcare

"At Aetna-U.S. Healthcare, we feel a tremendous responsibility to the millions of Americans who are our members. It's a responsibility that most certainly means providing access to the highest quality of care today. But it also means taking advantage of the immense opportunity we have to help elevate and improve the way medical care in this country will be delivered in the future."

"Prevention and Early Detection Are the Keys to Quality Health Care.

"The medical knowledge doctors have at their disposal today is astounding. We simply need to make it accessible to more people. That's why Aetna-U.S. Healthcare has taken a leadership role in pioneering disease prevention programs. That's why we are helping to identify high-risk situations through member health profiles. That's why we have established partnerships with many of the country's leading medical centers. And that's why we carefully screen our network of physicians and hospitals to assess quality of care."

"A Lifetime of Care Is A Promise We Intend to Keep."

*The Houston Chronicle* (Texas), November 16, 1997; *Boston Herald* (Massachusetts), November 14, 1997; *Philadelphia Inquirer* (Pennsylvania), April 29, 1997. (Emphasis added.)

"On the surface, they may seem to offer similar coverage. But we're confident that when you take a closer look at things like

-70-

experience, financial stability and quality ratings, you'll conclude that very few health care companies, if any, can compare with what Aetna-U.S. Healthcare brings to the table."

"Experience, financial strength, quality: the more you find out about Aetna-U.S. healthcare the more we think you'll agree that few companies can match our level of security and services.

"And, as a leader in the health care industry, we have a responsibility to our members to use these tools to improve the quality of care they can expect today and to provide the peace of mind that comes from knowing we'll be there for their children's tomorrow.

*Crain's New York Business*, November 17, 1997. (Emphasis added.)

"First class, blue ribbon, five star. Terms like these are reserved for the best, something of superior quality. Because whether in a well made watch or well built home, quality is very important. This is especially true when choosing a health plan. That's why at Aetna-U.S. Healthcare we continually look for new ways to provide our members with access to the highest level of quality medical care available. As America's largest managed care company, we feel it's our responsibility. From access to some of the nation's most renowned medical centers to our preventative care programs, we're committed to raising the quality of healthcare in America. A commitment to quality, one more reason why you'll feel better with us. Aetna-U.S. Healthcare."

*Radio Advertising* (Philadelphia Radio Market), November 20, 1997. (Emphasis added.)

"Here in Pittsburgh, we've recently changed our name from U. S. Healthcare to Aetna-U.S. Healthcare. We're confident you'll agree it's a change for the better. As one of the largest providers of health care coverage in the country, we feel it's our responsibility to help our 14 million members get access to the highest quality of care available today . Superior health coverage. Member satisfaction. Strength and stability. Just a few of the ways we're raising the quality of health care in Pittsburgh."

*Pittsburgh Post-Gazette* (Pennsylvania), March 25, 1998. (Emphasis added.)

"Raising the Quality of Healthcare in America.

*The Dallas Morning News* (Texas), October 21, 1998 and October 27, 1998.

-71-

"Raising the quality of healthcare in America.

"Raising the quality of healthcare is our goal."

*The Hartford Courant* (Connecticut), December 17, 1998. (Emphasis added.)

"Committed To Raising The Quality Of Healthcare In Rhode Island!

"Take a closer look at Aetna-U.S. Healthcare and you'll find experience and resources that few health benefits companies can match.

"We're Aetna-U.S. Healthcare. We're committed to raising the Quality of Healthcare in America. And we believe we can help your employer raise the quality of coverage for you and your family. Before you make a decision on healthcare coverage, look into our experience, our network of participating physicians and hospitals, and our outstanding preventive care programs.

Raising The Quality of Healthcare in America.

*The Providence Journal* (Rhode Island), December 21, 1998. (Emphasis added.)

"You'll feel better with U.S. Aetna-U.S. Healthcare"

Billboards in Dallas-Fort Worth market, August 9, 1999.

149.    The advertising, marketing, and member materials commonly distributed by Aetna to the plaintiffs and the class likewise include misrepresentations that Aetna's primary commitment to the plaintiffs and the class is to maintain and improve the quality of healthcare services and deliver healthcare services according to a patient's needs. Aetna's plan benefits material, for example, misrepresents to the plaintiffs and the class that Aetna's financial incentives are "intended to continually improve medical care" and "enhance patient satisfaction."

150.    The advertising, marketing, and member materials commonly distributed by Aetna to its enrollees throughout the United States contain misrepresentations that Aetna's Health Plan members are provided all needed medical services according to the independent

-72-

medical decisions of their physicians.  For example, Aetna's HMO Plan Member Handbook

includes misrepresentations stating:

    a.    participating physicians "maintain the physician-patient relationship with Members and are solely responsible to Member for all Medical Services which are rendered" by such physicians."

    b.    "Participating physicians and other health care providers "who care for you are not employees of the HMO and that the HMO does not control them." (Emphasis added.)

    c.    PCPs are given "quality incentives to enhance patient satisfaction [and] improve medical care...."

    151.    Aetna further states that its HMO members "help [their] doctor make

decision about [their] health care."  Its brochure "HMO Plan Benefits" represents that the plan

contains financial incentives intended to continually improve medical care, enhance patient

satisfaction, and intensify preventive care efforts. The member handbook, the provider directory,

and the subscriber agreement all emphasize the importance of each member's primary care

physician as though all medical decisions for healthcare services are made independent of Aetna

influence or interference.  The same materials do not disclose that Aetna will limit or deny

healthcare services—ostensibly for "coverage" reasons—because the modality of treatment

chosen by the subscriber's physician is considered by Aetna to be too costly.  The published

materials convey to the average, reasonable and literate person that Aetna's "coverage"

decisions will be based on a reasonable and articulate basis, not cost of treatment.  Such

deception is purposeful and is intended to cause the average, reasonable and literate potential

subscriber to accept and act on the clear conveyance of the English language.

-73-

152.    Aetna's misrepresentations through its advertising, marketing, and member materials are clearly designed to mislead the plaintiff and the class into believing that Aetna's physicians are independent practitioners whose medical decisions regarding the delivery of healthcare services will not be manipulated, influenced, or interfered with by Aetna.

153.    As another example, Aetna's HMO Plan Member Handbook and provider directory distributed to plaintiffs and the class also misrepresent that Aetna's physicians are compensated under a system that provides its physicians quality incentives to assure that Aetna's members receive high quality healthcare services. Aetna misrepresents, for example, that its compensation system is committed to quality and that its compensation system includes "quality incentives to enhance patient satisfaction" and to "improve medical care".

154.    Similar misrepresentations and omissions are contained in brochures for Aetna's HMO, PPO, and POS plans available from its internet website. Thus, for example, a consumer brochure for Aetna's Managed Choice POS plan asserts that "you can count on quality Benefits & Programs." A consumer brochure for Aetna's Open Choice PPO plan makes a similar assertion. Likewise, the website refers to the "quality benefits" supposedly provided by Aetna's HMO plans.

155.    In a press release dated October 7, 1999, Aetna assured its enrollees and the American public that "Aetna-USHC's general practice is to provide *full disclosure* to potential members on how our health plans operate including *how physicians are paid* and we *encourage participating physicians to discuss their financial arrangements with their patients.*" (Emphasis added.)

-74-

156.  On Aetna's website (www.aetna.com) and in the October 4, and November 1, 1999, editions of *Forbes* magazine, an Aetna-USHC advertisement showing a 747 airplane stated:

> "M R I, E K G, 7 4 7.
>
> "These are just a few of the tools we use to *provide our members access to quality health care.*
>
> "For example, our National Medical Excellence program covers our members at the country's finest medical centers, if the treatment they need is not available in their area. Demonstrating that we go to great lengths to give our members the health care coverage they need, even if that means flying across of the country.
>
> "To learn about other programs that are helping *to improve the quality of care for our members*, contact us at Aetnaushc.com ... Aetna-US Healthcare ... Raising the quality of healthcare in America." (Emphasis added.)

157.  On Aetna-USHC's internet website (www.aetnaushc.com) Aetna states, in its "Quality Center," under the heading of "A Philosophy of Care," that:

> "*At Aetna US Healthcare, we believe in a philosophy of care that brings together patients, physicians, employers, academic medical centers, and health plans to form a partnership that results in patient-centered, coordinated health care. Our mission is to reach out and help make sure that people get the care they need.*
>
> "Getting people timely preventive care and timely detecting disease early has been proven to be cost-effective, but that's not our chief motivation for doing it.
>
> "*We know that the best health care can't be judged by how much money is spent on it. The best health care is, quite simply, the right care. Our obsession with quality is about keeping people well, preventing needless suffering and improving their quality of life.*" (Emphasis added.)

-75-

158. Aetna represented and continues to represent to the Plaintiffs and the Class that their medical care would be provided, and is provided, by a highly qualified and *independent* primary care physician who oversees a patient's medical care and coordinates all of the patient's other health care needs. For example, Aetna-USHC's website provides that:

> "Your Primary Care Physician ... You can select your primary care physician (healthcare provider) from Aetna-USHC's broad network to *coordinate* your overall health care. Your healthcare provider will provide routine and preventive care, become familiar with your medical history and *work closely with you to help you make medical decisions.*" (Emphasis added.)

159. Aetna has misrepresented, and continues to misrepresent, for example, that Aetna's Health Plan members are provided "quality" healthcare services by healthcare providers exercising independent medical judgment based upon a patient's needs, free from fiscal and administrative policies. Aetna has even specifically misrepresented to the Plaintiffs and Class members that in order to ensure that Aetna's Health Plan members receive high quality healthcare, Aetna provides its physicians with compensation incentives based upon the *quality* of the healthcare provided.

160. Moreover, the Aetna HMO Membership Handbook assures members that they have a "right" to all of the following:

a.    *"Have a physician decide when coverage for treatment should be denied."* (Emphasis added.)

b.    "Discuss with your physician your condition and all care alternatives, including potential risks and benefits, even if a care option is not covered." (Emphasis added.)

-76-

c.     "Get up-to-date information about the physician and hospitals
who participate in the plan."

d.     "Obtain necessary care from participating specialists, hospitals,
and other providers."

e.     "Be referred to participating specialists who are experienced in
treating your chronic illness."

f.     "Be treated with respect for your privacy and dignity."

161.   Similar misrepresentations and omissions are contained in brochures for

Aetna's California POS and PPO plans available at Aetna-USHC's website.  For example,

these brochures state that "you can count on quality Benefits & Programs."

162.   Contrary to Aetna's misrepresentations that it is primarily committed to

maintaining and improving quality healthcare for Aetna enrollees, the AMA has concluded in a

discussion paper that Aetna's "primary legal obligation [is] to shareholders. . . . [T]heir

bottom line is always boosted by a determination of non-coverage of medical services."

163.   Aetna's executives have conceded the problems created by its Health

Plans' aggressive, undisclosed cost containment policies.  Huber, Aetna's former CEO,

admitted in a September 13, 1999 *American Medical News* interview that:  "'*We are in a con

game.*'  Huber continued,  'We sell a promise.  The important thing for a buyer is to have the

assurance that we will be there when it's time to collect on that promise.'"  (Emphasis added.)

Likewise, Aetna's own medical director, for example, publicly admitted to *The New York*

*Times* on October 20, 1998, that certain Aetna undisclosed policies are designed to prevent

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

physicians from dealing honestly with patients in providing medical services and advice of treatment options:

> "The [Texas] Medical Association's analysis of the provisions says 'This language would stop the physician from honestly dealing with the patient if it will harm the plan.' Dr. Leibowitz (Aetna's Medical Director) did not defend the provision. 'We do not intend any part of the contract to be construed as a gag clause,' he said. Asked why the contract included the provision, he said 'It's a fair point.'"

164.    Contrary to Aetna's representation that it "encourages" its physicians to disclose and discuss their financial arrangements with Aetna to their patients, Aetna imposes financial agreements and other arrangements and "gag" orders (or similar provisions) on its healthcare providers that deters them from disclosing their financial agreements with Aetna to patients and deters Aetna's healthcare providers from informing their patients of alternative treatments that are not covered by their Health Plans.

