UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MDL NO.: 1334

MASTER FILE NO.: 00-1334-MD-MORENO

**NIGHT BOX**
**FILED**

AUG 14 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

THIS DOCUMENT RELATES TO PROVIDER TRACK CASES

IN RE:
HUMANA, INC., MANAGED CARE LITIGATION

_____/

**AMENDED COMPLAINT**
**CLASS ACTION**

Rule 23, Fed.R.Civ.P.

CHARLES B. SHANE, M.D., EDWARD L. DAVIS,
D.O., JEFFREY BOOK, D.O., MANUAL PORTH, M.D.,
DENNIS BREEN, M.D., GLENN L. KELLY, M.D.,
MICHAEL BURGESS, M.D.,individually and
on behalf of a class of persons similarly situated,

        Plaintiffs,

vs.

HUMANA, INC.,  HUMANA HEALTH PLAN,
INC.; AETNA, INC.; AETNA-U.S. HEALTHCARE,
INC.; CIGNA CORPORATION; CONNECTICUT
GENERAL CORPORATION; CIGNA HEALTH
CORPORATION; CIGNA HEALTHCARE;
FOUNDATION HEALTH SYSTEMS, INC.;
PACIFICARE HEALTH SYSTEMS, INC.;
PACIFICARE OPERATIONS, INC.; THE
PRUDENTIAL INSURANCE COMPANY OF
AMERICA; UNITED HEALTHCARE; UNITED
HEALTH GROUP; WELLPOINT HEALTH
NETWORKS, INC.;

        Defendants.

_____/

## **PROVIDER PLAINTIFFS' AMENDED COMPLAINT**

### **I. INTRODUCTION**

Plaintiffs, by and through their undersigned attorneys, submit the following Amended Complaint as follows:

1.      The individual plaintiffs, Charles B. Shane, M.D., Edward L. Davis, D.O., Jeffrey Book, D.O., Manual Porth, M.D., Dennis Breen, M.D., Glenn L. Kelly, M.D., Michael Burgess, M.D., bring this action on behalf of themselves and a class of persons similarly situated, which is comprised of physicians who are victims of a scheme implemented by Defendants in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"). Plaintiffs and the class bring this action because they believe they have been damaged in their business as a result of the pattern of racketeering activity alleged herein, but moreover because they believe the defendants' scheme is detrimental to their patients.

2.      Physicians must receive adequate and timely reimbursement in order to maintain their practices and provide continuity of care that their patients require as a matter of sound medical practice. A stable health care system that fosters a trusting relationship between the physician and patient depends on reimbursement adequate to cover the costs of delivering the health care services patients have been promised by defendants. However, Defendants' failure to provide adequate funding of the health care system has resulted in tremendous hardships for all physicians. Physicians have been forced to suffer from patently unfair contract terms, delays, decreases and denials in payment of claims, and the refusal of defendants to provide the data necessary to enable physicians to evaluate the rates provided and the level of risk assumed under the contracts they have been provided. Physicians have also been forced to accept in toto, all of Defendants' insurance

products, because of an illegal scheme to tie unrelated products together as a condition of referral of patients.

3.      Defendants, both individually and through collusive activities, set reimbursement rates, including capitation rates to physicians, at unconscionably low levels which defendants know or recklessly fail to recognize are not adequate to cover the medical services defendants promise to provide their members and/or know or recklessly disregard are for services for which there can be no sound actuarial projections because expected usage cannot be controlled or predicted. Defendants engage in these and other coercive and unfair activities which threaten the physicians with economic injury if they do not accept defendants' reimbursement rates or "all products" requirements, as a condition of patient referral. Defendants' economic coercion forces physicians to accept inadequate reimbursement as an alternative to being denied patients to see and treat.  As the problems these individual physicians experience are a direct result of Defendants' unlawful activities, this lawsuit seeks to redress the harms suffered by Plaintiffs and the class.

4.      Therefore, Plaintiffs and the class seek a declaration regarding Defendants' practice of fraudulently concealing their methods of reimbursement from Plaintiffs and the class; and Defendants' economic coercion and extortion of Plaintiffs and the class into acceptance of Defendants' "all products" .  Plaintiffs and the class also seek injunctive and declaratory relief from Defendants' wrongful interference and coercive actions. Plaintiffs and the class further seek monetary and treble damages suffered by them to their business and property, as well as attorneys fees and costs for bringing this suit.

5.      Plaintiffs bring this individual and class action against Humana, Inc. and Humana Health Plan, Inc., which have undertaken a common scheme to further their own financial interests at the expense of Plaintiffs and the class and their patients.  Plaintiffs' claims as to this defendant

group involve common factual patterns and common legal principles. The Humana healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The Humana healthcare plans are collectively referred to as the "Humana health plan" or "Humana health plans". Defendants Humana, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The Humana healthcare plans are not charged as defendants in this Complaint. The defendants and the Humana healthcare plans are collectively referred to as "Humana" unless otherwise specified.

6. Plaintiffs bring this individual and class action against Aetna, Inc. and Aetna-U.S. Healthcare, Inc. ("Aetna"), which have undertaken a common scheme to further their own financial interests at the expense of Plaintiffs and the class and their patients. Plaintiffs' claims as to this defendant group involve common factual patterns and common legal principles. The Aetna healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The Aetna healthcare plans are collectively referred to as the "Aetna health plan" or "Aetna health plans". Defendants Aetna, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The Aetna healthcare plans are not charged as defendants in this Complaint. The defendants and the Aetna healthcare plans are collectively referred to as "Aetna" unless otherwise specified.

7. Plaintiffs bring this individual and class action against CIGNA Corporation, Connecticut General Corporation, CIGNA Health Corporation and CIGNA Healthcare, which have undertaken a common scheme to further their own financial interests at the expense of Plaintiffs and the class and their patients. Plaintiffs' claims as to this defendant group involve common factual

patterns and common legal principles. The CIGNA healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The CIGNA healthcare plans are collectively referred to as the "CIGNA health plan" or "CIGNA health plans". Defendants CIGNA, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The CIGNA healthcare plans are not charged as defendants in this Complaint. The defendants and the CIGNA healthcare plans are collectively referred to as "CIGNA" unless otherwise specified.

8.      Plaintiffs brings this individual and class action against Foundation Health Systems, Inc., which has undertaken a common scheme to further its own financial interests at the expense of Plaintiffs and the class and their patients. Plaintiffs' claims as to this defendant group involve common factual patterns and common legal principles. More specifically, Plaintiffs bring this action against Foundation Health Systems, Inc. ("Foundation"). The Foundation healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The Foundation healthcare plans are collectively referred to as the "Foundation health plan" or "Foundation health plans". Defendants Foundation, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The Foundation healthcare plans are not charged as defendants in this Complaint. The defendants and the Foundation healthcare plans are collectively referred to as "Foundation" unless otherwise specified.

9.      Plaintiffs brings this individual and class action against PacifiCare Health Systems, Inc. and PacifiCare Operations, Inc., which have undertaken a common scheme to further their own financial interests at the expense of Plaintiffs and the class and their patients. More specifically, Plaintiffs bring this action against PacifiCare Health Systems, Inc. and PacifiCare Operations, Inc.

("PacifiCare"). The PacifiCare healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The PacifiCare healthcare plans are collectively referred to as the "PacifiCare health plan" or "PacifiCare health plans". Defendants PacifiCare, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The PacifiCare healthcare plans are not charged as defendants in this Complaint. The defendants and the PacifiCare healthcare plans are collectively referred to as "PacifiCare" unless otherwise specified.

10.     Plaintiffs bring this individual and class action against The Prudential Insurance Company of America, which has undertaken a common scheme to further their own financial interests at the expense of Plaintiffs and the class and their patients. Plaintiffs' claims as to this defendant group involve common factual patterns and common legal principles. The Prudential healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The Prudential healthcare plans are collectively referred to as the "Prudential health plan" or "Prudential health plans". Defendants Prudential, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The Prudential healthcare plans are not charged as defendants in this Complaint. The defendants and the Prudential healthcare plans are collectively referred to as "Prudential" unless otherwise specified.

11.     Plaintiffs bring this individual and class action against United Healthcare and United Health Group, which have undertaken a common scheme to further their own financial interests at the expense of Plaintiffs and the class and their patients. Plaintiffs' claims as to this defendant group involve common factual patterns and common legal principles. The United healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The

United healthcare plans are collectively referred to as the "United health plan" or "United health plans". Defendants United, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The United healthcare plans are not charged as defendants in this Complaint. The defendants and the United healthcare plans are collectively referred to as "United" unless otherwise specified.

      12.     Plaintiffs bring this individual and class action against Wellpoint Health Networks, Inc., which has undertaken a common scheme to further their own financial interests at the expense of Plaintiffs and the class and their patients. Plaintiffs' claims as to this defendant group involve common factual patterns and common legal principles. The Wellpoint healthcare plans are alleged herein to be aiders, abettors and co-conspirators with each other. The Wellpoint healthcare plans are collectively referred to as the "Wellpoint health plan" or "Wellpoint health plans". Defendants Wellpoint, and their subsidiaries, operate health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and point of service ("POS") health plans in various states across the nation. The Wellpoint healthcare plans are not charged as defendants in this Complaint. The defendants and the Wellpoint healthcare plans are collectively referred to as "Wellpoint" unless otherwise specified.

## II. JURISDICTION AND VENUE

      13.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § § 1961, 1962, 1964, 29 U.S.C. 1001 *et seq.*, 15 U.S.C. § 1 *et seq.*, and 28 U.S.C. § § 1331, 1337 and 1367. The Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. § § 1965(b) and (d).

14.     Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), since each of the defendants is found, has an agent, and transacts affairs in this district.

### III.     **PARTIES**

15.     Plaintiff Charles B. Shane is *sui juris*, a physician who treats patients who are members of Humana health plans, is a resident of Kentucky, and a citizen of the United States of America.

16.     Plaintiff, Edward L. Davis, D.O. is a physician who treats patients who are members of Humana health plans, is a resident of Florida, and a citizen of the United States of America.

17.     Plaintiff, Jeffrey Book, D.O., is a physician who treats patients who are members of Humana health plans, is a resident of Florida, and a citizen of the United States of America.

18.     Plaintiff, Manual Porth, M.D., is a physician who treats patients who are members of Aetna, CIGNA, Prudential, and United health plans, is a resident of Florida, and a citizen of the United States of America.

19.     Plaintiff, Dennis Breen, M.D., is a physician who treats patients who are members of Foundation, PacifiCare and Wellpoint health plans, is a resident of California, and a citizen of the United States of America.

20.     Plaintiff, Glenn L. Kelly, M.D., is a physician who treats patients who are members of CIGNA  health plans and United health plans, is a resident of Colorado, and a citizen of the United States of America.

21.     Plaintiff, Michael Burgess, M.D., is a physician who treats patients who are members of Aetna health plans, is a resident of Texas, and a citizen of the United States of America.

22.      Defendant, Humana, Inc., is a Delaware corporation with corporate headquarters at 500 W. Main Street, Louisville, Kentucky 40202.  Humana is publicly traded on the New York Stock Exchange under the stock symbol "HUM."

23.      Defendant Humana Health Plan, Inc. ("HHP") is a Delaware corporation with corporate headquarters at 500 W. Main Street, Louisville, Kentucky 40202.

24.      Humana, Inc. and HHP do business in the State of Florida.

25.      The overwhelming majority of Humana's health plan membership is located in 15 states:  Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin, and Wyoming.  Humana offers health plans and other employee benefit products in at least 37 states, including (in addition to the 15 states listed above):  Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas.

26.      Humana, Inc. is the parent corporation of a number of subsidiaries that provide health care services.

27.      Through these entities (also collectively referred to as the "Humana Health Plans," unless otherwise specified), Humana, Inc. and HHP operate HMOs, PPOs and POS plans nationwide.  Humana, Inc. and HHP conduct business in the State of Florida.

28.      Unless otherwise specified, Humana Inc., HHP, and the Humana Health Plans, as well as Humana-owned, Humana-operated, Humana-controlled entities that offer health insurance, are collectively referred to herein as "Humana."

29.     Defendant Aetna, Inc. is a Connecticut corporation and the parent corporation of Aetna-USHC Inc. Aetna, Inc.'s corporate headquarters is located at 151 Farmington Avenue, Hartford, Connecticut 06156. Aetna, Inc. conducts business in the State of Florida.

30.     Defendant Aetna-USHC, Inc. ("Aetna-USHC") is a Pennsylvania corporation, located at 980 Jolly Road, P. O. Box 1109, Blue Bell, Pennsylvania 19422-0770. Aetna-USHC is the wholly-owned subsidiary of Aetna, Inc. Aetna-USHC provides health services to the public through four individual health products: HMOs, PPOs, POS plans, and Indemnity Plans. Aetna-USHC conducts business in the State of Florida and is the parent corporation of numerous Aetna Health Plans.

31.     The Aetna healthcare plans are collectively referred to as the "Aetna Health Plans." Aetna-USHC operates HMOs, POS plans, and PPOs nationwide through such plans. Aetna, through Aetna-USHC, acquired the MCO operations of defendant Prudential on or about August 6, 1999.

32.     Aetna, Inc., Aetna-USHC, and the Aetna Health Plans are responsible for the distribution of the advertising, marketing, and membership materials described herein for all the defendants' HMOs, POS plans, and PPOs. Additionally, Aetna, Inc. Aetna-USHC, and the Aetna Health Plans are responsible for the preparation and distribution of the provider agreements entered into between Aetna Health Plans and Aetna's healthcare providers, for all the defendants' HMOs, POS plans, and PPOs.

33.     Defendant CIGNA Corporation is a Delaware corporation with corporate headquarters at One Liberty Place, Philadelphia, Pennsylvania, 19192. CIGNA is publicly traded on the New York Stock Exchange under the stock symbol "CI."

34.     Defendant CIGNA Health Corporation is a Delaware corporation with corporate headquarters at One Liberty Place, Philadelphia, Pennsylvania.

35.     CIGNA's healthcare products are marketed in all 50 states.  It has managed care networks serving 45 states and the District of Columbia.  CIGNA does business in the State of Florida.

36.     The CIGNA defendants are the parent corporation(s) of a number of subsidiaries that provide health care services.

37.     Defendant Foundation Health Systems, Inc. ("FHS") is a Delaware corporation and the parent corporation of the entities that operate its health plans throughout the United States.  FHS' headquarters are located at 33120 Lake Center Drive in Santa Ana, California.  FHS does business in the State of Florida.

38.     The Foundation defendants are the parent corporation(s) of a number of subsidiaries that provide health care services.

39.     Through these entities (also collectively referred to as the "Foundation Health Plans," unless otherwise specified), FHS operates HMOs, PPOs, and POS plans nationwide.

