UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**NIGHT BOX FILED**

DEC - 2 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

IN RE:  **MANAGED CARE LITIGATION**          MDL NO. 1334

---

THIS DOCUMENT RELATES ONLY TO
PROVIDER TRACK CASES

MASTER FILE NO.
**00-1334-MD MORENO**

---

### PROVIDER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT WITH CIGNA HEALTHCARE AND OF FEE AWARD AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs and their counsel hereby move the Court for final approval of their settlement with CIGNA Healthcare, and for an award of attorneys' fees and reimbursement of expenses.  Class Counsel include dozens of attorneys from some of the most experienced class action firms in the country.  Through a coordinated effort of their skills and resources, Class Counsel have achieved a settlement with CIGNA with a value of over $540 million in changes to its business practices and cash.  Lauded throughout the medical community and expressly endorsed by 18 signatory medical associations, the settlement is an excellent achievement and should readily approved, as should the attorney's fee award requested by Class Counsel.

### I. BACKGROUND

**A.      The Nature of the Case**

In this litigation, Plaintiffs allege that CIGNA and the other Defendants have engaged in a fraudulent scheme to wrongfully deny, diminish, and delay payments owed to physicians for the provision of medical services to Defendants' members.

The named Plaintiffs and class members provide medical services to Defendants' members, including those of CIGNA. (Compl. pp.4-7, ¶¶ 75, 101). The Plaintiffs allege they do so in three ways. The first is by entering into fee-for-service contracts which, together with other provided material, promise to pay doctors for the covered, medically necessary services they render. (Compl. ¶ 76). The second is by rendering care to patients of Defendants with whom they have no contracts, based upon the understanding, cultivated by Defendants, that they will be paid for the covered, medically necessary services they render. (Compl. ¶¶ 75, 77). The third is pursuant to capitation agreements under which doctors are to be paid on the basis of the number of patients they are required to treat rather than on a fee-for-service basis. The premise of such capitation agreements is that if the doctors practice efficient, preventive medicine, they will be fairly compensated. (Compl. ¶¶ 101-102). In this context, Defendants represent that the doctors will receive an agreed upon monthly payment for each enrolled patient they treat, and that the pharmacy risk pools which are a part of capitation arrangements will only be charged the Defendants' actual drug costs. (Compl. ¶¶ 104, 106).

The Plaintiffs allege that fee-for-service doctors are required to submit their bills on standard coded claim forms that make use of AMA approved Current Procedural Terminology ("CPT") codes. (Compl. ¶¶ 79, 80). The Plaintiffs allege that unbeknownst to them, these claims are processed by computer programs, developed and deployed by Defendants, that reduce the payment due without reference to medical necessity or standard coding practices. The Defendants reduce the payments by downcoding – for example, turning long office visits into short ones or complicated examinations into simple ones; by ignoring modifiers – for example, turning a bilateral mastectomy into a single mastectomy; and by bundling – treating related services as one. (Compl. p.23). In addition,

Defendants often wrongfully "pend" doctors' bills, putting them in a state of suspense to avoid paying in a timely fashion. (Compl. ¶¶ 93, 94).

The Plaintiffs allege that in the capitation context, Defendants do not make capitation payments for new enrollees until those patients actually seek treatment. This undermines the actuarial premise of capitation, that payments for well patients will offset the cost of treating the sick. (Compl. ¶¶ 104, 105). Instead, Defendants send false capitation rolls to the doctors each month which omit these well patients. (Compl. ¶¶ 104, 105). The Defendants also conceal from doctors the discounts and rebates by pharmaceutical companies. This results in unfairly charging pharmacy risk pools the full, undiscounted costs of drugs, increasing the charges against the capitation payments due the doctors. (Compl. ¶ 106).

Plaintiffs allege that they and class members treat Defendants' insureds in reliance upon this misrepresented state of affairs, sending in their bills on the required coded forms, accepting reduced payments based upon explanations of benefits ("EOBs") that misrepresent the reasons for reductions in payment and conceal Defendants' processing schemes, and accepting reduced capitation payments based upon false patient rolls and inflated pharmacy risk pool charges. (Compl. ¶¶ 82, 97-99, 109).

**B.      History of the Litigation**

Following the filing of the Amended Complaint, the Defendants, including CIGNA, filed motions to dismiss and to compel arbitration. On March 2, 2001, after extensive briefing, this Court denied most of these motions, and granted portions of the motions relating to RICO without prejudice and with leave to file an amended complaint. A Consolidated Amended Class Action Complaint was filed on March 26, 2001.

Plaintiffs moved for class certification in MDL 1334 on October 20, 2000 after the parties

3

had been allowed to conduct class discovery.  In support of this motion, Plaintiffs submitted

extensive exhibits including depositions, documents, and the affidavits of a number of experts and

other witnesses.  On May 7, 2001, the Court held an exhaustive hearing on the issues of class

certification.  Shortly after this hearing, the Eleventh Circuit stayed proceedings in the Provider

Track of MDL 1334 pending resolution of the Defendants' appeal relating to the Court's arbitration

order.  The Eleventh Circuit then affirmed the arbitration order and the stay expired. *In re Managed*

*Care Litigation*, 285 F.3d 971 (11th Cir. 2002).

PacifiCare and United appealed, in part, the Eleventh Circuit's opinion to the United States

Supreme Court.  This appeal only addressed the arbitrability of direct RICO claims against these two

Defendants.  The Supreme Court ultimately reversed this part of the Eleventh Circuit's opinion,

holding that the issues of what damages were prohibited by the terms of the arbitration agreement

should first be addressed by the arbitrator.  *Pacificare v. Book*, 123 S. Ct. 1531 (2003).

After the Eleventh Circuit's stay was lifted, this Court ordered the parties to submit additional

materials relating to class certification and the effect of intervening decisions. On September 26,

2002, the Court entered the Class Certification Order certifying the following provider classes:

> The Global Class: All medical doctors who provided services to any person insured by any
> Defendant from August 4, 1990 to September 30, 2002.
>
> National Subclass: Medical doctors who provided services to any person insured by a
> Defendant, when the doctor has a claim against such Defendant and is not bound to
> arbitrate the claim.
>
> California Subclass: Medical doctors who provided services to any person insured in
> California by any Defendant when the doctor was not bound to arbitrate the claim being
> asserted.

The class and subclasses are certified as to the Plaintiffs' claims for RICO violations, breach of

contract, quantum meruit, unjust enrichment, state prompt pay violations, and violations of

4

California Business and Professions Code Section 17200.

Each of the Defendants joined in filing a 23(f) appeal to the Eleventh Circuit, arguing that this Court abused its discretion in certifying this class. The Defendants again moved the Eleventh Circuit to stay proceedings in the District Court. After briefing, the Eleventh Circuit denied the Defendants' motion for a stay. Oral argument in the 23(f) appeal was heard on September 11, 2003.

