# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MDL No. 1334
Master File No. 00-1334-MD-MORENO

IN RE: MANAGED CARE LITIGATION

THIS DOCUMENT RELATES TO
**PROVIDER TRACK CASES**

**NIGHT BOX FILED**

JAN ? ? 2004

CLARENCE MADDOX
CLERK USDC / SDFL / MIA

## MOTION FOR ORDER ENJOINING CLASS MEMBERS EAST COUNTY PHYSICIANS MEDICAL GROUP, INC. AND TED MAZER, M.D. AND THEIR ATTORNEYS FROM VIOLATING THIS COURT'S FINAL APPROVAL ORDERS AND JUDGMENT AND COMPELLING EAST COUNTY PHYSICIANS MEDICAL GROUP, INC., TED MAZER, M.D., AND THEIR ATTORNEYS TO SHOW CAUSE WHY THEY SHOULD NOT BE HELD IN CONTEMPT

Defendants Aetna Inc. and Aetna U.S. Healthcare Inc. (collectively, "Aetna"), hereby move this Court for an order enjoining class members East County Physicians Medical Group, Inc. and Ted Mazer, M.D. and their attorneys (collectively, "ECPMG") from violating this Court's Final Approval Order and Judgment, Supplemental Final Approval Order, and Final Judgment and compelling East County Physicians Medical Group, Inc., Ted Mazer, M.D., and their attorneys to show cause why they should not be held in contempt.

The grounds supporting this Motion are fully set forth in the accompanying Memorandum of Law, the Affidavit of Service (attached hereto as "Tab 1"), and the Declaration of Maria R. Acker (attached hereto as "Tab 2") and exhibits thereto.



Master File No. 00-1334-MD-MORENO

## Statement of Compliance with Pre-Filing Conference Requirement

In compliance with Local Rule 7.1(A)(3), counsel for Aetna has conferred with counsel for ECPMG in a good faith effort to resolve by agreement the issues raised in the present Motion and have been unable to do so.  *See* Declaration of Maria R. Acker, ¶ 7-10.

DATED: January 22, 2004

Respectfully submitted,

*Christine M. Nanfeldt*

Hilarie Bass
Florida Bar Number: 334243
E-mail: bassh@gtlaw.com
Mark P. Schnapp
Florida Bar Number: 501689
E-mail: schnappm@gtlaw.com
Christine Nanfeldt
Florida Bar Number: 114049
E-mail: nanfeldtc@gtlaw.com
**GREENBERG TRAURIG**
1221 Brickell Avenue
Miami, FL 33131
Tel: (305) 579-0500
Fax: (305) 579-0717

John J. Swenson
E-mail: jswenson@gibsondunn.com
Richard J. Doren
E-mail: rdoren@gibsondunn.com
Mark Erich Weber
E-mail: mweber@gibsondunn.com
Kay E. Kochenderfer
E-mail: kkochenderfer@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel: (213) 229-7000
Fax: (213) 229-6038

Miguel A. Estrada
E-mail: mestrada@gibsondunn.com
Daniel W. Nelson
E-mail: dnelson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 530-9616

*Attorneys for Defendants Aetna U.S. Healthcare Inc., Aetna Inc., Aetna Health Inc.*

2

Master File No. 00-1334-MD-MORENO

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY the foregoing was served overnight mail to Aaron S. Podhurst, Esq. and Harley S. Tropin, Esq.; one copy by electronic mail to all other counsel listed on the October 1, 2003 Service List; one copy to Michael A. Coval, John J. Pentz, Esq., Randall Henley, Esq., Nicholas M. Fausto, Esq., Stanley M. Chesley, Esq., Richard S. Wayne, Michael R. Barrett, Randall A. Pullman, J. Benton Stewart, Brian D. Marcus, Esq., Norman A. Yatooma, Peter A. Shapiro, Esq., Jeffrey M. Liggio, Esq., Jene P. Williams, Esq., Edward H. Zebersky, Esq., Joseph A. Schwartz, III, Esq., Traci L. Cotton, Justin L. Williams, Esq., William D. Strinden, M.D., Katherine Benesch, Esq., and Harvey W. Gurland, Jr. Esq. by electronic mail; one copy by U.S. mail to Justin L. Williams, Esq.; and one copy by U.S. mail to Joseph A. Schwartz, III, Esq., Walter J. Chlysta, M.D., 400 Wabash Avenue, Akron, Ohio 44307, Gary Eckenrode, M.D., P.O. Box 154, Richboro, PA 1895, David Russell Jacobson, P.O. Box A3042, Chicago, Illinois 60690, Lawrence W. Schonbrun, Esq., 86 Eucalyptus Road, Berkeley, CA 94705, Charles D. Levit, M.D., 203 East 72 Street (27C), New York, NY 10021 and one copy by overnight mail to Lee Squitieri, Esq., Squitieri & Fearon, LLP, 420 Fifth Avenue, 18th Floor, New York, New York 10175 and Joel R. Bennett, Esq., Matthew Fairshter, Esq., 225 South Lake Avenue, 9th Floor Pasadena, CA 91101 on this 22nd day of January, 2004.

_Christine M. Nanfeldt_
CHRISTINE NANFELDT

GREENBERG TRAURIG, P.A.

# TAB 1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

MDL No.1334
Master File No. 00-1334-MD-Moreno

IN RE:
MANAGED CARE LITIGATION

-----------------------------------------------------------

THIS DOCUMENT RELATES TO
PROVIDER TRACK CASES

## AFFIDAVIT OF SERVICE RE: EAST COUNTY PHYSICIANS

## MEDICAL GROUP, INC. AND TED MAZER, M.D.

John J. Swenson
Richard J. Doren
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90017-3197

Miguel A. Estrada
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

Hilarie Bass
Mark P. Schnapp
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131

Neil Manning, being duly sworn, deposes and says:

1.      I am an Account Executive, working in the Legal Services Division of Poorman-Douglas Corporation ("PDC"), the settlement administrator in the above-captioned case. I am fully familiar with the actions taken by PDC as described below.

2.      I submit this affidavit of service to provide proof of the mailing of the Notice of Class Action and Proposed Settlement ("Notice") and Proof of Claim Form ("Claim Form") to East County Physicians Medical Group, Inc. ("ECPMG") and Ted Mazer, M.D., both of California.

3.      As described in the Settlement Administrator's Report and Affidavit of Jenny Teston previously filed with this Court, one of PDC's responsibilities was to mail the Notice and Claim Form to all class members as defined in the Settlement Agreement. On July 2, 2003, a Notice was sent to ECPMG at the following addresses:  1400 West Hillcrest Park, Newbury Park, CA 91320 and 3900 Fifth Avenue, Suite 370 San Diego, CA 92103. The mailing to the Newbury Park address was returned as undeliverable on August 5, 2003. The mailing to the San Diego address, which I am informed and believe is the address for ECPMG and its registered agent currently on file with the California Secretary of State, was not returned to PDC.

4.      On July 2, 2003, a Notice and Claim Form was sent to Ted Mazer, M.D. at 6699 Alvarado Road, Suite 2209, San Diego, California 92120. This mailing was not returned to PDC.

5.      Neither ECPMG nor Dr. Mazer submitted any request for exclusion (or to "opt out") from the settlement to PDC.

STATE OF OREGON        )

                        )ss:

COUNTY OF WASHINGTON)

_____
NEIL MANNING

Sworn to before me on this 19th day of January, 2004

OFFICIAL SEAL
PATRICIA M. EVANS
NOTARY PUBLIC-OREGON
COMMISSION NO 337000
MY COMMISSION EXPIRES AUG 1, 2004

2

# TAB 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MDL No. 1334
Master File No. 00-1334-MD-MORENO

IN RE: MANAGED CARE LITIGATION

THIS DOCUMENT RELATES TO
**PROVIDER TRACK CASES**

## DECLARATION OF MARIA R. ACKER IN SUPPORT OF MOTION OF AETNA INC. AND AETNA U.S. HEALTHCARE INC. FOR AN ORDER ENJOINING CLASS MEMBERS EAST COUNTY PHYSICIANS MEDICAL GROUP, INC. AND TED MAZER, M.D. AND THEIR ATTORNEYS FROM VIOLATING THIS COURT'S FINAL APPROVAL ORDERS AND JUDGMENT AND COMPELLING EAST COUNTY PHYSICIANS MEDICAL GROUP, INC., TED MAZER, M.D., AND THEIR ATTORNEYS TO SHOW CAUSE WHY THEY SHOULD NOT BE HELD IN CONTEMPT

**John J. Swenson**
**Richard J. Doren**
**Gibson, Dunn & Crutcher LLP**
**333 South Grand Avenue**
**Los Angeles, CA 90017-3197**

**Miguel A. Estrada**
**Gibson, Dunn & Crutcher LLP**
**1050 Connecticut Avenue, N.W.**
**Washington, D.C. 20036**

**Hilarie Bass**
**Mark P. Schnapp**
**Greenberg Traurig, P.A.**
**1221 Brickell Avenue**
**Miami, FL 33131**

I, Maria R. Acker, declare as follows:

1.     I am a partner in the law firm of Gray Cary Ware & Freidenrich LLP and am responsible for the representation of Aetna Health of California Inc. in connection with the matter styled *East County Physicians Medical Group, Inc. et al. v. Aetna Life and Casualty Insurance Co., et al.*, pending in the Superior Court of California for the County of San Diego as Case No. 701044. I make this declaration in support of the motion of Aetna Inc. and Aetna U.S. Healthcare Inc. (hereafter "Aetna") for An Order Enjoining Class Members East County Physicians Medical Group, Inc. and Ted Mazer, M.D. and Their Attorneys from Violating This Court's Final Approval Orders and Judgment and Compelling East County Physicians Medical Group, Inc., Ted Mazer, M.D., and Their Attorneys to Show Cause Why They Should Not Be Held In Contempt. I am personally familiar with the facts set forth in this declaration, unless otherwise stated, and, if called upon to do so, could and would testify competently thereto.

2.     In June 1996, East County Physicians Medical Group, Inc. and Ted Mazer, M.D. (collectively, "ECPMG") sued Aetna and others for alleged unfair and anticompetitive business practices in California state court.

3.     In its most recent complaint, ECPMG asserted claims for violation of California's antitrust statute, breach of contract, violation of California's unfair competition statute, intentional interference with prospective business advantage, intentional interference with contractual relations, inducing breach of contract, and trade libel and disparagement. A copy of that complaint is attached hereto as Exhibit A.

4.     Aetna prevailed on a motion for summary judgment that was affirmed in part and reversed in part by the California Court of Appeal, Fourth Appellate District, Division One

1

("Court of Appeal"), filed March 28, 2000.  A copy of that Court of Appeal opinion is attached hereto as Exhibit B.

5.      The case was remanded to the Superior Court for the County of San Diego, and assigned to a new judge.  At the close of the discovery period Aetna moved for summary adjudication of ECPMG's claims for unfair competition and interference with contractual relations.  The Superior Court granted Aetna's motion.  The parties settled the breach of contract claim -- the only claim that remained at that point -- and ECPMG filed a second appeal.

6.      The Court of Appeal affirmed in part and reversed in part the order granting Aetna's motion for summary adjudication.  A copy of that second Court of Appeal opinion, filed June 12, 2003, is attached hereto as Exhibit C.  The case was remanded to the Superior Court for the County of San Diego as of September 17, 2003, and assigned to a new judge.  Only one claim remains pending, for interference with contractual relations.

7.      I informed counsel for ECPMG about the settlement, release and injunction ordered by the Southern District of Florida in the above-captioned MDL proceeding on or before December 12, 2003, the date of the first Case Management Conference in the remanded action.  Indeed, ECPMG filed multiple documents from this MDL proceeding related to Aetna's settlement prior to the December 12, 2003 conference.

8.      I am informed and believe that on January 7, 2004, this Court granted the motion for an order enjoining Westside EKG Associates ("Westside") and its attorneys from prosecuting Released Claims in a separate Florida state court action.  A copy of the Court's January 7, 2004 order is attached hereto as Exhibit D.  The transcript from the related hearing is attached hereto as Exhibit E.

2

9.      On January 16, 2004, I sent a letter about the Court's January 7, 2004 ruling in the Westside matter to counsel for ECPMG.  Together with that letter I sent copies of the following documents: (1) the transcript of the January 7, 2004 hearing in the Westside matter; (2) the Order Granting Aetna Inc. and Aetna U.S. Healthcare Inc.'s Emergency Motion For An Order Enjoining Westside EKG Associates And Its Attorneys From Prosecuting Appeal Case No. 4D03-3533, filed January 7, 2004; (3) the Final Approval Order and Judgment, filed October 24, 2003; (4) the Supplemental Final Approval Order, filed November 6, 2003; (5) the Final Judgment, filed November 7, 2003.  A copy of my January 16, 2004 letter to ECPMG's counsel is attached hereto as Exhibit F.

10.      Despite my efforts, ECPMG has refused to dismiss its action or even to defer discovery until after this Court decides Aetna's motion.

11.      I am informed and believe that ECPMG and Dr. Mazer have not filed any objection to Aetna's settlement in this MDL proceeding.

12.      In an effort to confirm Dr. Mazer's address, I went to the Google Internet website and inserted the name "Ted Mazer" as a search term.  One of the search results was an article entitled "Aetna to settle suit filed by physicians," reported in the San Diego Union-Tribune on May 23, 2003.  Dr. Mazer is quoted in that article, a copy of which is attached hereto as Exhibit G.

I declare under penalty of perjury under the laws of the United States of America and the State of Florida that the foregoing is true and correct and that this declaration was executed on January 21, 2004 in San Diego, California.

MARIA R. ACKER

3

# EXHIBIT A

1   JOEL R. BENNETT, ESQ., S.B. NO. 42162
    LAW OFFICES OF JOEL R. BENNETT
2   225 South Lake Avenue, Ninth Floor
    Pasadena, California 91101
3   (818) 683-3031

4   LOUIS B. RUBIN, ESQ., S.B. NO. 85281
    605 C Street, Suite 300
5   San Diego, California 92101
    (619) 702-5552

6

7   Attorneys for Plaintiffs
    East County Physicians Medical Group

8
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                         FOR THE COUNTY OF SAN DIEGO
10

11  EAST COUNTY PHYSICIANS MEDICAL      )   CASE NO. 701044
    GROUP, INC., a California           )
12  corporation; and TED MAZUR,         )   SECOND AMENDED COMPLAINT FOR
    M.D., individually and on           )   DAMAGES AND EQUITABLE RELIEF
13  behalf of all others similarly      )   FOR:
    situated,                           )
14                                      )   1.   VIOLATION OF THE
                                        )        CARTWRIGHT ACT;
15            Plaintiffs,               )   2.   CIVIL CONSPIRACY;
                                        )   3.   BREACH OF CONTRACT;
16                                      )   4.   UNFAIR COMPETITION;
         vs.                            )   5.   INTENTIONAL INTERFERENCE
17                                      )        WITH PROSPECTIVE
                                        )        BUSINESS ADVANTAGE;
18  AETNA LIFE AND CASUALTY CO.;        )   6.   INTENTIONAL INTERFERENCE
    AETNA HEALTH-CARE PROGRAMS OF       )        WITH CONTRACTUAL
19  CALIFORNIA, INC. DBA AETNA          )        RELATIONS;
    CHOICE HEALTH-CARE PLAN; AETNA      )   7.   INDUCING BREACH OF
20  HEALTH PLANS OF CALIFORNIA,         )        CONTRACT; AND
    INC.; AETNA HEALTH PLANS OF SAN     )   8.   TRADE LIBEL AND
21  DIEGO, INC.; FAMILY PRACTICE        )        DISPARAGEMENT
    ASSOCIATES OF SAN DIEGO; FPA        )
22  MEDICAL MANAGEMENT, INC.; and       )
    DOES 1 through 50, inclusive,       )        CLASS ACTION
23                                      )        [C.C.P. §382;
                                        )        LOCAL RULE 3.1]
24            Defendants.               )
    _____  )
25

26

27

28

complant.2ad

1    Plaintiffs file this Second Amended Complaint and allege the

2  following causes of action against the Defendants, and each of

3  them, demanding trial by jury, as follows:

4

5                          **FIRST CAUSE OF ACTION**

6     [For Violation of the Cartwright Act, §§16700 et seq., of the

7   California Business and Professions Code Against All Defendants]

8                                  I.

9                      **DESCRIPTION OF THE PARTIES.**

10    1.    Plaintiff, EAST COUNTY PHYSICIANS MEDICAL GROUP, Inc.

11 ("ECPMG"), is a California professional medical corporation

12 functioning as an Independent Physician Association (hereinafter

13 "IPA").  Its physicians provide managed health care physician

14 services pursuant to contracts between Plaintiff and numerous

15 Health Plans including Defendant, Aetna Health Plans of San

16 Diego, Inc.  Its offices are located in San Diego, California

17 within the County of San Diego at 3838 Camino Del Rio North,

18 Suite 262, San Diego, California 92108.

19    2.    TED MAZUR, M.D. is a physician and specialist who has

20 executed a contract with Plaintiff ECPMG.  He is a member of the

21 Board of Directors of ECPMG, and a shareholder of ECPMG.

22    3.    Plaintiff, TED MAZUR, M.D., brings this action on his

23 own behalf and on behalf of all persons similarly situated.  The

24 class that Plaintiff represents is composed of those physicians,

25 i.e., both primary care physicians and specialists, who are

26 shareholders of Plaintiff ECPMG and who have executed contracts

27 with Plaintiff which are still in effect as of this date.  The

28 persons in the class are so numerous, consisting of approximately

                                 1                       complant.2ad

1  two hundred ninety-three (293) individuals, that the joinder of
2  all such persons is impracticable and that the disposition of
3  their claims in a class action rather than in individual actions
4  will benefit the parties and the Court.

5      4.    There is a well-defined community of interest in the
6  questions of law and fact involved affecting the Plaintiff class
7  in that common questions of law and fact exist to be litigated in
8  this action, i.e., whether each physician under contract to
9  Plaintiff as a shareholder of ECPMG, has been injured and harmed
10  by the acts of Defendants alleged herein.  Each shareholder was
11  similarly adversely affected by the conduct of the Defendants.
12  These questions of law and fact predominate over questions that
13  affect only individual class members.  The claims of Plaintiff,
14  TED MAZUR, M.D., are typical of those of the class and Plaintiff
15  will fairly and adequately represent the interests of the class.

16      5.    There is no plain, speedy, or adequate remedy other
17  than by maintenance of this class action since Plaintiff is
18  informed and believes that it is economically unfeasible to
19  pursue remedies other than a class action.  Consequently, there
20  would be a failure of justice but for the maintenance of the
21  present class action.

22      6.    The prosecution of individual remedies by members of
23  the Plaintiff class would tend to establish inconsistent
24  standards of conduct for the Defendant and to result in the
25  impairment of class members' rights and the disposition of their
26  interests through actions to which they were not parties.

27      7.    Plaintiff, "ECPMG", is suing both on its behalf and on
28  behalf of the approximately two hundred ninety-three (293)

2

complant.2ad

1  physicians, i.e., shareholder physicians, who are third party

2  beneficiaries of the Agreement between Plaintiffs and the Aetna

3  Defendants, under the provisions of C.C.P. §369(a)(3).

4      8.    Each physician under contract with ECPMG is a

5  shareholder who has executed a "Physician Agreement" with

6  Plaintiff ECPMG.  (See Ex. "A" attached hereto and incorporated

7  herein by reference.)  ¶1.1 of said Agreement provides as

8  follows:

9               "Physician intends by entering into this Agreement

10              to provide professional services and allow ECPMG

11              to represent its interests in seeking and/or

12              providing contracting opportunities to physician

13              only pursuant to the terms of this Agreement."

14     9.    Each physician also has executed a "Limited Power of

15  Attorney" which is contained in Attachment to Ex. "A" attached

16  hereto.

17     10.   In September, 1990, Plaintiff and Defendant, Aetna

18  Health Plans of San Diego, Inc., executed a contract under the

19  express terms and provisions of which Plaintiffs' shareholder

20  physicians were intended beneficiaries thereof.

21     11.   The Contract between Plaintiff and Aetna was entered

22  into expressly for the benefit of the participating physicians

23  and participating providers who are members of Plaintiff.  At p.

24  1 of the Contract "Participating Physician" is defined as: "any

25  primary care physician or specialist physician as defined in

26  Sections J & M" (p.1).  Participating Provider means: "A

27  participating physician or other health professional or

28  healthcare service provider or facility which has met

3

complant.2ad

1   credentialing criteria and other requirements required by Health

2   Plan [Aetna] and has entered into a Participation Agreement with

3   IPA" [ECPMG].

4       12.   The contract (Tab "2") goes on, in section II "IPA

5   OBLIGATIONS", at p.2 thereof, to obligate Plaintiff ECPMG to:

6           ". . . Arrange for the provision of Covered Services to

7           Members [of the plan] by using its best efforts to

8           enter into Participation Agreements with such number of

9           physicians or groups of physicians and other ancillary

10          providers meeting Health Plan's [Aetna] criteria for

11          participation and practicing within IPA's service area

12          as is acceptable to Health Plan within a period to time

13          acceptable to Health Plan.  The final form and content

14          of such Participation Agreements and any amendments

15          thereto shall be subject to the approval of Health

16          Plan."

17      13.   Thus, Plaintiff was obligated to enter into contracts

18   with physician providers subject to the approval of Aetna, the

19   Health Plan.

20      14.   Finally, the Contract (Tab "2") specifically provides,

21   in III. "CLAIMS AND PAYMENT" (p.4), that:

22          "A.   Participating Provider or IPA, as indicated in

23          Attachment "A" and the applicable Product Description

24          shall be paid by the appropriate payor for covered

25          services rended to Members according to the

26          compensation schedule specified in Attachment "A" and

27          the applicable Product Descriptions.  Health plan shall

28          contractually arrange for all payors to compensate

                                4                    complant.2ad

1    participating provider of IPA as indicated on
2    applicable product descriptions in accordance with
3    Agreement."

4    15.   Attachment A-1-1 to the Contract (Tab "B") sets forth
5    the capitation rates to be paid to the participating physicians
6    and participating providers who are obligated to provide covered
7    services (medical services) which are covered under health
8    benefit plans with Aetna.  See description of the health
9    maintenance organization (HMO) product, at p. 21 of Tab "2".

10   16.   Thus, the specific terms of the Contract in question,
11   and the surrounding circumstances, make it clear that the
12   participating physicians and providers are expressly intended
13   third-party beneficiaries of the Contract between Plaintiff and
14   Aetna.

15   17.  Defendant, AETNA LIFE AND CASUALTY CO., on information
16   and belief, owns, operates, and controls co-Defendants, AETNA
17   HEALTHCARE PROGRAMS OF CALIFORNIA, INC., AETNA HEALTH PLANS OF
18   CALIFORNIA, INC., and AETNA HEALTH PLANS OF SAN DIEGO, INC.

19   18.  Defendant, AETNA HEALTHCARE PROGRAMS OF CALIFORNIA,
20   INC., on information and belief, is a health care service plan
21   licensed pursuant to the provisions of California Health and
22   Safety Code $1340, et seq. (The Knox-Keene Act.)  It executed a
23   provider services agreement with Plaintiffs in July, 1990.  Its
24   offices are located in San Diego County at 7676 Hazard Center
25   Drive, San Diego, California 92108.

26   19.   Defendant, AETNA HEALTH PLANS OF SAN DIEGO, INC.,  on
27   information and belief, is a California corporation licensed to
28   do business as a health care service plan under California Law.

20.   Defendant, AETNA HEALTH PLANS OF CALIFORNIA, INC.,  on information and belief, is a California corporation licensed to do business as a health care service plan under California law. It is located at 7676 Hazard Center Drive, San Diego, California 92108.

21.   Defendant, FAMILY PRACTICE ASSOCIATES OF SAN DIEGO, INC. ("FPA"), is a California corporation functioning as an Independent Physician Association (IPA) whose offices are located in San Diego County at 2655 Camino Del Rio No., Suite 150, San Diego, California 92108.  FPA had, until August, 1993, operated as a contract provider of physician services providing Aetna subscribers exclusively to Plaintiffs, at which time FPA terminated its contractual relationship with Plaintiffs.

22.   Defendant, FPA MEDICAL MANAGEMENT, INC. ("FPAMM"), is a Delaware medical corporation whose offices are located in San Diego county.  On information and belief, it operates, controls and manages Defendant, FPA.

23.   The true names and/or capacities whether individual, corporate, associate or otherwise, of the Defendants named as Does 1 through 50, inclusive, are presently yet unknown to Plaintiffs, which, therefore, sues them by these fictitious names.  Plaintiffs will seek leave of court to amend this complaint to allege the true names and/or capacities of the fictitiously named Defendants when they have been ascertained. Plaintiffs are informed and believes and, therefore, alleges that each of the fictitiously named Defendants is in some manner legally responsible for the actions alleged herein which have caused injury and damage to Plaintiffs.

6                           complant.2ad

24.   Plaintiffs are informed and believes and, based upon such information and belief, alleges that each of the Defendants designated herein as a "Doe" has offices and transacts business within the County of San Diego, State of California.

25.   At all times mentioned herein, the Defendants named herein, and each of them, have conspired with each other and with unnamed co-conspirators to commit acts in furtherance of the unlawful combinations, conspiracies and agreements hereinafter alleged.

26.   At all times mentioned herein, each of the Defendants was either the agent or the employee of each of the other Defendants and in doing the acts alleged herein was acting within the course and scope of such agency.

## II.

### RELEVANT MARKET.

27.   The relevant product or service market which is the subject of this action is the market for providing managed health care independent physician services within the relevant geographic market.  Defendant FPA possesses market power in the relevant market.  Defendant, FPA Medical Management, Inc. is the fifth largest physician practice management company in the nation.  The FPA Defendants collectively possess market power in the relevant geographic market.

28.   Another relevant product or service market which is a subject of this action is the health maintenance organization subscriber or health care financing market in the East County geographic region.  The Aetna Defendants collectively possess

complant.2ad

1   economic and market power in this relevant geographic market.

2   Defendant, Aetna Life and Casualty Company, on March 30, 1996,

3   merged with U.S. HealthCare to form the nation's largest managed

4   health care company.  The foregoing transaction was valued by

5   Aetna and U.S. HealthCare at $8.9 Billion Dollars.  Together the

6   two companies provide health care services to 23 million people

7   and is the nation's leading provider of managed health care

8   services with 10.3 million managed members.

9     29. The relevant geographic market in this action is the

10  East portion of San Diego County; more particularly, an area

11  known as East County.

12    30. Commencing in 1993, and continuing to the date of this

13  Complaint, Defendants, and each of them, have combined,

14  contracted, agreed and conspired with each other, and their co-

15  conspirators, in violation of the California Cartwright Act to

16  unreasonably restrain trade in the relevant markets, and have

17  committed overt acts in furtherance of said conspiracies designed

18  to eliminate Plaintiffs as a direct competitor of Defendant, FPA,

19  and other IPAs not named as Defendants herein.  As a result of

20  said conspiracy, there is less competition in the relevant

21  markets in question, and barriers to entry exist.

22    31. The conduct engaged in by Defendants was designed, had

23  the purpose and/or the effect of improperly interfering with the

24  business relationships of Plaintiffs, and illegally preventing

25  and precluding Plaintiffs from fairly competing with Defendant,

26  Family Practice Associates, and other IPAs.

27    32. Through the overt, predatory, exclusionary and anti-

28  competitive acts, practices and behavior alleged hereinafter,

8

complant.2ad

1  Defendants and their co-conspirators have sought to acquire,

2  maintain, further and preserve their market power in the relevant

3  markets and sub-markets thereof, and abuse that economic power.

4      33.   Defendants and their co-conspirators are continuing to

5  abuse their market and economic power in the relevant markets.

6

7                              III.

8                    **FACTUAL BACKGROUND**.

9      34.   Plaintiff, ECPMG, is a medical corporation which

10 functions as an Independent Physician Association ("IPA").

11 Plaintiff grew to be a successful physician provider contracting

12 with numerous HMOs, PPOs, EPOs, and third party payor entity

13 "Health Plans", including Defendant, Aetna HealthCare Programs of

14 California, Inc., Blue Cross, Blue Shield, Cigna, Health Net,

15 PacifiCare, PHCS, Secure Horizons, and Sharp Health Plan, _inter_

16 _alia_.

17     35.   Plaintiff, ECPMG, is an independent practice

18 association (IPA).  This association is compromised of over two

19 hundred (200) doctors who have joined to provide managed care

20 medical services under the provision of California's Health Care

21 Services Corporation Act (Health and Safety Code §1340 _et_ _seq._)

22     36.   As an independent practice association Plaintiff pays

23 virtually all money received from managed care plans to its

24 network providers for medical services including specialty care,

25 specialty testing and hospitalization.  As mandated by Health and

26 Safety Code § 1367 Plaintiff ECPMG ensures that the practice of

27 medicine is properly separated from financial pressures and

28 fiscal concerns associated with managed medical care.

complant.2ad

1    37.    Defendant Family Practice Medical Management, Inc., has
2    acted as a false front for an insolvent Independent Practice
3    Association, Family Practice Associates of San Diego ("FPA").
4    FPASD was an osteopathic corporation which acted as an
5    independent practice association and contracted with the full
6    array of specialty and ancillary providers to provide basic
7    medical services under managed care contracts.  FPASD was owned,
8    operated and controlled by five osteopathic physicians who also
9    formed, owned and operated Defendant, Family Practice Medial
10   Management, Inc.

11   38.    The same five osteopathic physicians who for years
12   formed, owned and operated FPA also incorporated and managed
13   FPAMM as a medical management company with the specific purpose
14   of raising large amounts of capital through financial markets.

15   39.    FPAMM was not financially successful.  Its appearance
16   of profitability was achieved at the expense of managed care
17   patients who were unable to obtain adequate specialty care and
18   ancillary services because of the lack of proper funding of the
19   professional operations of FPA, with particular emphasis on the
20   lack of proper funding for independent contracting specialists
21   affiliated with FPA.

22   40.    As of 1994, because of inadequate funding, virtually
23   the entire specialty network affiliated with FPA was in the
24   process of filing suit to collect unpaid specialist fees for the
25   thousands of capitated patients referred to them under their
26   contracts with FPA.

27   41.    To solve its financial dilemma, FPA borrowed Three
28   Million Dollars from the Sharp health Care System which was

10

complant.2nd

1 | utilized to compromise the claims of the aforementioned

2 | contracting specialists, and repay an existing loan from the

3 | parent corporation of Alvarado Hospital which, on information and

4 | belief, Plaintiffs allege was utilized by FPA to gain entry into

5 | the managed care market by the purchase of financially troubled

6 | practices, Extra Care, and Inland East Medical Center.

7 |     42.  As a result of this undisclosed loan, FPA moved most of

8 | its managed care operations and patients to Sharp's Grossmont

9 | Hospital and replaced most of its specialists prior to seeking

10 | additional funds through public stock offerings.

11 |     43.  Before going "public" FPAMM was able to stay afloat

12 | financially only by co-mingling business considerations with the

13 | practice of medicine.  The process of utilization review and

14 | specialty care authorization were its prime methods of avoiding

15 | costly procedures, tests, and specialty care largely because it

16 | was unable to afford the risk obligations built into the stop

17 | loss provisions of its myriad of managed care contracts.

18 |     44.  The FPA Defendants thus competed unfairly with

19 | Plaintiffs' medical practice association which devoted virtually

20 | all of its capitated funding to the delivery of appropriate

21 | medical care including specialty care within community and

22 | statutory standards.

23 |     45.  In <u>Conrad vs. Medical Board of California</u>, (1996)48

24 | Cal.App. 4th 1038, at pp. 1042-1043, Associate Justice Huffman,

25 | of the Fourth District, reiterated longstanding California public

26 | policy: "The medical practice Act prohibition of the corporate

27 | practice of medicine is declaratory of a basic public policy

28 | against corporate practice of the learned professions."

complant.2ad

1  (Citations omitted.)  The doctrine is intended to ameliorate "the

2  evils of divided loyalty and impaired confidence" which are

3  thought to be created when a corporation solicits medical

4  business from the general public and turns it over to a special

5  group of doctors, who are thus under lay control.  (Citations

6  omitted.)

7      46.   Our legislature recognized the importance of preserving

8  the separation between fiscal considerations and medical

9  standards in enacting California managed care enabling statute:

10  Health and Safety Code §1342(a) states the legislatures intent to

11  "assure the continued role of the professional as the determiner

12  of the patients health needs which fosters the traditional

13  relationship of trust and confidence between patient and

14  professional."

15      47.   Health and Safety Code §1367(d) states "the plan

16  (Health Care Service Plan) shall furnish services in a manner

17  providing continuity of care and ready referral of patients to

18  other providers at such times as may be appropriate consistent

19  with good professional practice."

20      48.   Health and Safety Code §1367(g) states "the plan shall

21  have the organizational and administrative capacity to provide

22  services to subscribers and enrollees.  The plan shall be able to

23  demonstrate to the department that medical decisions are rendered

24  by qualified medical providers, unhindered by fiscal and

25  administrative management.

26      49.   FPAMM is neither a licensed medical practice nor a

27  licensed Health Maintenance Organization.  By assuming the risk

28  of paying for the cost of specialty care and assuming control

1    over utilization review and authorization of specialty service,

2    it was able to circumvent any control by the Department of

3    Corporations or the Board of Medical Quality Assurance, and also

4    violated the prohibition against the corporate practice of

5    medicine.

6        50.    The FPA Defendants aggregated the largest number of

7    capitated lives possible, assigned capitated funds to the

8    unlicensed business entity FPAMM, and painted a false picture of

9    profitability by keeping the losses sustained under the

10   parameters of the professional corporation thus creating the

11   illusion of profit on behalf of the management company.

12   Defendant controlled profits by illegally and improperly co-

13   mingling the management of health care dollars with the medical

14   decision-making process.

15       51.    Plaintiff, ECPMG, and Defendant, Aetna Healthcare

16   Programs of California, Inc. executed a Services Agreement

17   (hereinafter "Agreement") in July, 1990.   Thereafter, Amendments

18   were executed from time to time by the parties thereto.   Under

19   the terms and provisions of this Agreement and its Amendments,

20   Plaintiffs agreed to provide physician services to Aetna

21   subscribers in return for payments for these services based upon

22   the type of health plan product in which the subscriber was

23   enrolled.

24       52.    Under the terms and provisions of said Agreement

25   Plaintiffs was provided a right of first refusal for Aetna

26   beneficiaries located within a 6 mile radius of Grossmont

27   Hospital ("Grossmont Service Area").   Under this right of first

28   refusal possessed by Plaintiffs, the Aetna Defendants were

complant.2ad

1  provide physician services to Aetna beneficiaries located in the

2  Grossmont Service Area before offering such opportunity to any

3  other IPA or physician group competitive to Plaintiffs.

4      53.  Prior to July 1993, Defendant FPA contracted with

5  Plaintiffs to provide physician services to subscribers of Health

6  Plans with whom Plaintiffs maintained service agreements.  One of

7  the Health Plans with which Plaintiffs maintained a service

8  agreement was Defendant Aetna Healthcare Programs of California.

9  On or about July 1993, Defendant FPA terminated its contract with

10  Plaintiffs, sending a copy of such termination notice to the

11  Aetna Defendants.

12      54.  Notwithstanding Plaintiffs' right of first refusal to

13  provide physician services within the Grossmont Service Area, as

14  described in ¶22 above, the Aetna Defendants advised Plaintiffs

15  that if Plaintiffs did not continue to contract with Defendant

16  FPA to treat Aetna subscribers, the Aetna Defendants would

17  contract directly with Defendant FPA to do so.

18      55.  The Aetna Defendants' reasons and motives for directly

19  contracting with Defendant FPA were anti-competitive and did not

20  fall within any exceptions to Plaintiffs' right of first refusal

21  under the Agreement.  Rather, Plaintiffs are informed and

22  believes that, since approximately twelve hundred (1200) Aetna

23  subscribers were assigned to Defendant FPA's physicians at the

24  termination of the contractual relationship between Plaintiffs

25  and Defendant FPA, the Aetna Defendants feared that, unless Aetna

26  contracted directly with FPA, in violation of the agreement

27  between Plaintiffs and the Aetna Defendants, the Aetna Defendants

28

complant.2ad

1  would lose some or all of those twelve hundred subscribers to

2  competing health plans.

3      56.    The conspiracy in unreasonable restraint of trade

4  alleged herein thus enabled Aetna to preserve its own subscriber

5  base and prevent any loss of same to competing health plans, with

6  which ECPMG had contracts, and thus preserve its subscriber

7  market share.

8      57.    Plaintiffs were, at all times, ready and able to

9  provide the necessary physician services to these twelve hundred

10  Aetna subscribers as required under ¶II.C of the Agreement.

11     58.    Despite advising Aetna that the Aetna subscribers

12  assigned to FPA should remain with Plaintiffs and despite

13  advising Aetna that Plaintiffs had more than ample Primary Care

14  Physicians ("PCPs") to service Aetna's enrollment, nevertheless,

15  and in breach of its Agreement with Plaintiffs, Aetna contracted

16  directly with Defendant, FPA, in violation of its right of first

17  refusal clause with Plaintiffs for exclusive rights within a six

18  mile radius of Grossmont Hospital.

19     59.    **Defendant, FPA,** in furtherance of its conspiracy with

20  the Aetna Defendants, accepted Aetna patients knowing that

21  **Plaintiffs had a right of** first refusal for such patients within

22  **the Grossmont Service Area,** i.e., within a 6 mile radius of

23  Grossmont Hospital.

24     60.    Aetna also illegally and improperly contracted

25  directly with other IPAs, including, _inter alia_, Scripps, Sharp,

26  and Mercy IPA and U.C.S.D., knowing that such contracts violated

27  the right of first refusal clause under which Plaintiffs provided

28

complant.2ad

1  exclusive provider services to Aetna subscribers located within a
2  six mile radius of Grossmont Hospital.

3      61.  Thereafter, Aetna directed the foregoing IPAs,
4  including Mercy IPA, Defendant FPA, Scripps, and Sharp, to
5  directly solicit Plaintiffs' Primary Care Physicians in order to
6  induce them to breach their contracts with Plaintiffs, leave
7  Plaintiffs and join a competing IPA.  Such actions by the Aetna
8  Defendants and the subsequent acquiescence to such directions by
9  the FPA Defendants, and other IPAs, constitute conspiracies
10  violative of the Cartwright Act in unreasonable restraint of
11  trade because: (1) the consumer welfare was harmed by a lack of
12  quality care provided to Aetna subscribers by FPA; (2)
13  Plaintiffs' PCPs left Plaintiffs and joined direct competitors;
14  and (3) Plaintiffs lost Aetna subscribers thereby.

15      62.  Thereafter, in furtherance of said conspiracy,
16  commencing sometime in 1993 through the present, Defendant, FPA,
17  directly solicited one of Plaintiffs' directors, Dr. Neil
18  Hirschenbein, for the purpose and with the intent to induce said
19  director to breach his agreement with Plaintiffs and leave
20  Plaintiffs' employ.  Dr. Hirschenbein left Plaintiffs on October
21  1, 1995, and thereafter joined the FPA Defendants.

22      63.  As a direct consequence of the foregoing conspiratorial
23  acts and conduct at least forty-eight (48) primary care
24  physicians under contract to Plaintiffs have left Plaintiffs and
25  joined Defendant FPA, and other competing IPAs.

26      64.  By such conduct Defendants have wrongfully gained
27  access to Plaintiffs' trade secrets and competitive planning
28  information.

complant.2ad

65.   The Aetna Defendants objective and goal was to maintain its market share in the relevant market by obtaining Plaintiffs' Aetna patients for Defendant, FPA, and other IPAs. By inducing Plaintiffs' physicians to leave Plaintiffs, and thereby to transfer their Aetna patients from Plaintiffs to Defendant FPA and other IPAs, Aetna was able to maintain its share of the HMO subscriber market, upon termination of Aetna's Agreement with Plaintiffs.

66.   The FPA Defendants' objective and goal was to jointly and collaboratively eliminate Plaintiffs as a competitor in the relevant geographic market by various illegal and improper means including, inter alia, payments and inducements by FPA to ECPMG **physicians so as to** obtain control of their medical practices.

67.   As a consequence of the foregoing conduct Defendant FPA has sharply increased its HMO enrollees by approximately three times that which had been previously projected.

68.   Such conspiracies, combinations and agreements with Plaintiffs' IPA competitors unreasonably restrain trade in the market for providing managed health care independent physician services in the relevant geographic market because they have had the effect of harming the consumer welfare by a lack of quality care provided to Aetna subscribers by FPA; and by causing plaintiff's PCP's and Aetna subscribers to leave Plaintiffs and join these competing IPAs.

69.   Thereafter, in furtherance of their conspiracy with the FPA Defendants, the Aetna Defendants prematurely issued a notice of termination, on December 5, 1994, ten (10) months in advance of the date, October 1, 1995, established by the Aetna Defendants

17

complant.2ad

1   as the termination date of Plaintiffs' contract with said

2   Defendants.  Aetna then widely disseminated such premature notice

3   of termination to primary care physicians and competing IPAs

4   located in the relevant geographic market.

5       70.   Defendant Aetna stated that its reason for its

6   "termination" was Plaintiffs' "weak" financial position.  In fact

7   and in truth, Defendant Aetna knew that Plaintiffs' financial

8   position was not weak and Plaintiffs provided documentation of

9   that fact to Aetna.  Aetna's real purpose was to eliminate

10   Plaintiffs as a competitor of Defendant FPA and other Aetna

11   contracted IPAs in the relevant market in furtherance of its

12   conspiracy with Defendant FPA.

13       71.   The early notice of termination issued by Defendant

14   Aetna had the effect of impeding and frustrating Plaintiffs'

15   ability to perform under its contract with Aetna.

16       72.   As a direct result of Aetna's premature notice of

17   termination, primary care physicians under contract to Plaintiffs

18   commenced terminating their contracts with Plaintiffs,

19   transferring to Defendant FPA and other IPAs, taking their Aetna

20   subscribers with them.

21       73.   By letter, dated February 28, 1995, Defendant Aetna

22   Health Plans notified Plaintiffs of a new Aetna policy, effective

23   March 1, 1995, which provided that when a primary care physician

24   transferred from one IPA/medical group to another, the Aetna

25   subscribers assigned to that PCP would automatically transfer to

26   the new IPA/medical group.

27       74.   The foregoing new policy effectuated a major change in

28   Aetna's policy: previously Aetna subscribers remained with the

complant.2ad

1  former medical group, unless they requested a transfer to the new

2  medical group.

3      75.    The effect of this new Aetna policy was that each

4  automatic transfer of Aetna members from Plaintiffs to another

5  IPA acted as a breach of the Agreement between Aetna and

6  Plaintiffs.  The automatic transfer constituted a breach of said

7  Agreement because Aetna executed contracts with competing IPAs in

8  violation of the Agreement's right of first refusal clause.

9  Aetna's new policy thus facilitated the exodus of primary care

10  physicians from Plaintiffs to FPA and other IPAs, and loss of

11  Aetna subscribers by Plaintiffs to said IPAs.

12      76.    Following Aetna's premature Notice of Termination to

13  Plaintiffs, referring physicians and other doctors, including

14  specialist physicians, came to believe that Plaintiffs would soon

15  be out of business and that they would have to move to Defendant

16  FPA, or other IPAs because Plaintiffs had lost its contract with

17  Aetna, which represented a substantial portion of Plaintiffs'

18  business.

19      77.    Defendant FPA knew that its contract with Aetna was

20  illegal and violated Plaintiffs' right of first refusal clause

21  and that Plaintiffs had the rights to all Aetna subscribers

22  within a 6 mile radius of Grossmont Hospital.  Yet, Defendant

23  FPA, in furtherance of its conspiracy with Aetna, directly

24  solicited Plaintiffs' Primary Care Physicians telling said

25  physicians that since Plaintiffs had lost its Aetna contract, it

26  was going to take over Aetna's subscribers, and that if the

27  Plaintiffs' Primary Care Physicians wanted to maintain their

28  Aetna patients, they should join Defendant FPA.

complant.2ad

1    78.   Defendant, Family Practice Associates of San Diego,

2  Inc., both offered and paid above market capitation rates to

3  Plaintiffs' PCPs in order to lure them away from Plaintiffs, in

4  furtherance of its conspiracy with Aetna.

5    79.   As a direct result, FPA had less financial resources

6  available with which to compensate specialists.  Consequently, on

7  information and belief, FPA approved fewer specialist referrals

8  by PCPs with the result that Aetna's subscribers did not receive

9  the appropriate treatment and care.

10    80.   As a direct consequence, competition has been injured

11  and harmed because the quality of care provided Aetna

12  subscribers, i.e., the consumer by FPA was adversely affected.

13    81.   On August 1, 1995, Aetna began to directly solicit

14  Plaintiffs' Primary Care Physicians, advising them that the

15  contractual relationship between Aetna Health Plans of

16  California, Inc. and Plaintiffs would be terminated effective

17  October 1, 1995, and that said PCPs would no longer participate

18  in Aetna Health Plans through Plaintiffs after September 30,

19  1995.    82.   Aetna then expressed its "desire" to continue a

20  relationship with Plaintiffs' Primary Care Physicians by

21  "transferring their participation to an existing contracted IPA

22  or medical group."

23    83.   As part of Aetna's continuing course of conduct, Aetna

24  then directly solicited Plaintiffs' PCPs to continue

25  participation in Aetna Health Plans of California, Inc. by

26  contracting with one of a number of IPAs on a list, advising said

27  PCPs that they may "only participate in Aetna Health Plans

28  through one contracted IPA or medical group."

84.    The foregoing direct solicitations by Aetna constitute willful, intentional and deliberate acts of interference with then existing contractual relationships between Plaintiffs and its Primary Care Physicians, and acts in furtherance of Aetna's conspiracy with FPA, and other IPAs.

85.    The Aetna Defendants thereafter approached the then president of Plaintiffs, Dr. Barry Smith, and induced and hired him away from Plaintiffs, the very day, i.e., at the end of August, 1995, that Dr. Smith sold his practice to Defendant FPA. Dr. Barry Smith, is now presently employed by the Aetna Defendants in the position of Regional Medical Director.

86.    Although ¶VI(a) of the Agreement requires that the parties meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement prior to instituting litigation relating to the Agreement, nevertheless, Defendants have refused, failed and declined to meet and confer in a good faith effort to resolve the termination issue.

87.    Since the Aetna Defendants control important economic interests in the East County health care market, the Aetna Defendants were obligated to provide fair procedures to protect Plaintiffs from any arbitrary or capricious exclusion or termination.   The Aetna Defendants failed to provide any fair procedure or due process to plaintiff with a view to resolving said disputes.

88.    The cumulative effect of the Aetna Defendants improper notice of termination of Plaintiffs' contract ten (10) months in advance, Aetna's direct solicitation of Plaintiffs' PCPs and Directors, contracting with competing IPAs in violation of

complant.2ad

1    Plaintiffs' right of first refusal, coupled with its change in

2    policy requiring automatic transfer of patients from Plaintiffs

3    to other medical groups, including Defendant FPA, and ultimate

4    termination of Plaintiffs' Agreement, proximately caused massive

5    physician defections and departures from Plaintiffs, loss of

6    Aetna subscribers, substantial and significant monetary and

7    financial damage to Plaintiffs, and its physician members, and

8    harm to the consumer welfare.

9        89.   Aetna's notice of termination of Plaintiffs' contract

10   and subsequent termination were a sham and pretextual.  The real

11   motive, purpose and objective for Defendant Aetna's termination

12   of Plaintiffs was to further its conspiracy in unreasonable

13   restraint of trade with the FPA Defendants in order to eliminate

14   Plaintiffs as a competitor and, thus, was for an anti-competitive

15   purpose, and had an anti-competitive effect.

16       90.   Such termination also constitutes an illegal group

17   boycott and concerted refusal to deal violative of the Cartwright

18   Act.

19       91.   As a direct result of the wrongful and illegal conduct

20   alleged, Plaintiff ECPMG lost approximately two-thirds (2/3) of

21   its primary care physicians as a direct and proximate consequence

22   of Defendants' conspiracy in unreasonable restraint of trade.

23   Its number of patients has diminished from approximately sixteen

24   thousand to approximately three thousand (16,000 to 3,000).

25   / / /

26

27

28

complant.2ad

## IV.

### ANTI-COMPETITIVE EFFECTS ADVERSE
### AFFECT ON PATIENTS' QUALITY OF CARE.

92.   As a direct and proximate consequence of the conduct engaged in by Defendants and each of them, serious, substantial and appreciable anti-competitive consequences and effects have occurred in the various relevant markets, and Plaintiffs has thereby suffered causal anti-trust injury as a result.

93.   As a direct consequence of FPA's violation of the California Ban of the Corporate Practice of Medicine, it was able to grow financially by virtue of its practice of paying inflated and overblown prices for the acquisition of medical practices in the relevant market.

94.   This growth and ultimate profitability was achieved illegally only by restricting patient access to specialty care, necessary and critical testing and procedures, and inflicting the risk of lack of quality of care on FPA's patients including Aetna enrollees shifted from Plaintiff to the FPA Defendants.  The FPA Defendants systematically withheld claims owed to specialists. Such specialists were also unable to obtain referrals.  Despite the fact that specialists wanted to perform certain types of procedures, therapies, and surgeries they could not get such approved by the FPA Defendants.

95.   The FPA Defendants redirected claims, rechecked them and engaged in ruses and shams which adversely affected the quality of care provided to their patients including the Aetna enrollees shifted from Plaintiff, ECPMG, to the FPA Defendants.

complant.2ad

96.   Patients were put at risk because necessary tests such as cat-scans were not approved.

97.   The delay in paying specialists of from six months to one year adversely affected their ability to provide quality care to their patients.

98.   Necessary studies and treatment were unreasonably delayed and ultimately not approved leading to "Therapeutic disenrollment" of patients.

99.   The referral authorization process threatened the well being of many patients as a result of these delays and refusals to pay specialists.

100.   The FPA Defendants also refused to pay for necessary medicines and drugs.

101.   Rare diseases that primary care physicians had never seen went undiagnosed by specialists for months and even years.

102.   Patients were denied cat-scans, cleft palette surgery, surgical biopsy of cancer, and the payment of necessary medications and drugs, as well as being denied the continued care of specialists critical for their health.

103.   The foregoing severe restriction on access to specialty providers and specialty care thus adversely affected the consumer welfare, i.e., the quality of care provided to Aetna's enrollees who followed the primary care physicians from ECPMG to the FPA Defendants.

104.   The HMO subscriber and health care financing markets in the East County has been, and continues to be, adversely affected by the conspiratorial conduct alleged herein because, as a direct

24

complant.2ad

1    consequence thereof, Aetna was able to retain subscribers it

2    might otherwise, in the absence of said conspiracy, lose to

3    competing HMO health plans with which Plaintiffs contracts.

4        105. The attempt to eliminate Plaintiffs from the managed

5    care provider market has injured competition in said relevant

6    market because there has occurred a significant adverse effect on

7    the quality of care provided by Defendant FPA's provider

8    physicians to the consumer, i.e., to Aetna's subscribers serviced

9    by said FPA provider physicians.  Aetna's subscribers that

10   shifted from Plaintiffs to FPA have suffered because they have

11   received inferior treatment from FPA providers.

12       106.  Consumer (Aetna subscribers) have thus been harmed by

13   being deprived of access to the superior patient care provided by

14   Plaintiffs' PCPs and have been deprived, and are continuing to be

15   deprived, of proper utilization review and quality assurance by

16   the FPA Defendants.

17       107.  Plaintiffs was also deprived of any ability to

18   effectively compete in the relevant market as a result of the way

19   and manner Aetna terminated ECPMG's contract as described

20   hereinabove.  As a consequence less price competition occurred in

21   the relevant market.

22       108.  Plaintiffs are entitled to have their damages trebled

23   pursuant to the provisions of §16750 of the California Cartwright

24   Act.

25       109. As a direct and proximate result of the aforesaid acts

26   engaged in by Defendants, Plaintiffs have also been required to

27   engage attorneys to prosecute this action.

28

25                                    complant.2ad

1    110. Plaintiffs are entitled to an award of reasonable

2    attorneys fees and costs incurred in prosecuting this action

3    under §16750 of the California Cartwright Act.

4

5                              V.

6                    SECOND CAUSE OF ACTION

7                    [For Civil Conspiracy]

8    111. Plaintiffs repeat and reallege ¶¶ 1 through 110

9    inclusive and incorporate them by this reference as though fully

10   set forth in this paragraph.

11   112. Defendants and each of them have conspired, agreed and

12   combined one with the other to commit the acts alleged

13   hereinabove, for the avowed purpose of eliminating ECPMG as a

14   competitor.

15   113. Defendants and each of them have committed overt acts

16   in furtherance of said conspiracy.

17   114. Plaintiff ECPMG and its shareholder physicians entered

18   into written agreements and contracts.

19   115. At a time which is unknown to Plaintiffs, Defendants

20   Platt and each of them knowingly and wilfully conspired and

21   agreed among themselves to destroy Plaintiff ECPMG by depriving

22   it of the benefits of the foregoing contracts by inducing said

23   shareholder physicians to breach said contracts.

24   116. Pursuant to said conspiracy, and in furtherance

25   thereof, Defendants conspired to induce said shareholders to

26   breach their written contracts with Plaintiff, ECPMG.

27

28

complant.2ad

1  physicians wrongfully breached their contracts with Plaintiff,

2  ECPMG.

3       118. Plaintiff, ECPMG has performed all conditions,

4  covenants and promises under said contracts, or was excused

5  therefrom.  Said acts of conspiracy alleged herein have been and

6  are the proximate cause of damage and injury to Plaintiff, ECPMG,

7  in an amount in excess of the Court's jurisdiction.

8       119. The acts performed by Defendants through which they

9  conspired to harm and injure Plaintiff were performed wilfully,

10 fraudulently, maliciously, and in conscious disregard of

11 Plaintiffs' rights for the purpose of injuring and damaging

12 Plaintiff.  Plaintiff is, therefore, entitled to an award of

13 punitive and exemplary damages as a result thereof.

14

15                              VI.

16                    **THIRD CAUSE OF ACTION**

17      **[Breach of Contract Against the Aetna Defendants Only]**

18      120. Plaintiffs incorporates ¶¶ 1 through 119 alleged

19 hereinabove as though fully set forth herein.

20      121. Plaintiff, ECPMG, and Defendant, Aetna Health Plans of

21 San Diego, Inc. executed a contract in July, 1990, under the

22 terms of which Plaintiffs was provided a right of first refusal

23 for Aetna beneficiaries located within six miles of Grossmont

24 Hospital.

25      122. Plaintiff executed said contract both for its benefit

26 and for the benefit of its shareholder-physicians and independent

27 contractor physicians, who are third-party beneficiaries

28 thereunder, under the provisions of C.C.P. §369(a)(3).

                                    complant.2ad

1    123. Plaintiff, ECPMG, fully performed or was excused from

2  performing all conditions under said contract.

3    124. The Aetna Defendants breached said contract, as well as

4  the implied covenant of good faith and fair dealing contained

5  therein, inter alia, by:

6        A.   By terminating Plaintiffs "for cause" under the

7  pretext of a "without cause" termination, thereby depriving

8  Plaintiffs of the rights and remedies available to it in a "for

9  cause" termination procedure.

10       B.   By failing to provide proper procedures for

11  termination, i.e., by fair procedures during the termination

12  process;

13       C.   By directly contracting with Defendant FPA and

14  other IPAs in violation of Plaintiffs' rights of first refusal;

15       D.   By facilitating the transfer of Aetna subscribers

16  in violation of Plaintiffs' right of first refusal by a change in

17  policy effective, March 1, 1995 allowing a primary care physician

18  who decided to change IPA/medical group affiliation to take his

19  patients who are Aetna subscribers with him to the new

20  IPA/medical group; and

21       E.   By giving Plaintiff, ECPMG premature notice of

22  termination ten months prior to its effective date, thereby

23  instigating an exodus of PCP's and consequently Aetna subscribers

24  prior to the effective date of termination.

25    125. Plaintiff, ECPMG, and its shareholder physicians, have

26  been damaged as a proximate result of the foregoing multiple

27  breaches of contract by the Aetna Defendants.

28

complant.2ad

126.   The specialist shareholderS of Plaintiff ECPMG have been harmed by being deprived of the profits they would have earned as a result of direct referrals as specialists from the ECPMG primary care physicians that left ECPMG and went to other IPAs including the FPA Defendants, had such PCP's stayed with ECPMG.

127. Plaintiffs have sustained damage as a result according to proof in excess of the Court's jurisdiction.

### VII.

#### FOURTH CAUSE OF ACTION

**[For Unfair Competition, i.e., For Violation of California Bus. & Prof. Code §17200 Against All Defendants]**

128. Plaintiffs repeat and reallege ¶¶ 1 through 127 inclusive, and incorporate them by this reference as though fully set forth in this paragraph.

129.   This cause of action is brought by Plaintiffs, ECPMG, and Ted Mazur, M.D., both on behalf of said Plaintiffs, and, as private attorney generals, on behalf of themselves and the current shareholders of ECPMG, i.e., the members thereof who have been directly harmed by the acts of unfair competition alleged herein.

130.   No governmental agency has regulatory or supervisory authority over Defendant FPA Medical Management, Inc., which is neither a medical provider nor a licensed health maintenance organization (HMO).   It is incumbent upon aggrieved parties and IPAs such as Plaintiffs herein to protect the citizens/patients/consumers of the San Diego community through

complant.2ad

1   all available means including the provisions of §17,200 of the

2   California Business and Professions Code.  This Court is the only

3   avenue through which the continuing harm to the public caused by

4   the FPA Defendants can be addressed and remedied.

5       131.   The shareholders of Plaintiff ECPMG are "members"

6   thereof within the meaning of §17,204 of the California Business

7   and Professions Code which provides that: "any person,

8   corporation or association or by any person acting for the

9   interests of itself, its members, or the general public "may

10  bring an action under §17,200."

11      132.   Defendants have violated numerous public policy

12  statutes and rules including the Ban Against the Corporate

13  Practice of Medicine, as alleged herein above, as well as the

14  **Cartwright Act.**

15      133.   **Thus, Plaintiff ECPMG, has been, and continues to be**

16  **unable to compete fairly with the FPA Defendants because they**

17  **were and are a law abiding IPA, whereas the FPA Defendants**

18  **operate in violation of numerous California Regulatory Laws and**

19  **Statutes.  The various violations of Law set forth herein have**

20  **enabled the FPA Defendants to unfairly compete against ECPMG.**

21      134.   Plaintiff ECPMG possesses standing to bring this cause

22  of action as a competitor under <u>Southwest Marine, Inc. vs. AAA</u>

23  <u>Machine Shop, Inc</u>., 720 F.Supp.805 (N.D. Cal. 1989) and <u>Saunders</u>

24  <u>vs. Superior Court</u>, 27 Cal.App.4th 832 (1994).

25      135.   The harm to both Plaintiffs, and to ECPMG's shareholder

26  members, outweighs the utility of Defendants' policies and

27  practices and, consequently, said conduct as alleged hereinabove,

28  constitutes unfair, illegal or fraudulent business acts or

1  practices within the meaning of Business and Professions Code

2  §17,200.

3       136. Each of the acts complained of herein is a business

4  practice which violates §17203 of the California Business &

5  Professions Code, i.e., the Unfair Competition Act, because each

6  of said acts committed by Defendants alleged hereinabove is

7  either unfair, illegal or fraudulent and without justification,

8  and damaged Plaintiffs and its shareholders in their business and

9  property.  Each of said acts also constitute acts of Unfair

10 Competition at common law.  Said acts of unfair competition are

11 on-going and Plaintiffs are entitled to an injunction enjoining

12 said conduct.

13      137. Plaintiffs are entitled to recover the net profits

14 earned by Defendants as a result of their acts of unfair

15 competition, and are entitled to the disgorgment of said profits

16 and the recovery of restitution thereof, pursuant to both

17 principles of common law and the provisions of §17203 of the

18 California Business & Professions Code.

19

20                          **VIII.**

21                   **FIFTH CAUSE OF ACTION**

22             [For Intentional Interference with

23         Contractual Relations Against All Defendants]

24      138. Plaintiffs incorporate ¶¶ 1 through 137 alleged

25 hereinabove as though fully set forth herein.

26      139.  Defendants at all times were aware of the existence of

27 Plaintiffs' contracts and agreements with its Primary Care

28 Physicians and patients.

complant.2ad

1    140. Defendants have improperly and without privilege
2    interfered with Plaintiffs' ongoing contractual relations with
3    its physicians and patients.

4    141. Plaintiffs are informed and believe and thereon allege
5    that, in engaging in the aforesaid acts and conduct of
6    interference Defendants intended to disrupt Plaintiffs' actual
7    contractual relations with its physicians and patients by
8    inducing them not to do business with Plaintiffs when each of
9    them would have done business with Plaintiffs but for said acts
10   of interference.

11   142. As a direct and proximate result of this tortious
12   interference and conduct committed by Defendants, Plaintiffs has
13   been damaged in their business and property.

14   143. Defendants committed the aforesaid tortious acts of
15   interfering with Plaintiffs' contractual rights knowingly and
16   willingly with malice and oppression and to enrich themselves at
17   Plaintiffs' expense and for the purpose and intent of eliminating
18   Plaintiffs as a competitor of FPA and other IPAs.  Plaintiffs are
19   therefore, entitled to an award of punitive damages in this
20   regard.  An officer or managing agent of each Defendant
21   authorized or ratified the wrongful conduct alleged herein and
22   Defendants are personally guilty of oppression, fraud, or malice.

23   144. Plaintiffs are therefore entitled to recover punitive
24   damages from Defendants.  Defendants have acted with the
25   intention of causing injury to Plaintiffs; and have committed
26   acts of malice, i.e., conduct which was and is intended to cause
27   injury to Plaintiffs.

28

complant.2ad

## IX.

## SIXTH CAUSE OF ACTION

[For Intentional Interference with Advantageous and Prospective Business Relations Against All Defendants]

145. Plaintiffs incorporate ¶¶ 1 through 144 alleged hereinabove as though fully set forth herein.

146. The acts, practices, behavior, and conduct complained of hereinabove have also interfered directly with both the actual and prospective business relationships entered into or anticipated by Plaintiffs herein with Aetna subscribers and PCPs, and by their conduct, practices, acts, and behavior, Defendants willfully and intentionally interfered with Plaintiffs' actual and prospective business relationships and advantages.

147. Plaintiffs are informed and believe and based thereon allege that, in engaging in the aforesaid acts and conduct, Defendants intended to disrupt Plaintiffs' prospective potentially profitable business relations with its physicians and patients and that Defendants actually did disrupt those prospective potentially profitable business relations in certain instances by inducing physicians and patients not to do business with Plaintiffs when they would otherwise have done business with Plaintiffs but for such act of intentional interference.

148. Each of said acts of intentional interference is independently wrongful and illegal independent and apart from the specific acts of interference themselves.

149. As a direct and proximate result of Defendants' intentional interference with Plaintiffs' actual and potential

complant.2ad

1  contractual relationships, Plaintiffs have suffered damages and

2  injury thereby.

3      150. The acts performed by Defendants through which they

4  intentionally interfered with Plaintiffs' potential and

5  prospective business advantage were performed willfully and in

6  conscious disregard of Plaintiffs' rights and for the purpose of

7  injuring Plaintiffs in its business and property.  Plaintiffs are

8  therefore, entitled to an award of punitive damages as a result

9  thereof.

10

11                            X.

12              <u>**SEVENTH CAUSE OF ACTION**</u>

13  **[For Inducing Wrongful Breach of Contract Against All Defendants]**

14      151. Plaintiffs incorporate ¶¶ 1 through 150 alleged

15  hereinabove as though fully set forth herein.

16      152.  There have been in existence both valid written and

17  oral contracts between Plaintiffs and various primary care

18  physicians.

19      153.  Defendants, and each of them, were all fully aware

20  and cognizant of the existence of said oral and written

21  contracts.

22      154.  By their conduct as alleged hereinabove, Defendants

23  intended to induce primary care physicians to breach their

24  written and oral contracts with Plaintiffs.

25      155.  Defendants intended to interfere with Plaintiffs'

26  contractual relationships with said primary care physicians and

27  specifically intended to induce multiple breaches of said written

28  and oral contracts.

complant.2ad

156.   Defendants intentionally engaged in acts and conduct which induced primary care physicians to breach their contracts with Plaintiffs.

157.   As a direct and proximate result of Defendants' conduct, Plaintiffs' contracts with numerous primary care physicians were in fact breached.

158.   As a direct and proximate result of Defendants' conduct Plaintiffs have been damaged and injured in an amount in excess of the Court's jurisdiction.

159. The acts performed by Defendants through which they intentionally induced said wrongful breaches of contract were performed willfully and in conscious disregard of Plaintiffs' rights and for the purpose of injuring Plaintiffs in their business and property.  Plaintiffs are therefore, entitled to an award of punitive damages as a result thereof.

## XI.

### EIGHTH CAUSE OF ACTION

#### [For Trade Libel and Disparagement
#### Against the Aetna Defendants Only]

160. Plaintiffs incorporate ¶¶ 1 through 159 alleged hereinabove as though fully set forth herein.

161. The Aetna Defendants have intentionally and willfully disparaged the quality of Plaintiffs' services by means of false statements of fact.  Defendant Aetna stated that its reason for its "termination" was Plaintiffs' "weak" financial position.  In fact and in truth, Defendant Aetna knew that Plaintiffs' financial position was not weak.

complant.2ad

162.   Such false statements have been made, on information and belief, both orally and in writing by the Aetna Defendants to the medical community.

163. The Aetna Defendants' representatives, in the course and scope of their employment by said Defendants, defamed Plaintiffs with the intent to injure it in its business and property.

164.   The foregoing statements were slanderous, defamatory and libelous because they were false, the Aetna Defendants knew these statements to be false, and they were intended to damage Plaintiffs' business to induce Plaintiffs' Primary Care Physicians to transfer their patients to Defendant FPA and other IPAs' to induce Plaintiffs' contract physicians to terminate their contracts with Plaintiffs, and to transfer Aetna beneficiaries and subscribers to FPA and other IPAs.

165. Plaintiffs are informed and believe and thereon alleges that these and/or similar statements were made to others, including physicians in the San Diego area, by Defendants and their authorized representatives, or others acting in concert and conspiracy with Defendants.

166. These accusations were false, and were known by Defendants and their authorized representatives to be false at the time the representations were made.

167. The accusations carried a defamatory meaning, and were understood by those who heard them in a way that defamed Plaintiffs.

168. As a direct and proximate result of the above-described accusations and false statements, Plaintiffs have suffered

36

complaint.2ad

1  general damages to their business in a sum not yet ascertained.

2  Plaintiffs will seek leave of Court to amend this Complaint when

3  the amount of such damages have been ascertained.

4      169. As a further proximate result of the above-described

5  accusations, Plaintiffs have also suffered special damages, i.e.,

6  the loss of PCPs' and Aetna subscribers, in a sum not yet

7  ascertained.

8      170. The above-described statements were spoken by the Aetna

9  Defendants with malice, oppression, and fraud, and were performed

10  wilfully and in conscious disregard of Plaintiffs' rights for the

11  specific purpose of injuring Plaintiffs in their business and

12  property.

13      171. Plaintiffs are further informed and believe and based

14  upon such information and belief allege that the Aetna

15  Defendants, through their authorized officers, employees and

16  directors, ratified and approved the acts and conduct alleged

17  hereinabove.  Plaintiffs are therefore, entitled to an award of

18  punitive damages from said Defendants in an appropriate amount.

19

20      WHEREFORE, Plaintiffs pray as follows:

21                    **FIRST CAUSE OF ACTION**

22                    [California Cartwright Act]

23      1.    For treble damages according to proof at trial

24  pursuant to the provisions of California Business & Professions

25  Code §16750;

26      2.    For an award of reasonable attorneys' fees and

27  costs as provided by §16750 of the California Business &

28  Professions Code; and

complant.2ad

1        3.   For injunctive relief.

2

3                    **SECOND CAUSE OF ACTION**

4                    [For Civil Conspiracy]

5        1.   For compensatory damages; and

6        2.   For punitive damages.

7

8                    **THIRD CAUSE OF ACTION**

9                  [For Breach of Contract]

10      1.   For compensatory damages.

11

12                  **FOURTH CAUSE OF ACTION**

13            **[For Unfair Competition for**

14    **Violation of California Bus. & Prof. Code §17200]**

15        1.   For restitution and disgorgment of Defendants' net

16  profits for Defendants' acts of unfair competition; and

17        2.   For injunctive relief.

18

19                    **FIFTH CAUSE OF ACTION**

20    **[For Intentional Interference With Contractual Relations]**

21        1.   For compensatory damages; and

22        2.   For punitive damages.

23

24                  **SIXTH CAUSE OF ACTION**

25           **[For Intentional Interference with**

26    **Advantageous and Prospective Business Relations]**

27      1.   For compensatory damages; and

28      2.   For punitive damages.

complant.2ad

1    <u>**SEVENTH CAUSE OF ACTION**</u>

2    **[For Inducing Breach of Wrongful Contract]**

3        1.   For compensatory damages; and

4        2.   For punitive damages.

5

6    <u>**EIGHTH CAUSE OF ACTION**</u>

7    **[For Trade Libel and Disparagement]**

8        1.   For compensatory damages; and

9        2.   For punitive damages.

10

11   <u>**ALL CAUSES OF ACTION**</u>

12       1.   For attorneys' fees;

13       2.   For costs of suit; and

14       3.   For such other and further relief as the Court

15   deems just and proper.

16

17   Dated: January 3, 1997   LAW OFFICES OF JOEL R. BENNETT
                                LAW OFFICES OF LOUIS B. RUBIN

18

19                          By: *Joel R. Bennett*

20                             JOEL R. BENNETT
                      Attorneys for Plaintiffs

21           EAST COUNTY PHYSICIANS MEDICAL GROUP

22

23

24

25

26

27

28

complant.2ad

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EX. "A"

## SHAREHOLDER PROFESSIONAL SERVICES AGREEMENT
## BETWEEN
## EAST COUNTY PHYSICIANS'
## MEDICAL GROUP, INC.
# (PHYSICIAN AGREEMENT)

This Agreement is between _____ ("PHYSICIAN"), a Shareholder of the East County Physicians' Medical Group, Inc. ("ECPMG") and ECPMG, Inc., a California corporation.

## I. RECITALS

1.1  PHYSICIAN is an individual or employee of a professional corporation, duly licensed by an applicable state professional licensing agency in California, has current privileges to practice at Grossmont District Hospital and is a shareholder in the ECPMG. PHYSICIAN intends by entering into this Agreement to provide professional services and allow ECPMG to represent its interests in seeking and/or providing contracting opportunities to PHYSICIAN only pursuant to the terms of this Agreement. PHYSICIAN further intends by entering into this Agreement to integrate the provision of his or her professional services with ECPMG, but only to the extent of those specific contracts for which he or she agrees to perform services pursuant to the terms of this Agreement.

1.2  ECPMG is a professional corporation duly incorporated in the State of California. It intends by entering into this Agreement to benefit PHYSICIAN and the practice of medicine in the community by advancing the practice of quality cost-effective medicine, by providing marketing, administrative and contracting services to PHYSICIAN, and by developing and providing contracting opportunities for PHYSICIAN.

## II. DEFINITIONS

2.1  "Payor" means a Preferred Provider Organization ("PPO"), a Health Maintenance Organization ("HMO"), an insurance company, self-insured employer, union or multi-employer trust, or other entity which has contracted to provide or pay for health care services to members, beneficiaries, enrollees, or employees, which ECPMG seeks to assist in the development of a list of physicians willing to contract to provide health care service with a Payor.

2.2  "Professional Services" means services rendered by PHYSICIAN within the scope of his or her license.

## III. RELATIONSHIP BETWEEN THE PARTIES

3.1  Independent Entities - No provision of this Agreement is intended to create nor shall be deemed or construed to create any relationship between PHYSICIAN and ECPMG other than that of independent entities contracting with each other solely for the purpose of carrying out the provisions of this Agreement. Neither party to this Agreement, nor any of their respective employees, shall be construed to be the agent, employee or representative of the other. Consequently, each party agrees that it shall neither make, nor be entitled to make, any claim for workers' compensation or any employee benefit against the other by virtue of this Agreement.

3.2  Third-Party Rights - The obligations created by this Agreement shall be enforceable only by the parties. No provision of this Agreement is intended to, nor shall it be construed to, create any rights or remedies for the benefit of or enforceable by any patient or party other than the parties of this Agreement.

3.3  Responsibility for Quality Professional Services  PHYSICIAN shall be solely responsible for the quality of professional services that he or she renders pursuant to a contract with Payor.

3.4  Non-Exclusivity - Nothing in this Agreement shall be deemed to establish an exclusive arrangement between PHYSICIAN and ECPMG nor preclude PHYSICIAN or ECPMG from entering into any other agreement.

3.5  Physician Employees of Professional Corporations - A PHYSICIAN who is an employee of a professional corporation may enter into this Agreement and contract with a Payor directly, by way of the Limited Power of Attorney or as a representative of the professional corporation.

## IV. SERVICES AND RESPONSIBILITIES OF PHYSICIAN

4.1  Provisions of Contracts - PHYSICIAN shall cooperate with, participate in and be bound by, all required provisions of each contract entered into by PHYSICIAN directly or by way of the Limited Power of Attorney, including but not limited to the provisions concerning Professional Services, definition of terms, utilization review, peer review, quality assurance and any other obligations, standards or procedures required by a particular Payor or by ECPMG. Such provisions shall be contained in each contract with a Payor, a copy of which shall be provided to PHYSICIAN.

4.2  Non-Discrimination - PHYSICIAN shall provide Professional Services to persons covered by a contract entered into pursuant to this Agreement in the same manner and with the same quality as those services are provided to all other patients of PHYSICIAN.

4.3  Provision of Information - Upon request, PHYSICIAN shall provide ECPMG with current information about PHYSICIAN'S practice including but not limited to office address, telephone, amount and type of insurance, professional license information, and other information requested by ECPMG in order to reasonably carry out the responsibilities of this Agreement.

4.4  Maintenance of Quality - PHYSICIAN shall maintain his or her hospital privileges at Grossmont District Hospital and shall maintain his or her state license in good standing.  PHYSICIAN shall cooperate with ECPMG if it seeks information about any legal or administrative action against PHYSICIAN or against his or her license or staff privileges.

4.5  Annual Fee - PHYSICIAN shall pay ECPMG an annual fee within thirty (30) days of the billing for such fee and annually thereafter when such a fee is required by ECPMG. There is currently no fee. Failure to pay the fee after written notice of delinquency shall be grounds for termination of this Agreement.

## V.  SERVICES AND RESPONSIBILITIES OF ECPMG

5.1  Contract Review Services - ECPMG shall provide contract review services and provide a recommendation to PHYSICIAN regarding each contract reviewed.

5.2  Limitations on Negotiating, Recommending or Signing Contracts - ECPMG shall negotiate, recommend and/or sign, on behalf of PHYSICIAN, only those contracts which after careful analysis, in the sole judgment of ECPMG, are deemed to be beneficial to ECPMG and PHYSICIAN and which carry out the purpose of this Agreement.

5.3  Limited Power of Attorney - PHYSICIAN shall sign a Limited Power of Attorney provided in Attachment A attached to and made a part of this Agreement.  That Limited Power of Attorney is intended to improve the ability of ECPMG to identify, develop, enter into and terminate contracting opportunities of PHYSICIAN with Payors and strengthen the ability of ECPMG to market the services of PHYSICIAN.

5.4  Analysis and Recommendation Regarding Contracts with Payors - ECPMG shall send to PHYSICIAN, when appropriate, an analysis and a recommendation for each Payor contract which is either proposed or entered into by ECPMG pursuant to the terms of the Limited Power of Attorney.  For a proposed Health Maintenance Organization (HMO) contract, PHYSICIAN shall have at least fifteen (15) working days to consent to participate.  If PHYSICIAN has signed the Limited Power of Attorney provided in Attachment A, PHYSICIAN shall have at least fifteen (15) working days to reject participation in Preferred Provider Organization (PPO) contracts and provide written notice of such rejection pursuant to the terms of the Limited Power of Attorney contained in Attachment A.

5.5  Marketing Services - ECPMG shall provide PHYSICIAN with marketing services designed to assist in marketing the professional services of PHYSICIAN pursuant to the terms of this Agreement.

5.6  Administrative and Other Services - ECPMG shall provide PHYSICIAN with such administrative and other services as specifically approved by ECPMG in order to carry out the terms of this Agreement, advance the purposes of ECPMG, comply with the requirements of any Payor contract entered into by ECPMG and assist PHYSICIAN in complying with the terms of any contract entered into pursuant to the terms of this Agreement.

## VI.  COMPENSATION AND BILLING

6.1  Acceptance of Payment Amount and Terms - PHYSICIAN shall accept as payment in full the stated fees and payment terms and conditions as provided in each contract into which PHYSICIAN has entered personally, as an employee of a professional corporation or by way of the Limited Power of Attorney.

6.2  Other Billing - PHYSICIAN may bill for non-covered services, deductibles, co-payments and/or as otherwise allowed under each contract.

## VII.  MAINTENANCE, AVAILABILITY, INSPECTION AND AUDITS OF RECORDS

7.1  Preparation and Maintenance - PHYSICIAN and ECPMG shall each prepare and maintain all appropriate medical and other records for Professional Services provided and for any other administrative purposes required by specific contracts or by ECPMG in order to carry out the terms of this Agreement. Preparation, confidentiality and ownership of records shall be controlled by applicable law.

7.2  Inspection, Audit and Duplication - PHYSICIAN and ECPMG shall each allow inspection, audit and duplication of those records required to be prepared and maintained by this Agreement, with reasonable notice, during regular business hours, provided that the party requesting the records shall bear any expenses incurred.

## VIII.  LIABILITY, INDEMNITY AND INSURANCE

8.1  Third-Party Liability - Neither ECPMG nor PHYSICIAN nor any of their respective agents or employees shall be liable to third parties for any act or omission of the other party.

8.2  Professional Liability - PHYSICIAN, at his or her sole expense, shall maintain insurance for professional liability in the amount required by ECPMG.

8.3  ECPMG Insurance - ECPMG shall, at its own expense, carry such types and amounts of liability insurance appropriate for the obligations it undertakes.  Alternatively ECPMG may make other arrangements to protect against the applicable risks associated with the obligations of this Agreement.

## IX.  MARKETING, ADVERTISING AND PUBLICITY

9.1  Use of Names - ECPMG and a Payor shall have the right to use the name, address, telephone numbers and other related information of PHYSICIAN for purposes of informing patients and prospective patients of the identity, location, telephone numbers, specialty and any limitations of the practice of PHYSICIAN. ECPMG may also use such information for other purposes related to other ECPMG functions.

9.2  Reservation of Other Rights - Each party, except as provided in Section 9.1, reserves the right to and the control of the use of its names, symbols, trademarks, service marks and all other proprietary information.

## X.  DISPUTE RESOLUTION

10.1  Meet and Confer - PHYSICIAN and ECPMG agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.  Any disputes specifically addressed in the Amended Bylaws shall be resolved as provided therein.

10.2  Arbitration - In the event that the procedure provided in Section 10.1 does not resolve a dispute, the matter shall be settled by binding arbitration conducted in the County of San Diego, under the applicable rules of the American Arbitration Association and the laws of the State of California.

## XI.  TERM AND TERMINATION

11.1  Effective Date - This Agreement is effective when signed by PHYSICIAN.

11.2  Term - The term of the contract shall be a calendar year.  It shall be automatically renewed for successive calendar years unless terminated in writing pursuant to Section 11.4.

11.3  Right to Termination - Either party may terminate for any reason upon providing the notice provided in Section 11.4.

11.4  Notice of Termination - Termination shall be effective when one party gives the other prior written notice.  PHYSICIAN shall provide written notice of not less than ninety (90) days prior to the date of termination set by PHYSICIAN.  ECPMG shall provide written notice as provided in the Amended Bylaws.

## XII.  GENERAL PROVISIONS

12.1  Amendment - This Agreement or any provision of it may be amended at any time during its term by mutual written consent of the parties or their duly authorized representatives.  If there is any conflict between the provisions of this Agreement and any amendment, the provisions of that amendment shall control as to the provisions of that amendment.

12.2  Assignment or Subcontract - No assignment, delegation or subcontract of the rights, duties or obligations of this Agreement shall be made by either party without the express written consent of a duly authorized representative of the other party.  Any attempted assignment, delegation or subcontract in violation of this provision shall be void as to the other party.

12.3  Entire Agreement - The Agreement, together with the Amended Bylaws and any attachments, contains the entire agreement between PHYSICIAN and ECPMG relating to the rights granted and the obligations assumed by both parties.  Any prior agreements, promises, negotiations, or representations, either oral or written, relating to the subject matter of this Agreement not expressly set forth in this Agreement are of no force or effect.

12.4  Attorney's Fees - In the event that either party institutes any legal action, suit or arbitration to enforce the provisions of the Agreement, each party shall pay one-half (1/2) of any arbitration costs and otherwise pay its own attorney's fees and its costs.

12.5  Waiver of Breach - Waiver of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other breach of the same or different provision.

12.6 Notice - Any notice required to be given by this Agreement and the Amended Bylaws shall be in writing, postage prepaid, and shall be sent by first class mail to the respective party at the addresses below.

PHYSICIAN:

ATTN: _____

EAST COUNTY PHYSICIANS' MEDICAL GROUP, INC.

ATTN:     President
          P.O. Box 2128
          La Mesa, CA 91943

12.7 Headings - The headings of articles and sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

12.8 Counterparts - This Agreement may be executed in counterparts each of which shall be deemed to be an original, but all of which together shall constitute one and the same.

PHYSICIAN:                                    EAST COUNTY PHYSICIANS' MEDICAL GROUP, INC.:



X_____            _____
Signature                                    Signature

                                               Gordon Lillie, M.D.
_____             _____
Name                                         Name

Title:_____            Title:  President

Date:_____             Date:_____

Address:_____

_____

_____

# SHAREHOLDER AGREEMENT

This Shareholder Agreement ("Agreement") is between East County Physicians' Medical Group, Inc., a California professional corporation ("ECPMG"), and the undersigned physician shareholder of ECPMG ("SHAREHOLDER").

## RECITALS

A. ECPMG was formed on April 12, 1985. Its primary purpose is to improve the quality of health care and advise its members about third-party payor contracts, and it intends to enter into provider contracts with preferred provider organizations (PPO's) and health maintenance organizations (HMO's).

B. SHAREHOLDER is a California licensed physician who owns a share of common stock of ECPMG ("Share") and who has agreed to become subject to the Physician Agreement and Amended Bylaws of ECPMG.

C. SHAREHOLDER acknowledges the restrictions printed on the individual share and has agreed to those restrictions.

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. Restrictions on Transfer. Except as set forth in this Agreement, SHAREHOLDER may not sell, transfer, assign, devise, or otherwise dispose of any shares the SHAREHOLDER owns or holds.

2. Definitions. The terms set forth below, when used in this Agreement, shall have the following meanings:
   (a) "Cost." The original amount paid by a SHAREHOLDER for the share.
   (b) "Disability." The inability of the SHAREHOLDER to substantially perform his or her obligations under the Physician contract, as determined by the Board of Directors of ECPMG in its sole discretion.
   (c) "Disqualified Person." A SHAREHOLDER who for any reason becomes legally disqualified to practice medicine in California in his or her particular specialty.
   (d) "Termination." Action taken pursuant to ECPMG Amended Bylaws to terminate the SHAREHOLDER'S share ownership and rights or benefits pursuant thereto.
   (e) "Formula Price." The most recent per share price paid by any physician to purchase a share of ECPMG from ECPMG.

3. Death. In the event of the death of SHAREHOLDER, his or her personal representative may sell the Share to another person who meets the shareholder eligibility requirements of the Bylaws, or if that does not occur, shall sell to ECPMG and ECPMG shall purchase the Share owned by the SHAREHOLDER at one hundred percent (100%) of the Formula Price. Payment shall be made in cash not later than one (1) year from the date of death.

4. Disability. In the event of the disability of SHAREHOLDER, SHAREHOLDER may sell the Share to another person who meets the shareholder eligibility requirements of the Amended Bylaws, or if that does not occur, shall sell to ECPMG and ECPMG shall purchase from SHAREHOLDER, the Share owned by SHAREHOLDER for one hundred percent (100%) of the Formula Price. Payment shall be made in one year of the date of disability.

5. Retirement. In the event of the retirement of SHAREHOLDER from the practice of medicine, SHAREHOLDER may sell the Share to another person who meets the shareholder eligibility requirements of the Amended Bylaws, or if that does not occur, shall sell to ECPMG, and ECPMG shall purchase from SHAREHOLDER, the Share owned by the SHAREHOLDER for one hundred percent (100%) of the Formula Price. Payment shall be made in cash within one year of the date of retirement.

6. Resignation, Termination or Disqualification. In the event of the resignation of SHAREHOLDER from ECPMG or the termination or disqualification for any reason whatsoever of the SHAREHOLDER'S share ownership and/or Professional Services Agreement (whether such termination is at the instigation of ECPMG or SHAREHOLDER) SHAREHOLDER may sell the Share to another person who meets the shareholder eligibility requirements of the Amended Bylaws, or if that does not occur, shall sell to ECPMG, and ECPMG shall purchase from SHAREHOLDER, the Share owned by the SHAREHOLDER, for twenty-five percent (25%) of the Formula Price. Payment shall be made within one year of the date of resignation, termination or disqualification.

7. Spouse. The spouse of SHAREHOLDER shall not acquire any equity or ownership interest in SHAREHOLDER'S Share. In the event of a divorce or dissolution of the marriage, SHAREHOLDER shall pay off any community property interest of the spouse in the Share with other assets and shall not transfer any interest in the Share to such spouse.

8. Successors. SHAREHOLDER shall not transfer his or her rights or obligations except as provided under this Agreement. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of ECPMG.

9. Attorneys' Fees. Should any action be brought by one party against the other party to enforce this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees, costs and expenses.

10. Modification. This Agreement may only be modified by the written consent of both parties.

11. Governing Law, Arbitration. This Agreement shall be governed by California law and any dispute arising out of it shall be settled by binding arbitration in the County of San Diego pursuant to the applicable rules of the American Arbitration Association.


SHAREHOLDER

X _____
Signature


_____
Print Full Name


EAST COUNTY PHYSICIANS' MEDICAL GROUP, INC.

_____
Signature

By  Gordon Lillie, M.D., President
_____

# EAST COUNTY PHYSICIANS' MEDICAL GROUP, INC.
## SUBSCRIPTION AGREEMENT

This ECPMG Subscription Agreement ("Agreement") is entered into between East County Physicians' Medical Group, Inc., a California professional corporation ("ECPMG"), and the undersigned physician ("PHYSICIAN").

## RECITALS

A.  The ECPMG has offered shares of its Common Stock ("Share") to certain qualified physicians.

B.  PHYSICIAN would like to subscribe for one (1) Share on the terms and conditions set forth below.

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1.  <u>Subscription.</u>  PHYSICIAN hereby receives one (1) Share, subject to acceptance pursuant to Section 3 and the other terms and conditions of this Agreement, the ECPMG agrees to issue such Share to PHYSICIAN.

2.  <u>Payment.</u>  Upon execution of this Agreement by PHYSICIAN, PHYSICIAN shall deliver to ECPMG this Agreement and all other required documents.

3.  <u>Acceptance of this Subscription.</u>  PHYSICIAN UNDERSTANDS THAT THE ECPMG WILL HAVE THE RIGHT TO ACCEPT OR REJECT THIS SUBSCRIPTION IN WHOLE AT ITS SOLE AND ABSOLUTE DISCRETION.  Upon receipt of this Agreement  executed by PHYSICIAN, and acceptance by ECPMG, ECPMG will execute all other related documents and this Agreement.

4.  <u>Successors.</u>  The rights and obligations of this Agreement may not be assigned by PHYSICIAN.  This Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of the ECPMG.

5.  <u>Attorneys' Fees.</u>  Should any action be brought by one party against the other party to enforce this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees, costs and expenses.

6.  <u>Entire Agreement.</u>  This Agreement constitutes the entire agreement among the parties with respect to the subject matter and supersedes any prior negotiations, understandings, or agreements.

7.  <u>Modification.</u>  This Agreement may only be modified by the written consent of both parties.

8.  <u>Counterpart Execution.</u>  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one Agreement.

9.  <u>Governing Law; Arbitration.</u>  This Agreement shall be governed by California law and any dispute arising out of it shall be settled by binding arbitration in the County of San Diego pursuant to the applicable rules of the American Arbitration Association.

10.  <u>Warranties.</u>  To induce the ECPMG to accept this subscription, PHYSICIAN hereby represents and warrants that:

    (a)  PHYSICIAN is a California resident.

    (b)  PHYSICIAN has obtained or will obtain and maintain professional liability coverage in the amount of $500,000 for each occurrence and $1,500,000 in the aggregate.

    (c)  PHYSICIAN understands that the Share has not been registered under the Securities Act of 1933, as amended, or under the securities laws of California, and that the Share has not been approved or disapproved by the Securities and Exchange Commission or by any other federal or state agency.

    (d)  PHYSICIAN is acquiring the Share for his or her own account, for investment purposes only, and not with a view to the sale or other distribution except as allowed by the Shareholder Agreement.

    (e)  By reason of his or her business or financial experience, PHYSICIAN has the capacity to protect his or her own interests in connection with this investment.

    (f)  PHYSICIAN understands that the Share may not be transferred except to the ECPMG pursuant to the Shareholder Agreement.

    (g)  PHYSICIAN agrees to abide by the Amended Bylaws of the ECPMG.

SHAREHOLDER

X _____
Signature

_____
Print Full Name

EAST COUNTY PHYSICIANS' MEDICAL GROUP, INC.

_____
Signature

By  **Gordon Lillie, M.D., President**
_____

# ATTACHMENT A

## LIMITED POWER OF ATTORNEY

A.  Limited Power of Attorney - PHYSICIAN hereby appoints ECPMG as PHYSICIAN'S attorney-in-fact with the authority to enter into contracts with Payors, on behalf of PHYSICIAN, subject to the conditions in this Attachment.

B.  Contracts - ECPMG may enter into a contract on behalf of PHYSICIAN pursuant to this Limited Power of Attorney only after performing an adequate analysis and determining that the contract is in the interest of PHYSICIAN. For purposes of this Power of Attorney Payor shall not refer to a Health Maintenance Organization.

C.  Rate Negotiations - Other than in the case of an HMO, ECPMG shall not engage in any negotiations with a Payor or make any recommendations to PHYSICIAN, concerning rates or related provisions, but shall communicate such rates and related provisions to PHYSICIAN.

D.  PHYSICIAN Bound Subject to Rejection - PHYSICIAN shall be notified in writing that he or she has been bound to a contract with a Payor by ECPMG, said notice shall include an analysis and recommendation and provide at least fifteen (15) business days to reject in writing the contract. The failure of PHYSICIAN to provide written notice of rejection within the fifteen (15) day period shall be deemed acceptance of the terms and rates of the contract. An extension of time to review the contract may be granted to PHYSICIAN by ECPMG for good cause.  For purposes of this Power of Attorney Payor shall not refer to a Health Maintenance Organization.

E.  Revocation of Power of Attorney - PHYSICIAN may revoke the appointment of ECPMG as attorney-in-fact by giving at least thirty (30) days prior written notice to ECMG. The notice period may be modified or waived by good cause. Upon receipt of that notice, ECPMG shall promptly remove PHYSICIAN'S name from the list of physicians for which it has the Limited Power of Attorney.  Termination of this appointment shall not relieve PHYSICIAN from any obligation PHYSICIAN had incurred prior to the date of revocation of the appointment pursuant to the terms of this Agreement.

**I HEREBY APPOINT EAST COUNTY PHYSICIANS' MEDICAL GROUP, INC. AS MY ATTORNEY-IN-FACT LIMITED BY THE PURPOSES SETFORTH IN THIS AGREEMENT.**

X_____
Signature

_____
Print Full Name

_____
Date

# RELEASE OF RECORDS

By subscribing for one (1) share of the East County Physicians' Medical Group, Inc. ("ECPMG"), Physician hereby:

(1)  Agrees to appear, if requested, for interview regarding such subscription;

(2)  Authorizes the ECPMG to consult with members of medical staffs of hospitals with which Physician has been associated and with others who may have information bearing on his/her competence, character and ethical qualifications, and authorizes such persons to provide all such information;

(3)  Consents to the ECPMG's inspection of all records and documents that may be material to an evaluation of his/her professional qualifications, personality, ability to cooperate with others, moral and ethical qualifications, and physical, mental and professional competence, and directs individuals who have custody of such records and documents to permit inspection and/or copying;

(4)  Certifies that he/she will report any changes in the information submitted in this Agreement which may subsequently occur to the ECPMG; and

(5)  Consents and authorizes ECPMG to release the records and information to third party payors for the purposes of credentialing, utilization management and contract participation.

(6)  Releases from any liability and hold harmless to the fullest extent permitted by law, all individuals and organizations providing information to ECPMG and all ECPMG representatives for their acts performed in connection with evaluating the Physician and his/her qualifications.

PHYSICIAN

X_____
Signature

_____
Print Full Name

_____
Date

1 | JOEL R. BENNETT, ESQ., S.B. NO. 42162
LAW OFFICES OF JOEL R. BENNETT
2 | 225 South Lake Avenue, Ninth Floor
Pasadena, California 91101
3 | (818) 683-3031

4 | LOUIS B. RUBIN, ESQ., S.B. NO. 85281
605 C Street, Suite 300
5 | San Diego, California 92101
(619) 702-5552

6 |

7 | Attorneys for Plaintiffs
East County Physicians Medical Group

8 |

9 |                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 |                        FOR THE COUNTY OF SAN DIEGO

11 | EAST COUNTY PHYSICIANS MEDICAL      )   CASE NO. 701044
GROUP, INC., a California           )
12 | corporation; and TED MAZUR,        )
M.D., individually and on           )   ERRATA TO SECOND
13 | behalf of all others similarly     )   AMENDED COMPLAINT
situated,                           )
14 |                                     )
                                    )
15 |          Plaintiffs,              )       · CLASS ACTION
                                    )         [C.C.P. §382;
16 |                                     )
                                    )         LOCAL RULE 3.1]
17 |     vs.                            )
                                    )
18 | AETNA LIFE AND CASUALTY CO.;       )
AETNA HEALTH-CARE PROGRAMS OF       )
19 | CALIFORNIA, INC. DBA AETNA         )
CHOICE HEALTH-CARE PLAN; AETNA      )
20 | HEALTH PLANS OF CALIFORNIA,        )
INC.; AETNA HEALTH PLANS OF SAN     )
21 | DIEGO, INC.; FAMILY PRACTICE       )
ASSOCIATES OF SAN DIEGO; FPA        )
22 | MEDICAL MANAGEMENT, INC.; and      )
DOES 1 through 50, inclusive,       )
23 |                                     )
                                    )
24 |          Defendants.              )
                                    )
25 |

26 |

27 |

28 |

errata 2nd

1    TO THE COURT AND TO ALL COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that the attached Contract designated as

3  Ex. "A" in the Second Amended Complaint, at page 3 thereof, was

4  inadvertently omitted as Ex. "A" therefrom.  Said Contract should

5  be considered part of the Second Amended Complaint, _nunc pro_

6  _tunc_, as Ex. "A".  Ex. "A" to the Second Amended Complaint should

7  be re-designated as Ex. "B".

8

9  Dated: January 16, 1997        Respectfully submitted,

10                                LAW OFFICES OF JOEL R. BENNETT
                                  LAW OFFICES OF LOUIS B. RUBIN
11

12                                By: _Joel R. Bennett_
                                  JOEL R. BENNETT
13                                Attorneys for Plaintiffs
                                  EAST COUNTY PHYSICIANS
14                                MEDICAL GROUP

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                                                    errata 2ad

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Ex. "A"**

errata.2ad

This Agreement is subject to                        San Diego
the approval of the California                          Base
Department of Corporations.                          Capitated

IPA
HEALTH CARE PROVIDER ORGANIZATION
SERVICES AGREEMENT

*(see amendment)*

This Agreement is entered into on this first day of ~~August~~ *Sept.*, 1990, by
and between Aetna Healthcare Programs of California, Inc. d/b/a AEtna Choice
Healthcare Plan ("Health Plan") and East County Physicians Medical Group, Inc.
("IPA").  Under this Agreement, IPA becomes a member of Health Plan's Health
Care Provider Organization and both parties agree to abide by the following
terms and conditions:

I.      DEFINITIONS

        A. "Covered Services" means all services Members are entitled to
receive as set forth in their respective health benefits plans.

        B. "Designated Products" means those Products which IPA has agreed to
participate in pursuant to the terms of this Agreement.

        C. An "Emergency" means a condition of such a nature that if not
immediately diagnosed and treated could reasonably result in severe pain or
deterioration to the point of placing the patient's life or health in jeopardy
or causing significant impairment to bodily function of the patient, as
determined by Payor.  Classification of situations as Emergencies is based on
signs and symptoms at the time of treatment, verified by the treating
physician.  Acute symptoms must occur suddenly and unexpectedly and be
sufficiently severe to cause the person to seek medical assistance regardless
of the hour of the day or night.  Heart attacks, cardiovascular incidents,
poisonings, loss of consciousness or respiration, convulsions, severe bleeding
or severe broken bones are examples of true Emergencies.

        D. "Health Care Provider Organization" means the Health Plan network
of health care providers who participate in various Products.

        E. "Members" means all persons eligible to receive Covered Services
under the health benefits plans described in the Product Descriptions.

        F. "Participating Physician" means any Primary Care Physician or
Specialist Physician, as defined in Sections J. and M.

        G. "Participating Provider" means a Participating Physician or other
health professional or health care service provider or facility which has met
credentialing criteria and other requirements required by Health Plan and has
entered into a Participation Agreement with IPA.

1998R                                                               06/19/90

H. "Participation Agreement" means any agreement for the provision of Covered Services to Members entered into between IPA and a Participating Provider or a group of Participating Providers.

I. "Payor" means the party responsible for payment for Covered Services pursuant to a Product Description.

J. "Primary Care Physician" means any duly licensed physician who has entered into a Participation Agreement with IPA to provide primary care Covered Services to Members, and who meets all other requirements, including the credentialing criteria of Health Plan and any additional criteria established by IPA related to Primary Care Physicians and specified by Health Plan and/or IPA.

K. "Products" means those health care products which Health Plan proposes that IPA participate in pursuant to the terms of this Agreement.

L. "Product Description" means the description of each Designated Product.

M. "Specialist Physician" means a physician other than a Primary Care Physician, who provides services within the range of a designated specialty area of practice, who has entered into a Participation Agreement with IPA to provide certain Covered Services to Members, and who meets all other requirements, including the credentialing criteria of Health Plan and any additional criteria established by the IPA, related to Participating Physicians and specified by Health Plan and/or IPA.

II.    IPA OBLIGATIONS

A. IPA shall initially participate in the Designated Products designated in Section VII in this Agreement and other Products subsequently designated pursuant to the terms set forth herein.  IPA's participation in Designated Products shall be in accordance with and as set forth in the Product Descriptions attached to and incorporated by reference into this Agreement.

B. IPA shall arrange for the provision of Covered Services to Members by using its best efforts to enter into Participation Agreements with such number of physicians or groups of physicians and other ancillary providers meeting Health Plan's criteria for participation and practicing within IPA's service area as is acceptable to Health Plan within a period of time acceptable to Health Plan.  The final form and content of such Participation Agreements and any amendments thereto shall be subject to the approval of Health Plan.  IPA shall amend such Participation Agreements to remain in compliance with this Agreement as amended.

C. After the effective date of the Agreement, before Health Plan may enter into an agreement with any medical group or IPA, other than a medical group and/or IPA, which has contracted with the Health Plan as of the effective date of this Agreement, to provide Covered Services to Members within a six-mile radius of Grossmont Hospital, it shall offer such medical groups and/or IPA an opportunity to provide the Covered Services required by Health Plan.  In the event Health Plan provides written notice to IPA that additional participating physicians are needed, IPA shall contract with additional Primary Care Physicians within thirty (30) days of the date of the notice and shall contract with additional Specialist Physicians within sixty (60) days of the date of the notice.  In the event IPA fails to contract with physicians within the time frames specified, Health Plan may directly contract with such providers, other physicians, or other physicians groups.

D. IPA shall assist Health Plan in administering the Designated Products.  Such assistance shall include, but not be limited to, transmitting information relating to the Designated Products to Participating Providers and assisting in and actively cooperating with the utilization management ("UM") and quality assurance ("QA") program and the grievance procedure for each Designated Product.

E. IPA agrees that Health Plan shall list IPA as a participant in Health Plan's Health Care Provider Organization and describe IPA in Health Plan's and Payor's marketing materials.  IPA shall have the right to approve the text of any description of IPA in Health Plan's and Payor's marketing materials in advance of publication.  Health Plan shall provide IPA with updated copies of its Provider Organization Directory.

F. IPA shall provide Health Plan with the information requested in Health Plan's application form supplied to IPA by Health Plan for each Participating Provider (and, if Participating Provider is a Participating Provider group, for each Participating Provider member of the group) and shall update this information as changes occur.

G. IPA shall maintain, in a minimum amount of $1 million per occurrence/$1 million aggregate, policies of general liability, professional liability, and directors and officers liability insurance to insure IPA and its employees against any claim or claims for damages arising under this Agreement.  Documentary evidence of such insurance policy or policies shall be provided to Health Plan upon request and IPA shall provide written notification to Health Plan of receiving notice of any material adverse change in coverage within fifteen (15) days of such change in coverage.

H. IPA shall require that all Participating Providers shall meet and remain in compliance with the minimum credentialing standards established by Health Plan.  Documentary evidence of Participating Providers' compliance with Health Plan's credentialing standards shall be provided to Health Plan upon request.

1998R                                                              06/19/90

I. Health Plan shall provide IPA with thirty (30) days prior written notice of material modifications in the UM/QA program or grievance procedures for each Designated Product. In the event IPA terminates this Agreement because of a material change in a Designated Products' UM/QA program or grievance procedures, IPA and Participating Providers shall not be required to comply with such change during the term of this Agreement or during the post-termination obligation period described in Section V-C of this Agreement.

III.   <u>CLAIMS AND PAYMENT</u>

A. Participating Provider or IPA, as indicated in Attachment A and the applicable Product Description shall be paid by the appropriate Payor for Covered Services rendered to Members according to the compensation schedule specified in Attachment A and the applicable Product Descriptions. Health Plan shall contractually arrange for all Payors to compensate Participating Provider or IPA as indicated on applicable Product Descriptions in accordance with this Agreement.

B. Health Plan shall propose replacement rates to IPA at least ninety (90) days prior to the end of the initial contract period and the end of each subsequent annual contract period.

C. Unless otherwise provided in the applicable Product Description, IPA agrees and shall ensure that IPA and Participating Providers agree that in no event, including, but not limited to non-payment by applicable Payor of amounts due to Participating Provider or IPA, as appropriate, under this Agreement, insolvency of Health Plan or applicable Payor or any breach of this Agreement by Health Plan or applicable Payor, shall Participating Provider, IPA or their assignees or subcontractors have a right to seek any type of payment from, bill, charge, collect a deposit from, have any recourse against, or maintain an action against, Member, persons acting on Member's behalf (other than applicable Payor), the employer or group contract holder for Covered Services provided pursuant to this Agreement except for the payment of applicable copayments or deductibles for Covered Services or fees for services not covered by the applicable Payor. Amounts due for non-Covered Services may be charged at Participating Provider's usual and customary charges. Neither Participating Providers, IPA, nor their assignees or subcontractors shall make any surcharge upon a Member or other person acting on Member's behalf. If Health Plan receives notice of any surcharge upon a Member, it shall be empowered to take appropriate action. The requirements of this clause shall survive any termination of this Agreement for services rendered prior to such termination, regardless of the cause of such termination. Members and Health Plan shall be third party beneficiaries of this clause. This clause supersedes any oral or written agreement now existing or hereafter entered into between IPA, Participating Provider and Member or persons acting on Member's behalf (other than the applicable Payor).

D. Except as set forth below, neither Members nor Payor shall be liable for payment for any health care service which is determined pursuant to the applicable UM/QA program to be medically unnecessary; provided however that IPA shall ensure that, if a Member requests health care services after

1998R                                                            06/19/90

-4-

being informed by Participating Provider prior to the rendition of such services that the services have been determined to be medically unnecessary pursuant to the applicable UM/QA program, such Member shall be solely liable for payment. Participating Provider shall obtain written confirmation from Members of such request prior to the rendition of services. IPA shall provide that Participating Provider may bill Members for medically unnecessary emergency room visits/treatments. This Section III-D shall survive the termination of this Agreement and shall supersede any oral or written contrary agreement heretofore or here after entered into between IPA, Participating Provider and any Member or persons acting on a Member's behalf. In providing services hereunder, IPA shall provide that Participating Provider may conclusively rely on any preauthorization of services as being medically necessary, unless clinical findings upon review of the medical record vary from the findings communicated to Health Plan or unless the plan of treatment varies from the plan approved by Health Plan.

  E. An identification card shall be distributed to Members.

  F. IPA shall arrange for Participating Providers to cooperate with the appropriate parties in claims payment administration for each Designated Product including, but not limited to, their coordination of benefits, subrogation, verification of coverage and record keeping procedures.

IV. PARTICIPATING PROVIDER OBLIGATIONS

  A. IPA shall arrange for each Participating Provider to comply with the following terms and conditions:

  1. Subject to availability of services, each Participating Provider shall provide those Covered Services to Members which he/she customarily provides to his/her other patients and which are within the scope of his/her licensure and expertise in accordance with the standards and procedures applicable to Participating Provider's other patients. Participating Provider shall not discriminate in the provision of health care services toward Members due to payment source. Notwithstanding the foregoing, if the compensation to IPA for any Designated Product is on a capitated basis, then IPA shall provide or arrange for the provision of the Covered Services described in the appropriate Attachment for all Members for whom IPA is paid a capitation payment, without regard to availability of services at IPA.

  2. Upon Participating Physician's election and Health Plan's approval, each Participating Physician shall be designated a Primary Care Physician or a Specialist Physician by Health Plan. Participating Physicians shall comply with Health Plan's procedures relating to such designations for each Designated Product. Primary Care Physicians agree to cooperate with Health Plan in arranging for the provision of Covered Services to Members twenty-four (24) hours a day, seven (7) days a week in the event of an Emergency and shall maintain reasonable hours of operation, in order to provide accessibility of services.

1998R                     06/19/90

3.    Each Participating Physician shall provide Health Plan with thirty (30) days prior written notice of his intention not to accept additional Members as patients.  Such practice closure shall be effective on the 1st day of the month following the thirtieth (30th) day of the notice period.

4.    Each Participating Provider shall agree to make referrals and accept referrals and admissions of Members only in accordance with the applicable Designated Products' procedures and only to Participating Providers or other providers who have entered into an agreement with Health Plan to provide Covered Services to Members, except in cases of Emergency or as specifically authorized by Health Plan's medical director.  For certain Designated Products, upon notice to IPA, Primary Care Physician may be required to designate, in advance, one hospital as his/her Health Plan admitting hospital and may not admit to any other hospital except in cases of Emergency or as specifically authorized, in advance, by Health Plan's medical director.  Nothing contained herein shall prohibit Participating Provider from advising a Member that he/she disagrees with Health Plan's decision to deny coverage for out-of-network care and from referring such Member to an out-of-network provider so long as Participating Provider notifies Member, in advance and in writing, that Member may be liable for costs incurred relating to such referral.

5.    Each Participating Provider shall participate in and actively comply with the UM/QA program for each Designated Product and Health Plan's credentialing program.  Each Participating Provider shall agree that any Member grievance or complaint shall be resolved in accordance with the grievance procedures for the applicable Designated Product.

6.    Each Participating Provider who is a Primary Care Physician shall maintain in the amounts of $200,000 per occurrence/$600,000 aggregate and each Participating Provider who is a Specialist Physician shall maintain in the amounts of $1 million per occurrence/$ 1 million aggregate, policies of professional liability insurance and each Participating Provider shall maintain such other insurance as shall be necessary to insure Participating Provider and his/her employees against any claim or claims for damages arising under his/her Participation Agreement.  Documentary evidence of such insurance policy or policies shall be provided to Health Plan by IPA upon request and IPA shall provide written notification to Health Plan of receiving notice of any material adverse change in coverage within fifteen (15) days of such change in Participating Physician coverage.

7.    Each Participating Provider shall represent and warrant that he/she is currently, and for the duration of this Agreement shall remain in full compliance with all applicable laws relating to the provision of medical services, including licensing laws.  Each Participating Physician shall maintain clinical privileges at a hospital affiliated with Health Plan and hold appropriate clinical privileges for services he/she is to perform unless the Participating Physician's practice is confined to an office and/or ambulatory practice.  A Participating Provider shall provide immediate notification to IPA of any formal action to suspend, revoke or restrict his/her license or privileges.  IPA shall notify Health Plan of such action.
1998R.                                                        06/19/90

8.    Each Participating Provider shall agree that Health Plan shall list Participating Provider as a participant in Health Plan's Health Care Provider Organization in Health Plan's and Payor's marketing materials.  Each Participating Provider shall agree that his/her name, specialty, address and telephone number may be listed in such materials, and shall update this information as changes occur.

9.    Each Participating Provider shall agree to notify IPA and IPA shall notify Health Plan of any personal injury suits or claims filed against Participating Provider, by or relating to a Member, within ten working days of Participating Provider's receipt of notice of such claim having been filed or such action having been brought.  Participating Provider shall provide IPA which shall provide Health Plan and applicable Payor with any information regarding such claims reasonably requested by Health Plan, subject to the laws regarding confidentiality of patient records, and not including any information which would otherwise be privileged under law.

10.    IPA shall require that each Participating Provider shall maintain medical records and billing records relating to Members, including (1) books, records and papers of Participating Provider relating to health care services provided to Members, to the cost thereof, and to payment received from Members, or from others on their behalf, and (2) books and records relating to the financial condition of Participating Provider, including financial statements and preserve them for the longer of five (5) years or such time periods as are required by applicable law, regulations and practices.  Such records shall be treated as confidential so as to comply with all state and federal laws and regulations regarding the confidentiality of patient records.  Subject to such confidentiality requirements, Participating Provider shall make such records reasonably available to IPA, Health Plan, and any applicable Payor; however, Participating Provider shall be required to make books and records relating to the financial condition of the Participating Provider available to Health Plan and Payor only to the extent required by law.  Any regulatory agency or government, including without limitation, the California Commissioner of Corporations, to the extent required by applicable laws or regulations of such agency, shall also have access at reasonable times upon demand to such records.  Health Plan shall be liable for reasonable costs associated with duplication of records when such records are requested by Health Plan, except that in no event shall Health Plan or Payor be liable for such costs relating to verification of billing.

11.    Each Participating Provider's Participation Agreement may be terminated without cause at any time by either IPA or Participating Provider giving the other party at least ninety (90) days prior written notice.

12.    Each Participating Provider, following any termination of his/her Participation Agreement shall, with respect to Members under active treatment by Participating Provider on the date of termination, continue at Health Plan's election, to abide by the terms of his/her Participation Agreement until Health Plan makes reasonable and medically appropriate arrangements for the transfer of such Member's care to another provider or until treatment is completed.

1998R                                                          06/19/90

V.   TERM AND TERMINATION.

A. The term of this Agreement shall commence on the date first written above, shall continue in effect for a period of one (1) year, and shall automatically renew thereafter for one-year terms, unless terminated pursuant to this section.  This Agreement may be terminated without cause at the end of the initial term or on any anniversary date of this Agreement by either party giving the other party ninety (90) days' prior notice.  IPA may terminate this Agreement upon ninety (90) days written notice to Health Plan in the event of a material change in a Designated Product's UM/QA program.  If either party materially breaches this Agreement, written notice must be given, specifying the breach.  If after conferring in good faith, the dispute has not been resolved or the breach not cured within thirty (30) days of the notice, then this Agreement may be terminated immediately by written notice to the breaching party.

B. In the event a Payor materially fails to make timely payment of Participating Providers' claims or capitation payments due, pursuant to the terms set forth in Attachment A of this Agreement, this Agreement may be terminated, as to such Payor, by IPA giving Health Plan notice of such failure.  If such failure is not cured within thirty (30) days of the notice, IPA may terminate this Agreement as to such Payor immediately upon written notice to Health Plan.  The Agreement will continue in full force and effect as to other Payors.

C. Following any termination of this Agreement, IPA shall, with respect to any Designated Product's health benefits plan in effect as of the date of termination, continue, at Health Plan's election, to abide by the terms of this Agreement until the anniversary date of such health benefits plan.  IPA shall use its best efforts to require Participating Providers to continue to furnish Covered Services to Members during any such extension period.  The reimbursement methodologies in force on the date of termination of this Agreement shall remain in effect for ninety (90) days.  Any services rendered after ninety (90) days until the end of the extension period will be reimbursed in accordance with Attachment B and the Product Description.

D. IPA shall terminate Participating Provider's participation in Health Plan's Health Care Provider Organization as follows:

1.    If Health Plan determines that a Participating Provider materially breaches his/her Participation Agreement, Health Plan shall give IPA written notice, specifying the breach and requesting termination of such Participating Provider's Participation Agreement.  Within five (5) days of receipt of such notice, IPA shall give the Participating Provider written notice, specifying the breach and the Participating Provider shall have thirty (30) days from the date notice is given to cure such breach, but if such breach shall not be cured within such thirty (30) day period, then IPA shall immediately suspend Participating Provider's Participation Agreement.  Subject to IPA's due process procedure, IPA may request that Health Plan reinstate a suspended Participating Provider's participation under this Agreement;

06/19/90

otherwise, such Participating Provider's participation shall be terminated. Such Participating Provider shall not be allowed to provide services to Members unless approved in writing by Health Plan. IPA shall also give Participating Provider written notice of breach with a thirty day opportunity to cure even if Health Plan has not notified IPA requesting termination for breach.

2.  Health Plan may request termination for cause of a Participating Provider's Participation Agreement one hundred and twenty (120) days prior to such Participating Provider's Participation Agreement's renewal date. If IPA objects to such termination, Health Plan and IPA shall meet and confer in good faith to resolve any differences regarding such termination, provided that if no agreement is reached thirty (30) days after delivery of such notice, IPA shall suspend such Participating Provider's Participation Agreement. Subject to IPA's due process procedure, IPA may request that Health Plan reinstate a suspended Participating Provider's participation under this Agreement; otherwise, such Participating Provider's participation shall be terminated. Such physician shall not be allowed to provide services to Members unless approved in writing by Health Plan.

3.  IPA shall terminate immediately a Participating Provider's Participation Agreement upon revocation or suspension of a Participating Provider's license.

4.  IPA shall suspend immediately a Participating Provider's Participation Agreement upon a material adverse change as determined by Health Plan medical director in a Participating Provider's insurance coverage. If adequate insurance coverage is not reinstated within thirty (30) days of such suspension, such Participating Provider's Participation Agreement shall be terminated by IPA within 3 working days, upon written notice by Health Plan.

5.  IPA shall suspend a Participating Provider's Participation Agreement if, in Health Plan's opinion, failure to take immediate action has the potential to result in danger to the health of any Member. Such written notice shall include details which support Health Plan's demand for suspension. If such Participating Provider has not, in Health Plan's opinion, remedied Health Plan's quality assurance concerns which caused IPA to suspend Participating Provider's Participation Agreement within thirty (30) days of such notice, Participating Provider's Participation Agreement shall be terminated by IPA. Subject to IPA's due process procedure, IPA may request that Health Plan reinstate a suspended Participating Provider's participation under this Agreement; otherwise, such Participating Provider's participation shall be terminated. Such Participating Provider shall not be allowed to provide services to Members unless approved in writing by Health Plan. Health Plan shall hold IPA harmless for any liability which IPA may incur due to the actions taken at the express request of Health Plan pursuant to this Section IV.D.5. with which IPA refuses to concur.

1998R                                              06/19/90

E. In the event IPA has not been certified by Health Plan to meet Health Plan's criteria for participation as a provider under a fully-capitated agreement, Health Plan and IPA agree to terminate this Agreement on a date mutually agreeable to both parties and execute the agreement entitled IPA HealthCare Provider Organization Services Agreement (Document 2011R), negotiated by Health Plan and IPA. Such certification by Health Plan shall not be unreasonably refused.

VI.   DISPUTE RESOLUTION

A. The parties agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement prior to instituting litigation relating to this Agreement.

B. Arbitration

1. If the parties to this Agreement cannot settle grievances or disputes between them in an informal and expeditious manner, the dispute shall be submitted, upon the motion of either party, to arbitration under the appropriate rules of the American Arbitration Association (AAA). All such arbitration proceedings shall be administered by the AAA; however, the arbitrator shall be bound by the applicable state and federal law, and shall issue a written opinion setting forth findings of fact and conclusions of law. The party against whom the award is rendered shall pay any monetary award and/or comply with any other order of the arbitrator within sixty (60) days of the entry of judgment on the award, or take appeal pursuant to the provisions of the California Civil Code.

2. In all cases submitted to AAA, the parties agree to share equally the AAA administrative fee as well as the arbitrator's fee, if any, unless otherwise assessed by the arbitrator. The administrative fees shall be advanced by the initiating party subject to the final apportionment by the arbitrator in the award.

3. The parties agree that the arbitrator's award may be enforced in any court having jurisdiction thereof by the filing of a petition to enforce said award. Costs of filing may be recovered by the party which initiates such action to have any award enforced.

4. Should the parties, prior to submitting a dispute to arbitration, desire to utilize other impartial dispute settlement techniques such as mediation or fact-finding, a joint request for such services may be made to the AAA, or the parties may initiate such other procedures as they may mutually agree upon at such time.

5. Nothing contained herein is intended to create, nor shall it be construed to create, any right of any IPA Member to independently initiate the arbitration procedure established in this Article. Further, nothing contained herein is intended to require arbitration of dispute regarding professional negligence between the Member and the IPA.

1998R                                                                06/19/90

-10-

VII.   **MISCELLANEOUS**

A.   IPA certifies and warrants that it is a duly organized corporation in good standing under applicable law and regulations governing its existence and operation and is empowered and duly authorized to enter into this Agreement.

B.   Health Plan certifies and warrants that it is a duly organized corporation in good standing under applicable law and regulations governing its existence and operation and is empowered and duly authorized to enter into this Agreement.

C.   Health Plan shall maintain, and shall require any third party performing utilization management on behalf of Health Plan or any Payor to maintain, in the amount of $1 million per occurrence/$1 million aggregate, policies of general liability, professional liability and directors and officers liability insurance to insure itself and its employees against any claim or claims for damages arising out of this Agreement. Documentary evidence of such insurance policy or policies shall be provided to IPA upon request and Health Plan shall provide written notification to IPA of any material adverse change in coverage within fifteen (15) days of receiving notice of such adverse change in coverage.

D.   Neither party shall utilize any trade name or service mark of the other party or of any Payor, or any material or property protected by patents, trademarks or copyrights of the other party or of Payor, except as expressly permitted by this Agreement or otherwise in writing.

E.   None of the provisions of this Agreement or the Health Plan program or any Designated Product are intended to create, nor shall be deemed or construed to create, any relationship among Health Plan, any Payor and IPA other than that of independent entities contracting with each other solely for the purpose of effectuating the provisions of this Agreement and of the Health Plan program. Neither Health Plan, any Payor nor IPA nor any of their respective employees shall be construed to be the agent, employer, or representative of the other.

F.   This Agreement may be amended only by mutual agreement in writing executed by the parties, except that this Agreement may be amended by Health Plan upon notice to IPA, to comply with applicable federal, state or local laws or regulations. Designated Products may be added to this Agreement only by mutual agreement in writing executed by the parties. In the event that such amendment has an adverse financial impact on IPA or Health Plan, IPA and Health Plan shall meet within thirty (30) days of written notification to negotiate any necessary changes in compensation.

G.   This Agreement, being intended to secure the services of IPA, shall not be assigned, subcontracted, delegated or transferred by IPA without the prior written consent of Health Plan and any attempted assignment, subcontract, delegation or transfer shall be void. Health Plan may not assign, subcontract, delegate or transfer this Agreement without the prior written consent of IPA, which shall not be unreasonably withheld.

1998R                                                                06/19/90

-11-

H. Any notice required to be given pursuant to the terms and provisions of this Agreement shall be in writing and shall be sent by certified or registered mail, return receipt requested, postage prepaid, by prepaid express mail, or by hand delivery to the parties at the addresses set forth on the signature page hereof.  Either party may change its mailing address hereunder by notice pursuant to this paragraph.

I. The invalidity or unenforceability of any terms or provisions hereof shall in no way affect the validity or enforceability of any other terms or provisions.  If the terms of the Product Descriptions conflict with the terms of this Agreement, including any Attachments, the terms of the Product Descriptions shall prevail.

J. The terms of this Agreement shall be subject to the requirements of the Knox-Keene Health Care Service Plan act of 1975, as amended (the "Knox-Keene Act"), and the regulations of the Commissioner of Corporations promulgated thereunder (the "Regulations"), to the extent applicable hereto, and any provision required to be in the Agreement by either the Knox-Keene Act or the Regulations shall bind Health Plan and Participating Provider, as appropriate, whether or not provided herein.  Without limiting the foregoing, the validity and enforceability of this Agreement, as well as the rights and duties of the parties hereunder, shall be governed by California law.

K. All other provider participation agreements executed by the parties are hereby terminated on the effective date of this Agreement.

VIII.   **INITIAL DESIGNATED PRODUCTS**

IPA shall initially participate in the following Designated Products attached hereto:  The Health Maintenance Organization Product.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first written above.

EAST COUNTY PHYSICIANS
MEDICAL GROUP

AETNA HEALTHCARE PROGRAMS OF
CALIFORNIA, INC. d/b/a AETNA
CHOICE HEALTHCARE PLAN

By: _Stuart H. Case_

By: _Stanley Aronovitch_

Name: Stuart H. Case

Name:  Stanley Aronovitch

Title: President

Title:  President and C.E.O.

Date: 6/24/90

Date: 7/5/90

1998R

-12-

06/19/90

Address for Notices:

Attention: Administrator
East County Physicians Medical Group
P.O. Box 2128
La Mesa, California  92044-0720

Address for Notices:

Attention:  President and C.E.O.
AEtna CHOICE Healthcare Plan
7676 Hazard Center Drive, 10th Floor
San Diego, California  92108

1990R

-13-

06/19/90

ATTACHMENT A-1
COMPENSATION SCHEDULE

I.   <u>Compensation for Covered IPA Services</u>

A.   By the fifteenth (15th) day of each month, Payor shall pay IPA a
monthly "Capitation Payment" based on the number of Members who
have selected a Participating Physician as Member's Primary Care
Physician ("IPA Members") in accordance with the schedule set forth
in Attachment A-1-1, subject to the adjustments described below.
Such Capitation Payments shall be actuarially adjusted by Health
Plan on a group by group basis to reflect benefit adjustments.

B.   In exchange for such Capitation Payment, IPA shall arrange for the
provision of all Covered Services set forth in Section II of this
Attachment A ("Covered IPA Services").

C.   For the purpose of calculating Capitation Payments due under this
Attachment A-1, the number of IPA Members will be determined as of
the first day of the month.  No payment adjustments will be made for
Members entering or leaving the applicable health benefits plan
after the fifteenth day of the month.  All Capitation Payments shall
be subject, for a period not to exceed three months, to subsequent
adjustment as required to reflect (1) delayed enrollment information
received by Health Plan from Payor's contract holders and (2)
Members changing primary care physicians.

D.   IPA shall provide Health Plan with encounter data on a quarterly
basis relating to payments made for Covered IPA Services.  IPA shall
provide Health Plan with summary data on magnetic tape, floppy disk,
or hard copy in a format acceptable to Health Plan within 30 days
after the end of the quarter.  This format, at a minimum, shall
include:  (1) Member name, (2) Member I.D. number, (3) date of
service, (4) CPT Code/ICD-9 code, (5) billed amount/paid amount, (5)
Member's Primary Care Physician, (6) provider rendering service if
other than Primary Care Physician and (7) coordination of benefits
information.

II.  <u>Covered IPA Services</u>

A.   Except as set forth in Section II.B below, IPA shall be responsible
for paying for the following Covered IPA Services received by IPA
Members:

1998R                                                          06/19/90

-14-

1. Inpatient and outpatient physician services and services of other health care professionals (podiatrists, anesthesia, other mental health providers, audiologists, etc.), including the "professional component" of charges associated with inpatient or outpatient facility services.

2. Outpatient "ancillary" services including lab, x-ray, and other outpatient diagnostic or therapeutic services.

3. Professional services associated with outpatient surgery, including anesthesia.

4. Outpatient professional services for physical, speech, occupational or other rehabilitation therapies.

5. Professional services for infertility treatment when a Covered Service for a Member.  Professional services associated with inpatient treatment for infertility.

6. In-area outpatient Emergency professional services including, but not limited to, medically necessary Emergency care for which prior authorization could not reasonably be obtained (professional services provided within San Diego County).

B. Notwithstanding the foregoing, the following services are not Covered IPA Services and shall be reimbursed pursuant to the terms set forth in Attachment B of this Agreement:

1. All services provided to any Member who requires a transplant, with the exception of corneal transplants, until treatment for the transplant is completed in the opinion of the Health Plan's medical director.

2. All services provided to any Member who diagnosed as HIV+, as of the time of diagnosis.

3. All services provided to any Member who receives burn treatment, where such treatment requires admission to a regional burn center, until such treatment is completed in the opinion of Health Plan's medical director.

III.   Payments to Providers

A. Unless otherwise stipulated in an agreement between IPA and a non-participating provider, IPA shall reimburse such providers within forty-five (45) days of receipt by IPA of a properly completed bill for Covered IPA Services rendered to IPA Members. Health Plan or Payor shall forward any bills it receives for these services to IPA for consideration of payment in accordance with Health Plan and IPA criteria.

1998R                                    06/19/90

B. IPA shall make a reasonable effort to seek reimbursement for Covered IPA Services under other third party coverages when applicable. Such reimbursement shall be retained by IPA as compensation in addition to the Capitation Payments made to IPA by Payor. Payor will provide IPA with information which would assist in efforts to seek reimbursement from third parties, if available.

C. Any disputed payment under this Attachment A-1 which may result in a charge being made against an IPA Member shall be reviewed with Health Plan and Payor, and IPA shall abide by all decisions made by Payor regarding the terms or extent of coverage under the various health benefits plans for Designated Products. In the event Payor authorizes payment for a service as an accommodation to a Member and such service is a non-Covered Service, as determined by Payor, Payor shall pay IPA for such services pursuant to terms set forth in Attachment B of this Agreement. Such payments shall be in addition to any Capitation Payments received. If IPA provides erroneous authorization to an IPA Member patient or provider concerning a Covered IPA Service, and Health Plan has not also authorized such service, that service shall nonetheless be paid for by the IPA out of the Capitation Payment. In the event that IPA fails to make appropriate payment for any Covered IPA Service for which it is responsible under this Attachment A-1, Payor shall have the right to make such payment on behalf of IPA and deduct the amount thereof from any subsequent Capitation Payments due to IPA under Section I of this Attachment A-1.

IV.  **Stop Loss**

A. The liability of IPA for Covered IPA Services rendered to an IPA Member during each twelve (12) month period (the first twelve (12) month period beginning on effective date of the Agreement) shall be limited to one hundred percent (100%) of the first $7,500 worth of Covered IPA Services rendered by IPA to that IPA Member. The basis for calculation of the value of services rendered by IPA in reaching the stop-loss level and the amounts due IPA pursuant to this section, shall be in accordance with the rates set forth in Attachment B of this Agreement and shall be adjusted for any third-party recoveries, co-insurance, copayments and deductibles.

B. IPA is responsible for monitoring the stop-loss and will use its best efforts to notify Health Plan when the cost of Covered IPA Services rendered to any IPA Member reaches seventy-five percent (75%) of the designated stop-loss level within ten (10) days of the occurrence of such event. IPA agrees that Health Plan's Medical Director will be notified of all catastrophic cases and may be, at the discretion of Health Plan, involved in the management of such cases.

1998R

06/19/90

c.  IPA shall submit to Health Plan all claims for payments due IPA for expenses incurred in the provision of IPA Services which are in excess of the stop-loss limits stated above. Such claims shall include the data elements set forth in Section I.D. IPA shall make such claims no later than sixty (60) days after the end of the contract year. Health Plan shall not be responsible for stop-loss claims submitted after said sixty (60) day period. Payments to IPA pursuant to Section IV.A. shall be made within 45 working days following receipt of applicable claims from IPA.

V.  <u>Provision of Services</u>

When unusual or infrequently-used Covered IPA Services are required by IPA and cannot be provided by a Participating Provider, IPA shall arrange for the provision of these services. When arranging for such services, IPA shall first consider utilizing the services of providers which have entered into an Agreement with Health Plan to provide Covered Services to Members. All such services shall be rendered subject to the terms and conditions of this Agreement.

VI.  <u>Access To Records</u>

IPA shall maintain books and records relating to the financial condition of IPA, including financial statements and records relating to payments to Participating Providers and preserve them for the longer of 5 years or such time periods as are required by applicable law, regulations and practices. IPA shall make such records reasonably available to Health Plan, and any applicable Payor; however, IPA shall be required to make books and records relating to the financial condition of IPA available to Health Plan and Payor only to the extent required by law. Any regulatory agency or government, including without limitation, the California Commissioner of Corporations, to the extent required by applicable laws or regulations of such agency, shall also have access at reasonable times upon demand to such records.

1998R

-17-

06/19/90

## ATTACHMENT A-1-1

The capitation rates shown in tables 1 and 2 correspond to the "Product Type" designated in the monthly eligibility lists.

### TABLE 1

| | | PLAN A | | | PLAN B | | | PLAN C | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Office Visit Copay | | $ 0.00 | $ 5.00 | $10.00 | $ 5.00 | $10.00 | $15.00 | $10.00 | $15.00 | $20.00 |
| Children | Under 1 | $76.30 | $73.96 | $72.04 | $73.66 | $71.74 | $70.16 | $71.45 | $69.88 | $64.79 |
| | 1 | 35.27 | 33.87 | 32.65 | 33.73 | 32.52 | 31.47 | 32.39 | 31.34 | 29.07 |
| | 2-6 | 22.74 | 21.25 | 19.89 | 21.13 | 19.77 | 18.47 | 18.47 | 18.36 | 17.56 |
| | 7-18 | 16.52 | 15.46 | 14.49 | 15.37 | 14.41 | 13.50 | 14.33 | 13.42 | 12.77 |
| Male | 19-39 | $23.71 | $22.47 | $21.28 | $22.34 | $21.15 | $20.11 | $21.02 | $19.98 | $19.08 |
| | 40-49 | 36.56 | 34.64 | 32.80 | 34.66 | 32.60 | 30.98 | 32.40 | 30.78 | 29.39 |
| | 50-59 | 60.97 | 58.16 | 55.49 | 57.81 | 55.14 | 52.76 | 54.80 | 52.42 | 50.22 |
| | 60-64 | 86.60 | 83.28 | 80.14 | 82.76 | 79.62 | 76.90 | 79.12 | 76.40 | 73.40 |
| Non-Medicare | 65+ | 113.43 | 108.70 | 104.19 | 107.99 | 103.48 | 99.50 | 102.80 | 98.82 | 95.30 |
| Medicare | 65+ | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 |
| Female | 19-39 | $57.72 | $54.83 | $52.09 | $56.49 | $51.72 | $49.19 | $51.39 | $48.86 | $46.50 |
| | 40-49 | 64.25 | 60.96 | 57.83 | 60.61 | 57.48 | 54.68 | 57.14 | 54.32 | 51.87 |
| | 50-59 | 78.52 | 74.60 | 70.88 | 74.16 | 70.45 | 67.13 | 70.04 | 66.72 | 63.74 |
| | 60-64 | 90.43 | 86.41 | 82.61 | 83.90 | 82.10 | 78.75 | 81.60 | 78.24 | 74.90 |
| Non-Medicare | 65+ | 113.65 | 108.91 | 104.40 | 108.20 | 103.69 | 99.71 | 103.01 | 99.03 | 95.52 |
| Medicare | 65+ | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 |

### TABLE 2
#### Plans G, H, I, and J

| | | Copay | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Office Visit Copay | | $ 0.00 | $ 3.00 | $ 4.00 | $ 5.00 | $ 7.00 | $10.00 | $15.00 | $20.00 |
| Children | Under 1 | $76.30 | $75.37 | $74.27 | $73.96 | $73.29 | $72.04 | $70.46 | $65.37 |
| | 1 | 35.27 | 34.55 | 34.04 | 33.87 | 33.42 | 32.65 | 31.60 | 29.33 |
| | 2-6 | 22.74 | 21.67 | 21.46 | 21.25 | 20.71 | 19.89 | 18.59 | 17.78 |
| | 7-18 | 16.52 | 15.76 | 15.59 | 15.46 | 15.08 | 14.49 | 13.58 | 12.93 |
| Male | 19-39 | $23.71 | $22.84 | $22.62 | $22.47 | $22.01 | $21.28 | $20.25 | $19.35 |
| | 40-49 | 36.56 | 35.22 | 34.88 | 34.64 | 33.92 | 32.80 | 31.18 | 29.79 |
| | 50-59 | 60.97 | 59.04 | 58.51 | 58.16 | 57.13 | 55.49 | 53.11 | 50.91 |
| | 60-64 | 86.60 | 84.36 | 83.66 | 83.28 | 82.10 | 80.14 | 77.43 | 74.44 |
| Non-Medicare | 65+ | 113.43 | 110.08 | 109.25 | 108.70 | 106.98 | 104.19 | 100.21 | 96.69 |
| Medicare | 65+ | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 | 26.03 |
| Female | 19-39 | $57.72 | $55.76 | $55.20 | $54.83 | $53.76 | $52.05 | $49.53 | $47.16 |
| | 40-49 | 64.25 | 61.97 | 61.36 | 60.96 | 59.74 | 57.83 | 55.00 | 52.55 |
| | 50-59 | 78.52 | 75.81 | 75.08 | 74.60 | 73.15 | 70.88 | 67.56 | 64.58 |
| | 60-64 | 90.43 | 87.69 | 86.90 | 86.41 | 84.95 | 82.61 | 79.25 | 75.92 |
| Non-Medicare | 65+ | 113.65 | 110.29 | 109.46 | 108.91 | 107.19 | 104.40 | 100.42 | 96.91 |
| Medicare | 65+ | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 | 26.08 |

1998R

06/19/90

ATTACHMENT B

A.  Subject to third-party recoveries, co-insurance, copayments and deductibles, (1) the valuation of Covered IPA Services for stop loss coverage and (2) the reimbursement rate for services provided which are not Covered Services but which are authorized by Payor (3) the reimbursement rate for services set forth in Section II.B., III.C., and IV.A. of Attachment A-1 and (4) the reimbursement rates for Covered IPA Services set forth in Section 4.A of the Product Description shall be the lesser of:

(1)  An amount based on the 1974 California Relative Value System and the following conversion factors:*

| CATEGORIES | CONVERSION FACTORS |
|---|---|
| Normal Delivery | $1300.00 (per case) |
| C-Section | 1700.00 (per case) |
| Surgery | 142.00 |
| Medicine | 6.50 |
| Radiology | 13.00 |
| Pathology | 1.30 |
| Anesthesiology | 32.00 |

(2)  Participating Provider's usual and customary charge for such service.

---

*  Claims adjudication will be based on CPT-4 procedural coding, and CRVS-74 guidelines.  In areas where a procedure is not listed in CRVS-74, the latest Health Plan relative value schedule will be used with an appropriate conversion factor to assure consistency with CRVS.  Health Plan reserves the right to audit office charges and adjust future payments if records do not reflect levels of service for which claims have been submitted.  Health Plan shall make no adjustment to future payments under this paragraph without advance written notice to Physician Group of at least ten (10) working days.  All surgical claims and emergency room claims must be accompanied with operative reports and progress notes respectively.

1998R

-19-

06/19/90

B. For services provided which are not Covered IPA Services which are authorized by Payor and for Covered Services set forth in Section II.B. of Attachment A-1, IPA shall use its best effort to submit all claims for such services to the party designated by Health Plan within sixty (60) days after such services are rendered. Payor will not be obligated to pay for such services unless a claim for such services is submitted to the appropriate party within one hundred and twenty (120) days after the service is rendered. IPA shall submit such claims on billing form HCFA-1500. Payor shall pay IPA for Participating Providers' claims for such services within forty-five (45) working days of receipt, when such claims are accurate, complete and in the form designated above, subject to applicable COB and other nonduplication of payment rules. Individual Participating Providers shall not be entitled to direct payment from Payor for services rendered to Members.

1998R

-20-

06/19/90

PRODUCT DESCRIPTION
for the
Health Maintenance Organization ("HMO") Product

1.      IPA and Provider shall participate in the "HMO Product".  Under the HMO
        Product, HMO Members must select and use only Participating Providers.

2.      IPA and Participating Provider shall provide Covered Services which are
        covered under health benefits plans with a HMO feature ("HMO Covered
        Services") to Members eligible to receive such services ("HMO Members")
        pursuant to the terms of this Agreement.

3.      For the HMO Product, the Payor shall be Health Plan.  Such Payor shall
        be responsible for payment for HMO Covered Services for its respective
        health benefits plans.

4.      A.   For the HMO Product, the compensation arrangements set forth in
             Attachment A-1 of the Agreement shall apply to those HMO Members who
             are listed on Health Plan's monthly eligibility lists as capitated
             patients.  For the HMO Product, generally, the compensation
             arrangements set forth in Attachment A-1 of the Agreement shall not
             apply to those HMO Members who are listed on Health Plan's monthly
             eligibility lists as fee-for-service patients ("Fee-For-Service HMO
             Members").  Instead, for Fee-For-Service HMO Members, Participating
             Providers shall be compensated on a fee-for-service basis pursuant
             to the terms set forth in Attachment B.  For Fee for Service
             Members, a fifteen percent (15%) withhold shall be taken on net
             amounts paid for Specialist Physician HMO Covered Services, except
             normal vaginal deliveries, and a ten percent (10%) withhold shall be
             taken on net amounts paid for Primary Care Physician HMO Covered
             Services, except normal vaginal deliveries. ("HMO Withhold Amounts")

5.      For Fee for Service HMO Members, the following risk sharing mechanism
        shall apply to the HMO Product:

        A.   Each primary care physician shall be assigned, after consultation
             with IPA, to an "HMO Medical Services Pool" with other primary care
             physicians in IPA.

        B.   The following HMO Withhold Amounts shall be credited, for accounting
             purposes, to the "HMO Medical Services Risk Sharing Fund" for each
             HMO Medical Services Pool: (1) HMO Withhold Amounts attributable to
             primary care physicians assigned to a particular HMO Medical
             Services Pool which relate to HMO Covered Services and (2)
             two-thirds (2/3) of the specialist physician services HMO Withhold
             Amounts attributable to those HMO Covered Services provided to Fee
             for Service HMO Members who have selected primary care physicians
             assigned to such HMO Medical Services Pool as their primary care
             physicians ("Medical Services Pool HMO Members") ("HMO Medical
             Services Withhold Amounts").

1998R                                                              06/19/90

C.  Health Plan shall determine a monthly budgeted amount, on an age/sex basis, for expenses for "HMO Medical Services", as defined below, for each Medical Services Pool HMO Member.  HMO Medical Services shall mean all Covered Services except (1) those services described in Attachment I of this Product Description, (2) mental health/chemical dependency services, (3) pharmacy, and (4) expenses relating to out-of-area emergency care.  For purposes of this Product Description out of area emergency care shall mean out of area emergency services rendered outside of San Diego County.  The budgeted amounts will be adjusted for catastrophic expenses as described in Section 5.F of this Product Description.  Such budgeted amounts shall be credited, for accounting purposes, to the appropriate HMO Medical Services Pool.

D.  Settlement of each HMO Medical Services Pool shall be performed within one hundred and twenty (120) days after the end of each "Distribution Period", as set forth below.  Distribution Period means the annual periods beginning each August 1. September (see amendment)

E.  At the end of each Distribution Period, Health Plan shall calculate the balance for each HMO Medical Services Pool for that Distribution Period by subtracting from the budgeted amounts for that Distribution Period in the appropriate HMO Medical Services Pool (1) the total amount of claims paid for HMO Medical Services provided to Medical Services Pool HMO Members during that Distribution Period, including any applicable HMO Medical Services Withhold Amounts and adjusted as described in Section 5.F of this Product Description and (2) Health Plan's estimate of the total claims which have been incurred, but not paid for HMO Medical Services provided to Medical Services Pool HMO Members during that Distribution Period, including any applicable HMO Medical Services Withhold Amounts and adjusted as described in Section 5.F of this Product Description.

F.  If the total amount of claims paid for HMO Medical Services provided to a Medical Services Pool HMO Member exceeds $7,500 during a Distribution Period, such amounts in excess of $7,500 will not be charged against the budget of the applicable HMO Medical Services Pool.

G.  If the balance in an HMO Medical Services Pool for that Distribution Period after the calculation described in  Section 5.E of this Product Description is positive, all of the HMO Medical Services Risk Sharing Fund for that Distribution Period shall be paid to IPA.

H.  If the balance in an HMO Medical Services Pool for that Distribution Period after the calculation described in Section 5.E of this Product Description is negative, all of the deficit shall be deducted from the HMO Medical Services Risk Sharing Fund for that Distribution Period, up to the HMO Medical Services Withhold Amounts.  If any amounts are remaining in the HMO Medical Services Risk Sharing Fund after making such deduction, such remaining amounts shall be paid to IPA.

1998R                                                                                06/19/90

I.   In the event Physician performs Covered IPA Services referred by primary care physicians who have agreed to risk sharing mechanism other than the risk sharing mechanism set forth in Section 5, his/her HMO Medical Services Withhold Amounts will be credited to such primary care physician's HMO Medical Services Pool and utilized and distributed pursuant to the terms applicable to such pool.  In addition, as to such services, Physician shall be entitled to surplus sharing pursuant to the terms applicable to such pool, rather than to the terms of this Agreement.  Health Plan shall provide Physician with information relating to such other risk sharing mechanisms upon request.

6.   In the event the bed days per thousand, considering stays at all hospitals, excluding days utilized for mental health and chemical dependency, ("Bed Days Per Thousand") exceed 265 for Fee for Service HMO Members who have selected IPA Primary Care Physicians who have designated Grossmont District Hospital ("Hospital") as their Health Plan admitting hospital during a Distribution Period, one-third (1/3) of the Specialist Physician Withhold Amounts attributable to the HMO Covered Services provided to such Fee for Service HMO Members during such Distribution Period ("HMO Hospital Withhold Amounts") shall be paid to Health Plan.  If the Bed Days Per Thousand for such Fee for Service HMO Members meet or are less than 265, each Specialist Physician's HMO Hospital Withhold Amounts for that Distribution Period which relate to such HMO Members will be returned to IPA.

7.   Notwithstanding the foregoing, for any Distribution Period or portion of a Distribution Period which follows the date that Hospital is paid on a capitated basis, HMO Hospital Withhold Amounts attributable to HMO Covered Services provided to such Fee for Service HMO Members during such period shall be paid as jointly specified in writing by IPA and Hospital.

8.   For the HMO Product, in the event the IPA has confirmed an HMO Member's eligibility through Health Plan via telephone or in writing prior to services being provided pursuant to Health Plan procedures and (1) it is subsequently determined that such patient is not eligible for coverage and (2) IPA provides Health Plan with evidence that it has unsuccessfully sought payment for such charges for such patient or the person having legal responsibility for such patient and if applicable, from another payor, including the federal and state governments, through three thirty (30) day billing cycles, HMO Payor shall pay IPA for uncollected charges pursuant to the terms set forth in Attachment B of this Agreement.

9.   For the HMO Product, Health Plan shall delegate certain UM/QA functions to IPA upon review and approval of IPA's UM/QA plan by Health Plan.  Health Plan's approval of such plan shall not be unreasonably withheld.

1998R                                                                    06/19/90

ATTACHMENT I
HMO PRODUCT DESCRIPTION

The following services are excluded from the HMO Medical Services Pool:

I.      Inpatient Hospital Services

   A.   Services and Facilities

        All inpatient hospital services provided for the medical or
        surgical prevention, diagnosis and treatment of illness or
        injury.  This includes:

        1.  General medical/surgical accommodations in semi-private rooms
            (four patients or less) or private rooms if medically
            necessary.

        2.  Intensive care unit services if medically necessary.

        3.  Newborn nursery services including all levels of neonatal ICU.

        4.  Obstetric and delivery room services.

        5.  All operating room services.

II.     Ancillary Services and Supplies

        The following inpatient services, supplies, and facilities, when
        provided to hospitalized Member:

        A.  Routine and intensive nursing services including special duty
            nursing when medically necessary as determined by the Health Plan.
        B.  Respiratory therapy services (including oxygen and pulmonary
            function testing)
        C.  Physical therapy, occupational therapy and speech therapy (for
            short term rehabilitation)
        D.  Social service and discharge planning services
        E.  Dietary counseling and education

F. Surgical and anesthetic supplies

G. All medications

H. Surgically implanted devices

I. Administration of blood and blood derivatives

J. Clinical laboratory studies and services (excluding professional services)

K. Cytology and pathology services

L. Radiology services including x-rays, fluoroscopy and tomography (excluding professional services)

M. Computerized tomography (CT)

N. Magnetic resonance imaging (MRI/NMR)

O. Ultrasound

P. Nuclear medicine scans

Q. Echocardiograms

R. Nuclear cardiology studies

S. Cardiac stress testing

T. Angiography

U. EKG/ECG (including holter monitor)

V. EEG

W. EMG

X. ENG

Y. Hemodialysis

Z. Radiation therapy and radioactive implants (excluding professional services)

AA. Casts, splints, and dressings

BB. Any other services considered to be customarily a hospital inpatient service.

III. Outpatient Services

A. The facility costs, equipment and supplies for outpatient surgery. Hospital may provide outpatient surgical services in its own facilities or through arrangements with another facility pursuant to contracts approved by Health Plan.

B. The facility costs for emergency room services.

IV. Alternatives to Hospital Care

A. Skilled Nursing Care

Care in a skilled nursing facility when the Member meets Medicare criteria for skilled nursing care.

B. Custodial or domiciliary care is not a Covered Service and is therefore not a Covered Hospital Service. However, the Hospital may arrange and pay for care to be provided in a subacute setting acceptable to the Health Plan if such an arrangement would reduce Hospital's costs.

**CERTIFICATE OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) and not a party to the within action; my business address is 225 South Lake Street, Ninth Floor, Pasadena, California 91101.

On January 16, 1997, I served the foregoing:

**ERRATA TO SECOND AMENDED COMPLAINT**

on the following parties in this action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California addressed as follows:

PAUL H. ROEDER
GRAY CARY WARE FREIDENRICH, APC
401 B. Street, Suite 1700
San Diego, CA 92101-4297

DEAN HANSELL
ALLYSON S. TAKETA
LeBOEUF, LAMB, GREENE & MacRAE, L.L.P.
Citicorp Center, 36th Floor
725 S. Figueroa Street
Los Angeles, CA 90017-5436

DAVID FLORIN
MICHAELS, WISHNER & BONNER, P.C.
1140 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20030-4036

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 1997 at Los Angeles, California.

MARISA STEWART

errata.2ad

# EXHIBIT B

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D

Stephen M Kelly Clerk

MAR 2 8 2000

Court of Appeal Fourth District

| | |
|---|---|
| EAST COUNTY PHYSICIANS MEDICAL GROUP, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> AETNA LIFE AND CASUALTY INSURANCE COMPANY et al., <br><br> Defendants and Respondents. | D030865 <br><br> (Super. Ct. No. 701044) |

APPEAL from a judgment of the Superior Court of San Diego County, S. Charles Wickersham, Judge.  Reversed with directions.

Plaintiff East County Physicians Medical Group, Inc. (Medical Group) appeals from a summary judgment in favor of defendants Aetna Life and Casualty Insurance Company and Aetna Health Plans of California, Inc. (collectively Aetna).  Medical Group contends the court erred in summarily adjudicating its causes of action against Aetna for breach of contract, intentional interference with contractual relations, and intentional interference with prospective economic advantage.

Medical Group also challenges the court's order sustaining Aetna's demurrer to its cause of action for unfair competition. We conclude the court erred in sustaining Aetna's demurrer to the cause of action for unfair competition and summarily adjudicating the causes of action for breach of contract and intentional interference with contractual relations.

FACTUAL AND PROCEDURAL BACKGROUND

Medical Group is an independent physicians association (IPA) formed for the purpose of providing managed care medical services to health maintenance organizations (HMO's) and other health plans. Medical Group contracts with various HMO's and health plans to provide the services of its physician members on a reduced cost basis. Aetna is a health insurer that offers an HMO option known as "Aetna Choice."

In July 1990 Medical Group contracted with Aetna to provide physician services within a six-mile radius of Grossmont Hospital, referred to as the Grossmont service area, to persons enrolled in Aetna health plans. Section II, paragraph C (Section II(C)) of the contract required Aetna to give Medical Group an opportunity to provide covered services within its specified service area before contracting with another IPA to provide those services, unless the other IPA had contracted with Aetna as of the effective date of Medical Group's contract. Section II(C) further provided: "In the event [Aetna] provides

2

written notice to [Medical Group] that additional participating physicians are needed, [Medical Group] shall contract with additional Primary Care Physicians within thirty (30) days of the date of the notice and shall contract with additional Specialist Physicians within sixty (60) days of the date of the notice.  In the event [Medical Group] fails to contract with physicians within the time frames specified, [Aetna] may directly contract with such providers, other physicians, or other physicians groups."

Section V, paragraph A provided, in part, that the term of the agreement was one year, and that the agreement would "automatically renew thereafter for one-year terms, unless terminated pursuant to this section.  This Agreement may be terminated without cause at the end of the initial term or on any anniversary date . . . by either party giving the other party ninety (90) days' prior notice."

Medical Group's contract with its individual physician members did not preclude the physicians from belonging to other IPA's in addition to Medical Group, but rather expressly provided:  "Nothing in this Agreement shall be deemed to establish an exclusive arrangement between PHYSICIAN and [Medical Group] nor preclude PHYSICIAN or [Medical Group] from entering into any other agreement."  It also provided that

3

either party could terminate the agreement for any reason on 90 days' written notice.

Sometime during the early 1990's, six physicians affiliated with Family Practice Associates of San Diego, Inc. (FPA) joined Medical Group. At that time FPA did not have a contract with Aetna. As of July 1993, the FPA physicians were the primary care physicians for about 1,200 Aetna enrollees through the contract between Aetna and Medical Group. On July 30, 1993, the six FPA physicians gave Medical Group and Aetna written notice that they were terminating their Medical Group membership as of November 1, 1993.

In response, Aetna sent Medical Group a letter dated September 16, 1993, stating that under section II(C) of their contract the letter would "serve as notification of [Aetna's] request for [Medical Group] to retain [its] contractual relationship with FPA." Aetna noted there were about 1,200 Aetna enrollees assigned to the FPA physicians in an area that was geographically important to Aetna, and that FPA maintained agreements independent of Medical Group with health plans that would be competing with Aetna in the upcoming open enrollment period. Consequently, Aetna stated that to maintain current membership, it was imperative that FPA continue to participate as providers for Aetna. The letter concluded: "If [Medical Group] is unable to reach an agreement to move forward with

4

[FPA] within the next thirty days, [Aetna] will be required to initiate negotiations directly with FPA."

On October 14, 1993, two days before expiration of the 30-day period referenced in Aetna's September 16 letter to Medical Group, Aetna and FPA executed a memorandum of understanding (MOU) that provided it was to be effective on November 1, 1993, and continue in effect until an IPA agreement was executed by both parties or it was rescinded in writing by either party. On October 25, Aetna and FPA entered into a formal IPA contract.

The Aetna-Medical Group contract was renewed in 1994. Soon thereafter, Medical Group asked to negotiate for the October 1995 renewal, hoping to obtain better terms. Aetna agreed to negotiate. During the course of those negotiations, Aetna decided not to renew Medical Group's contract in 1995, in part because it was of the opinion that Medical Group was not financially viable. On December 5, 1994, Aetna sent Medical Group a letter containing notice that it would not renew the contract.

In August 1995, Aetna sent letters to Medical Group's primary care physicians informing them that its contract with Medical Group would terminate on October 1 and they would no longer be able to participate in Aetna through Medical Group after September 30. The letter stated: "Our desire is to continue our relationship with you by transferring your

5

participation to an existing contracted IPA or medical group."
The letter further stated that if Aetna did not receive
notification of the physician's participation in one of Aetna's
contracted groups by August 31, Aetna would begin the process of
transferring the physician's Aetna enrollees to one of its
contracted primary care physicians.  Aetna also wrote to certain
of its contracted IPA's informing them of the letter it had sent
to Medical Group's primary care physicians and requesting their
"cooperation in expediting the recruitment of these physicians."
Medical Group claims that as a result of Aetna's conduct, it
lost two-thirds of its primary care physicians and its number of
patients diminished from about 16,000 to about 3,000.

Medical Group filed a second amended complaint (the
complaint) against Aetna and FPA[1] including causes of action for
violation of the Cartwright Act, civil conspiracy, breach of
contract, unfair competition, intentional interference with
contractual relations, intentional interference with prospective
business advantage, inducing breach of contract, and trade
libel.  The complaint added class action allegations and named
one of Medical Group's physicians as a representative plaintiff
suing on behalf of similarly situated members of Medical Group.

Aetna filed a demurrer attacking the class action
allegations as well as the first, second and fourth causes of

---

[1]   Medical Group's appeal was dismissed as to FPA due to FPA's
bankruptcy.

6

action for violation of the Cartwright Act, civil conspiracy, and unfair competition, respectively.  In addition, Aetna joined in FPA's demurrer, which included a general demurrer to the first, second, and fourth through seventh causes of action on the ground Medical Group and its co-plaintiff physician lacked standing to sue on behalf of Medical Group's individual physicians who were not named in the complaint.  Aetna also joined in FPA's motion to strike third-party beneficiary allegations from the complaint.  Medical Group opposed the demurrers and filed an unsuccessful motion for class certification.

The court sustained the demurrers to the first, second and fourth causes of action without leave to amend and also sustained without leave to amend "[d]efendants' demurrers to the first, second, fourth, fifth, sixth, and seventh causes of action pled on behalf of [the individual physician plaintiff] and the other physician shareholders of [Medical Group] . . . for lack of standing."  The court deemed FPA's motion to strike moot based on its ruling on the demurrers.

Aetna moved for summary judgment on Medical Group's remaining causes of action.  The court granted summary judgment and denied Medical Group's subsequent motion for reconsideration.

## DISCUSSION

I.   *Demurrer to Cause of Action for Unfair Competition*

Medical Group contends the court erred in sustaining Aetna's demurrer to its fourth cause of action for unfair competition under Business and Professions Code section[2] 17200 et seq.

Preliminarily, we note that an order sustaining a demurrer is not separately appealable, but is reviewable on appeal from the final judgment.  (*Shepardson* v. *McLellan* (1963) 59 Cal.2d 83, 88; Code Civ. Proc., § 472c, subd. (b)(1).)  In reviewing the sustaining of a demurrer without leave to amend, we accept as true all facts properly pleaded in the complaint and all reasonable inferences that may be drawn from those facts. (*Aubry* v. *Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967; *Dubins* v. *Regents of University of California* (1994) 25 Cal.App.4th 77, 82.)  We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context to determine whether its factual allegations are adequate to state a cause of action under any legal theory. (*Quelimane Co.* v. *Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.)

Section 17200 of the Unfair Competition Act (UCA) (§ 17200 et seq.) defines "unfair competition" to "mean and include any

---

[2]   All further statutory references are to the Business and Professions Code unless otherwise specified.

8

unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" under section 17500. A claim made under section 17200 "'is not confined to anticompetitive business practices, but is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct. [Citation.] Thus, California courts have consistently interpreted the language of section 17200 broadly.'" (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 877, quoting *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 519.)

"Injunctive relief and restitution are the remedies provided by the UCA. [Citation.] It is not necessary to show the defendant intended to injure anyone since a violation of the UCA is a strict liability offense. [Citation.] Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition--acts or practices which are unlawful, or unfair, or fraudulent. 'In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa.' [Citation.] . . . [¶] The independent 'unfairness' prong of the UCA is 'intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.] The test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons,

9

justifications and motives of the alleged wrongdoer.  In brief,
the court must weigh the utility of the defendant's conduct
against the gravity of the harm to the alleged victim . . . .  [
Citations.]" . . . .'  [Citation.]"  (*Podolsky* v. *First
Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647.)  This court
has held that "'an "unfair" business practice occurs when it
offends an established public policy or when the practice is
immoral, unethical, oppressive, unscrupulous or substantially
injurious to consumers.'  [Citation.][3]"  (*South Bay Chevrolet
v. General Motors Acceptance Corp.*, *supra*, 72 Cal.App.4th at pp.
886-887.)

Regarding the process of weighing the utility of the
defendant's conduct against the gravity of the harm to the
alleged victim, the Court of Appeal in *Motors, Inc.* v. *Times
Mirror Co.* (1980) 102 Cal.App.3d 735, 740, observed:  "While
this process is complicated enough after a hearing in which the
defendant has revealed the factors determining the utility of
his conduct, it is really quite impossible if only the plaintiff

---

3      In a footnote at this point, we noted:  "This definitional
language . . .  has been disapproved by the Supreme Court as
'too amorphous' and as providing 'too little guidance to courts
and businesses' in a case involving an action by a competitor
alleging anticompetitive practices.  [Citation.]  However, the
Supreme Court's discussion of such language was expressly
limited to the competitor context and specifically stated not to
relate to 'actions by consumers.'  ([*Cel-Tech Communications,
Inc.* v. *Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th
163,] 187, fn. 12.)"

has been heard from, as is the case when it is sought to decide the issue of unfairness on demurrer.  Therefore--since the complaint is unlikely to reveal defendant's justification--if that pleading states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story.  If, as will often be the case, the utility of the conduct clearly justifies the practice, no more than a simple motion for summary judgment would be called for."  (Fn. omitted.)

In *Cel-Tech Communications, Inc.* v. *Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at page 187, the California Supreme Court addressed the meaning of "unfairness" in the context of an action under the UCA against a direct competitor of the plaintiff.  *Cel-Tech* concluded:  "[T]o guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition.  We thus adopt the following test:  When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its

11

effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (Fn. omitted.)

The court's stated reason for sustaining Aetna's demurrer to Medical Group's fourth cause of action for unfair competition was that Medical Group failed "to plead facts sufficient to support a valid cause of action against Aetna. All of the facts that would support such a claim are pled against FPA." We disagree with that conclusion. The fourth cause of action states it is brought against all defendants and incorporates by reference all of the preceding allegations of the complaint. The only allegation of wrongful conduct in the fourth cause of action itself is the allegation in paragraph 133 that "the FPA Defendants operate in violation of numerous California Regulatory Laws and Statutes[,]" which allegedly has "enabled the FPA Defendants to unfairly compete against [Medical Group]." It is clear that the "acts complained of herein" and "acts committed by Defendants alleged hereinabove" referred to in paragraph 136 of the fourth cause of action are acts alleged in the incorporated paragraphs preceding the fourth cause of action. Hence, we consider those allegations in determining

whether the complaint states a cause of action for unfair competition.[4]

We conclude the complaint states sufficient facts to constitute a cause of action for unfair competition against Aetna. The complaint alleges the following facts. Aetna conspired with the FPA defendants to restrain trade and eliminate Medical Group as a direct competitor of FPA and other IPA's in the relevant market. The FPA defendants were not financially successful but maintained an appearance of profitability by not properly funding or referring patients to specialty care.

When FPA left Medical Group, Aetna contracted directly with FPA and other IPA's to provide medical services to Aetna enrollees in the Grossmont service area in violation of Medical Group's right of first refusal to provide those services under section II(C) of its contract with Aetna. In furtherance of its conspiracy with the FPA defendants, Aetna directed FPA and other Aetna-contracted IPA's to solicit Medical Group's primary care physicians to breach their contracts with Medical Group by leaving Medical Group and joining a competing IPA. As a result, Medical Group lost at least 48 of its contracted primary care physicians and consumer welfare was harmed by the lack of

_____

4    We note that Medical Group stipulated to withdraw certain paragraphs from the complaint and do not consider those paragraphs.

quality care provided to Aetna enrollees by FPA.  Additionally,
defendants wrongfully gained access to Medical Group's trade
secrets and competitive planning information.

Also in furtherance of its conspiracy with the FPA
defendants, Aetna issued notice of termination of its contract
with Medical Group 10 months in advance of the termination date
and widely disseminated the notice to primary care physicians
and IPA's in Medical Group's geographical market.  Aetna falsely
stated that its reason for the termination was Medical Group's
weak financial position.  Aetna's notice of termination was
pretextual, as Aetna knew Medical Group was not actually
financially weak.  Aetna's real objective was to eliminate
Medical Group as a competitor of FPA and other Aetna-contracted
competitors.  The premature notice of termination caused primary
care physicians under contract with Medical Group to terminate
their contracts and transfer to FPA and other IPA's, taking
their Aetna enrollees with them.  Aetna facilitated that process
by instituting a new policy of allowing Aetna enrollees to stay
assigned to their primary care physician when the physician
transferred from one Aetna-contracted IPA to another.  Aetna's
previous policy was that when a physician left a medical group,
his or her patients would remain with the medical group unless
they requested a transfer to the new group.  In furtherance of
its conspiracy with Aetna, FPA directly solicited Medical

Group's primary care physicians by telling them it was going to take over Medical Group's Aetna subscribers and offering them above-market capitation rates.[5]  As a result of paying such above-market compensation, FPA approved fewer specialist referrals by primary care physicians with the result that Aetna enrollees did not receive appropriate treatment and care.  Thus, as a direct consequence of Aetna and FPA's conspiracy, competition was injured and the quality of care provided to consumers adversely affected.

The complaint also contains allegations of Aetna's direct solicitation of Medical Group physicians through its August 1995 letter informing the physicians that its contract with Medical Group was about to terminate and that they would no longer be able to participate in Aetna through Medical Group unless they transferred their participation to a contracted IPA or medical group.  As a result of the defendants' conduct, Medical Group allegedly lost two-thirds of its primary care physicians and its number of patients diminished from about 16,000 to about 3,000.

In addition to the numerous allegations of conspiracy between Aetna and FPA throughout the factual background section of the complaint, Medical Group alleged that "each of the

_____

[5]   Payment on a "capitation" basis means the physician's reimbursement from a health plan is calculated on a per capita basis, with a flat rate paid for each individual enrolled in the plan during a particular time period.  (See *Solorzano* v. *Superior Court* (1992) 10 Cal.App.4th 1135, 1141.)

Defendants was either the agent or the employee of each of the other Defendants and in doing the acts alleged herein was acting within the course and scope of such agency."

Viewing these allegations and the facts reasonably inferable from them as true, we conclude the complaint sufficiently states a cause of action for unfair competition under section 17200. The allegations depict a conspiracy between Aetna and FPA to eliminate Medical Group as a competitor in the East County primary care market by inducing its primary care physicians to leave it and affiliate with FPA and other IPA's under contract with Aetna, with resultant harm to competition and the quality of patient care. The defection of Medical Group's primary care physicians was accomplished in part by Aetna's intentional misrepresentation that Medical Group was financially weak. A reasonable inference from the allegations of the Aetna-FPA conspiracy to eliminate Medical Group as a competitor and the allegations of FPA's reluctance to approve referrals to specialists is that Aetna sought to save costs associated with specialty referrals by shifting primary care services for its enrollees from Medical Group to FPA, at the expense of quality care for its enrollees. The complaint adequately alleges conduct on the part of Aetna that "significantly threatens or harms competition" and is thus "unfair" within the meaning of section 17200 and *Cel-Tech.*

(*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 187.)   The court erred in sustaining Aetna's demurrer to Medical Group's fourth cause of action for unfair competition.

II.   *Intentional Interference with Contractual Relations*

Medical Group contends the court erred in granting summary judgment as to its cause of action against Aetna for intentional interference with contractual relations.   "On appeal from a ruling on a motion for summary judgment, the appellate court conducts its own independent review of the moving and opposition papers and applies the same standard as the trial court in determining whether the motion was properly granted.   The appellate court is not bound by the trial court's stated reasons for its ruling on the motion, as the appellate court reviews only the ruling and not its rationale.   [Citation.]"   (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 873.)

The elements of a "cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.   [Citations.]"   (*Pacific Gas &*

17

*Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.)
It is unnecessary to prove an actual breach; the plaintiff need
only establish interference with or disruption of his or her
contractual relations.  (*Id.* at p. 1129.)

    In its fifth cause of action for intentional interference
with contractual relations, Medical Group alleged that the
defendants "intended to disrupt [Medical Group's] actual
contractual relations with its physicians and patients by
inducing them not to do business with [Medical Group] when each
of them would have done business with [Medical Group] but for
said acts of interference."

    Aetna sought summary adjudication of the fifth cause of
action on the ground there was no evidence that it intended to
disrupt Medical Group's contractual relationships with its
member physicians.  Noting that the non-exclusivity clause
Medical Group's contracts with its physicians allowed the
physicians to continue as members of Medical Group despite
affiliation with another Aetna-contracted IPA, Aetna contended
it wrote to Medical Group physicians and other Aetna-contract
IPA's simply to transition the care of Aetna enrollees who were
then assigned to Medical Group.  As evidentiary support for that
contention, Aetna cited a paragraph in the declaration of its
"Senior Network Manager" Lisa Luster, in which she stated that
she directly participated in the meetings in which the decision

18

to write to Medical Group physicians and Aetna-contracted IPA's was discussed and that she was responsible for preparing the letters to those parties on Aetna's behalf.  Luster declared: "Aetna did not intend to disrupt or otherwise affect the relationship between [Medical Group] and its member physicians by its actions; to the contrary, we simply wanted to provide a means through which continuity of care for Aetna enrollees could be preserved. · Aetna was aware that [Medical Group] physicians could be members of multiple IPAs, thus their affiliation with another Aetna-contracted IPA did not mean they had to terminate from [Medical Group]."

The court ruled the fifth cause of action "fails as a matter of law because there is no evidence that Aetna intended to disrupt the contractual relationship between [Medical Group] and any of its member physicians.  Because those physicians were free to participate in multiple IPAs, Aetna's solicitation to join other IPAs was not a solicitation for them to sever their relations with [Medical Group].  There is no evidence that Aetna intended such a result and there is no rationale for them to desire such a result."

Medical Group contends Aetna failed to meet its burden of showing the absence of a factual issue as to whether it intended to interfere with Medical Group's contracts, as it merely relied on Luster's declaration that it did not act with bad intent.

Medical Group points out that under Code of Civil Procedure section 437c, subdivision (e), the court has discretion to deny summary judgment "where a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof." Aetna cites *Golden West Baseball Co.* v. *Talley* (1991) 232 Cal.App.3d 1294, 1306 for the proposition that "the converse is also true, and a court has the discretion to grant a motion for summary judgment under such circumstances as well."

We agree with Medical Group that Aetna failed to establish the absence of factual issue as to whether it intended to interfere with Medical Group's contracts its member physicians. When a party's motive or intent is the central issue, the trier of fact must often rely heavily on circumstantial evidence and inferences and need not accept self-serving declarations of intent. (See *Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 334.) Here, the evidence of Aetna's efforts to persuade Medical Group physicians to join other Aetna-contracted IPA's upon the termination of its contract with Medical Group gives rise to an inference that Aetna intended to disrupt or interfere with Medical Group's contractual relationships with those physicians -- i.e., the trier of fact could reasonably find that Aetna's conduct was substantially certain to interfere with Medical Group's physician contracts and

20

infer intent from that fact. (See *Savage* v. *Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 450.) "The court has no power in a summary proceeding to weigh one inference against another, or against other evidence . . . . [Citation.]" (*Murillo* v. *Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 841.) Accordingly, the court erred in basing summary judgment on Luster's self-serving declaration of intent in the face of conflicting inferences reasonably drawn from other evidence.[6] The record presents a triable issue of fact as to whether Aetna intended to interfere with Medical Group's contractual relationships with its physicians.

### III. Intentional Interference with Prospective Economic Advantage

The elements of a cause of action for intentional interference with prospective economic advantage are "'"(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately

---

[6]   We do not base our conclusion that summary judgment was improper on the declaration of Medical Group employee Gerald S. Higgins or expert witness John M. Edelston, as we find the court properly sustained Aetna's evidentiary objections to those declarations.

caused by the acts of the defendant."  [Citations.]'

[Citation.]"  (*LiMandri* v. *Judkins* (1997) 52 Cal.App.4th 326,

339.)  Additionally, the plaintiff must plead and prove that the

defendant "engaged in conduct that was wrongful by some legal

measure other than the fact of interference itself."  (*Della*

*Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376,

393; *LiMandri* v. *Judkins, supra,* 52 Cal.App.4th at p. 340.)  The

court granted summary judgment as to Medical Group's cause of

action for intentional interference with prospective economic

advantage on the ground there was no evidence that Aetna engaged

in wrongful conduct apart from the alleged interference itself.

The court ruled correctly.

In *LiMandri*, we noted that "*Della Penna* did not specify

what sort of conduct would qualify as 'wrongful' apart from the

interference itself.  Justice Mosk's concurring opinion in *Della*

*Penna* suggested the wrongfulness requirement would be satisfied

by conduct that is independently tortious or a restraint of

trade.  [Citation.]  The Oregon Supreme Court suggested the

requirement of wrongful conduct would be satisfied by conduct

that violates a statute, regulation or recognized rule of common

law.  [Citations.]  In *Willard* v. *Caterpillar, Inc.* (1995) 40

Cal.App.4th 892, the court tested the defendant's alleged

intentional spoliation of evidence, an offshoot of intentional

interference with prospective economic advantage, for

'wrongfulness' under *Della Penna* in light of the suggestion in the Restatement Second of Torts that 'conduct which is "illegal or unfair or immoral according to the common understanding of society" may subject one to tort liability. [Citation.]' (*Id.* at p. 920.)" (*LiMandri* v. *Judkins, supra,* 52 Cal.App.4th at pp. 340-341.)

In the present case, the evidence fails to raise a triable issue as to whether Aetna's interference with Medical Group's prospective economic advantage was independently wrongful. Medical Group argues that Aetna's conduct was wrongful (apart from interfering with Medical Group's prospective economic advantage) because Aetna sought to recruit Medical Group's members to other IPA's with tortious intent reflected by (1) its orchestrated campaign to save money by shifting patients to IPA's where they would receive less care; (2) the simultaneous occurrence of its attempt to recruit Medical Group physicians and its "premature" termination of its contract with Medical Group; (3) its fraudulent conduct; and (4) its purported termination of its contract with Medical Group on the false ground of Medical Group's lack of financial viability. The first and second of these enumerated circumstances do not

23

reflect independently wrongful conduct, but rather constitute Aetna's alleged interference itself.[7]

Aetna's "premature" termination of its contract with Medical Group and alleged false ground for that termination are immaterial because those acts are separate from Aetna's alleged interference with Medical Group's prospective economic advantage, which Medical Group specifies on appeal as Aetna's recruitment of Medical Group's physicians to other IPA's.[8]  As we pointed out in *LiMandri*, under *Della Penna* "' . . . a plaintiff **seeking to recover** for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's *interference* was wrongful "by some other measure beyond the fact of the interference itself." [Citation.]'  [Citation.]  Thus, the plaintiff must allege the conduct constituting the interference was itself wrongful by some other measure beyond the fact it amounted to interference. It **is insufficient to allege** the defendant engaged in tortious

---

[7]   To the extent Medical Group contends Aetna's alleged motive of **saving money by shifting** patients to IPA's where they would receive *less care renders* Aetna's interference independently wrongful, we note that although such a motive can be inferred from the allegations in Medical Group's complaint, Medical Group presented no evidence on that point in opposing summary judgment.

[8]   In its opposition to Aetna's motion for summary judgment, Medical Group specified, as its prospective business advantage, "the Aetna subscribers and enrollees its physicians were servicing."

conduct distinct from or only tangentially related to the conduct constituting the actual interference."  (*LiMandri v. Judkins, supra,* 51 Cal.App.4th at p. 342.)  Aetna's alleged misrepresentation regarding Medical Group's financial condition and allegedly improper premature termination of Medical Group's contract were distinct from its alleged interference with Medical Group's prospective advantage by recruiting Medical Group's physicians to join other IPA's.

Finally, Medical Group's contention that Aetna engaged in fraudulent conduct is supported only by a citation to a single page of the deposition of Lloyd Stephen Nelson, a former chief executive of Medical Group who was discharged in October 1993. The cited page contains Nelson's conclusory statement that he believes "Aetna committed fraud against [Medical Group], extensively, and . . . in very large dollar amounts."  Medical Group cites no testimony by Nelson or other evidence supporting Nelson's conclusory charge of fraud on the part of Aetna or connecting the alleged fraud with Aetna's alleged interference with Medical Group's prospective economic advantage.  Hence, Nelson's testimony does not raise a triable issue of fact as to whether Aetna engaged in acts of interference with Medical Group's prospective economic advantage that were wrongful apart from the interference itself.  The court did not err in summarily adjudicating Medical Group's sixth cause of action for

intentional interference with prospective economic advantage in Aetna's favor.

### IV. *Breach of Contract*

In its breach of contract cause of action, Medical Group alleged that Aetna breached its contract with Medical Group by (1) terminating the contract "for cause" under the pretext of a termination "without cause," thereby depriving Medical Group of the rights and remedies available under the contract for a termination for cause; (2) failing to provide fair and proper procedures for termination; (3) directly contracting with FPA and other IPA's in violation of Medical Group's first right of refusal; (4) facilitating the transfer of Aetna subscribers in violation of Medical Group's first right of refusal by adopting the policy of allowing a primary care physician who affiliates with a new Aetna-contracted IPA to transfer his or her Aetna subscribers to the new IPA; and (5) giving Medical Group premature notice of termination.

In ruling on Aetna's summary judgment motion, the court decided there was no material issue of fact as to whether Aetna's actions in terminating its contract with Medical Group constituted a breach of contract. Although the court found that Aetna breached the contract by executing its MOU with FPA before expiration of the 30-day period within which it directed Medical Group to retain its contractual relationship with FPA, the court

26

concluded that "because the execution of the MOU was only three days short of the required notice period, and because of its terms, the breach caused by the MOU was not a material one."

Medical Group contends summary judgment was improper because whether Aetna's breach was material is a triable issue of fact.[9]  Medical Group also contends there was a material question of fact as to whether Aetna terminated the contract "for need" and whether such need actually existed.  Finally, Medical Group contends the court erred by failing to address the allegation in its breach of contract cause of action that the acts constituting Aetna's alleged breaches of contract also constituted breaches of the implied covenant of good faith and fair dealing.[10]

Assuming Medical Group's passing reference to the issue of whether Aetna *terminated its contract* with Medical Group for "need," adequately raises that issue on appeal, we note, as Aetna points out, that Medical Group is apparently confusing the distinct events of Aetna's termination of the contract in 1995

---

[9]   **Medical Group does not challenge and therefore we do not address the court's conclusion that Aetna did not breach the contract other than by prematurely executing the MOU with FPA.** (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6. ["Although our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in plaintiffs' brief."].)

[10]   The complaint does not set forth a separate cause of action for breach of the implied covenant of good faith and fair dealing.

and Aetna's invoking of the provision in section II(C) regarding
"needed" additional physicians in 1993 in connection with FPA's
severance of its contractual relationship with Medical Group.
There is no evidence that Aetna terminated Medical Group's
contract for "need." Whether Aetna properly invoked section
II(C) in directing Medical Group to retain the FPA physicians
and contracting directly with those physicians in 1993 is an
issue of contract interpretation that the court decided in
Aetna's favor. Because Medical Group does not challenge that
aspect of the court's summary judgment ruling on appeal, we do
not address it.

The trial court's failure to address whether Aetna breached
the contract's implied covenant of good faith and fair dealing
is not a basis for disturbing the summary judgment ruling.
Although Aetna addressed Medical Group's implied covenant theory
in its summary judgment motion, Medical Group ignored that
theory in its opposition to summary judgment and did not
adequately brief it on appeal. The full extent of Medical
Group's discussion of its implied covenant theory in its opening
brief is as follows: "Aetna's conduct went beyond violating the
express terms of the contract. It also violated an implied term
that Aetna would act in good faith. The Court failed to address
this, requiring remand. The evidence proffered by Aetna does

not address this fundamental breach of contract.  Material
questions of fact remain."

A fundamental rule of appellate practice is that "every
brief should contain a legal argument with citation of
authorities on the points made.  If none is furnished on a
particular point, the court may treat it as waived, and pass it
without consideration.'  [Citation.]  [¶] It is the duty of
appellants' counsel, not of the courts, 'by argument and the
citation of authorities to show that the claimed error exists.'
[Citation.]"  (*Sprague* v. *Equifax, Inc.* (1985) 166 Cal.App.3d
1012, 1050.)  An appellate court is not "required to consider
alleged error where the appellant merely complains of it without
pertinent argument."  (*Rossiter* v. *Benoit* (1979) 88 Cal.App.3d
706, 710.)  Medical Group merely complains of the court's
failure to address its allegation that Aetna breached the
implied covenant of good faith without pertinent argument or
citation to authority.

More important is Medical Group's failure to address its
implied covenant theory in opposing summary judgment after Aetna
specifically challenged that theory in its moving papers.  The
following language from *Robinson* v. *Hewlett-Packard Corp.* (1986)
183 Cal.App.3d 1108, 1127 applies: "If [Medical Group] was
serious about preserving [its breach of the implied covenant]
claim, [it] had ample opportunity to do so.  [Medical Group]

29

took no advantage of the opportunity, and as a result no triable issue was presented. '[P]ossible theories not fully developed or factually presented to the trial court cannot create a "triable issue" on appeal.' [Citation.] Furthermore, 'issues raised and then abandoned in the trial court also cannot be considered on appeal. [Citation.]" Accordingly, we consider the issue of whether Aetna breached the implied covenant of good faith and fair dealing abandoned.

We conclude, however, that the court erred by ruling that Aetna breached its contract with Medical Group but was nevertheless entitled to summary disposition of Medical Group's cause of action for breach of contract because the breach was not material.[11] The materiality of a party's breach of a contract is ordinarily a question of fact, typically arising in the context of the more general issue of whether a breach was sufficiently material to justify the other party's cancellation or rescission of the contract. (See *Superior Motels, Inc.* v. *Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1051-1052; *Pennel* v. *Pond Union School Dist.* (1973) 29 Cal.App.3d 832, 838;

---

[11]   We conclude the court correctly decided that the MOU executed by Aetna and FPA was a contract and not merely an unenforceable agreement to make an agreement under the principles stated in *Beck* v. *American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1562, and that Aetna breached section II(C) of its contract with Medical Group by executing the MOU before expiration of the 30-day period it gave Medical Group to reinstate its contractual relationship with FPA.

Andersen, *A New Look at Material Breach in the Law of Contracts*
(1988) 21 U.C. Davis L.Rev. 1073.)  We have been unable to find
any California authority supporting the proposition that the
immateriality of a defendant's breach is a proper basis for
summarily disposing of a breach of contract action in the
defendant's favor.  Such a result is improper because even a
technical or minor breach may entitle a plaintiff to nominal
damages and costs.  (See *Hancock* v. *Hubbell* (1887) 71 Cal. 537
[where breach is established but no damages are proven, nonsuit
is erroneous because plaintiff is entitled to nominal damages
and costs]; *Garton* v. *Title Ins. & Trust Co.* (1980) 106
Cal.App.3d 365, 382.)  For that reason, we must reverse the
summary judgment as to the third cause of action for breach of
contract.

However, because the only aspect of the court's summary
adjudication of the third cause of action adequately challenged
by Medical Group on appeal is the erroneous determination that
Aetna is entitled to summary adjudication despite the finding
that it breached the contract by contracting with the FPA
physicians before the expiration of the 30-day first right of
refusal period, any further litigation of the third cause of
action is limited to the issue of Medical Group's damages, if
any, resulting from that breach.  Medical Group has waived the

31

other claims of breach alleged in its third cause of action by failing to argue they were erroneously adjudicated.

## DISPOSITION

The judgment is reversed.  The court is directed to vacate its order sustaining Aetna's demurrer to the fourth cause of action of the second amended complaint without leave to amend and enter a new order overruling that demurrer.  The court is further directed to vacate its order on Aetna's motion for summary judgment/summary adjudication and enter a new order denying the motion for summary judgment; denying the motion for summary adjudication as to the third cause of action for breach of contract and fifth cause of action for intentional interference with contractual relations; and granting the motion for summary adjudication as to the sixth cause of action for intentional interference with advantageous and prospective business relations, seventh cause of action for inducing breach of contract and eighth cause of action for trade libel and disparagement.  Any further litigation of the third cause of action is limited to the issue of Medical Group's damages, if any, resulting from Aetna's breach by contracting with the FPA physicians before the expiration of the 30-day first right of

refusal period afforded Medical Group by section II(C) of the

contract.   The parties shall bear their own costs on appeal.

_____

NARES, J.

WE CONCUR:

_____

KREMER, P.J.

_____

HUFFMAN, J.

33

# EXHIBIT C

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D

Stephen M. Kelly Clerk

JUN 1 2 2003

Court of Appeal Fourth District

| | |
|---|---|
| EAST COUNTY PHYSICIANS MEDICAL GROUP, INC., | D038241 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 701044) |
| AETNA LIFE AND CASUALTY COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith McConnell, Judge. Reversed with directions.

Plaintiff East County Physicians Medical Group, Inc. (Medical Group)[1] appeals from a judgment in favor of defendants Aetna Life and Casualty Company and Aetna Health Plans of California, Inc. (currently known as Aetna U.S. Healthcare of California,

---

[1] Although Medical Group's operative pleading (the second amended complaint) also names as a plaintiff Ted Mazur, M.D. "individually and on behalf of all others similarly situated," the record indicates he was not regarded as a party to the action after the court denied Medical Group's motion for class certification. There is no reference to him in Medical Group's notice of appeal.

written notice to [Medical Group] that additional participating physicians are needed, [Medical Group] shall contract with additional Primary Care Physicians within thirty (30) days of the date of the notice and shall contract with additional Specialist Physicians within sixty (60) days of the date of the notice. In the event [Medical Group] fails to contract with physicians within the time frames specified, [Aetna] may directly contract with such providers, other physicians, or other physicians groups."

Section V, paragraph A provided, in part, that the term of the agreement was one year, and that the agreement would "automatically renew thereafter for one-year terms, unless terminated pursuant to this section. This Agreement may be terminated without cause at the end of the initial term or on any anniversary date . . . by either party giving the other party ninety (90) days' prior notice."

Medical Group's contract with its individual physician members did not preclude the physicians from belonging to other IPA's in addition to Medical Group, but rather expressly provided: "Nothing in this Agreement shall be deemed to establish an exclusive arrangement between PHYSICIAN and [Medical Group] nor preclude PHYSICIAN or [Medical Group] from entering into any other agreement." It also provided that either party could terminate the agreement for any reason on 90 days' written notice.

Sometime during the early 1990's, six physicians affiliated with Family Practice Associates of San Diego, Inc. (FPA) joined Medical Group. At that time FPA did not have a contract with Aetna. As of July 1993, the FPA physicians were the primary care physicians for about 1,200 Aetna enrollees through the contract between Aetna and

3

terms. Aetna agreed to negotiate. During the course of those negotiations, Aetna decided not to renew Medical Group's contract in 1995, in part because it was of the opinion that Medical Group was not financially viable. On December 5, 1994, Aetna sent Medical Group a letter containing notice that it would not renew the contract.

In August 1995, Aetna sent letters to Medical Group's primary care physicians informing them that its contract with Medical Group would terminate on October 1 and they would no longer be able to participate in Aetna through Medical Group after September 30. The letter stated: "Our desire is to continue our relationship with you by transferring your participation to an existing contracted IPA or medical group." The letter further stated that if Aetna did not receive notification of the physician's participation in one of Aetna's contracted groups by August 31, Aetna would begin the process of transferring the physician's Aetna enrollees to one of its contracted primary care physicians. Aetna also wrote to certain of its contracted IPA's informing them of the letter it had sent to Medical Group's primary care physicians and requesting their "cooperation in expediting the recruitment of these physicians." Medical Group claims that as a result of Aetna's conduct, it lost two-thirds of its primary care physicians and its number of patients diminished from about 16,000 to about 3,000.

Medical Group filed a second amended complaint (the complaint) against Aetna and FPA including causes of action for violation of the Cartwright Act, civil conspiracy, breach of contract, unfair competition, intentional interference with contractual relations, intentional interference with prospective business advantage, inducing breach of contract, and trade libel. The complaint added class action allegations and named one of Medical

5

contractual relations, and intentional interference with prospective economic advantage, and the sustaining of Aetna's demurrer to its fourth cause of action under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.).[2]  We concluded the court erroneously sustained the demurrer to the fourth cause of action for unfair competition because the allegations of the complaint were sufficient to state a cause of action under the UCL as interpreted by case law, including *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 (*Cel-Tech*).

We decided the court erred in summarily adjudicating the fifth cause of action for intentional interference with contractual relations on the ground there was no evidence Aetna intended to disrupt Medical Group's contracts with its member physicians.  We concluded a trier of fact could reasonably find Aetna's conduct was substantially certain to interfere with those contracts and could infer intent from that fact.

We decided the summary adjudication of Medical Group's third cause of action for breach of contract was erroneous because the court found Aetna had committed a nonmaterial breach of the subject contract.  However, we directed that any further litigation of that cause of action was to be limited to the issue of Medical Group's damages, if any, resulting from the nonmaterial breach.

We upheld the court's summary adjudication of the cause of action for intentional interference with prospective economic advantage, concluding the evidence failed to

---

2      Medical Group also appealed as to FPA, but its appeal as to FPA was dismissed due to FPA's bankruptcy.

with contractual relations was barred by the "competition privilege," reasoning that a "competitive relationship exists between Aetna and [Medical Group] ultimately for patients by way of contracts with doctors."

After the court issued its ruling, Aetna and Medical Group stipulated to settle and dismiss the third cause of action of action for breach of contract with prejudice as to both Aetna Life and Casualty Company and Aetna U.S. Healthcare of California, Inc., and to dismiss the entire action with prejudice as to Aetna Life and Casualty Company. The court then entered judgment reflecting the parties' stipulation and the summary adjudication of the fourth and fifth causes of action.

## DISCUSSION

On appeal from a ruling on a motion for summary judgment, we conduct our own independent review of the moving and opposition papers and apply the same standard as the trial court in determining whether the motion was properly granted. (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 873.) "A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion. Both are reviewed de novo." (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819.)

unfair competition under the UCL and existing case law interpreting the UCL. In doing so, as we stated in the opinion, we accepted as true all facts properly pleaded in the complaint and all reasonable inferences that could be drawn from those facts. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967; *Dubins v. Regents of University of California* (1994) 25 Cal.App.4th 77, 82.) We did *not* specifically authorize Medical Group to seek disgorgement of specialty care savings realized by Aetna as a result of Aetna's contract with FPA and termination of its contract with Medical Group or any other particular remedy under the fourth cause of action. We were not called upon to consider what remedies, if any, were available to Medical Group under the UCL and did not address that issue in our opinion. The language in a judicial opinion must be understood in accordance with the facts and issues before the court; an opinion is not authority for a point not raised, considered, or resolved. (*Styne v. Stevens* (2001) 26 Cal.4th 42, 58-59; *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195.) Similarly, the "law-of-the-case" doctrine does not apply to points of law that were not determined in the prior appeal. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 302.)

The parties' briefs and our opinion in the prior appeal reflect an unarticulated assumption that monetary relief in the form of disgorgement of financial gain realized by Aetna as a result of unfair competition would be available to Medical Group under the UCL if Medical Group proved Aetna's alleged violation(s) of the UCL. However, at the time we filed our prior opinion, the California Supreme Court had not yet decided *Kraus, supra,* 23 Cal.4th 116, and *Cortez v. Purolator Air Filtration Products Co.* (2000) 23

11

(*Korea Supply*).  The Supreme Court explained that the above-quoted passage from

*Kraus* "merely *defined* the term 'disgorgement' in order to demonstrate that it was broader

in scope than 'restitution.' [*Kraus*] was not approving of disgorgement as a remedy under

the UCL.  To the contrary, [the Supreme Court] held in *Kraus* that while restitution was

an available remedy under the UCL, disgorgement of money obtained through an unfair

business practice is an available remedy in a representative action only to the extent that

it constitutes restitution." (*Korea Supply,* at p. 1145.)

Any doubt that *Kraus* limits disgorgement to restitution in a UCL action that is not

certified as a class action is further put to rest by the following language in *Cortez,* which

was filed the same day as *Kraus* and involved the unfair business practice of failing to

pay employees overtime wages: "Fluid recovery is not authorized in a UCL action that is

not certified as a class action.  For that reason the trial court may not make an order for

disgorgement of all benefits [a] defendant may have received from failing to pay

overtime wages. *It may only order restitution to persons from whom money or property

has been unfairly or unlawfully obtained.*" (*Cortez, supra,* 23 Cal.4th at p. 172, italics

added.)

Accordingly, restitutionary relief is not available to Medical Group in this case

because the disgorgement Medical Group seeks does not translate into discrete, readily

ascertainable sums of money that were taken from, and thus can be restored to, specific

members of Medical Group.  To determine Aetna's alleged cost savings resulting from

Medical Group's primary care physicians moving to FPA or other IPA's under contract

with Aetna and then making fewer specialty referrals, the court would have to determine,

13

Cal.3d 1118, 1126.) It is unnecessary to prove an actual breach; the plaintiff need only establish interference with or disruption of his or her contractual relations. (*Id.* at p. 1129.)

A. *Competition Privilege*

Aetna contends and the trial court decided that Medical Group's cause of action for intentional interference with contractual relations is barred by the competition privilege set forth in the Restatement Second of Torts section 768 (section 768) as follows: "(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if [¶] (a) the relation concerns a matter involved in the competition between the actor and the other and [¶] (b) the actor does not employ wrongful means and [¶] (c) his action does not create or continue an unlawful restraint of trade and [¶] (d) his purpose is at least in part to advance his interest in competing with the other. [¶] (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will."

The competitive privilege applies to interference with prospective economic advantage and to existing contracts that are terminable at will. (*San Francisco Design Center Associates v. Portman Companies* (1995) 41 Cal.App.4th 29, 40-41.) "Whether [the competition privilege] constitutes an affirmative defense in a particular action is a factual issue to be decided upon all the circumstances in the case." (*Id.* at p. 41.) The

This commentary supports the view that the competition privilege applies when the plaintiff and defendant are business competitors in the commonly understood sense — i.e., they compete as buyers or sellers of goods, products or services in a particular market. We decline to apply the privilege to the unique circumstances of the instant case involving a dispute between two entities whose businesses do not ordinarily bring them into competition with one another. In the ordinary course of its business, Medical Group does not compete with Aetna or other medical insurers or HMO's for the services of physicians or the business of patients. Rather, its relationship with such entities is symbiotic in that insurers or HMO's contract with it for the provision of medical services to their enrollees and it contracts with physicians to fulfill that obligation. The purported competition in this case between Aetna and Medical Group for the services of the physicians (and ultimately for the business of Aetna enrollees/patients) was a unique circumstance that does not normally arise in the business relationship between a health plan provider and an IPA.

In the previous appeal, Aetna acknowledged Medical Group was not a business competitor in the commonly understood sense by stating in its respondent's brief: "In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., supra,* 20 Cal.4th at page 187, the California Supreme Court held an unfair competition claim between competitors must be based on conduct that threatens or violates the policy or spirit of

17

alleged interference was incidental. The court based that portion of its ruling on the following language from *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 56 (*Quelimane*), quoting the Restatement Second of Torts, section 766, comment j, page 12:

> "'The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.' [Citation.]"[7]

The court's ruling stated: "Because the contracts between [Medical Group] and the Aetna participating physicians were non-exclusive, it is reasonable to conclude that any interference with the contractual relationship between [Medical Group] and the physicians was incidental as a matter of law."[8]

The court's statement raises the question of whether it is also reasonable to conclude Aetna's interference with the contractual relations between Medical Group and its member physicians was *not* incidental as a matter of law. The statement also leaves open the question of whether the incidental nature of Aetna's alleged contract interference

---

[7]    The court's ruling included the second sentence of this quotation.

[8]    The ruling referred to the incidental nature of the alleged interference as a reason Aetna's conduct was protected by the competition privilege of section 768. However, whether a defendant's contract interference is sufficiently incidental to the defendant's legitimate business objectives to be nonactionable is a distinct issue from whether the interference falls within the competition privilege of section 768.

Here, reasonable minds could differ as to whether Aetna's contract interference was justified as merely incidental to its legitimate pursuit of its own interests, particularly in light of Medical Group's claim that Aetna's actions resulted in the loss of two-thirds of Medical Group's primary care physicians and over 80 percent of its patients.[9] In reversing the previous summary adjudication of the fifth cause of action, we impliedly determined the evidence does not conclusively establish that Aetna's alleged contract interference was sufficiently incidental to Aetna's main purpose to be nonactionable. Whether the alleged interference was such a minor and incidental consequence and so far removed from Aetna's legitimate business objectives that it should be found not to be improper is an issue for the trier of fact to decide.

### C. *Aetna's Motive*

The court's summary judgment ruling also stated: "[I]t is reasonable and in fact, undisputed, that Aetna's motive was [to protect] patients' continuity of care and its own business interests in retaining its enrollees by encouraging physicians to contract with other medical groups to continue to care for the physicians' Aetna patients." To the extent this statement constitutes a ruling that, as a matter of law, Aetna did not *intend* to disrupt Medical Group's contractual relations with its physicians (as the trial court ruled

---

9      Although a physician did not have to leave Medical Group to join an IPA under contract with Aetna, a reasonable inference from the mass exodus claimed by Medical Group is that circumstances (not revealed by the record) rendered it unlikely that Medical Group physicians who joined another IPA to keep their Aetna patients would remain members of Medical Group. Thus, in addition to losing Aetna patients to other IPA's under contract with Aetna, Medical Group stood to lose patients covered by other health plans and HMO's if those patients' primary care physicians left Medical Group.

Cal.App.4th 833, 841.)  Accordingly, the court erred in basing summary judgment on Luster's self-serving declaration of intent in the face of conflicting inferences reasonably drawn from other evidence.  The record presents a triable issue of fact as to whether Aetna intended to interfere with Medical Group's contractual relationships with its physicians." (Fn. omitted.)

Because we concluded in the prior appeal that the evidence raises a triable issue of fact as to whether Aetna intended to interfere with Medical Group's contractual relationships with its physicians, and no new evidence was presented in Aetna's second summary judgment motion, the court erred to the extent it based is summary adjudication of the fifth cause of action on a finding that Aetna did not intend to interfere with Medical Group's physician contracts.

D. *Independent Wrongfulness Requirement*

Aetna argues that the independent wrongfulness requirement set forth in *Della Penna, supra,* 11 Cal.4th 376, that is applicable to a cause of action for intentional interference with prospective economic advantage should also apply to a cause of action for intentional interference with contractual relations when the subject contract is terminable at will because such contracts create a mere expectancy of future performance.

California law extends greater protection to existing at-will contracts than to prospective economic advantage.  "In California, an at-will contract is an *enforceable* contract and thus it may be actionable to interfere with that contract." (*PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 599, fn. 15 [questioning a New York court's holding that interference with an at-will contract is merely interference with prospective economic advantage], disapproved on another point in *Korea Supply, supra,*

23

intentional interference with prospective economic advantage to a cause of action for intentional interference with an existing contract terminable at will.

## DISPOSITION

The judgment is reversed. The court is directed to vacate its order on Aetna's second motion for summary judgment/summary adjudication and enter a new order denying the motion for summary judgment, denying the motion for summary adjudication as to fifth cause of action for intentional interference with contractual relations, and granting the motion for summary adjudication as to the fourth cause of action for violation of Business and Professions Code section 17200. The parties shall bear their own costs on appeal.

_____
NARES, J.

WE CONCUR:

_____
KREMER, P. J.

_____
HUFFMAN, J.

# EXHIBIT D

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**MDL No. 1334**
**Master File No. 00-1334-MD-MORENO**

IN RE: MANAGED CARE LITIGATION

FILED by RKS D.C.

JAN - 7 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

THIS DOCUMENT RELATES TO
**PROVIDER TRACK CASES**

## ORDER GRANTING AETNA INC. AND AETNA U.S. HEALTHCARE INC.'S EMERGENCY MOTION FOR AN ORDER ENJOINING WESTSIDE EKG ASSOCIATES AND ITS ATTORNEYS FROM PROSECUTING APPEAL CASE NO. 4D03-3533

THIS MATTER came before the Court upon Defendants', Aetna Inc. And Aetna U.S. Healthcare Inc., Emergency Motion for an Order Enjoining Westside EKG Associated and Its Attorneys From Violating This Court's Final Approval Orders and Judgment and Compelling Westside EKG and Its Attorneys to Show Cause Why They Should Not Be Held in Contempt, filed on **January 6, 2003**.

THE COURT has considered the motion and heard oral argument, and being otherwise fully advised in the premises, it is

**ADJUDGED** that the Defendants' Emergency Motion For An Order Enjoining Westside EKG Associates and its Attorneys is GRANTED. Westside EKG Associates and its attorney, Jeffrey M. Liggio, are directed to dismiss with prejudice the pending appeal in *Westside EKG Associates v. Aetna U.S Healthcare*, Case No. 4D03-3533, by 4:00 P.M. today Wednesday, January 7, 2004 at 4:00 P.M. for the reasons stated in open court on the same date. Because Mr. Liggio agreed to comply with this

Court's Order, the motion to be held in contempt is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 7 day of January, 2004.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

COPIES PROVIDED TO:

COUNSEL ON THE OCTOBER 1, 2003 SERVICE LIST

Miguel Estrada, Esq.
  1050 Connecticut Avenue, N.W.
  Washington, D.C. 20036

Jeffrey M. Liggio, Esq.
  1615 Forum Place, Suite 3B
  West Palm Beach, FL 33401

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:
HUMANA, INC., MANAGED CARE LITIGATION

Case MDL NO: 1334

MIAMI, FLORIDA
JANUARY 7, 2004

TRANSCRIPT OF AETNA'S EMERGENCY MOTION TO ENJOIN
BEFORE THE HONORABLE FEDERICO A. MORENO,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR WESTSIDE          JEFFREY M. LIGGIO, ESQ..
EKG:                  JENE P. WILLIAMS-RHOADS, ESQ.,
                      and EDWARD H. ZEBERSKY, ESQ.


FOR AETNA:            MIGUEL ESTRADA, ESQ.,.

                      STEPHEN R. SMEREK, ESQ.,

                      and CHRISTINE NANFELDT, ESQ.


REPORTED BY:


                      ANTON B. SCHWARTZ, RPR-CP

                      Official Federal Court Reporter

                      Federal Justice Building, Ste. 1061

                      99 Northeast 4th Street

                      Miami, FL  33132 - 305/523-5118

**2**

1     THE COURT: Let me call In Re: Humana Managed Care
2 litigation and specifically Aetna's emergency motion filed for
3 an order enjoining Westside EKG Associates and its attorneys
4 from prosecuting a particular case, now appeal of the
5 dismissal.
6     On behalf of Aetna, who do we have?
7     MR. ESTRADA: Miguel Estrada from Gibson, Dunn &
8 Crutcher. Your Honor. I have with me Stephen Smerek, who is
9 not admitted to practice in Federal Court here, but who
10 practices in the State Court pro hac in the case that we are
11 seeking to get dismissed and whose declaration furnishes the
12 factual basis for our motion.
13     I got ahold of him last night in Atlanta. I thought
14 he might be useful if he were here in case any issues came up.
15     MS. NANFELDT: Christine Nanfeldt with Greenberg
16 Traurig.
17     THE COURT: On behalf of Aetna, as well?
18     MR. ESTRADA: Correct.
19     THE COURT: On behalf of EKG?
20     MR. LIGGIO: I am Jeffrey Liggio. I am lead counsel,
21 and I am here with my co-counsel, Edward Zebersky, and my
22 partner and co-counsel, Jene Williams.
23     THE COURT: Who is going to speak for EKG?
24     MR. LIGGIO: I will, Your Honor.
25     THE COURT: Grab the lectern. The rest of you sit

**3**

1 down.
2     You probably didn't have a chance to file a response,
3 and I know it is short notice, but let's get down to the issue.
4     Is Westside EKG a member of the settlement class?
5     MR. LIGGIO: Yes, and, Judge --
6     THE COURT: Did Westside EKG opt out?
7     MR. LIGGIO: We objected. We did not opt out and we
8 are --.
9     THE COURT: There is a different, isn't there?
10     MR. LIGGIO: Yes, there is, and although the
11 distinction as far as how it affects the state class action and
12 this class action was one we wrestled with.
13     THE COURT: The problem I am having with this, it is
14 not just this one case -- what is the purpose of Aetna or, for
15 that matter, Cigna, because Cigna is also a defendant in the
16 state case that you all filed back in 2001, if things are going
17 to be prosecuted, then there is no settlement, and what is the
18 net effect of my order?
19     It was kind of a meaningless thing.
20     MR. LIGGIO: The dilemma that we had, and let me say
21 first, if you are inclined to sanction us, I am the captain of
22 the ship. I have two terrific young lawyers that work with me,
23 and if you are inclined to sanction anybody, I am here to take
24 the sanctions.
25     THE COURT: I always put that at the end

**4**

1     MR. LIGGIO: I am letting you know that, that I take
2 full responsibility.
3     THE COURT: Don't be so quick at it because the Court
4 Reporter will tell you I am more of a jailing Judge than a
5 fining Judge.
6     MR. LIGGIO: I learned when I was a plebe at the Naval
7 Academy that as the leader you take the heat.
8     Let me tell you our dilemma.
9     THE COURT: Let's go through it in this way, and that
10 way, what I am going to do is that I will lead you into a
11 corner.
12     MR. LIGGIO: I am ready.
13     THE COURT: I am going to try. You did not opt out.
14 Right?
15     MR. LIGGIO: We did not. We objected.
16     THE COURT: You objected and you filed an appeal of
17 the settlement.
18     MR. LIGGIO: We have.
19     THE COURT: By my approving the settlement, your state
20 claims have been released. True?
21     MR. LIGGIO: Yes and no.
22     THE COURT: The yes I understand. Tell me the no
23 part.
24     MR. LIGGIO: Counsel provided you attached to his
25 emergency motion, although it is not an emergency, our

**5**

1 complaint in the state class action.
2     THE COURT: Whether it is an emergency or not, it was
3 labeled as one. There is a brief that you have to file by
4 tomorrow before the Fourth District Court of Appeals, and
5 unless there is another extension --
6     MR. LIGGIO: I think it is Friday. It is the 9th
7 Today is the 7th. We have until Friday and I was on the phone
8 with appellate counsel today.
9     THE COURT: The 9th, I apologize. You are right, but
10 that is pretty close.
11     MR. LIGGIO: Yes, it is
12     THE COURT: They have to respond, unless they get
13 extensions, twenty days, but, more importantly, I have to take
14 care of this because of the impact it may have on hundreds of
15 other cases
16     MR. LIGGIO: Let me tell you why again. They provided
17 the complaint, and the definition of the class that our clients
18 seek to represent, and there are some obligations as a
19 purported class representative, even if the class has not yet
20 been certified --
21     THE COURT: What did the State Judge do in Broward
22 County, Judge Tobin?
23     MR. LIGGIO: Judge Tobin dismissed the case, and so we
24 are on appeal in that dismissal
25     THE COURT: Based upon what? Based upon this

6

1 approval?

2     MR. LIGGIO: No, no. What happened was, there was a
3 new Florida Supreme Court case named Villazon, and there is
4 some language in there, but our class definition in the state
5 case is not just physicians. Our class definition in the state
6 case is all medical providers. We may have in the state
7 case --

8     THE COURT: So, what you have to do is, the physicians
9 can no longer prosecute that case. Agreed?

10     MR. LIGGIO: There will be a potential standing
11 problem as far as the other providers.

12     THE COURT: Tell me yes or no. The physicians in Case
13 No. 01-016184-02, Broward County, cannot prosecute the case,
14 can they?

15     MR. LIGGIO: As to the release claims, correct.

16     THE COURT: Well, what other claims are there by
17 physicians?

18     MR. LIGGIO: I have looked at the settlement
19 agreement, and I direct your attention, Your Honor, to Page No.
20 73, as to what has been released, and the time period for
21 claims that have been released.

22     Judge, any time a physician submits a bill for
23 services, that is a new claim. Any time a physician submits a
24 bill for service subject to the Florida procedural requirements
25 of the prompt pay laws, that is a new claim.

7

1     Page No. 74 or 73, I should say, in the settlement
2 agreement talks about that the claims that have been released
3 are the claims that have accrued up to the date of the approval
4 of the settlement, which in your Court was October 23rd of this
5 past year.

6     My client has ongoing claims as do -- if my client
7 submitted a bill October 30th --

8     THE COURT: But your case was filed in 2001.

9     MR. LIGGIO: That is correct.

10     THE COURT: So, 2001, what kind of claims are there in
11 2001 that are not included in this settlement?

12     MR. LIGGIO: None of those past claims, Judge. That
13 is correct.

14     THE COURT: So, what is the 2001 case all about?

15     MR. LIGGIO: The 2001 case was all about -- it is a
16 two count complaint, basically. A declaratory count asking the
17 Judge to declare that the conduct violated the contracts of
18 insurance. No. 2, there is a breach of contract cause of
19 action as third party beneficiaries, not as assignees and not
20 as participating providers.

21     THE COURT: Dealing with what period of time?

22     MR. LIGGIO: I think as far as the declaratory count
23 especially, it may go on to the present time.

24     If my client submitted a medical bill November 1st of
25 2003, and Aetna did not comply with the statutes which are

8

1 drafted in the contract, by operation under our position under
2 the common law of the State of Florida, that is a claim that
3 has not been released in this case, and that is a claim that
4 may be affected by a liability ruling and/or declaratory ruling
5 at some point in the future when we get it back from the
6 Florida Fourth District Court of Appeals.

7     So, we wrestled with, do we opt out and does that
8 affect --

9     THE COURT: Why didn't you opt out? If you opted out,
10 you wouldn't be before me right now. You would be writing your
11 briefs.

12     MR. LIGGIO: The problem we have is, even though the
13 class had not been certified, are we then -- do we then have a
14 problem with are we opting out other purported members of the
15 class. Is there a conflict there, and even though our
16 clients -- the class had not been certified, and the Judge had
17 not found that our client had been a proper class
18 representative, we thought that the prudent cause of action was
19 to object, respectfully, and, if necessary, appeal, which we
20 have. We didn't do it in bad faith.

21     THE COURT: A few days ago, someone said about that
22 old saying, you cannot eat your cake and have it, too, which is
23 the appropriate order, and that is what you are trying to do.

24     MR. LIGGIO: Well, we are on the horns of a dilemma.

25     THE COURT: You see what a mess this is. How do I

9

1 resolve -- I will hear from whoever, Mr. Estrada or whoever is
2 going to speak on those issues -- but see how this could --
3 just like there is someone like your client, there are hundreds
4 of others.

5     MR. LIGGIO: Here's what I suggest.

6     THE COURT: I am putting aside the non-physicians for
7 the time being.

8     MR. LIGGIO: Here is the suggestion. The
9 underlying -- I should not say that -- the state court appeal,
10 we have non-MDL defendants. That appeal is going to happen.

11     There is going to be a ruling on those private right
12 of action issues that were raised below. That is going to be
13 resolved by the Florida Appellate Courts.

14     If, in the event, the Eleventh Circuit reverses you,
15 we are going to be back there, anyway.

16     What I suggest, if there is a problem, since they
17 don't want to obviously do a brief, we will agree to stay our
18 case against Aetna, pending the outcome of the Eleventh Circuit
19 appeal.

20     THE COURT: I don't know whether you can actually have
21 a stay in a Court of Appeals. I don't think they are going to
22 be able to do that, because that Appellate Court is sitting
23 there and they have an appeal, they are not just going to stay
24 an appeal.

25     They are going to say, "File your brief. If you don't

10

1 file it, it is going to be dismissed."
2      MR. LIGGIO:  The problem is under the Syngenta case
3 that the Supreme Court issued last year, we honestly filed our
4 class action --
5      THE COURT:  You are the one who did not opt out  See
6 That's the problem.
7      MR. LIGGIO:  It is a dilemma.
8      THE COURT:  You cannot do both because, if not, I am
9 going to have a bunch of other people doing the same thing.
10 There are bound to be disputes later on between other doctors.
11      So, what kind of a settlement did Aetna get when they
12 are going to be sued by all these class members who did not opt
13 out?
14      MR. LIGGIO:  But if a class member did not object --
15      THE COURT:  I don't know whether you have greater
16 standing as an objector  That is what you are telling me.
17      MR. LIGGIO:  I think so.
18      THE COURT:  In which case --
19      MR. LIGGIO:  Are we plowing new grounds?  I think we
20 are  It was not done in bad faith  It certainly was not done
21 to abuse your power in any way, and, again, if you feel
22 inclined to sanction any lawyers, I am standing right here.
23      THE COURT:  All right.
24      MR. LIGGIO:  Thank you, Judge.
25      THE COURT:  Mr. Estrada, frankly, from a practical

11

1 standpoint, I have to think that it is easier just to do the
2 brief before the Fourth District Court of Appeals
3      Mr. Estrada was here a couple of days ago, flew back,
4 flies back in here.
5      MR. ESTRADA:  Thank you, Your Honor.  Miguel Estrada
6 for Gibson and Aetna.
7      THE COURT:  I assume the principle is more important
8 than the time it would take to do one brief.
9      MR. ESTRADA:  For several reasons, Your Honor  Our
10 position in this case is pretty much set forth in our papers
11 I won't belabor it at length
12      Just let me restate a few of the salient facts  They
13 could have opted out  They had a case pending  They could
14 have opted out  They did not do so
15      THE COURT:  You are not asking me to do anything to
16 the non physician plaintiffs
17      MR. ESTRADA:  If they have a potential plaintiff,
18 which they don't currently have in the pending case, who is not
19 a physician, everyone who is a named plaintiff in the pending
20 case is a physician, but if they can find a plaintiff who is
21 not a physician, I would not be in your courtroom telling you
22 to enjoin them anymore than if they brought a suit on behalf of
23 a bus driver
24      I am here because the settlement has been approved
25 There is a final judgment and there is, in addition, an

12

1 injunction that you entered keeping class members from further
2 prosecuting claims, and, in this case, we have somebody who had
3 plenty of actual knowledge of the settlement.
4      We gave them all the papers.  They came into your
5 courtroom  Mr. Zebersky was here and objected ably.  They
6 filed an appeal.  They sought to intervene in the case here,
7 and by doing all of that, by failing to opt out, what they did
8 was cast their lot in Federal Court.
9      What that means is, if they should be successful in
10 the Eleventh Circuit, the answer is no, now they get to
11 litigate in Federal Court -- I mean in State Court.  The answer
12 is, they will be back in front of you, and they will have a
13 claim in front of you, but they will still be class members in
14 front of you.
15      What that means is that their state case is gone.
16 There is an injunction that says they may not move forward with
17 it, and at the bottom of Page 9 --
18      THE COURT:  What did you do with the injunction in the
19 State Court proceeding where the Judge entered a ruling on the
20 substantive issues?  Why don't you have that be stayed or
21 enjoined?
22      MR. ESTRADA:  We asked for a stay.  We filed a notice
23 of your settlement and asked for a stay.  The Judge did not
24 rule on it because he ruled on the merits of the claim, finding
25 that there was no merit.

13

1      Now that we are no longer at the preliminary approval
2 stage, but we have moved to final approval and there is a final
3 judgment, and now that you have, in addition, entered an
4 injunction with an order that you retain jurisdiction, this is
5 the appropriate forum to bring these questions.
6      Our position is very simple.  I don't have any
7 animosity for plaintiff's lawyers.  I get along with them very
8 well  I am not here asking you to punish the captain or the
9 corporal on the ship.  All I want is the benefit of our
10 settlement, and the law on this is very clear.
11      If you look at Page 9 of our brief, the bottom of Page
12 9, and Page 10, we have cited any number of cases from the
13 Supreme Court of the United States, with the relevant quotation
14 following the citation in a parenthetical, which all of them
15 say in words of one syllable that anyone who is ordered to do
16 something by a Court or is the subject of an injunction, even
17 if it is filed on appeal and even if he ultimately wins, must
18 comply in the interim, and all I want from this hearing -- I
19 don't relish looking for sanctions against counsel  All I
20 want --
21      THE COURT:  You want the injunction.
22      MR. ESTRADA:  We served them  We already have an
23 injunction  They are not obeying it, and we served them when
24 you entered your judgment with a stipulation of dismissal,
25 which we have given you  I have another copy.

**14**

1 THE COURT: I have seen it. I can't force them to
2 stipulate to dismissal, can I?
3 MR. ESTRADA: Well, if it is a proper contempt
4 hearing, yes, you may, because if the situation is, I have
5 enjoined you to dismiss the case, and you are refusing, then I
6 will go back to the statement that you made earlier, the
7 choices then become jail or fines until they comply.
8 That is the law of civil contempt, and either the
9 injunction means something or it does not, and you are
10 absolutely right; that we are here because this is an issue
11 that will come up again and again, and having the cases go away
12 is the essence of our settlement.
13 If you took the view that Mr. Liggio had, they would
14 stay the appeal only as to Aetna. It would go forward as to
15 anybody else, and what I would have to do, as counsel for
16 Aetna, is I would file an amicus brief or monitor or make sure
17 that the people that remain in the case are litigating it in a
18 way that does not harm my client's interests.
19 You mentioned that I was here a couple of days ago,
20 and you know that we have cases in this courtroom that we have
21 not settled, and whenever there are important legal issues that
22 you are considering that may affect my client's interests in
23 non-settled cases, I show up and I sit in the back, and if I
24 have to do that for one million dollars all over the country
25 who want to file a case in State Court, my client will go

**15**

1 bankrupt, and that is not the benefit of our settlement.
2 THE COURT: You would be probably take a lot of cases
3 for that to happen, but that is all right.
4 MR. ESTRADA: But --
5 THE COURT: I got the point.
6 MR. ESTRADA: Thank you, Your Honor, and, as I said,
7 it is a proper motion for contempt. I don't relish making it.
8 I don't want people to be punished, but I would like them, as
9 people who, with the advice of counsel, elected not to opt out,
10 to sign our stipulation of dismissal, as the law requires, so
11 we may get the benefit of our settlement.
12 THE COURT: All right. Mr. Liggio.
13 MR. LIGGIO: I have nothing more, but I will answer
14 any questions.
15 THE COURT: Well, once I issue the injunction, do I
16 really have any choice? What you are asking me to do is to
17 vacate the injunction, which, of course, would mean I would
18 have to vacate the settlement.
19 I don't even know if I have jurisdiction to do that.
20 You have put me in a very uncomfortable situation.
21 MR. LIGGIO: It seems that maybe -- I was thinking
22 about this on the way down -- and maybe we should have -- I am
23 learning as I am going, Judge. Maybe we should have come to
24 you when the injunction was entered and asked you to modify it
25 so that we could prosecute or continue to prosecute the state

**16**

1 appeal against all the defendants, including Aetna, and I
2 didn't do that.
3 THE COURT: But the chances are -- you were here for
4 or your client was here for the objections. So, the issue was
5 raised appropriately.
6 The question is whether you can actually prosecute a
7 claim on behalf of physicians against Aetna, and the answer is
8 you really cannot and the injunction stays.
9 Now, the question is, what are you going to do with
10 Aetna, and this is going to probably come up if I finally
11 approve Cigna. So, you might as well think about that.
12 MR. LIGGIO: We did not object to Cigna, and so I
13 think Cigna is going to go away, even in the state case, but we
14 have a standing issue there that we are wrestling with.
15 THE COURT: I don't see how you can prosecute this
16 appeal, because I have to think of this case the same way as if
17 you were before Judge Tobin and he had not ruled on the merits.
18 I would restrain you and enjoin you from pursuing that
19 claim, any claim, related to this settlement. I have done it
20 I would have to do that.
21 Now, if it was a Trial judge, there would be an easy,
22 practical solution. The State Judge would simply say, "I will
23 stay it. See what happens before the Eleventh Circuit," if he
24 wanted to do that or he would dismiss it.
25 Courts of Appeals don't really stay cases. They

**17**

1 probably want to rule on the issue.
2 You have other defendants, do you not?
3 MR. LIGGIO: We do.
4 THE COURT: I have no power over them.
5 MR. LIGGIO: What is baffling to me is, if the moon
6 were green, but, if, in fact, the Eleventh Circuit decides to
7 reverse you in this case --
8 THE COURT: On the settlement.
9 MR. LIGGIO: So there is no settlement any more, and
10 they are litigating on the merits, we will, against the other
11 defendants, have a ruling on those substantive issues and maybe
12 back and they will not have had an opportunity to participate
13 THE COURT: I think if they are not a party in that
14 case, because I have enjoined you, they will live with the fact
15 that someone else on behalf of another defendant will raise
16 those issues and maybe he will monitor, but right now he is
17 under the obligation of responding to your brief, and I think
18 it is unfair, and, more importantly, it goes against the order
19 that I issued.
20 It is not criminal contempt that he is seeking. It is
21 just civil contempt. In other words, coercive, to tell you you
22 have to cease and desist. You have to dismiss it, whatever it
23 takes.
24 I cannot force someone to enter into a stipulation,
25 but I can tell you that you cannot prosecute any case,

18

1 including an appeal, and, if you do so, you will be in
2 contempt.
3        MR. LIGGIO:  Against Aetna.
4        THE COURT:  That is the only one.  I think it is going
5 to come up, if I finally approve Cigna, obviously.  We know it
6 is going to come up, and the chances are if I approve it, the
7 same thing is going to happen.
8        MR. LIGGIO:  We will look at that very carefully now
9 ourselves, I promise.
10       THE COURT:  So, you have a brief due on the 9th.
11 Between now and then, are you going to dismiss against Aetna?
12       MR. LIGGIO:  You are ordering me to do so, and we will
13 go back --
14       THE COURT:  Go ahead and talk to him, if you want.
15       MR. LIGGIO:  I don't think -- if I go ahead, because
16 we are talking to others -- we have other clients that just are
17 not as named plaintiffs.
18       THE COURT:  Has the class been certified?
19       MR. LIGGIO:  No.
20       THE COURT:  So then they are not really parties.
21       MR. LIGGIO:  They are clients.  They are not parties.
22 But I may be able to, before Friday, bring in the hospital
23       THE COURT:  In an appeal?
24       MR. LIGGIO:  Sure.
25       THE COURT:  How can you do that on an appeal?

19

1        MR. LIGGIO:  We can substitute a party and we have
2 checked --
3        THE COURT:  While the case is up on appeal?
4        MR. LIGGIO:  Sure.
5        THE COURT:  Wouldn't they send it to the Trial Court
6 and say -- I know Appellate Courts are always accused --
7        MR. LIGGIO:  This is a different world.
8        THE COURT:  They don't like to do any of that.  They
9 say, "Remand it to the Trial Court to do whatever you want."
10 They don't like to deal with factual issues that have not been
11 reviewed by a lower Court.
12       MR. LIGGIO:  I am going to do exactly what you ordered
13 me to do.  We will dismiss Aetna only.
14       THE COURT:  That's all I am asking.
15       MR. LIGGIO:  As a defendant in the appeal before
16 Friday by my clients.  If the Fourth District lets us
17 substitute a party, then that is between the Fourth District --
18       THE COURT:  I would never enjoin another Court to do
19 anything.  We went through that here.
20       MR. LIGGIO:  Again, I am sorry.  It was no disrespect
21 to you at all.
22       THE COURT:  I accept that and I think it is evident.
23       MR. ESTRADA:  Just to clarify, there is no magic in
24 the stipulation that we proffered.  It was merely a vehicle for
25 accomplishing what the order already does in front of the State

20

1 Court.
2        I just want to make clear that given that you have
3 entered a judgment on the merits, the dismissal of my client
4 has to be with prejudice.
5        MR. LIGGIO:  I would appreciate it being without
6 prejudice just in case we prevail in the Eleventh.  We are
7 going to dismiss them.
8        THE COURT:  But if you prevail on the Eleventh, you
9 get to come before me, not about the State Court.
10       MR. LIGGIO:  It will with prejudice.  It will be with
11 prejudice.
12       THE COURT:  What is wrong with the stipulations that
13 they submitted?
14       MR. LIGGIO:  The stipulation is certainly different
15 than the Court order.  I have not looked at it, to tell you the
16 truth, Judge.
17       THE COURT:  So, without the word stipulation --
18       MR. LIGGIO:  What I would like to do -- yes, sir.
19 What I would like to do is just make sure I talk to appellate
20 counsel for the appropriate wording.  I will follow your
21 ruling.
22       MR. LIGGIO:  I can't help you with that because what I
23 should do is direct you to enter a particular order of
24 dismissal.
25       What language don't you like about that?  Let's see.

21

1        MR. LIGGIO:  Stipulation.
2        THE COURT:  We will take stipulation out.  Motion to
3 dismiss appeal.
4        MR. LIGGIO:  Yes, sir.
5        THE COURT:  Against --
6        MR. ESTRADA:  The Aetna defendants.
7        THE COURT:  I was thinking how many Aetna's are there.
8 There is only one here.  Right?
9        MR. LIGGIO:  I think so, Judge.  We will make sure
10 they are all included.
11       MR. ESTRADA:  I don't even see Aetna in the stipulation
12 Where is that.  Where is Aetna in the stipulation that I have?
13       I see Prudential, Cigna, Foundation.  There it is
14       So, to make it clear, against Aetna, U S Healthcare
15 Inc , first known as Prudential Healthcare Plan, Inc
16       So, it would be a motion to dismiss the appeal against
17 that party, and it would say notifies the Court that all claims
18 against Aetna Health, Inc , have been extinguished by final
19 approval of the nationwide class action settlement in the
20 Federal multi district litigation caption, and we have that
21       Accordingly, pursuant to Rule 9 350(a) of the Federal
22 Rules of Appellate Procedure, Westside EKG Associates  I
23 don't know.  Would that rule be the one about moving to
24 dismiss?
25       MR. ESTRADA:  Yes, Your Honor.

**22**

```
 1        MR. LIGGIO:  It is a stipulation, Judge.
 2        THE COURT:  No.  I am taking Aetna out.  It has
 3   nothing to do with it.  This is between you and I.  We are
 4   putting this aside.
 5        I will direct you to dismiss Aetna Health, Inc., from
 6   the present appeal with prejudice, and it is going to have to
 7   be done today.
 8        MR. LIGGIO:  Yes, Your Honor.
 9        MR. ESTRADA:  Your Honor, just to clarify something
10   else.  I never heard of a Court of Appeals in which you can add
11   a new party with a new claim on appeal, and all I want to make
12   clear that if there is a subterfuge to litigate against Aetna
13   the very ruling that involves physicians only, that came from
14   Judge Tobin, we will be back in front of you.
15        THE COURT:  We will see.  Right now, everybody is
16   acting in good faith.  If you keep coming back, you know what
17   happens with that good faith account?  It gets depleted.
18        MR. LIGGIO:  I don't want to be back in an emergency
19   hearing looking at contempt again.  We will not be back in
20   front of you.
21        THE COURT:  I am directing the plaintiff, Westside EKG
22   & Associates, through their lawyers, who have been here in
23   Court, to dismiss the appeal in Case No. 4D03-3533, which is
24   the appeal before the Fourth District Court of Appeals in the
25   State of Florida.  It is the appeal of the lower case number
```

**23**

```
 1   01-016184-02, a dismissal on the merits, and the reason for
 2   that is because this case -- the members of the class did not
 3   opt out and settled and I approved the settlement in this
 4   nationwide class action in Shane versus Humana, 00-MDL-1334,
 5   and I direct Mr. Liggio, Mr. Zebersky and Ms. Williams to file
 6   the motion to dismiss the appeal no later than today at 4:00
 7        MR. LIGGIO:  Done.
 8        THE COURT:  In view of the agreement by Westside EKG
 9   to do that, there is no need to hold anyone in contempt.
10        MR. ESTRADA:  We agree, Your Honor.
11        THE COURT:  Anything else that I can help you with?
12        MR. LIGGIO:  Thank you, Judge.
13        THE COURT:  Have a safe trip on I-95 and to wherever
14   you are going, Atlanta, Los Angeles, Washington, and I have
15   never seen Mr. Tropin be so silent here.  He is an observer.
16   He is taking the Estrada mode.
17        MR. ESTRADA:  We may have another similar
18   non-emergency motion in a case that has been filed in New York.
19        THE COURT:  If you put emergency, the local counsel
20   will tell you, you put emergency in front of me, and I am going
21   to act on it in an emergency basis.
22        MR. ESTRADA:  I will never file in front of you an
23   emergency motion that I don't think is an emergency.
24        I am just letting you know I may have one or two more
25   in which there is still some time.  I will just file them in
```

**24**

```
 1   the regular course.
 2        THE COURT:  Based upon this order, what you should do
 3   is let the other people know what I have done here.
 4        MR. ESTRADA:  I will get an expedited copy of the
 5   transcript.
 6        THE COURT:  Have a safe trip.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**25**

```
 1              C E R T I F I C A T E
 2        I hereby certify that the foregoing is an accurate
 3   transcription of proceedings in the above-entitled matter.
 4
 5   _____
     DATE FILED       ANTON B. SCHWARTZ, RPR
 6                     Official Federal Court Reporter
                       Federal Justice Building, Ste. 1061
 7                     99 Northeast 4th Street
                       Miami, FL  33132 - 305/523-5118
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**A**

able 9:22 18:22
ably 12:5
above-entitled 25:3
absolutely 14:10
abuse 10:21
Academy 4:7
accept 19:22
accomplishing 19:25
account 22:17
accrued 7:3
accurate 25:2
accused 19:6
act 23:21
acting 22:16
action 3:11,12 5:1 7:19 8:18 9:12
    10:4 21:19 23:4
actual 12:3
add 22:10
addition 11:25 13:3
admitted 2:9
advice 15:9
Aetna 1:14 2:6,17 3:14 7:25 9:18
    10:11 11:6 14:14,16 16:1,7,10
    18:3,11 19:13 21:6,11,12,14
    21:18 22:2,5,12
Aetna's 1:7 2:2 21:7
affect 8:8 14:22
ago 8:21 11:3 14:19
agree 9:17 23:10
Agreed 6:9
agreement 6:19 7:2 23:8
ahead 18:14,15
ahold 2:13
amicus 14:16
and/or 8:4
Angeles 23:14
animosity 13:7
answer 12:10,11 15:13 16:7
ANTON 1:21 25:5
anybody 3:23 14:15
anymore 11:22
anyway 9:15
apologize 5:9
appeal 2:4 4:16 5:24 8:19 9:9,10
    9:19,23,24 12:6 13:17 14:14
    16:1,16 18:1,23,25 19:3,15
    21:3,16 22:6,11,23,24,25 23:6
Appesia 5:4 8:6 9:21 11:2 16:25
    22:10,24
appellate 5:8 9:13,22 19:6 20:19
    21:22
appreciate 20:5
appropriate 8:23 13:5 20 20
appropriately 16:5
approval 6:1 7:3 13:1,2 21:19
approve 16:11 18 5,6
approved 11:24 23:3
approving 4:19
aside 9:6 22:4
asked 12 22,23 15 24
asking 7 16 11:15 13 8 15 16
    19 14
assignees 7 19
Associates 2 3 21:22 22 22
assume 11 7
Atlanta 2 13 23 14
attached 4 24
attention 6 19
attorneys 2 3

**B**

B 1:21 25 5
back 1 16 8 3 9 15 11 3,4 12 12
    14 6,23 17 12 18 13 22 14,16
    22 18,19
bad 8 20 10 20
baffling 17 5
bankrupt 15 1
Based 5 25,25 24 2
basically 7 16

basis 2:12 23:21
behalf 2:6,17,19 11.22 16:7
    17:15
belabor 11:11
beneficiaries 7:19
benefit 13:9 15:1,11
bill 6:22,24 7:7,24
bottom 12:17 13:11
bound 10:10
breach 7:18
brief 5:3 9:17,25 11:2,8 13:11
    14:16 17:17 18:10
briefs 8:11
bring 13:5 18:22
brought 11:22
Broward 5:21 6:13
Building 1:23 25:6
bunch 10:9
bus 11:23

**C**

C 25:1,1
cake 8:22
call 2:1
can't 14:1 20:22
capacia 3:21 13:8
caption 2:17
care 1:4 2:1 5:14
carefully 18 8
case 1:4 2:4,10,14 3:14,16 5:23
    6:3,5,6,7,9,12,13 7:8,14,15 8:3
    9:18 10 2,8 11:10,13,18,20
    12:2,6,15 14:5,17,25 16:13,16
    17:7,14,25 19:13 20:6 22:23,25
    23:2,18
cases 5:15 13:12 14:11,20,23
    15:2 16:25
cast 12:8
cause 7:18 8:18
cease 17:22
certainly 10.20 20:14
certified 5:20 8:13,16 18 18
certify 25:2
chance 3:3
chances 16:3 18:6
checked 19:2
choice 15:16
choices 14:7
Christine 1:16 2:15
Cigna 3:15,15 16:11,12,13 18:5
    21:13
Circuit 9:14,18 12:10 16:23 17:6
citation 13:14
cited 13:12
civil 14:8 17:21
claim 6 23,25 8 2,3 12 13,24
    16 7,19,19 22 2 11
claims 4:20 6:15,16,21 7 2,3,6,10
    7:12 12 2,22 17
clarify 19:23 22:9
class 3 4,11,12 5 1,17,19,19 6 4,5
    8 13,15,16,17 10 4,12,14 12 1
    12:13 18:18 21 19 23 2,4
clear 13:10 20:2 21:14 22 12
client 7 6,6,24 R 17 9 3 14:25
    16 4 20 3
clients 5:17 8 16 18 16,21 19 16
client's 14:18,22
close 5 10
coercive 17 21
came 14 11 15 23:16 10 18 5,6
    20 9
coming 22 16
common 8 2
complaint 5 1,17 7 16
comply 7:25 13 18 14 7
conduct 7 17
conflict 8 15
considering 14 22
contempt 14 3,8 15 7 17 20,21
    18 2 22 19 23 9
continue 15 25

contract 7:18 8:1
contracts 7:17
copy 13:25 24:4
corner 4:11
corporal 13:9
correct 2:18 6:15 7:9,13
counsel 2:20 4:24 5:8 13:19
    14:15 15:9 20:20 23:19
count 7:16,16,22
country 14:24
County 5:22 6:13
couple 15:19 24:1
course 15:17 24:1
courtroom 11:21 12:5 14:20
Courts 9:13 16:25 19:6
co-counsel 2:21,22
criminal 17:20
Crutcher 2:8
currently 11:18

**D**

date 7:3 25:5
days 5:13 8:21 11:3 14:19
deal 19:10
Dealing 7:21
decides 17:6
declaration 2:11
declaratory 7:16,22 8:4
declare 7:17
decision 3:17 15:19 19:15
defendants 9:10 16:1 17:2,11
    21:6
definition 5:17 6:4,5
depleted 22:17
desist 17:22
didn't 3:2 8:9,20 16:2
different 3:9 19:7 20:14
dilemma 3:20 4:8 8 24 10:7
direct 6:19 20:23 22:5 23:5
directing 22:21
dismiss 14:5 16:24 17 22 18:11
    19 13 20 7 21 3,16,24 22 5,23
    23:6
dismissal 2:5 5 24 13:24 14:2
    15:10 20:3,24 23 1
dismissed 2:11 5:23 10:1
disputes 10:10
disrespect 19:20
distinction 3:11
District 1:1,1,8 5:4 8:6 11:2
    19 16,17 22:24
DIVISION 1:2
doctors 10:10
doing 10 9 12:7
dollars 14:24
don't 4:3 9 17,20,21,25 10 15
    11 18 12:20 13 6,19 15 7,8,19
    16 15,25 18 15 19 8,10 20 25
    21 11,23,22 23:18 23,23
drafted 8:1
driver 11:23
due 18:10
Dunn 2:7

**E**

E 25 1,1
earlier 14 6
easier 11 1
easy 16 21
eat 8 22
Edward 1 11 2 21
effect 3 18
either 14 8
EKG 1 1,2 3,19,23 1 3 4,6 21 22
    22 21 23 8
elected 15 9
eleventh 9 14,18 12 10 16 23
    17 6 20 6,8
emergency 1 7 2 2 4 25,25 5 2
    22 18 23 19,20,21,23,23
enjoin 1 7 11 22 16 18 19 18
enjoined 12 21 14 5 17 14

enjoining 2:3
enter 17:24 20:23
entered 12:1,19 13:3,24 15:24
    20:3
especially 7:23
ESQ 1:10,11,11,14,15,16
essence 14:12
Estrada 1:14 2:7,7,18 9:1 10:25
    11:3,5,5,9,17 12:22 13:22 14:3
    15:4,6 19:23 21:6,25 22:9
    23:10,16,17,22 24:4
event 9:14
everybody 22:15
evident 19:22
exactly 19:12
expedited 24:4
extension 5:5
extensions 5:13
extinguished 21:18

**F**

F 25:1
fact 17:6,14
facts 11:12
factual 2:12 19:10
failing 12:7
faith 8:20 10:20 22:16,17
far 3:11 6:11 7:22
Federal 12:23,2 9 12:8,11
    21:20,21 25:6,6
FEDERICO 1:8
feel 10:21
file 3:2 5:3 9:25 10:1 14:16,25
    23:5,22,25
filed 2:3 3:16 4:16 7:8 10:3 12:6
    12:22 13:17 23:18 25:5
final 11:25 13:2,2 21:18
finally 16:10 18:5
find 11:20
finding 12:24
fines 14:7
fining 4:5
first 3:21 21:15
FL 1:25 25:7
flew 11:3
files 11:4
Florida 1:1,6 6:3,24 8:2,6 9:13
    22:25
follow 20:20
following 14:19
force 14:1 17:24
foregoing 25:2
forth 11:10
forum 13:5
forward 12:16 14:14
found 8:17
Foundation 21 13
Fourth 5:4 8:6 11 2 19 16,17
    22 24
frankly 10:25
Friday 5 6,7 18 22 19:16
front 12 12,13,14 19 25 22 14,20
    23 20,22
full 4 2
furnishes 2 11
further 12 1
future 8 5

**G**

Gibson 2 7 11 6
given 13 25 20 2
go 4 9 7 23 14 6,11,14,25 16 13
    18 13,14,15
goes 17 18
going 2 23 3 16 4 10,19 9 2,10
    9 11,12,15,21,23,24 10 1,9,12
    15 23 16 9,10,11 18 4,6,7,11
    19 12 20 7 22 6 23 14,20
good 22 16,17
Grab 2 25
greater 10 15
green 17 6

Greenberg 2:15
grounds 10:19

**H**

H 1:11
hac 2:10
happen 9:10 15:3 18:7
happened 6:2
happens 16:23 22:17
harm 14:18
Health 21:18 22:5
Healthcare 21:14,15
hear 9:1
heard 22:10
hearing 13:18 14:4 22:19
heat 4:7
help 20:22 23:11
Here's 9:5
hold 23:9
honestly 10:3
Honor 2:8,24 6:19 11:5,9 15:6
21:25 22:8,9 23:10
HONORABLE 1:8
horns 8:24
hospital 18:22
Humana 1:4 2:1 23:4
hundreds 5:14 9:3

**I**

impact 5:14
important 11:7 14:21
importantly 5:13 17:18
inclined 3:21,23 10:22
included 7:11 21:10
including 16:1 18:1
injunction 12:1,16,18 13:4,16,21
13:23 14:9 15:15,17,24 16:8
insurance 7:18
interests 14:18,22
interim 13:18
intervene 12:6
involves 22:13
isn't 3:9
issue 3 3 14 10 15 15 16:4,14
17:1
issued 10:3 17:19
issues 2:14 9:2,12 12:20 14:21
17:11,16 19:10
I-95 23:13

**J**

jail 14:7
jailing 4:4
JANUARY 1:6
Jeffrey 1 10:2 20
Jene 1:11 2:22
judge 1:8 3:3 4:4,5 5:21,22,23
6:22 7:12,17 8 16 10:24 12:19
12:23 15:23 16:17,21,22 20:16
21:9 22:1,14 23:12
judgment 11:25 13:3,24 20 3
jurisdiction 13:4 15:19
Justice 1 23 25 6

**K**

keep 22:16
keeping 12:1
kind 3:19 7:10 10:11
know 3 3 4 1 9 20 10 15 14 20
15:19 18:5 19 6 21 23 22 16
23:24 24 3
knowledge 12:3
known 21:15

**L**

labeled 5:3
language 6:4 20:25
law 8:2 13:10 14:8:15:10
laws 6:25
lawyers 3:22 10:22 13:7 22:22

---

lead 2:20 4:10
leader 4:7
learned 4:6
learning 15:23
lectern 2:25
legal 14:21
length 11:11
letting 4:1 23:24
let's 3:3 4:9 20:25
liability 8:4
Liggio 1:10 2:20,20,24 3:5,7,10
3:20 4:15,6,12,15,18,21,24 5:6
5:11,16,23 6:2,10,15,18 7:9,12
7:15,22 8:12,24 9:5,8 10:2,7
10:14,17,19,24 14:13 15:12,13
15:21 16:12 17:3,5,9 18:3,8,12
18:15,19,21,24 19:1,4,7,12,15
19:20 20:5,10,14,18 21:1,4,9
22 1,8,18 23:5,7,12
litigate 12:11 22:12
litigating 14:17 17:10
litigation 1:4 2:2 21:20
live 17:14
local 23:19
longer 6:9 13:1
look 13:11 18:8
looked 6:18 20:15
looking 13:19 22:19
Los 23 14
lot 12 8 15:2
lower 19:11 22:25

**M**

M 1:10
magic 19:23
making 15:7
Managed 1:4 2:1
master 3:15 25:3
MDL 1:4
mean 12:11 15:17
meaningless 3:19
means 12:9,15 14:9
medical 6:6 7:24
member 3:4 10:14
members 8:14 10:12 12 1,13
23:2
mentioned 14:19
merely 19:24
merit 12:25
merits 12:24 16:17 17:10 20:3
23:1
mess 8:25
Miami 1:2,6,25 25:7
Miguel 1:14 2:7 11:5
million 14:24
mode 23 16
modify 15:24
monitor 14:16 17 16
moon 17:5
MORENO 1:8
motion 1:7 2:2,12 4:25 15:7 21 2
21:16 23:6,18,23
move 12 16
moved 13:7
moving 21:23
multi-district 21:20

---

non-physicians 9:6
non-settled 14:23
Northeast 1:24 25:7
notice 3:13 12:22
notifies 21:17
November 7:24
number 13:12 22:25

**O**

obeying 13:23
object 8:19 10:14 16:12
objected 3:7 4:15,16 12:5
objections 16:4
objector 10:16
obligation 17:17
obligations 5:18
observer 23:15
obviously 9:17 18:5
October 7:4,7
Official 1:22 25:6
old 8:22
once 15:15
ongoing 7:6
operation 8:1
opportunity 17:12
opt 3:6,7 4:13 8:7,9 10:5,12 12:7
15:9 23:3
opted 8:9 11:13,14
opting 8:14
order 2:3 3:18 8:23 13:4 17:18
19:25 20:15,23 24:2
ordered 13:15 19:12
ordering 18:12
outcome 9:18

**P**

P 1:11
Page 6:19 7:1 12:17 13:11,11,12
papers 11:10 12:4
parenthetical 13:14
part 4:23
participate 17:12
participating 7:20
particular 2:4 20:23
parties 18:20,21
partner 2:22
party 7:19 13:15 17:13 19:1,17
21:17 22:11
pay 6:25
pending 9:18 11:13,18,19
people 10:9 14:17 15:8,9 24:3
period 6:20 7:21
phone 5:7
physician 6:22,23 11:19,20,21
physicians 6:5,8,12,17 16:7
22:13
plaintiff 11:17,19,20 22:21
plaintiffs 11 16 18:17
plaintiff's 13:7
Plan 21:15
plebe 4:6
plenty 12:3
plowing 10:19
point 8:5 15:5
position 8 1 11:10 13 6
potential 6:10 11:17
power 10:21 17:4
practical 10:25 16:22
practice 2:9
practices 2:10
prejudice 20 4,6,10,11 22:6
preliminary 13:1
present 7:23 22:6
pretty 5:10 11:10
prevail 20 6,8
principle 11:7
private 9:11
pro 2:10
probably 3 2 15 2 16 10:17 1
problem 3:16 8 11 8 12,14 9:16
10:2,6
procedural 6:24

---

Procedure 21:22
proceeding 12:19
proceedings 25:3
proffered 19:24
promise 18:9
prompt 6:25
proper 8:17 14:3 15:7
prosecute 6:9,13 15:25,25 16:6
16:15 17:25
prosecuted 3:17
prosecuting 2:4 12:2
provided 4:24 5:16
providers 6:6,11 7 20
prudent 8:18
Prudential 21:13,15
punish 13:8
punished 15:8
purported 5:19 8:14
purpose 3:14
pursuant 21:21
pursuing 16:18
put 3:25 15:20 23:19,20
putting 9:6 22:4

**Q**

question 16:6,9
questions 13:5 15:14
quick 4:3
quotation 13:13

**R**

R 1:15 25:1
raise 17:15
raised 9:12 16:5
ready 4:12
really 15:16 16:8,25 18:20
reason 23:1
reasons 11:9
refusing 14:5
regular 24:1
related 16:19
release 6:15
released 4:20 6:20,21 7 2 8 3
relevant 13:13
relish 13:19 15:7
remain 14:17
Remand 19:9
REPORTED 1:19
Reporter 1:22 4:4 25:6
represent 5:18
representative 5:19 8:18
requirements 6:24
requires 15:10
resolve 9:1
resolved 9:13
respectfully 8:19
respond 5:12
responding 17 17
response 3:2
responsibility 4:2
rest 2 25
restate 11:12
restrain 16:18
retain 13 4
reverse 17 7
reverses 9 14
reviewed 19:11
right 4 14 5 9 8 10 9 11 10 22,23
14 10 15 3,12 17 16 21 8
22 15
RPR 25:5
RPR-CP 1 21
rule 12:24 17:1 21 21,23
ruled 12 24 16 17
Rules 21 22
ruling R 4,4 9 11 12 19 17 11
20 21 22 13

**S**

safe 23 13 24 6
salient 11 12

sanction 3:21,23 10:22
sanctions 3:24 13:19
saying 8:22
says 12:16
SCHWARTZ 1:21 25:5
see 8:25 9:2 10:5 16:15,23 20:25
  21:11,13 22:15
seek 5:18
seeking 2:11 17:20
seen 14:1 23:15
send 19:5
served 13:22,23
service 6:24
services 6:23
set 11:10
settled 14:21 23:3
settlement 3:4,17 4:17,19 6:18
  7:1,4,11 10:11 11:24 12:3,23
  13:10 14:12 15:1,11,18 16:19
  17:8,9 21:19 23:3
Shame 23:4
ship 3:22 13:9
short 3:3
show 14:23
sign 15:10
silent 23:15
similar 23:17
simple 13:6
simply 16:22
sir 20:18 21:4
sit 2:25 14:23
sitting 9:22
situation 14:4 15:20
Smerek 1:15 2:8
solution 16:22
somebody 12:2
sorry 19:20
sought 12:6
SOUTHERN 1:1
speak 2:23 9:2
specifically 2:2
stage 13:2
standing 6:10 10:16,22 16:14
standpoint 11:1
state 2:10 3:11,16 4:19 5:1,21 6:4
  6:5,6 8:2 9:9 12:11,15,19
  14:25 15:25 16:13,22 19:25
  20:9 22:25
statement 14:6
States 1:1,8 13:13
statutes 7:25
stay 9:17,21,23 12:22,23 14:14
  16:23,25
stayed 12:20
stays 16:8
Ste 1:23 25:6
Stephen 1:15 2:8
stipulate 14:2
stipulation 13:24 15:10 17:24
  19:24 20:14,17 21:1,2,11,12
  22:1
stipulations 20:12
Street 1:24 25:7
subject 6:24 13:16
submits 6:22,23
submitted 7:7,24 20:13
substantive 12:20 17:11
substitute 19:1,17
subterfuge 12:12
successful 12:9
sued 10:12
suggest 9:5,16
suggestion 9:8
suit 11:22
Supreme 6:3 10:3 13:11
sure 14:16 18:24 19:4 20:19 21:9
syllable 13:15
Syngenta 10:2

**T**

T 25:1,1
take 3:23 4:1,7 5:13 11:8 15:2

21:2
takes 17:23
talk 18:14 20:19
talking 18:16
talks 7:2
tell 4:4,8,22 5:16 6:12 17:21,25
  20:15 23:20
telling 10:16 11:21
terrific 3:22
Thank 10:24 11:5 15:6 23:12
That's 10:6 19:14
thing 3:19 10:9 18:7
things 3:16
think 5:6 7:22 9:21 10:17,19 11:1
  16:11,13,16 17:13,17 18:4,15
  19:22 21:9 23:23
thinking 15:21 21:7
third 7:19
thought 2:13 8:18
time 6:20,22,23 7:21,23 9:7 11:8
  23:25
Tobin 5:22,23 16:17 22:14
today 5:7,8 22:7 23:6
tomorrow 5:4
transcript 1:7 24:5
transcription 25:3
Traurig 2:16
Trial 16:21 19:5,9
trip 23:13 24:6
Tropin 23:15
True 4:20
truth 20:16
try 4:13
trying 8:23
twenty 5:13
two 3:22 7:16 23:24

**U**

ultimately 13:17
uncomfortable 15:20
underlying 9:9
understand 4:22
unfair 17:18
United 1:1,8 13:13
useful 2:14
US 21:14

**V**

vacate 15:17,18
vehicle 19:24
versus 23:4
view 14:13 23:8
Villazon 6:3
violated 7:17

**W**

want 9:17 13:9,18,20,21 14:25
  15:8 17:1 18:14 19:9 20:2
  22:11,18
wanted 16:24
Washington 23:14
way 4:9,10 10:21 14:18 15:22
  16:16
went 19:19
Westside 1:10 2:3 3:4,6 21:22
  22:21 23:8
Williams 2:22 21:5
WILLIAMS-RHOADS 1:11
wins 13:17
won't 11:11
word 20:17
wording 20:20
words 13:15 17:21
work 3:22
world 19:7
wouldn't 8:10 19:5
wrestled 3:12 8:7
wrestling 16:14
writing 8:10
wrong 20:12

**Y**

year 7:5 10:3
York 23:18
young 3:22

**Z**

Zebersky 1:11 2:21 12:5 23:5

**0**

00-MDL-1334 23:4
01 6:13
01-016184-02 23:1
016184-02 6:13

**1**

1st 7:24
10 13:12
1061 1:23 25:6
1334 1:4

**2**

2 7:18
2001 3:16 7:8,10,11,14,15
2003 7:25
2004 1:6
23rd 7:4

**3**

30th 7:7
305/523-5118 1:25 25:7
33132 1:25 25:7

**4**

4D03-3533 22:23
4th 1:24 25:7
4:00 23:6

**7**

7 1:6
7th 5:7
73 6:20 7:1
74 7:1

**9**

9 12:17 13:11,12
9th 5:6,9 18:10
9.350(a) 21:21
99 1:24 25:7

# EXHIBIT F

# GRAYCARY

401 B Street, Suite 2000
San Diego, CA  92101-4240
www.graycary.com
O] 619-699-4712
F] 619-699-2701

January 16, 2004
*VIA FACSIMILE AND OVERNIGHT MAIL*

OUR FILE NO. 101501-150953

Joel R. Bennett, Esq.
Bennett & Fairshter, LLP
225 South Lake Avenue, 9th Floor
Pasadena, CA 91101

Re:     **East County Physicians Medical Group, Inc. v. Aetna Life and Casualty Insurance Co.**

Dear Joel:

This letter is to inform you again that continued prosecution of the *East County Physicians Medical Group, Inc. v. Aetna Life and Casualty Insurance Co., et al.* litigation (the "California Action") violates the injunction issued by the United States District Court for the Southern District of Florida in *In Re Managed Care Litigation*, MDL No. 1334 (Master File No. 00-1334-MD-Moreno), and to demand that the California Action be dismissed immediately.

As you are aware, Judge Moreno of the Southern District of Florida issued a Final Approval Order and Judgment on October 24, 2003, and a Supplemental Final Approval Order on November 6, 2003 (collectively "Approval Order") approving the Settlement Agreement between Aetna and Class Representatives in the Provider Track Cases. Final Judgment was entered on November 7, 2003. Under the Approval Order, Judge Moreno "permanently enjoined [ECPMG and Dr. Mazer, hereafter collectively "ECPMG"] from: (a) filing, commencing, prosecuting, intervening in, participating in (as [a] class member[] or otherwise) or receiving any benefits from any lawsuit, administrative or regulatory proceeding or order in any jurisdiction based on any or all Released Claims against [Aetna]...." *See* **Supplemental Final Approval Order** ¶ 6. Although I believe you already have these papers, I attach copies of Judge Moreno's Final Approval Order, Supplemental Final Approval Order, and Final Judgment for your convenience.

The allegations contained in the California Action are within the scope of the Released Claims, as defined by the Settlement Agreement and Approval Order. As a class member who did not timely opt out of the Settlement Agreement, ECPMG is bound by the terms of the Agreement, as well as the Approval Order and Final Judgment.

You should know that on January 7, 2004, Judge Moreno issued an order directing counsel for another physician group, Westside EKG, to immediately dismiss an action they had filed in Florida state court. Like ECPMG, that physician group is a class member and was seeking to prosecute Released Claims. Aetna was forced to file a motion to enjoin Westside EKG from further violation of the court's injunction. At the hearing on that motion, Judge Moreno directed Aetna to "let other people know what I have done here" in an effort to avoid any further motions. Attached for your review is a copy of the transcript from that hearing and the order. At the hearing, Judge Moreno observed that to allow prosecution of other cases by class members would render the settlement

**Gray Cary Ware & Freidenrich LLP**

Joel R. Bennett, Esq.
January 16, 2004
Page Two

and his orders "meaningless." Transcript at p. 3:16-19.  Judge Moreno further instructed counsel for Westside EKG that "I can tell you that you cannot prosecute any case, including an appeal, and, if you do so, you will be in contempt." Transcript at pp. 17:25-18:2.

Please advise us by no later than noon on January 20, 2004 that ECPMG will dismiss the California Action.  If ECPMG refuses to comply with this demand, Aetna will be forced to seek the appropriate relief from Judge Moreno.

Sincerely,

**Gray Cary Ware & Freidenrich LLP**

By: _Maria R Acker._

Maria R. Acker
macker@graycary.com

Admitted to practice in California and the District of Columbia

MRA:epr

Gray Cary\SD\1587328.1
101501-150953

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION


IN RE:
HUMANA, INC., MANAGED CARE LITIGATION

Case MDL NO: 1334


MIAMI, FLORIDA
JANUARY 7, 2004


TRANSCRIPT OF AETNA'S EMERGENCY MOTION TO ENJOIN
BEFORE THE HONORABLE FEDERICO A. MORENO,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR WESTSIDE            JEFFREY M. LIGGIO, ESQ..
EKG:                   JENE P. WILLIAMS-RHOADS, ESQ.,
                       and EDWARD H. ZEBERSKY, ESQ.



FOR AETNA:             MIGUEL ESTRADA, ESQ.,.

                       STEPHEN R. SMEREK, ESQ.,

                       and CHRISTINE NANFELDT, ESQ.



REPORTED BY:



                       ANTON B. SCHWARTZ, RPR-CP

                       Official Federal Court Reporter

                       Federal Justice Building, Ste. 1061

                       99 Northeast 4th Street

                       Miami, FL  33132 - 305/523-5118

2

1     THE COURT: Let me call In Re: Humana Managed Care
2 litigation and specifically Aetna's emergency motion filed for
3 an order enjoining Westside EKG Associates and its attorneys
4 from prosecuting a particular case, now appeal of the
5 dismissal.
6     On behalf of Aetna, who do we have?
7     MR. ESTRADA: Miguel Estrada from Gibson, Dunn &
8 Crutcher. Your Honor. I have with me Stephen Smerek, who is
9 not admitted to practice in Federal Court here, but who
10 practices in the State Court pro hac in the case that we are
11 seeking to get dismissed and whose declaration furnishes the
12 factual basis for our motion.
13     I got ahold of him last night in Atlanta. I thought
14 he might be useful if he were here in case any issues came up.
15     MS. NANFELDT: Christine Nanfeldt with Greenberg
16 Traurig.
17     THE COURT: On behalf of Aetna, as well?
18     MR. ESTRADA: Correct.
19     THE COURT: On behalf of EKG?
20     MR. LIGGIO: I am Jeffrey Liggio. I am lead counsel,
21 and I am here with my co-counsel, Edward Zebenky, and my
22 partner and co-counsel, Jene Williams.
23     THE COURT: Who is going to speak for EKG?
24     MR. LIGGIO: I will, Your Honor.
25     THE COURT: Grab the lectern. The rest of you sit

3

1 down.
2     You probably didn't have a chance to file a response,
3 and I know it is short notice, but let's get down to the issue.
4     Is Westside EKG a member of the settlement class?
5     MR. LIGGIO: Yes, and, Judge --
6     THE COURT: Did Westside EKG opt out?
7     MR. LIGGIO: We objected. We did not opt out and we
8 are --.
9     THE COURT: There is a different, isn't there?
10     MR. LIGGIO: Yes, there is, and although the
11 distinction as far as how it affects the state class action and
12 this class action was one we wrestled with.
13     THE COURT: The problem I am having with this, it is
14 not just this one case -- what is the purpose of Aetna or, for
15 that matter, Cigna, because Cigna is also a defendant in the
16 state case that you all filed back in 2001, if things are going
17 to be prosecuted, then there is no settlement, and what is the
18 net effect of my order?
19     It was kind of a meaningless thing.
20     MR. LIGGIO: The dilemma that we had, and let me say
21 first, if you are inclined to sanction us, I am the captain of
22 the ship. I have two terrific young lawyers that work with me,
23 and if you are inclined to sanction anybody, I am here to take
24 the sanctions.
25     THE COURT: I always put that at the end

4

1     MR. LIGGIO: I am letting you know that, that I take
2 full responsibility.
3     THE COURT: Don't be so quick at it because the Court
4 Reporter will tell you I am more of a jailing Judge than a
5 fining Judge.
6     MR. LIGGIO: I learned when I was a plebe at the Naval
7 Academy that as the leader you take the heat.
8     Let me tell you our dilemma.
9     THE COURT: Let's go through it in this way, and that
10 way, what I am going to do is that I will lead you into a
11 corner.
12     MR. LIGGIO: I am ready.
13     THE COURT: I am going to try. You did not opt out
14 Right?
15     MR. LIGGIO: We did not. We objected.
16     THE COURT: You objected and you filed an appeal of
17 the settlement.
18     MR. LIGGIO: We have.
19     THE COURT: By my approving the settlement, your state
20 claims have been released  True?
21     MR. LIGGIO: Yes and no.
22     THE COURT: The yes I understand. Tell me the no
23 part.
24     MR. LIGGIO: Counsel provided you attached to his
25 emergency motion, although it is not an emergency, our

5

1 complaint in the state class action.
2     THE COURT: Whether it is an emergency or not, it was
3 labeled as one  There is a brief that you have to file by
4 tomorrow before the Fourth District Court of Appeals, and
5 unless there is another extension --
6     MR. LIGGIO: I think it is Friday. It is the 9th.
7 Today is the 7th. We have until Friday and I was on the phone
8 with appellate counsel today.
9     THE COURT: The 9th, I apologize. You are right, but
10 that is pretty close.
11     MR. LIGGIO: Yes, it is
12     THE COURT: They have to respond, unless they get
13 extensions, twenty days, but, more importantly, I have to take
14 care of this because of the impact it may have on hundreds of
15 other cases
16     MR. LIGGIO: Let me tell you why again  They provided
17 the complaint, and the definition of the class that our clients
18 seek to represent, and there are some obligations as a
19 purported class representative, even if the class has not yet
20 been certified -
21     THE COURT: What did the State Judge do in Broward
22 County, Judge Tobin?
23     MR. LIGGIO: Judge Tobin dismissed the case, and so we
24 are on appeal in that dismissal
25     THE COURT: Based upon what? Based upon this

**6**

1 approval?

2    MR. LIGGIO: No, no. What happened was, there was a

3 new Florida Supreme Court case named Villazon, and there is

4 some language in there, but our class definition in the state

5 case is not just physicians. Our class definition in the state

6 case is all medical providers. We may have in the state

7 case --

8    THE COURT: So, what you have to do is, the physicians

9 can no longer prosecute that case. Agreed?

10   MR. LIGGIO: There will be a potential standing

11 problem as far as the other providers.

12   THE COURT: Tell me yes or no. The physicians in Case

13 No. 01--016184-02, Broward County, cannot prosecute the case,

14 can they?

15   MR. LIGGIO: As to the release claims, correct.

16   THE COURT: Well, what other claims are there by

17 physicians?

18   MR. LIGGIO: I have looked at the settlement

19 agreement, and I direct your attention, Your Honor, to Page No.

20 73, as to what has been released, and the time period for

21 claims that have been released

22   Judge, any time a physician submits a bill for

23 service, that is a new claim. Any time a physician submits a

24 bill for service subject to the Florida procedural requirements

25 of the prompt pay laws, that is a new claim.

**7**

1    Page No. 74 or 73, I should say, in the settlement

2 agreement talks about that the claims that have been released

3 are the claims that have accrued up to the date of the approval

4 of the settlement, which in your Court was October 23rd of this

5 past year.

6    My client has ongoing claims as do -- if my client

7 submitted a bill October 30th --

8    THE COURT: But your case was filed in 2001

9    MR. LIGGIO: That is correct.

10   THE COURT: So, 2001, what kind of claims are there in

11 2001 that are not included in this settlement?

12   MR. LIGGIO: None of those past claims, Judge. That

13 is correct.

14   THE COURT: So, what is the 2001 case all about?

15   MR. LIGGIO: The 2001 case was all about - it is a

16 two count complaint, basically. A declaratory count asking the

17 Judge to declare that the conduct violated the contracts of

18 insurance. No. 2, there is a breach of contract cause of

19 action as third party beneficiaries, not as assignees and not

20 as participating providers.

21   THE COURT: Dealing with what period of time?

22   MR. LIGGIO: I think as far as the declaratory count

23 especially, it may go on to the present time

24   If my client submitted a medical bill November 1st of

25 2003, and Aetna did not comply with the statutes which are

**8**

1 drafted in the contract, by operation under our position under

2 the common law of the State of Florida, that is a claim that

3 has not been released in this case, and that is a claim that

4 may be affected by a liability ruling and/or declaratory ruling

5 at some point in the future when we get it back from the

6 Florida Fourth District Court of Appeals.

7    So, we wrestled with, do we opt out and does that

8 affect --

9    THE COURT: Why didn't you opt out? If you opted out,

10 you wouldn't be before me right now. You would be writing your

11 briefs.

12   MR. LIGGIO: The problem we have is, even though the

13 class had not been certified, are we then -- do we then have a

14 problem with are we opting out other purported members of the

15 class. Is there a conflict there, and even though our

16 clients -- the class had not been certified, and the Judge had

17 not found that our client had been a proper class

18 representative, we thought that the prudent cause of action was

19 to object, respectfully, and, if necessary, appeal, which we

20 have. We didn't do it in bad faith.

21   THE COURT: A few days ago, someone said about that

22 old saying, you cannot eat your cake and have it, too, which is

23 the appropriate order, and that is what you are trying to do

24   MR. LIGGIO: Well, we are on the horns of a dilemma.

25   THE COURT: You see what a mess this is. How do I

**9**

1 resolve -- I will hear from whoever, Mr. Estrada or whoever is

2 going to speak on those issues -- but see how this could --

3 just like there is someone like your client, there are hundreds

4 of others

5    MR. LIGGIO: Here's what I suggest

6    THE COURT: I am putting aside the non physicians for

7 the time being

8    MR. LIGGIO: Here is the suggestion. The

9 underlying -- I should not say that -- the state court appeal,

10 we have non-MDL defendants. That appeal is going to happen

11   There is going to be a ruling on those private right

12 of action issues that were raised below. That is going to be

13 resolved by the Florida Appellate Courts.

14   If, in the event, the Eleventh Circuit reverses you,

15 we are going to be back there, anyway.

16   What I suggest, if there is a problem, since they

17 don't want to obviously do a brief, we will agree to stay our

18 case against Aetna, pending the outcome of the Eleventh Circuit

19 appeal.

20   THE COURT: I don't know whether you can actually have

21 a stay in a Court of Appeals. I don't think they are going to

22 be able to do that, because that Appellate Court is sitting

23 there and they have an appeal, they are not just going to stay

24 an appeal

25   They are going to say, "File your brief. If you don't

10

1 file it, it is going to be dismissed."
2      MR. LIGGIO:  The problem is under the Syngenta case
3 that the Supreme Court issued last year, we honestly filed our
4 class action --
5      THE COURT:  You are the one who did not opt out.  See.
6 That's the problem.
7      MR. LIGGIO:  It is a dilemma.
8      THE COURT:  You cannot do both because, if not, I am
9 going to have a bunch of other people doing the same thing.
10 There are bound to be disputes later on between other doctors.
11      So, what kind of a settlement did Aetna get when they
12 are going to be sued by all these class members who did not opt
13 out?
14      MR. LIGGIO:  But if a class member did not object --
15      THE COURT:  I don't know whether you have greater
16 standing as an objector  That is what you are telling me.
17      MR. LIGGIO:  I think so.
18      THE COURT:  In which case --
19      MR. LIGGIO:  Are we plowing new grounds?  I think we
20 are  It was not done in bad faith  It certainly was not done
21 to abuse your power in any way, and, again, if you feel
22 inclined to sanction any lawyers, I am standing right here
23      THE COURT:  All right
24      MR. LIGGIO:  Thank you, Judge
25      THE COURT:  Mr. Estrada, frankly, from a practical

11

1 standpoint, I have to think that it is easier just to do the
2 brief before the Fourth District Court of Appeals
3      Mr. Estrada was here a couple of days ago, flew back,
4 flies back in here.
5      MR. ESTRADA:  Thank you, Your Honor.  Miguel Estrada
6 for Gibson and Aetna.
7      THE COURT:  I assume the principle is more important
8 than the time it would take to do one brief.
9      MR. ESTRADA:  For several reasons, Your Honor  Our
10 position in this case is pretty much set forth in our papers
11 I won't belabor it at length
12      Just let me restate a few of the salient facts  They
13 could have opted out.  They had a case pending.  They could
14 have opted out  They did not do so
15      THE COURT:  You are not asking me to do anything to
16 the non physician plaintiffs
17      MR. ESTRADA:  If they have a potential plaintiff,
18 which they don't currently have in the pending case, who is not
19 a physician, everyone who is a named plaintiff in the pending
20 case is a physician, but if they can find a plaintiff who is
21 not a physician, I would not be in your courtroom telling you
22 to enjoin them anymore than if they brought a suit on behalf of
23 a bus driver
24      I am here because the settlement has been approved
25 There is a final judgment and there is, in addition, an

12

1 injunction that you entered keeping class members from further
2 prosecuting claims, and, in this case, we have somebody who had
3 plenty of actual knowledge of the settlement.
4      We gave them all the papers.  They came into your
5 courtroom. Mr. Zebersky was here and objected ably.  They
6 filed an appeal.  They sought to intervene in the case here,
7 and by doing all of that, by failing to opt out, what they did
8 was cast their lot in Federal Court.
9      What that means is, if they should be successful in
10 the Eleventh Circuit, the answer is no, now they get to
11 litigate in Federal Court -- I mean in State Court.  The answer
12 is, they will be back in front of you, and they will have a
13 claim in front of you, but they will still be class members in
14 front of you.
15      What that means is that their state case is gone.
16 There is an injunction that says they may not move forward with
17 it, and at the bottom of Page 9 --
18      THE COURT:  What did you do with the injunction in the
19 State Court proceeding where the Judge entered a ruling on the
20 substantive issues?  Why don't you have that be stayed or
21 enjoined?
22      MR. ESTRADA:  We asked for a stay.  We filed a notice
23 of your settlement and asked for a stay.  The Judge did not
24 rule on it because he ruled on the merits of the claim, finding
25 that there was no merit.

13

1      Now that we are no longer at the preliminary approval
2 stage, but we have moved to final approval and there is a final
3 judgment, and now that you have, in addition, entered an
4 injunction with an order that you retain jurisdiction, this is
5 the appropriate forum to bring these questions.
6      Our position is very simple.  I don't have any
7 animosity for plaintiff's lawyers.  I get along with them very
8 well  I am not here asking you to punish the captain or the
9 corporal on the ship.  All I want is the benefit of our
10 settlement, and the law on this is very clear.
11      If you look at Page 9 of our brief, the bottom of Page
12 9, and Page 10, we have cited any number of cases from the
13 Supreme Court of the United States, with the relevant quotation
14 following the citation in a parenthetical, which all of them
15 say in words of one syllable a party who is ordered to do
16 something by a Court or is the subject of an injunction, even
17 if it is filed on appeal and even if he ultimately wins, must
18 comply in the interim, and all I want from this hearing -- I
19 don't relish looking for sanctions against counsel  All I
20 want --
21      THE COURT:  You want the injunction
22      MR. ESTRADA:  We served them  We already have an
23 injunction  They are not obeying it, and we served them when
24 you entered your judgment with a stipulation of dismissal,
25 which we have given you  I have another copy

**14**

1  THE COURT: I have seen it. I can't force them to
2  stipulate to dismissal, can I?
3      MR. ESTRADA: Well, if it is a proper contempt
4  hearing, yes, you may, because if the situation is, I have
5  enjoined you to dismiss the case, and you are refusing, then I
6  will go back to the statement that you made earlier, the
7  choices then become jail or fines until they comply.
8      That is the law of civil contempt, and either the
9  injunction means something or it does not, and you are
10 absolutely right; that we are here because this is an issue
11 that will come up again and again, and having the cases go away
12 is the essence of our settlement.
13     If you took the view that Mr. Liggio had, they would
14 stay the appeal only as to Aetna. It would go forward as to
15 anybody else, and what I would have to do, as counsel for
16 Aetna, is I would file an amicus brief or monitor or make sure
17 that the people that remain in the case are litigating it in a
18 way that does not harm my client's interests.
19     You mentioned that I was here a couple of days ago,
20 and you know that we have cases in this courtroom that we have
21 not settled, and whenever there are important legal issues that
22 you are considering that may affect my client's interests in
23 non-settled cases, I show up and I sit in the back, and if I
24 have to do that for one million dollars all over the country
25 who want to file a case in State Court, my client will go

**15**

1  bankrupt, and that is not the benefit of our settlement.
2      THE COURT: You would be probably take a lot of cases
3  for that to happen, but that is all right.
4      MR. ESTRADA: But --
5      THE COURT: I got the point.
6      MR. ESTRADA: Thank you, Your Honor, and, as I said,
7  it is a proper motion for contempt. I don't relish making it
8  I don't want people to be punished, but I would like them, as
9  people who, with the advice of counsel, elected not to opt out,
10 to sign our stipulation of dismissal, as the law requires, so
11 we may get the benefit of our settlement.
12     THE COURT: All right. Mr. Liggio
13     MR. LIGGIO: I have nothing more, but I will answer
14 any questions
15     THE COURT: Well, once I issue the injunction, do I
16 really have any choice? What you are asking me to do is to
17 vacate the injunction, which, of course, would mean I would
18 have to vacate the settlement
19     I don't even know if I have jurisdiction to do that
20 You have put me in a very uncomfortable situation
21     MR. LIGGIO: It seems that maybe -- I was thinking
22 about this on the way down -- and maybe we should have I am
23 learning as I am going, Judge  Maybe we should have come to
24 you when the injunction was entered and asked you to modify it
25 so that we could prosecute or continue to prosecute the state

**16**

1  appeal against all the defendants, including Aetna, and I
2  didn't do that.
3      THE COURT: But the chances are -- you were here for
4  or your client was here for the objections. So, the issue was
5  raised appropriately.
6      The question is whether you can actually prosecute a
7  claim on behalf of physicians against Aetna, and the answer is
8  you really cannot and the injunction stays.
9      Now, the question is, what are you going to do with
10 Aetna, and this is going to probably come up if I finally
11 approve Cigna. So, you might as well think about that.
12     MR. LIGGIO: We did not object to Cigna, and so I
13 think Cigna is going to go away, even in the state case, but we
14 have a standing issue there that we are wrestling with.
15     THE COURT: I don't see how you can prosecute this
16 appeal, because I have to think of this case the same way as if
17 you were before Judge Tobin and he had not ruled on the merits.
18     I would restrain you and enjoin you from pursuing that
19 claim, any claim, related to this settlement. I have done it.
20 I would have to do that
21     Now, if it was a Trial judge, there would be an easy,
22 practical solution. The State Judge would simply say, "I will
23 stay it. See what happens before the Eleventh Circuit," if he
24 wanted to do that or he would dismiss it.
25     Courts of Appeals don't really stay cases. They

**17**

1  probably want to rule on the issue.
2      You have other defendants, do you not?
3      MR. LIGGIO: We do.
4      THE COURT: I have no power over them.
5      MR. LIGGIO: What is baffling to me is, if the moon
6  were green, but, if, in fact, the Eleventh Circuit decides to
7  reverse you in this case --
8      THE COURT: On the settlement.
9      MR. LIGGIO: So there is no settlement any more, and
10 they are litigating on the merits, we will, against the other
11 defendants, have a ruling on those substantive issues and maybe
12 back and they will not have had an opportunity to participate
13     THE COURT: I think if they are not a party in that
14 case, because I have enjoined you, they will live with the fact
15 that someone else on behalf of another defendant will raise
16 those issues and maybe and he will monitor, but right now he is
17 under the obligation of responding to your brief, and I think
18 it is unfair, and, more importantly, it goes against the order
19 that I issued
20     It is not criminal contempt that he is seeking  It is
21 just civil contempt  In other words, coercive, to tell you you
22 have to cease and desist  You have to dismiss it, whatever it
23 takes
24     I cannot force someone to enter into a stipulation,
25 but I can tell you that you cannot prosecute any case,

**18**

1 including an appeal, and, if you do so, you will be in
2 contempt.
3    MR. LIGGIO:  Against Aetna.
4    THE COURT:  That is the only one.  I think it is going
5 to come up, if I finally approve Cigna, obviously.  We know it
6 is going to come up, and the chances are if I approve it, the
7 same thing is going to happen.
8    MR. LIGGIO:  We will look at that very carefully now
9 ourselves, I promise.
10    THE COURT:  So, you have a brief due on the 9th.
11 Between now and then, are you going to dismiss against Aetna?
12    MR. LIGGIO:  You are ordering me to do so, and we will
13 go back --
14    THE COURT:  Go ahead and talk to him, if you want.
15    MR. LIGGIO:  I don't think -- if I go ahead, because
16 we are talking to others -- we have other clients that just are
17 not as named plaintiffs.
18    THE COURT:  Has the class been certified?
19    MR. LIGGIO:  No.
20    THE COURT:  So then they are not really parties.
21    MR. LIGGIO:  They are clients.  They are not parties.
22 But I may be able to, before Friday, bring in the hospital.
23    THE COURT:  In an appeal?
24    MR. LIGGIO:  Sure.
25    THE COURT:  How can you do that on an appeal?

**19**

1    MR. LIGGIO:  We can substitute a party and we have
2 checked --
3    THE COURT:  While the case is up on appeal?
4    MR. LIGGIO:  Sure.
5    THE COURT:  Wouldn't they send it to the Trial Court
6 and say -- I know Appellate Courts are always accused --
7    MR. LIGGIO:  This is a different world.
8    THE COURT:  They don't like to do any of that.  They
9 say, "Remand it to the Trial Court to do whatever you want."
10 They don't like to deal with factual issues that have not been
11 reviewed by a lower Court.
12    MR. LIGGIO:  I am going to do exactly what you ordered
13 me to do.  We will dismiss Aetna only.
14    THE COURT:  That's all I am asking.
15    MR. LIGGIO:  As a defendant in the appeal before
16 Friday by my clients.  If the Fourth District lets us
17 substitute a party, then that is between the Fourth District
18    THE COURT:  I would never enjoin another Court to do
19 anything.  We went through that here.
20    MR. LIGGIO:  Again, I am sorry.  It was no disrespect
21 to you at all.
22    THE COURT:  I accept that and I think it is evident.
23    MR. ESTRADA:  Just to clarify, there is no magic in
24 the stipulation that we proffered.  It was merely a vehicle for
25 accomplishing what the order already does in front of the State

**20**

1 Court.
2    I just want to make clear that given that you have
3 entered a judgment on the merits, the dismissal of my client
4 has to be with prejudice.
5    MR. LIGGIO:  I would appreciate it being without
6 prejudice just in case we prevail in the Eleventh.  We are
7 going to dismiss them.
8    THE COURT:  But if you prevail on the Eleventh, you
9 get to come before me, not about the State Court.
10    MR. LIGGIO:  It will with prejudice.  It will be with
11 prejudice.
12    THE COURT:  What is wrong with the stipulations that
13 they submitted?
14    MR. LIGGIO:  The stipulation is certainly different
15 than the Court order.  I have not looked at it, to tell you the
16 truth, Judge.
17    THE COURT:  So, without the word stipulation --
18    MR. LIGGIO:  What I would like to do -- yes, sir.
19 What I would like to do is just make sure I talk to appellate
20 counsel for the appropriate wording.  I will follow your
21 ruling.
22    THE COURT:  I can't help you with that because what I
23 should do is direct you to enter a particular order of
24 dismissal.
25    What language don't you like about that?  Let's see.

**21**

1    MR. LIGGIO:  Stipulation.
2    THE COURT:  We will take stipulation out.  Motion to
3 dismiss appeal.
4    MR. LIGGIO:  Yes, sir.
5    THE COURT:  Against --
6    MR. ESTRADA:  The Aetna defendants.
7    THE COURT:  I was thinking how many Aetna's are there.
8 There is only one here.  Right?
9    MR. LIGGIO:  I think so, Judge.  We will make sure
10 they are all included.
11    THE COURT:  I don't even see Aetna in the stipulation.
12 Where is that.  Where is Aetna in the stipulation that I have?
13    I see Prudential, Cigna, Foundation.  There it is.
14    So, to make it clear, against Aetna, U.S. Healthcare
15 Inc., first known as Prudential Healthcare Plan, Inc.
16    So, it would be a motion to dismiss the appeal against
17 that party, and it would say notifies the Court that all claims
18 against Aetna Health, Inc., have been extinguished by final
19 approval of the nationwide class action settlement in the
20 Federal multi district litigation caption, and we have that
21    Accordingly, pursuant to Rule 9.350(a) of the Federal
22 Rules of Appellate Procedure, Westside EKG Associates -- I
23 don't know.  Would that rule be the one about moving to
24 dismiss?
25    MR. ESTRADA:  Yes, Your Honor.

**22**

1 MR. LIGGIO: It is a stipulation, Judge.

2 THE COURT: No. I am taking Aetna out. It has

3 nothing to do with it. This is between you and I. We are

4 putting that aside.

5 I will direct you to dismiss Aetna Health, Inc., from

6 the present appeal with prejudice, and it is going to have to

7 be done today.

8 MR. LIGGIO: Yes, Your Honor.

9 MR. ESTRADA: Your Honor, just to clarify something

10 else. I never heard of a Court of Appeals in which you can add

11 a new party with a new claim on appeal, and all I want to make

12 clear that if there is a subterfuge to litigate against Aetna

13 the very ruling that involves physicians only, that came from

14 Judge Tobin, we will be back in front of you.

15 THE COURT: We will see. Right now, everybody is

16 acting in good faith. If you keep coming back, you know what

17 happens with that good faith account? It gets depleted.

18 MR. LIGGIO: I don't want to be back in an emergency

19 hearing looking at contempt again. We will not be back in

20 front of you

21 THE COURT: I am directing the plaintiff, Westside EKG

22 & Associates, through their lawyers, who have been here in

23 Court, to dismiss the appeal in Case No: 4D03-3533, which is

24 the appeal before the Fourth District Court of Appeals in the

25 State of Florida. It is the appeal of the lower case number

**23**

1 01-016184-02, a dismissal on the merits, and the reason for

2 that is because this case -- the members of the class did not

3 opt out and settled and I approved the settlement in this

4 nationwide class action in Shane versus Humana, 00-MDL-1334,

5 and I direct Mr. Liggio, Mr. Zebersky and Ms. Williams to file

6 the motion to dismiss the appeal no later than today at 4:00

7 MR. LIGGIO: Done

8 THE COURT: In view of the agreement by Westside EKG

9 to do that, there is no need to hold anyone in contempt

10 MR. ESTRADA: We agree, Your Honor

11 THE COURT: Anything else that I can help you with?

12 MR. LIGGIO: Thank you, Judge

13 THE COURT: Have a safe trip on I-95 and to wherever

14 you are going, Atlanta, Los Angeles, Washington, and I have

15 never seen Mr. Trupin be so silent here. He is an observer

16 He is taking the Estrada mode

17 MR. ESTRADA: We may have another similar

18 non-emergency motion in a case that has been filed in New York

19 THE COURT: If you put emergency, the local counsel

20 will tell you, you put emergency in front of me, and I am going

21 to act on it in an emergency basis

22 MR. ESTRADA: I will never file in front of you an

23 emergency motion that I don't think is an emergency

24 I am just letting you know I may have one or two more

25 in which there is still some time. I will just file them in

**24**

1 the regular course.

2 THE COURT: Based upon this order, what you should do

3 is let the other people know what I have done here.

4 MR. ESTRADA: I will get an expedited copy of the

5 transcript.

6 THE COURT: Have a safe trip.

**25**

1 C E R T I F I C A T E

2 I hereby certify that the foregoing is an accurate

3 transcription of proceedings in the above-entitled matter

4

5 _____

DATE FILED          ANTON B. SCHWARTZ, RPR

6                    Official Federal Court Reporter

                    Federal Justice Building, Ste. 1061

7                    99 Northeast 4th Street

                    Miami, FL 33132 - 305/523-5118

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

able 9:22 18:22
ably 12:5
above-entitled 25:3
absolutely 14:10
abuse 10:21
Academy 4:7
accept 19:22
accomplishing 19:25
account 22:17
accrued 7:3
accurate 25:2
accused 19:6
act 23:21
acting 22:16
action 3:11,12 5:1 7:19 8:18 9:12
  10:4 21:19 23:4
actual 12:3
add 22:10
addition 11:25 13:3
admitted 2:9
advice 15:9
Aetna 1:14 2:6,17 3:14 7:25 9:18
  10:11 11:6 14:14,16 16:1,7,10
  18:3,11 19:13 21:6,11,12,14
  21:18 22:2,5,12
Aetna's 1:7 2:2 21:7
affect 8:8 14:22
age 8:21 11:3 14:19
agree 9:17 23:10
Agreed 6:9
agreement 6:19 7:2 23:8
ahead 18:14,15
ahold 2:13
amicus 14:16
and/or 8:4
Angeles 23:14
animosity 13:7
answer 12:10 11:1 15:13 16:7
ANTON 1:21 25:5
anybody 3:23 14:15
anymore 11:22
anyway 9:15
apologize 5:9
appeal 2:4 4:16 5:24 8:19 9:9,10
  9:19,23,24 12:6 13:17 14:14
  16:1,16 18:1,23,25 19:3,15
  21:3,16,22 6,11,23,24,25 23:6
Appeals 5:4 8:6 9:21 11:2 16:25
  22:10,24
APPEARANCES 1:9
appellate 5:8 9:13,22 19:6 20:19
  21:22
appreciate 20:5
appropriate 8:23 13:5 20:20
appropriately 16:5
approval 6:17 3:13 1,2 21:19
approve 16:11 18:5,6
approved 11:24 23:3
approving 4:19
aside 9:6 22:4
asked 12 22,23 15:24
asking 7:16:11 15:13 8 15:16
  19:14
assigners 7:19
Associates 2:3 21:22 22:22
assume 11:7
Atlanta 2:13 23:14
attached 4:24
attention 6:19
attorneys 2:3:1

**B**

B 1:21 25:5
back 1:16:8 5:9 15:11 3,4 12:12
  14:6,23 17:12 18:13:22 14:16
  22:18,19
bad 8:20:10:20
baffling 17:5
bankrupt 15:1
Based 5:25,25 24:2
basically 7:16

basis 2:12 23:21
behalf 2:6,17,19 11:22 16:7
  17:15
belabor 11:11
beneficiaries 7:19
benefit 13:9 15:1,11
bill 6:22,24 7:7,24
bottom 12:17 13:11
bound 10:10
breach 7:18
brief 5:3 9:17,25 11:2,8 13:11
  14:16 17:17 18:10
briefs 8:11
bring 13:5 18:22
brought 11:22
Broward 5:21 6:13
Building 1:23 25:6
bunch 10:9
bus 11:23

**C**

C 25:1,1
cake 8:22
call 2:1
can't 14:1 20:22
captain 3:21 13:8
caption 21:20
care 1:4 2:1 5:14
carefully 18:8
case 1:4 2 4,10,14:3 14,16 5:23
  6:3,5,6,7,9,12,13 7:8,14,15 8:3
  9:18 10:2,18 11:10,13,18,20
  12:2,6,15 14:5,17,25 16:13,16
  17:7,14,25 19:3 20:6 22:23,25
  23:2,18
cases 5:15 13:12 14:11,20,23
  15:2 16:25
cast 12:8
cause 7:18 8:18
cease 17:22
certainly 10:20 20:14
certified 5:20 8:13,16 18:18
certify 25:2
chance 3:2
chances 16:3 18:6
checked 19:2
choice 15:16
choices 14:7
Christine 1:16 2:15
Cigna 3:15,15 16:11,12,13 18:5
  21:13
Circuit 9:14,18 12:10 16:23 17:6
citation 13:14
cited 13:12
civil 14:8 17:21
claim 6:23,25 8:2,3 12 1 3,24
  16:7,19,19 22:11
claims 4 20 6:15,16,21 7 2,3,6,10
  7:12 12:2,21:17
clarify 19:23 22:9
class 3:4,11,12 5:1,17,19,19 6:4,5
  8:13,15,16,17 10 4,12,14 12:1
  12:13 18:18 21:19 23:2,4
clear 13:10 20:22:1 14:2 12
client 7:6,6,24 R 17 9 3:14 25
  16:4 20:3
clients 5:17 8:16 18 16,21 19:16
client's 14 18,22
close 5:10
coercive 17:21
come 14:11 15:23 16:10 18:5,6
  20:9
coming 22:16
common 8:2
complaint 5:1,17 7:16
comply 7:25 1:13 18:4:7
conduct 7:17
conflict 8:15
considering 14:22
contempt 14:3,8:15 7:17 20,21
  18:2,22:19:23:9
continue 15:25

contract 7:18 8:1
contracts 7:17
copy 13:25 24:4
corner 4:11
corporal 13:9
correct 2:18 6:15 7:9,13
counsel 2:20 4:24 5:8 13:19
  14:15 15:9 20:20:23 23:19
count 7:16,16,22
country 14:24
County 5:22 6:13
couple 11:3 14:19
course 15:17 24:1
courtroom 11:21 12:5 14:20
Courts 9:13 16:25 19:6
co-counsel 2:21,22
criminal 17:20
Crutcher 2:8
currently 11:18

**D**

date 7:3 25:5
days 5:13 8:21 11:3 14:19
deal 19:10
Dealing 7:21
decides 17:6
declaration 2:11
declaratory 7:16,22 8:4
declare 7 7
defendant 13:17 15:15 19:15
defendants 9:10 16:1 17:2,11
  21:6
definition 5:17 6:4,5
depleted 22:17
desist 17:22
didn't 3:2 8:9,20 16:2
different 3:9 19:7 20:14
dilemma 3:20 4:8 8:24 10:7
direct 6:19 20:23 22:5 23:5
directing 22:21
dismiss 14:5 16:24 17:22 18:11
  19:13 20:7 21:3,16,24 22:5,23
  23:6
dismissal 2:5 5:24 13:24 14:2
  15:10 20:3,24 23:1
disputes 10:10
disrespect 19:20
distinction 3:11
District 1:1,1,8 5:4 8:6 11:2
  19:16,17 22:24
DIVISION 1:2
doctors 10:10
doing 10:9 12:7
dollars 14:24
don't 4:3 9:17,20,21,25 10:15
  11:18,12:20 17:6,19 15:7,8,19
  16:15,25 18:15 19:8,10 20:25
  21:11,23 22:18 23:23
drafted 8:1
driver 11:23
due 18:10
Dunn 2:7

**E**

E 25:1,1
earlier 14:6
easier 11:1
easy 16:21
eat 8:22
Edward 1:11 2:21
effect 3:18
either 14:8
EKG 11:2 3,19,23 1 1,4,6 21:22
  22:21:23:8
elected 15:9
Eleventh 9:14,18 12:10:16:23
  17:6 20:6,8
emergency 1:7 2:2 4 25,25 5:2
  22:18:21 19,20,21,21,23
enjoin 1:7 11 22 16 18:19:18
enjoined 12:21 14:5 17:14

**F**

F 25:1
fact 17:6,14
facts 11:12
factual 2:12 19:10
failing 12:7
faith 8:20 10:20 22:16,17
far 3:11 6:11:7:22
Federal 1:22,23 2:9 12:8,11
  21:20,21 25:6,6
FEDERICO 1:8
feel 10:21
file 3:2 5:3 9:25 10:1 14:16,25
  23:5,22,25
filed 2:2 3:16 4:16 7:8 10:3 12:6
  12:22 13:17 23:18 25:5
final 11:25 13:2,2 21:18
finally 16:10 18:5
find 11:20
finding 12:24
fines 14:7
fining 4:5
first 3:21 21:15
FL 1:25 25:7
flew 11:3
flies 11:4
Florida 1:1,6 6:3,24 8:2,6 9:13
  22:25
follow 20:20
following 13:14
force 14:1 17:24
foregoing 25:2
forth 11:10
forum 13:5
forward 12:16 14:14
found 8:17
Foundation 21:13
Fourth 5:4 8:6 11:2 19:16,17
  22:24
frankly 10:25
Friday 5:6,7 18 22:19:16
front 12:12,13,14 19:25 22:14,20
  23:20,22
full 4:2
furnishes 2:11
further 12 1
future 8:5

**G**

Gibson 2:7 11:6
given 11:25 20:2
go 4:9 7:23 14:6,11,14,25 16:13
  18:13,14,15
goes 17:18
going 2:3 3:16 4:10,13 9:2,10
  9:11,12,15,21,23,25 10:1 9,12
  15:21:16:9,10,11 18:4,6,7,11
  19:12 20:7:12 22:6:23:14,20
good 22:16,17
Grab 2:25
greater 10:15
green 17:6

Greenberg 2:15
grounds 10:19

**H**

H 1:11
hac 2:10
happen 9:10 15:3 18:7
happened 6:2
happens 16:23 22:17
harm 14:18
Health 21:18 22:5
Healthcare 21:14,15
hear 9:1
heard 22:10
hearing 13:18 14:4 22:19
heat 4:7
help 20:22 23:11
Here's 9:5
hold 23:9
honestly 10:3
Honor 2:8,24 6:19 11:5,9 15:6
    21:25 22:8,9 23:10
HONORABLE 1:8
horns 8:24
hospital 18:22
Humana 1:4 2:1 23:4
hundreds 5:14 9:3

**I**

Impact 5:14
important 11:7 14:21
importantly 5:13 17:18
inclined 3:21,23 10:22
included 7:11 21:10
including 16:1 18:1
injunction 12:1,16,18 13:4,16,21
    13:23 14:9 15:15,17,24 16:8
insurance 7:18
interests 14:18,22
interim 13:18
intervene 12:6
involves 22:13
isn't 3:9
issue 3:3 14:10 15:15 16:4,14
    17:1
issued 10:3 17:19
issues 2:14 9:2,12 12:20 14:21
    17:11,16 19:10
1-95 23:13

**J**

jail 14:7
jailing 4:4
JANUARY 1:6
Jeffrey 1:10 2:20
Jene 1:11 2:22
judge 1:8 3:3 4:4,5 5:21,22,23
    6:22 7:12,17:8 16:10 24 12:19
    12:23 15:23 16 17:21,22 20:16
    21:9 22:1,14 23:12
judgment 11:25 13:3,24 20:3
jurisdiction 13:4 15:19
Justice 1:23 25:6

**K**

keep 22:16
keeping 12:1
kind 3:19 7:10 10:11
know 3:3 4:1 9:20 10:15 14:20
    15:19 18:5 19:6 21:23 22:16
    23:24,24:3
knowledge 12:3
known 21:15

**L**

labeled 5:3
language 6:4 20:25
law 8:2 13:10 14:8 15:10
laws 6:25
lawyers 3:22 10:22 13:7 22:22

lead 2:20 4:10
leader 4:7
learned 4:6
learning 15:23
lectern 2:25
legal 14:21
length 11:11
letting 4:1 23:24
let's 3:3 4:9 20:25
liability 8:4
Liggio 1:10 2:20,20,24 3:5,7,10
    3:20 4:11,6,12,15,18,21,24 5:6
    5:11,16,23 6:2,10,15,18 7:9,12
    7:15,22 8:1,2,24 9:5,8 10:2,7
    10:14,17,19,24 14:13 15:12,13
    15:21 16:12 17:3,5,9 18:3,8,12
    18:15,19,21,24 19:1,4,7,12,15
    19:20 20:5,10,14,18 21:1,4,9
    22:1,8,18 23:5,7,12
litigate 12:11 22:12
litigating 14:17 17:10
litigation 1:4 2:2 21:20
live 17:14
local 23:19
longer 6:9 13:1
look 13:11 18:8
looked 6:18 20:15
looking 13:19 22:19
Los 23:14
lot 12:8 15:2
lower 19:11 22:25

**M**

M 1:10
magic 19:23
making 15:7
Managed 1:4 2:1
matter 3:15 25:3
MDL 1:4
mean 12:11 15:17
meaningless 3:19
means 12:9,15 14:9
medical 6:6 7:24
member 3:4 10:14
members 8:14 10:12 12:1,13
    23:2
mentioned 14:19
merely 19:24
merit 12:25
merits 12:24 16:17 17:10 20:3
    23:1
mess 8:25
Miami 1:2,6,25 25:7
Miguel 1:14 2:7 11:5
million 14:24
mode 23:16
modify 15:24
monitor 14:16 17:16
moon 17:5
MORENO 1:8
motion 1:7 2:2,12,4,25 15:7 21:2
    21:16 23:6,18,23
move 12:16
moved 11:2
moving 21:23
multi-district 21:20

**N**

named 6:3 11:19 18:17
Nanfeldt 1:16 2:15,15
nationwide 21:19 23:4
Naval 4:6
necessary 8:19
need 21:9
net 3:18
never 19:18 22:10 21:15,22
new 6:3,23,25 10:19 22:11,11
    21:18
night 2:13
non-emergency 23:18
non-MDL 9:10
non-physician 11:16

non-physicians 9:6
non-settled 14:23
Northeast 1:24 25:7
notice 3:3 12:22
notifies 21:17
November 7:24
number 13:12 22:25

**O**

obeying 13:23
object 8:19 10:14 16:12
objected 3:7 4:15,16 12:5
objections 16:4
objector 10:16
obligation 17:17
obligations 5:18
observer 23:15
obviously 9:17 18:5
October 7:4,7
Official 1:22 25:6
old 8:22
once 15:15
ongoing 7:6
operation 8:1
opportunity 17:12
opt 3:6,7 4:13 8:7,9 10:5,12 12:7
    15:9 23:3
opted 8:9 11 13,14
opting 8:14
order 2:3 3:18 8:23 13:4 17:18
    19:25 20:15,23 24:2
ordered 13:15 19:12
ordering 18:12
outcome 9:18

**P**

P 1:11
Page 6:19 7:1 12:17 13:11,11,12
papers 11:10 12:4
parenthetical 13:14
part 4:23
participate 17:12
participating 7:20
particular 2:4 20:23
parties 18:20,21
partner 2:22
party 7:19 13:15 17:13 19:1,17
    21:17 22:11
pay 6:25
pending 9:18 11:13,18,19
people 10:9 14:17 15:8,9 24:3
period 6:20 7:21
phone 5:7
physician 6:22,23 11:19,20,21
physicians 6:5,8,12,17 16:7
    22:13
plaintiff 11:17,19,20 22:21
plaintiffs 11:16 18:17
plaintiff's 13:7
Plan 21:15
plebe 4:6
plenty 12:3
plowing 10:19
point 8:5 15:5
position 8:1 11:10 13:6
potential 6:10 11:17
power 10:21 17:4
practical 10:25 16:22
practice 2:9
practices 2:10
prejudice 20:4,6,10,11 22:6
preliminary 13:1
present 7:23 22:6
pretty 5:10 11:10
prevail 20:6,8
principle 11:7
private 9:11
pro 2:10
probably 3:2 15:2 16 10 17:1
problem 3:13 6:11 8 12,14 9:16
    10:2,6
procedural 6:24

Procedure 21:22
proceeding 12:19
proceedings 25:3
proffered 19:24
promise 18:9
prompt 6:25
proper 8:17 14:3 15:7
prosecute 6:9,13 15:25,25 16:6
    16:15 17:25
prosecuted 3:17
prosecuting 2:4 12:2
provided 4:24 5:16
providers 6:6,11 7.20
prudent 8:18
Prudential 21:13,15
punish 13:8
punished 15:8
purported 5:19 8:14
purpose 3:14
pursuant 21:21
pursuing 16:18
put 3:25 15:20 23:19,20
putting 9:6 22:4

**Q**

question 16:6,9
quick 4:3
questions 13:5 15:14
quick 4:3
quotation 13:13

**R**

R 1 15 25:1
raise 17:15
raised 9:12 16:5
ready 4:12
really 15:16 16:8,25 18:20
reason 23:1
reasons 11:9
refusing 14:5
regular 24:1
related 16:19
release 6:15
released 4.20 6:20,21 7.2 8.3
relevant 13:13
relish 13:19 15:7
remain 14:17
Remand 19:9
REPORTED 1:19
Reporter 1:22 4:4 25:6
represent 5:18
representative 5:19 8.18
requirement 6:24
require 15:10
resolve 9:1
resolved 9:13
respectfully 8:19
respond 5:12
responding 17:17
response 3:2
responsibility 4 2
rest 2:25
restate 11:12
restrain 16:18
retain 13:4
reverse 17:7
reverses 9:14
reviewed 19:11
right 4 14:5 9:8 10:9 11:10 22,23
    14:10:15 3,12 17 16 21:8
    22:15
RPR 25:5
RPR-CP 1:21
rule 12:24 17:1 21:21,23
ruled 12:24 16:17
Rules 21:22
ruling 8.4,4.9 11:12 19:17.11
    20:21 22:13

**S**

safe 23:13 24:6
salient 11:12

**S**

sanction 3:21,23 10:22
sanctions 3:24 13:19
saying 8:22
says 12:16
SCHWARTZ 1:21 25:5
see 8:25 9:2 10:5 16:15,23 20:25
  21:11,13 22:15
seek 5:18
seeking 2:11 17:20
seen 14:1 23:15
send 19:5
served 13:22,23
service 6:24
services 6:23
set 11:10
settled 14:21 23:3
settlement 3:4,17 4:17,19 6:18
  7:1,4,11 10:11 11:24 12:3,23
  13:10 14:12 15:1,11,18 16:19
  17:8,9 21:19 23:3
Shane 23:4
ship 3:22 13:9
short 3:3
show 14:23
sign 15:10
silent 23:15
similar 23:17
simple 13:6
simply 16:22
sir 20:18 21:4
sit 2:25 14:23
sitting 9:22
situation 14:4 15:20
Smerek 1:15 2:8
solution 16:22
somebody 12:2
sorry 19:20
sought 12:6
SOUTHERN 1:1
speak 2:23 9:2
specifically 2:2
stage 13:2
standing 6:10 10:16,22 16:14
standpoint 11:1
state 2:10 3:11,16 4:19 5:1,21 6:4
  6:5,6 8:2 9:9 12:11,15,19
  14:25 15:25 16:13,22 19:25
  20:9 22:25
statement 14:6
States 1:1,8 13:13
statutes 7:25
stay 9:17,21,23 12:22,23 14:14
  16:23,25
stayed 12:20
stays 16:8
Ste 1:23 25:6
Stephen 1:15 2:8
stipulate 14:2
stipulation 13:24 15:10 17:24
  19:24 20:14,17 21:1,2,11,12
  22:1
stipulations 20:12
Street 1:24 25:7
subject 6:24 13:16
submits 6:22,23
submitted 7:7,24 20:13
substantive 12:20 17:11
substitute 19:1,17
subterfuge 22:12
successful 12:9
sued 10:12
suggest 9:5,16
suggestion 9:8
suit 11:22
Supreme 6:3 10:3 13:13
sure 14:16 18:24 19:4 20:19 21:9
syllable 13:15
Syngenta 10:2

**T**

T 25:1,1
take 3:23 4:1,7 5:13 11:8 15:2

21:2
takes 17:23
talk 18:14 20:19
talking 18:16
talks 7:2
tell 4:4,8,22 5:16 6:12 17:21,25
  20:15 23:20
telling 10:16 11:21
terrific 3:22
Thank 10:24 11:5 15:6 23:12
That's 10:6 19:14
thing 3:19 10:9 18:7
things 3:16
think 5:6 7:22 9:21 10:17,19 11:1
  16:11,13,16 17:13,17 18:4,15
  19:22 21:9 23:23
thinking 15:21 21:7
third 7:19
thought 2:13 8:18
time 6:20,22,23 7:21,23 9:7 11:8
  23:25
Tobin 5:22,23 16:17 22:14
today 5:7,8 22:7 23:6
tomorrow 5:4
transcript 1:7 24:5
transcription 25:3
Traurig 2:16
Trial 18:21 19:5,9
trip 23:13 24:6
Tropin 23:15
True 4:20
truth 20:16
try 4:13
trying 8:23
twenty 5:13
two 3:22 7:16 23:24

**U**

ultimately 13:17
uncomfortable 15:20
underlying 9:9
understand 8:21
unfair 17:18
United 1:1,8 13:13
useful 2:14
US 21:14

**V**

vacate 15:17,18
vehicle 19:24
versus 23:4
view 14:13 23:8
Villazon 6:3
violated 7:17

**W**

want 9:17 13:9,18,20,21 14:25
  15:8 17:11 18:14 19:9 20:2
  22:11,18
wanted 16:24
Washington 23:14
way 4:9,10 10:21 14:18 15:22
  16:16
went 19:19
Westside 1:10 2:3 3:4,6 21:22
  22:21 23:8
Williams 2:22 21:5
WILLIAMS-RHOADS 1:11
wins 13:17
won't 11:11
word 20:17
wording 20:20
words 13:15 17:21
work 3:22
world 19:7
wouldn't 8:10 19:5
wrestled 3:12 8:7
wrestling 16:14
writing 8:10
wrong 20:12

**Y**

year 7:5 10:3
York 23:18
young 3:22

**Z**

Zebersky 1:11 2:21 12:5 23:5

**0**

00-MDL-1334 23:4
01 6:13
01-016184-02 23:1
016184-02 6:13

**1**

1st 7:24
10 13:12
1061 1:23 25:6
1334 1:4

**2**

2 7:18
2001 3:16 7:8,10,11,14,15
2003 7:25
2004 1:6
23rd 7:4

**3**

30th 7:7
305/523-5118 1:25 25:7
33132 1:25 25:7

**4**

4D03-3533 22:23
4th 1:24 25:7
4:00 23:6

**7**

7 1:6
7th 5:7
73 6:20 7:1
74 7:1

**9**

9 12:17 13:11,12
9th 5:6,9 18:10
9.350(a) 21:21
99 1:24 25:7

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

FILED by KKS D.C.

JAN - 7 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

MDL No. 1334
Master File No. 00-1334-MD-MORENO

IN RE: MANAGED CARE LITIGATION

---

THIS DOCUMENT RELATES TO
**PROVIDER TRACK CASES**

---

## ORDER GRANTING AETNA INC. AND AETNA U.S. HEALTHCARE INC.'S EMERGENCY MOTION FOR AN ORDER ENJOINING WESTSIDE EKG ASSOCIATES AND ITS ATTORNEYS FROM PROSECUTING APPEAL CASE NO. 4D03-3533

THIS MATTER came before the Court upon Defendants', Aetna Inc. And Aetna U.S. Healthcare Inc., Emergency Motion for an Order Enjoining Westside EKG Associated and Its Attorneys From Violating This Court's Final Approval Orders and Judgment and Compelling Westside EKG and Its Attorneys to Show Cause Why They Should Not Be Held in Contempt, filed on **January 6, 2003**.

THE COURT has considered the motion and heard oral argument, and being otherwise fully advised in the premises, it is

**ADJUDGED** that the Defendants' Emergency Motion For An Order Enjoining Westside EKG Associates and its Attorneys is GRANTED. Westside EKG Associates and its attorney, Jeffrey M. Liggio, are directed to dismiss with prejudice the pending appeal in *Westside EKG Associates v. Aetna U.S Healthcare*, Case No. 4D03-3533, by 4:00 P.M. today Wednesday, January 7, 2004 at 4:00 P.M. for the reasons stated in open court on the same date. Because Mr. Liggio agreed to comply with this

Court's Order, the motion to be held in contempt is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 7th day of January, 2004.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

COPIES PROVIDED TO:

COUNSEL ON **THE OCTOBER 1, 2003 SERVICE LIST**

Miguel Estrada, Esq.
  1050 Connecticut Avenue, N.W.
  Washington, D.C. 20036

Jeffrey M. Liggio, Esq.
  1615 Forum Place, Suite 3B
  West Palm Beach, FL 33401

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**MDL No. 1334**
**Master File No. 00-1334-MD-MORENO**

IN RE: MANAGED CARE LITIGATION

---

CLASS PLAINTIFFS,

vs.

AETNA INC., AND AETNA - US
HEALTHCARE, INC.

Defendants.

_____/

FILED by ___ D.C.

OCT 2 4 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

## FINAL APPROVAL ORDER AND JUDGMENT

Class Plaintiffs and Defendants Aetna, Inc. and Aetna-US Healthcare (collectively, "AETNA") have submitted for final approval a proposed settlement of this class action. For the reasons set out in detail below, this Court has determined that the Settlement is fair, reasonable, and adequate and should therefore be approved. Accordingly, this Court issues this Final Approval Order and Judgment, approves the Settlement and dismisses the Second Amended Complaint in this action with prejudice as it relates to AETNA.

1.      On October 14, 2003, this Court held a hearing, after proper notice, to consider the fairness, reasonableness and adequacy of the proposed Settlement.

2.      In reaching its decision in this case, this Court considered the Settlement agreement, the extensive Court file in this case, and the presentations by Plaintiffs and Defendant AETNA in support of the fairness, reasonableness and adequacy of the Settlement. This Court also considered the objections of class members.

3.      As recognized in the Order Preliminarily Approving Settlement on May 30, 2003, this Court previously certified a class, under Rules 23(a) and 23 (b)(2) and (3) of the Federal Rules

1

of Civil Procedure, of physicians in a case against Health Maintenance Organizations, including AETNA, alleging that they systematically reduced, denied and delayed payments owed to the doctors for medical care rendered to patients who subscribed to the defendant entity.

4.     The Court affirms its decision certifying the class and preliminarily approving the settlement.  The Court finds that the requirements of numerosity, commonality, typicality and adequacy pursuant to Fed.R.Civ.P. 23(a) have been met.

5.     In making the latter determination of adequacy, this Court has considered the following: a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class; c) the desirability of concentrating the litigation of the claims in this particular forum; and d) the difficulties likely to be encountered in the management of a class action.

6.     In its Order of Preliminary Settlement Approval, this Court preliminarily approved the notice, and found that the proposed form and content of the Notice to the Class members satisfied the requirements of due process. The Court reaffirms that finding and holds that the best practicable notice was given to class members.  The Court overrules both the objections argued at the fairness hearing and raised before in the pleadings regarding the notice.

7.     The parties timely caused the notice to be mailed to each of the class members, as well as through such high volume publications, as *USA Today* (July 10 and 17, 2003); *Wall Street Journal* (July 10 and 17, 2003); as well as the *Journal of American Medical Association* (July 23 and 30, 2003).  Information was also posted  on counsels' websites as well as the websites of numerous medical associations.  The notice (attached as Court's exhibit #1) advised class members of, among other things, the allegations in the complaint, the terms of the proposed settlement, the requirements including deadlines, for objections to the Settlement, and the scheduled October 14, 2003 Final Approval Fairness Hearing.  The notice further identified class counsel and set forth the

2

bases for class counsel's motion for attorneys' fees and expenses.  The notice also set forth in full the claims released by class members as part of the Settlement, and advised class members in bold face to read the notice carefully because it would affect their rights if they failed to timely object to the Settlement.

8.      This Court has again reviewed the notice and finds the "best practicable" notice was given to the class and that the notice was "reasonably calculated" a) to describe the action and the plaintiffs and class members' rights in it; and b) to apprise interested parties of the pendency of the action and of their right to have their objections to the Settlement heard. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810 (1985); *accord* FRCP 23(c)(2)("best notice practicable under the circumstances, including notice to all members who can be identified through reasonable effort," shall be given to class members).  This Court further finds that class members were previously given an opportunity to opt out of the action and that they were adequately represented.  The Court thus reaffirms its findings that the notice given to the class satisfies the requirements of the due process clause and holds that it has personal jurisdiction over all class members.

9.      The Court must determine whether the proposed settlement is "fair, adequate and reasonable and is not the product of collusion" between the parties. *Leverso v. Southtrust Bank of Ala.*, 18 F.3d 1527, 1530 (11th Cir. 1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981).  In making this determination, the Court considers six factors: a) the likelihood that plaintiffs would prevail at trial; b) the range of possible recovery if plaintiffs prevailed at trial; c) the fairness of the settlement compared to the range of possible recovery, discounted for the risks associated with litigation; (d) the complexity, expense and duration of litigation; (e) the substance and amount of opposition to the settlement; and (f) the stage of the proceedings at which the settlement was achieved. *Bennett*, 737 F.2d at 986; *Corrugated Container*, 643 F.2d at 212; *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538-39 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

3

10.     In considering this Settlement, the Court need not re-address the merits of this case. This Court has considered the submissions of the parties, and the class action discovery conducted in this case, all of which show that, notwithstanding the plaintiffs' success on class certification, there remains substantial risk and uncertainty in plaintiffs ultimately prevailing on their claims on appeal. This risk and uncertainty is increased by the Eleventh Circuit's decision to grant a Rule 23(f) petition, presently pending before that court. Moreover, this Court has not yet ruled on the latest motion to dismiss attacking the last amended complaint. Given these considerable open issues and the uncertainty of the inevitable plenary appeal, the benefits available directly to the Class represent an excellent result and can be summarized as follows:

### Benefits of the AETNA Settlement

A.     The Settlement requires changes and commitments in AETNA's business **practices to eliminate** the worst of the improper practices involved in managed care:

　　　1.     The Settlement eliminates downloading and improper bundling and computerized denial practices.

　　　2.     The Settlement eliminates gag clauses and all-product clauses.

　　　3.     The Settlement establishes the standard of a "Physician, exercising prudent clinical judgment" for "medically necessary" services, and allows cost considerations only when an alternative services is at least as likely to produce equivalent results.

　　　4.     The Settlement creates a revolutionary dispute resolution mechanism, using an independent, specialty matched external review of decisions regarding medical necessity and an efficient optional billing dispute procedure.

　　　5.     The Settlement provides for a facilitator to assist physicians in enforcing the Agreement.

　　　6.     The Settlement allows a physician to enforce any state or federal law or regulation, even when there is no private right of action.

B.     The Settlement creates a substantial fund - $100,000,000 - for physicians to recover some of their damages.

4

    C.     The Settlement establishes a foundation "dedicated to promoting high quality health care and shall give particular emphasis to initiatives that assist to improve/enhance the quality of care received by patients."

    D.     The Settlement includes a right to opt-out, so any physician or group may decline participation and proceed otherwise.

11.    If this case were to proceed without settlement, the resulting trial and the inevitable appeal would be complex, lengthy and very expensive. The Settlement eliminates a substantial risk that the class would walk away empty-handed after the conclusion of such appeals. *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992). Further, defendant AETNA has defended this action vigorously and, absent a settlement, has indicated that it would continue to do so upon appeal. Because of the resulting motion practice, trial and appeals, it could be years before class members would see any recovery, even if they were to prevail on the merits, which might not produce a better recovery than they have achieved in this settlement. *Behrens*, 118 F.R.D. at 543 (settlement "shortened what would have been a very hard-fought and exhausting period of time, which may have realistically ended with a decision similar to the terms of this settlement"). More importantly, the Settlement calls for the prospective elimination of billing and payment practices detrimental to physicians.

12.    A total of nineteen timely objections were received. Two of these were by co-defendants, who have since withdrawn those objections. Three other objections were by non-class members (subscribers, podiatrists and chiropractors) who release no claim which they may have. Another objector, the Florida Attorney General was represented by Keith Vanden Dooren, Senior Assistant Attorney General who appeared *amicus curiae* to express "concern about the medical necessity definition as a matter of public policy "but" insisted he was not there to derail the Settlement. Another objection by Dr. Robert M. Siegel and Advanced Cardiac Specialist was withdrawn on October 21, 2003.

Three objectors objected to the amount of attorneys' fees and two physicians, Drs. Lenet and

Jacobson, objected to the "managed care" system as a whole.

Putting these aside, there are six set of objectors addressing the substance of the Settlement, which represent a minuscule percentage of the 950,000 class members notified through 1.9 million notices, plus the extensive media coverage that this case has received.[1]

13.　The remaining objections may be summarized as follows:

A.　Drs. Arnold Komisar, David Jacobsen and Joseph Leonard:

1.　Inadequate Legal Counsel

a.　Conflict of Interest - the class lawyers are simultaneously representing physicians and medical societies. Medical societies have a variety of interests, and money was taken away from physicians to give to a charitable foundation run by the societies. *See* Section 8.4(f) of the Settlement agreement. Further, the medical societies are not members of the class.

2.　Settlement is not fair

a.　AETNA settlement favors certain class members over others - *e.g.* disparate treatment regarding non-participating physicians vs. participating doctors.

b.　External medical necessity review provisions are onerous and unfair. Basically, physicians must pay for this privilege. It is binding, bars legal recourse and states already give an entitlement to this review.

c.　Settlement "amount" for each physician is not fair and is completely unrelated to actual damages. The Settlement amount pales in comparison to actual injuries.

3.　Settlement has too many loopholes rendering AETNA's forward-going commitments ineffective. *See* Section 7.29(o), Section 12.8 (allows AETNA to modify agreements).

---

[1] The Settlement is supported by the medical societies and associations of numerous states, including Alabama, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Louisiana, Massachusetts, Nebraska, New Jersey, New York, Oklahoma, Rhode Island, South Carolina, Tennessee, Texas, Virginia and Washington as well as the American Medical Association's President Donald Palmisano, M.D.

4.    Settlement releases claims that should not be released

    a.    Limiting the liability of all Settlement participants is unfair. *See* Section 11 of the Settlement agreement.

    b.    The Settlement release future claims. *See* Section 13(b) of the Settlement agreement.

5.    Requirement to submit all disputes over this Settlement to arbitration is improper. *See* Section 12.2 of the Settlement agreement (awarding attorney's fees and costs to prevailing party in disputes)

**B.**    **Dr. Harry Fry, on behalf of certain Ohio and Kentucky physicians:**

1.    Overly broad releases provision - complains that this provision may extinguish antitrust claims dismissed but now pending in state appellate courts in Ohio and Kentucky. *See* Section 13 of Settlement agreement. Alleges that claims in those cases, including anti-competitive practices and violations of state laws, do not arise from the conduct in this litigation.

2.    Settlement fund inadequate - if those antitrust claims are covered, then the settlement fund is not adequately funded to compensate them for the damages. However, there are 1800 physicians in the Ohio/Kentucky action who have opted out.

3.    Settlement fails to comply with Fed. R. Civ. P. 23

    a.    Representation is inadequate because the Ohio and Kentucky doctor subclass was not represented properly.

    b.    Notice is inadequate as objector was not on notice of preliminary hearing or of the broad release language of the Settlement.

4.    Settlement agreement fails to address inadequate reimbursement rates paid to objector in greater Cincinnati/Northern Kentucky region - it forces them into the alternative dispute resolution process.

5.    Release of objector's claims is not supported by valid consideration.

**C.**    **Dr. Lisa Reznick:**

1.    Concerned with charitable foundation - the $20 million set aside should first be disbursed to physicians and then the remainder should go to the foundation.

a.   The goals of the foundation should be to address improprieties in insurance claims handling not the broad goal of "promoting high quality health care".

b.   No mechanism to notify class members regarding details of proposed foundation.

D.   Dr. Edward Mewborne from Texas:

1.   Settlement is not "fair, adequate or reasonable" -Mainly concerns with Sections 7 and 12 of the Agreement

a.   The value of the entire settlement is uncertain because of illusory business practices.

b.   No disclosure or range of recovery and therefore AETNA's possible liability.

2.   Argues that the business practice initiatives are illusory - Primary consideration for settlement is implementation of future changes in AETNA's business practices - and there is a false amount stated because many of these business practices are already required by state of federal law. *See, e.g.*, Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

3.   The Settlement fund of $100 million is inadequate. In light of the unique legal remedies available in Texas, there is inadequate damages to Texas class members.

4.   Notice of Proposed Settlement was infirm - no way to calculate the actual value of the settlement as to each class member since no estimate of size of class was provided.

14.   Many of these objections lack merit because the objectors can simply opt out if they ave concerns about releasing their claims. The objections to the notice are overruled because the court finds that notice was adequate.

The Court is also satisfied that the amount to be received by the physicians, $100 million plus the changes in defendant AETNA's procedures to pay the doctors' claims as outlined by Richard Frank in his October 2, 2003 affidavit (attached as Exhibit #2) are of substantial value to the class.

8

The Court, at the fairness hearing, expressed reservations about the utility of a "Foundation". However the Court is convinced that the foundation is a material element of the agreement, obtained through more than two dozen arms' length negotiation sessions that mutually benefit both sides.

15.     In addition to finding the terms of the proposed settlement fair, reasonable and adequate, this Court must determine that there was no fraud or collusion between the parties or their counsel in negotiating the Settlement's terms. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428-29 (5th Cir. 1977). In this case, there is no evidence of fraud or collusion between the parties. Furthermore, the terms of the Settlement make it clear that the process by which the settlement was achieved was fair. Finally, there is no evidence of unethical behavior, want of skill or lack of zeal on the part of class counsel. The only objections related to this issue may be the different treatment received by participating physicians versus non-participant providers. However those doctors not having claims, or opting out, are not affected by the release provisions. Furthermore, plaintiffs' class counsel reiterated the agreement that physicians will continue to be represented in the processing of their claims and will not be left to fend for themselves as suggested by counsel for one of the objectors.

16.     The terms of the agreement are fully and finally approved as fair, reasonable and adequate and in the best interests of the class.

## ATTORNEYS' FEES

17.     The agreement also provides that class counsel would be paid a total amount of $50,000,000 in attorneys' fees, including $6.5 million in on expenses. Although a figure of $43.5 million may appear on its face as exorbitant, an analysis of the work done by 152 attorneys from 26 law firms nationwide renders the fee reasonable. (See Court Exhibit #3). Because the fee award is being paid by Defendant AETNA, when added to the total benefits being given

directly to the Class, the total settlement benefit appears to be between $400 and $450 million.

It is fair to note that under a common-fund analysis, by which a class action fee award is determined based on a percentage of the overall benefit achieved on behalf of the Class, the fee is a reasonable one. Pursuant to *Camden I Condo. Assoc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991), an attorneys' fee award in a class action must be "based on a reasonable percentage of the fund established for the benefit of the class." The total amount of fees requested (the fee and cost payment, less Class counsel's costs) falls within the "benchmark" range of 25-30% even if the settlement's value is at one objector's suggested low end of only $200 million. *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294-95 (11th Cir. 1999); *Camden I, 946 F.2d at 774*. Moreover, the fee is reasonable in view of the great risk associated with asserting these claims; the novelty and difficulty of the questions involved; the excellent results achieved for the class and the extensive time (three years) and effort it took to achieve that result as verified by the affidavits in support of the attorneys' fee filed by experienced litigators and a prominent professor; the experience, reputation and ability of the attorneys; and the preclusion of other employment by the attorneys due to acceptance of this case. Accordingly, the fee award set forth in the Settlement agreement is approved and shall be paid in accordance with the terms of the agreement.

## CONCLUSION

18.     The complaint, including all individual claims and class claims against AETNA that were or could have been raised in this action are dismissed on the merits and with prejudice. The agreement is hereby approved. Without limiting any term of the agreement, this Final Approval Order and Judgment, including all exhibits, shall forever be binding upon all class members, as well as their heirs, executors and administrators, successors and assigns. Regardless of whether or the extent to which class members may make claims under the settlement, this Final Approval Order and Judgment releases Defendant AETNA from any and

all claims of plaintiff class members that arise from, or in any way relate, to this complaint. Of course those class members who elected to opt out, or interested objectors who were not even members of the class, are completely unaffected by the settlement and this litigation.

DONE AND ORDERED in Chambers in the Southern District of Florida, at Miami, Florida this _24th_ day of October, 2003.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

COPIES PROVIDED TO COUNSEL ON
THE *OCTOBER 1, 2003* SERVICE LIST

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

MDL NO.: 1334
MASTER FILE NO.: 00-1334-MD-MORENO

IN RE:
MANAGED CARE LITIGATION

THIS DOCUMENT RELATES TO
PROVIDER TRACK CASES ONLY

FILED by RM D.C.

NOV 0 6 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

## SUPPLEMENTAL FINAL APPROVAL ORDER

Defendants Aetna Inc. and Aetna-U.S. Healthcare Inc. (together, "Aetna") and the plaintiffs (collectively, the "Parties") have jointly moved for clarification of this Court's October 24, 2003 Final Approval Order and Judgment ("October 24, 2003 Order"). Having reviewed the Parties' motion and being familiar with the arguments in support of and against approval of the settlement between Aetna and plaintiffs in this action, the Court has determined that the Parties' motion should be granted. Accordingly, the Court issues this Supplemental Final Approval Order.

1. This Order is not intended to disturb the Court's October 24, 2003 Order, with the sole exception that the penultimate sentence of paragraph 18 of the October 24, 2003 Order, stating "Regardless of whether or the extent to which class members may make claims under the settlement, this Final Approval Order and Judgment releases Defendant AETNA from any and all claims of plaintiff class members that arise from, or in any way relate, to this complaint," is hereby deleted and replaced by paragraphs 3 through 8 of this Order.

MASTER FILE NO.: 00-1334-MD-MORENO

2.  The Court expressly adopts paragraphs G, 5-11 and 14-18 of the Proposed Final
    Order attached as Exhibit A to the Stipulation signed by the Parties and the non-
    settling co-defendants on October 10, 2003.  To ensure that there is no dispute over
    the scope of the Court's orders, the terms of those paragraphs are set forth below.
    Capitalized terms in this Order that are not otherwise defined herein are intended to
    have the meanings defined in the Settlement Agreement.

3.  The "Released Parties," which shall include Aetna and each of its present and former
    parents, present and former wholly-owned subsidiaries, present and former divisions
    and affiliates (including without limitation Lion Connecticut Holdings, Inc. (formerly
    Old Aetna) and each of its subsidiaries as of December 14, 2000) and each of their
    respective current or former officers, directors, employees, and attorneys (and the
    predecessors, heirs, executors, administrators, legal representatives, successors and
    assigns of each of the foregoing), but excluding all Delegated Entities and the
    Prudential Insurance Company of America, shall be released and forever discharged
    by the Signatory Medical Societies and all members of the Class who have not validly
    and timely elected to opt-out of the Settlement and the Class in accordance with the
    procedures set forth in the Preliminary Approval Order, and by their respective heirs,
    executors, agents, legal representatives, professional corporations, partnerships,
    assigns, and successors, but only to the extent such claims are derived by contract or
    operation of law from the Claims of Class Members (collectively, the "Releasing
    Parties") from any and all causes of action, judgments, liens, indebtedness, costs,
    damages, obligations, attorneys' fees, losses, claims, liabilities and demands of
    whatever kind or character (each a "Claim"), arising on or before the date of entry of

2

the Preliminary Approval Order, that are, were or could have been asserted against any of the Released Parties based on or arising from the factual allegations of the complaint in the Action, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons (the "Released Claims"). Notwithstanding the foregoing, the Releasing Parties shall not be deemed to have released claims for payment (the "Retained Claims") for Covered Services as to which, as of the date of entry of this Order, (i) no claim with respect to such Covered Services has been filed with Company, provided that the contractual period for filing such claim has not elapsed; or (ii) a claim with respect to such Covered Services has been filed with Company but such claim has not been finally adjudicated by Company, as provided for in section 13(d) of the Settlement Agreement.

4. In addition to the Released Claims, the Releasing Parties shall be deemed to have discharged any and all claims that exist now or that might arise in the future against any other persons or entities, which claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before May 30, 2003 (the date of the Preliminary Approval Order) and are, or could have been, alleged in the complaint in the Action, whether any such claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other persons or entities. Nothing in this paragraph or in the Settlement Agreement is intended to relieve any person or entity that is not a Released Party from responsibility for its own conduct or the conduct of other persons or entities who are not Released Parties.

5. With respect to the Released Claims and the claims described in paragraph 4 of this Order, each member of the Class that has not timely elected to opt-out of the

3

MASTER FILE NO.: 00-1334-MD-MORENO

Settlement and the Class is hereby deemed expressly to have waived and released any

and all provisions, rights and benefits conferred either (a) by California Civil Code

§ 1542, which reads:

> Section 1542. <u>General release; extent.</u> A general release does not
> extend to claims which the creditor does not know or suspect to
> exist in his favor at the time of executing the release, which if
> known by him must have materially affected his settlement with
> the debtor.

or (b) by any law of any state or territory of the United States, or principle of common

law, which is similar to § 1542 of the California Civil Code.

6.  The Releasing Parties are permanently enjoined from: (a) filing, commencing,

prosecuting, intervening in, participating in (as class members or otherwise) or

receiving any benefits from any lawsuit, administrative or regulatory proceeding or

order in any jurisdiction based on any or all Released Claims against one or more

Released Parties; (b) instituting, organizing class members in, joining with class

members in, amending a pleading in or soliciting the participation of class members

in, any action, including but not limited to a purported class action, in any court

against one or more Released Parties based on, involving, or incorporating, directly or

indirectly, any or all Released Claims, and (c) filing, commencing, prosecuting,

intervening in, participating in (as class members or otherwise) or receiving any

benefits from any lawsuit, administrative or regulatory proceeding or order in any

jurisdiction based on an allegation that Company's compliance with the provisions of

the Settlement Agreement violates any legal right of any member of the Class.

7.  All persons, including without limitation all defendants named in the complaint other

than Aetna and Old Aetna, who are, have been, could be, or could have been alleged

4

to be joint tortfeasors, co-tortfeasors, co-conspirators, or co-obligors with the Released Parties or any of them respecting the Released Claims or any of them, are hereby, to the maximum extent permitted by law, barred and permanently enjoined from instituting, commencing, prosecuting, participating in or continuing any claim, claim-over, cross-claim, action, or proceeding, however denominated, regardless of the allegations, facts, law, theories or principles on which they are based, in this Court or in any other court or tribunal, against the Released Parties or any of them with respect to the Released Claims, including without limitation equitable, partial, comparative, or complete contribution, set-off, indemnity or otherwise, whether by contract, common law or statute, arising out of or relating in any way to the Released Claims. All such claims are hereby fully and finally barred, released, extinguished, discharged, satisfied, and made unenforceable to the maximum extent permitted by law, and no such claim may be commenced, maintained, or prosecuted against Aetna, Old Aetna or any Released Party. Nothing in this paragraph 7 shall be construed to bar any person who is alleged to be a joint tortfeasor, co-tortfeasor, co-conspirator, or co-obligor with any of the Released Parties from instituting, commencing, prosecuting, or participating in any claim, claim-over, cross-claim, action, or proceeding, however denominated, against a Released Party in any litigation in which claims against the Released Party are not released and discharged pursuant to this order ("Non-released Litigation"); provided however, that such persons may serve discovery on a Released Party in Non-released Litigation only to the extent such discovery is directed solely to the allegations in such litigation and is not otherwise used to obtain discovery in the lead provider track action Shane v. Humana et al.,

MASTER FILE NO.: 00-1334-MD-MORENO

MDL No. 1334. Where the claims of a person who is, has been, could be, or could have been alleged to be a joint tortfeasor, co-tortfeasor, co-conspirator or co-obligor with a Released Party respecting the Released Claims have been barred and permanently enjoined by this Paragraph 7, the claims of Released Parties against that person respecting those Released Claims are similarly fully and finally barred, released, extinguished, discharged, satisfied and made unenforceable to the maximum extent permitted by law.  As consideration for the foregoing relief, the Settlement Agreement and paragraph 4 of this Order relieve the parties who are so enjoined from any liability in the Action based on the conduct of the Released Parties.

8.  In contemplation of the dismissal with prejudice of such actions after this Order becomes final, all proceedings are stayed as to Aetna, Old Aetna or any other Released Party who is a defendant in any action brought by or on behalf of members of the Class that asserts any claim that as of the date of this Order would constitute a Released Claim that has been, or will in the future be assigned to this Court under MDL Docket No. 1334, *provided, however*, that this stay in contemplation of dismissal shall not apply to any such action to the extent that a named plaintiff has timely elected to opt-out of the Settlement and the Class.

9.  In accordance with the terms of the Settlement Agreement, the Releasing Parties and Class Counsel are barred from pursuing discovery in the Action against Aetna, Old Aetna or the other Released Parties.  It is the intent of Aetna, Old Aetna, and the other Released Parties, to limit, to the maximum extent appropriate under law, further discovery burdens on Aetna, Old Aetna, and other Released Parties in the Action. Accordingly, persons not released by this order will be permitted to obtain discovery

MASTER FILE NO.: 00-1334-MD-MORENO

in the Action from Aetna, Old Aetna, or other Released Parties only upon first moving the Court for leave to obtain said discovery and demonstrating good cause for said discovery.

10. A list of those members of the Class who have timely elected to opt-out of the Settlement and the Class and who therefore are not bound by the Settlement, the provisions of the Settlement Agreement, the Court's October 24, 2003 Order, this Order and the Judgment to be entered by the Clerk of the Court hereon, has been submitted to the Court as Exhibits A & B to the Second Supplemental Affidavit of Jenny Teston sworn to on October _____ 2003, which is incorporated by reference herein. All other members of the Class shall be subject to all of the provisions of the Settlement, the Settlement Agreement, the Court's October 24, 2003 Order, this Order and the Judgment to be entered by the Clerk of the Court.

11. Aetna and Old Aetna are hereby permanently relieved from any and all obligations under the Agreed Order For Preservation of Records entered in this Action on January 12, 2001.

12. Neither the Settlement Agreement nor any provision therein, nor any negotiations, statements or proceedings in connection therewith shall be construed as, or be deemed to be evidence of, an admission or concession on the part of any of the Representative Plaintiffs, the Signatory Medical Societies, Class Counsel, any members of the Class, Aetna, Old Aetna or any other person of any liability or wrongdoing by them, or that the claims and defenses that have been, or could have been, asserted in the Action are or are not meritorious, and this Order, the Settlement Agreement or any such communications shall not be offered or received in evidence

7

in any action or proceeding, or be used in any way as an admission or concession or evidence of any liability or wrongdoing of any nature or that Representative Plaintiffs, the Signatory Medical Societies, any member of the Class or any other person has or has not suffered any damage; *provided, however*, that the Settlement Agreement, this Order and the Judgment to be entered thereon may be filed in any action by Aetna, Old Aetna or any Released Party seeking to enforce the Settlement Agreement or the Judgment by injunctive or other relief, or to assert defenses including, but not limited to, *res judicata,* collateral estoppel, release, good faith settlement, judgment bar or reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.  The terms of the Settlement Agreement and of this Order and the Judgment shall be forever binding on, and shall have *res judicata* and preclusive effect in, all pending and future lawsuits or other proceedings that are subject to the Release and other prohibitions that are set forth in paragraphs 3, 4, 6 and 7 of this Order that are maintained by, or on behalf of, the Releasing Parties or any other Person subject to those provisions of this Order.

13. In the event that the Settlement Agreement does not become effective or is canceled or terminated in accordance with the terms and provisions of the Settlement Agreement, then this Order and the Judgment shall be rendered null and void and be vacated and all orders entered in connection therewith by this Court shall be rendered null and void.

14. The Clerk of the Court is directed to enter the Judgment in the form attached to this Order dismissing the Action with prejudice as to Aetna and Old Aetna pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

8

MASTER FILE NO.: 00-1334-MD-MORENO

15. Without in any way affecting the finality of this Order or the Court's October 24, 2003 Order, this Court hereby retains jurisdiction as to all matters relating to (a) the interpretation, administration, and consummation of the Settlement Agreement and (b) the enforcement of the injunctions described in paragraphs 6 and 7 of this Order. In accordance with the terms of the Settlement Agreement, in any future dispute concerning the negotiation, approval, performance or alleged breach of the Settlement Agreement that may arise between or among the parties to the Settlement Agreement, the Court shall award attorneys' fees and costs to the prevailing party.

SO ORDERED this 6th day of _____, 2003.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

COPIES PROVIDED TO COUNSEL ON
THE OCTOBER 1, 2003 SERVICE LIST

9

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

MDL No. 1334
**Master File No. 00-1334-MD-MORENO**

IN RE: MANAGED CARE LITIGATION

THIS DOCUMENT RELATES TO
**PROVIDER TRACK CASES**

/

FILED by ___ D.C.

NOV 0 7 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

**FINAL JUDGMENT**

In accordance with, and for the reasons set forth in, the Final Approval Order and Judgment

entered on <u>October 24, 2003</u>, and the Supplemental Final Approval Order entered on **November**

**6, 2003**, this Action is DISMISSED with prejudice as to defendants Aetna Inc., a Connecticut

corporation and Aetna U.S. Healthcare, Inc., (now known as Aetna Inc.) a Pennsylvania corporation

pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

DONE AND ORDERED in Chambers at Miami, Florida, this 6 day of November, 2003.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

# EXHIBIT G

Case 1:00-md-01334-FAM   Document 2845   Entered on FLSD Docket 01/23/2004   Page 192 of
194
Aetna to settle suit filed by physicians;



Learn how to fight corporate power with FTCR's latest book.
**CORPORATEERING**

### THE FOUNDATION FOR TAXPAYER & CONSUMER RIGHTS

Home  Volunteer  Donate  Subscribe  Contact  FTCR Websites  Site Map

## HEALTHCARE

▶ **Main Page**
▶ **Press Releases**
▶ **In the Media**
▶ **Factsheets**
▶ **Reports**
▶ **Medical Malpractice Stories**
▶ **HMO Arbitration Abuse Report**
▶ **Casualty of the Day**

**OTHER TOPICS**

Corporate Accountability
Insurance
Citizen Advocacy
The Justice System
Billing Errors
Energy
About FTCR



home / healthcare / in the media

**The San Diego Union-Tribune**
**May 23, 2003**
by Cheryl Clark; STAFF WRITER

# Aetna to settle suit filed by physicians;

## Health plan agrees to pay doctors faster, ease authorizations

Leading health insurer Aetna Inc. yesterday agreed to settle a class-action lawsuit filed by 700,000 physicians by promising to pay them faster and remove authorization burdens the doctors said delayed and even harmed patient care.

"Aetna has given us the opportunity to bring decision-making back to a process between the doctor and the patient, and other health care plans should follow suit," said Dr. Ronald Bangasser, president of the California Medical Association, which represents 35,000 physicians in the state. "I give Aetna a lot of credit for stepping up."

The doctors and medical groups in more than a dozen states accused Aetna and other large for-profit health plans of conspiring to delay, lower or block reimbursement for physicians' services and interfere with their recommendations for treatment.

"This was about changing their unethical and unscrupulous business practices," said Dr. James Knight, president of the San Diego County Medical Society. "You can imagine how you'd feel if every time you got a paycheck it was something less than what you earned and you had no recourse."

The CMA is one of 19 medical groups listed as plaintiffs in the case.

In the settlement, Aetna agreed to pay $100 million to 700,000 physicians -- roughly $142 per doctor -- and $20 million to establish a foundation to help eliminate racial health care disparities, childhood obesity, improve end-of-life care and address the problem of the uninsured.

It also will set up a committee of practicing physicians to influence Aetna policies.

In announcing the settlement, Dr. John W. Rowe, Aetna chairman and chief executive, said the new policies represent "a sea change in relations between physicians and Aetna that will lead to greater cooperation on critical aspects of quality, availability and affordability of care."

The health plan, which has 13 million enrollees nationally, including 1 million in California and 141,000 in San Diego County, said prompt payment and reduced need for authorization time will translate to $300 million in savings to physicians. Aetna also agreed to pay $50 million in legal fees.

The settlement is expected to be approved by the federal court for the Southern District of Florida this summer and to take effect immediately thereafter.

The lawsuit, filed three years ago under the federal Racketeer Influenced and Corrupt Organizations Act or RICO, alleged that Aetna and eight other large for-profit health plans conspired since 1990 to obstruct claims processing and authorizations for health services.

Cases against other health plan defendants, Cigna Corp., UnitedHealth Group Inc., Wellpoint Health Networks Inc., Anthem Inc., Humana Inc., Pacificare Health Systems Inc., Coventry Health Care and Prudential, have not yet been settled, but several physicians said Aetna's agreement will put more pressure on them to follow.

"This pretty much sets a standard by which other companies will have to come to the table or risk going to trial," said Dr. Ted Mazer of the San Diego County Medical Society.

Physician groups from 13 states complained the health plans failed to provide written explanations of how they reimbursed doctors, frequently changed the rules mid-contract and required physicians' staffs to spend hours on the phone getting authorization for needed procedures, tests or drugs.

Bangasser explained how Aetna's delays affected his practice and patients. A patient with an acute knee injury needed an MRI, but the plan's review took time, and varied from patient to patient. "Sometimes they'd say (the patient) could get by with just an X-ray, where in my opinion, he couldn't," he said.

Required authorizations and delays also hurt physicians' ability to prescribe some drugs their patients needed, he said.

"The complicated and difficult process in getting a drug that wasn't on the formulary required me or my staff to sit on the phone for half

an hour" to get the drug approved, Bangasser said.

"This settlement means the patient won't have to wait months and months for a service while the doctor and the insurance company hash out who owes what," said Mazer. "When I have someone with unilateral hearing loss and suspicion of a brain tumor, I shouldn't have to stop and call and wait all week for someone to call me back to authorize an MRI."

Mazer added that all too often, Aetna would assign a value to a procedure based on a formula, "but wouldn't discuss with us doctors what that is."

Jamie Court of the Foundation for Taxpayer and Consumer Rights in Santa Monica was more skeptical about the settlement's benefits to doctors in California because recent changes in state law protect physicians from health plan retaliation if they inform patients about treatment options not available under the plan.

Rather, he said, the settlement "is about stopping hassles for doctors."

He accused physician groups of using the legal system to improve their own situation while at the same time lobbying Congress to reduce the ability of patients to sue them for malpractice.

"This is an advance for doctors, but it's not a home run for patients," he said. "I'd say it's more like a walk."

But Steven Fisher, deputy director of the state Department of Managed Care in Sacramento, said he thinks the settlement will mean "patients will be put ahead of these (health plan vs. doctor) disputes."

Contact Cheryl Clark: (619) 542-4573; cheryl.clark@uniontrib.com

▲ back to top

© 2000 UTCP. All Rights Reserved. [illegible] and Privacy Policy