# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**MDL NO.: 1334**
**MASTER FILE NO. 01-1334-MD-MORENO**

IN RE:
MANGAGED CARE LITIGATION

THIS DOCUMENT RELATES TO THE PROVIDER TRACK CASES

NIGHT BOX
FILED

MAY · 5 2005

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

| | |
|---|---|
| JEFFERSON DENTAL CLINICS, P.C., | § |
| | § |
|    Plaintiff, | § |
| vs. | § |
| | § |
| TRUSTMARK INSURANCE | § |
| COMPANY, et al., | § |
| | § |
|    Defendants. | § |

TRANSFEROR COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
Civil Action No. 3:02-CV-0861-M

## PLAINTIFF'S THIRD AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff, JEFFERSON DENTAL CLINICS, P.C., (hereinafter "Jefferson" or "Plaintiff") and files its Third Amended Complaint, complaining against the actions of TRUSTMARK INSURANCE COMPANY ("Trustmark"), CORESOURCE, INC. ("Coresource"), AETNA U.S. HEALTHCARE, INC. ("Aetna"), GUARDIAN LIFE INSURANCE COMPANY OF AMERICA ("Guardian"), GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY ("Great-West"), KATRINA



HARRIS, INDIVIDUALLY AND AS AN AGENT OF GUARDIAN LIFE INSURANCE COMPANY OF AMERICA ("Katrina Harris"), and BEN ABLON, INDIVIDUALLY AND AS DIRECTOR OF ENFORCEMENT FOR THE TEXAS STATE BOARD OF DENTAL EXAMNERS ("Ben Ablon") (collectively "Defendants"). As good and sufficient grounds for said Amended Complaint, Plaintiff would respectfully show this Honorable Court as follows:

## I. SUMMARY

1.     This is a case involving breach of contract, tortious interference, and conspiracy to commit fraud and extortion, and civil rights violations. These claims are brought against several insurance companies and other individuals. This lawsuit arises from the Defendant insurance companies' attempt to specifically drive Jefferson out of business by harassing and intimidating its patients and doctors, destroying Jefferson's and its dentists' reputation, and engaging in abusive and illegal claims payment procedures. These tortious acts and wrongful conduct have injured Jefferson's business and professional reputation.

2.     This case is much more than a dispute about the denial of specific dental claims. Rather, it is a dispute about the manner in which the Defendants entered into an illegal union to drive Jefferson out of business. Jefferson was to be the model for the systematic destruction of providers who did not play by the unwritten rules of the insurance industry. Jefferson seeks redress under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 ("ERISA") for the Defendants' breach of their contracts with Jefferson through its patients. The only claim brought under ERISA *is for*

the Defendants' violation of contract in their failure to pay Jefferson's claims on behalf of its insured patients.

3.      Jefferson's additional claims are asserted under the Racketeer Influenced and the Corrupt Organizations Act ("RICO"), Title 18 U.S.C. §§ 1341, 1343, 1951, 1961, and 1962. Additionally, Jefferson asserts claims under Title 42 U.S.C. 1981 and Title VI of the Civil Rights act of 1964. Additionally, Jefferson asserts several pendant state law claims including, tortious interference with contract and prospective contracts, tortious interference with prospective business relations and continuing business relations, business disparagement, libel and slander, negligent misrepresentation, unjust enrichment, common law fraud, and violations of article 21.55 and 3.70-3C, § 3A of the Texas Insurance Code regarding the prompt payment of claims. Jefferson's pendant state law claims are brought singularly within the context of Jefferson's business relations with the Defendant Insurance companies and not as the assignee of its patient benefits.

## II. **PARTIES**

4.      Plaintiff Jefferson Dental Clinics, P.C. is a professional corporation with its principal place of business in Dallas, Texas.

5.      Defendant U.S. Healthcare, Inc. ("Aetna") has already appeared in this action and is subject to the jurisdiction of this Court.

6.      Defendant Trustmark Insurance Company ('Trustmark") has already appeared in this action and is subject to the jurisdiction of this Court.

7.      Defendant Coresource, Inc. ("Coresource") has already appeared in this action and is subject to the jurisdiction of this Court.

8.      Guardian Life Insurance Company of America ("Guardian") has already appeared in this action and is subject to the jurisdiction of this Court.

9.      Great-West Life & Annuity Insurance Co. ("Great West") has already appeared in this action and is subject to the jurisdiction of this Court.

10.      Defendant Katrina Harris ("Katrina Harris"), Individually and as an Agent of Guardian Life Insurance Company of America. Katrina Harris is a Citizen of the State of Washington, operating as an employee and agent of Guardian Life Insurance Company of America, which conducts business in every state, including Texas.  The Court has personal jurisdiction over Katrina Harris because all of the transactions involving Katrina Harris that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication to Texas.  Katrina Harris is sued in her individual capacity and her capacity as an agent of Guardian.  Pursuant to Federal Rules of Civil Procedure 4(d), Plaintiff requests that this Defendant waive service of a summons.  Concurrent with the filing of this pleading, Plaintiff is sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request.  Otherwise, service on Ms. Harris can be made at the Special Investigation Unit from the Western Regional Home Office of Guardian Life Insurance Company of America, located at 777 East Magnesium Road, Spokane Washington, 99208-9921.

11.      Defendant Ben Ablon ("Ben Ablon"), Individually and as Director of Enforcement for the Texas State Board of Dental Examiners.  Mr. Ablon is a citizen of the state of Texas and is working for the Texas State Board of Dental Examiners as the Director of Enforcement.  Ben Ablon is sued in his individual and official capacity.  The Court has personal jurisdiction over Ben Ablon because all of the transactions involving Ben Ablon serve as the basis of this suit, either occurred in Texas or involve business in

Texas, and involve interstate communication to and from Texas. Pursuant to Federal Rules of Civil Procedure 4(d), Plaintiff requests that this Defendant waive service of a summons. Concurrent with the filing of this pleading, Plaintiff is sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request. Otherwise, service of Mr. Ablon can be made by personal service at the office of his employer, the Texas Board of Dental Examiners (hereinafter referred to as the "Board of Dental Examiners"), 333 Guadalupe Tower 3, Suite 800, Austin, Texas 78701.

### III. JURISDICTION AND VENUE

12.     This dispute is brought under the laws of the State of Texas and United States of America. Defendants breached multiple business contracts and committed multiple tortious and criminal acts against Plaintiff. This Court has federal question subject matter jurisdiction pursuant to 18 U.S.C. § 1331. The district court shall have jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States of America. The federal questions at issue here arise under: (1). the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001; (2). the Racketeer Influenced and the Corrupt Organizations (RICO) Act, Title 18 U.S.C. §§ 1341, 1343, 1951, 1961, and 1962; (3). Title 42 U.S.C. 1981 and (4). Title VI of the Civil Rights act of 1964. Additionally, this Court has pendent subject matter jurisdiction as to any remaining state law claims pursuant to 18 U.S.C. § 1367.

13.     This case was originally brought in multiple separate lawsuits in the Justice of the Peace Courts, in Dallas County, Texas. These cases were removed to the United States District Court for the Northern District of Texas, Dallas Division, and

consolidated into a single suit by that Court. On January 20, 2004, Defendant Aetna

submitted a Notice of Tag-Along Action to the MDL panel hearing Managed Care

Litigation. The MDL panel issued a Conditional Transfer Order on March 18, 2004 and

a Final Transfer Order on August 6, 2004. On September 16, 2004, this Court issued a

Notice of Court Practice in MDL Tag-Along Actions. Upon transfer to this Court, this

case was stayed pursuant to this Court's August 21, 2003 ***Order Staying Provider Track***

***Tag-Along Cases.*** On October 15, 2004, the parties to this case presented the Court with

a Joint Tag-Along Status Report. On May 2, 2005, the Plaintiff presented the Court with

a Supplemental Written Status Report for Tag-Along Actions.

14. The Multi-District Litigation Panel duly transferred this matter from the

Northern District of Texas, Dallas Division to this Court to join the Managed Care

Litigation, styled as *In re: Managed Care Litigation;* Master File No. 01-1334-MD-

Moreno, in the Southern District of Florida, Miami Division. This matter was transferred

for pretrial purposes only. Therefore, by virtue of this case originating in the Northern

District of Texas, this Court continues to have personal jurisdiction as to all Defendants

because the breaches, torts, and criminal acts they committed occurred, in part or whole,

in Texas. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C.

§1392(b)(2) because a substantial part of the events or omissions giving rise to the claims

that Jefferson alleges herein occurred within the Northern District of Texas.

## IV. INDEX

I.      SUMMARY..................................................................................................2
II.     PARTIES...................................................................................................3
III.    JURISDICTION AND VENUE..............................................................5
IV.     INDEX.......................................................................................................6
V.      FACTS.......................................................................................................8
        A.      The History of Jefferson.............................................................8

B.      The Beginning of the Problem..........................................................................9

C.      One Example:  Defendants' Co-Conspirators Stretch as far as an
Administrative Agency of the State of Texas --The Texas State
Board of Dental Examiners.........................................................................10

D.      To this day Guardian has continued to File Dozens of Complaints against
Jefferson....................................................................................................16

E.      Defendants' Tortious Conduct.....................................................................17

F.      The Result of Defendants' Tortious Conduct..............................................29

VI.     CAUSES OF ACTION...........................................................................................32

A.      ERISA.........................................................................................................32

B.      RICO...........................................................................................................33

          1. General Allegations..............................................................................33

          2. Pattern of Unlawful Racketeering Activity...........................................37

          3. Managed Care Enterprise and Scheme.................................................40

          4. Violation of 18 U.S.C. §  1962(c).........................................................47

          5. Violation of 18 U.S.C. §  1962(d).........................................................48

          6. Defendants' Actions Affect Interstate Commerce...............................49

C.      Discrimination: Violations under Title 42 U.S.C. 1981 for the
Right to Contract and the Right to be Free from Discriminatory
Practices in the Managed Care Industry.....................................................50

D.      Violation of Title VI of the Civil Rights Act of 1964.................................51

E.      Violation of Prompt Payment Statutes under the
Texas Insurance Code.................................................................................55

F.      Tortious Interference with Contract.............................................................55

G.      Tortious Interference with Prospective Contract........................................56

H.      Tortious Interference with Prospective Business Relations
and Continuing Business Relations.............................................................57

I.       Business Disparagement..............................................................................57

J.       Libel and Slander........................................................................................58

K.      Negligent Misrepresentation.......................................................................58

L.      Common Law Fraud....................................................................................59

M.     Unjust Enrichment......................................................................................59

VII.    DAMAGES..........................................................................................................60
VIII.   ATTORNEYS' FEES, EXPENSES AND COST OF COURT...............................62
IX.     PRAYER............................................................................................................63
CERTIFICATE OF SERVICE.............................................................................64

## V. **FACTS**

### A. **The History of Jefferson**

15.     Jefferson dates its history back to 1967, when it was owned and operated by Dr. Graham. Dr. Graham provided dentistry services in Oak Cliff, Texas.

16.     Dr. David Alameel had come to the United States from Lebanon in 1972 and immediately began working at various jobs prior to enlisting in the U.S. Army. While in the Army, Dr. Alameel worked as a pharmacy technician and attended college in San Antonio, Texas. Upon graduating from college and upon being honorably discharged from the U.S. Army, Dr. Alameel proceeded to dental school. In 1981, Dr. Alameel graduated from the U.T. Health Science Center, with a degree in dentistry. Dr. Alameel immediately began his Texas dentistry practice in 1981.