165.    Aetna has also misrepresented, and continues to misrepresent, that the healthcare provided under their Health Plans is entrusted to PCPs and other healthcare providers who are independent and not controlled by defendants. Aetna-USHC's website represents that it is "*Partnering with Physicians* ... Sharing data and providing feedback to physicians helps raise the quality of healthcare." The website continues:

> "*At Aetna-US Healthcare, we believe that the best way to help improve the quality of care that our members receive is to have a strong partnership with our contracted physicians.*
>
> "One important way in which we partner with physicians is through our unique ability to collect and analyze data about the care our members receive. By sharing this data with physicians we help improve the quality of care by helping physicians help their patients both stay well and better manage illness." (Emphases added.)

-78-

166.    Contrary to Aetna's representations that it is "Partnering with Physicians," Dr. D. Ted Lewers, a member of the AMA Board of Trustees, in an AMA Press Release dated December 2, 1997, voiced concerns that Aetna's so-called "agreements" with its physicians were not agreements at all, but rather "take-it-or-leave-it" contracts that interfered with the physician-patient relationship.

> "'*Clearly these contracts are not in the patient's best interest,*' said D. Ted Lewers, M.D., a member of the AMA Board of Trustees. '*Physicians cannot speak up for their patients if they are precluded from speaking at all.*' 'Patients and physicians deserve a level playing field when negotiating with managed care companies. These contracts force physicians to scramble uphill with both hands tied behind their backs,' he added.

> "The Aetna contract is representative of others in the industry. According to Dr. Lewers, 'there is a trend developing in which managed care companies with large market shares offer one-sided contracts on a take-it-or-leave it basis.' '*Physicians who sign these contracts are virtually signing away their ability to properly advise their patients and provide optimal care—the very service they entered into the contract to provide*,' he said.

> . . .

> "Dr. Lewers worries that 'patients as well as physicians are kept in the dark. Patients need to be vigilant these days about asking questions of their physicians and of their managed care plans. Yet many patients still don't know what questions to ask. They don't see the hidden dangers until it is too late. Lifting the cloak of secrecy surrounding managed care contracts is part of my ethical obligation as a patient advocate,' he added." (Emphasis added.)

167.    In addition, contrary to Aetna's representations that its healthcare providers are solely responsible for making medical decisions for all medical services free of Aetna's influence and interference and that Aetna "partners" with its physicians, Aetna's

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

systemic fiscal and administrative policies prevent Aetna's healthcare providers from openly

discussing with their patients "all care alternatives."

168.   Aetna's definition of "medical necessity" is another example of how

Aetna interferes with, and restricts, the physician-patient relationship.  Aetna's agreements

with its primary care physicians define "medical necessity" in a severely limited fashion that

focuses on cost and efficiency and neglects patients' medical considerations.  In fact, the AMA

has publicly recognized the degree to which Aetna's definition of "medical necessity" is

"dangerous" to the patient.  In a discussion paper published in February 1999, the AMA

stated:

> "Aetna defines 'medical necessity' as 'health care services that
> are appropriate and consistent with the diagnosis in accordance
> with accepted practices and medical standards that are likely to
> result in demonstrable medical benefit, *and which are the least
> costly of alternative* supplies or levels of services which can be
> safely and effectively provided to the patient.'  *The definition
> does not include any role for the treating physician in that
> determination.*  However, it clearly gives the plan final authority
> to determine 'covered services,' which is defined as 'those
> medically necessary services' a member is entitled to receive.
>
> "Patient impact: *Premising medical necessity on least costly
> alternatives is dangerous when it does not explicitly leave the
> determination of whether a service can be 'safely and effectively
> provided to the patient' in the hands of the treating physician,
> and in fact, appears to give the plan ultimate decision making
> power.*
>
> "A 'least costly alternative,' that might be safely and effectively
> provided to a majority of patients may be both ineffective and
> *dangerous* when provided to a specific patient.  That is a
> determination that must be left in the hands of the treating
> physician."  (Emphasis added.)

169.   Aetna's pamphlet distributed to the class entitled "How We Measure

Quality" likewise misrepresents that its physicians generally are compensated under a system

-80-

that provides its physicians quality incentives to assure that Aetna's members receive high quality healthcare services. The pamphlet states, for example:

> Aetna-U.S. Healthcare has been recognized as the industry leader in using information about the quality of care and service provided to members to help determine how primary care physicians are paid. Our incentives are directed to reward better quality care and to guard against any potential to withhold care. This innovative payment method, the Quality Care Compensation System (QCCS), is in the process of being extended to Aetna-U.S. Healthcare participating physicians across the nation.... In particular, QCCS can positively influence care by rewarding primary care physicians whose charts reflect their attention to quality preventive medicine."

170. The Aetna misrepresentations, through its Member Handbook, provider directory, and quality pamphlet, are clearly designed to uniformly mislead the plaintiff and the class into believing, (i) that Aetna's HMO, PPO, and POS plans are primarily committed to maintaining and improving quality healthcare services for its members, (ii) that Aetna's members receive high quality healthcare services from physicians that make independent medical decisions according to the patient's needs without manipulation, influence, or interference from Aetna, and (iii) that Aetna's physicians are compensated under a system that provides incentives for providing quality healthcare services to assure Aetna's members receive high quality and improved healthcare. Aetna even deceptively allures the plaintiff and the class into believing that it has made all appropriate disclosures in such materials by prominently displacing slogans such as "THE MORE YOU KNOW THE BETTER YOU FEEL." In reality, Aetna's fraudulent misrepresentations and omissions are more like "THE LESS YOU KNOW THE MORE WE PROFIT."

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

2.      <u>Cigna's False And Misleading Advertising, Marketing, And Member</u>

<u>Materials</u>.

171.    Cigna's website (www.Cigna.com) makes broad misrepresentations about the quality of its HMO, PPO and POS plan healthcare services and its commitment to the best interests of members:

> **"You've trusted us with your health.** And that's a commitment we take very seriously. At CIGNA HealthCare, nothing is more important than quality care. Everything we do, every program we provide, every decision we make is based on improving and maintaining your health and well-being. No other health care company is as committed to quality. No other health care company could be as committed to **you.**

> "Our approach to quality includes:

> **1. Improving and maintaining your health**

> **2. Convenient access to quality health care providers**

> **3. Maintaining high levels of satisfaction for our members, their employers, and our participating physicians**

> **4. Delivering positive medical outcomes**

> **5. Providing outstanding customer service**

> "Your CIGNA HealthCare health plan is designed to deliver the care you need when you need it, 24 hours a day. You can be sure that the doctors, hospitals, labs and other facilities that participate in CIGNA HealthCare have met very demanding standards for quality and performance.

> "Our members come first, which is why quality management is a fundamental priority for all of our health plans. Each plan has established a quality management program including rigorous standards for care and services provided to members. ...What's more, each of our health plans has a Quality Committee focused solely on ensuring that care is second to none.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

**"We Don't Compromise Quality to Cut Costs**

"At CIGNA HealthCare, you come first. We continually strive to provide our members with access to the most timely, effective, quality care possible.

We believe that keeping health care simple keeps people happy. ...**We Work to Keep You Healthy**." (Emphasis in original.)

172.    Moreover, the website provides under the heading "Services We Provide:" "We are dedicated to providing quality service to entry CIGNA HealthCare customer. This means assisting our participants in understanding and using their coverage effectively, streamlining plan administration for benefits managers, and helping our providers to deliver care to you . . . ."

173.    Likewise, Cigna's 1998 Annual Report, found on Cigna's website, contains broad representations that Cigna "intend[s] to be the best at helping our customers enhance and extend their lives and protect their financial security. Satisfying customers is the key to meeting employee needs and shareholder expectations, and will enable CIGNA to build on our reputation as a financially strong and highly respected company."

174.    Cigna further misrepresents, through its Health Plan documents, that: (i) Cigna's HMO, PPO and POS plans are primarily committed to maintaining and improving quality healthcare services for its members, (ii) that Cigna's members receive high quality healthcare services from physicians that make independent medical decisions according to the patient's needs without manipulation, influence, or interference from Cigna, and (iii) that Cigna's physicians are compensated under a system that provides incentives and disincentives for providing quality healthcare services to assure Cigna's members receive high quality and improved healthcare. Cigna failed to disclose to the plaintiff, the Class, and the Subclass that

-83-

its undisclosed internal policies and practices are in direct contravention of the

misrepresentations made in its advertising, marketing, and membership materials to induce

subscriptions to and enrollment in Cigna's Health Plans.

175.   Under the heading of "Providing Outstanding Customer Service," Cigna

assures its enrollees that it not only does it have a "commitment to quality," but that "*Your*

*CIGNA HealthCare Health Plan will always improve. You can count on new ideas, new*

*programs and new approaches to your needs, all designed to provide you with an even higher*

*level of care.*"  (Emphasis added.)

    3.   <u>FHS's False and Misleading Advertising, Marketing, and</u>

        <u>Member Materials</u>.

176.   The largest Health Plan that FHS operates is Health Net.  Health Net's

brochures and other Disclosure Documents represent that Health Net "empowers" its members

to make more informed decisions. For example, a Health Net brochure entitled "Women's

Health Initiatives . . . Delivering quality care to women of all ages," represents that Health

Net "*empower[s] our members* . . . [b]y taking advantage of this program, our members can

make *more informed decisions. As a result they can take a more responsible role in their own

health.*"  (Emphasis added.)  This brochure shows a women smiling, with the caption

"EMPOWERING YOU WITH PROGRAMS AND SERVICES to help you make the best

health care decisions."  Moreover, under the heading "More advantage for a better way of

life," it assures:

> "*Your health and well-being are our [Health Net's]*
> *primary goals.*  Picture yourself as the center of our attention.
> Surrounding you are your Primary Care Physician, your hospital,
> your specialists, medical service centers, and even community

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

groups. *We're all working together to provide you with the kind of quality health care you deserve.*" (Emphasis added.)

177.    Similarly, Health Net's September 1998 Participating Physician Report Cards for the Central Region, Greater Los Angeles Area, Sacramento Area, San Francisco Bay Area, and San Diego Area (found on the Internet) all assure patients that Health Net is "*[k]eeping our Members informed,  Helping them make better decisions.  Putting their satisfaction first.  These are our foremost goals at Health Net, California Health Plan. . . . Our Quality of Care Incentive Program rewards physician groups with incentives to deliver the highest quality of care and service . . . . At Health Net, putting our Members first is our company's guiding force.*"  (Letter to Members from Mr. Arthur M. Southam, M.D., President and CEO.)  (Emphasis added.)

178.    FHS's website emphasizes the "high quality" of medical services that it purportedly provides.  For example, the Foundation Health Systems 1998 Annual Report found on Foundation Health Systems' website (www.fhs.com) provides:

    a.    The Foundation Health Vision entails "[w]orking together with our partners to provide high quality, innovative and affordable solutions to our members' health care needs."

    b.    FHS "[p]rovide[s] affordable health care products that respond to consumers' needs for improved health and well-being and are viewed as best in the market."

179.    FHS's CEO, Jay M. Gellert, in a letter to shareholders found in the 1998 Annual Report, repeats the "quality" assurance theme found throughout Foundation's Disclosure Documents.  The letter states:

-85-

"The reason FHS exists, after all, is based on the simple fact that
health care is one of the most important parts of people's lives.
By focusing on the basics of high quality health care and service,
we will demonstrate that managed care works and works well
when provided by sound, stable organization."

180.    Not only does FHS represent that its Health Plans provide "high quality"

health care services, but its website also contains two Quality Assurance Statements, promising

superior products, commitment to excellence, and quality of care to its Members.  The first

Quality Assurance Statements promises. "All member companies are aligned to deliver

consistency for national employers, our valued customers. We provide superior products

unparalleled service, guided by a shared commitment to excellence. Our national presence

gives us the strength to provide local solutions—the key to customer satisfaction anywhere in

the world."

181.    The second Quality Assurance Statements assures that:

"[a]t FHS, we are committed to the scientific assessment and
improvement of the quality of care and service provided to our
members. ... By using evidence-based research methodologies,
we have assessed, developed and implemented tools to improve
the quality of life and the health status of our members. ... FHS
maintains its role as a leader in the health care industry by
recognizing quality of care as the foundation of our medical
delivery system. *Dedication to quality is a hallmark of FHS
companies. As part of our commitment to quality improvement,
our integrated system of care sends an important message to both
consumers and employer groups: We at FHS hold ourselves
accountable to improving the health of our members.*"  (Emphasis
added.)