40.     Defendant Pacificare Health Systems, Inc. ("PHS") is a Delaware corporation with its headquarters located at 33120 Lake Center Drive, in Santa Ana, California.

41.     The PacifiCare defendants are the parent corporation(s) of a number of subsidiaries that provide health care services.

42.     Through these entities (also collectively referred to as the "PacifiCare Health Plans" unless otherwise specified), PHS operates HMOs, PPOs, POS plans, and indemnity health plans nationwide.  PHS does business in the State of Florida.

43.     Defendant Prudential Insurance Company of America is a Delaware corporation and is the parent corporation of Prudential Health Care Plan, Inc.   Prudential's corporate

headquarters are located at Newark, New Jersey. Prudential conducts business in the State of Florida.

44.     The Prudential defendants are the parent corporation(s) of a number of subsidiaries that provide health care services.

45.     Through these entities (also collectively referred to as the "Prudential Health Plans," unless otherwise specified), Prudential operated HMOs, PPOs, and POS plans nationwide during the relevant period herein alleged and conducted, and conducts, business in the State of Florida.

46.     Defendant United Health Group ("United") is a Minnesota corporation and the parent corporation of the entities that operate the United health plans. United's headquarters are located at 300 Opus Center, 9900 Bren Road East in Minnetonka, Minnesota. United conducts business in the State of Florida. In its 1998 Form 10K/A filed with the Securities and Exchange Commission ("SEC"), United also refers to itself as United HealthCare Corporation.

47.     Defendant United HealthCare ("UHC") is the subsidiary of United that operates organized health systems. According to the aforementioned SEC filing, it has majority ownership of health plans operating in approximately 40 markets nationwide and in Puerto Rico. UHC conducts business in the State of Florida.

48.     The United defendants are the parent corporation(s) of a number of subsidiaries that provide health care services.

49.     UHC is responsible for the distribution of the advertising, marketing, and membership materials described herein for all of its HMOs, PPOs, and POS plans. Additionally, UHC and the United Health Plans are responsible for the preparation and distribution of the provider agreements entered into between the United Health Plans and United's healthcare providers for all the defendants' HMOs, PPOs, and POS plans.

50.     Defendant Wellpoint Health Networks, Inc. is a California corporation, with corporate headquarters at One WellPoint Way, Thousand Oaks, California 91362.

51.     Defendant Wellpoint Health Networks, Inc. is a health plan which operates and administers Wellpoint healthcare and the numerous Wellpoint health plans in California and throughout the United States.

52.     The Wellpoint defendants are the parent corporation(s) of a number of subsidiaries that provide health care services..

53.     Each defendant is responsible for the distribution of the advertising, marketing, and membership materials described herein for its respective Health Plans. Additionally, each defendant is responsible for the preparation and distribution of its provider agreements entered into between itself and its healthcare providers for all of its Health Plans.

54.     Whenever this Complaint alleges that any defendant did any act or thing, it is meant that it or its directors and/or its subsidiaries, affiliates, directors, officers, agents, or employees performed or participated in such act or thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of each defendant performed or participated in such act or thing, they were authorized to and did in fact act on behalf of that defendant.

55.     Whenever this Complaint alleges that Humana did any act or thing, it is meant that Humana, and the directors of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of Humana performed or participated in such act or thing, they were authorized to and did in fact act on behalf of Humana.

56.     At all relevant times, each Humana defendant and Humana health plan was an agent and/or employer of the other Humana defendants and Humana health plans. In committing the acts

alleged herein, these defendants acted within the scope of their agency and/or employment and were acting with the consent, permission, authorization and knowledge of their other respective defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein. All actions of the Humana defendants and Humana health plans alleged herein were ratified and approved by the other respective Humana defendants and Humana health plans or their respective officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

57.     At all relevant times, each Humana plan co-conspirator was respectively an agent and/or employer of each and every other Humana plan co-conspirator and the respective defendants. In committing the acts alleged herein, the Humana plan co-conspirators acted within the scope of their respective agency and/or employment and were acting with the consent, permission, authorization and knowledge of each of the other Humana plan co-conspirators and defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.

58.     All actions of the Humana plan co-conspirators and the respective defendants alleged herein were ratified and approved by the other respective Humana plan co-conspirators and the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

59.     Whenever this Complaint alleges that Aetna did any act or thing, it is meant that Aetna, and the directors of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of Aetna performed or participated in such act or thing, they were authorized to and did in fact act on behalf of Aetna.

60.     At all relevant times, each Aetna defendant and Aetna health plan was an agent and/or employer of the other Aetna defendants and Aetna health plans. In committing the acts alleged herein, these defendants acted within the scope of their agency and/or employment and were acting with the consent, permission, authorization and knowledge of their other respective defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein. All actions of the Aetna defendants and Aetna health plans alleged herein were ratified and approved by the other respective Aetna defendants and Aetna health plans or their respective officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

61.     At all relevant times, each Aetna plan co-conspirator was respectively an agent and/or employer of each and every other Aetna plan co-conspirator and the respective defendants. In committing the acts alleged herein, the Aetna plan co-conspirators acted within the scope of their respective agency and/or employment and were acting with the consent, permission, authorization and knowledge of each of the other Aetna plan co-conspirators and defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.

62.     All actions of the Aetna plan co-conspirators and the respective defendants alleged herein were ratified and approved by the other respective Aetna plan co-conspirators and the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

63.     Whenever this Complaint alleges that CIGNA did any act or thing, it is meant that CIGNA., and the directors of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of CIGNA performed or participated in such act or thing, they were authorized to and did in fact act on behalf of CIGNA.

64.     At all relevant times, each CIGNA defendant and CIGNA health plan was an agent and/or employer of the other CIGNA defendants and CIGNA health plans. In committing the acts alleged herein, these defendants acted within the scope of their agency and/or employment and were acting with the consent, permission, authorization and knowledge of their other respective defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein. All actions of the CIGNA defendants and CIGNA health plans or their respective officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

65.     At all relevant times, each CIGNA plan co-conspirator was respectively an agent and/or employer of each and every other CIGNA plan co-conspirator and the respective defendants. In committing the acts alleged herein, the CIGNA plan co-conspirators acted within the scope of

their respective agency and/or employment and were acting with the consent, permission, authorization and knowledge of each of the other CIGNA plan co-conspirators and defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.

66.     All actions of the CIGNA plan co-conspirators and the respective defendants alleged herein were ratified and approved by the other respective CIGNA plan co-conspirators and the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

67.     Whenever this Complaint alleges that Foundation did any act or thing, it is meant that Foundation Health Systems, Inc., and the directors of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of Foundation Health Systems, Inc. performed or participated in such act or thing, they were authorized to and did in fact act on behalf of Foundation Health Systems, Inc.

68.     At all relevant times, each Foundation defendant and Foundation health plan was an agent and/or employer of the other Foundation defendants and Foundation health plans. In committing the acts alleged herein, these defendants acted within the scope of their agency and/or employment and were acting with the consent, permission, authorization and knowledge of their other respective defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein. All actions of the Foundation defendants and Foundation health plans alleged herein were ratified and approved by the other respective Foundation defendants and Foundation

health plans or their respective officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

69.     At all relevant times, each Foundation plan co-conspirator was respectively an agent and/or employer of each and every other Foundation plan co-conspirator and the respective defendants.  In committing the acts alleged herein, the Foundation plan co-conspirators acted within the scope of their respective agency and/or employment and were acting with the consent, permission, authorization and knowledge of each of the other Foundation plan co-conspirators and defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.

70.     All actions of the Foundation plan co-conspirators and the respective defendants alleged herein were ratified and approved by the other respective Foundation plan co-conspirators and the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

71.     Whenever this Complaint alleges that PacifiCare did any act or thing, it is meant that PacifiCare Health Systems, Inc. and PacifiCare Operations, Inc., and the directors of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of PacifiCare Health Systems, Inc. and PacifiCare Operations, Inc. performed

or participated in such act or thing, they were authorized to and did in fact act on behalf of PacifiCare Health Systems, Inc. and PacifiCare Operations, Inc.

72.     At all relevant times, each PacifiCare defendant and PacifiCare health plan was an agent and/or employer of the other PacifiCare defendants and PacifiCare health plans. In committing the acts alleged herein, these defendants acted within the scope of their agency and/or employment and were acting with the consent, permission, authorization and knowledge of their other respective defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.  All actions of the PacifiCare defendants and PacifiCare health plans alleged herein were ratified and approved by the other respective PacifiCare defendants and PacifiCare health plans or their respective officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

73.     At all relevant times, each PacifiCare plan co-conspirator was respectively an agent and/or employer of each and every other PacifiCare plan co-conspirator and the respective defendants.  In committing the acts alleged herein, the PacifiCare plan co-conspirators acted within the scope of their respective agency and/or employment and were acting with the consent, permission, authorization and knowledge of each of the other PacifiCare plan co-conspirators and defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.

74.     All actions of the PacifiCare plan co-conspirators and the respective defendants alleged herein were ratified and approved by the other respective PacifiCare plan co-conspirators and the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters

or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

75.      Whenever this Complaint alleges that Prudential did any act or thing, it is meant that Prudential., and the directors of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of Prudential performed or participated in such act or thing, they were authorized to and did in fact act on behalf of Prudential.

76.      At all relevant times, each Prudential defendant and Prudential health plan was an agent and/or employer of the other Prudential defendants and Prudential health plans. In committing the acts alleged herein, these defendants acted within the scope of their agency and/or employment and were acting with the consent, permission, authorization and knowledge of their other respective defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein. All actions of the Prudential defendants and Prudential health plans alleged herein were ratified and approved by the other respective Prudential defendants and Prudential health plans or their respective officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

77.      At all relevant times, each Prudential plan co-conspirator was respectively an agent and/or employer of each and every other Prudential plan co-conspirator and the respective defendants. In committing the acts alleged herein, the Prudential plan co-conspirators acted within the scope of their respective agency and/or employment and were acting with the consent,

permission, authorization and knowledge of each of the other Prudential plan co-conspirators and

defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts

described herein.

78.     All actions of the Prudential plan co-conspirators and the respective defendants

alleged herein were ratified and approved by the other respective Prudential plan co-conspirators and

the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters

or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and

aiding and abetting violations set forth herein have been and are contrary to stated corporate policy

and to representations to the Plaintiff.

79.     Whenever this Complaint alleges that United did any act or thing, it is meant that

United Healthcare, and the directors of said entities, or their subsidiaries, affiliates, directors,

officers, agents, or employees who performed or participated in such thing, and in each instance

where the subsidiaries, affiliates, directors, officers, agents, or employees of United Healthcare.

performed or participated in such act or thing, they were authorized to and did in fact act on behalf

of United Healthcare.

80.     At all relevant times, each United defendant and United health plan was an agent

and/or employer of the other United defendants and United health plans. In committing the acts

alleged herein, these defendants acted within the scope of their agency and/or employment and were

acting with the consent, permission, authorization and knowledge of their other respective

defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described

herein. All actions of the United defendants and United health plans alleged herein were ratified and

approved by the other respective United defendants and United health plans or their respective

officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though

the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

81.     At all relevant times, each United plan co-conspirator was respectively an agent and/or employer of each and every other United plan co-conspirator and the respective defendants. In committing the acts alleged herein, the United plan co-conspirators acted within the scope of their respective agency and/or employment and were acting with the consent, permission, authorization and knowledge of each of the other United plan co-conspirators and defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.

82.     All actions of the United plan co-conspirators and the respective defendants alleged herein were ratified and approved by the other respective United plan co-conspirators and the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

83.     Whenever this Complaint alleges that Wellpoint did any act or thing, it is meant that Wellpoint of California, Inc., and the directors of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing, and in each instance where the subsidiaries, affiliates, directors, officers, agents, or employees of Wellpoint of California, Inc. performed or participated in such act or thing, they were authorized to and did in fact act on behalf of Wellpoint of California, Inc.

84.     At all relevant times, each Wellpoint defendant and Wellpoint health plan was an agent and/or employer of the other Wellpoint defendants and Wellpoint health plans. In committing

the acts alleged herein, these defendants acted within the scope of their agency and/or employment and were acting with the consent, permission, authorization and knowledge of their other respective defendants, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein. All actions of the Wellpoint defendants and Wellpoint health plans alleged herein were ratified and approved by the other respective Wellpoint defendants and Wellpoint health plans or their respective officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

85. At all relevant times, each Wellpoint plan co-conspirator was respectively an agent and/or employer of each and every other Wellpoint plan co-conspirator and the respective defendants. In committing the acts alleged herein, the Wellpoint plan co-conspirators acted within the scope of their respective agency and/or employment and were acting with the consent, permission, authorization and knowledge of each of the other Wellpoint plan co-conspirators and defendants respectively, and perpetrated and/or conspired to or aided and abetted the unlawful acts described herein.

86. All actions of the Wellpoint plan co-conspirators and the respective defendants alleged herein were ratified and approved by the other respective Wellpoint plan co-conspirators and the respective defendants or their officers, directors, controlling persons, agents, aiders and abetters or co-conspirators even though the overt and predicate acts in furtherance of the conspiracy and aiding and abetting violations set forth herein have been and are contrary to stated corporate policy and to representations to the Plaintiff.

87.     As defendants have engaged in the unlawful overt and predicate acts against the Physicians Groups, the Physicians Groups are not co-conspirators or otherwise involved in the aiding or abetting of the violations set forth herein.

### IV. CLASS ALLEGATIONS

88.  Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

89.     The plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(1)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, and USDC Southern District of Florida Local Rule 23.1, as a class action on behalf of themselves and the nationwide class of all persons defined as:

> All individual physicians and Physician Groups, who are entitled to be compensated by Defendants for services provided to members of Defendants' health plans during the class period from January 1990 to the present date (the "class period").

90.     The named plaintiffs and the alleged class each and all have tangible and legally protectable interests at stake in this action. Specifically, each class member, as a physician providing services under Defendants' healthcare plans, is entitled to reasonably expect he or she will be adequately compensated as bargained for, and further that he or she will be able to provide healthcare services free of economic coercion, extortion, and mononpolistic restraint of trade.

91.     The claims of the named class representatives and the absent class members have a common origin and share a common basis. The claims of all class members originate from the same heavy-handed and extortionate and fraudulent practices of the defendants and the defendants healthcare plans of conspiracy and aiding and abetting.

92.     The proposed class representatives state a claim for which relief can be granted that is typical of the claims of absent class members. If brought and prosecuted individually, each class

member would necessarily be required to prove the instant claim upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

93.      The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members and ensure that the universal claim of the class will be prosecuted with diligence and care by the plaintiffs as representatives of the class.