After the certification of the class, the Provider Plaintiffs served comprehensive requests for the production of documents and computer data on each of the Defendants. Since then, the parties engaged in numerous meet and confer sessions as well as numerous discovery hearings conducted by Special Master Sorondo. These proceedings have yielded the production of tens of millions of pages of documents from the Defendants and third parties, as well as live claims data from each of the Defendants' computerized claims processing systems. Plaintiffs have also taken extensive deposition testimony to develop their theory of the case.

In the course of this litigation, CIGNA attempted to terminate the case by settling with another plaintiffs' group. CIGNA did so by using a case in Illinois, *Kaiser v. CIGNA Corp.* Eighteen medical societies opposed the *Kaiser* settlement, considering it deficient. To prevent a settlement they believed inappropriate from evading this Court's jurisdiction, the Plaintiffs - - at significant cost of time and effort - - sought and received from the Court an All Writs Act injunction. CIGNA and the *Kaiser* plaintiffs appealed that injunction to the Eleventh Circuit. While the appeal was pending, the Judicial Panel on Multidistrict Litigation transferred *Kaiser* to this Court. CIGNA subsequently reached the settlement with the Plaintiffs and dismissed its appeal, and the Court vacated its All Writs Act injunction, although the *Kaiser* plaintiffs' appeal remains pending.

Discovery and extensive motion practice is ongoing as to the Non-Settling Defendants. The

trial against those Defendants will be set following June of 2004.

**C.     The Settlement Process**

The negotiations with CIGNA were long and hard-fought.   Counsel first met with representatives of CIGNA in August 2000 to discuss settlement.  Negotiations continued, on and off, over the next three years with dozens of meetings and conference calls until the settlement was finally presented to the Court on September 4, 2003.

Prior to entering into settlement negotiations, Co-Lead Counsel Archie Lamb and other attorneys representing the Plaintiff class spent days conferring with doctors and medical associations to understand the issues most important to the physicians.  Without exception, doctors and their associations emphasized the importance of changing the ongoing managed care practices over recovering money in this litigation.   After extensive negotiation, CIGNA agreed to make far more changes in practices than it was initially willing to make and to pay far more money than it was prepared to pay earlier in the negotiations.

**D.     The Settlement**

The Settlement with CIGNA is outstanding.  It is comprised of three parts, including business practices initiatives by CIGNA; a contribution of $15 million to the Plaintiffs' charitable foundation; a settlement fund to satisfy all valid proofs of claim; and payment of attorney's fees and costs capped at $55 million.

1.      Business Practice Initiatives

The heart of the Settlement consists of changes in CIGNA's business practices.   These changes are designed to eliminate what physicians believe to be the worst of the improper practices involved in managed care, to force CIGNA to engage in a level of disclosure and transparency

previously unknown in the managed care industry, and to provide independent dispute resolution procedures that will allow physicians to resolve their disputes in an efficient and meaningful way.

Regarding its policies and procedures, CIGNA has agreed to:

a)   include in its contracts with Physicians a definition of medical necessity which bases medical necessity determinations on generally accepted standards of medical practice;

a)   use clinical guidelines that are based on credible scientific evidence published in peer-reviewed medical literature (taking into account Physician Specialty Society recommendations, the views of Physicians practicing in the relevant clinical areas, and other relevant factors);

b)   provide members of the Class access to CIGNA's medical necessity external review process;

c)   establish an independent, external billing dispute resolution mechanism;

d)   continue to pursue initiative designed to facilitate the automated adjudication of claims submitted by Physicians and thereby the average time taken by CIGNA to pay valid claims;

e)   fund initiatives to reduce the percentage of resubmitted claims;

f)   not automatically reduce the intensity coding of evaluation and management codes billed for certain covered services;

g)   disclose payment rules and conform its bundling and other computerized editing rules as specified in the Agreement;

h)   not include in its contracts with members of the Class "all products clauses," "all affiliates clauses," or "gag clauses";

i)   devote resources to improve accuracy of information about eligibility of plan members;

j)   where all necessary information is available to CIGNA, interest on claims not paid within 15 business days for claims submitted electronically or 30 calendar days for claims submitted on paper;

k)   provide members of the Class with the ability to view applicable fee schedule amounts for billing codes related to their practice;

7

l)      establish a compliance dispute resolution mechanism to address disputes regarding CIGNA's compliance with the Agreement;

m)     disclose additional information about its claim administration policies and procedures on its existing internet website.

2.      A Charitable Foundation

The Settlement requires CIGNA to provide $15 million in funding to the plaintiffs' charitable foundation.   As discussed in the course of the Aetna settlement, this foundation will provide real benefits to all practicing physicians. The foundation is dedicated to promoting high quality healthcare and will give particular emphasis to initiatives that assist physicians to improve and enhance the quality of care received by patients.

In addition to CIGNA's initial financing, members of the Class may elect to have their payment from the settlement fund contributed to the foundation on their behalf. Unclaimed cash in the settlement fund after payment of all claims would also be contributed to the foundation to support its operations and initiatives.

3.      The Settlement Fund

Under the proposed settlement, CIGNA will pay two separate, alternative types of compensation to members of the Class: 1) "Category A Settlement Fund"; and 2) "Claim Distribution Fund" which includes retrospective compensation related to claim coding and bundling edits and denials of claims on medical necessity grounds.

a)  Category A Settlement Fund:  A component of the consideration to be provided to members of the Class under the proposed settlement is the establishment of a settlement fund in the aggregate amount of Thirty Million Dollars ($30,000,000.00).  If the settlement is approved by the Court, each member of the Class will be entitled to payments from this settlement fund in accordance

8

with the formula set forth in the Agreement.  Each member of the Class desiring to file a Category

A Claim  may elect to either receive the payment from the Category A Settlement Fund or to direct

that such amount be contributed to the Foundation on his, her or its behalf, or to a foundation

established by a state medical society.

     b)  Claim Distribution Fund:  CIGNA will establish a Claim Distribution Fund to pay three

categories of compensation to members of the Class affected by claim coding and bundling edits or

medical necessity denials.  CIGNA will replenish this fund as often as necessary to pay all valid

proofs of claim.

     With regard to this litigation only, CIGNA is waiving any right to require those members of

the Class with valid and enforceable arbitration provisions to arbitrate their Fee for Service Claims

during the Class Period against CIGNA.  This waiver will permit all members of the Class to

participate in the settlement compensation funds, even if they have valid and enforceable arbitration

provisions in their contracts with CIGNA.

     Finally, the Settlement includes a right to opt out.  Any physician, group or organization may

elect not to participate, and may pursue claims through other means.