17.     In 1984, Dr. Graham died and his family began looking for someone to purchase his practice. In 1984, Dr. Alameel learned that the Jefferson practice was for sale and then purchased the practice. At that time, Jefferson was a single office located on Jefferson Boulevard in Oak Cliff, Texas staffed by only a handful of employees, one of them being Dr. Alameel's Spanish-speaking wife, Martha Alameel.

18.     Prior to Dr. Alameel purchasing Jefferson, the practice had not been profitable. At the same time, Oak Cliff's low income Hispanic clientele began working for companies that provided health insurance were having significant trouble locating dental practice who spoke Spanish. Assisted by Martha Alameel's ability to speak Spanish and an increase in patients, Jefferson became profitable.

19.     As Jefferson's client base grew, Dr. Alameel's practice expanded and he opened another Jefferson clinic in Pleasant Grove. The success of Jefferson is attributed to Jefferson's concept of meeting the dentistry needs of Dallas' lower-income Hispanic community. Since 1994, Jefferson has continued to expand and currently operates ten (10) offices in the Dallas area.

20.     Today, Jefferson interacts with over 150 different insurance companies, files between 100-200 dental claims per day, submits bills for reimbursement from insurance companies, and earns a good living for it's owners and employs approximately 120 people. Most of the Jefferson offices are located in low-income areas, allowing Jefferson to provide necessary dental care to many of the area's less economically fortunate and largely Hispanic residents.

## B.  The Beginning of the Problem

21.     Certain insurance companies were not paying claims timely or at all. At that time, Jefferson identified Trustmark and Coresource, as insurance companies who were creating artificial delays in the claims-payment process. These delays resulted in failing to pay claims or paying claims in an untimely manner. As early as 1999, Guardian was denying as much as 90% of Jefferson's claims. By 2000, Guardian, Aetna and Great West were also identified as companies who were failing to pay claims timely.

22.     In 1999, Jefferson contacted Trustmark and complained of its actions. Trustmark denied these actions were occurring and continued its inappropriate activity.

23.     In late 2000, Jefferson noticed that not only was Trustmark and its related entities failing to properly pay claims and delaying claim payments, but also that the other Defendant Insurance Companies had also began embracing these tortious tactics. Additionally, Jefferson contacted Katrina Harris at Guardian and inquired into the large

number of denials. Jefferson informed Guardian that because of the nature of Jefferson's clientele, that these patients were reluctant to contact Guardian. Katrina Harris with Guardian flippantly stated that if a patient had a problem they could "contact Guardian directly." In the meanwhile, Guardian stated that they would review (delay) Jefferson's claims for "an indefinite period of time." This "indefinite period" was mentioned *in a letter sent by U.S. Postal Mail*, from Guardian, dated September 30, 1999. As of the date of drafting this Amended Complaint, this behavior continues.

24.     Unfortunately for Jefferson, insurance companies talk to one another. Upon information and belief, the Defendant companies engage in informal communication and conspiracies to target certain Dental/Medical organizations or clinics for special investigations and claim processing slow-downs. This investigations have repeatedly proven to be unwarranted.

**C. One Example: Defendants' Co-Conspirators Stretch as far as an Administrative Agency of the State of Texas --The Texas State Board of Dental Examiners.**

25.     Beginning in the summer of 2002, Katrina Harris, an "investigator" with Guardian Life Insurance Company of America began lodging complaints with the Texas State Board of Dental Examiners (the "Board") against Jefferson. Upon information and belief, the initial complaint was delivered via the U.S. Telephone System (wire) from Katrina Harris in the state of Washington to Ben Ablon in the State of Texas. The complaint concerned Jefferson's business, billing practices and professional practices. After Guardian's complaint, Katrina Harris and Ben Ablon, the Director of Enforcement for the Texas State Board of Dental Examiners, entered into an agreement to secretly conduct an illegal investigation concerning Jefferson.

26.     This illegal investigation and assistance was in violation of Section 255.003 of the Texas Occupations Code. Additionally, although the Board is required, pursuant to Chapter 107 of the Dental Board Procedures, to immediately notify Jefferson of a lodged complaint, Jefferson did not receive notice of the complaint until four months later in December of 2002.[1] Since that time, Ablon and Harris contrived to concoct a scenario to make it appear as if the "investigation' had formally began in August 2002, when in fact the subject of the complaint was not formally notified until 2002. Ablon received phone calls from Dr. Alameel who had received information from his staff that Katrina Harris had boasted about "an investigation." In a recent deposition in another civil matter, Ablon falsely testified to the date of "the investigation." Such testimony was an act in furtherance of his, Katrina Harris' and Guardian's conspiracy to destroy Jefferson Dental Clinic. **Prior to July/August 2002, no complaint had <u>ever</u> been filed with Board against Jefferson. <u>It is important to note in Jefferson's 40-year history it has seen nearly a quarter million patients.</u> It was only when Katrina Harris, and other analogous personnel at the other Defendant insurance companies started this "campaign," that Jefferson started receiving complaints to the Board.**

27.     Upon information and belief, after Guardian initially contacted the Board about Jefferson, Ben Ablon took it upon himself to contacted Dr. Palmer, a local doctor in Dallas, Texas, to enlist his aid to act as an "expert" to assist Guardian. After Dr. Palmer agreed in good faith to assist Ben Ablon, he secretively told Dr. Palmer that, "you may or may not hear from me again." Then Ben Ablon contacted Katrina Harris with Guardian to tell her that she may proceed with the investigation of Jefferson by utilizing

---

[1] Texas State Board of Dental Examiners, Rules and Regulations, Chapter 107, Subchapter B, § 107.012 (d): "At the initiation of the investigation, the respondent ***shall*** be provided a copy of the complaint to facilitate a response..." Additionally § 107, as well as Texas Occupational Code, § 255.005, require quarterly notice of any such investigations.

the services of Dr. Palmer. Katrina Harris with Guardian then contacted Dr. Palmer to perform "in mouth examinations" of four Jefferson patients to determine if the treatments and services provided by Jefferson were done and were appropriate.[2]

28.     Both Ben Ablon and Katrina Harris told Dr. Palmer that they were investigating fraud or implied that was the purpose of the examinations. When Dr. Palmer was finished with his "in mouth examinations" of the four patients, he sent the complete charts of all four patients he examined, including but not limited to findings, charting, periodontal charting, x-rays, and intra-oral photographs to Guardian and Guardian paid Dr. Palmer's dental services. Guardian never had anyone qualified nor did it seek a qualified person to look at Dr. Palmer's findings. Then on November 25, 2002, Guardian submitted a second complaint from the state of State of Washington, by U.S. Mail, to the Texas State Board of Dental Examiners against Jefferson, using the findings of Dr. Palmer as a basis for Guardian's complaint about Jefferson's business and billing practices.

29.     In Guardian's complaint dated November 25, 2002 (several weeks before Jefferson was ever notified of the complaint filed by Guardian), Katrina Harris informed the Board and Ben Ablon that Dr. Palmer had completed "in mouth examinations" of two patients.[3] Guardian's complaint alleged that Jefferson had billed Guardian on behalf of two of its patients for services not actually done, had provided inadequate dental treatment, and provided unnecessary service when receiving dental treatment at Jefferson.

---

[2] The "in mouth examinations" consisted of taking x-rays of the teeth, physically examining the teeth, and checking the gums of the four Jefferson patients. These examinations are to determine whether or not the patients had sealants applied or restoration work to their teeth. Also, the examinations of the patients' gums to were to determine the pocket depth of the gums and whether root scaling and planning would be appropriate.

[3] In truth however, Palmer had completed four (4) examinations.

A simple viewing of the chart and x-rays would have shown Katrina Harris was not truthful. The patients had insurance through Guardian. Guardian and Katrina Harris indiscriminately questioned all of the services and charges provided by Jefferson.

30.     Upon information and belief, despite Dr. Palmer's reasonably accurate reporting (when considering the totality of the information Dr. Palmer provided to Guardian), Katrina Harris, investigator for Guardian, took the findings made by Dr. Palmer and falsely represented and otherwise colored or changed Dr. Palmer's findings in the worst possible light so as to attempt to affect the State Board's determination in its investigation of Jefferson. Additionally, upon information and belief, the complaint was used as a pretext to justify the slow pay or to stop paying all of Jefferson's claims. For years Guardian has not paid or processed the claims of Jefferson Dental Clinic timely or fairly. This in itself caused tremendous damage to Jefferson's business and reputation. Additionally, this process was soon joined by other insurance companies, which to date has resulted in millions of dollars in damages.

31.     As it relates to the facts of this cause of action, the Plaintiff and Dr. Palmer believe that Dr. Palmer was taken advantage of and was misled by both Katrina Harris and Ben Ablon. At the request of Ben Ablon and Katrina Harris, Dr. Palmer, in good faith, agreed to perform dental examinations upon four Jefferson patients. Additionally, Plaintiff asserts that Ben Ablon had a conflict of interest in contacting Dr. Palmer to assist the Board and Guardian in this investigation. Prior to the facts are make the basis of this civil action, Dr. Palmer had filed an unrelated complaint with the Texas State Board of Dental Examiners about the dental practice that Dr. Palmer took over when he had moved from Louisiana to Dallas, Texas. Ben Ablon was, in fact, the investigator for the complaint that Dr. Palmer filed with the State Board. At the time that Ben Ablon

contacted Dr. Palmer to assist in the alleged fraud investigation of Jefferson, Dr. Palmer's complaint was still pending before the Board and Ben Ablon was the main investigator on said complaint. Clearly, this is a conflict of interest. In essence, an investigator for the State Board asked a dentist, (who had previously sought a favorable outcome in his own complaint with this State Board), to investigate another dentist for which the investigator desired any information indicating alleged wrong doing by the instant Plaintiff.

32.     In further violation of the Board's own rules, Jefferson was not notified by the Board or Ben Ablon about the Guardian complaint until December 2002. This is despite the fact that Katrina Harris and Ben Ablon began their investigation of Jefferson in July/August 2002. *As a matter of fact, Jefferson did not ever receive actual "notice" of the complaints filed by Katrina Harris and Guardian. The first time that Jefferson was ever informed about complaints was when it received a "quarterly report" from the Board informing Jefferson that the complaint against it was still pending and that no action had been taken.* Nevertheless, Jefferson, shocked and in dismay, responded immediately by providing the Board with any and all information it deemed necessary to investigate the complaint. The Board investigator was allowed complete access to all files and treatment records of the Jefferson patients in question. Jefferson had absolutely nothing to hide.

33.     Jefferson diligently assisted the investigator and even went so far as to request permission from the Board to re-examine and x-ray the patients in question, to definitely show that Guardian's complaint was false and inaccurate. Jefferson quickly provided the Board investigator with the post treatment x-rays. Upon review of the entire file, including the post treatment x-rays, the Board investigator inquired, "why is

Guardian wasting my time with these complaints?" The investigator recommended that the Board find that Jefferson had appropriately provided all the services in question.

34.     Because of the efforts of Guardian (specifically Katrina Harris) and Ben Ablon of the Texas Board of Dental Examiners, Jefferson has suffered great damages. It is undisputed that Jefferson has lost substantial revenue as a result of Guardian and the other instant Defendants' conduct. Jefferson lost patients who have been wrongly drug into a financial tug-of-war. Upon information and belief, Jefferson lost current and potential patients because Guardian's beliefs were republished in the tightly interwoven Hispanic community that Jefferson serves. Jefferson's reputation and business have been damaged by these actions.