-86-

4.    Humana's False and Misleading Advertising, Marketing, and

Member Materials.

182.    Humana states on its website (www.humana.com) that "[u]nfortunately,

you may associate HMOs with complicated rules that interfere with the doctor's desire to

provide care. HumanaHMO is different." Humana on its website also makes broad

misrepresentations about the quality of its Health Plans' healthcare services and its

commitment to the best interests of members:

> "Quality-assurance systems. In the past, Humana has broken
> ground for others in quality assurance. Today, we're expanding
> our leadership by introducing new tools to help doctors pursue
> delivery of quality care to our members. For example, our
> Hospital Internal Medicine Specialist (HIMS) program, available
> with selected products, assigns an on-site physician to oversee the
> care of our members during a hospital stay. Programs like these
> are among the factors evaluated by nationally recognized
> accrediting organizations."

> "With HMOs, it is particularly important that you have
> confidence in the quality of our network. HumanaHMO gives you
> that confidence. Our plans carefully review the credentials and
> qualifications of each doctor with whom we affiliate."

> "Commitment to service. Humana's new service philosophy puts
> you, the customer, at the center of everything we do. By
> enhancing our call center, we're answering questions more
> quickly than ever before. And that's just a beginning: We won't
> stop innovating until Humana is the most trusted name in health
> care."

> "Network physicians are responsible for guiding member through
> a health care system that promotes wellness and quality."

> "Your health is our primary concern. In providing healthcare
> services to our members, quality is not something that becomes
> important just a few days every year. It's a vital ingredient in
> how we think and what we do. Every minute, every day. To us,
> that means providing quality healthcare to meet each of our
> member's needs. It means using our resources efficiently to

-87-

continually seek new and better ways to improve our service to our members."

"With HMOs, it is particularly important that you have confidence in the quality of our network. HumanaHMO gives you that confidence."

"Humana strives to offer products that are affordable, easy to use and easy to understand. The company is also a leader in developing innovative programs in prevention, early intervention and disease management."

183.   Humana further represents, through its plan documents that: (i) Humana's HMO, PPO and POS plans are primarily committed to maintaining and improving quality healthcare services for its members, (ii) that Humana's members receive high quality healthcare services from physicians that make independent medical decisions according to the patient's needs without manipulation, influence, or interference from Humana, and (iii) that Humana's physicians are compensated under a system that provides incentives and disincentives for providing quality healthcare services to assure Humana's members receive high quality and improved healthcare. In these and other misrepresentations, Humana failed to disclose to the plaintiffs, the Class, and the Subclass that its undisclosed internal policies and practices are in direct contravention of its advertising, marketing, and membership materials, which are designed to induce subscriptions to and enrollment in Humana's Health Plans.

184.   Humana has likewise made misrepresentations in other contexts. For example, in the November 12, 1998 issue of the Louisville, Kentucky *Courier-Journal* Humana stated that: "Health plans like Humana's don't practice medicine, only physicians do .... We don't pinch pennies to deny necessary care. We put the health of our members first."

-88-

5.      PHS' False and Misleading Advertising, Marketing, and Member
        Materials.

185.    In the same manner as other Defendants, PHS also promises and assures

its members that its mission is to improve the health of its members.  The PHS website

(www.pacificare.com) provides "[o]ur mission, quite simply, is to *improve the health of our*

*members and the success of our contracting physicians. We do this by making it easier for your*

*doctors to do what they do best -- practice quality medicine. . . .*" (Emphasis added.)

186.    With respect to the quality of healthcare services provided its enrollees,

PHS assures enrollees that it offers "quality" medical services founded on "integrity."  Under

PHS' website's section entitled "Vision and Value," it represents:

    a.  *"We are an organization of dedicated people committed to improving*

        *the quality of those lives we touch."*  (Emphasis added.)

    b.  "We are a high performance PacifiCare.  Quality is a part of

        everything we do.  Nothing less will be accepted."

    c.  "We adhere to a code of values and make commitments that

        contribute to the welfare of our constituents. *We express ourselves*

        *clearly, consistently, and completely and live up to our word."*

        (Emphasis added.)

187.    Similarly, PHS' website even contains a section called "Quality

Assurance."  In this section, PHS specifically assures that it provides "quality health care

services."  It asserts:

> *"PacifiCare believes that providing access to quality health care*
> *services is an essential ingredient for success.* To achieve this
> goal, the PacifiCare has established a peer review procedure at

-89-

each HMO, which is implemented by a Quality Assurance
Committee chaired by the HMO's Medical Director and
comprised of physicians and representatives of the physician
groups at each HMO. When a new physician or physician group
is considered by one of the PacifiCare's HMOs as a potential
provider, the Quality Assurance Committee of the HMO
evaluates, among other things, the quality of the physician or
group's medical facilities, medical records, laboratory and x-ray
licenses and the capacity to handle membership demands. Once
selected, a physician or group is periodically reviewed to monitor
whether members are receiving quality medical care." (Emphasis
added.)

188.  Not only does PHS represent that it provides "quality" healthcare, but

PHS' HMO Disclosure and Benefits form assures its members that they have the *right* to all of

the following:

    a.    "Timely, Quality Care[.]"

    b.    "Candid discussion of appropriate or Medically Necessary

        treatment options for your condition, regardless of cost or

        benefit coverage." (Emphasis added.)

    c.    "Timely access to your Primary Care Physician and

        referrals to specialists when Medically Necessary."

        (Emphasis added.)

    d.    "Actively participate *in decisions regarding your own*

        *health and treatment options.*" (Emphasis Added.)

    e.    "Treatment with Dignity and Respect[.]"

189.  Similarly, PHS' HMO "Health Care Compass" document represents and

assures its members that they have the *right* to all of the following:

-90-

    a.      "Information regarding how medical treatment decisions are made by the contracting medical providers or the health plan, including payment structure." (Emphasis added.)

    b.      "Receive as much information about any proposed treatment or procedure as you may need in order to give an informed consent or to refuse a course of treatment." (Emphasis added.)

    c.      "Information about PacifiCare, covered services, and procedures."

    d.      "Receive information about an illness, the course of treatment prospects for recovery in terms you can understand."

190.    PHS misrepresents that its primary commitment to the Plaintiffs and the Class is to maintain and improve the quality of healthcare services and deliver healthcare services according to a patient's needs. For example, PHS' California "HMO Plan Benefits" material misrepresents that PHS' financial incentives are "intended to continually improve medical care" and "enhance patient satisfaction."

191.    Similarly, PHS misrepresents that its enrollees are partnering with their physicians and it. For example, numerous disclosure and benefits documents and other documents provided to Plaintiffs and the Class, contain the representation, "You, your doctor, and PacifiCare."

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

192.   In the "Why we are Unique" section at the PacifiCare website, PHS represents that it does not interfere with the patient-physician relationship.  This section specifically assures:

> "*PacifiCare understands that health care decisions are best made between you and your doctors.  So we assist quietly*, providing your doctors with information from case studies and treatment results, creating time-saving systems to reduce duplication of efforts and quickly approving a referral or an additional test. Our years of experience are working for you and your doctor."
> (Emphasis added.)

193.   In his 1998 Letter to Shareholders, PHS' former CEO, Alan R. Hoops, represented that PHS "leaves clinical decision-making to physicians" and that it "capitated" business model only "minimal" intrusion on the doctor-patient relationship.  Mr. Hoops stated:

> "PacifiCare has long relied on a 'capitated, delegated' business model.  In other words, we pay our health care providers a fixed amount per member per month and *then leave the clinical decision-making to physicians*. Of course, PacifiCare provides substantial financial, administrative and systems support to medical groups, gradually teaching them to achieve greater efficiency and autonomy.  We've been able to achieve the purest form of this model in our more mature markets, resulting in increased provider and member satisfaction because there is *minimal intrusion by the HMO in the doctor-patient relationship.* The model also nurtures financial success because the medical group and the HMO share the same incentives to provide quality health care in the most efficient way possible."  (Emphasis added.)

6.     Prudential's False and Misleading Advertising, Marketing, and

Member Materials.

194.   During the relevant time herein alleged, in the course of seeking to induce new and continued membership in its HMO plan, Prudential advertised its Health Plans, solicited new members to join its Health Plans, issued marketing materials, and issued

-92-

certificates of coverage, member handbooks, member information, and provider directories and other documents that contained false and misleading information.  In these documents, Prudential misrepresented the quality of healthcare services provided by Prudential's Health Plans as better than it was and misled potential and current members as to the quality and delivery of healthcare services provided by its Health Plans.

195.    During the relevant period, Prudential advertised, marketed, and distributed member materials throughout the United States.  Prudential's misrepresentations and omissions failed to disclose that Prudential's internal systemic policies and practices and fraudulent and extortionate practices were specifically designed to: (1) discourage physicians from delivering honest medical services, (2) limit or deny the delivery of honest medical services based upon cost criteria or other arbitrary criteria that are different from or more restrictive than medical necessity criteria, and (3) interfere with the medical judgment of physicians by substituting the judgment of claims reviewers without appropriate medical training and specialization and without regard to medical needs of the Plaintiffs, the Class, and the Subclass.

196.    For example, Prudential's California HMO Plan Member Handbook ("PruCare Handbook") included promises of all the following.

   a.      "PruCare HMO provides the Rock Solid health coverage you deserve."  (PruCare Handbook cover.)

   b.      "Each member has the right to participate in decision making regarding their care.  Prior to the initiation of any procedure with a recognized element of risk, each Member should be provided

-93-

with sufficient information to form the basis of an informed

decision regarding such a procedure, except in emergencies."

(PruCare Handbook, p. 14.)

c.    The PruCare Handbook provides that its PCPs are "committed to

providing you with the most appropriate care for your medical

needs." (PruCare Handbook, p. 3.)

d.    "If you need specialty care or hospitalization, your Primary Care

Physician will refer you to a specific network Provider (i.e., a

Participating Specialty Care Physician, Hospital or other Health

Care Provider or Facility)."  (PruCare Handbook, p. 4.)

e.    "Through the Primary Care Physician referral, you will have

access to Participating Specialty Care Physicians, Hospitals and

other Health Care Providers."  (PruCare Handbook, p. 3.)

f.    "Each Member seeking advice or assistance has the right to be

assisted in a . . . responsible manner." (PruCare Handbook, p.

13.)

g.    "Each Member has the right to be provided with information

concerning his/her own diagnosis, treatment, and prognosis in

terms that are understandable to him/her." (PruCare Handbook,

p. 13.)

h.    "Each Member has the right to be provided with information

about PruCare's health services, Member's Rights and

-94-

Responsibilities, [and] the contracted practioners providing care . . ." (PruCare Handbook, pp. 13-14.)

     i.     "Each Member has the right to receive prompt and appropriate treatment . . ." (PruCare Handbook, p. 14.)

     j.     Prudential Health Care Plan of California, Inc.'s HMO is "backed by Prudential," referring to The Prudential Insurance Company of America. (PruCare Handbook, p. 3.)

197.    Prudential's HMO Plan Member Handbook and provider directory also misrepresented that Prudential's physicians are compensated under a system that provides its physicians quality incentives to assure that Prudential's members receive high quality and "appropriate" healthcare services.

198.    Prudential Health Care's current internet website also makes broad promises of quality healthcare at odds with its concealed physician-patient intruding and medical care limiting policies. The website contains the following statement: "Prudential Health Care . . . you expect a good health care plan to cover the costs of quality medical care. Prudential Health Care plans are doing that. And doing it well."

199.    Likewise, Prudential HealthCare's current Internet website has a "guide" to its HMO plan that nowhere explains its cost-containment policies described above. Instead, the website indicates that a plan member's PCP will decide on admission to a hospital if necessary; no indication is given of how Prudential interferes with or influences these physicians' decisions.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. · OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET · SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

200.   In 1997, Prudential disseminated a package of information that purported to describe the material terms and conditions of the benefits offered to members by Prudential and emphasized the importance of the PCP to Prudential members. For example, the Prudential "Member Handbook" for the "Prudential Plus" plan stated:

> "Primary Care Physician. All of the care you receive within the Prudential Plus network is *managed by your Primary Care Physician*—the physician you select from our network of providers when you enroll.