94.      The members of the class ("class members") are so numerous that joinder of all members is impracticable. Defendants offer managed care services to over 160 million subscribers and accomplishes this through the services of over 500,000 physicians. The class of physicians, however, is ascertainable as the names and addresses of all class members can be identified in business records maintained by the defendants.

95.      There are questions of law and fact common to the class. Such common questions include, *inter alia*:

  a. Whether Defendants' acts and practices constitute violations of applicable law for which Plaintiffs and members of the class are entitled to recover restitution or damages or for which disgorgement of ill-gotten monies is appropriate;

  b. Whether Defendants, through a scheme or artifice, unlawfully attempted to and/or did interfere with, and deprive the plaintiffs and the class of their intangible property right to conduct their business free of extortionate and coercive influence;

  c. Whether Defendants attempted to and/or did exploit Plaintiffs and class members' fear of economic loss and/or loss of business through heavy handed and coercive requirements that Plaintiffs and the class accept Defendants' "all products" requirements;

  d. Whether the plaintiffs and the class have an intangible property right to conduct their business free of extortionate influence;

  e. Whether the plaintiffs and the class have an intangible property right to conduct their business without Defendants' exploitation of fear of economic loss and/or loss of business;

f.  Whether Defendants, through a scheme or artifice, attempted to and/or did deprive the plaintiffs and the class of their intangible property right to conduct their business free of extortionate influence and their intangible property right to practice their profession without Defendants' exploitation of fear of economic loss and/or loss of business;

g.  Whether Defendants engaged in a pattern of racketeering activity and violated RICO;

h.  Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting proximately caused and causes injury to the plaintiffs' and class members' business or property or irreparably harmed and harms the plaintiffs and the class and if so, the appropriate relief to which they are entitled;

i.  Whether Defendants have failed to compensate Plaintiffs and the class as assignees of benefit plans;

j.  Whether Defendants violated the OBRA "Clean-Claim Payment" Regulations, 42 C.F. R. § 417.500(a)(6)

k.  Whether Defendants have breached applicable contracts with plaintiffs and the class;

l.  Whether Defendants are liable to plaintiffs and the class under quantum meruit (work and labor done);

m.  Whether Defendants have been unjustly enriched through the activities described herein.

95.  The prosecution of separate actions by individual members of the plaintiff class against the individual members of the defendants would create a risk of inconsistent adjudications on the common issues of law or fact material to this action.  The same would be true if there were separate class actions by singular plaintiff classes against localized or regional health plans.  The hundreds of thousands of physicians who contract with these health plans would, except for this cause being permitted to proceed as a class, necessitate separate actions across the United States to obtain similar relief based upon the same legal theories.  It is from such large numbers of separate actions that there is the risk of incompatible standards of health plan conduct of the type complained of herein.

96.     Adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members of the class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

97.     Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate final relief with respect to the class as a whole.  The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class.  Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the plaintiff class.  Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions.  The plaintiffs also allege that declaratory and injunctive relief are appropriate for the class as a whole, making certification appropriate under Rule 23(b)(2).  The plaintiffs also allege that questions of law and fact applicable to the class predominate over individual questions and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.  In addition, public policy and the authorities under Rule 23 favor class actions for the purpose of, *inter alia*, deterring wrongdoing and providing judicial relief for individually small, commonly based claims.

98.     The named plaintiffs allege that they are willing and prepared to serve the court and proposed class in a representatives capacity with all of the obligations and duties material thereto.

99.    The self-interests of the named class representatives are co-extensive with and not antagonistic to those of the absent class members. The proposed representatives will undertake to well and truly protect the interests of the absent class members.

100.    The named plaintiffs have engaged the services of counsel indicated below. The said counsel are experienced in complex class litigation and will adequately prosecute this action and will assert, protect and otherwise represent well the named class representatives and absent class members.

101.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the class is impracticable. There will be no difficulty in the management of this action as a class action.

102.    The plaintiffs will fairly and adequately protect the interest of the class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

102.    Plaintiffs aver that there exist no administrative remedies available to them prior to bringing this suit, and even where administrative remedies are allegedly available, the exercise of same is futile.

## VI.  FACTUAL ALLEGATIONS COMMON TO ALL COUNTS
## AGAINST THE HUMANA DEFENDANTS

103.   **Definitions.**

As used herein, the following terms are defined as:

a.    "Provider Agreement" refers to the uniform and standard form provider agreements entered into between Humana and provider class members.

b.    "Physicians Manual" or "Manual" refers to Humana's Physician's Administration Manual.

c.    "Contract Documents" refers to the Provider Agreement.

d.    "Downcoding" is a procedure whereby Humana wrongfully disregards the appropriate CPT Code submitted by a physician provider and arbitrarily changes the CPT or benefits code to an inapplicable code with a lower reimbursement rate. The purpose and result of this automatic "downcoding" is to reduce payments due to physicians. Humana engaged in "downcoding" practices which utilized computer programs not based on medical necessity criteria and having the sole purpose of arbitrarily and wrongfully reducing payments to physician providers. Claims reviewers also utilized wrongful and improper "downcoding" procedures to avoid proper claims payments. The term "downcoding" also includes improper "bundling." Bundling involves violation of Humana's contractual agreement to pay providers 100% of the allowable fee for the primary procedure and a lesser percentage of any additional related procedures. Humana adopted systematic practices for paying 100% only of the cheapest procedure, rather than the primary procedure, thereby effectively engaging in another form of "downcoding" for the purpose of avoiding proper payment and reimbursement to providers.

e.    "Health Plan" means a plan that provides or arranges for the provision of medical and other health services and health insurance to employment groups, other affinity groups and individuals.

f.    "Benefit Plan" means an ERISA-governed employee welfare plan offered by an employer as an employment benefit and provided in exchange for the employee's labor, cash, and/or services.

g.    "Humana Medical Necessity Definition" means the essential factors set forth by Humana in Provider Agreements and Manuals.

h.    According to the Humana Medical Necessity Definition, services and supplies are medically necessary when they are:

a.    consistent with the symptom or diagnosis and treatment of the member's injury or sickness;

b.    appropriate with regard to standards of good medical practice;

c.    not solely for the convenience of a member, physician, hospital or ambulance care facility; and

d.    the most appropriate supply or level of service which can be safely provided to the member. When applied to the care of an inpatient, it further means that the Members' medical symptoms or condition require that the services cannot be safely provided to the member on an outpatient basis.

i.    "Health Policy" means a contract for the provision of health insurance between an insured and Humana Inc. and/or a Humana Plan.

j.    "Utilization Policies and Procedures" means those policies and procedures set forth in the Utilization Management Policies and Procedures Manuals approved by Defendant.

k.    "Undisclosed Cost-Based Criteria" means internal and external criteria based in whole or in part on cost considerations, which are used by Humana to

determine the medical necessity of treatment for coverage purposes, including but not limited to (i) Interqual Criteria, including ISD-AC criteria, (ii) Milliman and Robertson Criteria, and (iii) Value Health Sciences, Inc. criteria and guidelines.

**The Humana Contract and Humana's Improper Relationship with Third Parties.**

104.    Humana has entered into standard form provider agreements with the approximately 330,000 providers nationwide, including Plaintiffs and the Class Members.

105.    Although a local Humana subsidiary is typically a party to the provider agreements, one of the named Humana Defendants is also always a party to such provider agreements. The named Humana Defendants are the parent corporations of the local Humana subsidiaries. Said named Humana Defendants operate, direct, and control the Humana health plan business from the headquarters of the Humana Defendants in Louisville, Kentucky.

106.    All of the substantive practices, policies, and procedures of the Humana health plans are established, implemented, monitored and ratified by the Humana Defendants. The local Humana subsidiaries do not function as independent corporate entities but rather have an alter-ego relationship with the Humana Defendants which generally direct and control the operations of said subsidiaries and, specifically, direct such operations in connection with the provider agreements with class members.

107.    The provider agreements contain and/or incorporate fee schedules and the codes for current procedural terminology recognized by medical providers and insurers (hereinafter referred to as "CPT codes"). CPT codes are applicable to various procedures and services rendered by medical providers including the Plaintiffs and the class members.

108.    The provider agreements typically require the Humana Defendants to pay the physician providers according to fee schedules such as Humana, Medicare or other fee schedules. Such fee schedules are based upon the CPT code system. That is, a particular procedure or service is identified or designated by a particular CPT code and the applicable fee schedule (Humana, Medicare, or otherwise) in turn, establishes a fee or charge for each such CPT code.

109.    The provider agreements also typically provide that the physician providers shall adhere to Humana policies and procedures set out in a physician administration manual (the "Physicians Manual"). The manual obligates Humana, among other things, to base coverage decisions on medical necessity.

110.    The Humana provider agreements and manuals were standard and uniform in all respects relevant to Plaintiffs' claims and the claims of Class Members. All contained the same Humana medical necessity definition and were uniform in providing for payment according to applicable fee schedules and the CPT Code system.

111.    In its provider agreements and its Physicians Manual, as well as other standard bulletins and newsletters periodically mailed by Humana to class members, Humana has consistently represented that its coverage and treatment decisions and its payments and reimbursements to providers, would be on the basis of medical necessity and applicable fee schedules and CPT codes.

112.    However, contrary to its agreements with and representations with class members, Humana has adopted internal policies and procedures specifically designed to wrongfully and systematically obstruct, reduce, delay and deny payments and reimbursements to health care providers. The wrongful internal policies and procedures of Humana are discussed in detail *infra*, "Common Factual Allegations" relating to Humana.

113.     Accordingly, because of Humana's actual and undisclosed internal policies and procedures for wrongfully denying and avoiding payments and reimbursements due to providers, the Humana statements in the Provider Agreements and the Physician Manuals that Humana would pay providers based upon medical necessity and applicable fee schedules and CPT codes constitute knowing and intentional misrepresentations by Humana. The misrepresentations in Humana's standard provider agreement and Physician's Manual were uniform in all material respects and uniformly concealed Humana's wrongful internal policies and procedures.

114.     These wrongful procedures include but are not limited to payment of incentives to Humana utilization and claim reviewers to deny claims, utilization of computer programs to select authorizations and claims for arbitrary limitation or denial and without regard to medical necessity, and application by utilization and claims reviewers of criteria unrelated to medical necessity to limit or deny claims.

115.     In addition, Humana systematically targeted, coerced, threatened and intimidated providers who objected to Humana's wrongful practices. Specifically, Humana has utilized computer programs to target physicians who provide medically necessary services. These computer programs are based upon inappropriate criteria unrelated to medical necessity.

116.     Humana identifies such "targeted" physicians as "outliers" and Humana then threatens and intimidates such physicians with retaliation, audits, focused reviews, arbitrary claims denials and expulsion from Humana's network.

117.     Humana improperly provided incentives to its authorization and claim reviewers for the "targeting" of these physicians.

118.     Physicians whose requests for admissions, for procedure approval and reimbursement requests exceeded pre-established targets established by Humana were identified by Humana's computer system, thus "targeting" these physicians.

119.     The pre-established Humana targets were not based upon medical necessity but rather were based upon improper criteria and were developed for the purpose of avoiding, reducing, or denying payment and reimbursement to physicians.

120.     The provider agreement and Manuals also have failed to disclose that Humana delegated and subcontracted the utilization and claims review process, in many instances, to third parties.  Said third parties  likewise improperly based utilization and claim approval decisions on improper policies and procedures other than medical necessity.

121.     Specifically, Humana delegated the making of claims determinations to a Florida corporation, Aztec Medical Systems, LC.  Aztec, with the full knowledge and complicity of Humana, systematically made improper claims decisions based upon criteria unrelated to medical necessity and also engaged in the wrongful "downcoding" of claims referred to Aztec for determination.

122.     Humana also contracted with Value Health Sciences, Inc., a division of Value Health, Inc., a corporation with its principal place of business in Santa Monica, California, for purported "medical review systems" which allegedly reviewed requests for authorizations and claims for medical necessity.  In fact, the Value Health "medical review systems" made utilization and claims determinations based upon improper criteria unrelated to medical necessity.  Humana and Value Health utilized this purported "medical review system" to replace the exercise of independent judgment by qualified medical professionals, including the provider class members and substituted electronic, non-medical criteria for limiting or denying claims.  ProCare Sciences, Inc., which has

its principal place of business in Santa Monica, California, is the successor to Value Health Sciences, Inc.

123. In addition, Humana contracted with Milliman & Robertson, Inc., a firm of actuaries and consultants, to provide services relating to the review of authorization requests and claims and the payment of claims. In concert with Milliman & Robertson, Humana developed purported actuarial criteria, unrelated to medical necessity, for the purpose of wrongfully denying payment of claims and reducing payments to providers.

## C. Humana's Breach of Contract.

124. Humana has wrongfully failed and refused to pay provider claims for medical services rendered.

125. Humana has wrongfully disregarded Humana's medical necessity definition in refusing to approve or make payments to providers for medical services.

126. Humana has wrongfully applied improper criteria unrelated to medical necessity, in refusing to approve or make payments to providers for medical services.

127. Humana has engaged in improper "downcoding" and "bundling" in refusing to approve or make payments to providers for medical services.

128. Humana has failed to implement reasonable standards, practices, and procedures for the prompt investigation of provider requests for authorization and claims and has systematically failed to properly investigate such requests and claims.

129. On information and belief, Humana has intentionally refused to reasonably investigate requests for authorization and claims submitted by providers where the subscriber insured

was subject to ERISA because Humana knew and understood that such subscribers had only limited remedies available to them.

130.    Humana failed to affirm or deny coverage for claims within a reasonable period of time and intentionally refused to act in good faith in connection with paying claims.

131.    Humana has systematically failed and refused to process claims as required by applicable state "prompt pay" statutes.

132.    Humana has wrongfully based payments to providers on Undisclosed Cost Based Criteria unrelated to or different from proper considerations of medical necessity.

133.    Humana has wrongfully paid incentives to Humana utilization and claim reviewers to induce reviewers to deny claims properly payable to providers.

134.    Humana has wrongfully delegated utilization and claims review to third party organizations not qualified to perform such review and have wrongfully paid incentives to such third party reviewers to induce denial of claims.  Indeed, Humana has intentionally and wrongfully failed to make third party reviewers aware of the definitions of medical necessity and other utilization and payment criteria contained in the Contract Documents.

135.    Humana has wrongfully and improperly paid incentives to Humana utilization and claims reviewers to induce those reviewers to limit or deny medically necessary and properly payable claims.

136.    Humana has improperly utilized and adopted computer software programs and internal utilization and claims reviewer procedures to arbitrarily and randomly select a specified number or percentage of requests for authorization and claims for limitation or denial without regard to medical necessity.

137.     Humana has wrongfully adopted and utilized computer software programs and internal utilization and claims review procedures to identify and punish, coerce, threaten and intimidate physician providers who provided medically necessary services.