## II.    THE CIGNA SETTLEMENT SHOULD BE APPROVED.

     The CIGNA settlement resolves this dispute to provide doctors wide relief, surpassing what

could be achieved through trial.  Achieved only after years of litigation, the settlement is clearly an

arms-length compromise.  The parties' agreement should therefore be readily approved by the Court,

especially considering the well-settled policy favoring the settlement of cases.   It is a truism that

"[c]ompromises of disputed claims are favored by the Courts."  *Williams v. First Nat'l Bank*, 216

U.S. 582, 585 (1910). This policy applies with particular force to class-action lawsuits, the

complexity and expenses of which impose special burdens borne by the judicial system as well as the litigants. *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *see also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."). Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice . . . ." *Behrens v. Wometco Enterp.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988).

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of any class-action settlement. "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find the settlement is fair, adequate and reasonable and not the product of collusion between the parties." *Cotton*, 559 F.2d at 1330. In reaching this determination, the "inquiry should focus upon the terms of the settlement," together with "an analysis of the facts and the law relevant to the proposed compromise." *Id.* Specifically, the settlement terms should be compared "with the likely rewards the class would have received following a successful trial of the case," subject to the following four qualifications. *Id.*

First, courts, including those in this Circuit, have continuously stressed that it should not "be forgotten that compromise is the essence of settlement." *Cotton*, 559 F.2d at 1330. As a result, in evaluating the terms of the compromise in relation to the likely benefits of a successful trial, "the trial judge ought not try the case in the settlement hearings," nor should the court "make a proponent of a proposed settlement justify each term of the settlement against a hypothetical or speculative measure of what concessions might have been gained . . . ." *Id.* To the contrary, "the court must be

10

mindful that inherent in compromise is a yielding of absolutes and an abandonment of highest hopes." *Ruiz v. McKaskle*, 724 F.2d 1149 (5th Cir. 1984); *see also Young v. Katz*, 447 F.2d 432 (5th Cir. 1971) (explaining that a mini-trial on the underlying merits for purposes of approving a settlement "would emasculate the very purpose for which settlements are made").

Second, courts have consistently stressed that in evaluating a settlement in light of the risk of continued litigation, the district court "is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330; *see also Behrens*, 118 F.R.D. at 539 ("The Court can rely upon the judgment of experienced counsel and, absent fraud, should be hesitant to substitute its own judgment for that of counsel."). "Courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching." *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 625 (D. Colo. 1976).

Third, the courts have also stressed that "litigants should be encouraged to determine their respective rights between themselves," and that "there is an overriding public interest in favor of settlement." *Cotton*, 559 F.2d at 1331. This principle is particularly compelling in class-action lawsuits which "have a well deserved reputation as being most complex." *Id.* As the Eleventh Circuit has emphasized:

> Public policy strong favors the pretrial settlement of class action lawsuits. Complex litigation -- like the instant case -- can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.

*In re U.S. Oil and Gas*, 967 F.2d at 493 (internal citation omitted); *see also Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426 (5th Cir. 1977) ("Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and

preventing lawsuits.").

Finally, in considering the merits of the proposed settlement, the court should take into account practical considerations such as the complexity of the case and the expense and likely duration of the litigation. *Susquehanna Corp. v. Korholz*, 84 F.R.D. 316, 322 (E.D. Ill. 1979). One of those practical considerations is the vagaries of litigation and the benefits of an immediate recovery as compared "to the mere possibility of relief in the future, after protracted and expensive litigation." *In re King Resources*, 420 F. Supp. at 625. In this respect, "it has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.*

Guided by these overriding principles, the Eleventh Circuit has outlined several factors useful in determining whether a proposed class action settlement is fair, adequate and reasonable. *See Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984). These factors are: (a) the likelihood of success at trial; (b) the range of possible recovery; (c) the point at or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (d) the complexity, expense, and duration of the litigation; (e) the substance and amount of opposition to the settlement; and (f) the stage of proceedings at which the settlement is achieved. *Bennett*, 737 F.2d at 987; *Behrens*, 118 F.R.D. at 538-39.

## A.     Likelihood of Success at Trial

Class Counsel are building a case with a good likelihood of success at trial. In fact, Plaintiffs are still preparing to go to trial with the Non-Settling Defendants. However, as the Court acknowledged in approving the Aetna settlement, "there remains substantial risk and uncertainty in plaintiffs ultimately prevailing on their claims on appeal." Final Approval Order and Judgment entered October 24, 2003 (hereinafter "Aetna Approval Order") at 4. Therefore, consideration of

this factor supports the approval of this settlement. Furthermore, it would take a significant amount of time to reach the trial, and appeals would inevitably follow, causing additional delay. *See id.* at 5. The Defendants argue strenuously that RICO provides no injunctive relief for private litigants. While Class Counsel disagree, risk and uncertainty remain because the Supreme Court has not addressed the issue. As a result, physicians could obtain a monetary award with no injunctive relief, which is at the heart of what the vast majority of physicians want from this litigation.

**B.      The Range of Possible Recovery and the Recovery Achieved**

From the very early stages of this litigation, our individual clients, the associations we represent, and many class members have made this point clear: the primary goal of this litigation must be to change Defendants' business practices. With this goal in mind, Class Counsel have always approached the litigation by focusing on business changes, while achieving a significant monetary recovery in addition to those changes. It is obviously difficult to quantify the possible range of recovery if the focus of litigation is injunctive. At the same time, it is difficult to imagine that more comprehensive business changes could have been achieved at the trial of this case rather than through this settlement. In fact, the likelihood is that injunctive relief after a trial would not be as comprehensive, at least in some areas. The guaranteed monetary relief secured through settlement is also fair, and certainly within the range that could have been achieved at trial. As such, this factor weighs heavily towards the approval of this settlement.

As this Court has explained, "[t]he settlement eliminates a substantial risk that the class would walk away empty-handed . . . . More importantly, the Settlement calls for the prospective elimination of billing and payment practices detrimental to physicians." Aetna Approval Order at 5. The results of the CIGNA settlement, in light of the case's substantial risks, thus strongly factor

in favor of approval.

**C.      The Complexity, Expense, and Duration of the Litigation**

This is one of the most complex cases ever prosecuted in this nation.  This litigation involves the practices of multi-billion dollar defendants and the effect of those practices on hundreds of thousands of physicians.  The litigation has been ongoing for more than four years and resulted in Class Counsel expending over 132,500 hours of time and over $7.6 million in costs to date in pursing this litigation.

This litigation has involved  four appeals  to the Eleventh Circuit, one appeal to the United States Supreme Court, and volumes of complex briefing on various issues at the District Court.  Discovery in this litigation has been arduous and hard fought.  Class Counsel have filed various motions to compel and been involved in dozens of meet and confers.  The end result has been the continued production and assimilation of tens of millions of pages of documents and the production of data from the computerized systems of each of the Defendants.  Consideration of this factor heavily weighs towards the approval of this settlement.