35.     Additionally, as discussed previously, Guardian took Dr. Palmer's representations and used them as justification to either slow pay thousands of unrelated payments or stop payments on all Jefferson claims. A campaign was further launched by Guardian to contact many of Jefferson's patients in an attempt to cause these patients to call into question their treatment by Jefferson and to convince them that seeking dental services with Jefferson may result in inferior treatment and/or increased personal financial cost.

36.     Unfortunately, these actions did not occur within a vacuum. Katrina Harris, Guardian, and the other Defendant insurance companies have communicated and shared information, as described above, such that other insurance companies engaged in similar practices by questioning Jefferson's billing practices by slow paying and denying claims. As of the filing of the Original Complaint in this matter, Jefferson had suffered nearly two million dollars in arrears billing and a considerable loss in new patient

business. As of the date of the drafting of this Third Amended Complaint, Jefferson is approximately three-quarters of a million dollars in arrears billing from Guardian alone.

**D.    To this day Guardian has Continued to File Dozens of Complaints against Jefferson with the Texas State Board of Dental Examiners**

37.    Since Guardian and other Defendant insurances companies, including Great West, began their investigations of Jefferson, they have lodged approximately 40 complaints with the Texas State Board of Dental Examiners complaining of Jefferson's business, billing and professional practices. To date, not a single one has proved to be of merit. On an even more egregious level, Ben Ablon, as the Director of Enforcement for the Texas State Board of Dental Examiners has intentionally sat idle and has done nothing to prevent Katrina Harris' and Guardian's frivolous complaints toward Jefferson. He states that he is obligated to accept every complaint. Ben Ablon, as the Director of Enforcement, has a duty to protect dental patients and dentist in the state of Texas. More importantly, Ben Ablon has aided and abetted the insurance companies in their conspicuous and malicious attempts to destroy dental practices, such as Jefferson. With every additional complaint that Katrina Harris files with the Texas State Board of Dental Examiners, it puts another undeserved, unfounded, and suspicious black mark on the professional record of the dentists who happen to work for Jefferson. Not only has Guardian tried to put Jefferson out of business, it is victimizing every dentist employed by Jefferson into believing that they may be subject to sanctions or even possibly having their dental license suspended by the Texas State Board of Dental Examiners if they continue working for Jefferson. This seems to be Ben Ablon's and Katrina Harris' goal.

38.    On a more global basis, it simply is *too* coincidental for the five Defendants, out of the 150 or so insurance companies that Jefferson deals with, to have

engaged in these nearly identical practices. There is no explanation for this except, upon information and belief, that persons *within* each individual Defendant insurance company, persons *between* each defendant company, as well as persons within each and outside individuals (vendors, government officials, etc). have entered into a conspiracy to destroy Jefferson's business and reputation.

39. Jefferson is acutely aware that allegations of RICO violations are very serious. Nevertheless, Jefferson notes that it deals with over 150 insurance companies. As a general rule, Jefferson does not experience these problems with any of the other approximately 145 insurance companies who are not Defendants in this action. For example, out of the nearly 150 insurance companies that reimburse Jefferson through dental policies, only the Defendants require additional documentation without first reviewing x-rays. In fact, Jefferson has had more claims questioned, delayed or otherwise complained of by these five Defendant companies, than all of the other 145 insurance companies combined.

**E. Defendants' Tortious Conduct**

40. Defendants have denied many claims that are plainly valid and have created artificial delays in the claims-payment process. They did this, and some still do this, by, among other things, indefinitely pending claims after receiving requested records, and asking for all records, notes, x-rays, and other documents before payment of claims (even when the procedure forming the basis of the claim is merely a follow-up visit or other preventive procedure). In fact, some of the Defendants have accelerated the slow-down in processing claims and added new obstacles to Jefferson's payment of claims since October 3, 2002. Large volumes of claims submitted by Jefferson are followed up with a timely submittal of x-rays to the Defendants. Even though the

Defendants required x-rays to justify the claim, **these x-rays are routinely returned, via U.S Mail, unopened, without even being reviewed by the Defendant insurance companies**.

41.     The Defendants then, without basis, request additional information to determine alleged "medical necessity," even for routine and preventative procedures. Jefferson is then forced to consult the Defendants' agents, via telephone, to try to "straighten out" the problem. Normally, emboldened by their financial strength, the insurance companies either refuse to pay pending "further investigation" or if they do pay, they do so late, after so much effort is expended by Guardian, that from a financial standpoint, the activity is nearly futile. The clear point is that the Defendants are not interested in the extra records to justify claims; the exercise is a rouse used to slow or avoid payment.

42.     By way of example, Aetna had $75,000 in unpaid claims over 60 days for basic services in October 2003 alone. Jefferson was forced to follow up these "inquiries" with contacts within each individual company, normally via telephone. More often than not, Jefferson is faced with the same obstinate and baseless excuses and complaints. The design of this system is not to locate questionable claims, but rather, to question nearly every claim as to slow down Jefferson's business and income stream.

43.     It is clear that Defendants have "red or flagged" Jefferson. Aetna, for instance, assigned one claims representative - Laura Gay - as the only Aetna employee that Jefferson employees can talk to regarding claims-processing issues. Jefferson files dozens of claims with Aetna alone per day. Many times, Jefferson representatives attempted to reach Ms. Gay to no avail. Other times, Ms. Gay informed Jefferson that Aetna has not received certain previously requested documents when, in fact, such

documents were sent to Aetna. In fact, Aetna has stated that there was an "alert" on claims submitted by Jefferson, and that Jefferson is under investigation. Aetna further has indicated that Jefferson is a "red-flagged provider." Since the activities were based on no good cause, said activities are some evidence of a desire to alter or destroy Jefferson Dental's business.

44. All Defendants have admitted, either through oral or written communications or by their conduct, that Jefferson is being treated differently that other dental care providers. Persons were similarly assigned as special "Jefferson screening investigators" within the other Defendant companies. For example, for Trustmark: Mary Shanahan; and Coresource: Chris Hall. In fact, Guardian has outrageously gone so far to tell Jefferson to make disputed individual claim inquires with Guardians attorney, Stephen Howen. As described in detail supra, upon information and belief, and similar to other managed care suits that are ongoing within the context of *In re: Managed care*, the companies started off by using computer programs to select out certain Jefferson claims. Then at some point, all claims originated by Plaintiff are "flagged," such that every single performed dental procedure was called into question.

45. Defendants have also engaged in a scheme and course of conduct designed to destroy Jefferson's customer base by destroying its reputation with its patients. They have sent out, via U.S. Mail, repetitive surveys and Explanation of Benefits ("EOBs") to Jefferson's patients. These surveys and EOBs have had the effect of arousing suspicion and fear among Jefferson's nearly exclusive Hispanic clientele. This suspicion and fear had the effect of decreasing Jefferson's patient base by nearly 50%. The survey letters indicate that the Defendants are "conducting a review" or an "audit" of the claims

submitted by the attending dentist. The patients are asked to indicate which procedures have not actually been performed.

46.     The surveys, framed as rank "leading questions," sought to create the impression that Jefferson and its dentists had engaged in wrongdoing. Many of these letters are sent out in English to Spanish speaking patients. Additionally, Jefferson has been contacted by former clients who told Jefferson the Defendants have stated that dental work performed by Jefferson was not necessary, not done, or not done in a professional manner. Additionally, when claims are questioned by the Defendants, often EOB's are sent out telling the patients that the service was unnecessary and that they, the patient, will be financially responsible. This is an attempt to "scare off" Jefferson patients.

47.     The repetitive EOBs sent out to Jefferson patients indicate that either the claim is pending or the claim has been denied. Contained in the EOBs are two columns headed "Patient Responsibility." The EOBs are intentionally formatted to look like bills from Jefferson. In other words, the Defendants have engaged in an assault on Jefferson that has three prongs: (1) to deny a valid claim, (2) to harass and damage Jefferson economically and (3) to send out deceptive EOB's regarding denials in an attempt to convince the particular patient that because of Jefferson's behavior, the patient will now have to pay the balance of the bill.

48.     This sort of behavior is not limited to the scope of these single patients. Jefferson serves a community of people that talk with one another. Rumors about Jefferson flourished, particularly because many of the patients have had little or no prior interaction with organizations, such as the Defendant insurance companies. These patients tend to perceive the insurance companies as being governmental, which results in

fear of these organizations. It must be realized that this Spanish speaking community is often just one generation away from a *Napoleonic* legal tradition that requires the *person* to prove their innocence or non-responsibility in a criminal matter. When patients become convinced that they may be in trouble with the government as a result of their association with Jefferson, they avoid Jefferson. This destroys Jefferson's business. The Defendants have scurrilously taken advantage of this.

49.     Jefferson has decided that while this litigation is pending it will not bill the patients who have legitimate insurance coverage. Jefferson allows its patients to pay balances due on a scheduled basis because its patient base consists of low-income individuals and their families. Jefferson believes that because the EOBs are designed appear like a bill from Jefferson, many of Jefferson's patients decide not to use its clinics in fear that they will be asked to pay their balance in full before further treatment can be performed. Jefferson has chosen not to bill any patients on the claims that are the subject of this lawsuit. In fact, Jefferson continues to see many patients notwithstanding the fact that it will not be reimbursed for the services provided, at least until judicial relief is obtained. Many patients are going without dental care because of the EOB "surveys" and other documents they receive from the Defendants. Defendants, who are in the healthcare industry, are *causing* patients to go without healthcare because they know they it will save them money.

50.     Additionally, to add insult to injury, at least one Defendant, Aetna, has stated to Jefferson patients that Jefferson has employed non-licensed dentists.

51.     Prior to performing any dental work on any patient, Jefferson verifies insurance coverage for its patients. This is done via wire transmission (computer or phone). This insurance coverage verification not only confirms that the patient is insured

for dental service, but also determines the rate of reimbursement per procedure. This is done to insure that Jefferson will be paid for services rendered. On thousands of occasions, Jefferson has received verification from one or more of the Defendants that coverage existed with respect to a particular patient or procedure, only to be advised days later that no such coverage existed, even though the service had already been provided.

52.     The tactics the Defendants have used to accomplish their goal of putting Jefferson out of business, include, but are not limited to:

a.      Invariably requesting the full patient file on all claims, without looking at whether x-rays submitted warrant such request.

b.      Requesting to look at x-rays for routine cleanings.

c.      Assigning only one claims representative to handle thousands of claims.

d.      Denying having received x-rays despite them being sent by Jefferson two, three, and four times.

e.      Sending repetitive surveys to patients to ascertain if work was "really" done, and if Jefferson overcharged the patient for the services performed.

f.      Sending redundant EOB's to patients, via U.S. Mail.

g.      Contacting patients to ask them to file complaints with the Board of Dental Examiners, via mail and/or wires.

i.      Falsely telling patients that Jefferson dentists are not licensed, when in fact they are.

j.      Treating Jefferson as "red."

k.      Treating Jefferson as "flagged."

l.      Slow paying on "clean claims" then hiding behind the law because Jefferson is an out of network provider. In other words, indefinitely

suspending payment on legitimate claims in an attempt to get Jefferson to conform its billing to "on network" providers or face destruction.

m.  Slow paying on clean claims for preventative services.

n.  Indicating that an "alert" applies to Jefferson.

o.  Refusing to pay on any claims without receipt of the entire patient chart. including privileged information.

p.  **Specifically indicating that Jefferson is the only provider for which these administrative procedures are enacted.**

q.  The following is a non-exclusive description of practices which each Defendant has used to improperly either deny or delay claims payments:

*Aetna*

(1)  Requiring full charts, notes, and x-rays before agreeing to pay simple teeth-cleaning claims.