> "Your Primary Care Physician is committed to providing you with the appropriate medical care. He/she should be your first contact for all your health needs. Through your Primary Care Physician's referral, you will have access to the specialists and hospitals associated with Prudential Plus . . ." (Emphasis added.)

201.   During this same period, these same representations were repeated on Prudential's Internet website. Prudential's website emphasized that subscribers choose a PCP, "with whom [they] can build a strong physician-patient partnership," and who "will be responsible for coordinating all [their] health care needs." Moreover, the website emphasized the role of the PCP in determining appropriate medically necessary care, stating:

> "Your PCP is your key to consistent medical care. When you visit your PCP, he or she will become familiar with your medical history and that information will help the PCP manage your total health care and prescribe any medically necessary specialized care in the future."

202.   In 1997, the Prudential Member Handbook also emphasized that Prudential would cover the expenses of necessary medical care or hospitalizations authorized by the PCP, stating:

> "Specialty Care. Your Primary Care Physician should be your first contact for all medical care. If your Primary Care Physician determines that specialty care is necessary, he/she will refer you to a specialist in the Prudential Plus network. Orthopedic surgeons, general surgeons and cardiologists are examples of the

-96-

specialists included in the network.  All specialty care must be authorized by your Primary Care Physician, unless furnished in connection with emergency care."

"Hospital Care.  If you or any of your eligible dependents require hospitalization, your Primary Care Physician will arrange for admission to a Prudential Plus network hospital,

"All hospital services must be provided by a network hospital and authorized by your Primary Care Physician, unless they are furnished in connection with emergency care."

203.    Similarly, the Prudential web page, as of 1997, specified that "[i]f you need specialty medical care that your [PCP] cannot provide, you will be referred to a specialist within the Prudential HealthCare HMO network," and "[b]ased upon your medical condition, your [PCP] may give you a referral detailing the services authorized, as well as the number of visits with a network specialist."  It also stated that "[i]f you need specialty treatment that is not available within the Prudential HealthCare network, your [PCP] will arrange for you to receive the appropriate specialty care."

204.    As for hospitalization, the 1997 Prudential's website stated that if a patient's PCP recommends authorization, the patient need follow no pre-certification procedures; "[o]ne of the benefits of having your PCP manage your care is that there are no hospital pre-certification procedures to follow.  Your PCP office staff handles all of that for you."

205.    During the relevant period, Prudential stressed its so-called "quality assurance guidelines," in its Provider Directory:

"At Prudential, we also use quality assurance guidelines to evaluate our medical providers and their facilities.  The Quality Improvement Program monitors and evaluates the care and services provided to Prudential members by participating providers.  This is done through reviewing medical records, utilization reports and various health care data.  The program's

-97-

objectives focus on detecting current or potential concerns and facilitating their correction."

206.    Prudential's advertising also emphasized the importance of NCQA standards, highlighting it as a relevant indication of the high quality of its health care plans. For example, in 1997, Prudential's website provided:

> "To give customers confidence in the quality of Prudential HealthCare products and services, Prudential HealthCare was one of the first organizations to seek accreditation of its plans from the National Committee for Quality Assurance ["NCQA"] an independent non-profit organization that uses 50 demanding criteria to evaluate health plans. Approximately 88% of Prudential HealthCare's plans have received full, one-year or provisional accreditation from NCQA."

207.    Similarly, in 1997 the Prudential website represented:

> "We make every effort to see that our Members receive the care they need, while guarding against misuse. Our system for achieving this includes utilization management protocols which use medical professionals to make the necessary medical decisions, and a requirement for fast turnaround on decisions and appeals."

208.    State regulators have condemned Prudential's practices in this regard. For example, the California Department of Corporation's Summary of Report of Medical Survey ("Report") for Prudential Health Care Plan of California, Inc. ("Prudential-Cal") dated February 14, 1997 found that Prudential-Cal's Health Plan had violated numerous state laws[2] concerning the *quality and continuity of care* provided to its enrollees, including:

---

[2]    The section references in this section refer to the Knox-Keene Health Care Service Plan Act of 1975, as amended (California Health and Safety Code Section 1340 *et seq.*). The references to "Rule" refer to regulations promulgated pursuant to the Knox-Keene Act. *See* Title 10 of the California Code of Regulations, beginning at Section 1300.43.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

a.  California Health & Safety Code ("H&S") Section 1367(d), which requires that each plan furnish services in a *"manner providing continuity of care and ready referral of patients to other providers at such times as may be appropriate [sic] consistent with good professional practice."* *See* Report at 6. (Emphasis added.)

b.  "Rule 1300.671(e)[, which] requires that each plan provide health care services in a manner which provides continuity of care, including an adequate system of documentation of referrals to physicians or other health professionals and that the monitoring of the follow up of enrollees' health care documentation be the responsibility of the health care service plan and associated health professionals." *See* Report at 8.

c.  H&S Section 1367(e), which requires "all services be readily available at reasonable times to all enrollees and, to the extent feasible, that the Plan make all services readily accessible to all enrollees." *See* Report at 5.

d.  H&S Section 1370, which requires "every plan to establish procedures in accordance with Department regulations for continuously reviewing the quality of care, performance of medical personnel, utilization of services and facilities, and costs." *See* Report at 2.

-99-

e.  California Code of Regulations Section 1300.70(b)(1)(A), which *"requires that each plan's quality assurance program be designed to ensure that a level of care which meets professionally recognized standards of practice is being delivered to all enrollees."* *See* Report at 2.  (Emphasis added.)

f.  Rule 1300.70(b)(1)(B), which "requires that each plan's quality assurance program be designed to ensure that quality of care problems are identified and corrected for all provider entities[.]" *See* Report at 2.

g.  Rule 1300.68(h), which "requires a grievance system providing for prompt review of complaints by the management or supervisory staff responsible for the services or operation which are the subject of the complaint." *See* Report at 2.

h.  Rule 1300.67.2(f), which "requires that each health care service plan have a documented system for monitoring and evaluating accessibility of care, including a system for addressing problems that develop, which shall include, but not be limited to, waiting time and appointments." *See* Report at 5.

i.  Rule 1300.67.1(e), which "requires that each plan provide basic health care services in a manner which provides continuity of care, including an adequate system of documentation of referrals to physicians or other health professionals and that the monitoring

-100-

of the follow up of enrollees' health care documentation be the responsibility of the health care service plan and associated health professionals[.]" *See* Report at 6.

7.   United's False and Misleading Advertising, Marketing, and Member Materials.

209.   There are numerous examples of United's advertisements during the relevant period that misrepresent its HMOs, PPOs, and/or POS plans, mislead the Plaintiffs and the Class, and fraudulently induce Class members to join or maintain their membership in United's plans.

210.   For example, the UHC HMO Certificate of Coverage under the heading of "Membership rights" provides that "Enrollment in the PLAN entitles" enrollees to all of the following:

a.   "To information about how the PLAN operates its care delivery system and/or explanation of benefits for which participants are eligible under the terms of the Policy." (Emphasis added.)

b.   "To give your informed consent before the start of any surgical procedure or treatment."

c.   "To obtain Medically Necessary Emergency Health Services without unnecessary delay."

211.   United's internet site (www.uhc.com) represents that it is committed to its members' needs and preserving the integrity of the patient-physician relationship. It assures that its Health Plans are:

-101-

"Providing access to health services tailored to our members' diverse needs. Preserving the integrity of the patient-physician relationship. Engaging the member, physician and health plan in the shared responsibility for improving health and well-being. Improving quality while making health care readily available and more affordable to our members. Working with network physicians to contribute to their clinical information by sharing the results of our own data analysis."

212.    This site also represents that United *empowers* its enrollees and is

committed to improving health care for everyone involved in the delivery of its health care

services.

"We are taking a new approach to health care. *One that empowers people to take more control over their own health care and choose from a wide array of services.*

*"We are committed to improving the health care experience for everyone involved –* from the employers who purchase health benefits, the doctors who deliver the care, and most of all the *individuals who use the health care services.*" (Emphasis added.)

213.    With respect to United's pharmacy management program, this internet

site assures:

"UnitedHealthcare's pharmacy management program helps ensure that your employees work with their doctors to receive the most appropriate medications, at the right time for their conditions. The focus is on improved patient outcomes, along with cost and administrative efficiency. We go further than managing pharmacy benefit alone—we integrate pharmacy with medical benefits."

214.    UHC's 1996 Annual Report contains similar representations that United

helps its enrollees make an informed medical decisions, respects the physician-patient

relationship, and provides quality healthcare.

**"Members have rights** - Members have a right to expect their health plan to treat them with respect, compassion and dignity. We provide our members with health information that will help them hold informed discussions with their physicians, and we

-102-

encourage our members to participate in decisions with their physicians regarding their care. Our members have the right to receive complete information regarding the nature and effect of any treatment, test or procedure, even if it isn't covered by our health plan . . ."

"Heading:  "Does Managed Care Come Between Patients and Their Physicians?"

"The patient-physician relationship is the foundation of health care, and United HealthCare is working to make that relationship better. Our health education initiatives *help members become more informed and confident health care consumers*. We provide our participating physicians with objective information about their own practice patterns and the best medical practices. Armed with better information, patients and physicians are able to reach the right treatment decisions together."

**"Guidelines aid decisions** - *United HealthCare doesn't tell doctors what to do. We don't restrict care or set automatic requirements for discharging patients from the hospital after a standard number of days. "*

. . .

*"But when it comes to making treatment decisions, United HealthCare believes there's room for only two: the patient and the physician. "*

. . .

**"Trust and candor** - Managed care was never intended to interfere in the patient-physician relationship or silence doctors on treatment options. *United HealthCare believes that trust and candor are vital to decisions by a patient and physician. "*(Emphasis added.)

"United HealthCare expects primary care physicians to coordinate their patients' care. That means deciding whether specialized care is needed and referring the patient to an appropriate network specialist. So, we are eliminating procedures that require physicians to obtain authorization before making a referral."

-103-

215.   In a Letter to Shareholders, dated October 4, 1999, UHC's CEO and

Chairman, William W. McGuire asserted:

> "Our business – through all of our companies – builds and generates
> real value for people in one of the most important areas
> imaginable...health and well-being.  Abusing the trust of those we
> seek to help has never been, is not now, and never will be
> acceptable or tolerated here . . . ."

> "As you know, our approach to service is directed to expanding
> access, promoting delivery of care at the most appropriate time and
> place in conformity with the highest standards of health care, and
> using information to enhance decision-making by individuals as well
> as their care providers.  We are proud of our record for service –
> and committed to continuing to achieve our mission.  Our services
> are designed to enhance the health and well-being of people while
> offering demonstrable value to the business sponsors that purchase
> our health plans.  Millions of people have benefited from more
> timely, more frequent, more affordable, and more accessible health
> care as a result of our plans in particular and the managed care
> industry in general."

216.   UHC's 1998 Annual Report represents that United "helps its members

achieve optimal health and well-being results" by doing all the following:

a.   "Designing the most innovative, consumer-oriented health benefit

offerings that value consumer choice and control in accessing

health care."

b.   "Simplifying access to care by coordinating disparate health care

resources and services in a convenient and seamless manner."

c.   "Providing cost-effective access to quality, convenient health care

delivery networks."

d.   "Promoting education programs and incentive pricing strategies,

where UnitedHealthcare can help its member-consumers

-104-

understand healthcare needs and participate in access and buying decisions."

217.    Similarly, United claims to be the "most progressive health services company in the world. [United] is a company that creates enormous marketplace value by helping people achieve optimal health and well-being results at fair costs, with simplified access to the right care, respect for individual choice and control . . . ."

218.    United's advertising, marketing, and member materials commonly distributed to the plaintiffs and the Class include misrepresentations that United's primary commitment to the plaintiffs and the Class is to maintain and improve the quality of healthcare services and deliver healthcare services according to a patient's needs.

219.    The advertising, marketing, and member materials commonly found on United Health Plans' internet sites (such as those of UnitedHealthCare of California (www.ca.optumcareforyou.com), Oregon (www.or.optumcareforyou.com), Colorado (www.co.optumcareforyou.com), and Arizona (www.unitedhealthcareaz.com)) contain misrepresentations that United's *core values* consist the following:

    a.    "Systematic improvement in the quality of health care."

    b.    "Respect for the patient-physician relationship."

    c.    "Commitment to leading edge innovation."

    d.    "Compassion for people."

    e.    "Honesty and integrity."