138.     In addition, Humana has engaged in and committed the material fraudulent concealment and omission and fraudulent misrepresentations referred in Paragraphs ___ , *infra*.

### D.     Humana's Omissions, Suppression and Concealment

139.     Humana has fraudulently concealed from Class Members numerous practices that have the purpose and effect of breaching, or facilitating the breach, of Humana's obligation to compensate and reimburse class members for medical services rendered under applicable provide agreements.

1.     The Contract Documents failed to disclose that Humana provides direct cash bonuses and other financial incentives to utilization and claims reviewers who limit or deny claims for service or limit hospital admissions and stays regardless whether those authorization, claims or hospital admissions otherwise satisfied the Medical Necessity Definition.  The bonuses and financial incentives provided by Humana including, among other things, a "Utilization Incentive Plan" that provided for direct bonus payments and other benefits to utilization claim reviewers who limited or denied a certain percentage or absolute number of submitted requests or claims for hospital covered costs from Class Members, irrespective whether the submitted requests or claims satisfied the Medical Necessity Definition.  These incentives thus reduced the value of the Health Plans for which Class Members paid.

2.     The Contract Documents failed to disclose that in addition to, or in place of, the Medical Necessity Definition, Humana uses Undisclosed Cost-Based Criteria to

approve or deny benefit requests or claims by Class Members. These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria including ISD-AC criteria; (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Science. While these Undisclosed Cost-Based Criteria vary in detail, they share one critical dimension: in whole or in part, they all base coverage determinations on considerations other than medical necessity and contrary to the terms of the Medical Necessity Definition set forth in the Contract Documents. All Undisclosed Cost-Based Criteria therefore are designed to reduce the level of medically necessary services available to Class Members and did reduce the value of the Health Plans for which Class Members paid. By omitting to disclose the existence and use of these cost-based criteria to class members, and by affirmatively misrepresenting to class members that coverage decisions would be made based on the Medical Necessity Definition, Humana was able to unjustly enrich itself at the expense of class members.

3. The Contract Documents failed to disclose that Humana subcontracts to third parties, such as Value Health Science (VHS), responsibility and authority to review utilization requests and claims and manage benefits, for certain medical conditions and medical procedures. In determining payment eligibility for utilization requests and claims submitted by Class Members, these third parties use different criteria from and more restrictive than, the Humana Medical Necessity Definition.

4. The Contract Documents failed to disclose that in determining payment eligibility for claims submitted by Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the

training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Contract Documents.

5. Also, Humana engages in undisclosed automatic "downcoding" of claims submitted by physicians, a process whereby (among other things) Humana arbitrarily changes the benefits code assigned to rendered services so as to reduce the payments due physicians. Arbitrary or automatic downcoding results in a wrongful failure to properly pay provider Class Members for services rendered.

### E.   Humana's Material Misrepresentations to the Classes

140.   Having made the omissions identified in the preceding paragraph, Humana also misrepresented to the provider Class Members in the Contract Documents that treatment and coverage decisions under Humana Health Plans would be based on the Medical Necessity Definition. This representation was an affirmative misrepresentation because Humana knew that Humana (and entities to whom Humana delegated responsibility for administering its Health Plans) made treatment and coverage decisions on the basis of cost-based criteria and financial incentives unrelated to, and more restrictive than, the Medical Necessity Definition, with the effect of reducing the value of the Health Plans for which Class Members paid.   For example:

1. Humana knowingly uses Undisclosed Cost-Based Criteria, in addition to or in place of the Medical Necessity Definition, to approve or deny benefit claims by Class Members.   These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, including ISD-AC criteria (ii) Milliman & Robertson guidelines, (iii) guidelines and criteria developed and/or used by Value Health Science.   While these Undisclosed Cost-Based Criteria vary in detail, they share one critical

dimension: in whole or in part, they all based coverage determinations on considerations other than medical necessity and contrary to the terms of the Medical Necessity Definition set forth in the Contract Documents.

2.      Humana provides undisclosed direct cash bonuses and other financial incentives to utilization and claims reviewers who limit or deny utilization and claims for service or limit hospital admissions and stays regardless whether those utilization request, claims or hospital admissions otherwise satisfied the Medical Necessity Definition. The bonuses and financial incentives provided by Humana included, among other things, a "Utilization Incentive Plan" that provided for direct bonus payments and other benefits to utilization claim reviewers who denied a certain percentage or absolute number of submitted claims for hospital costs from Class Members, irrespective whether the submitted authorization requests or claims satisfied the Medical Necessity Definition.

3.      Humana does not disclose that it subcontracts to third parties, such as Value Health Science (VHS), responsibility and authority to review utilization and claims and manage benefits, for certain medical conditions and medical procedures.   In determining payment eligibility for utilization requests and claims submitted by Class Members, these third parties use criteria different from and more restrictive than, the Humana Medical Necessity Definition.

4.      Humana does not disclose that in determining payment eligibility for utilization requests or claims submitted by Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the training and specialization necessary to determine whether particular

benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Disclose Documents.

5.   Humana engages in undisclosed automatic "downcoding" of claims submitted by physicians, a process whereby (among other things) Humana arbitrarily changes the benefits code assigned to rendered services so as to reduce the payments due physicians.   Arbitrary or automatic downcoding results in a wrongful failure to property pay provider Class Members for services rendered.

Taken together, these various undisclosed arrangements and incentives are designed to breach, or facilitate the breach of Humana's obligation to compensate and reimburse provider Class Members for medical services rendered under applicable provider agreements.

**F.   Humana Operates Its Network to Implement and Promote Its Wrongful Scheme**

141.   Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to Class Members. Through the centralized structure, Humana knowingly and intentionally:

1.   Maintained centralized control over the content of the provider agreements, physician manuals and related documents.

2.   Maintained centralized control over, and deceived Class Members with respect to, the existence and use of Undisclosed Cost-Based Criteria;

3.   Maintained control, implemented, and deceived Class Members with respect to utilization and claims reviewer bonuses, including without limitation, the Utilization Incentive Plan that provided for direct bonus payments and other benefits to

utilization and claim reviewers who limited or denied a certain percentage or absolute number of submitted authorization requests or claims from Class Members.

4.     Maintained centralized control over, arranged for, and deceived Class Members with respect to subcontracts to third parties, such as Value Health Science, for the review of authorization requests or claims and the management of providing benefits for certain medical conditions and medical procedures.

5.     Maintained central control over, and precluding disclosure to Class Members of the Undisclosed Cost-Based Criteria used to determine whether to approve or deny utilization and reimbursement of requests or claims by Class Members, including without limitation the Interqual Criteria, ISD-AC criteria, the Milliman & Robertson guidelines, and guidelines and criteria developed and/or used by Value Health Science.

6.     Maintaining centralized control over, and precluding disclosure to Class Members of, subcontracts to third parties, such as Value Health Science, for the review of utilization requests or claims and the management of providing benefits for certain medical conditions and medical procedures.

**G.     Harm to the Class**

142.     The provider Class Members have suffered direct injury to their property rights under the Contract Documents. Specifically, as a result of the scheme and artifice of Humana, as alleged herein, the provider Class Members have been denied proper payment for medical services rendered by them and, further, have suffered direct tangible economic injury as a result of Humana's obstruction, misrepresentations and omissions, and failure to timely pay proper claims.

143.    As a proximate result of the Humana Defendants' scheme and artifice to defraud plaintiffs and the class, extortion and coercion through use of monopolistic and anti-competitive pressures created by the Humana Defendants' dominance of the market, Plaintiff and the class have suffered direct injury to their property rights.

## VII.  FACTUAL ALLEGATIONS COMMON TO ALL COUNTS AGAINST ALL DEFENDANTS

144.    This case arises from Defendants' systematic, intentional and wrongful refusal to pay and reimburse healthcare providers for medical services rendered to Defendants' insureds. Defendants have adopted systematic internal procedures designed to wrongfully deny payment to providers and to avoid, obstruct, and delay payment and reimbursement to medical providers.

145.    Defendants have entered into standard form provider agreements with hundreds of thousands of physicians nationwide, including Plaintiffs and the Class Members.

146.    Although a subsidiary of a Defendant may typically be a party to the provider agreements, one of the named Defendants is also always a party to such provider agreements. The named Defendants are the parent corporations of the local Defendants subsidiaries. Said named Defendants operate, direct, and control their health plan business from their parent corporate headquarters.

147.    All of the substantive practices, policies, and procedures of the Defendants' health plans are established, implemented, monitored and ratified by the Defendants themselves. The local subsidiaries of the named Defendants do not function as independent corporate entities but rather have an alter-ego relationship with the named Defendants which generally direct and control the operations of said subsidiaries and, specifically, direct such operations in connection with the provider agreements with class members.

148.     The provider agreements require the physician providers to follow billing procedures based upon fee schedules and the codes for current procedural terminology recognized by medical providers and insurers (hereinafter referred to as "CPT codes").  CPT codes are applicable to various procedures and services rendered by medical providers including the Plaintiffs and the class members.

149.     The provider agreements typically require the Defendants to pay the physicians according to fee schedules such as those promulgated by Defendants, Medicare or other fee schedules.  Such fee schedules are based upon the CPT code system.  That is, a particular procedure or service is identified or designated by a particular CPT code and the applicable fee schedule (whether promulgated by Defendants, Medicare, or otherwise) in turn, establishes a fee or charge for each such CPT code.

150.     The provider agreements also typically provide that the physician providers shall adhere to Defendants' policies and procedures set out in a physician administration manual (the "Physicians Manual").  The Manual obligates Defendants, among other things, to base coverage decisions on medical necessity.

151.     Each of the Defendants' own provider agreements and manuals are standard and uniform in all respects relevant to Plaintiffs' claims and the claims of Class Members.  Each of the separate Defendants' manuals contain the same definitions of medical necessity and each is uniform in providing for payment according to applicable fee schedules and the CPT Code system.

152.     In their provider agreements and standard physician's manuals, as well as other standard brochures and materials provided to class members, Defendants have consistently represented that their coverage and treatment decisions and their payments and reimbursements to providers, would be on the basis of medical necessity and applicable CPT codes.

153.    However, contrary to their agreements and representations to class members, Defendants have each adopted internal policies and procedures specifically designed to systematically obstruct, reduce, delay and deny payments and reimbursements to health care providers. The wrongful internal policies and procedures of Defendants are discussed in detail below "common factual allegations." The misrepresentations in Defendants' standard provider agreements, physician's manuals and other purported disclosures to class members by each Defendant are uniform in all material respects and uniformly conceal each Defendants' wrongful internal policies and procedures.

154.    These wrongful procedures include but are not limited to payment of incentives to Defendants' claim reviewers to deny claims, utilization of computer programs to select claims for denial arbitrarily and without regard to medical necessity, and utilization by claims reviewers of criteria unrelated to medical necessity to deny claims.

155.    In addition, Defendants systematically target, coerce, threaten and intimidate providers who objected to Defendants wrongful practices. Specifically, Defendants have utilized computer programs to target physicians who provide medically necessary services. These computer programs are based upon inappropriate criteria unrelated to medical necessity. Defendants identify such physicians as "outliers" and Defendants then threaten and intimidates such physicians with retaliation, audits, arbitrary claims denials and expulsion from Defendants' networks.

156.    Defendants have fraudulently concealed from plaintiffs and the class numerous practices that have the purpose and effect of breaching, or facilitating the breach, of Defendants' obligation to compensate and reimburse plaintiffs and the class for medical services rendered under applicable provider agreements.

157.     Having made the omissions identified below, Defendants also misrepresent to plaintiffs and the class in their contract documents that treatment and coverage decisions under Defendants health plans are based on their definition of "Medical Necessity". This representation is an affirmative misrepresentation because Defendants know that they (and entities to whom Defendants delegate responsibility for administering their Health Plans) make treatment and coverage decisions on the basis of cost-based criteria and financial incentives unrelated to, and more restrictive than, their own definitions of "Medical Necessity", with the effect of reducing the reimbursement levels below the value of the health services provided by Plaintiffs and the Class. For example:

158.     Defendants contracts fail to disclose that Defendants provide direct cash bonuses and other financial incentives to claims reviewers who deny claims for service or limit hospital admissions and stays regardless whether those claims or hospital admissions otherwise satisfied their own definitions of "Medical Necessity". The bonuses and financial incentives include direct bonus payments and other benefits to claim reviewers who deny a certain percentage or absolute number of submitted claims for hospital costs from Plaintiffs and the Class, irrespective whether the submitted claims satisfied their own definition of "Medical Necessity".

159.     Defendants contracts fail to disclose that in addition to, or in place of, their own definitions of "Medical Necessity", Defendants utilize undisclosed cost-based criteria, to approve or deny benefit claims by Plaintiffs and the Class.  These undisclosed cost-based criteria include defendants' own guidelines and criteria, as well as guidelines and criteria of third parties, who remain undisclosed to Plaintiffs and the Class.  While these undisclosed cost-based criteria vary in detail, they share one critical dimension: in whole or in part, they all base coverage determinations on considerations other than realistic medical necessity and contrary to their own definitions of the

term "Medical Necessity" as set forth in Defendants contract documents. All undisclosed cost-based criteria therefore are designed to reduce the reimbursement amounts to points below the actual cost of Plaintiffs and the class' provision of truly medically necessary services. By omitting to disclose the existence and use of these cost-based criteria to class members, and by affirmatively misrepresenting to class members that coverage decisions would be made based on the "Medical Necessity" definitions set forth in their own contracts, Defendants are able to unjustly enrich themselves at the expense of Plaintiffs and the class.

160.    Defendants contract documents fail to disclose that Defendants subcontract to third parties, the responsibility and authority to review claims and manage benefits, for certain medical conditions and medical procedures.

161.    Specifically, Defendants have delegated the making of claims determinations to third party corporations such as Milliman & Robertson, a firm of actuaries and consultants, to provide services relating to the review of claims and the payment of claims. In concert with Millimen & Robertson, Defendants have developed purported actuarial criteria, unrelated to medical necessity for the purpose of wrongfully denying payment of claims and reducing payments to providers.

162.    In determining payment eligibility for claims submitted by Plaintiffs and the class, these third parties use different criteria from and more restrictive than, the Defendants definitions of "Medical Necessity".

163.    Defendants contracts fail to disclose that in determining payment eligibility for claims submitted by Plaintiffs and the class, Defendants, as well as third parties with which Defendants subcontract, use both physicians and non-physicians who lack the training and specialization necessary to determine whether particular benefits should be provided in accordance

with Defendants definition of "Medical Necessity" and as furnished to Plaintiffs and the class in Defendants' contract documents.

164.    Defendants also engage in undisclosed automatic "downcoding" of claims submitted by physicians, a process whereby (among other things) Defendants arbitrarily, and without prior notice, will change the benefits code assigned to rendered services so as to reduce the payments due physicians. Arbitrary or automatic downcoding results in a wrongful failure to properly pay Plaintiffs and the class for services rendered.