**D.      The Substance and Amount of Opposition to the Settlement**

Objection to this settlement is extraordinarily light given the fact that the class consists of hundreds of thousands of individuals.  Only seven objections have been filed in this nationwide class action. At the same time, endorsement of this settlement by the medical community has been substantial.  The settlement has been endorsed by 18 signatory associations and medical societies. The widespread acceptance of the settlement, and its thin opposition, weigh strongly in favor of its approval.

E.    **The Stage of Proceedings at Which Settlement was Achieved**

This settlement was achieved only after years of hard-fought litigation, while merits discovery was fully under way.  By this point in the litigation, Class Counsel had assimilated enough information about CIGNA's practices to meaningfully and appropriately reach the agreement.  In contrast, the likelihood of completing the litigation through trial and post-verdict appeals was still potentially years away.  As such, the settlement has reached a point when Class Counsel could fully evaluate the terms, but could also accelerate by a significant amount of time the implementation of benefits to the Class.  As in the Aetna settlement, "the terms of the Settlement make it clear that the process by which the settlement was achieved was fair."  Aetna Approval Order at 9.  This factor thus strongly supports the approval of this settlement.

F.    **The Notice Program Approved by the Court was Effectuated.**

Class Counsel met all of their obligations with regard to notice as set forth in this Court's Order of Preliminary Approval.  Under the notice provisions, five law firms representing the Plaintiff Class were required to post information about the settlement on their websites.  Class counsel have answered thousands of telephone calls made to Miami, New York, and Birmingham.  Class counsel have also responded to thousands of emails.  Numerous medical associations have also posted information about the settlement on their websites.  The settlement has received widespread publicity.

Under the program approved by the Court and carried out by the parties, the notice given was the best means of notice that was practicable under the circumstances.  As the Court ruled both in the Order of Preliminary Approval and the Aetna Approval Order, that notice was sufficient.

### III.   CLASS COUNSEL'S FEE REQUEST
### SHOULD BE APPROVED.

Class Counsel request that the Court award attorneys' fees and expenses based upon the common fund created through its efforts in settling the Class's claims against CIGNA. The attorney's fee requested is $55 million, inclusive of expenses.[1] The fee request amounts to less than 11% of the value of the settlement, which is conservatively estimated to be worth at least $500 million. The request is well within the range of percentages recognized as appropriate by the Eleventh Circuit under *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). For the reasons set forth below, Class Counsel submit that the requested fee award is appropriate, fair and reasonable under the applicable law.

### A.   The Law Awards Class Counsel Fees from the Common Fund Created Through their Efforts.

It is well established that when a representative party has conferred a substantial benefit upon a class, class counsel is entitled to an allowance of attorneys' fees based upon the benefit obtained. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970); *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194-95 (6th Cir. 1974).

The substantial benefit doctrine is an exception to the general rule that each party must bear its own litigation costs. The doctrine serves the "twin goals of removing a potential financial

---

[1] Class Counsel also do not oppose the request of $8 million in attorney's fees and expenses by the Corrigan Counsel, for their work in enhancing the CIGNA Settlement. The "Corrigan Counsel" are: Michael C. Dodge, David W. Dodge (of Dodge, Anderson, Jones, Bezney & Gillman, P.C.), Dennis Reich (of Reich & Binstock, L.L.P.); and Debra Brewer-Hayes (of counsel at Reich & Binstock, L.L.P.), four of the six attorneys appointed as class counsel in *Timothy N. Kaiser and Suzanne LeBel Corrigan v. CIGNA Corporation, et al.*, Cause No. 02-CV-1179-GPM (S.D. Ill.), formerly Case No. 00-L-480, in the Circuit Court of Madison County, Illinois (hereinafter referred to as the "Illinois Action"). Although Corrigan Counsel were jointly appointed in Illinois Action with Judy Cates and Troy Doles (formerly of Carr, Korein, Tillery, Cates, Katz & Glass, and now both with different firms), Plaintiffs exclusively support Corrigan Counsel, who in contrast with others in *Kaiser* worked in support of rather than adversely to the benefit of the Class.

16

obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.*, 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted); *see also Reiser v. Del Monte Properties Co.*, 605 F.2d 1135, 1139 (9th Cir. 1979); *Ramey*, 508 F.2d at 1195. The doctrine is based on the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Van Gemert*, 444 U.S. at 478; *Mills*, 396 U.S. at 392. The Supreme Court, the Eleventh Circuit, and courts in this District have thus all noted that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole." *See In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001) (citing *Boeing Co. v. Van Gemert*, 100 S. Ct. 745 (1980)); *see also Camden I*, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.")

Courts also have recognized that appropriate awards of attorneys' fees in cases such as this encourage redress for wrongs caused to entire classes of persons, as well as discourage future misconduct of a similar nature:

> [C]ourts . . . have acknowledged the economic reality that in order to encourage 'private attorney general' class actions brought to enforce . . . laws on behalf of persons with small individual losses, a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid.

*Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988); *see also Deposit Guaranty National Bank v. Rope*, 445 U.S. 326, 338-339 (1980). Adequate compensation promotes the availability of counsel for plaintiffs:

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . . We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law. It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit. It is an experience in which few of us have participated. The dimensions of the undertaking are awesome.

*Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985) (awarding requested 35% fee).

In the Eleventh Circuit, class counsel are awarded a percentage of the funds generated through a class action settlement. In *Camden I* -- the controlling authority in this circuit dealing with the issue of attorneys' fees in common-fund class-action cases -- the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774. Class Counsel may receive a percentage of the common fund they have generated for the class, regardless of the applicability of any fee shifting statute. The common fund in such instances includes the amount paid by the defendant to extinguish exposure for statutory fees. *See, e.g., Brytus v. Spang & Co.*, 203 F.3d 238 (3d Cir. 2000); *Florin v. Nationsbank*, 34 F.3d 560 (7th Cir. 1994); *Skelton v. General Motors Corp.*, 860 F.2d 250, 255 (7th Cir. 1988); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 583 (3d Cir. 1984).

The Court has substantial discretion in determining the appropriate fee percentage awarded to counsel. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each

case." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774). Nevertheless, "[t]he majority of common fund fee awards fall between 20% to 30% of the fund," although "an upper limit of 50% of the fund may be stated as a general rule." *Id.* (quoting *Camden I*, 946 F.2d at 774-75). Significantly, the Eleventh Circuit has found that "district courts are beginning to view the median of this 20% to 30% range, *i.e.*, 25% as a 'bench mark' percentage fee award which may be adjusted in accordance with the individual circumstances of each case . . . ." *Id.* (quoting *Camden I*, 946 F.2d at 775); *see also Waters v. Intern. Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (approving fee award where the district court determined that the benchmark should be 30% and then adjusted the fee award higher based on the circumstances of the case); *Walco Inv., Inc. v. Thenen*, 975 F. Supp. 1468, 1470 (S.D. Fla. 1997) (quoting *Camden I* and explaining 25% of the common fund is the benchmark).