(2)  Stating that x-rays are missing, **even though x-rays may have been sent up to five times previously**; requiring a patient's entire dental history since the inception of the patient going to Jefferson, denying claims for lack of medical necessity, while at the same time returning documents to Jefferson that have not been reviewed such as unopened x-rays.

(3)  Mandating that doctor's notes be supplied with claims, even though doctor's notes are not necessary for claims payment determination.

(4)  Limiting all communications with Aetna regarding claims to one contact person who is generally non-responsive and unavailable, knowing full well that Jefferson files a large number of claims each day with Aetna.

### *Trustmark/Coresource*

(1)     Denying entire claims, even though portions of the claim, such as basic teeth cleaning, are clearly covered items.

(2)     Sending questionnaires to patients, implying that the services were not performed.

(3)     Requiring x-rays be produced before paying basic teeth-cleaning claims.

(4)     Denying the payment of claims based on the fact that the patient may have supplied a false Social Security number to its employer, while at the same time not returning the premiums paid on that individual's behalf. Plaintiff avers that questioning the validity of patients' social security numbers has a racial overtone that is consistent with the Civil Rights claims discussed ante.

(5)     Alleging that employers told them not to pay claims, when in fact employers deny ever stating that.

### *Guardian*

(1)     Requiring excessive documentation for procedures as simple as teeth cleaning.

(2)     Filing frivolous and harassing complaints with the Texas Board of Dental Examiners ("Board of Dental Examiners" or "Board"), as discussed in detail in V (C) & (D) above. Notice of the latest of these attempts was received as late as January 19, 2005. In this latest bout of ridiculousness, Katrina Harris was notified that in this particular complaint, she had misidentified the treating doctor. Additionally, the

falseness of the claim could be and was demonstrated by producing the records. Even though the complaint was false, Ms. Harris on behalf of Guardian, simply "cut and pasted" a new name on the false complaint and re-filed it.

(3)    Denying claims, stating that "independent consultants" did not confirm the necessity of services, while in fact, the consultant was never asked about the service for which the claim is being denied.

(4)    Claiming to use an "independent consultant" when in fact the "independent consultant" is a full time employee of Guardian.

(5)    Persisting in a campaign that stretches back for more than six years that has as its singular goal to destroy Jefferson. Simply stated, Guardian and Katrina Harris' offenses are to numerous to list in this complaint. Guardian told Jefferson that its investigation of Jefferson would continue indefinitely. **Guardian has committed more offensive acts than any other insurance company**. Guardian has denied thousand of claims, for no cause whatsoever, other than possibly for greed and racial animus. **Currently, Guardian is hundreds of thousands of dollars in arrears to Jefferson**. They have been *ordered* by a federal judge to pay Jefferson and still refuse to pay. Make no mistake, they did not appeal this order, they don't deny the order or its validity, they simply feel that the persecution of Jefferson may be conducted with impunity. In a deposition on an unrelated case, counsel for Guardian was inquired as to when the would pay the money they had been ordered to pay. Counsel for Guardian, Stephen Howen stated that they would not pay until they had

received "assignment of benefits."  When confronted with the fact that he and his client had been served with this many times, he flatly and untruthfully denied receipt of these assignments.

(6)     Guardian, without a shred of justification, has required Jefferson to demonstrate medical necessity by producing every single record, on every single patient, for every single procedure.  No other insurance company in the world does this.  All the while, they have refused to pay.  Jefferson took the valid position that not a single one of these requests were valid. The Guardian asked for example, for x-rays to justify a cleaning. Jefferson sought relief from the Federal Judge in this matter.  The judge asked, as a show of good faith, would Jefferson comply with the request to produce the records.   Jefferson agreed and spent tens of thousands of dollars digitizing every single document in its possession, and recording them onto CD's for the *Defendants* convenience.  First, Guardian denied receipt of the disks.  Jefferson then proved service and receipt of these disks. Then Guardian argued that there *were too many records on the disk to review* when Guardian insisted on receiving them all!  Finally, after all of this, Guardian then took the position that the digitized copies were not originals and therefore not justification for payment.  To this ridiculous behavior, the Judge ordered payment.   Guardian has recently as of February 3, denied that any assignment had been received.   The lengths that Guardian and its attorney's will travel to avoid its legal and financial obligations seem unending.  When counsel for Plaintiff showed counsel for Guardian receipts for delivery, Guardian decided to send expired

checks. These actions amply demonstrate their nefarious independent scheme to destroy Jefferson's business.

(6)     In particular, it would appear that Guardian's counsel has entered into the conspiracy to deny claims. Notwithstanding the Judge's order, notwithstanding the fact that both Guardian and Counsel for Guardian, Stephen Howen have both been served with digital and hard copies of the all medical records and hard copies of all assignment of benefits and "signature strips" authorizing the assignment of benefits, this Defendant and Defendant's counsel have refused to pay the claims owed to Jefferson. In fact, when confronted with the reasons for not paying the nearly three-quarters of a million dollars in arrear, Mr. Howen vacillated between simply stating that they "decided" not to pay or that he had not "received" the required documentation, even though his firm had signed for receipt of said documentation.

(7)     Whether this Defendant acknowledges receipt of none, some or all of the requested documentation is no longer relevant. *They have denied every single claim without cause.* Nearly 2000 claims have been denied without justification in violation of state and federal law. At last count, $687,640.45 was owed. This amount was arrived at by the following process:   On every claim submitted for services rendered, Guardian verifies that there is coverage and authorizes the work to be done. Jefferson bills Guardian and Guardian has either done nothing or made a request for more records to consider processing the claim. Then after the additional records have been sent to Guardian as requested, none of the

claims have ever paid.   No adequate explanation is ever given by Guardian.   Numerous occasions requested x-rays have been returned unopened with the claim still denied for no reason.

8.      In fact, Stephen Howen and Guardian have created uproar over these so-called authorizations.  Therefore, some explanation of this should be produced.  A patient arrives at Jefferson with proof of coverage from Guardian.   Guardian is contacted and verifies coverage and authorizes services.     Services are rendered and billed.     Guardian, without justification, requests extra documentation for virtually every single patient.    This is a great deviation from the industry norms.    Said documentation/records are dutifully given to Guardian.   Often these are returned un-opened.   Then payment is either denied, or simply nothing happens – no denial and no payment.   When a further inquiry is made, Guardian or the attorneys request proof that the benefits were "assigned" by the person they have already verified the coverage for, and authorized the service that were rendered by Jefferson.   In the instant case, all of these have been turned over even though the request is nothing more than further delay tactic.  After all of this, Guardian has denied payment after having acknowledging receipt of these assignments, and then apparently sent checks to it attorney – who then denied payment either because the had "decided" not to pay, or because the law firm had not received these assignments, even though the Plaintiff has signed receipts for their delivery.  Once again, the whole process seeks to make this dental practice impossible such that it destroys Jefferson's company.

### *Great West*

(1)    Indefinitely pending claims after receiving all requested records.

(2)    Asking for all records, notes, x-rays, and other documents, even thought the visit is a follow-up visit related to prior dental work.

(3)    Requiring that Jefferson obtain a letter from the IRS verifying Jefferson's tax ID information.

(4)    Claiming that services provided by Jefferson were actually performed outside the United States, and are therefore, not covered.

(5)    Accusing Jefferson of simply going through the phone book and picking out Hispanic names and filing false claims.

(6)    Filing frivolous and harassing complaints with the Texas Board of Dental Examiners ("Board of Dental Examiners" or "Board"), as discussed in detail in V (C) & (D) above.

## F. **The Result of Defendants' Tortious Conduct**

53.    Jefferson has had outstanding receivables from Defendants that totals over totaling as much as $2,000,000.  These receivables far exceed the receivables owed, or ever owed, by the other 145 plus insurance companies with which Jefferson processes claims.  As a result of Defendants' tortious claims practices, Jefferson has been forced to hire additional employees, whose sole purpose is to process claims with the insurance Defendants in an attempt to obtain payment.  Additionally, Jefferson's growth has been stymied because Jefferson's capital has been tied up in unpaid claims and suffered from a

loss of goodwill due to the Defendants' patient-by-patient and community-by-community assault on Jefferson.

54.    Certain Defendants have contacted Jefferson's clients and had them visit other dentists to verify the work done by Jefferson. Even though the verification process has indicated that Jefferson had done the appropriate dentistry, the mere fact that its insurance company contacted a client requesting them to visit another dentist, is damaging. Equally damaging is the amount of time Jefferson has spent fighting with the insurance companies to obtain payment of the claims, as well as defending Jefferson from patently frivolous administrative actions filed by certain Defendants -- "allegedly on behalf of patients."

55.    Jefferson has been advised that many patients have stopped coming to Jefferson because their insurance company does not recognize it as a legitimate provider and because insurance companies do not pay Jefferson's insurance claims. Likewise, patients have stopped coming to Jefferson because they are afraid of the letters being sent to them by Defendants, which have the effect of causing them to believe that they did something that could get them in trouble or have a negative impact on their credit rating.

56.    Defendants' tortious conduct, although directed at Jefferson, has a profound effect on Jefferson's patients. As the result of Defendants' outrageous conduct, Jefferson was about to go out of business and its patients were not receiving their much-needed dental care. Jefferson has been in severe financial distress as a result of Defendants' conduct. The Defendants are succeeding in their attempts to cause Jefferson to go out of business. Jefferson was on the verge of bankruptcy and its business has decreased greatly. Additionally, approximately 40% of all claims actually paid by Defendants are paid well outside the industry standard of forty-five (45) days. In fact, the

Defendants' average days-to-payment is one-hundred and ten (110) days. Many of these claims are for preventative services and other basic procedures, such as x-rays and cleanings, the validity of which should not be in dispute.

57.     Amazingly, *Defendants are asking* for copies of x-rays to *prove* the *need* for *basic cleanings*! Defendants' grotesque conduct can only lead to the conclusion that Defendants do not want to pay for dental care at facilities that serve primary poor Hispanics. At least as to Aetna, this clearly contradicts its much publicized mission statement that Aetna strives to "bring health and related benefits to the attention of the . . . Hispanic/Latino markets" and its "ongoing commitment to diversity."

58.     Defendants' outrageous conduct cannot be explained. After discovery, Jefferson believes that one or more of the following will arise as the true motivation for Defendants' conduct:

-       Defendants grossly miscalculated the extent of the expanding Hispanic population, and need and extent of that need and for dental care. Alternately, Jefferson believes this behavior is grounded in racism.

-       Defendants failed to account for the fact that as the Hispanic population increases in number, more and more Hispanics would have access to dental insurance through increased employment with employers who provided dental coverage. As a consequence, many lower-income Hispanics have access to top-quality dental care for *the first* time in their life when they visit a Jefferson clinic. Thus, these patients will obviously have more severe and long-standing dental problems than other patients. This insurance is simply failed at

underwriting. Instead of re-grouping and altering premiums, if necessary, the insurance companies instead decided to ruin Jefferson's business.

-        Defendants are punishing Jefferson for not being a participating provider.

-        It cannot be disputed that out-of-network providers costs insurance companies more than in-network providers.

59.        Whatever the problem, Defendants' attempted solution is clear: decrease costs in the form of claims paid, and therefore maximize profit.