220.    United's misrepresentations through its advertising, marketing, and member materials are designed to mislead the Plaintiffs and the Class into believing that

-105-

United's physicians are independent practitioners whose medical decisions regarding the delivery of healthcare services will not be manipulated or interfered with by United.

221.   Contrary to United's representations mentioned herein, *inter alia*, that its core values consist of "[s]ystematic improvement in the quality of health care," "respect for the patient-physician relationship," and is "[c]ommit[ed] to leading edge innovation," the California Department of Corporations' Final Report of Medical Survey ("Report") for United Healthcare of California ("United-Cal") dated November 5, 1997 found that United-Cal's Health Plan had violated numerous state laws concerning the *quality and continuity of care* provided to its enrollees.

222.   The Report cited numerous cases demonstrating United's deficiencies in its delivery of health services to its enrollees.  Case #4 stands out as a lucid example of how United delivers its so-called "quality care."

> "In a case in which the enrollee parents of a premature newborn appealed the denial of out-of-plan newborn care and complained regarding the provider group's failure to authorize medically necessary specialty services on a timely basis, the Department found: (1) *The provider group and Plan [United-Cal] failed to ensure timely authorization for medically necessary out-of-network services requested by the enrollee's PCP*;  (2) *The provider group, following the newborn's discharge from inpatient neonatal intensive care, failed to appropriately coordinate medically necessary specialty care*;  (3) *There was no evidence in the file that the Plan Medical Director (Southern California) reviewed the case prior to the request for a grievance hearing, more than nine months after the initial appeal*;  (4) Although the Plan eventually identified the issues of an independent treatment authorization process and lack of appropriate specialty providers associated with this provider group (more than nine months after the initial appeal), the Department found no evidence that the Plan conducted any follow up monitoring of this group to ensure that the identified quality of care

-106-

problems do not recur." *See* Report at 19.  (Emphasis added.)

223.    On November 9, 1999, United perpetuated its fraudulent course of conduct by announcing its so-called "Care Coordination" initiative. As part of that initiative, it stated that it would allow physicians participating in its healthcare programs to make final determinations of medical necessity. United claimed that it had spent $100 million annually in the process of reviewing such determinations and conceded that such an expenditure was a waste of funds. In explaining its action, United also admitted that it was "no secret that state and federal lawmakers want to put an end to much of this practice." However, United's announcement was itself deceptive, because it misled prospective or existing enrollees into believing that United would no longer exert any influence over physicians' determinations of medical necessity. On December 21, 1999, the Medical Society of New Jersey denounced United's new policy as a sham. The organization noted that on December 1, United issued a new "Physicians' Reference Guide" that contradicted its public statements in November. The guide indicated that claims would be adjudicated retrospectively, according to a five-step process. As of December 1, United is now demanding submission of all medical documentation with all Level 4 and Level 5 Evaluation & Management claims, including all office and outpatient services, consultations, and unlisted evaluation and management services. Moreover, physicians must still receive pre-certification from United for MRIs, CAT-Scans, physical therapy and other medical procedures. These limitations, of course, were not announced publicly by United. United has also failed to disclose that it has kept in place various programs or policies that will continue to interfere with determinations of treatment by physicians. For example, in reviewing necessity determinations after the fact, United will still urge doctors not to exceed average usages of various types of

-107-

treatment set by United and its consultants; indeed, there is a clear likelihood that United will continue to deny reimbursement for procedures deemed inappropriate on a retrospective basis. United has also said that it will continue to place emphasis on "report cards" that track the performance of physicians across all of United's enrollees. United may publicize these report cards in an apparent effort to intimidate physicians who recommend costly treatments; it has also said that it will use them in deciding whether to "delist" physicians from its network of providers. Moreover, United's purported new policy of non-interference is full of important exceptions: hospital treatment, home health care, or treatments involving expensive equipment such as those noted above are still subject to a requirement of pre-authorization by United's administrators. Those administrators, according to United, will continue to advocate less costly treatments to physicians. The new policy also does not apply to certain categories of treatment, such as mental healthcare. In short, United's new policy is a cynical sham, designed to dupe consumers and offer a sop to angry state and federal legislators and regulators. It is part and parcel of the fraudulent scheme described herein.

**FIRST CLAIM FOR RELIEF**
**RICO VIOLATIONS**
**(For All Class Members)**

A.      General Allegations.

224.    Plaintiffs repeat each and every allegation contained in the foregoing paragraphs of this First Amended Complaint and incorporate such allegations herein by reference.

225.    Plaintiffs' First Claim for Relief arises under 18 U.S.C. §1964(a) of RICO and seeks to recover actual and treble damages against the Defendants for violations of

-108-

18 U.S.C. §1962(c), for a conspiracy to violate 18 U.S.C. §1962(a) and (c) in violation of 18

U.S.C. §1962(d), and for seeking to aid and abet and aiding and abetting violations of 18

U.S.C. §1962(a) and (c) within the meaning of 18 U.S.C. §2.

226.    The Plaintiffs, and each member of the Class that the Plaintiffs

represent, are "persons" within the meaning of 18 U.S.C. §1964(c).

227.    At all times relevant herein alleged, the Plaintiffs, Class members and

the Defendants were "persons" within the meaning of 18 U.S.C. §1961(3).

228.    With respect to the activities alleged herein, each Defendant acted at all

times with malice toward Plaintiffs and the Class, intending to engage in the conduct

complained of for the benefit of themselves and with knowledge that such conduct constituted

unlawfulness. Such conduct was done with actionable wantonness and reckless disregard for

the rights of the Plaintiffs and the Class as well as for the laws to which each Defendant was

subject.

229.    With respect to the activities alleged herein, the non-MCO co-

conspirators, Defendants' respective Health Plans, and others not named as defendants in this

Complaint aided and abetted Defendants in committing those activities, within the meaning of

18 U.S.C. §2, by seeking to aid and abet and aiding and abetting a scheme to violate 18

U.S.C. §§1962(a) and (c). Each Defendant and some or all of these co-conspirators also

agreed to the operation of the scheme or artifice to defraud and to obtain money by false

pretenses and to the scheme or artifice to deprive members of the Class of the intangible right

to the delivery of honest medical services.  In furtherance of these agreements, Defendants also

agreed with their respective Health Plans and others to interfere with, obstruct, delay or affect

-109-

commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants was not entitled through the exploitation of its physicians' fear of economic loss and/or loss of business.

230.   With respect to the overt acts and activities alleged herein, each Defendant and its respective Health Plans conspired with persons and entities not named as defendants in this Complaint, to violate 18 U.S.C. §§1962(a) and (c), all in violation of 18 U.S.C. §1962(d).  Each Defendant also conspired with the other Defendants and with non-MCO co-conspirators to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to obtain money by false pretenses, and to deprive Plaintiffs and Class members of the intangible right of honest services.  Each Defendant also agreed and conspired with its respective Health Plans to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendant was not entitled through the exploitation of fear of economic loss and/or loss of business.

231.   The numerous predicate acts of mail and wire fraud, interference with the operation of employee benefit plans, extortion, and Travel Act violations described herein were part of each Defendant's common fraudulent and extortionate scheme that was designed to *inter alia*:

    a.   defraud the Plaintiffs and members of the Class of money and property interests under false pretenses;

    b.   deprive the Plaintiffs and the Class of the delivery of honest medical services through the physician-patient fiduciary

-110-

relationship and place each Defendant's financial interests over patient medical needs; and

c.   deprive the Plaintiffs and the Class of the delivery of honest services contrary to each Defendant's obligations to the Plaintiffs and the Class as a fiduciary.

232.   The Plaintiffs and the Class, as victims of the unlawful pattern of illegal activity, suffered losses as a result of these activities.

B.   Each Defendant's Racketeering Activities Violate 18 U.S.C. §1961(a).

233.   In carrying out the overt acts and fraudulent and extortionate scheme described above, each Defendant engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1341 and 1343, 18 U.S.C. §§1341 and 1346, 18 U.S.C. §§1343 and 1346, 18 U.S.C. §1951(b)(2), 18 U.S.C. §1952(a), 18 U.S.C. §1954, and 18 U.S.C. §1961 *et seq.*, as stated herein.

234.   Section 1961(1) of RICO provides that "'racketeering activity' means . . . any act which is indictable under any of the following provisions of Title 18, United States Code . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) . . . section 1951 (relating to . . . extortion), section 1952 (relating to racketeering [Travel Act]) . . . [and] section 1954 (relating to unlawful welfare fund payments). . . ."

235.   In 1998, the United States Congress amended the mail and wire fraud statutes by codifying a partial definition of the central term "scheme or artifice to defraud." The newly created definition of a "scheme or artifice" for purposes of specifically recognizing by statute certain unlawful acts also constituting mail and wire fraud violations under 18

-111-

U.S.C. §§1341 and 1343, respectively, now reads in its entirety as follows: "[f]or purposes of this chapter, the term 'scheme or artifice' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §1346.

1.  Defendants Violated 18 U.S.C. §§1341 And 1343, 18 U.S.C. §§1341 and 1346, and 18 U.S.C. §§1343 And 1346.

236.   For the purpose of executing and/or attempting to execute each Defendant's scheme to defraud and to obtain money by means of false or fraudulent pretenses, representations, or promises, as well as to execute and/or attempt to execute their scheme or artifice to deprive another of the intangible right of honest services, each Defendant, in violation of 18 U.S.C. §1341 and 18 U.S.C. §§1343 and 1346, placed in post offices and/or in authorized repositories for mail matter, matters and things to be sent or delivered by the Postal Service, and received matters and things therefrom and knowingly caused to be delivered by mail those matters and things according to the directions thereon or at the place at which they were directed to be delivered by the persons to whom they were addressed.

237.   For the purpose of executing and/or attempting to execute the scheme to defraud and to obtain money by means of false or fraudulent pretenses, misrepresentations, or promises, as well as to execute and/or attempt to execute their scheme or artifice to deprive another of the intangible right of honest services, each Defendant, in violation of 18 U.S.C. §1343 and 18 U.S.C. §§1343 and 1346, transmitted in interstate commerce wire, radio, and television transmissions advertising that Defendant's Health Plans.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

238.   In those matters and things sent or delivered by the Postal Service and the advertising referred to above, each Defendant falsely and fraudulently represented to the Plaintiffs and members of the Class that, *inter alia*:

a.   That Defendant's primary commitment to the Plaintiffs and the Class was to maintain and improve the quality of healthcare services;

b.   That Defendant's Health Plan members received high quality healthcare services from physicians solely responsible for providing all needed medical services based on their independent medical judgment free of outside influence or interference with the physician-patient relationship; and,

c.   Physicians employed in that Defendant's network were compensated under a system that provided incentives based upon the quality of healthcare services provided the Plaintiffs and the Class.

239.   With respect to their unlawful activities described above, each Defendant also transmitted funds, contracts, and other forms of business communications and transactions in a continuous and uninterrupted flow across state lines and employed the United States mails and interstate wires in violations of 18 U.S.C. §§1341 and 1343, 18 U.S.C. §§1341 and 1346, 18 U.S.C. §§1343 and 1346.

240.   Each Defendant intentionally and knowingly made those material misrepresentations to the Plaintiffs and members of the Class referred to above for the purpose of deceiving them and thereby obtaining financial gain.  Each Defendant either knew or recklessly disregarded that the misrepresentations and omissions described above were

-113-

material. The Plaintiffs and members of the Class reasonably relied on the misrepresentations and omissions.

241.    The Plaintiffs and members of the Class enrolled in each Defendant's respective Health Plans and made periodic premium payments to that Defendant for a level and quality of healthcare services that said Defendant had no intention of providing. As a result, Plaintiffs and members of the Class were deprived of their intangible right of honest service as a result of the Defendant's fraudulent conduct involving the United States mails and interstate wires and as a result of the Defendant's fraudulent misrepresentations, omissions, and unlawful conduct.

242.    The Plaintiffs and members of the Class, therefore, were injured in their business or property by each Defendant's overt acts and racketeering activities in amounts to be determined at trial.