165.    Defendants also engage in undisclosed automatic "bundling" of claims submitted by physicians, a process whereby (among other things) Defendants arbitrarily, and without prior notice, will combine the benefits codes of two or more procedures in order to reduce the payments due physicians for the health services they provide. Arbitrary or automatic bundling results in a wrongful failure to properly pay Plaintiffs and the class for services rendered.

166.    Taken together, these various undisclosed arrangements and incentives are designed to breach, or facilitate the breach of Defendants' obligations to compensate and reimburse plaintiffs and the class for medical services rendered under applicable provider agreements.

167.    Defendants purposefully created centralized structures to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to plaintiffs and the class. Through the centralized structures, Defendant knowingly and intentionally:

> 1.    Maintain centralized control over the content of the provider agreements, physician manuals and related documents.
>
> 2.    Maintain centralized control over, and deceive Plaintiffs and the class with respect to, the existence and use of undisclosed cost-based criteria;

3.     Maintain control, implement, and deceive Plaintiffs and the class with respect to claims reviewer bonuses, that provide for direct bonus payments and other benefits to claim reviewers who deny a certain percentage or absolute number of submitted claims from Plaintiffs and the class

4.     Maintain centralized control over, arrange for, and deceive Plaintiffs and the class with respect to subcontracts to third parties, for the review of claims and the management of providing benefits for certain medical conditions and medical procedures.

5.     Maintain central control over, and preclude disclosure to Plaintiffs and the class of the undisclosed cost-based criteria used to determine whether to approve or deny reimbursement of claims by Plaintiffs and the class, including without limitation, guidelines and criteria developed and/or used by undisclosed third parties.

6.     Maintain centralized control over, and preclude disclosure to Plaintiffs and the class of, subcontracts to third parties, for the review of claims and the management of providing benefits for certain medical conditions and medical procedures.

168.     Contrary to misrepresentations that physicians cannot be penalized for filing a complaint or appeal, Defendants fail to provide a reasonable mechanism for their physicians to appeal a Defendants' decision regarding medical necessity or the funding necessary to provide the care. Instead, the appeals process, (where it exists), is created and applied in an arbitrary, confusing, costly and overly-time consuming manner designed to discourage the physician from appealing the Defendants' determination of "medical necessity" or reimbursement.

169.     Defendants base their funding and coverage decisions on their own fiscal determinations and are not bound by the medical necessity decisions of Plaintiffs and the class or

sound actuarial projections as to what it actually costs to provide the medically appropriate care Plaintiffs and the class provide to Defendants' members.

170.    Defendants' formularies or lists of covered prescription drugs are subject to change at Defendants' discretion. Defendants' decisions to remove a drug, even in the middle of treatment, is based upon financial considerations and incentives from pharmaceutical manufacturers rather than the members' healthcare need or the physicians' medical expertise. Such decisions are based solely on cost without consideration of the efficacy or the potency of the drug.

171.    Defendants' contracts create ostensibly "shared" risk pools for provision of pharmacy services. In the event a pool falls short, the parties are required to make up the shortage in accordance with a contractually pre-determined split.

172.    Although the risk is presumably "shared", Defendants base their funding of the risk pools on projections, which they know are unsound, (assuming any projection could be sound), and which Defendants know are inadequate to cover the reasonably foreseeable costs of providing pharmacy services to their patients. This information, however, is concealed from plaintiffs and the class, who likewise have no input into the creation of the risk pool arrangement. As a result, Defendants' own "risk" in these pharmaceutical pools is no risk at all, and represents yet another method by which Defendants secretly shift the costs of providing healthcare to Plaintffs and the class.

173.    For example, Defendants set reimbursement rates at unreasonably low levels which are not sufficient to cover the cost of providing the services promised under their policies. By providing reimbursement that is too low to cover the cost of providing medically appropriate care, Defendants attempt to illegally exert control over the range of services a physician can realistically provide.

174. Defendants have also utilized their overwhelming and dominant economic and market power to coerce Plaintiffs and the class into accepting contracts and Defendants' policies and practices on a "take it or leave it" basis, whereby in order for physicians to see and treat members of Defendants' various health plans, physicians are required to provide health care services for patients covered by capitated insurance along with patients covered by fee for service insurance. Defendants' refusal to negotiate regarding policies, practices, payment rates, and contract provisions directly injures plaintiffs and the class who are forced to accept "all products" of health insurance reimbursement put forth by Defendants in lieu of being denied patient referrals or even "black-listed" by Defendants altogether.

175. Through their market dominance, Defendants have also maintained apolicy and practice of retaining the power to unilaterally amend the terms of their physician contracts, including fee structures and clinical protocols and procedures.

176. Through their overall dominance of the health insurance industry, Defendants have engaged in extortionate conduct designed to exploit Plaintiffs and the class' fear of economic loss or loss of business through the use of their restrictive "all products" requirements. Not only is this arrangement unconscionable as an illegal restraint of trade in interstate commerce, but it is also a method by which Defendants' practice their business of extorting plaintiffs and the class through fear of economic loss.

177. Furthermore, Plaintiffs and the class must also bear the burden of ever-increasing expenditures of administrative time and expense, all without compensation, to the detriment of their business and property.

178. As explained herein, each of the defendants engages in fraudulent and deceptive healthcare and health management practices that are unlawful pursuant to the provisions of RICO

and ERISA. Plaintiffs allege that those similar or identical practices are not undertaken in isolation by each defendant, but are instead undertaken in adherence to an agreed-upon industry-wide approach to managed care, developed and perpetuated in conjunction with the Non-Managed Care Organization ("MCO") co-conspirators.

179.    These third-party Non-MCO co-conspirators create and promulgate reimbursement guidelines that effect reimbursement levels below the actual cost of the healthcare services provided by Plaintiffs and the Class. This conspiracy involves, *inter alia*: (1) the development and adoption of clinical practice guidelines and related healthcare review criteria; (2) the joint development of accreditation standards by the managed healthcare industry; (3) participation in trade associations that develop common industry standards and/or act as vehicles by which their members could exchange sensitive business information or otherwise collude; and (4) the use of industry informational sources to facilitate such collusion.

180.    As a proximate result of Defendants' scheme and artifice to defraud plaintiffs and the class, extortion and coercion through use of monopolistic and anti-competitive pressures created by Defendants' dominance of the market, Plaintiff and the class have suffered direct injury to their property rights.

181.    Defendants have also concealed from Plaintiff and the class their own collusive activities in which all Defendants are engaged in their domination, and control over the health insurance business in the United States. Through their collusive efforts, along with the aid and assistance (and through the use of) other third-party co-conspirators, Defendants have engaged in a scheme to artificially set healthcare reimbursement rates to physicians, without regard to actuarial soundness of those rates. Furthermore, Defendants have also acted in restraint of interstate commerce and trade through their illegal use of "all products" or tying arrangements in negotiation

with physicians. These arrangements are illegally offered to physicians in a "take it or leave it" basis, leaving the plaintiffs and the class with no meaningful choice but to accept Defendants' bargaining terms, no matter how oppressive, or risk losing all patients and/or patient referrals.

182.     Defendants' conduct, as described herein constitutes a pattern of racketeering activity as set forth in the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Defendants are liable to the class members under RICO. Defendants are also liable to the class members for the additional claims breach of ERISA obligations to pay benefits; common law breach of contract; quantum meruit; violation of OBRA regulations; violation of substantially similar state statutes requiring prompt payment of claims to providers; and unjust enrichment.

183.     In furtherance of their profit goals, Defendants have and are continuing to conspire with and aid and abet certain unknown co-conspirators and aiders and abetters (such as those persons or entities providing support for Defendants' acquisition of other PPOs, HMOs and POSs) in attempting to and actually extorting property interests from Plaintiffs and the class. Defendants' conduct has and is continuing to result in multiple unlawful acts of extortion under 18 U.S.C. § 1951(b)(2), thereby damaging Plaintiffs and the class in its business or property.

184.     In committing multiple acts of extortion under 18 U.S.C. § 1951(b)(2), Defendants have traveled in interstate commerce and have utilized the United States mail for the purpose of and committing such illegal acts through policy making and implementation, the distribution of materials to Plaintiffs and the class, through seminars, training, contract negotiations, audits, inspection visits, and have thereby committed multiple violations of the Travel Act, 18 U.S.C. § 1952(a), which have damaged and which continue to damage Plaintiffs and the class in its business or property.

185.     Defendants have also exhibited a pattern of conduct constituting mail and wire fraud in their intentional misrepresentations to Plaintiffs and the class of material facts designed to induce

their reliance upon same, through use of the United States mails and interstate wire transmissions, in violation of 18 U.S.C. § § 1341 and 1343, in order to further their fraudulent scheme.

186.     Furthermore, Defendants have acted to improperly influence and interfere with employee welfare benefit plans by accepting and soliciting monetary compensation in interference with those plans in violation of 18 U.S.C. § 1954.

187.     By engaging in this unlawful scheme, and conspiring to violate 18 U.S.C. § 1962(a) and (c) and by continuing to commit multiple overt acts and RICO predicate acts of mail fraud, wire fraud, extortion, and Travel Act violations, Defendants have proximately caused Plaintiffs and the class, injury to its business or property and have violated 18 U.S.C. § 1962(d). By engaging in this unlawful scheme to violate 18 U.S.C. § 1962(a) and (c), Defendants have likewise violated 18 U.S.C. § 2 and have acted as principals in seeking to and in aiding and abetting unlawful schemes to violate 18 U.S.C. § 1962(a) and (c).

188.     The Defendants' violations of federal laws and the effects thereof are continuing and will continue unless compensatory money damages, treble damages (where applicable), and declaratory or injunctive relief prohibiting the Defendants' illegal acts which constitute a pattern of racketeering activity.

189.     The relief that the Plaintiffs and the class seek is money damages (for the injury to their business and property) and treble damages.  Plaintiffs also seek declaratory and injunctive relief, costs of suit, attorneys' fees, and such other relief as this Honorable Court deems just and proper.

## VIII. GENERAL ALLEGATIONS RELATING TO ALL CLAIMS FOR RELIEF

190.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein, and the following allegations are made upon Plaintiffs information and belief.

A.    **RICO.**

200.    These claims arise under 18 U.S.C. § 1964(a) and (c) of RICO and seek to obtain injunctive and declaratory relief against the defendants for violations of 18 U.S.C. § 1962(a) and (c), for a conspiracy to violate 18 U.S.C. § 1962(a) and (c) in violation of 18 U.S.C. § 1962(d) and for seeking to aid and abet and for aiding and abetting violations of 18 U.S.C. § 1962(a) and (c) within the meaning of 18 U.S.C. § 2.

201.    The Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1964(c).

202.    At all times relevant hereto, the Plaintiffs and the class, and the defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

203.    Plaintiffs and the class allege alternative theories of enterprise.  An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

204.    The first theory of enterprise is that the health care delivery system in the United States is an enterprise.  The health care delivery system is made up of physicians and other health care providers who must be associated in fact for the system to function.  The health care delivery system in the United States has an ascertainable structure separate and apart from the pattern of racketeering conduct. The health care providers must be associated and must function as at least an informal organization to provide health care services to the residents of the United States.  The defendants and other for profit health plans have sought to participate in the affairs of the enterprise through the pattern of racketeering activity that Plaintiff and the class have alleged.

205.    Alternatively, the Plaintiff and the class allege that the health care systems within each geographic region constitute enterprises and that the defendants have participated in the affairs of those enterprises through a pattern of racketeering conduct.

206.     Alternatively, Plaintiff and the class allege that the third-party entities which promulgate health care reimbursement guidelines and/or which are subcontracted by Defendants for the purpose of reviewing claims made of Defendants by Plaintiffs and the class, constitute an enterprise, in whose affairs Defendants have participated and/or exerted control or influence.

207.     Under all theories of enterprise alleged by the plaintiffs and the class, the enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants engage.

208.     With respect to the activities alleged herein, the Defendants acted at all times with malice toward the class, intent to engage in the conduct complained of for the benefit of the corporate Defendants and with knowledge that such conduct constituted unlawfulness. Such conduct was done with actionable wantonness and reckless disregard for the rights of the plaintiffs and the class, as well as the laws to which the Defendants are subject, the same amounting to actionable wantonness.

209.     With respect to the activities alleged herein, each Humana defendant and Humana health plan aided and abetted each other Humana defendant and Humana health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Each Humana defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business. In furtherance of these agreements, each Humana defendant and Humana health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

210.    With respect to the overt acts and activities alleged herein, each Humana defendant and Humana health plan conspired with each other Humana defendant and Humana health plan, and with others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d).  Each Humana defendant and Humana health plan also agreed and conspired with each other Humana defendant and Humana health plan to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to wrongfully retain money owed to Plaintiffs and the class.  Each Humana defendant and Humana health plan also agreed and conspired with each other Humana defendant and Humana health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

211.    With respect to the activities alleged herein, each Aetna defendant and Aetna health plan aided and abetted each other Aetna defendant and Aetna health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c).  Each Aetna defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business.  In furtherance of these agreements, each Aetna defendant and Aetna health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

212.    With respect to the overt acts and activities alleged herein, each Aetna defendant and Aetna health plan conspired with each other Aetna defendant and Aetna health plan, and with

others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d). Each Aetna defendant and Aetna health plan also agreed and conspired with each other Aetna defendant and Aetna health plan to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to wrongfully retain money owed to Plaintiffs and the class. Each Aetna defendant and Aetna health plan also agreed and conspired with each other Aetna defendant and Aetna health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

213. With respect to the activities alleged herein, each CIGNA defendant and CIGNA health plan aided and abetted each other CIGNA defendant and CIGNA health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Each CIGNA defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business. In furtherance of these agreements, each CIGNA defendant and CIGNA health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

214. With respect to the overt acts and activities alleged herein, each CIGNA defendant and CIGNA health plan conspired with each other CIGNA defendant and CIGNA health plan, and with others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d). Each CIGNA defendant and CIGNA health plan also agreed

and conspired with each other CIGNA defendant and CIGNA health plan to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to wrongfully retain money owed to Plaintiffs and the class. Each CIGNA defendant and CIGNA health plan also agreed and conspired with each other CIGNA defendant and CIGNA health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

215.    With respect to the activities alleged herein, each Foundation defendant and Foundation health plan aided and abetted each other Foundation defendant and Foundation health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Each Foundation defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business. In furtherance of these agreements, each Foundation defendant and Foundation health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