## B.  The Eleventh Circuit's *Camden I* Factors Support Class Counsel's Requested Fee.

The Eleventh Circuit has provided a set of factors the Court should use to determine a reasonable percentage to award class-action counsel. These factors are:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions involved;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
> (5) the customary fee;
> (6) whether the fee is fixed or contingent;
> (7) time limitations imposed by the client or the circumstances;
> (8) the amount involved and the results obtained;
> (9) the experience, reputation, and ability of the attorneys;
> (10) the 'undesirability' of the case;
> (11) the nature and the length of the professional relationship with the client;
> (12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway*

*Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are not exclusive. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 775). Furthermore, these factors are merely guidelines. The Eleventh Circuit has also "encouraged the lower courts to consider additional factors unique to the particular case." *Id.* (quoting *Walco Investments, Inc. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997)).

Applied here, the *Camden I* factors establish that the Court should award counsel the full $55 million in fees they have requested.

## 1.       The CIGNA Case Required Substantial Time and Labor.

There can be no doubt this case has demanded substantial time and labor, including arduous briefing and extensive settlement negotiations. As Class Co-Lead Counsel's declarations establish, 149,806 hours have been expended in aggregate by the 26 law firms who constitute the Class Counsel in this litigation.[2] *See* Joint Decl'n of Lead Counsel, Ex. A. The Plaintiffs' lawyers have spent tens of thousands of hours in investigating and analyzing the facts of this case and in briefing and arguing the legal issues in this Court and in the multiple appeals. Counsel also spent thousands of hours in settlement negotiations, which occurred over the course of nearly two years and dozens of meetings.

The substantial amount of time and labor spent on the case was necessary, given the breadth

---

[2]These figures do not include the time expended by Corrigan Counsel, whose application Class Counsel does not oppose. *See infra* n. 5.

and complexity of the case's allegations.  To uncover the Defendants' improper practices such as bundling and downcoding has required Class Counsel to acquire, assimilate, and analyze millions of pages of documentary evidence.  The discovery battles alone were substantial.  Beyond discovery, the motions to dismiss, motions regarding arbitration, motion for class certification, and appeals at every opportunity demanded extraordinary amounts of time and effort.

### 2. The Issues Are Novel, Difficult, and Require the Exceptional Skill of a Highly Talented Group of Attorneys.

It is beyond dispute that this litigation is of a particularly complex nature, involving complicated and novel issues of law and fact.  This case has to date involved five appeals to the Eleventh Circuit Court of Appeals and an appeal to the United States Supreme.  Yet the considerable appellate work reflects a mere fraction of the complex motion practice and discovery efforts ongoing in this Court.  The record before the Court establishes that this case involved novel and difficult issues surrounding every phase of the litigation.

To litigate a case such as this requires counsel highly trained in class action matters and in the specialized issues the case presents.  The skill of counsel must be commensurate with the novelty and complexity of the issues in  this case, as well as the skill of the opposing counsel.  *See Walco*, 975 F. Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results").  The attorneys that compose the Plaintiffs' Class Counsel have the specialized skills to handle this litigation.  As this Court has previously noted in another case in which one of the undersigned Counsel participated, the "experience and competency" of counsel was "evident in both their pleadings and oral presentations to the Court." *Walco v. Thenen*, 168 F.R.D. 315, 327 (S.D. Fla. 1996).  Each of the lawyers on the Provider Plaintiffs' Steering Committee has extensive

experience in complex litigation.  The records and accomplishments detailed in their resumes speak for themselves.

In assessing the quality of representation by the Plaintiffs' Counsel, the Court also should consider the quality of the opposition.  *See, e.g., Camden I,* 946 F.2d at 772 n.3; *Johnson,* 488 F.2d at 718; *Ressler v. Jacobson,* 149 F.R.D. 651, 654 (M.D. Fla. 1992).  The excellent quality of that opposition has been no less apparent, and has demanded the best possible performance of Plaintiffs' counsel.

Considering the novelty and complexity of this case, and the matching skill and experience of Class Counsel, the fee request is eminently reasonable.

### 3.    The Case Against CIGNA Was Expensive and Risky, and Thus Undesirable.

By any reasonable view, this case was extremely risky.  The issues are complex; the legal hurdles are many and substantial; the opponents are powerful, wealthy, and ably defended; the time and expense demands daunting.  Such circumstances justify a generous fee award.  "A court's consideration of this factor recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk.  Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case.  All of this and more is enveloped by the term 'undesirable.'"  *In re Sunbeam,* 176 F. Supp. 2d at 1336.

Courts have also made clear that if, by their skill and determined efforts, plaintiffs' counsel ultimately secure a settlement, that fact is not relevant to assessing the risk they assumed at the case's inception. *See Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied,* 493 U.S. 810 (1989) ("The point at which plaintiffs settle with defendants . . . is simply not relevant to

determining the risks incurred by their counsel in agreeing to represent them."); *Lindy Bros.*

*Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976);

*Walco*, 975 F. Supp. at 1473. "Undesirability" and relevant risks must be evaluated from the

standpoint of plaintiffs' counsel as of the time they commenced the suit, and not retroactively with

the benefit of hindsight.

The term "undesirable" certainly applies to this case, as it originally came to Class Counsel.

As Michael Hanzman, an experienced counsel in class litigation, has explained:

> When Class Counsel undertook representation in this action, they
> were facing the following: (1) alleging and, at some point, proving a
> complex RICO action against the ten largest managed care companies
> in the United States; (2) litigating against some of the best defense
> firms in the country for years to come; (3) the inevitable motions to
> dismiss and summary judgment motions in connection with pleading
> and proving a RICO claim; (4) statute of limitations defenses; (5)
> arbitration provisions; (6) McCarran-Ferguson reverse pre-emption
> issues; (7) significant choice of law concerns; (8) abstention
> arguments typically asserted by regulated industries; and (9) the task
> of preparing an acceptable damage model. . . . To put it simply,
> Class Counsel had to clear multiple hurdles in order to succeed in this
> case, and a failure to clear *any* one of them could have (and in many
> cases - such as class certification - would have) resulted in a total
> loss.

(Hanzman aff. ¶ 16.) Unsurprisingly, although Mr. Hanzman himself had an opportunity to take this

case, he rejected it, because he "concluded that it would likely take years, perhaps even a decade, to

resolve the case, with a substantial risk of never recouping time or expenses, both of which would

be enormous." (*Id.* ¶ 17.)