## VI. CAUSES OF ACTION

### A. ERISA

60.        Plaintiff incorporates by reference all allegations in this Amended Complaint.

61.        Jefferson brings claims under ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) for failure to pay claims only. Defendants' actions in unreasonably delaying claims, denying certain claims, and refusing to address certain claims constitute behavior, which is arbitrary and capricious. In addition to the violation of the above ERISA sections, Jefferson asserts its claims under ERISA §502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) for delayed benefits payments, as well as interest. The extent these claims are ERISA claims, exhaustion is not required because, as set forth above, Defendants' late payments are part of an intentional scheme that renders a resort to administrative remedies as futile. In addition, these remedies are inadequate and impractical, and Jefferson has no meaningful access to them. Further, Defendants' conduct of not notifying Jefferson regarding actual claims denial in violation of 29 U.S.C. § 1132(1) makes such efforts futile, as Defendants concealed and continue to conceal the denial of benefits.

62.     Prior to performing dental work on any patient, Jefferson receives an executed assignment of benefits from the patient assigning to Jefferson the patients' benefits and rights under his or her dental policy with one of the Defendants.  This assignment appointed Jefferson as an agent for receipt of reimbursement under the policy.  Consequently, Jefferson is the assignee of the patients' benefits or agent for receipt of the same or both.  Additionally, to the extent that prior to the beginning of this tortious behavior Defendants are estopped from asserting that Jefferson cannot recover under ERISA and have waived such assertion by their conduct.  Defendants have paid a large volume of claims submitted by Jefferson amounting to hundreds of thousands, if not millions of dollars in claims.

## B. RICO

### 1. General Allegations

63.     Plaintiff incorporates by reference all allegations in this Amended Complaint including, but not limited, to paragraphs 21, 23, 25, 32, 34-36, 37-39, 39, 40-45, 51-52.

64.     Plaintiff repeats that it understands the gravity of making RICO accusations against any person or organization.  Jefferson does not make these allegations lightly.  Jefferson also notes that other suits recently settled and ongoing in this country have similarly lodged RICO complaints against insurance companies for similar conduct.  Although some of activities committed against Jefferson may be similar to some of the activities committed against the other Plaintiffs, for example *In Re Managed Care* suit or derivative actions, the fact of the matter is that Jefferson's suit is far different.  The named Defendant companies in this civil action have gone after Jefferson *in particular*.

Plaintiff avers that its cause of action as it regards RICO is, if anything, exactly the sort of behavior that RICO seeks to address and prevent. After all, RICO was originally designed to affect *organized crime.*

65.   For example, and hypothetically within the organized crime model, suppose that a criminal organization is attempting to extort money from a small business. They demand payment of a portion of the businesses revenue, or face having their business burned to the ground. Suppose further, a couple of notes are sent or phone calls are made reminding this business to hand their money over or face destruction. This situation would be precisely addressable by RICO *because the underlying action is criminal.*

66.   This sort of behavior almost exactly describes what has happened, and is happening to Jefferson. Jefferson is being told by the Defendants: "Because you serve a certain population, you bill too many services. You *will* accept lower payments. In other words, we [the defendants] will take and keep some of your money, or we [the Defendants] will destroy your corporation." Assuming this description is true, the Plaintiff proffers the following question, how does Plaintiff's circumstance differ from the hypothetical described in the paragraph above? Are the actions described criminal and reprehensible? The answers to these questions are yes. There is no difference; these are criminal actions of fraud and extortion by the Defendants.

67.   Therefore, the Plaintiff contends that the Defendants committed racketeering activities by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; extortion, in violation of 18 U.S.C. §§ 1951(a) and (b)(2); and violations

of the Travel Act, 18 U.S.C. § 1952(a)(3).[4]  To violate RICO, a defendant must engage in a pattern of racketeering activities. RICO designates the violation of certain federal criminal laws as "racketeering activities." *See* 18 U.S.C. § 1961 (1).

68.    Defendants violated the Racketeer Influenced and Corrupt Organizations Act in connection with a scheme devised, conducted, and/or participated in by Defendants in conjunction with third party persons both named and unnamed, including but not limited to Katrina Harris, Kristi Cronkhite (Guardian), Mary Shanahan (Trustmark), Laura Gay (Aetna), Chris Hall (Coresource), numerous unnamed "clerks" or "friendly consultants," "special investigators," claim specialists, providers and developers of claim processing software (herein globally referred to as "CPT") or other "automatic theft software", and the Texas State Board of Dental Examiners (in particular Ben Ablon) through a pattern of racketeering activity.[5]  Defendants conducted, or participated directly or indirectly in conduct of, the affairs of an association-in-fact enterprise (hereinafter referred to as the "Enterprise"), associating with themselves as well as unnamed parties. Defendants are "persons" with in the meaning of 18 U.S.C. 1961 (3).[6]

---

[4] "travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

[5] 18 U.S.C. § 1961(1) defines "racketeering activity" to include violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. 1952 (extortion under the Hobbs Act), 18 U.S.C. § 1952(a)(3) (violations of the Travel Act). As more fully explained herein, Defendants committed both mail fraud and wire fraud in furtherance of a fraudulent scheme. Plaintiff further alleges that Defendants engaged in a "pattern" of racketeering activity in that they committed "at least two acts of... [mail fraud or wire fraud or extortion or violations of the travel act] ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

[6] A "person" includes any individual or entity capable of holding a legal or beneficial interest in property.

69.     Defendants violated 18 U.S.C. 1951[7] by extorting money from the Plaintiff by refusing to pay valid dental claims. The result of this scheme was that the Defendants, named and unnamed conspirators, conspired to and did knowingly, wrongfully, and unlawfully reduce, refuse, avoid, and/or delay reimbursement to Jefferson for covered services provided to Defendants Members, all to the benefit and financial gain of Defendants, and to the detriment of Jefferson. Further, the Defendants wrongfully used the fear of economic loss to convince Jefferson to except no payment or reduced payment for services and to convince Plaintiff to reduce services or bill fewer services on behalf of its patients, or face the destruction of Plaintiff's company.

70.     As described above and below, this extortion was accomplished with the purpose of removing or reducing the payment (already) owed to Jefferson or in the alternative destroying Jefferson's business such that the Defendants would not have to pay for services that Defendants believed would interfere with their profit margin. Since it can be amply demonstrated that the services that were billed by Jefferson were (1) justified, (2) previously approved, and (3) and since it can be demonstrated that there was a contract for these services between Jefferson and the Defendants, refusal to pay or reducing the level of payment was done wrongfully as required by the Act.

71.     In carrying out the scheme to defraud Jefferson, Defendants engaged, inter alia, in conduct in violation of federal laws, to wit: mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343, violation of the Travel Act, 18 U.S.C. § 1952(a)(3), and violation of the Hobbs Act 18 U.S.C. 1951.

---

[7] Under the Hobbs Act, 18 U.S.C. § 1951, "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). The "fear" may be of *economic loss* as well as of physical harm. *See United States v. Addonizio*, 451 F.2d 49, 72 (3rd Cir. 1972).

72.     As a result of the above, Defendants violated, 18 U.S.C. § 1962 (a),[8] 18

U.S.C. § 1962 (c),[9] and 18 U.S.C. § 1962(d).[10]

### 2. Pattern of Unlawful Racketeering Activity

73.     Plaintiff incorporates by reference all allegations in this Amended

Complaint including, but not limited, to paragraphs 21, 23, 25, 32, 34-36, 37-39, 39, 40-

45, 51-52. See also the predicate acts described below.

74.     Defendants have engaged in and continue to engage in a "pattern of

racketeering activity," as defined in 18 U.S.C. §1961(5), by committing and/or conspiring

to commit a scheme consisting of at least two related predicate acts of racketeering

activity, as described in detail below, within the past ten years.

75.     The multiple acts of racketeering activity committed and/or conspired in

by Defendants were related to each other and amount to, and pose a threat of, continued

racketeering activity, and therefore constitute a "pattern of racketeering activity," as

defined in 18 U.S.C. § 1961(5).

76.     During the relevant time period, Defendants, along with (other persons),

knowingly, wrongfully, and unlawfully reduced, refused, avoided, and/or delayed

---

[8] 18 U.S.C. § 1962 (a) states: It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

[9] 18 U.S.C. § 1962(c) states: It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

[10] 18 U.S.C. § 1962(d) states: It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

payment to Jefferson for medically necessary covered services rendered to Members, all to the benefit and financial gain of Defendants and to the detriment of Jefferson.

77.     This scheme to *defraud* Jefferson evolved over time as a pattern of racketeering activities that inflicted discrete harms to the Plaintiff.  Jefferson was the victim of these unlawful patterns of racketeering activity because it suffered discrete financial losses as a direct and proximate result of Defendants' activities

78.     In carrying out the scheme to defraud the Plaintiff, Defendants engaged, inter alia, in conduct in violation of federal laws, to wit: mail fraud, in violations of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, extortion under 18 U.S.C. § 1951, and Travel Act, 18 U.S.C. § 1952(a)(3).

79.     Although, upon information and belief, thousands occasions of such fraud and violations of federal law have occurred, the following predicate acts are given.  The Plaintiff avers that it has records of as many as 20,000 claim denials or payment inquiries. *This constitutes 20,000 predicate acts*.  Each one of these denials or inquiries follows a process that for each and everyone, **constitute multiple uses of the mail, wire and, possibly travel related services, in furtherance of the fraudulent pattern and scheme**.

80.     Traditionally, when a patient shows up at Jefferson, a verification of coverage is made.  A confirmation of coverage is received via wire transmission. Services are rendered and billing is made via wire or mail.  A denial of coverage is then made, in spite of the previous confirmation.  This is normally done via the mail.  An inquiry is made about the denial, via mail or wire transmission (telephone or fax).  What often then ensues is a "ping pong-like" game of inquiry, request for more records, and

denial that often stretches on for month or even years. As previously stated, there have been over 20,000 examples of discrete predicate acts, furthered by mails and wires. Pursuant to statute, listed below are two predicate acts for each named Defendant:

| Defendant Company and/or Individual | Patient Initials | Date of claim |
| --- | --- | --- |
| Aetna | B.C. | 5/27/2003 |
| Aetna | S.H. | 4/18/2003 |
| Guardian | R.G. | 7/16/2004 |
| Guardian | R.H. | 3/18/2004 |
| Core Source | G.T. | 8/22/2003 |
| Core Source | M.G. | 2/24/2004 |
| Trustmark | J.S. | 3/8/2004 |
| Trustmark | A.G. | 3/16/2004 |
| Great West | A.R. | 1/30/2004 |
| Great West | K.A. | 11/22/2003 |
| Katrina Harris | A.V. | 8/24/02 |
| Katrina Harris | C.S. | 8/19/02 |
| Ben Ablon | A.V. | 8/24/2002 |
| Ben Ablon | C.S. | 8/19/2002 |

### 3. **Managed Care Enterprise and Scheme**

81.     Plaintiff incorporates by reference all allegations in this Amended Complaint including, but not limited, to paragraphs 21, 23, 25, 32, 34-36, 37-39, 39, 40-45, 51-52.

82.     Through its standard advertising, brochures, communications and representations to Jefferson, Defendants consistently represented that it would reimburse Jefferson on the basis of appropriate reporting of covered services, and said services being "Medically Necessary."

83.     The Agreements and accompanying attachments, which describe the above bases for reimbursement, were, and are, typically sent to Jefferson by Defendants via regular United States mail.  Advertising, brochures, and other representations also advise Jefferson and Members of the ability to grant an assignment of benefits to Non-participating Providers.[11]   Advertising, brochures, and other representations made by Defendants to Providers, which also describe the above bases for reimbursement, are typically sent via regular United States mail.