2.    <u>Defendants Violated of 18 U.S.C. §1951(b)(2).</u>

243.    During the relevant times herein alleged, and in furtherance of and for the purpose of executing and/or attempting to execute the above discussed scheme and artifice to defraud or deprive, each Defendant, aided and abetted by non-MCO co-conspirators, Defendant's respective Health Plans, and others not named as defendants in this Complaint, conspired to and attempted to and did interfere with, obstruct, delay or affect "commerce" as the term is defined in 18 U.S.C. §1951 and by "extortion" as defined in 18 U.S.C. §1951(b)(2). Each Defendant unlawfully attempted to and/or induced numerous physicians and others to part with various property interests to which that Defendant was not lawfully entitled. These property interests included the intangible property right of physicians to conduct their

-114-

profession free of extortionate influence and their intangible property right and fiduciary obligation to provide their patients honest services without the Defendant's exploitation of fear of economic loss and/or loss of business, in violation of 18 U.S.C. §1951(b)(2).

244.   In furtherance of each Defendant's scheme or artifice to defraud and obtain money by false pretenses and the scheme or artifice to deprive the Plaintiffs and members of the Class of their intangible right of honest services, each Defendant, aided and abetted by non-MCO co-conspirators, Defendant's respective Health Plans, and others not named as defendants in this First Amended Complaint, participated, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which that Defendant was not entitled through the exploitation of physicians' fear of economic loss and/or loss of business.  Each Defendant either knew or recklessly disregarded that the natural consequences of its words and acts was and continue to be to exploit fear of economic loss or loss of business to attempt to and to interfere with and secure tangible and/or intangible property rights to which they were not entitled.

245.   Each Defendant's overt acts and fraudulent and extortionate racketeering activity unlawfully intruded on the physician-patient relationship and defrauded the Plaintiffs and members of the Class of their intangible right to the delivery of honest medical services.

246.   The Plaintiffs and members of the Class, therefore, were injured in their business or property by the each Defendant's overt acts and racketeering activities in amounts to be determined at trial.

-115-

3.    Defendants Violated 18 U.S.C. §1952(a).

247.    During the relevant times, and in furtherance of and for the purpose of executing the above-described scheme and artifice to defraud the Plaintiffs and members of the Class, each Defendant on numerous occasions traveled and caused others, not named as defendants in this Complaint, to travel in interstate commerce in order to attempt to commit, and in committing, mail fraud, wire fraud, and extortion in violation of the Travel Act, 18 U.S.C. §1952(a).

248.    Each Defendant's overt acts and fraudulent and extortionate racketeering activity defrauded the Plaintiffs and members of the Class of money, unlawfully interfered with the physician-patient relationship, and attempted and/or deprived the Plaintiffs and members of the Class of their intangible right of honest services.

249.    The Plaintiffs and members of the Class, therefore, were injured in their business or property by each Defendant's overt acts and racketeering activities in amounts to be determined at trial.

4.    Defendants Violated 18 U.S.C. §1954.

250.    During the relevant times, and in furtherance of, and for the purpose of, executing the above-described scheme and artifice to defraud the Plaintiffs and members of the Class, each Defendant on numerous occasions did receive and/or solicit money or other things of value for the purpose of influencing the Plaintiffs and Class members' decisions, actions or other duties relating to employee benefit plans in violation of 18 U.S.C. §1954.

-116-

251.   The Plaintiffs and members of the Class, therefore, were injured in their business or property by each Defendant's overt acts and racketeering activities in amounts to be determined at trial.

C.   Defendants Have Engaged In A Pattern Of Racketeering Activity And Therefore Violated 18 U.S.C. §1962(c).

252.   Plaintiffs repeat each and every allegation contained in the foregoing paragraphs of this First Amended Complaint and incorporate such allegations herein by reference.

253.   Each Defendant has engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO, by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including the Plaintiffs and the members of the Class.

254.   The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by the non-MCO co-conspirators and others not named as defendants, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

255.   This claim for relief arises under 18 U.S.C. §1964(c) of RICO and seeks to recover actual and treble damages for Each Defendant's violations of 18 U.S.C. §1962(c) and their violations of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C.

-117-

§1962(a) and (c).

256.    Section 1962 (c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

257.    There are seven Section 1962(c) claims presented here.  The persons with respect to each of these claims are, respectively, Aetna, Cigna, FHS, Humana, PHS, Prudential, and United.  The enterprise for each of those claims is an association in fact consisting of those respective persons, their primary physicians, medical specialists, medical laboratories, hospitals, healthcare clinics, pharmacies, home healthcare agencies, and other miscellaneous healthcare providers, all of which serve the purpose of providing healthcare services to enrollees in Defendants' Health Plans, and non-MCO co-conspirators (the "Section 1962(c) Enterprise(s)").  These respective Section 1962(c) Enterprises are distinct from each of the Defendants and include many persons who were not employed by the Defendants. Moreover, many of these entities involved in the Section 1962(c) Enterprises are not owned by any of the Defendants.

258.    The respective Section 1962(c) Enterprises are engaged in, and their activities substantially affect, interstate commerce.

259.    The respective Defendants were associated with the respective Section 1962(c) Enterprise as described above and conducted and participated in the conduct of the affairs of that enterprise through the pattern of racketeering activity described herein.

-118-

Plaintiff and Class members were directly and proximately injured both by this pattern of activity and by the respective Defendant's conduct and participation, for which they are entitled to actual and treble damages, attorneys' fees, and costs under 18 U.S.C. §1964(c).

D.    Defendants Have Violated 18 U.S.C. §1962(d).

260.    The Plaintiffs repeat each and every allegation contained in the foregoing paragraphs of this First Amended Complaint and incorporate such allegations herein by reference.

261.    This claim for relief arises under 18 U.S.C. §1964(c) of RICO and seeks to recover actual and treble damages for Each Defendant's violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(a) and (c).

262.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

263.    Section 1961(4) of RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

264.    Section 1962 (a) of RICO provides that it "shall be unlawful for any person who received any income derived, directly or indirectly, from a pattern of racketeering activity. . . to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

-119-

265.    For purposes of the claim of a conspiracy in violation of Section 1962(d) to violate Section 1962(a), the persons under the latter subsection consist, respectively, of Aetna, Cigna, FHS, Humana, PHS, Prudential, and United and the enterprise consists of those respective persons and their respective Health Plans (the "Investment Enterprise(s)").

266.    At all times relevant herein, the Investment Enterprises are and were an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962 (a).  The Investment Enterprises were and continue to be the investment beneficiary of additional monies realized from the above overt acts and fraudulent and extortionate scheme or activities to defraud the Plaintiffs and the Class of money and to deprive them of their intangible right of honest services.

267.    Each Defendant operated Health Plans in multiple states; indeed, some of the Defendants operate in all fifty states.  Revenues and assets generated from the Each Defendant's unlawful practices described herein were in the billions of dollars.  Accordingly, Defendant were engaged in, and their activities substantially affected, interstate commerce.

268.    Each of the Defendants conspired to derive, and did derive, substantial income and proceeds through the above described pattern of racketeering activity, and conspired to use or invest, and did use or invest, directly or indirectly, a significant part of such income or proceeds in the operation of its respective enterprise described above, in violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(a).  This use or investment injured Plaintiffs and Class members because it permitted each such enterprise to continue, expand, and extend their fraudulent schemes and artifices and to acquire other HMO, PPO, and POS organizations that were incorporated into the enterprise, thereby increasing its

-120-

revenue and profits.  This use and investment directly and proximately injured the Plaintiffs and Class members in a manner that was distinct from the injury caused by the pattern of racketeering activity described herein.

269.    During the Class period, each Defendant, non-MCO co-conspirators, and their multiple agents engaged in this nationwide conspiracy with that Defendant's Health Plans, and their multiple agents.  These co-conspirators also conspired with certain other parties not named as defendants in this First Amended Complaint.

270.    The object of this conspiracy was to violate 18 U.S.C. §1962(a) by deriving income from a pattern of racketeering activity and to using or investing, directly or indirectly, such income or any part of such income in the operation of each of the Investment Enterprises, each of which affected interstate commerce, in violation of 18 U.S.C. §1962(d). Specifically, the object of the conspiracy was to secure income and sustain and/or increase each such Investment Enterprise's profits through a pattern of activity that fraudulently induced the Plaintiffs and members of the Class to subscribe to, enroll, and make premium payments in reliance on material misrepresentations and omissions regarding the quality and level of each Defendant's healthcare services provided by its Health Plans, while each Defendant and its co-conspirators failed to disclose their pattern of fraudulent and extortionate activity specifically designed to decrease the quality and level of delivery of healthcare services misrepresented to the Plaintiffs and the Class in order to defraud them of money and deprive them of their intangible rights of honest services.

271.    Each Defendant also violated Section 1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy was to conduct or participate in, directly or

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

indirectly, the conduct of the affairs of its respective Section 1962(c) Enterprise described previously through a pattern of racketeering activity.

272.   Defendants, their subsidiaries, employees, and multiple agents were joined in the conspiracies to violate 18 U.S.C. §1962(a) and (c) in violation of Section 1962(d) by various third parties not named as defendants herein, such as the non-MCO co-conspirators, persons or entities participating in the provision of healthcare services by each Defendant's Health Plans and those persons or entities providing support for each Defendant's acquisition of other MCOs.

273.   As demonstrated in detail above, the various co-conspirators engaged in numerous overt and predicate fraudulent and extortionate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to fraudulently induce the Plaintiffs and members of the Class to subscribe to, enroll, and make premium payments.  Moreover, each Defendant failed to disclose numerous internal systemic fraudulent and extortionate policies and practices that were designed to defraud the Plaintiffs and members of the Class of money, to unlawfully influence and interfere with the physician-patient relationship and deprive them of their intangible right of honest services by physicians participating in each Defendant's respective Health Plans.

274.   The co-conspirators' pattern of fraudulent and extortionate racketeering acts included, but was not limited to, acts in furtherance of the conspiracy not to disclose conflicts of interest brought about by each Defendant's numerous internal policies and practices that were contrary to each Defendant's misrepresentations to the Plaintiffs and the Class and contrary to each Defendant's fiduciary duties of disclosure.  These internal policies and

-122-

practices included, but were not limited to, undisclosed internal policies and practices by the co-conspirators that were specifically designed to:

    a.    Provide financial incentives to provide a lower quality and level of healthcare services than misrepresented to the Plaintiffs and members of the Class;

    b.    Intrude with, and deprive, the Plaintiffs and members of the Class of the independent medical judgment, advice, and delivery of honest medical services by Each Defendant's participating physicians;

    c.    Exploit physicians' fear of economic loss and/or loss of business in order to extort from each of the Defendant's participating physicians their tangible property interests of money and their intangible property interests to be able to conduct their practice of medicine free of extortionate conduct;

    d.    Exploit physicians' fear of economic loss and/or loss of business in an attempt to deprive the Plaintiffs and members of the Class of their intangible property right of honest services by their physicians; and

    e.    Deprive the Plaintiffs and members of the Class of their intangible property right of honest services by physicians participating in each Defendant's Health Plans and their intangible property right of honest services from each Defendant as a fiduciary.

    275.    The nature of the above-described co-conspirators' acts gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. §1962(d) violation of

-123-

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

RICO by conspiring to violate 18 U.S.C. §§1962(a) and (c), but they were aware that their ongoing fraudulent and extortionate acts were an integral part of an overall pattern of racketeering activity.

276.    As a direct and proximate result of such overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §§1962(a) and (c), the Plaintiffs and members of the Class were injured in their business or property. Pursuant to 18 U.S.C. §1964(c), the Plaintiffs are entitled, therefore, to bring this action on behalf of the Class and to recover actual and treble damages, as well as the costs of bringing this suit and attorneys' fees.

277.    Each Defendant sought to and engaged in the commission of the following described unlawful racketeering predicate acts in order to generate income or proceeds through racketeering activity, to-wit:

a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§1341 and 1343;

b.    Multiple instances of mail fraud violations of 18 U.S.C. §§1341 and 1346;

c.    Multiple instances of wire fraud violations of 18 U.S.C. §§1343 and 1346;

d.    Multiple instances of extortion violations of 18 U.S.C. §1951(b)(2);

-124-

e.      Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. §1952(a); and

f.      Multiple instances of violations of 18 U.S.C. §1954.