216.    With respect to the overt acts and activities alleged herein, each Foundation defendant and Foundation health plan conspired with each other Foundation defendant and Foundation health plan, and with others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d). Each Foundation defendant and Foundation health plan also agreed and conspired with each other Foundation defendant and Foundation health plan to participate, directly or indirectly, in the fraudulent scheme or artifice

alleged herein, to wrongfully retain money owed to Plaintiffs and the class. Each Foundation defendant and Foundation health plan also agreed and conspired with each other Foundation defendant and Foundation health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

217.    With respect to the activities alleged herein, each PacifiCare defendant and PacifiCare health plan aided and abetted each other PacifiCare defendant and PacifiCare health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Each PacifiCare defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business. In furtherance of these agreements, each PacifiCare defendant and PacifiCare health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

218.    With respect to the overt acts and activities alleged herein, each PacifiCare defendant and PacifiCare health plan conspired with each other PacifiCare defendant and PacifiCare health plan, and with others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d). Each PacifiCare defendant and PacifiCare health plan also agreed and conspired with each other PacifiCare defendant and PacifiCare health plan to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to wrongfully retain money owed to Plaintiffs and the class. Each PacifiCare defendant and PacifiCare

health plan also agreed and conspired with each other PacifiCare defendant and PacifiCare health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

219.    With respect to the activities alleged herein, each Prudential defendant and Prudential health plan aided and abetted each other Prudential defendant and Prudential health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Each Prudential defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business. In furtherance of these agreements, each Prudential defendant and Prudential health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

220.    With respect to the overt acts and activities alleged herein, each Prudential defendant and Prudential health plan conspired with each other Prudential defendant and Prudential health plan, and with others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d). Each Prudential defendant and Prudential health plan also agreed and conspired with each other Prudential defendant and Prudential health plan to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to wrongfully retain money owed to Plaintiffs and the class. Each Prudential defendant and Prudential health plan also agreed and conspired with each other Prudential defendant and Prudential health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting

commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

221.     With respect to the activities alleged herein, each United defendant and United health plan aided and abetted each other United defendant and United health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Each United defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business. In furtherance of these agreements, each United defendant and United health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

222.     With respect to the overt acts and activities alleged herein, each United defendant and United health plan conspired with each other United defendant and United health plan, and with others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d). Each United defendant and United health plan also agreed and conspired with each other United defendant and United health plan to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to wrongfully retain money owed to Plaintiffs and the class. Each United defendant and United health plan also agreed and conspired with each other United defendant and United health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

223.    With respect to the activities alleged herein, each Wellpoint defendant and Wellpoint health plan aided and abetted each other Wellpoint defendant and Wellpoint health plan, and others not named as defendants in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Each Wellpoint defendant also agreed to the operation of the scheme or artifice to deprive Plaintiffs and the class of the right to provide appropriate services free of the exploitation of fear of economic loss and/or loss of business. In furtherance of these agreements, each Wellpoint defendant and Wellpoint health plan also agreed to interfere with, obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

224.    With respect to the overt acts and activities alleged herein, each Wellpoint defendant and Wellpoint health plan conspired with each other Wellpoint defendant and Wellpoint health plan, and with others not named as defendants in this Complaint, to violate 18 U.S.C. § 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d). Each Wellpoint defendant and Wellpoint health plan also agreed and conspired with each other Wellpoint defendant and Wellpoint health plan to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to wrongfully retain money owed to Plaintiffs and the class. Each Wellpoint defendant and Wellpoint health plan also agreed and conspired with each other Wellpoint defendant and Wellpoint health plan to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants are not entitled through the exploitation of fear of economic loss and/or loss of business.

225.    The numerous predicate acts of mail and wire fraud, extortion, Travel Act and benefit plan interference violations described herein are part of separate fraudulent and extortionate

schemes by Defendants designed to defraud and the class of money and property interests under false pretenses. The Plaintiffs and the class as a victim of these unlawful patterns of illegal activity has and continues to suffer losses as a result of these activities.

226.     In carrying out the overt acts and fraudulent and extortionate scheme described above the defendants engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. §§ 1341 and 1346, 18 U.S.C. § 1343 and 1346, 18 U.S.C. § 1951(b)(2), 18 U.S.C. § 1952(a), 18 U.S.C. § 1954, and 18 U.S.C. § 1961 *et seq.*

227.     Section 1961(1) of RICO provides that "racketeering activity" means,  any act which is indictable under any of the following provisions of Title 18, United States Code § 1341 (relating to mail fraud), §1343 (relating to wire fraud), § 1346 (relating to scheme or artifice to defraud), § 1951 (relating to extortion), § 1952 (relating to racketeering [Travel Act]), [and] § 1954 (interference with an employee welfare benefit plan)."

## VIOLATIONS OF 18 U.S.C. § § 1341, 1343 and 1346

228.  For the purpose of executing and/or attempting to execute their scheme to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. §§ 1341 and 1346, placed in post offices and/or in authorized repositories for mail matter, matters and things to be sent or delivered by the Postal Service, and received matters and things therefrom and knowingly caused to be delivered by mail those matters and things according to the direction thereon or at the place at which they were directed to be delivered by the person to whom they were addressed.

229.     For the purpose of executing and/or attempting to execute their scheme to defraud and to obtain money by means of false or fraudulent pretenses, misrepresentations, or promises, as well as to execute and/or attempt to execute their scheme or artifice to deprive Plaintiffs and the class

of property interests, including its right to adequate reimbursement for services provided, and its right to conduct its business free of extortionate influence, the defendants, in violation of 18 U.S.C. §§ 1343 and 1346, transmitted in interstate commerce wire, radio and television transmissions marketing their plans to plaintiffs and the class.

230.     In those matters and things sent or delivered by the Postal Service and the other interstate electronic media, Defendants falsely and fraudulently misrepresented and falsely and fraudulently suppressed material facts from Plaintiffs and the class as described above, in violation of 18 U.S.C. §§ 1341, 1343, and 1346.

231.     The Defendants intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the class, for the purpose of deceiving it and thereby obtaining financial gain. The Defendants either knew or recklessly disregarded that the misrepresentations and omissions described above were material.  The Plaintiffs and the class justifiably relied on the misrepresentations and omissions.

232.     Plaintiffs and the class has therefore been injured in its business or property by the Defendants' overt acts and racketeering activities.

## VIOLATIONS OF 18 U.S.C. § 1951(b)(2)

233.     During the relevant times, and in furtherance of and for the purpose of executing and/or attempting to execute the above discussed scheme and artifice to defraud or deprive, the Defendants and others not named as defendants in this Complaint on numerous occasions aided and abetted and conspired to and attempted to and did interfere with, obstruct, delay or affect "commerce" as the term is defined in 18 U.S.C. §1951 and by "extortion" as defined in 18 U.S.C. §1951(b)(2). The defendants unlawfully attempted to and/or did induce Plaintiffs and the class to

part with various property interests to which Defendants are not entitled, in violation of 18 U.S.C. §1951(b)(2).

234.     In furtherance of the scheme or artifice to defraud and obtain money by false pretenses and the scheme or artifice to deprive the Plaintiffs and the class of its intangible property right to conduct its business free of extortionate influence, the Humana, Aetna, CIGNA, Foundation, PacifiCare, Prudential, United,, and WellPoint defendants agreed and conspired amongst themselves, with each other and with others not named as defendants, as well as those persons or entities providing support for Defendants' acquisition of other PPOs, HMOs and POSs, to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which these Defendants are not entitled through the exploitation of physicians' fear of economic loss and/or loss of business.

235.     The Defendants' overt acts and fraudulent and extortionate racketeering activity have and continue to defraud the Plaintiffs and the class, and have and continue to attempt to and/or deprive the Plaintiffs and the class of its intangible right to conduct its business free of extortionate influence and exploitation of fear of economic loss and/or loss of business.

236.     The Plaintiffs and the class have therefore been injured in its business or property by the Defendants' overt acts and racketeering activities.

## VIOLATIONS OF 18 U.S.C. § 1952(a)

237.     During the relevant times, and in furtherance of and for the purpose of executing the above-described scheme and artifice to defraud the Plaintiffs and the class, the Defendants on numerous occasions did travel and caused others not named as defendants in this Complaint to travel in interstate commerce in order to attempt to and to commit mail fraud, wire fraud, and extortion in violation of the Travel Act, 18 U.S.C. §1952(a).

238.    The Defendants' overt acts and fraudulent and extortionate racketeering activity have and continue to defraud the Plaintiffs and the class of money, and have attempted to and/or deprived and continue to attempt to and/or deprive the Plaintiffs and the class of their intangible right to conduct its business free of extortionate influence and exploitation of fear of economic loss and/or loss of business.

239.    The Plaintiffs and the class have therefore been injured in its business or property by the Defendants' overt acts and racketeering activities.

240.    The Defendants have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO, by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years. Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including the Plaintiffs and the class.

241.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

## **VIOLATIONS OF 18 U.S.C. § 1954**

242.    During the relevant times, and in furtherance of and for the purpose of executing the above-described scheme and artifice to defraud the plaintiffs and the class, the Defendants were agents or administrators of health benefits provided by Defendants through various employee benefit plans as defined under 18 U.S.C. § 1954.

243.     As agents and/or administrators of said health benefits and in other capacities, Defendants, by their overt acts and fraudulent and extortionate racketeering activity, have and continue to unlawfully interfere with the health benefits portion of said employee welfare benefit plants in violation of 18 U.S.C. § 1954.

244.     Defendants have and continue to act to offer, solicit and accept the monetary benefits of the above-described employee welfare benefit plans through their conduct of unlawful, extortionate and fraudulent acts committed against Plaintiffs and the class, in violation of 18 U.S.C. § 1954.

245.     The plaintiffs and the class therefore have been injured in its business or property as a result of Defendants' overt acts and racketeering activities.

246.     The Defendants have engaged in a "pattern of racketeering activity," as defined in § 1961(5) of RICO, by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years. Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including the plaintiff's membership.

247.     The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

**B.     ERISA**

248.     Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

249. Many of the healthcare plans are subject to ERISA. Others, including governmental, church, partnership, individual, and certain other plans, are not within the scope of ERISA. Plaintiffs and the class also claim under provider agreements, as well as under assignments of plan benefits, claims against Humana, Aetna, CIGNA, Foundation PacifiCare,, Prudential, United, and WellPoint respecting ERISA healthcare plans under assignment of plan benefits are governed, in part, by ERISA, although the terms of the plans are governed by the prompt pay statutes. In some cases, a healthcare provider will have two or more claims against the defendants, under both the provider agreements and under the assignment of benefits. In such cases, if the plan is an ERISA plan, one claim (the assignment of benefits claim) may be governed by ERISA and the claim(s) under the provider agreement will be governed by state or federal law, or both claims will be governed by state or federal law if the plans are not an ERISA plan. Where ERISA governs, the remedy is generally the same as under state or federal law.

## COUNT I

### (VIOLATIONS OF RICO 18 U.S.C. § 1962(a))

250. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

251. Section 1962(a) of RICO provides that, "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of § 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."

252.     Plaintiffs incorporate, as if fully set out herein, its allegations about enterprise.

253.     With respect to the allegations contained herein, the Defendants have engaged in a "pattern of racketeering activity", as defined in § 1961(5) of RICO, by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, has similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including the Plaintiffs and the class.

254.     The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by the Defendants, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore, constitute a "pattern of racketeering activity", as defined in 18 U.S.C. § 1961(5).

255.     With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and the class in their efforts to acquire and maintain an interest in an enterprise(s) which affects interstate commerce.

256.      The Defendants' acts amount to an overt and extortionate scheme to acquire or maintain an interest in or  control of, an enterprise(s) which affect interstate commerce.  The Defendants' acts amount to an overt and extortionate scheme to deprive Plaintiffs and the class of business or property rights, including the right to receive bargained for reimbursement for health care delivered by Plaintiffs and the class to Defendants' members, without fear of reprisals or economic and/or business loss, have and continue to constitute a pattern of illegal activity that has and continues to inflict harm upon the Plaintiffs and the class.

257.     In carrying out the overt acts and fraudulent extortionate scheme described above, the defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C.

§§ 1341 and 1343, 18 U.S.C. § § 1341 and 1346, 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. §

1951(b)(2), 18 U.S.C. § 1952(a), 18 U.S.C. § 1954 and 18 U.S.C. § 1961, et seq. (RICO) as set forth

more fully above.

258.    Therefore, Defendants have each engaged in "racketeering activity which is defined

in § 1961(1) of RICO to mean "any act which is indictable under any of the following provisions of

Title 18, United States Code § 1341 (relating to mail fraud), § 1343 (relating to wire fraud) § 1951

(relating to extortion), § 1952 (relating to racketeering [Travel Act]), [and] § 1954 (interference with

an employee welfare benefit plan).

259.    As a proximate result of Defendants' unlawful pattern of illegal extortionate

conduct as described above, Plaintiffs and the class has been injured in its business or property as

described above.

**COUNT II**

**(VIOLATIONS OF RICO 18 U.S.C. § 1962(c))**

260.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out

herein.

261.    Section 1962(c) of RICO provides that it "shall be unlawful for any person

employed by or associated with any enterprise engaged in, or the activities of which affect, interstate

or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

262.    Plaintiffs incorporate, as though fully set out herein, its allegations about enterprise.

263.    With respect to the allegations contained herein, the Defendants have engaged in

a "pattern of racketeering activity", as defined in § 1961(5) of RICO, by committing and/or

conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as

described above, within the past ten years. Each such act of racketeering activity was related, has

similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including the Plaintiffs and the class.

264.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by the Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore, constitute a "pattern of racketeering activity", as defined in 18 U.S.C. § 1961(5).

265.    With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiff's membership in their efforts to acquire and maintain an interest in an enterprise(s) that affects interstate commerce.

266.    The Defendants' acts amount to an overt and extortionate scheme to exercise control over Plaintiffs and the class by withholding payments, by threatening to withhold payments due for services provided and/or other coercive activities. The Defendants' respective acts amount to an overt and extortionate scheme to deprive Plaintiffs and the class of business or property rights, including the right to receive bargained for reimbursement for health care delivered by Plaintiffs and the class to Defendants' members without fear of reprisals or economic and/or business loss, have and continue to constitute a pattern of illegal activity that has and continues to inflict harm upon the Plaintiffs and the class.

267.    In carrying out the overt acts and fraudulent extortionate scheme described above, the Defendants have engaged in conduct in violation of federal laws, including inter alia 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § § 1341 and 1346, 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. § 1951(b)(2), 18 U.S.C. § 1952(a), 18 U.S.C. § 1954 and 18 U.S.C. § 1961, et seq. (RICO) as set forth more fully above.

268.    Therefore, defendants have each engaged in "racketeering activity which is defined in § 1961(1) of RICO to mean "any act which is indictable under any of the following provisions of Title 18, United States Code § 1341 (relating to mail fraud), § 1343 (relating to wire fraud) § 1951 (relating to extortion), § 1952 (relating to racketeering [Travel Act]), [and] § 1954 (interference with an employee welfare benefit plan)."