This case has been expensive, risky, and so undesirable. Class counsel are entitled to be

compensated for accepting the risks associated with undertaking such a case.

4.     **Class Counsel Assumed Substantial Risk and Litigated this Case on a Pure Contingency Basis.**

This action was prosecuted by counsel on an entirely contingent fee basis. In undertaking to prosecute this complex action on that basis, counsel assumed a significant risk of nonpayment or underpayment. That risk warrants an appropriate fee.

Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award. "A contingency fee arrangement often justifies an increase in the award of attorneys' fees." *In re Sunbeam,* 176 F. Supp. 2d at 1335 (quoting *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd,* 899 F.2d 21 (11th Cir. 1990)); *see also In re Continental Illinois Sec. Litig.,* 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel *must* be compensated adequately for the risk of non-payment); *Ressler,* 149 F.R.D. at 656 ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award."); *Walters v. Atlanta,* 652 F. Supp. 755, 759 (N.D. Ga. 1985), *modified,* 803 F.2d 1135 (11th Cir.); *York v. Alabama State Bd. of Educ.,* 631 F. Supp. 78, 86 (M.D. Ala. 1986).

> As this Court has noted:
>
> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer.
> . . .
> A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd,* 899 F.2d 21 (11th Cir.

1990).

The case against CIGNA was a highly risky contingency case, which factors heavily in favor of awarding the requested fee.  The case has been  risky and difficult, with several potential legal pitfalls that could have led to no recovery at all.  Thus, the contingency risk in this case was substantial.  This factor favors awarding Class Counsel their requested fees.

## 5.    Counsel Have Achieved Excellent Results.

Counsel have achieved a settlement valued at over $500 million.  The settlement is a monumental achievement.  Instead of facing additional years of costly litigation, class members will profit now from significant business practice changes, a substantial settlement fund, and a foundation created for their benefit.  These results have been hailed by physicians and associations throughout the country, including 18 signatory professional associations.

When determining the total value of a class action settlement for purposes of calculating the attorneys' fee award, the court should consider both the direct compensatory relief and the economic value of any prospective injunctive relief obtained for the class.  *See Camden* I, 946 F.2d at 775; *Sheppard v. Consolidated Edison Co.*, 2002 WL 2003206, at *7 (E.D. N.Y. 2002) (in valuing total settlement for percentage-based attorneys' fee award, court included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief"); *Steiner v. Williams*, 2001 WL 604035, at *4 (S.D. N.Y. 2001) ("Although the settlement in this action did not involve the payment of money by the defendants, counsel may nonetheless recover a fee if the settlement conferred a substantial non-monetary benefit.").[3]

---

[3] *See also Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69, 71 (2d Cir. 1995) (attorneys' fees may be awarded based on non-pecuniary benefit obtained for class); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 199 (S.D. N.Y. 1997) (in determining fee award in employment discrimination case, court considered value of prospective wage increases and defendants' costs of initiating and maintaining internal civil rights task force); *In re*

As the Supreme Court has recognized, the rationale of the common-fund doctrine "must logically extend, not only to litigation that confers a monetary benefit on others, but also to litigation 'which corrects or prevents an abuse which would be prejudicial to the rights and interests' of those others." *Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396 (1970)); *see also, Kaplan v. Rand*, 192 F.3d 60, 70 (2d Cir. 1999) (noting "'well-established [rule] that non-monetary benefits, such as . . . deterring future misconduct by management may support a fee award") (quoting *Koppel v. Wien*, 743 F.2d 129, 134-35 (2d Cir. 1984)); *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975) ("[A]s the Supreme Court has developed the 'common fund' rationale for awarding attorneys fees, assessment of such fees . . . may be predicated on the conferral of benefits which are neither monetary in nature nor explicitly sought on behalf of the entire group").

CIGNA's agreement to business practice initiatives, including an independent external review process, is the type of substantial non-monetary benefit justifying attorney compensation. If plaintiffs had received no monetary damages in these settlements, Class Counsel would still be entitled to substantial attorneys' fees for those benefits alone. *Steiner*, 2001 WL 604035, at *4. *Cf., City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) ("Congress made clear that it intended that the amount of fees awarded under [the Civil Rights Act] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature.") (internal quotations omitted;

*Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (in justifying fee award of 33.8%, court noted that "class counsel's efforts may reasonably be expected to have created a benefit beyond the immediate settlement proposed"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) ("[i]ncidental or non-monetary benefits conferred by the litigation are a relevant circumstance" in evaluating the reasonableness of attorneys' fees); *Shaw v. Toslba America Information Systems, Inc.*, 91 F. Supp. 2d 942, 971 (E.D. Tex. 2000) ("When considering the quality of the proposed Settlement Agreement, this Court considered both the monetary and the non-monetary benefits the class is to receive.").

emphasis in original).

This case was not exclusively, nor even primarily, instituted to recover compensatory relief for past conduct.  While the monetary damages plaintiffs claimed in this case were significant, the elimination of CIGNA's coding practices was more important.   Therefore, any calculation of the true value of the settlements to plaintiffs, and the appropriate percentage to be applied, must account for this substantial injunctive relief.  Courts should consider the value of the injunctive relief in determining what percentage of the fund should be awarded.  *See Staton v. Boeing, Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("courts should consider the value of the injunctive relief obtained as a relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees") (internal quotation and citation omitted).

By any measure, the CIGNA settlement is a tremendous success.  The settlement achieves the relief the physicians wanted from onerous managed care practices, and establishes a settlement fund to provide compensation for all valid claims and a $15 million charitable contribution as well. The successful results in this case are a powerful factor weighing in favor of Class Counsel's fee request.