84.     Additionally, as described above, the Defendants produced and mailed numerous "explanation of benefits" to Jefferson patients.  The purpose of the benefits, disguised as a benefit for their insured, were drafted as to cast disparagements on Jefferson and to cause Jefferson's patients to question the quality of service they received.  This was done for the purpose of driving Jefferson's patients off or inducing them to complain about service.  Additionally, since many of Jefferson's patients have limited English language proficiency, these "EOB's" have been mistaken for bills or

---

[11] Jefferson is a non-participating provider.

invoices causing these patients to fear they would have to pay for services. This tortious, fraudulent behavior was accomplished via the Mail in violation to 18 U.S.C. § 1341, and was done as part of a larger conspiracy to reduce Jefferson business or to place Jefferson in fear of economic law via inherently wrongful behavior.

85.    Defendants, via wire and mail communications, represented to Jefferson that their claims would be evaluated based on industry standards. As a result, Defendants received and continues to receive Jefferson's claims for payment for Medically Necessary covered services.

86.    As facilitated by the above-mentioned mail and wire communications and representations, Defendants have engaged in unlawful practices designed to delay, avoid, reduce, and/or deny payment to Providers.

87.    Additionally, the Defendants entered into scheme to deny or reduce payments owed Jefferson as a method of employing economic fear. The denial or delays proceeded as factually described above included denying claims, reducing claims, and otherwise "red flagging" Jefferson. First, the act of denying otherwise valid claims, the payment of which were the subject of a contract between Jefferson and the Defendants. Second, it was done within the context of (1) the denial or delay of multiple claims or otherwise "red flagging" Jefferson; (2) communications between and among the various Defendants causing them to behave similarly; (3) sending out EOB's in an attempt to "scare off" patients; and (4) causing numerous baseless and spurious investigations and complaints of Jefferson dentist to be accomplished.

88.    These combined events were done with the purpose of forcing Jefferson to accept the loss of money and resolve to "bill" less or face reduced business or in the

alternative the destruction of Jefferson's business altogether. Once again, this behavior is analogous to the hypothetical described in the paragraphs supra. In essence, this was extortion that is within the ambit of the Hobbs Act.[12]

89.     In order to effectuate this scheme, Defendants participated in and engaged in the affairs of the "Enterprise."

90.     The "Enterprise" is an *association-in-fact* enterprise comprised of the following entities and/or persons: (1) Defendants, (2) third party entities which develop and implement patient care and medical necessity guidelines and software tools used by Defendants, (3) party entities which perform the medical reviews of the patient files, and (4) Investigators or "contact" persons that coordinate these attacks (for example Katrina Harris), and (5) and Government officials (such as Ben Ablon).

91.     Through the affairs of the "Enterprise," Defendants were and are able to manipulate and control payments to Jefferson. This scheme, as described in more detail above and below, was and is accomplished via written agreements, associations, and the sharing of information between Defendants. Through the "Enterprise," Defendants and the named and unnamed parties were and are able to conceal their scheme.

92.     As a result of the scheme, Defendants have received and continue to receive a direct benefit and financial gain, all to the detriment of Jefferson. In fact, to this day, benefits are still being denied by Defendants.

93.     Defendants associated between themselves and with others to acquire and apply methods of payment (alternatively referred to as reimbursement), which

---

[12] *See Grider v. Keystone Health Plan Cent., Inc.*, 2003 U.S. Dist. LEXIS 16551, 2003 WL 22182905 (E.D. Pa. Sept. 18, 2003).

systematically misuse guidelines, logic, methodology, and codes to avoid paying for Medically Necessary covered services (collectively "guidelines"). Additionally, as the conspiracy and animosity created increased, any such CPT programs were in fact suspended in favor of simply flagging and denying every single Jefferson claim without ridiculously exaggerated justification. In other words, the "guidelines" in many cases, as twisted and bent in the favor of the Defendants as they may have been, were, upon information and belief, in many cases simply abandoned in favor of "total flagging," or calling into question every single claim Jefferson submitted.

94.     Defendants' employees are in positions of authority, influence, and control over Defendants' reimbursement practices, including but not limited to Medical Executives, Nurse Executives, Medical Management Team, and Regional Trainers, clerks and investigators. Furthermore, said guidelines were incorporated into Defendants' claim payment policies.

95.     Contrary to Defendants' representations, medical necessity guidelines were not and are not based on true medical necessity factors. Rather, the guidelines are cost-driven guidelines designed to maximize financial gain to Defendants by denying, avoiding, reducing, and/or delaying payment to Jefferson. It should also go with out saying that flatly denying claims, without justification, maximizes Defendants' profit.

96.     In addition, the guidelines are designed to require that Jefferson submit certain forms of medical documentation before any determination of payment will be made. However, Defendants have refused to provide these submission requirements to Jefferson. Therefore, payments are denied for inadequate documentation. The net result is that denials are at best, arbitrary and capricious.

97.     On information and belief, in order to conceal the scheme from Jefferson, Defendants agreed, via mail and wire communications, not to disclose to Jefferson the purported patient care and medical necessity guidelines by which payment to Jefferson would be, in part, determined.

98.     The result of this portion of the scheme is that hundreds of medical services, procedures and/or supplies are designated for automatic denial or reduction of payment based upon alleged medical necessity grounds, and/or in the alternative, via the policy of screening, delaying or denying each and every Jefferson claim.

99.     Upon information and belief, and as described supra, as the conspiracy to destroy Jefferson became fully active, the "CPT" program(s) that are used in large scale throughout the country began to play a smaller and smaller role.  In fact, certain Defendant companies began to flatly refuse to take "electronic filings" from Jefferson. This was in fact an effort to screen 100% of Jefferson's claims.  As a practical matter, if all of the other clinics in the country are filing electronically, and Jefferson was forced to file non-electronically, Jefferson by default was having all of its claims subject to flagging, delay, and often complete denial.

100.    What is patently obvious is that any program, any standard, any guideline as described ante, was eventually of little or no consequence.  When the Defendants have screened and delayed every single claim of Jefferson, it stands to reason that there are other motives at hand other than a concern about over-billing.  In other words, it is not the feigned concern over alleged fraudulent billing that motivates the Defendants in their actions.  As practical matter, would any reasonable person believe that Jefferson (a clinic that has had zero complaints in its near 40 year history, has never had any complaints

with the governing bodies in the State of Texas, and who has served over 200,000 satisfied patients) would as a matter of course, falsify every singe procedure on every single claim that it submits? The answer is a resounding no. The denial of every claim is part of a RICO conspiracy to destroy Jefferson.

101.    The standard fraudulent practice that is at the heart of this RICO conspiracy is this:  Virtually every claim put fort by Jefferson was scrutinized and questioned, or worse denied. It is an over-simplification to state that these systems were used to screen, down-code, and reduce. Rather, the genuine goal here seemed to be to put Jefferson, *specifically Jefferson*, out of business. This heavily distinguishes Jefferson's case from the large MDL Panel Litigation in Florida. *Furthermore, it is this exact distinction that Jefferson believes demonstrates the fact that a group of conspirators launched in to an independent <u>enterprise</u>, separate and independent from their normal business, with the goal of damaging or destroying Jefferson.*

102.    There are two basic theories that the Plaintiff asserts that explain the Defendants' tortious conduct.  First, it is based on the fact that, as a result of the particular population that Jefferson serves, (the Dallas are Hispanic population), and the fact that Jefferson's patients were "busting the premiums collected by Defendants." That is, rendering services and billing for services in excess of the profit margins sought by the Defendants and, frankly second, that the Defendant had not anticipated the costs associated with dealing with the burgeoning population, not to mention the racial animus that accompanies this.  The Defendants perpetuated a scheme that sought to decrease costs and services to this population.

103.    Additionally, upon information and belief, in order to ensure that the scheme was completed, Defendants instituted a program providing incentives and bonuses to its claim processors or investigators who adjust claims or otherwise, delay or ignore claims based upon the above referenced fraudulent medical necessity and claim processing guidelines and/or the Defendants conscious decision to treat Jefferson claims differently.    These incentive and bonus-based claim processing programs are communicated to the claim adjusters or investigators via wire and mail communications.

104.    As a result of the above agreements and associations, Defendants received and continue to receive a direct benefit and financial gain.

105.    Defendants receive a direct benefit and financial gain as a result of their associations and agreements when it applies the improper and fraudulent claim processing criteria, or other arbitrary denials of claims pursuant to the Defendants fraudulent scheme. As stated above, these improper and fraudulent claim processing and editing criteria consistently and systematically misuse and misapply CPT guidelines, logic, methodology, and codes. Specific to Jefferson, often 100% of Jefferson's claims are separated for personal review by a single person. Accordingly, the more often Defendants apply the improper and fraudulent claims processing criteria and/or screening to Jefferson's claims, the more Defendants improperly reduce, deny, avoid, and delay payment to Jefferson, thus benefiting itself and perpetuating the scheme.

106.    As a direct and proximate result of the above-referenced associations between Defendants, both named and unnamed, was (and is) to reduce, avoid, deny, and/or delay payment to Jefferson, until Jefferson is either destroyed or is forced to

except the insisted billing price, all to the harm of Jefferson and all to the benefit of Defendants.

### 4. Violation of 18 U.S.C. § 1962(c)

107.    Plaintiff incorporates by reference all allegations in this Amended Complaint including, but not limited, to paragraphs 21, 23, 25, 32, 34-36, 37-39, 39, 40-45, 51-52.

108.    Jefferson is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

109.    Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

110.    Unnamed Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

111.    At all times relevant herein, the Enterprise was and is an "association-in-fact enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and said Enterprise was and is engaged in activities that affect interstate commerce.

112.    Defendants were and are associated with said Enterprise and conducted or participated, directly or indirectly, in conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1962(c): to wit, multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, multiple instances of wire fraud, in violation of 18 U.S.C. § 1343, violations of the Hobbs Act, 18 U.S.C. 1951, and the Travel Act 18 U.S.C. § 1952(a)(3).

113.    Although Defendants directly participated in the Enterprise, Defendants also have an existence separate and distinct from the Enterprise.

114.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c). Jefferson was injured in its business and/or property in a yet to be determined amount, all within the meaning of 18 U.S.C. § 1964 (a) and (c).

### 5.  Violation of 18 U.S.C. §  1962(d)

115.    Plaintiff incorporates by reference all allegations in this Amended Complaint including, but not limited, to paragraphs 21, 23, 25, 32, 34-36, 37-39. 39, 40-45, 51-52.

116.    Jefferson is a  "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

117.    Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

118.    Unnamed defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and  1964(c).

119.    At all times relevant herein, the Enterprise was and is an "association-in-fact enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which Enterprise was and is engaged in activities affecting interstate commerce.

120.    Defendants were and are associated with said Enterprise and conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, Defendants conspired to conduct or participate, directly or indirectly, in the conduct and affairs of the Enterprise through a pattern of racketeering activity within the meaning of

18 U.S.C. §§ 1961 (1)(B) and 1962(c), to wit, multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud, in violation of 18 U.S.C. § 1343, the Hobbs Act, 18 U.S.C. 1951, and the Travel Act 18 U.S.C. § 1952(a)(3).

121.    Although Defendants directly participated in the Enterprise and is a part of same, Defendants also have an existence separate and distinct from the Enterprise. Specifically, the enterprise described supra that sought to damage Jefferson.    As discussed and incorporated herein, the scheme to damage or destroy Jefferson in particular, as demonstrated by the Defendants treatment of Jefferson as compared with the treatment of any other providers demonstrates an independent enterprise.