E.      <u>Defendants Violated 18 U.S.C. §2 By Seeking To Aid And Abet And Aiding And Abetting A Scheme To Violate 18 U.S.C. §§1962(a) And (c).</u>

278.    The Plaintiffs repeat each and every allegation contained in the paragraphs above of this Complaint and incorporate such allegations herein by reference.

279.    This claim for relief arises under 18 U.S.C. §1964(c) of RICO, that provides for the recovery of actual and treble damages for Each Defendant's violations of 18 U.S.C. §2 by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. §§1962(a) and (c) .

280.    With respect to the Each Defendant's violations of 18 U.S.C. §2, Defendants were  aided and abetted by non-MCO co-conspirators, their respective Health Plans, and others not named as defendants in the commission of those violations of 18 U.S.C. §2 by seeking to and aiding and abetting a scheme to violate 18 U.S.C. §§1962(a) and (c).

281.    Defendants aided and abetted and shared the intent to aid and abet these others in attempting to derive substantial income and proceeds through the above-described pattern of racketeering activity.  Defendants also had a shared intent with these others in attempting to use or invest, and did use or invest, directly or indirectly, a part of such income or proceeds in the operation of the Investment Enterprises described above in violation of

-125-

18 U.S.C. §2 and 18 U.S.C. §1962(a).   The Defendants further aided and abetted, and had a shared intent, to aid and abet their respective Health Plans and others, in conducting or participating in the conduct of the affairs of the Section 1962(c) Enterprise described above through a pattern of racketeering activity, in violation of 18 U.S.C. §2 and 18 U.S.C. §1962(c).

       282.    As a direct and proximate result of Each Defendant's RICO violation of 18 U.S.C. §2 by seeking to and aiding and abetting a scheme to violate 18 U.S.C. §§1962(a) and (c), the Plaintiffs and the Class were injured in their business or property.  Pursuant to 18 U.S.C. §1964(c) of RICO, the Plaintiffs are entitled, therefore, to bring this action on behalf of the Class and to recover actual and treble damages, as well as the costs of bringing this suit and attorneys' fees.

       283.    The Defendants attempted to aid and abet, aided and abetted, and attempted to commit, and committed all the following unlawful racketeering predicate acts:

      a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§1341 and 1343;

      b.    Multiple instances of mail fraud violations of 18 U.S.C. §§1341 and 1346;

      c.    Multiple instances of wire fraud violations of 18 U.S.C. §§1343 and 1346;

      d.    Multiple instances of extortion violations of 18 U.S.C. §1951(b)(2);

-126-

  e.  Multiple instances of travel in interstate commerce to attempt to

and to actually commit mail fraud, wire fraud, and extortion, in

violation of 18 U.S.C. §1952(a); and

  f.  Multiple instances of violations of 18 U.S.C. §1954.

  284. Each Defendant's violations of the above federal laws and the effects

thereof detailed above were continuing and will continue unless injunctive relief prohibiting the

Each Defendant's illegal acts constituting a pattern of racketeering activity is fashioned and

imposed by this Court.

  285. By reason of each Defendant's violations of 18 U.S.C. §1962(d) and 18

U.S.C. §2 by conspiring to violate 18 U.S.C. §§1962(a) and (c), and seeking to and aiding and

abetting a scheme to violate 18 U.S.C. §§1962(a) and (c), the Plaintiffs and the Class are

entitled to actual and treble damages pursuant to 18 U.S.C. §1964(c).

**SECOND CLAIM FOR RELIEF**
**BREACHES OF ERISA**
**(For the Subclass Only)**

  286. The Plaintiffs repeat each and every allegation contained in the foregoing

paragraphs of this First Amended Complaint and incorporates such allegations herein by

reference.

  287. Plaintiffs allege distinct claims under ERISA for:  (a) breach of

disclosure obligations; (b) breaches of fiduciary obligations; (c) failure to discharge plan

responsibilities; (d) failure to exercise due care; and (e) prohibited transactions.

  288. Each Defendant's policies and practices to increase their profitability and

shareholders' equity through the reduction and limitation of the delivery of healthcare services

-127-

to its members and to fraudulently and deceptively fail to disclose such business conduct to Plaintiffs and members of the Class as described above, constitute an actionable breach of the fiduciary duties imposed by law and more fully described by governing and authoritative case law. By this claim, Plaintiffs and the Subclass assert that each Defendant's failure to fully and accurately disclose their policies and practices detrimental to the interests of its members constitutes a breach of its fiduciary duties. The Plaintiffs and members of the Subclass do not seek a remedy for individual Subclass members based upon claims concerning decisions to not provide benefits; instead their claim is premised on each Defendant's false and fraudulent representations about the quality of benefits being provided to enrollees in Each Defendant's Health Plans.

289. At all relevant times herein alleged, each Defendant was a fiduciary within the meaning of that term in 29 U.S.C. §1002(21)(A) because it exercised discretionary authority, control and responsibility over the management and administration of ERISA-governed health plans through which Subclass members purchased their respective HMO, PPO, POS coverage. Each Defendant at all relevant times exercised full express and *de facto* discretion and authority, *inter alia,* to determine payment eligibility for claims submitted by Subclass members and determine the scope of ERISA-covered benefits.

290. At all relevant times, each Defendant was a plan administrator within the meaning of that term in 29 U.S.C. §1002(16)(A), subject to the express disclosure requirements of 29 U.S.C. §§1022 and 1024. ERISA requires that each member of the Subclass be furnished a summary plan description written in a manner calculated to be understood by the average plan participant and sufficiently accurate and comprehensive to

reasonably apprise each Subclass member of his or her rights and obligations under the plan.
ERISA also mandates that each Subclass member be furnished with a summary plan description containing, *inter alia*, information regarding the plan's requirements respecting eligibility for participation and benefits and circumstances which may result in disqualification, ineligibility or denial or loss of benefits.

291.    As a result of the conduct described above, each Defendant breached its fiduciary obligations under 29 U.S.C. §1104(a)(1) to discharge its duties with respect to its Health Plans "solely in the interest" of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.  While managed health care need not be provided in a manner that creates a conflict of interest between an ERISA fiduciary and beneficiaries, each Defendant took purposeful actions, described in detail above, that created a conflict of interest between each Defendant, as a fiduciary, and members of the Subclass, as beneficiaries.

292.    As a result of the conduct described above, each Defendant breached its duty of disclosure to, *inter alia,* provide a description of the plan's requirements for eligibility for benefits and of the circumstances that may result in the denial of benefits by failing to disclose its internal systemic policies and practices described above.

293.    By failing to use appropriate criteria to evaluate the medical necessity of the Subclass's claims for medical services, each Defendant failed to carry out the terms of their ERISA-governed health plans, and thereby violated the duty to discharge responsibilities in accordance with plan documents pursuant to 29 U.S.C. §1104(a)(1)(D).

-129-

294.   By managing, operating and administering ERISA-governed health plans in the manner described herein, each Defendant failed to exercise the care of an ordinarily prudent person engaged in a similar activity under prevailing circumstances in violation of 29 U.S.C. §1104(a)(1)(B).

295.   Each Defendant further breached its fiduciary duty by materially misleading the Subclass to which it owed a duty of loyalty and prudence.  Each Defendant received unearned premium revenues from the Subclass and therefore was unjustly enriched.

296.   By evaluating the medical necessity of medical services in accordance with its undisclosed internal systemic policies and practices, each Defendant intended to provide, and provided coverage of lesser value than was represented to and purchased by Subclass members.  Each Defendant intended to retain and did retain the difference in value between the coverage described in its ERISA-governed Health Plans promised to and purchased by the Subclass and the coverage actually provided to the Subclass.  Accordingly, each Defendant fraudulently implemented its ERISA-governed Health Plans for its own benefit and to the detriment of the members of the Subclass.  Those members were therefore entitled to appropriate equitable relief under 29 U.S.C. §1132(a)(3) to redress the violations of 29 U.S.C. §1104 set forth herein, and to recover the amounts by which Defendants were unjustly enriched as a result of such violations.

297.   As participants and beneficiaries of ERISA-governed HMOs, PPOs, or POS plans, the members of the Subclass are entitled to obtain appropriate relief under 29 U.S.C. §1132(a)(2), to redress violations of 29 U.S.C. §1109, and to restore to such plans any losses to the plan resulting from each breach of fiduciary duty imposed by ERISA.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. · OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET · SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

298.   ERISA also absolutely prohibits plan fiduciaries from engaging in certain self-dealing transactions with plan assets.  Such transactions include those that result in any conflict of interest between a plan fiduciary and its beneficiaries.  Each Defendant's failure to disclose its internal systemic policies and practices described herein resulted, in its receipt of compensation in excess of a reasonable amount and, thus, constitutes a prohibited transaction within the meaning of 29 U.S.C. §1106.

## PRAYER FOR RELIEF

### First Claim for Relief

WHEREFORE, with regard to the Plaintiffs' First Claim For Relief, the Plaintiffs pray for judgment in their favor and in favor of the Class against the Defendants jointly and/or severally, where applicable in each claim for relief, as well as general and special relief as follows:

1.   An Order certifying that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

2.   Compensatory damages, in an amount to be proven at trial, the principal of which the Plaintiffs and the Class "shall recover threefold" pursuant to 18 U.S.C. §1964(c);

4.   Costs and reimbursements for this action, including the cost of the suit and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and reimbursement of expenses and expert fees in amounts to be determined by the Court;

5.   Pre-judgment and post-judgment interest; and

6.   Granting such other and further relief as this Honorable Court deems to be just and appropriate.

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. · OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET · SUITE 800, MIAMI, FLORIDA 33130−1780
(305) 358−2800

**Second Claim for Relief**

WHEREFORE, with regard to the Plaintiffs' Second Claim For Relief, the named Plaintiffs, individually and for all others similarly situated as absent Class members, pray for the following equitable relief.

1.      That this Court assume jurisdiction of the parties hereto and the subject matter alleged in this action;

2.      That this Court certify this action to proceed as a class action pursuant to Rule 23(b)(1)(A) of the Federal Rules Of Civil Procedure;

3.      That upon plenary trial judgment be rendered and entered in favor of the named Subclass representatives and Subclass and against Defendants and that the Court fashion the following requested specific equitable relief to meet the allegations herein and proof adduced:

   a.  The creation of an equitable constructive trust to be imposed upon the fiduciary and that such trust be funded by the ill-gotten, wrongful revenues obtained by virtue of the recurrent breach of the fiduciary duties imposed by law and that such trust and corpus thereof be administered by the Court under the equitable doctrine of *cy pres* as an appropriate remedy pursuant to 29 U.S.C. §1132(a)(3);

   b.  Pursuant to its equitable authority, the Court administer the *cy pres* trust thus created and funded in such a manner as the Court, in its sound discretion, shall deem appropriate in the circumstances;

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

c.  In the alternative to such a trust, this Court order restitution of amounts obtained by Defendants by virtue of their breaches of fiduciary duty; and

d.  In the exercise of its sound discretion, this Court appropriately order compensation to class counsel for their professional services rendered in bringing and prosecuting of this action and the creation of the *cy pres* constructive trust to the public benefit, as well as costs of suit, and that such compensation be paid from the *cy pres* funded trust, and that costs of suit be taxed against the Defendants.

-133-

## DEMAND FOR TRIAL BY JURY

The Plaintiffs and the Class demand a trial by jury of all issues so triable.