269.    As a proximate result of Defendants' unlawful pattern of illegal extortionate conduct as described above, Plaintiffs and the class and its membership have been injured in its business or property as described above.

## COUNT III

### (VIOLATIONS OF RICO 18 U.S.C. § 1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(a) and (c))

270.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

271.    This claim for relief arises under 18 U.S.C. § 1964(a) of RICO and seeks to obtain injunctive and declaratory relief from the Defendants activities described herein for violations of 18 U.S.C. § 1962(d) for their conspiring to violate 18 U.S.C. § 1962(a) and (c).

272.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

273.    Plaintiffs incorporate, as though fully set out herein, its allegations about enterprise.

274.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a). The object of this conspiracy has been and is to acquire or maintain an interest in or control over the affairs of the § 1962(a) enterprises described previously through a pattern of racketeering activity

275.    Defendants have also violated § 1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or

indirectly, the conduct of the affairs of the § 1962(c) Enterprises described previously through a pattern of racketeering activity.

276.    Defendants, their subsidiaries, employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(a) and (c) in violation of § 1962(d) by various third parties not named as defendants herein, such as those persons or entities providing support for Defendants' acquisition of other PPOs, HMOs, and POSs.

277.    As demonstrated in detail above, the Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent and extortionate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to fraudulently induce the Plaintiffs and the class to agree to provide healthcare services to Defendants' members and failure to disclose numerous internal systemic fraudulent and extortionate policies and practices designed to defraud the Plaintiffs and the class of money, to unlawfully influence and interfere with the physician-patient relationship and to deprive Plaintiffs and the class of its intangible property rights including the right to receive bargained for reimbursement for health care delivered by Plaintiffs and the class to Defendants' members without the Defendants' exploitation of fear of economic loss and/or loss of business.

278.    The defendants co-conspirators' pattern of fraudulent and extortionate racketeering acts include, but are not limited to providing inadequate payment, withholding payments, threatening to withhold payments due for services provided, adoption of internal policies and practices by the co-conspirators that are: (1) specifically designed to interfere with Plaintiffs and the class' right to receive bargained for reimbursement for health care delivered by Plaintiffs and the class to Defendants' members; (2) specifically designed to exploit fear of economic loss and/or loss of

business in attempting to extort Plaintiffs and the class of compensation and its ability to conduct the practice of medicine free of extortionate conduct.

279.    The nature of the above described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(a) and (c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

280.    As a direct and proximate result of the Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §§ 1962(a) and (c), the Plaintiffs and the class has been and is continuing to be injured in its business or property as set forth more fully above. Pursuant to 18 U.S.C. § 1964(c) of RICO, the Plaintiffs are entitled, therefore, to bring this action on behalf of themselves and the class it seeks to represent, and to obtain injunctive and declaratory relief, as well as the costs of bringing this suit and attorneys' fees.

281.    The defendants have sought to and have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by defendants from such pattern of racketeering activity, including:

        a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1343;

        b.    Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

        c.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346;

        d.    Multiple instances of extortion violations of 18 U.S.C. § 1951(b)(2);

e.    Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. § 1952(a);

f.    Multiple instances of offers, solicitations and acceptance of money in their activity to influence and interfere with employee welfare benefit plans in violation of 18 U.S.C. § 1954.

282.    The defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting the defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## COUNT IV

## (RICO VIOLATIONS OF 18 U.S.C. § 2

## BY SEEKING TO AND AIDING AND ABETTING

## A SCHEME TO VIOLATE 18 U.S.C. § 1962(a) and (c))

283.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

284.    This claim for relief arises under 18 U.S.C. § 1964(c) of RICO providing for injunctive and declaratory relief for Defendants' violations of 18 U.S.C. § 2 by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c).

285.    Plaintiffs incorporate, as though fully set out herein, its allegations about enterprise.

286.    With respect to the defendants' violation of 18 U.S.C. § 2, each defendant and their respective health plans have sought to, and have aided and abetted, each other respectively, and others not named as defendants in this Complaint, in the commission of those violations of 18 U.S.C. § 2 by seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c).

287.    Each Humana defendant and Humana health plan; each Aetna defendant and Aetna health plan, each CIGNA defendant and CIGNA health plan, each Foundation defendant and Foundation health plan, each PacifiCare defendant and PacifiCare health plan, each Prudential defendant and Prudential health plan, each United defendant and United health plan, and each Wellpoint defendant and Wellpoint health plan, has aided and abetted, and has a shared intent to aid and abet each other Humana defendant and Humana health plan; each Aetna defendant and Aetna health plan, each CIGNA defendant and CIGNA health plan, each Foundation defendant and Foundation health plan, each PacifiCare defendant and PacifiCare health plan, each Prudential defendant and Prudential health plan, each United defendant and United health plan, and each Wellpoint defendant and Wellpoint health plan respectively, in attempting to derive, and in actually deriving substantial income and proceeds through the above described pattern of racketeering activity. Each Humana defendant and Humana health plan; each Aetna defendant and Aetna health plan, each CIGNA defendant and CIGNA health plan, each Foundation defendant and Foundation health plan, each PacifiCare defendant and PacifiCare health plan, each Prudential defendant and Prudential health plan, each United defendant and United health plan, and each Wellpoint defendant and Wellpoint health plan respectively has aided and abetted, and has a shared intent to aid and abet, each other Humana defendant and Humana health plan; each Aetna defendant and Aetna health plan, each CIGNA defendant and CIGNA health plan, each Foundation defendant and Foundation health plan, each PacifiCare defendant and PacifiCare health plan, each Prudential defendant and Prudential health plan, each United defendant and United health plan, and each Wellpoint defendant and Wellpoint health plan respectively in acquiring or maintaining an interest or control of the § 1962(a) Enterprise described above through a pattern of racketeering activity, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1962(a).  Each Humana defendant and Humana health plan; each Aetna defendant

and Aetna health plan, each CIGNA defendant and CIGNA health plan, each Foundation defendant and Foundation health plan, each PacifiCare defendant and PacifiCare health plan, each Prudential defendant and Prudential health plan, each United defendant and United health plan, and each Wellpoint defendant and Wellpoint health plan respectively, has further aided and abetted, and has a shared intent to aid and abet, each other defendant and health plan respectively, in conducting or participating in the conduct of the affairs of the Section 1962(c) Enterprise described above through a pattern of racketeering activity, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1962(c).

288.    As a direct and proximate result of Defendants' RICO violation of 18 U.S.C. § 2 by seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c), the Plaintiffs and the class have been and are continuing to be injured in their business or property.  Pursuant to 18 U.S.C. § 1964 (c) of RICO, the Plaintiffs are entitled, therefore, to bring this nationwide class action on behalf of themselves and the class they seek to represent, and to obtain injunctive and declaratory relief, as well as the costs of bringing this suit and attorneys' fees.

289.    The Defendants have attempted to and have aided and abetted and have committed and continue to commit the following unlawful racketeering predicate acts.  Through these unlawful racketeering predicate acts, Defendants have attempted to generate, and have continued to generate, income or proceeds, including:

    a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1343;

    b.    Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

    c.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346;

    d.    Multiple instances of extortion violations of 18 U.S.C. § 1951(b)(2);

e.   Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. § 1952(a); and

f.   Multiple instances of offers, solicitations and acceptance of money in their activity to influence and interfere with employee welfare benefit plans in violation of 18 U.S.C. § 1954.

290.   The defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting the defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

291.   By reason of each Defendants' violations of 18 U.S.C. § 1962(d) and 18 U.S.C. § 2 by conspiring to violate 18 U.S.C. §§ 1962(a) and (c), and seeking to and aiding and abetting a scheme to violate 18 U.S.C. §§ 1962(a) and (c), the plaintiffs are entitled to injunctive and declaratory relief pursuant to 18 U.S.C. § 1964(c).

### COUNT V

### (CLAIM FOR BENEFITS UNDER ERISA)

292.   Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

293.   Plaintiffs plead this Count, alleging failure to provide benefits due under ERISA, in the alternative to Counts VI and VII which assert common law claims for breach of contract and quantum meruit.

294.   Plaintiffs assert and base their claims for payment and reimbursement for medical services provided on Defendants' breach of the applicable contract documents.  That is, Plaintiffs contend that Defendants are liable to Plaintiffs and the provider class members based upon

Defendants' breach of the contract documents entered into directly between Defendants and the Plaintiffs and Plaintiff class members.

295.    However, in the event the Court determines that ERISA is applicable to the claims asserted herein Plaintiffs and the Plaintiff Class Members assert and allege the claims set forth in this Count.

296.    Specifically, Plaintiffs and the Plaintiff Class Members are entitled to recover the payment and reimbursement for services rendered by them pursuant to Section 502(a)(1)(b) of ERISA, 29 U.S.C. § 1132(a)(1)(b).  The Plaintiffs and Plaintiff Class are entitled to recover all payment and reimbursement for medical services rendered which Humana has wrongfully failed to pay, in an amount to be determined at trial.  Plaintiffs and the Plaintiff Class are also entitled to an injunction and such other declaratory and injunctive relief as the Court determines proper, requiring Humana to adhere to and comply with the contract documents and to make payments to Plaintiffs and the Plaintiff Class Members are provided therein for medical services rendered.

297.    Further, pursuant to Section 502(a)(3) of ERISA, Plaintiffs are entitled to appropriate equitable relief to enforce the terms and provisions of the applicable Contract Documents and to recover restitution and the amount of monies owed to them but not paid by Humana, and further to obtain unjust enrichment received by Defendants as a result of its breach of the Contract Documents and other wrongful conduct as alleged herein.

## COUNT VI

### (CLAIM FOR QUANTUM MERUIT)

298.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

299.     The individual plaintiffs and the class have performed work and labor, for which

they are entitled to receive compensation, but which has been wrongfully withheld by the defendants

as described above.

300.     These plaintiffs therefore seek reimbursement for their work and labor due in an

amount to be determined by this count (Quantum Meruit).

## COUNT VII

### (CLAIM FOR BREACH OF CONTRACT)

301.     Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

302.  Humana has breached its obligation to pay Plaintiffs and Plaintiff Class Members for

medical services rendered as provided and required by the applicable Contract Documents.

Plaintiffs and Plaintiff Class Members are entitled to recover damages, in an amount to be

determined at trial, equal to the amount of payments for medical services rendered which

Defendant Humana has wrongfully refused to make to Plaintiffs and the Plaintiff class members.

## COUNT VIII

### (CLAIM FOR INJUNCTIVE RELIEF AND DECLARATORY

### RELIEF FOR DEFENDANTS' VIOLATION OF FEDERAL
### "CLEAN-CLAIM PAYMENT" REGULATIONS.  42 CFR § 417.500(a)(6))

303.     Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

304.     Pursuant to the Omnibus Budget Reconciliation Act of 1986, § 9312(d), as codified

at 42 CFR § 417.500(a)(6), health insurers are required to reimburse health providers at a minimum

of 95% of all "clean claims" within thirty (30) days of the claims' submission for payment.

305.     Through the schemes outlined in detail above, Defendants have each violated this

requirement and regulatory authority by improperly and intentionally deeming claims made to them

as "unclean" in order to avoid or at least delay reimbursement of healthcare providers, which is their obligation under OBRA.

306.     Plaintiffs request this Court to exercise its equitable jurisdiction to declare Defendants' practices as violative of the requirements of OBRA and further to enjoin Defendants from continuance of this practice.

## COUNT IX

### (CLAIM FOR UNJUST ENRICHMENT)

307.     Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

308.     Defendants, through the acts and omissions described herein, are in possession of money that is the rightful property of Plaintiffs and the class.  As a result, Defendants have been unjustly enriched by their activities.

## COUNT X

### (VIOLATION OF STATE "PROMPT PAY" STATUTES)

309.     Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

310.     Approximately 95% of Humana subscribers and the class members providing medical services to said subscribers are located in the 15 states referred in Paragraph –, *supra*. With the exception of Arkansas and Indiana, each of the states has a "prompt pay" statute which requires Humana to pay claims for medical services rendered within a stated period of time, typically, 30 to 45 days.  These "prompt pay" statutes are substantially the same.

311.     Humana has adopted a common, uniform and system practice and policy of violating these state "prompt pay" statutes with respect to the overwhelming majority and the very predominate number of claims submitted by provider class members in said states.

312.    Accordingly, Defendant Humana is liable to the Plaintiff Class Members submitting claims in said thirteen states for violation of the "prompt pay" statutes of those states. Said statutes are substantially the same, and Humana's violation of those statutes involves common questions of law and fact which predominate over individual issues, if any.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs and the class pray for judgment in its favor and against the defendants in each claim for relief, as well as general and special relief as follows:

A.    An injunction enjoining Defendants from pursuing the fraudulent and extortionate policies and practices complained of herein, including but not limited to:

(1) prohibiting the payment of reimbursement by Defendants which is not adequate to cover the costs of delivering the health care services Defendants have promised Defendants' members,

(2) prohibiting the delegation of undefined or unreasonable risk by Defendants including but not limited to the failure to disclose that information to the physicians and Physician Groups, which is reasonable and necessary to enable them to assess the level of risk to be assumed, and to monitor and/or audit any and all payments, withholds, deductions, surpluses, credits and other financial calculations made by Defendants with respect to the physicians and/or Physician Groups.

(3) prohibiting the failure or refusal of Defendants to provide additional reimbursement to Plaintiff's members (including physicians and Physician Groups) for unanticipated costs and expenses which arise after a contract with the physicians or Physician Groups has been executed, which relate to medically necessary services the patient requires the Defendants' members require, including, but not limited to,  new diagnostic or therapeutic procedures, treatments or devices, immunizations, injectables, or pharmaceutical therapeutics,

(4) prohibiting the failure or refusal of Defendants to disclose the scope of all services to be provided under the contract with the physicians or Physician Groups, the amount of the payment by Defendants to physicians or Physician Groups for such services, and the failure or refusal of Defendants

to provide full disclosure of Defendants' methodology for determining the payment for a health care service,

(5) prohibiting the use or enforcement of any definition of medical necessity which is at variance with the professional standard of care,

(6) prohibiting Defendants from making medical necessity determinations without providing appropriate deference to the treating physician's judgment,

(7) prohibiting Defendants, and each of them, from unreasonably using, applying or enforcing medically inappropriate utilization management policies and procedures over which Plaintiffs' membership has no effective input or control and as to which Plaintiffs' membership cannot deviate when necessary to provide medically appropriate patient care without suffering adverse financial or other consequences,

(8) prohibiting Defendants, and each of them, from unreasonably using, applying or enforcing medically inappropriate clinical practice guidelines and/or medical management policies and procedures over which Plaintiffs' membership has no effective input or control and as to which Plaintiffs' membership cannot deviate when necessary to provide medically appropriate patient care without suffering adverse financial or other consequences,

(9) prohibiting Defendants from requiring physicians or Physician Groups to be capitated for services for which there can be no sound actuarial projection, or for which expected usage cannot be predicted or controlled by the physician or Physician Groups, i.e., pharmaceuticals, new diagnostic or therapeutic procedures or treatments, new drugs and devices, organ transplants, etc.,

(10) prohibiting Defendants from imposing a charge for medications to physicians and/or Physician Groups or the Pharmacy Risk Pool which is greater than that actually incurred by Defendants, including, but not limited to, any rebates which have been or will be obtained from the manufacturer or pharmacy by Defendants.