### 6.    Counsel's Fee Request Comports with Customary Fees and  Awards in Similar Cases.

The fee requested here is well within customary charges and the experience of similar cases. The requested fee of $55 million amounts to substantially less than 11% of the value of the settlement.  A fee award equal to 30% of a common fund remains well within the range of what may be considered customary.  *See, e.g., In re Sunbeam,* 176 F.  Supp. 2d at 1333-34.  In fact, many recent decisions in this Circuit have routinely awarded attorneys' fees up to and at times in excess

of thirty percent, which further confirms the fairness and reasonableness of the fee requested here.[4]

Counsel's fee request comports with the standard contingent fee amount found in the marketplace.  *See, e.g., In re Continental Illinois Sec. Litig.,* 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco, Inc. Sec. Litig.,* Fed. Sec. L. Rep. (CCH) ¶ 94,268 (S.D.N.Y. 1992) ("what should govern [fee] awards is . . . what the market pays in similar cases . . . ."); *see also Kirchoff v. Flynn,* 786 F.2d 320, 325 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'") (emphasis in original).  The requested fee is consistent with practice in the private marketplace where contingent fee arrangements ranging from 30% to 40% are customary.  As Justices Brennan and Marshall observed in one concurring opinion: "In tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery." *Blum v. Stenson,* 465 U.S. 886, 904 (1984); *see also Kirchoff,* 786 F.2d at 323, 325 n.5 (observing that "40% is the customary fee in tort litigation"); *In re Public Service Co.,* Fed. Sec. L. Rep. (CCH) ¶ 96,988 at 94, 291-92 (S.D. Cal. 1992) ("If this were a non-representative litigation, the customary fee arrangement would be contingent on a percentage basis, and in the range of 30% to 40% of the

---

[4] *See, e.g., Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291 (11th Cir. 1999) (awarding 33 1/3%); *In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323 (S.D. Fla. 2001) (awarding 25%); *Diaz v. Hillsborough County Hosp. Authority,* 2000 WL 1682918 (M.D. Fla. Aug. 7, 2000) (awarding 30%); *see also Tapken v. Brown,* Case No. 90-0691-CIV-Marcus (S.D. Fla. 1995) (awarding 33%); *In re Int'l Recovery Corp. Sec. Litig.,* Case No. 92-1474-CIV-Atkins (S.D. Fla. 1994) (fee award represented 30% of class benefit); *In re Sound Advice, Inc. Sec. Litig.,* Case No. 92-6457-CIV-Ungaro-Benages (S.D. Fla. 1994) (awarding 30%); *In re Belmac Corp. Sec. Litig.,* Case No. 92-1814-CIV-T-23-(C) (M.D. Fla. 1994) (awarding 31%); *Holloway v. Chapnick,* Consol. Case No. 89-6572-CIV-Paine (S.D. Fla. 1994) (awarding 30%); *In re Perfumania, Inc. Sec. Litig.,* Case No. 92-1490-CIV-Marcus (S.D. Fla. 1993) (awarding 30%); *In re Royce Lab., Inc. Sec. Litig.,* Case No. 92-0923-CIV-Moore (S.D. Fla. 1993) (awarding 30%); *Kaser v. Swann,* Case No. 90-607-CIV-Orl-3A18 (M.D. Fla. 1993) (awarding 30%); *In re Home Shopping Network Sec. Litig.,* Case No. 87-428-T-13(A) (M.D. Fla. 1991) (awarding 33%).

recovery.").

The record here well establishes that Class Counsel's fee request is customary and comports with those in similar cases. Professor Arthur Miller and three leading advocates in complex commercial and class action cases – Thomas Scott, a former federal judge; Roberto Martinez, a former U.S. Attorney; and Michael Hanzman, a preeminent class action attorney – are providing declarations attesting to the reasonableness of the fee in this case. Class Counsel's fee request comports with custom and experience in the complex class action setting.

> ### 7.    The Remaining *Camden I* Factors Also Favor Approving Class Counsel's Fee Request.

The remaining *Camden I* factors also weigh in favor of allowing Class Counsel the fees they request. First, the burdens of this litigation have precluded the pursuit of other cases by the Class Counsel. Given the relatively small size of the firms representing Plaintiffs and the major commitment involved with accepting this representation, this case undoubtedly precluded the firms from working on other matters and accepting certain other representations.

The time limitations imposed by the case also weigh in favor of approving the fee request. The CIGNA case has proceeded at an aggressive pace. The litigation was first transferred to this Court less than three years ago. Furthermore, the Eleventh Circuit Court of Appeals stayed this action for more than one full year as it considered the arbitration appeal, thus accelerating the proceedings when the case was not stayed. Therefore, the pace of this litigation warrants consideration in the approval of the requested fee.

That the case's settlement took years, including years of negotiation in dozens of meetings, also weighs in favor of allowing the requested fee. It is important to recall that the benefits to the class were addressed before the fee issue. This is not a case where the class was given meaningless

relief in a quick settlement to benefit counsel. While some objections have been filed, the number of objections is minuscule in proportion to the thousands of members in the class. At the same time, favor for the settlement is overwhelming, with 18 associations endorsing its terms.

Finally, Class Counsel's fee request is firmly rooted in "the economics involved in prosecuting a class action." *See In re Sunbeam*, 176 F. Supp. 2d at 1333. Without adequate compensation and financial reward, cases such as this – highly risky, costly, massive and meritorious litigation, aimed at creating real societal change – could not be pursued.

### C.    The Requested Fee Is Also Reasonable When Cross Checked Against the "Lodestar" Approach.

Some courts use the lodestar method as a cross-check of the percentage of the fund approach. *In re Sunbeam*, 176 F. Supp. 2d at 1336 (citing *Ressler*, 149 F.R.D. at 653 n.4). Applied here, the lodestar method shows Class Counsel's fee request easily passes muster. Class Counsel have expended 149,806 hours at a value of $49.3 million, and costs of $7.6 million.[5] Even considering the $50 million fee award in the Aetna settlement - - which remains pending on appeal - - the total of both awards would be $105 million, less than two times Class Counsel's fees and expenses. The lodestar multiplier would therefore be significantly less than 2.

If the lodestar approach applied here, undoubtedly this case would justify a multiplier significantly greater than 2. In a pre-*Camden I* case, the Court performed both methods of analysis and gathered cases on the range of fee awards under either method and noted that lodestar multiples "in large and complicated class actions" range from 2.26 to 4.5, while "three appears to be the average." *Behrens v. Wometco Enter., Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988). In many cases,

_____

[5]These figures do not include the time and expenses are those of Corrigan Counsel (17,527.80 hours, $6,344,248.95 in billable time, and $633,755.51 in expenses), whose application Class Counsel does not oppose. Including those figures would reduce the lodestar multiplier further.

including cases in this jurisdiction, multiples much higher than three have been approved. *See, e.g.,* *Weiss v. Mercedes-Benz of North America, Inc.,* 1995 U.S. Dist. LEXIS 14708 (D.N.J. 1995) (multiple of 9.3 times lodestar); *In re RJR Nabisco, Inc. Sec. Litig.,* Fed. Sec. L. Rep. (CCH) ¶ 96,984 (S.D.N.Y. 1992) (multiple of 6 times lodestar); *Cosgrove v. Sullivan,* 759 F. Supp. 166 (S.D.N.Y. 1991) (multiple of 8.74); *Glendora Comm. Redevelopment Agency v. Demeter,* 155 Cal. App. 3d 465 (1984) (multiple of 12 times lodestar); *Grimshawe v. New York Life Insurance Co.,* Case No. 96-0746-Civ-Nesbitt (S.D. Fla. 1996) (percentage-based fee award equivalent to a multiple of 8.5). Empirical data shows that the average Lodestar multiplier is 3.89, and the average Lodestar in cases with a range of recovery greater than $100 million is 4.50. Stuart J. Logan et al., *Attorney Fee Awards in Common Fund Class Action,* 24 Class Action Prep. 169 (2003). Considering that a multiplier would surely be justified in this case, Class Counsel's fee request easily satisfies the cross check using the lodestar method.