### 6. **Defendants' Actions Affect Interstate Commerce**

122.    Plaintiff incorporates by reference all allegations in this Amended Complaint including, but not limited, to paragraphs 21, 23, 25, 32, 34-36, 37-39, 39, 40-45, 51-52.

123.    Jefferson states that the insurance industry and the Defendants' underlying criminal behavior affects commerce. However, Jefferson avers that since the RICO claim is based upon violations of <u>federal</u> criminal statutes, the commission of the underlying federal crime necessarily establishes (*See* 18 U.S.C. § 1961(1)(B)) the nexus with interstate commerce. Moreover, because the U.S. Constitution confers the postal powers upon the federal government, acts of mail fraud, even intrastate use of the mails, have an inherent nexus with interstate commerce.

124.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Jefferson was injured in its business and/or property in an amount yet to be

determined within the meaning of 18 U.S.C. § 1964(c). Jefferson believes that after a reasonable opportunity for further investigation or discovery, additional relevant evidence may further support this claim.

## C. **Discrimination: Violations under Title 42 U.S.C. 1981 for the Right to Contract and the Right to be Free from Discriminatory Practices in the Managed Care Industry**

125.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

126.    Defendants actions have violated Title 42 U.S.C. 1981.[13]

127.    As factually described above, Jefferson serves almost exclusively, the Dallas area Hispanic community. The Defendants have sought to break, disrupt, and otherwise prevent the contract(s) that exist between Jefferson and their patients.

128.    Specifically Plaintiff affirmatively pleads that Jefferson's patients are members of a racial minority.

129.    Defendants had the intent to discriminate on the basis of basis of race; to wit: the Defendants intended to disrupt or otherwise destroy the contractual relationships between Jefferson and its patients on the basis of their race.

130.    Defendants' actions have violated one of the enumerated activities described in § 1981; to wit: "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Specifically, by continuously refusing to pay or slow paying

---

[13] (a) Statement of equal rights: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined: For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

claims brought by Jefferson on behalf of their Hispanic patients, Defendants attempted to force Jefferson from further contacts with these patients.

131.    Further, through the Defendants sending out numerous "EOB's" designed expressly to convince Jefferson's patients, many of which have limited English proficiency, that they may be responsible for higher personal costs, that they may in fact be receiving inferior treatment, or that they may be in trouble with the government. With scare tactics such as these, Jefferson reputation is being destroyed in this community. Finally, by lodging numerous fraudulent and spurious complaints with the Texas Board of Dental Examiners which either involve the re-evaluation of Jefferson's patients that create suspicion within this community and/or in the alternative, upon information and belief, cause Jefferson's duly licensed dentist to move to different practice groups, based on fear of loosing their professional reputation.

132.    Jefferson affirmatively pleads that this intent is demonstrated by the Defendants' actions.   For example, upon information and belief, not only do the Defendants treat other clinics that do not serve the minority community differently, the Defendants have overtly made racial remarks about Jefferson's practice and clientele. For example, Great West stated "why do you have so many patients with Hispanic names, do you go to phone book and just write down names?" Additionally and/or in the alternative, intent should be inferred by the Defendants' actions.  Jefferson believes that after a reasonable opportunity for further investigation or discovery, additional relevant evidence may further support this claim.

**D.  <u>Violation of Title VI of the Civil Rights Act of 1964</u>**

133.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

134.    Additionally, and/or in the alternative, the Plaintiff states that to the extent that the Defendants engage in an "activities program or activity receiving Federal financial assistance," they fall with in the ambit if Title VI of the Civil Rights Act of 1964; as amended in Title VI, 42 U.S.C. § 2000d et seq.[14], in that:

135.    Jefferson's patients are a member of a protected class; specifically that they are of a primarily Hispanic decent possessing limited English proficiency, and that these persons applied for, and

136.    Were eligible for a program[15] that receives government assistance that was accepting patients, and;

137.    That despite the person's eligibility, he or she had their claim denied and additionally that the Defendants sought to take advantage of the limited English proficiency of Jefferson's clientele through the use of English "EOB's" as described supra or other such surveys written in English designed to simultaneously damage Jefferson's reputation and otherwise interfere with these patients access to care.[16] Upon information and belief, the Defendants selected applicants, at other clinics, of a different race, color, or national origin than the insured seeking service at Jefferson or that these programs remained open or otherwise operated without interference and the Defendants continued to accept Patients of a different race, color, or national origin than the complainant's patients.

---

[14] "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [federal] financial assistance."

[15] See explanation of covered programs under of the title VI as explained in paragraph 138.

[16] The U.S. Supreme Court, in *Lau v. Nichols*, 414 U.S. 563 (1974), recognized that recipients of Federal financial assistance have an affirmative responsibility, pursuant to Title VI, to provide limited English proficient "LEP" persons with meaningful opportunity to participate in public programs.

138.    According the Department of Health and Human Services ("HHS"): "[A]ll entities that receive Federal financial assistance from HHS, either directly or indirectly, through a grant, contract or subcontract, are covered [by title VI]...Examples of covered entities include but are not limited to hospitals, nursing homes, home health agencies, *managed care organizations…*" Further, it is not relevant to any such violation of title VI whether the "federal financial assistance" received is used in the specific program that is committing the violation of title VI. Again, according to HHS, "Title VI prohibits discrimination in any program or activity that receives Federal financial assistance. What constitutes a program or activity covered by Title VI was clarified by Congress in 1988, when the Civil Rights Restoration Act of 1987 (CRRA) was enacted. The CRRA provides that, in most cases, when a recipient/covered entity receives Federal financial assistance for a particular program or activity, **all operations of the recipient/covered entity are covered by Title VI, not just the part of the program that uses the Federal assistance. Thus, all parts of the recipient's operations would be covered by Title VI, even if the Federal assistance is used only by one part**." *See* <u>Title VI of the Civil Rights Act of 1964; Policy Guidance on the Prohibition Against National Origin Discrimination As It Affects Persons With Limited English Proficiency</u>, Department of Health and Human Services, Office of Civil Rights. Located in the Federal Register, August 30, 2000, Volume 65, No. 169, pages 52762-52774. Additionally, Jefferson believes that after a reasonable opportunity for further investigation or discovery, additional relevant evidence may further support this claim.

139.    Plaintiff affirmatively pleads that Defendants' actions demonstrate a prima facia case of intentional discrimination and/or in the alternative that the intentional conduct of the Defendants can be inferred from Defendants' conduct. Additionally,

and/or in the alternative, the Defendants' actions have resulted both disparate treatment and impact within the community Jefferson serves. Plaintiff asserts that Defendants have acted "with malice or reckless indifference to the federally protected rights of aggrieved individuals."

140.   Further, Jefferson affirmatively pleads that, upon information and belief, Defendants' violations fall within the ambit of Title VI of the Civil Rights Act of 1964; as amended in Title VI, 42 U.S.C. §§ 2000d et seq, in particular, § 504 (title 29 U.S.C. 794 as amended) of the act, but to the extent that they do not, the law should be extended to cover this sort of egregious behavior.   Jefferson believes that after a reasonable opportunity for further investigation or discovery, additional relevant evidence may further support this claim.[17]

---

[17] Section 504 clearly provides for a private cause of action to enforce a claim of discrimination see, e.g., *Barnes v. Gorman*, 536 U.S. 181, 153 L. Ed. 2d 230, 122 S. Ct. 2097 (2002). Although Title VI does not mention a private right of action …prior decisions have found an implied right of action, e.g., *Cannon v. University of Chicago*, 441 U.S. 677, 703, 60 L. Ed. 2d 560, 99 S. Ct. 1946 (1979), and Congress has acknowledged this right in amendments to the statute, leaving it "beyond dispute that private individuals may sue to enforce" Title VI, *Alexander v. Sandoval*, 532 U.S. 275, 280, 149 L. Ed. 2d 517, 121 S. Ct. 1511 (2001). Plaintiff avers that a private right of action is created by virtue of the interaction between Defendant's conduct and the intent of the statutes cited. A private right of action may be implied where (1) plaintiffs are within the class for whose especial benefit a statute was enacted; (2) there is indication of a legislative intent, explicit or implicit, to create a remedy for the plaintiffs; and (3) implying a remedy is consistent with the underlying purposes of the legislative scheme. *See Cort v. Ash*, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975). Additionally, Jefferson has standing to bring these causes of action. Although it is a well-established tenet of standing that a "litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties," *Powers v. Ohio*, 499 U.S. 400, 410, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), the prohibition is not invariable and our jurisprudence recognizes third-party standing under certain circumstances. *See Campbell v. Louisiana*, 523 U.S. 392, 397-98, 140 L. Ed. 2d 551, 118 S. Ct. 1419 (1998); *see also Hodel v. Irving*, 481 U.S. 704, 711, 95 L. Ed. 2d 668, 107 S. Ct. 2076 (1987) (acknowledging general rule that party must assert own interests is "subject to exceptions"). In particular, if a course of conduct "prevents a third-party from entering into a relationship with the litigant (*typically a contractual relationship*), to which relationship the third party has a legal entitlement," third-party standing may be appropriate. *United States Dep't of Labor v. Triplett*, 494 U.S. 715, 720, 108 L. Ed. 2d 701, 110 S. Ct. 1428 (1990). For instance, doctors may be able to assert the rights of patients; lawyers may be able to assert the rights of clients; vendors may be able to assert the rights of customers; and candidates for public office may be able to assert the rights of voters. See, e.g., *Chartered v. United States*, 491 U.S. 617, 105 L. Ed. 2d 528, 109 S. Ct. 2646, 109 S. Ct. 2667 (1989) (holding lawyer could bring Sixth Amendment lawsuit on behalf of criminal defendant); *Singleton v. Wulff*, 428 U.S. 106, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976) (conferring standing on physicians on behalf of patients to challenge a statute that excluded funding for abortions from Medicaid benefits); *Craig v Boren*, 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976) (allowing vendor to challenge statute that prohibited

### E. Violation of Prompt Payment Statutes

141.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

142.    Defendants violated Tex. Insurance Code Ann. §§ 20A.18B, 21.55, and 3.70-3C by failing to pay claims within the time specified in the statute. Plaintiff relies on § 20A.18B(g) and an implied cause of action theory. As a direct and proximate of Defendants' delayed payment, Jefferson is entitled to statutory damages pursuant to Tex. Insurance Code Ann. §§ 20A.18B, 21.55, and 3.70-3C. (See footnote 20 below).

### F. Tortious Interference with Contract

143.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

144.    ERISA does not preempt the following pendant state law claims. Jefferson affirmatively states that the pendant state law claims that it brings are not pre-empted by ERISA because (1) there is a presumption that in regards to ERISA, Congress never intended to preempt state law,[18] (2) the state law governing these specific torts does not mandate an employee benefit structure or administration,[19] and (3) the suit does not seek an alternative means of enforcement then granted under ERISA, because these causes of action are not brought on behalf of the patient / plan participant, but rather by

males under age of twenty-one from buying beer); *Mancuso v. Taft*, 476 F.2d 187 (1st Cir. 1973) (permitting candidate for public office to raise voters' rights). In the case, *In re Doe v. Bolton*, 410 U.S. 179 (1973), the Supreme Court of the United States held that abortion providers have standing to assert the rights of their patients who are not parties to the action. *See, e.g., New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1347-1348 (2d Cir. 1989), cert. denied, 495 U.S. 947, 109 L. Ed. 2d 532, 110 S. Ct. 2206 (1990); *Planned Parenthood Ass'n of Cincinnati v. Cincinnati*, 822 F.2d 1390, 1394-1396 (6th Cir. 1987).

[18] *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 646 (U.S. 1995).