Respectfully submitted,

Dated: May _10_, 2000

_Aaron S. Podhurst_

Aaron S. Podhurst, Esq.
Fla. Bar. No. 063606

PODHURST, ORSECK, JOSEFSBERG,
EATON, MEADOW, OLIN & PERWIN,
P.A.
Barry L. Meadow, Esq.
Fla. Bar No. 201227
City National Bank Building
24 W. Flagler Street, Suite 800
Miami, Florida 33130-1780
(305) 358-2800
(305) 358-2382 (FAX)

Richard F. Scruggs, Esquire
Mississippi Bar No. 6582
Sidney A. Backstrom, Esquire
Louisiana Bar No. 232632
SCRUGGS, MILLETTE, BOZEMAN &
DENT, P.A.
P.O. Drawer 1425
Pascagoula, MS 39568
(228) 762-6068
(228) 762-1207 (FAX)

Ronald L. Motley, Esquire
South Carolina Bar No. 4123
H. Blair Hahn, Esquire
South Carolina Bar No. 65102
NESS, MOTLEY, LOADHOLT,
RICHARDSON & POOLE
P.O. Box 1792
28 Bridgeside Blvd. (29464)
Mt. Pleasant, SC 29465
(843) 216-9211
(843) 216-9519 (FAX)

-134-

Walter Umphrey, Esquire
Texas Bar No. 20380000
Keith Kebodeaux, Esquire
Texas Bar No. 11144300
PROVOST UMPHREY LAW FIRM,
L.L.P.
P.O. Box 4905
Beaumont, TX 77704
(409) 835-6000
(409) 838-8888 (FAX)

Paul S. Minor, Esquire
Mississippi Bar No. 3345
MINOR AND ASSOCIATES
P.O. Box 1388
Biloxi, MS 39533
(228) 374-5151
(228) 374-6159 (FAX)

John Eddie Williams, Esquire
Texas Bar No. 21600300
Herbert T. Schwartz, Esquire
Texas Bar No. 17863020
Florida Bar No. 100248
WILLIAMS BAILEY LAW FIRM, L.L.P.
8441 Gulf Freeway, Suite 600
Houston, TX 77017-5001
(713) 230-2200
(713) 643-6226 (FAX)

Joseph C. Langston, Esquire
Mississippi Bar No. 1060
John Fletcher Perry III
Mississippi Bar No. 10530
LANGSTON, LANGSTON, MICHAEL
BOWEN & TUCKER
P.O. Box 787
Booneville, MS 38829
(662) 738-3138
(662) 728-1992 (FAX)

-135-

Hiram Eastland, Esquire
Mississippi Bar No. 5294
EASTLAND LAW OFFICES
P.O. Drawer 1079
Greenwood, MS 38930
(662) 453-1227
(662) 453-2808 (FAX)

David O. McCormick, Esquire
Mississippi Bar No. 2244
DAVID O. MCCORMICK, P.A.
P.O. Drawer 1176
Pascagoula, MS 39568
(228) 762-8048
(228) 762-4864 (FAX)

Frederick P. Furth, Esquire
California Bar No. 38438
FURTH, FAHRNER & MASON
Furth Building, Ste. 1000
201 Sansome Street
San Francisco, CA 94104
(415) 433-2070
(415) 982-2076 (FAX)

George Chandler, Esquire
CHANDLER LAW OFFICES
Texas Bar No. 04094000
P.O. Box 340
Lufkin, Texas 75901
(409) 632-1614
(409) 632-1304 (FAX)

R.W. (Ricky) Richards, Esquire
Texas Bar No. 16854100
PHIFER & RICHARDS
P.O. Box 1309
Jacksonville, TX 75766
(903) 586-2544
(903) 586-6529 (FAX)

-136-

Cary Patterson, Esquire
NIX, PATTERSON & ROACH, L.L.P.
Texas Bar No. 15587000
205 Linda Drive
Dangerfield, TX 75638
(903) 645-7333
(903) 645-5389 (FAX)

Harry Potter, Esquire
Texas Bar No. 16175300
100 Congress Ave., Suite 2100
Austin, TX 78701
(512) 469-3500
(512) 469-3501 (FAX)

Wayne D. Blackmon, Esquire
5301 Westbard
Bethesda, Md. 20816
Phone: (202) 362-9229

Grant Kaiser
Texas Bar No. 11078900
KAISER & MORRISON, P.C.
440 Louisiana, Suite 1440
Houston, Texas 77002
(713) 223-0000
(713) 223-0440 (FAX)

Shane F. Langston
Mississippi Bar No. 1061
LANGSTON, FRAZER, SWEET &
FREESE, P.A.
P.O. Box 23307
Jackson, MS 39225
(601) 959-1356
(601) 968-3866 (FAX)

Lowry M. Lomax
Mississippi Bar No. 1394
MAPLES & LOMAX, P.A.
2502 Market Street
P.O. Drawer 1368
Pascagoula, MS 39568
(228) 762-3161
(228) 762-5768 (FAX)

-137-

John P. Coale
D.C. Bar No. 212662
David K. Lietz
D.C. Bar No. 430557
Coale, Cooley, Lietz, McInerny & Broadus
818 Connecticut Avenue, NW
Suite 857
Washington, D.C.  20006
(202) 887-4770
(202) 887-4778 (Fax)

WE HEREBY CERTIFY that a copy of the foregoing  was mailed to all parties on the attached service list this _10_ day of May, 2000.

Respectfully submitted,

PODHURST, ORSECK, JOSEFSBERG,
EATON, MEADOW, OLIN & PERWIN, P.A.
City National Bank Building, 8th Floor
25 W. Flagler Street
Miami, FL  33130
Ph:  (305) 358-2800
Fx:  (305) 358-2382

By:_____
        Aaron S. Podhurst, Esq.
        Fla. Bar #063606

By:_____
        Barry L. Meadow, Esq
        Fla. Bar #201227

-138-

## SERVICE LIST

Richard F.  Scruggs, Esquire
Scruggs, Millette, Bozeman & Dent, P.A.
P.O. Drawer 1425
Pascagoula, MS 39568

Ronald L. Motley, Esquire
Ness, Motley, Loadholt, Richardson & Poole
174 East Bay Street, Suite 100
Charleston, S. Carolina 29401

Walter Umphrey, Esquire
Provost Umphrey Law Firm, L.L.P.
P.O. Box 4905
Beaumont, TX 77704

Paul S. Minor, Esquire
Minor And Associates
P.O. Box 1388
Biloxi, MS 39533

John Eddie Williams, Esquire
Williams Bailey Law Firm, L.L.P.
8441 Gulf Freeway, Suite 600
Houston, TX 77017-5001

Joseph C.  Langston, Esquire
Langston, Langston, Michael Bowen & Tucker
P.O. Box 787
Booneville, MS 38829

Hiram Eastland, Esquire
Eastland Law Offices
P.O. Drawer 1079
Greenwood, MS 38930

David O. McCormick, Esquire
David O. Mccormick, P.A.
P.O. Drawer 1176
Pascagoula, MS 39568

1

Frederick P. Furth, Esquire
Furth, Fahrner & Mason
Furth Building, Ste. 1000
201 Sansome Street
San Francisco, CA 94104

George Chandler, Esquire
Chandler Law Offices
Texas Bar No. 04094000
P.O. Box 340
Lufkin, Texas 75901

R.W. (Ricky) Richards, Esquire
Phifer & Richards
P.O. Box 1309
Jacksonville, TX 75766

Cary Patterson, Esquire
Nix, Patterson & Roach, L.L.P.
205 Linda Drive
Dangerfield, TX 75638

Harry Potter, Esquire
100 Congress Ave., Suite 2100
Austin, TX 78701

Wayne D. Blackmon, Esquire
5301 Westbard
Bethesda, Md. 20816

Grant Kaiser, Esquire
Kaiser & Morrison, P.C.
440 Louisiana, Suite 1440
Houston, Texas 77002

Shane F. Langston, Esquire
Langston, Frazer, Sweet & Freese, P.A.
P.O. Box 23307
Jackson, MS 39225

2

Lowry M. Lomax , Esquire
Maples & Lomax, P.A.
2502 Market Street
P.O. Drawer 1368
Pascagoula, MS 39568

David H.  Nutt, Esquire
David Nutt & Associates
P.  O.  Box 1039
Jackson, MS 39215-1039

John P.  Coale, Esquire
Coale, Cooley, Lietz, McInerny &Broadus
818 Connecticut Ave., N.W., Suite 857
Washington, D.  C.  20006

David Boies, Esquire
Stephen Neuwirth, Esq.
Boies, Schiller & Flexner, L.L.P.
80 Business Park Drive
Suite 110
Armonk, NY 10504

Brian D.  Boyle, Esquire
O'Melveny & Meyers, L.L.P.
555 13th Street, N.W.
Washington, D.  C.  20004

Steven E.  Fineman, Esquire
Lieff, Cabraser, Heimann & Bernstein, LLP
10 Rockefeller Plaza
12th Floor
New York, NY 10020

Andrew B.  Peretz, Esquire
Barrett, Gravante, Carpinello & Stern
One East Broward Blvd., Suite 620
Ft.  Lauderdale, FL 33301

3

Mark K.  Gray, Esquire
O'Koon,Gray & Weiss
1400 Citizens Plaza
500 W.  Jefferson Street
Louisville, KY 40202


H.  Laddie Montague, Jr., Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

Greg A.  Lewen, Esq.
Miller, Schwartz & Miller, P.A.
2435 Hollywood Blvd.
Hollywood, FL   33020

Joe R.  Whatley, Jr., Esq.
Whatley Drake, L.L.C.
1100 Financial Center
505 20th Street North
Birmingham, Alabama 35203-4601

David Krathen, Esq.
David Krathen, P.A.
888 East Las Olas Blvd, - Suite 200
Ft.  Lauderdale, FL 33301

David Deep, Esq.
Deep & Womack
790 Bob Posey Street
Henderson, KY 42420

James W.  Beasley, Jr., Esq.
Beasley, Leacock & Hauser, P.A.
Flagler Center, Suite 1400
505 South Flagler Drive
West Palm Beach, FL 33401

Walter G. Campbell, Jr. , Esquire
Krupnick, Campbell, Malone, Roselli,
Buser, Slama, Hancock, McNelis, Liberman & McKee
700 Southeast Third Avenue
Courthouse Law Plaza - Ste 100
Ft. Lauderdale, FL 33316


Richard Drubel, Esquire
Boies Schiller & Flexner, LLP
26 South Main Street
Hanover, NH 03755

Anne Elizabeth Hinds, Esquire
Stuart Singer, Esquire
Boies Schiller & Flexner, LLP
2435 Hollywood Boulevard
Hollywood, FL 33020

Michael D. Hausfeld, Esquire
Joseph Sellers, Esquire
Margaret G. Farrell, Esquire
Donna Solen, Esquire
Cohen Milstein Hausfeld & Toll, PLLC
1100 New York Avenue NW
West Tower, Suite 500
Washington, DC 20005-3934

Albert R. Huerta, Esuire
Huerta Hastings & Allison
924 Leopard
P.O. Box 23080
Corpus Christi, TX 78403-3080

Theodore Jon Leopold, Esquire
Ricci Hubbard Leopold Frankel & Farmer, P.A.
250 Mellon United National Bank Tower
1645 Palm Beach Lakes Boulevard
P.O. Box 2946
West Palm Beach, FL 33402

Nicholas Gravante, Esquire
Andrew B. Peretz, Esquire
Barrett, Gravante Carpinello & Stern, P.A.
One East Broward Boulevard
Suite 620
Fort Lauderdale, FL 33301-1406

James F. Miller, Esquire
Charles F. Miller, Esquire
Greg A. Lewen, Esquire
Miller Schwartz & Miller, P.A.
2435 Hollywood Boulevard
P.O. Box 7259
Hollywood, FL 33081

Michael Straus, Esquire
Bainbridge & Straus, LLP
2210 Second Avenue North
Birmingham, AL 35203

Stephen N. Zack, Esquire
Zack, Kosnitzky, P.A.
2800 NationsBank Tower
100 Southeast Second Street
Miami, FL 33131-2144

Mary Boies, Esquire
Jboies & McInnes, LLP
Village Green
Bedford, NY 10506

Michael Eidson, Esquire
Colson Hicks Eidson Colson Matthews Martinez & Mendoza
4700 First Union Financial Center
200 South Biscayne Blvd.
Miami, FL  33131-2351

Russel Herman, Esquire
Herman Middleton Casey & Kitchens, LLP
820 O'Keefe Avenue
New Orleans, LA 70113

Linda Smith, Esquire
O'Melveny & Myers, LLP
400 S Hope Street
Los Angeles, CA   90071-2899

Linda J. Smith, Esquire
O'Melveny & Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

Peter Alan Sachs, Esquire
Jones Foster Johnston & Stubbs
505 South Flagler Driver
Suite 1100
P.O. Box 3475
West Palm Beach, FL 33402-3475

Henry N. Adorno, Esquire
Raoul G. Cantero, III, Esquire
Adorno & Zeder, P.A.
2601 South Bayshore Drive
Suite 1600
Miami, FL 33133