(11) prohibiting Defendants from offsetting pharmacy deficits against other risk pool surpluses or capitation payments.

(12) prohibiting Defendants, and each of them, from unreasonably using, applying or enforcing medically inappropriate patient referral policies and procedures over which Plaintiffs' membership has no effective input or control and as to which Plaintiffs' membership cannot deviate when

necessary to provide medically appropriate patient care without suffering adverse financial or other consequences,

(13)     prohibiting Defendants, and each of them, from unreasonably using, applying or enforcing medically inappropriate quality improvement programs and audits over which Plaintiffs' membership has no effective input or control and as to which Plaintiffs' membership cannot deviate when necessary to provide medically appropriate patient care without suffering adverse financial or other consequences,

(14)     prohibiting Defendants from requiring physicians or Physician Groups to accept capitation with respect to pools of members which are not sufficiently large to permit sound actuarial projections of expected use of covered services,

(15)     prohibiting Defendants from imposing withholds, deductions and/or penalties which impede the provision of medically appropriate services, and/or will adversely impact the solvency of a physician or Physician Group,

(16)     prohibiting Defendants from imposing withholds, deductions and/or penalties on capitation payments paid to physicians or Physician Groups under any and all circumstances,

(17)     prohibiting Defendants from requiring physicians or Physician Groups to indemnify Defendants for liability arising under the contract between Defendants and the physician or Physician Group,

(18)     prohibiting Defendants from threatening to terminate a physician or Physician Group contract (or otherwise penalize a physician or Physician Group) based upon participation or support of this complaint or concepts in this complaint by such physician or Physician Group;

(19)     prohibiting Defendants from charging excessive rates to physicians and/or physician groups for stop-loss insurance and/or requiring physicians and/or physician groups to purchase stop-loss insurance from Defendants,

(20)     prohibiting Defendants from revoking and re-assuming claims payment, credentialing and/or utilization management duties delegated to a Physician Group without following policies and procedures previously provided to and mutually agreed to by the Defendants and the Physician Group which allow detailed prior notice of any deficiencies, development of a mutually agreed to corrective action plan, a reasonable cure period, and defined criteria and procedures allowing the Physician Group to become re-delegated for such delegated functions,

(21)   if delegated functions are re-assumed by Defendants, prohibiting the failure or refusal to comply with and be held accountable to the Physician Group for compliance with Defendant policies and procedures regarding the re-assumed delegated functions and all applicable state and federal laws and regulations, including, but not limited to, HCFA laws and regulations and NCQA standards, and

(22)   prohibiting Defendants from requiring physicians and/or Physician Groups to accept additional patients from Defendants if the physician and/or Physician Group determines it does not have the clinical or financial capacity to do so;

C.   An injunction enjoining Defendants from using or enforcing any current or proposed provider contracts with physicians and/or Physicians Groups, in whole or in part, or policies which compromise medically appropriate patient care or are otherwise unfair or unreasonable set forth above;

D.   An award of compensatory or actual damages in the amount in which Plaintiffs and the class has been injured in its business or property.

E.   An award of treble damages;

F.   Costs and reimbursements for this action, including the cost of the suit and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15, and reimbursement of expenses and expert fees in amounts to be determined by the Court; and

G.   Granting such other and further relief as this Honorable Court deems just and appropriate.

## JURY DEMAND

The Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted,

LAW OFFICES OF ARCHIE LAMB, LLC
2017 Second Avenue North
2nd Floor
Birmingham, Alabama 35203
(205) 324-4644
Lead Counsel for Provider Plaintiffs


BY: _____
      Archie C. Lamb, Jr.

and

PODHURST, ORSECK, JOSEFSBERG,
EATON, MEADOW, OLIN &
PERWIN, P.A.
25 West Flagler Street, Suite 800
Miami, Florida 33130
(305) 358-2800 / Fax (305) 358-2382
Co-Liaison Counsel for Plaintiffs

BY _____
    Aaron S. Podhurst
    Fla. Bar No. 063606
    Barry L. Meadow
    Fla. Bar No. 201227

Nicholas B. Roth
EYSTER, KEY, TUBB, WEAVER
 & ROTH, L.L.P.
402 E. Moulton Street
Post Office Box 1607
Decatur, Alabama 35602
Telephone: (256) 353-6761

Jeffery A. Mobley
LOWE, MOBLEY & LOWE
1210 - 21st Street
Post Office Box 576
Haleyville, Alabama 35565
Telephone: (205) 486-5296

KOZYAK TROPIN & THROCKMORTON, P.A.
2800 First Union Financial Center
200 S. Biscayne Boulevard
Miami, Florida 33131
(305) 372-1800
Co-counsel for the Subscriber Plaintiffs


BY: _____
    Harley S. Tropin
    Fla. Bar No. 241253
    Adam M. Moskowitz
    Fla. Bar No. 984289

Dennis G. Pantazis
GORDON, SILBERMAN, WIGGINS &
CHILDS, P.C.
1400 SouthTrust Tower
Birmingham, Alabama 35203
Telephone: (205) 328-0640

Joe Whatley, Jr.
WHATLEY DRAKE, LC
1100 Financial Center
505 North 20th Street
Birmingham, Alabama 35203-4601
Telephone: (205) 328-9576

J. Mark White
WHITE, DUNN & BOOKER
The Massey Building
290 21st Street North
Suite 600
Birmingham, Alabama 35203
Telephone: (205) 323-1888

Guido Saveri (22349)
R. Alexander Saveri (173102)
Cadio Zirpoli
One Embarcadero Center, Suite 1020
San Francisco, California 94111-3600

Jay Waller
CAMPBELL, WALLER & McCALLUM, LLC
2000-A SouthBridge Parkway
Suite 330
Birmingham, Alabama 35209

Mark Gray
GRAY & WEISS
1400 Citizen Plaza
500 West Jefferson Street
Louisville, Kentucky 40202

Robert Foote
FOOTE & MEYERS
13 South 7th Street
Geneva, Illinois 60134

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing Amended Class Action

Complaint was served by U.S. mail on this 14th day of August, 2000 to : All Counsel on the attached

Service List.

## SERVICE LIST
## Case No. 00-1334-MD MORENO

**Plaintiffs' Lead Counsel**
**Subscriber Track**

David Boies, Esq./Stephen Neuwirth, Esq.
BOIES, SCHILLER & FLEXNER, LLP
80 Business Park Drive
Armonk, NY 10504

Richard F. Scruggs, Esq.
Sidney A. Backstrom, Esq.
SCRUGGS, MILLETTE, BOZMAN & DENT, P.A.
734 Delmas Ave.
P.O. Drawer 1425
Pascagoula, MS 39568

**Plaintiffs' Lead Counsel**
**Provider Track**

Archie C. Lamb, Jr., Esq.
LAW OFFICES OF ARCHIE C. LAMB, LLC
2017 Second Ave.
N. Birmingham, AL 35203

**Plaintiffs' Liaison Counsel**
**All Tracks**

Aaron S. Podhurst, Esq./Barry L. Meadow, Esq.
PODHURST, ORSECK, JOSEFSBERG, EATON,
MEADOW, OLIN & PERWIN, P.A.
25 W. Flagler St., Suite 800
Miami, FL 33130-1780

**Plaintiffs' Liaison Counsel**
**Subscriber Track**

Charles F. Miller, Esq./James F. Miller, Esq.
Greg A. Lewen, Esq.
MILLER, SCHWARTZ & MILLER, P.A.
2435 Hollywood Blvd.
Hollywood, FL 33020

Michael Eidson, Esq./Dean Colson, Esq.
Enid Duany Mendoza, Esq.
COLSON, HICKS, EIDSON, COLSON, et al.
255 Aragon Avenue, 2nd Floor
Coral Gables, FL 33134

**Plaintiffs' Steering Committee**
**Subscriber Track**

H. Laddie Montague, Jr., Esq.
Jerome M. Marcus, Esq./Jonathan Auerbach, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust St.
Philadelphia, PA 19103-6365

Michael D. Hausfeld, Esq./Joseph Sellers, Esq.
Donna Solen, Esq./Margaret G. Farrell, Esq./
Stephen Annand, Esq.
COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3934

Theodore Jon Leopold, Esq.
RICCI, HUBBARD, LEOPOLD, et al.
Suite 250
Mellon United National Bank Tower
1645 Palm Beach Lakes Blvd.
West Palm Beach, FL 33401

Stephen N. Zack, Esq./Stephen Rash, Esq.
ZACK, KOSNITSKY, P.A.
2800 NationsBank Tower
100 S.E. 2nd St.
Miami, FL 33131-2144

Michael Straus, Esq./Timothy D. Battin, Esq.
BAINBRIDGE & STRAUS,LLP
2210 2nd Ave. North
Birmingham, AL 35203

Ronald L. Motley, Esq./H. Blair Hahn, Esq.
NESS, MOTLERY, LOADHOLT, et al.
P.O. Box 1792
Mount Pleasant, SC 29465

Joseph C. Langston, Esq.
John Fletcher Perry, III, Esq.
LANGSTON, LANGSTON, MICHAEL, et al.
P.O. Box 787
Booneville, MS 38829

John E. Williams, Esq./Herbert T. Schwartz, Esq.
WILLIAMS BAILEY LAW FIRM, L.L.P.
8441 Gulf Freeway, Suite 600
Houston, TX 77017-5001

Paul S. Minor, Esq.
MINOR AND ASSOCIATES
P.O. Box 1388
Biloxi, MS 39533

Frederick P. Furth, Esq.
THE FURTH FIRM
Furth Bldg., Suite 1000
201 Sansome St.
San Francisco, CA 94104

Steven E. Fineman, Esq./Robert Eisler, Esq./
Davis S. Stellings, Esq.
LIEFF, CABRASER, et al.
780 Third Avenue, 48th Floor
New York, NY 10017

Russ M. Herman, Esq./Stephen J. Herman, Esq.
Steven J. Lane, Esq.
HERMAN, MIDDLETON, CASEY, et al.
820 O'Keefe Ave.
New Orleans, LA 70113

**Plaintiffs' Steering Committee**
**Provider Track**

CAMPBELL, WALLER & McCALLUE, L.L.C.
Suite 330, 2000-A Southbridge Parkway
Birmingham, AL 35209

Dennis George Pantazis, Esq.
GORDON, SILBERMAN, WIGGINS, et al.
1400 SouthTrust Tower
420 N. 20th St.
Birmingham, AL 35203

Joe R. Whatley, Jr., Esq.
WHATLEY DRAKE, L.L.C.
1100 Financial Center
505 N. 20th St.
Birmingham, AL 35203-2605

J. Mark White, Esq.
WHITE, DUNN & BOOKER
2025 3rd Ave North, Suite 600
Birmingham, AL 35203

Nicholas B. Roth, Esq.
EYSTER, KEY, TUBB, WEAVER & ROTH
Eyster Bldg.
402 E. Moulton St., S.E.
P.O. Box 1607
Decatur, AL 35602

Jeffrey A. Mobley, Esq.
LOWE, MOBLEY & LOWE
1210-21st St.
P.O. Box 576
Haleyville, AL 35565

Mark K. Gray, Esq./Janice Weiss, Esq.
GRAY & WEISS
1400 Citizen Plaza
500 W. Jefferson
Louisville, KY 40202

Robert M. Foote, Esq.
FOOTE MEYERS
10 S. 7th St.
Geneve, IL 60134

**Counsel for Unitedhealthcare**

Edward Soto, Esq.
Weil, Gotshal & Manges
701 Brickell Ave., Suite 2100
Miami, FL 33131

James Quinn, Esq.
Jeffrey Klein, Esq.
Weil, Gotshal & Mange LLP
767 Fifth Ave.
New York, NY 10153

**Counsel for Foundation**

Eduardo Palmer, Esq.
STEEL, HECTOR & DAVIS
200 S. Biscayne Blvd., Suite 4000
Miami, FL 33131

Edward Crane, Esq.
R. Ryan Stoll, Esq.
SKADDEN, ARPS, SLATE
333 West Wacker Dr., Suite 2100
Chicago, IL 60606

**Counsel for Aetna**

Hilarie Bass, Esq.
Mark Schnapp, Esq.
Greenberg, Traurig
1221 Brickell Avenue
Miami, FL 33131

Miguel A. Estrada, Esq.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5305

John J. Swenson, Esq.
Gibson, Dunn & Crutcher, LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197

**Counsel for Pacificare**

Michael Nachwalter, Esq.
Maria Beguiristain, Esq.
KENNY NACHWALTER
201 S. Biscayne Blvd., Suite 1100
Miami, FL 33131

Stephen Neal, Esq.
Martin Schenker, Esq.
COOLEY GODWARD
3000 El Camino Real
Palo Alto, CA 94306

William Grauer, Esq.
Christopher R.J. Pace, Esq.
COOLEY GODWARD
4365 Executive Dr., Suite 1100
San Diego, CA 92121

**Counsel for Defendant Humana, Inc.**

John H. Beisner, Esq./Brian Brooks, Esq./
Brian D. Boyle, Esq./Robert Eccles, Esq./
Ira H. Raphaelson, Esq./John A. Rogovin, Esq.
O'MELVENY & MYERS, LLP
555 13th St., N.W.
Suite 500 West
Washington, D.C. 20004-1109

Linda J. Smith, Esq.
O'MELVENY & MYERS, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

Henry N. Adorno, Esq./Raoul G. Cantero, III, Esq.
ADORNO & ZEDER, P.A.
2601 S. Bayshore Dr., Suite 1600
Miami, FL 33133

Peter Alan Sachs, Esq.
JONES FOSTER JOHNSTON & STUBBS
505 S. Flagler Dr., Suite 1100
P.O. Box 3475
West Palm Beach, FL 33402-3475

**Wellpoint Health Networks, Inc.**
(California BlueCross)

Wellpoint Health Networks, Inc.
One Wellpoint Way
Thousand Oaks, California 91362

**Counsel for California Blue Cross/Wellpoint**
Stan Blumenfeld
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2899
(Los Angeles County)
Telephone: 213-430-6000