Finally, it is important to recognize that the lodestar method is a cross check only. As Judge Posner of the Seventh Circuit has explained, "the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character." *In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 572 (7th Cir. 1992). "In fine, the market pays for the result achieved." *In re: Thirteen Appeals,* 56 F.3d 295, 307 (1st Cir. 1995). The results here are excellent, as shown by the sparsity of objections from the sizeable class of physicians. In light of those results, Class Counsel are entitled to the full award of their request.

## IV.  CONCLUSION

The CIGNA Settlement is an arms-length compromise wrought from years of litigation and negotiation, providing compensation for all valid claims and wide-ranging changes to CIGNA's business practices – changes exceeding the plaintiffs' possible relief following trial.  The settlement is not merely reasonable; it is extraordinary.  Unquestionably the CIGNA Settlement should be approved.

The Court should also approve class counsel's fee request, which is fair and reasonable.  The fee request easily satisfies the guidelines of *Camden I*, especially in light of the complicated nature of the case, the time, effort, and skill required to litigate the case and reach the settlement with CIGNA, and the outstanding result Class Counsel have obtained.  Accordingly, the Plaintiffs respectfully request that this Court approve the CIGNA Settlement, grant Class Counsel's fee request, and enter the proposed Order and Final Judgment.

Respectfully submitted this _2d_ day of December, 2003.

Archie C. Lamb, Jr.
LAW OFFICES OF ARCHIE LAMB
2017 - 2nd Avenue North
Birmingham, AL 35203
Tel: 205-324-4644
Co-Lead Counsel for Provider Plaintiffs

Aaron Podhurst
PODHURST ORSECK JOSEFSBERG,
EATON MEADOW OLIN & PERWIN
25 West Flagler Street, Ste 800
Miami, FL 33130
Liaison Counsel for Plaintiffs

Nicholas B. Roth
EYSTER KEY TUBB WEAVER & ROTH
402 E. Moulton Street, Decatur, AL 35601

Harley S. Tropin  (Fla. Bar No. 241253)
Janet L. Humphreys (Fla. Bar No. 607258)
Adam M. Moskowitz  (Fla. Bar No. 984289)
Thomas A. Tucker Ronzetti (Fla. Bar No. 965723)
KOZYAK TROPIN & THROCKMORTON
200 S. Biscayne Boulevard, Ste 2800
Miami, FL 33131
Tel: 305-372-1800 / Fax: 305-372-3508
Co-Lead Counsel for the Provider Plaintiffs

Dennis G. Pantazis
GORDON SILBERMAN WIGGINS & CHILDS
1400 SouthTrust Tower / 420 North 20th Street
Birmingham, AL 35203

32

Jeffery A. Mobley
LOWE MOBLEY & LOWE
1210 - 21st Street, Haleyville, AL 35565

Mark Gray
GRAY & WEISS
1200 PNC Plaza / 500 West Jefferson
Louisville, KY 40202

Robert Foote
FOOTE & MEYERS
416 S. 2nd Street, Geneve, IL 60134

Jay Waller
CAMPBELL WALLER & McCALLUM
2100-A Southbridge Parkway, Ste 475
Birmingham, AL 35209

James B. Tilghman
STEWART TILGHMAN FOX & BIANCHI
1 SE 3rd Avenue, Ste 3000
Miami, FL 33131-1764

Joe R. Whatley, Jr.
WHATLEY DRAKE
2323 2nd Avenue North, Birmingham, AL 35203

J. Mark White
WHITE DUNN & BOOKER
2025 3rd Avenue North, Ste 600
Birmingham, AL  35203

Guido Saveri / R. Alexander Saveri / Cadio Zirpoli
SAVERI & SAVERI
111 Pine Street, Ste 1700
San Francisco, CA 94111-5619

Kenneth S. Canfield
DOFFERMYRE SHIELDS CANFIELD
KNOWLES & DEVINE
1355 Peachtree St., Ste 1600, Atlanta, GA 30309

Edith M. Kallas / Joseph P. Gugliemo
MILBERG WEISS BERSHAD HYNES & LERACH
One Pennsylvania Plaza, New York, NY 10119

James E. Hartley, Jr.
DRUBNER HARTLEY & O'CONNOR
500 Chase Parkway, 4th Fl.,Waterbury, CT 06708

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ⁀day of December, 2003, a true copy of the foregoing was served via hand-delivery and e-mail to Edward Soto, Esq. at Weil Gotshal & Manges, LLP, 701 Brickell Avenue, Suite 2100, Miami, Florida 33131 (Defense Liaison Counsel); via e-mail on all parties of record on the 10/01/03 Service List; and by first-class U.S. Mail to those on the attached list as indicated.

2957/101/232775.1

33

# SERVICE LIST FOR
# OBJECTORS TO CIGNA SETTLEMENT

| Party | E-mail Service | Via First Class Mail |
|---|---|---|
| Victoria P. Wolfson, M.D. | David Miller, Esq.<br>c/o<br>Victoria P. Wolfson<br>25 Elm Place, #2<br>Somerville, MA 02143 | ✔ |
| Lisa Reznick, M.D., P.A. | Bryan D. Marcus, Esq. (x13201@aol.com)<br>19500 Middlebelt Road, Suite 110 East<br>Livonia, MI 48152<br><br>Norman A. Yatooma, Esq. (nya@normanyatooma.com)<br>219 Elm Street<br>Birmingham, Michigan 48009 | |
| David E. Rogers, M.D. | David E. Rogers, M.D. (www.friscogyn.com)<br>5575 Warren Parkway, Suite 316<br>Frisco, Tx 75034 | |
| Dr. Barry Erner | John J. Pentz, Esq. (clasaxn@earthlink.net)<br>736 Boston Post Road/3<br>Sudbury, MA 01776 | |
| Timothy N. Kaiser, M.D.<br>Jonas T. Johnson, M.D.<br>M. Jennifer Derebery, M.D.<br>John W. Galbreath, D.C. | Judy L. Cates (jcates@cateslaw.com)<br>24 Bronze Pointe<br>Belleville, IL 62226 | |
| Emergency Department Practice Management Association (EDPMA) | Miles A. McGrane, III, Esq.<br>(mmcgrane@mn-lawfirm.com)<br>2801 Ponce de Leon Blvd., 12th Floor<br>Coral Gables, Florida 33134 | |

2957/101/232612.1