[19] The nexus of Jefferson's claims are not about "an employee benefit plan" and rather are about Defendants' attempts to destroy Jefferson.

Jefferson complaining of the Defendants interference with Jefferson's relation with these patients and the community.

145.     Defendants' actions are *specifically* directed towards Jefferson. Although the Plaintiff works within the healthcare industry and works with ERISA participants, the torts asserted are torts which are part of a design and scheme to damage Jefferson; even if the outcome ultimately damages Jefferson's clients' ability to obtain services. In essence these are state law claims brought complaining of the Defendants attempt to destroy Jefferson, even albeit partially through denial of payments in an assigned benefits context.

146.     Defendants tortiously interfered with contracts. Jefferson can show that it: (1) had valid contracts with patients whereby Jefferson provides dental services and the patients agree to pay, or cause payment to be made to, Jefferson. As a direct result of Defendants' tortious conduct, including, but not limited to, they have attempt to put Jefferson out of business by cutting off its revenue stream, harassing patients and, "trolling" for specious complaints to be filed with Board of Dental Examiners; (2) that the Defendants tortiously, willfully, and intentionally interfered, and are continuing to so interfere, with Jefferson's contracts with its patients; and (3) have proximately caused Jefferson to sustain actual damages and loss of revenue and business.

## G.  **Tortious Interference with Prospective Contract**

147.     Plaintiff incorporates by reference all allegations in this Amended Complaint.

148.     Additionally, or in the alternative, Jefferson has established a successful dental practice through which it provides dental services, to many lower income and

largely Hispanic residents. It has built up a significant presence in the market place. Jefferson can show that: (1) there is a reasonable probability that Jefferson would have entered into future and additional contracts with new and repeat patients; (2) Defendants' intentional interference was independently tortious and unlawful; (3) these actions are a proximate cause of damages to Jefferson; and (4) Jefferson has sustained actual damages.

## H.   Tortious Interference with Prospective Business Relations and Continuing Business Relations

149.   Plaintiff incorporates by reference all allegations in this Amended Complaint.

150.   Additionally, or in the alternative, Jefferson can show that: (1) Defendants interfered with prospective business relationships; to wit: Defendants' actions have damaged Jefferson's reputation within the community such that there has been a loss of perspective business and business growth; (2) Defendants actions were unlawful or tortious; (3) Defendants conduct is a proximate cause of Jefferson's damages, and (4) there have been actual damages suffered by Jefferson.

## I. Business Disparagement

151.   Plaintiff incorporates by reference all allegations in this Amended Complaint.

152.   Additionally, or in the alternative, upon information and belief and as asserted exhaustively above, the Defendants have published false, disparaging words about Jefferson's economic interests without privilege or justification, thereby causing Jefferson to incur special damages, including but not limited to pecuniary losses, including loss of existing, future and potential patient relationships and lost profits, that have or would have been realized or liquidated absent Defendants' conduct. These

disparaging statements were false, made with malice or a reckless disregard for the falseness, were published without privilege, and the words have caused special damages.

## J. Libel and Slander

153.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

154.    Additionally, or in the alternative, Defendants have published, orally and in writing, defamatory, false statements of fact referring to Jefferson that were made with actual malice or were made negligently, thereby causing Jefferson pecuniary and other injury.  They were made with the intention to injure the business and personal reputation of Jefferson and its principal, and to expose Jefferson to public contempt or ridicule, tended to expose Jefferson's business to financial injury, and tended to impeach the honesty and integrity of Jefferson.  These allegations are false and Defendants were aware they were false when the allegations were and are made, or they were made recklessly without regard to the truth.

155.    As a direct and proximate result of Defendants' conduct, Jefferson has suffered economic loss, loss of income, loss of future business, and other pecuniary loss. Defendants' statements are not only untrue, but are made with malice.  Accordingly, Jefferson is entitled to exemplary damages.

## K. Negligent Misrepresentation

156.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

157.    Additionally, or in the alternative, Defendants made representations and provided information to Jefferson in the course of Defendants' business or in a

transaction in which Defendants had an interest, including representations prior to treatment that certain patients had insurance coverage. Defendants made these false representations for the guidance of Jefferson and without the exercise of reasonable care or competence in obtaining or communication the information. Jefferson justifiably relied on the representations and information. Defendants' negligent misrepresentation proximately caused Jefferson's injury, including, but not limited to, pecuniary loss.

## L. **Common Law Fraud**

158.    Plaintiff incorporates by reference all allegations in this Amended Complaint including, but not limited, to paragraphs 21, 23, 25, 32, 34-36, 37-39, 39, 40-45, 51-52.

159.    Additionally, or in the alternative, Defendants committed fraud by making material representations to Jefferson regarding insurance coverage prior to Jefferson treating certain patients. Defendants made these false representations for the guidance of Jefferson and knew the representations were false. Or, in the alternative, Defendants made the representations recklessly, as a positive assertion, and without knowledge of its truth. Defendants made the representations with the intent that Plaintiff act on the information regarding insurance coverage of certain patients that Jefferson treated. Jefferson justifiably relied on the representations and information. Defendants' fraudulent representations proximately caused Jefferson's injury, including, but not limited to, pecuniary loss.

## M. **Unjust Enrichment**

160.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

161.    Additionally, or in the alternative, Jefferson provided services to patients after Defendants falsely and fraudulently misrepresented to Jefferson that patients were eligible to participate and receive dental benefits from the Defendants.  As a direct result of Jefferson's rendition of services to the insured patients, a benefit was conferred to Defendants because the patients received dental treatment for which Defendants were obligated to pay.  Defendants accepted premium payments from patients, while at the same time refusing to pay Jefferson for services performed.  Defendants will be unjustly enriched if allowed to retain the payments received while refusing to pay for the services provided by Jefferson.

## VII.  **DAMAGES**

162.    Plaintiff incorporates by reference all allegations in this Amended Complaint.

163.    Jefferson has suffered arrears billing from the Defendants as high as Two Million Dollars ($2,000,000.00) since 1997.  Additionally, Jefferson has spent in excess of a million dollars in administrative and legal expenses, attempting to straighten out these billings issues, even though it can be demonstrated that not a single solitary claim has been improperly billed.  Jefferson has actually had to employ staff, specifically tasked with these issues.

164.    Jefferson, through no fault of its own, has suffered a loss of business and reputation within its community that is difficult to calculate.  The tortious conduct in this matter has been ongoing since 1997.

165.    Jefferson has plead intentional torts that, upon judgment, entitles Jefferson to exemplary damages, RICO which entitles trebling of pecuniary damages, and slow payment statues that entitle Jefferson to statutory interest of eighteen percent (18%)

compounded per-annum, plus a statutory penalty not to exceed one thousand dollars per day, per claim.

166.   Jefferson pleads that Jefferson is, upon judgment, entitled to pecuniary damages plus statutory interest, fees and costs;

167.   Trebling of these damages plus pre and post judgment interest and costs;

168.   Statutory interest in an undetermined amount,[20] and;

169.   In light of Defendants' conduct, which has sought to or has disrupted the health services of Jefferson clientele, specifically the Hispanic or Spanish speaking population in Dallas, upon judgment, Jefferson is in entitled to pecuniary and exemplary damages.  In particular Defendants have acted with malice or reckless indifference to the federally protected rights of aggrieved individuals.  Jefferson avers that establishing the appropriate amount of punitive damages will require a review of 1) financial statements; 2) income tax returns; 3) documents reflecting the defendant's gross income, net income, and expenditures; 4) bank statements and deposit records; and 5) general ledgers.  As of the production of this Amended Complaint, such review has not been accomplished.

170.   As reflected by the factual allegations herein, which are incorporated by reference for all purposes, Defendants have conducted their business in a manner which underlies their blatant disregard for their contractual and ethical obligations, the rights of

---

[20]   *The applicable penalty here is substantial.*   Such penalty is found in § 6 of Article 21.55 of the Texas Insurance Code, which provides for statutory "damages" in the amount of "18 percent per annum" for failure timely to pay an insurance claim.  This applies 18% interest to one year.  There could be as many as 6 years of damage in the case at bar.  Additionally, a PPO or an HMO that fails to pay a provider in accordance with these requirements "is liable to a . . . provider for the full amount of billed charges submitted on the claim or the amount payable under the contracted penalty rate, less any amount previously paid or any charge for a service that is not covered by" the health insurance policy or health care plan, *id.* art. 3.70-3C, § 3A(f); *id.* art. 20A.18B(f), and "is subject to an administrative penalty under Article 1.10E" of the Insurance Code, *id.* art. 3.70-3C, § 3A(h); *id.* art. 20A.18B(h).  "The administrative penalty imposed under that article may not exceed $1,000 for each day *the* claim remains unpaid in violation of Subsection (c) or (e) of this section." *Id.* art. 3.70-3C, § 3A(h); *id.* art. 20A.18B(h).  In the instant case, there have been hundreds if not thousands of delayed, reduced or denied claims.

persons and businesses that deal with the insurance industry, and the applicable state and/or federal laws.  An innocent mistake or misstatement may happen once, but here there was ample opportunity to rectify such matters prior to causing Jefferson such devastating economic damage.

171.   When such conduct occurs, it is conscious indifference and reckless disregard by such individuals for the interests of themselves or others.  Opportunistic members of the business community must be reminded that persons with stronger positions of knowledge are in fact stronger positions of power, which carry great responsibility and are not a license to act as Defendants have acted.   Jefferson respectfully submits that Defendants should be assessed exemplary and punitive damages in an amount at least four (4) times Jefferson's actual damages, so as to confirm society's unwillingness to tolerate the kind of conduct Defendants are guilty of and to serve as an example to others.

172.   Jefferson further submits that damage calculation should be sufficient to motivate the Defendants to refrain from similar activities in the future, but fall well short of destroying the Defendant Companies.  After all, in spite of the Defendants attempts to destroy Jefferson, seeking to destroy another company is an evil action.

### VIII.  ATTORNEYS' FEES, EXPENSES AND COSTS OF COURT

173.   Plaintiff has had to retain the services of an attorney to prosecute this civil action.  As allowed by law and/or statute, Plaintiff requests reasonable attorneys' fees, expenses and costs of Court.

## XI. **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff Jefferson Dental Clinics, P.C., prays that the Defendants be cited to appear and answer herein; that upon final trial hereof it have judgment of the Court against the Defendants, jointly and/or severally, as allowed under applicable law, including but not limited to judgment for all damages, including actual, consequential, exemplary, and punitive damages, and other relief sought herein, together with pre-judgment interest, post-judgment interest, attorneys' fees, and costs of Court. Plaintiff Jefferson Dental Clinics, P.C. further prays for such other and further relief, both general and special, at law and in equity, to which Plaintiff may show itself justly entitled.

RESPECTFULLY SUBMITTED,

By: S. R. Well

**CHARLES E. SOECHTING**
State Bar No. 18821300
**STEPHEN R. WALKER**
State Bar No. 24034729
**O'QUINN LAMINACK & PIRTLE**
2300 Lyric Center Building
440 Louisiana
Houston, Texas  77002
713-223-1000 telephone
713-223-0937 facsimile

**ATTORNEYS FOR PLAINTIFF**
**JEFFERSON DENTAL CLINICS, P.C.**

## CERTIFICATE OF SERVICE

I hereby certify that on this ___5th___ day of May 2005, a true and correct copy of the foregoing instrument has been delivered via facsimile, overnight mail and/or electronic mail to all Parties, including Parties listed on the 02/08/2005 Service List.

_S. R. Well_

STEPHEN R. WALKER