UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**IN RE:  MANAGED CARE LITIGATION**                    MDL NO. 1334

THIS DOCUMENT RELATES ONLY TO                    MASTER FILE NO.
PROVIDER TRACK CASES                             **00-1334-MD MORENO**

### PROVIDER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH HEALTH NET, INC. AND THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND CORRESPONDING FEE AWARDS AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs and their counsel hereby move the Court for final approval of their settlements with Health Net, Inc. ("Health Net") and the Prudential Insurance Company of America ("Prudential"), and for an award of attorneys' fees and reimbursement of expenses.  These settlements guarantee the Class the relief they have long sought, eliminating the specter of extremely risky continued litigation, including dispositive motions and a trial that could potentially resolve the case in favor of the Defendants.  The settlements are excellent, with a total conservatively estimated value of over $508 million.  The Health Net settlement provides for broad injunctive relief, and both settlements establish monetary funds to compensate the Class for the damages claimed in this case.  Class Counsel – comprised of dozens of attorneys from 26 of the most experienced plaintiffs firms in the country – have achieved these extraordinary settlements with Health Net and Prudential only after expending over 270,000 hours in time and over $110 million in fees and expenses.  Accordingly, the settlements should be readily approved, as should the attorneys' fee awards requested by Class Counsel.

# I. BACKGROUND

## A.    The Nature of the Case

In this litigation, Plaintiffs allege that Health Net, Prudential, and the other Defendants have engaged in a fraudulent scheme to wrongfully deny, diminish, and delay payments owed to physicians for the provision of medical services to Defendants' members.

The named Plaintiffs and class members provide medical services to Defendants' members, including those of Health Net and Prudential. (Compl. pp.4-7, ¶¶ 75, 101). The Plaintiffs allege they do so in three ways. The first is by entering into fee-for-service contracts which, together with other provided material, promise to pay doctors for the covered, medically necessary services they render. (Compl. ¶ 76). The second is by rendering care to patients of Defendants with whom they have no contracts, based upon the understanding, cultivated by Defendants, that they will be paid for the covered, medically necessary services they render. (Compl. ¶¶ 75, 77). The third is pursuant to capitation agreements under which doctors are to be paid on the basis of the number of patients they are required to treat rather than on a fee-for-service basis.

The Plaintiffs allege that fee-for-service doctors are required to submit their bills on standard coded claim forms that make use of AMA approved Current Procedural Terminology ("CPT") codes. (Compl. ¶¶ 79, 80). Unbeknownst to the doctors, these claims are processed by computer programs, developed and deployed by Defendants, that reduce the payment due without reference to medical necessity or standard coding practices. The Defendants reduce the payments by downcoding – for example, turning long office visits into short ones or complicated examinations into simple ones; by ignoring modifiers – for example, turning a bilateral mastectomy into a single mastectomy; and by bundling – treating related services as one. (Compl. p.23). In addition, Defendants often

2

wrongfully "pend" doctors' bills, putting them in a state of suspense to avoid paying in a timely fashion. (Compl. ¶¶ 93, 94).

The Plaintiffs allege that in the capitation context, Defendants do not make capitation payments for new enrollees until those patients actually seek treatment. This undermines the actuarial premise of capitation, that payments for well patients will offset the cost of treating the sick. (Compl. ¶¶ 104, 105). Instead, Defendants send false capitation rolls to the doctors each month which omit these well patients. (Compl. ¶¶ 104, 105). The Defendants also conceal from doctors the discounts and rebates by pharmaceutical companies. This results in unfairly charging pharmacy risk pools the full, undiscounted costs of drugs, increasing the charges against the capitation payments due the doctors. (Compl. ¶ 106). The Court has just recently granted summary judgment in favor of the Defendants on the capitation aspect of Plaintiffs' claims.

Plaintiffs allege that they and class members treat Defendants' insureds in reliance upon this misrepresented state of affairs, sending in their bills on the required coded forms, accepting reduced payments based upon explanations of benefits ("EOBs") that misrepresent the reasons for reductions in payment and conceal Defendants' processing schemes, and accepting reduced capitation payments based upon false patient rolls and inflated pharmacy risk pool charges. (Compl. ¶¶ 82, 97-99, 109).

**B.     History of the Litigation**

Following the filing of the Amended Complaint, the Defendants, including Health Net and Prudential, filed motions to dismiss and to compel arbitration. On March 2, 2001, after extensive briefing, this Court denied most of these motions, and granted portions of the motions relating to RICO without prejudice and with leave to file an amended complaint. A Consolidated Amended Class Action Complaint was filed on March 26, 2001. *See* Joint Declaration of Lead Counsel at ¶¶

3

21-22.

Following resolution of the initial certification issue, the Defendants fought mightily to have the Class's claims sent to arbitration, which for all practical purposes would have doomed the litigation and the Class's hopes for any meaningful recovery. *See* Joint Dec. Ld. Cnsl. at ¶¶ 23-24. The Eleventh Circuit and the Supreme Court reviewed the arbitration order, allowing most of the Class's claims to proceed. *See In re Managed Care Litigation*, 285 F.3d 971 (11th Cir. 2002); *Pacificare v. Book*, 123 S. Ct. 1531 (2003).

On September 26, 2002, the Court entered the Class Certification Order certifying a Global Class and two subclasses. The class and subclasses were certified as to the Plaintiffs' claims for RICO violations, breach of contract, quantum meruit, unjust enrichment, state prompt pay violations, and violations of California Business and Professions Code Section 17200. Appeals followed, and certification was ultimately affirmed. *See* Joint Dec. Ld. Cnsl. at ¶ 25.

After the certification of the class, the Provider Plaintiffs served comprehensive requests for the production of documents and computer data on each of the Defendants. Since then, the parties engaged in countless meet and confer sessions as well as numerous discovery hearings conducted by Special Master Sorondo. These proceedings have yielded the production of tens of millions of pages of documents from the Defendants and third parties, as well as live claims data from each of the Defendants' computerized claims processing systems. Plaintiffs have also taken and defended over a hundred depositions throughout the discovery period. *See* Joint Dec. Ld. Cnsl. at ¶ 27.

In May of 2003, after extensive, hard-fought negotiations, the Provider Plaintiffs settled the claims against Aetna. In that settlement, Aetna agreed to numerous business practice initiatives and further agreed to a fund to reimburse Class Members for various practices complained of in this

4

lawsuit. The Court approved the Aetna settlement in October of 2003, and its approval was subsequently affirmed by the Eleventh Circuit.

The Provider Plaintiffs also successfully fought an effort by outside counsel and CIGNA to undermine the case by settling outside of the mandated, consolidated multi-district litigation. CIGNA did so by using a case in Illinois, *Kaiser v. CIGNA Corp.* To prevent a settlement they believed inappropriate from evading this Court's jurisdiction, the Plaintiffs – with significant time and effort – sought and received from the Court an All Writs Act injunction. CIGNA and the *Kaiser* plaintiffs appealed that injunction to the Eleventh Circuit. While the appeal was pending, the Judicial Panel on Multidistrict Litigation transferred *Kaiser* to this Court. CIGNA subsequently reached the settlement with the Plaintiffs and dismissed its appeal, and the Court vacated its All Writs Act injunction, and the *Kaiser* plaintiffs' appeal was denied. This Court subsequently approved a comprehensive settlement between CIGNA and Provider Plaintiffs. *See* Joint Dec. Ld. Cnsl. at ¶ 28.

The remaining Defendants, including Health Net and Prudential, have filed extensive motions for summary judgment seeking resolution of this case in their favor prior to trial. Provider Plaintiffs have spent countless hours defending against these motions through both briefing and argument before the Court. While Plaintiffs are confident in their positions, those motions are currently pending, and could potentially resolve the case in Defendants' favor. Indeed, the Court has recently granted summary judgment with respect to Plaintiffs' capitation claims. Motion practice is ongoing as to the Non-Settling Defendants. The trial against those Defendants is scheduled to begin in January of 2006. *See* Joint Dec. Ld. Cnsl. at ¶¶ 29-30.

5

**C.     The Settlement Process**

The negotiations with Health Net were long and hard-fought.  Negotiations continued, on and off, over a two year period with dozens of face-to-face meetings and conference calls until the settlement was finally presented to the Court on May 2, 2005.  *See* Joint Dec. Ld. Cnsl. at ¶¶ 31-32.

The Prudential negotiations occurred during the same time frame, and were also hard-fought, arms-length discussions.  These negotiations also occurred in numerous face-to-face meetings and conference calls, culminating in the settlement which was presented to the Court on May 5, 2005. *See* Joint Dec. Ld. Cnsl. at ¶ 33.

**D.     The Health Net Settlement**

The settlement with Health Net exceeds expectations.  It is comprised of three parts, including business practices initiatives by Health Net; the establishment of a Physicians' Foundation for Health Systems Innovations; a settlement fund to satisfy valid proofs of claim; and payment of attorney's fees and costs capped at $20 million.

1.     <u>Business Practice Initiatives</u>

The heart of the Settlement consists of changes in Health Net's business practices.  These changes are designed to eliminate what physicians believe to be the worst of the improper practices involved in managed care, to force Health Net to engage in a level of disclosure and transparency previously unknown in the managed care industry, and to provide independent dispute resolution procedures that will allow physicians to resolve their disputes in an efficient and meaningful way.

Regarding its policies and procedures, Health Net has agreed to:

a)     increase efficiency and streamline the processing of claims submitted by physicians, enabling those physicians to receive reimbursements more quickly and accurately (§ 7.1);

Kozyak Tropin & Throckmorton, P.A.

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

b)   provide members of the Class with the ability to view applicable fee schedule amounts for billing codes related to their practice (§ 7.3);

c)   reduce procedures requiring pre-certification by physicians (§ 7.5);

d)   provide greater notice of policy and procedure changes to members of the Class (§ 7.6);

e)   implement initiatives and procedures to reduce claims resubmissions (§ 7.7);

f)   disclose payment rules and conform its bundling and other computerized editing rules as specified in the Agreement (§ 7.8);

g)   establish a Physician's Advisory Committee made up of representatives from both Health Net and the Class to consider issues and concerns arising between them (§ 7.9);

h)   establish an independent, external billing dispute resolution mechanism (§ 7.10);

i)   establish an external review program for disputes relating to medical necessity determinations (§ 7.11);

j)   exclude from its contracts with members of the Class "all products clauses" or "gag clauses" (§§ 7.11, 7.29);

k)   provide members of the Class with the right to refuse to accept new patients (§ 7.13);

l)   provide notice to Class members regarding fee schedule changes and agree to not make such changes more than once per calendar year (§ 7.14);

m)   include in its contracts with Physicians a definition of medical necessity which bases medical necessity determinations on generally accepted standards of medical practice (§ 7.16);

n)   where all necessary information is available to Health Net, pay interest on claims not paid within 15 business days for claims submitted electronically or 30 calendar days for claims submitted on paper (§ 7.18);

o)   not contest the timeliness of bills received within 120 days of the later of the date of service or the date of the physician's receipt of an EOB from the primary payor where Health Net is the secondary payor (§ 7.17);

p)   not automatically reduce the intensity coding of evaluation and management codes

7

billed for certain covered services (§ 7.19);

q)  take actions necessary to make its claims editing software more reasonable and CPT compliant (§ 7.20);

r)  fund resources to revise the EOB forms for its products (§ 7.21);

s)  take actions to reduce overpayments and implement standardized procedures for recovering any overpayments actually made (§ 7.22);

t)  initiate actions designed to improve the speed, accuracy, and efficiency of current information about eligibility of plan members (§ 7.23);

u)  respond more efficiently to physician inquiries (§ 7.24); and

v)  implement various initiatives related to capitation payments to physicians, including increased disclosure of rates and methods for determining those rates (§ 7.28).

2.  <u>Charitable Foundations</u>

The Settlement allows for class members to designate funding for one of several different foundations to improve the condition of physicians and the health care system. Each Class member who files a valid proof of claim may elect either to receive payment from the Settlement Fund or direct that such amount be contributed on his or her behalf to a Foundation. (§ 8.6).

3.  <u>The Settlement Fund</u>

Under the settlement, Health Net will pay $40,000,000 into a Settlement Fund. One portion of the Fund, the "Retired Physician Amount," will be used to satisfy claims submitted by retired physicians based on the formula set forth in the Agreement. The other portion, the "Active Physician Amount," will be used to satisfy claims submitted by physicians still practicing based on the formula set forth in the Agreement. These amounts include retrospective compensation related to claim coding and bundling edits and denials of claims on medical necessity grounds. (§ 8.4).

With the exception of one million dollars to be used to insure compliance with this settlement

8

agreement (the "Compliance Fund"), the remainder of this fund, with interest from preliminary approval, will be paid to physicians. Those physicians who have provided more services to members of plans insured or administered by Health Net will be paid more. Each actively participating physician will be entitled to receive payment from the fund in an amount determined according to whether the physician's gross receipts for providing services to Health Net's insureds during the calendar year period of 2002-2004 were (1) less than $5,000; (2) at least $5,000 but less than $50,000; or (3) $50,000 or greater. (§ 8.4(c)).

The one million dollar Compliance Fund is a valuable aspect of this Settlement. It is of the upmost importance to the Class that settling Defendants comply with the terms of their agreements with the Class, otherwise the injunctive relief the Class fought so hard for would not be meaningful. Monitoring compliance is a costly process. Class Counsel has determined in the other settlements that there is a need for the facilitator to retain experts and to call upon other resources in determining whether there is a viable compliance dispute and in achieving resolution of filed and potential disputes. The Compliance Fund returns to the Class adequate funding for the expenses of volunteers dedicated to guaranteeing compliance with the prospective relief agreed to by the Defendants, and it is, therefore, far more valuable than the alternative of disbursing approximately $1.11 per Class Member. In addition to the Compliance Fund, the Settlement contains a number of other improvements with respect to compliance and enforcement of the injunctive provisions. For example, the compliance procedure is expedited. The combination of the Compliance Fund and the improvements in the compliance procedure make this a much better Agreement. *See* Joint Dec. Ld. Cnsl. at ¶ 36.

Finally, the Settlement includes a right to opt out. Any physician, group or organization may

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 I Phone 305.372.1800 I Fax 305.372.3508 I kttlaw.com

elect not to participate, and may pursue claims through other means. (§ 6.1).

## E. The Prudential Settlement

The Agreement with Prudential also represents an excellent result for the Class. Prudential exited the managed care business in August of 1999 when its operations were acquired by Aetna. The Aetna settlement, previously approved by this Court, encompasses the operations acquired by Aetna from Prudential, and affords the Class members injunctive relief in the form of the various business practice initiatives to which Aetna agreed. Accordingly, there is no additional injunctive relief to be granted with respect to Prudential. *See* Joint Dec. Ld. Cnsl. at ¶ 40.

Prudential has agreed to compensate the Class through a Compliance Fund of $22,050,000. (§ 8). The Compliance Fund is the most meaningful relief that could be provided to the class for a number of reasons. First, since Prudential is no longer in the health insurance business, it, unlike all of the other Defendants, was willing to establish a fund that can be used prospectively to investigate and remedy the on-going abuse of managed care. While the settlements in this case are trail blazing remedies that address the existing abuses of managed care, the record shows that managed care companies are innovative in developing and implementing additional abuses which injure physicians. This Fund will provide resources to ferret out and remedy those abuses on a prospective basis. Second, this Fund will provide additional resources to insure compliance of the other settlements reached in this case. Third, the fact that Prudential went out of the health insurance business in 1999 and the difficulties shown in data discovery and analysis from physicians as well as Defendants proves that any attempt to distribute funds to individual physicians would present inefficiencies and practical hurdles. The Fund created in the Prudential Settlement is the best practical use of the funds. *See* Joint Dec. Ld. Cnsl. at ¶ 41.

10

The Prudential settlement also provides that any physician, group or organization may opt out, electing not to participate, and may pursue claims through other means. (§ 6.1)

## II.  THE HEALTH NET AND PRUDENTIAL SETTLEMENTS SHOULD BE APPROVED.

The Health Net settlement resolves this dispute to provide doctors wide relief, surpassing in some instances what could be accomplished through trial.  Achieved after years of litigation, the settlement is clearly an arms-length compromise.  Similarly, the Prudential Settlement provides compensation to the Class Members, while recognizing that prospective injunctive relief has been addressed in the settlement with Aetna, which has acquired Prudential's managed care operations. The agreements should therefore be readily approved by the Court, especially considering the well-settled policy favoring the settlement of cases.

It is a truism that "[c]ompromises of disputed claims are favored by the Courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 585 (1910). This policy applies with particular force to class-action lawsuits, the complexity and expenses of which impose special burdens borne by the judicial system as well as the litigants. *See In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."). Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice . . . ." *Behrens v. Wometco Enterp.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988).

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of any class-

11

action settlement. "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find the settlement is fair, adequate and reasonable and not the product of collusion between the parties." *Cotton*, 559 F.2d at 1330. In reaching this determination, the "inquiry should focus upon the terms of the settlement," together with "an analysis of the facts and the law relevant to the proposed compromise." *Id*. Specifically, the settlement terms should be compared "with the likely rewards the class would have received following a successful trial of the case," subject to the following four qualifications. *Id*.

First, courts, including those in this Circuit, have continuously stressed that it should not "be forgotten that compromise is the essence of settlement." *Cotton*, 559 F.2d at 1330. As a result, in evaluating the terms of the compromise in relation to the likely benefits of a successful trial, "the trial judge ought not try the case in the settlement hearings," nor should the court "make a proponent of a proposed settlement justify each term of the settlement against a hypothetical or speculative measure of what concessions might have been gained . . . ." *Id*. To the contrary, "the court must be mindful that inherent in compromise is a yielding of absolutes and an abandonment of highest hopes." *Ruiz v. McKaskle*, 724 F.2d 1149 (5th Cir. 1984). *See also Young v. Katz*, 447 F.2d 432 (5th Cir. 1971) (explaining that a mini-trial on the underlying merits for purposes of approving a settlement "would emasculate the very purpose for which settlements are made").

Second, courts have consistently stressed that in evaluating a settlement in light of the risk of continued litigation, the district court "is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330. *See also Behrens*, 118 F.R.D. at 539 ("The Court can rely upon the judgment of experienced counsel and, absent fraud, should be hesitant to substitute its own judgment for that of counsel."). "Courts have consistently refused to substitute their business

12

judgment for that of counsel, absent evidence of fraud or overreaching." *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 625 (D. Colo. 1976).

Third, the courts have also stressed that "litigants should be encouraged to determine their respective rights between themselves," and that "there is an overriding public interest in favor of settlement." *Cotton*, 559 F.2d at 1331. This principle is particularly compelling in class-action lawsuits which "have a well deserved reputation as being most complex." *Id.* As the Eleventh Circuit has emphasized:

> Public policy strongly favors the pretrial settlement of class action lawsuits. Complex litigation -- like the instant case -- can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.

*In re U.S. Oil and Gas*, 967 F.2d at 493 (internal citation omitted). *See also Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426 (5th Cir. 1977) ("Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits.").

Finally, in considering the merits of the proposed settlement, the court should take into account practical considerations such as the complexity of the case and the expense and likely duration of the litigation. *See Susquehanna Corp. v. Korholz*, 84 F.R.D. 316, 322 (E.D. Ill. 1979). One of those practical considerations is the vagaries of litigation and the benefits of an immediate recovery as compared "to the mere possibility of relief in the future, after protracted and expensive litigation." *In re King Res.*, 420 F. Supp. at 625. In this respect, "it has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.*

Guided by these overriding principles, the Eleventh Circuit has outlined several factors useful

13

in determining whether a proposed class action settlement is fair, adequate and reasonable. *See Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984). These factors are: (a) the likelihood of success at trial; (b) the range of possible recovery; (c) the point at or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (d) the complexity, expense, and duration of the litigation; (e) the substance and amount of opposition to the settlement; and (f) the stage of proceedings at which the settlement is achieved. *See Bennett*, 737 F.2d at 987; *Behrens*, 118 F.R.D. at 538-39.

## A.     Likelihood of Success at Trial

Class Counsel have continued to build a case with a good likelihood of success at trial. In fact, Plaintiffs are still preparing to go to trial with the Non-Settling Defendants in January of 2006. However, as the Court acknowledged in approving the Aetna settlement, "there remains substantial risk and uncertainty in plaintiffs ultimately prevailing on their claims . . . ." Final Approval Order and Judgment entered October 24, 2003 (hereinafter "Aetna Approval Order") at 4. Therefore, consideration of this factor supports the approval of this settlement. Furthermore, it would take a significant amount of time and expense to reach and conclude trial, and appeals would inevitably follow, causing additional delay. *See id.* at 5. With respect to the Health Net settlement, the Defendants argue strenuously that RICO provides no injunctive relief for private litigants. While Class Counsel disagree, risk and uncertainty remain because the Supreme Court has not addressed the issue. As a result, physicians could obtain a monetary award with no injunctive relief, which is at the heart of what the vast majority of physicians want from this litigation. *See* Joint Dec. Ld. Cnsl. at ¶ 43; Affidavit of Michael Hanzman at ¶¶ 8-10.

14

## B.    The Range of Possible Recovery and the Recovery Achieved

From the very early stages of this litigation, our individual clients, the associations we represent, and many class members have made this point clear:  the primary goal of this litigation must be to change Defendants' business practices.  With this goal in mind, Class Counsel have always approached the litigation by focusing on business changes, while achieving a significant monetary recovery in addition to those changes.  They have previously garnered Aetna's agreement to such business changes, and the Prudential settlement is therefore limited to a monetary recovery.  Class Counsel have now persuaded Health Net to agree to similar business changes.  It is obviously difficult to quantify the possible range of recovery if the focus of litigation is injunctive.  At the same time, it is difficult to imagine that more comprehensive business changes could have been achieved at the trial of this case rather than through this settlement.  In fact, the likelihood is that injunctive relief after a trial would not be as comprehensive, at least in some areas.  The guaranteed monetary relief secured through settlement is also fair, and certainly within the range that could have been achieved at trial.  As such, this factor weighs heavily towards the approval of this settlement.  *See* Joint Ld. Cnsl. Dec. at ¶ 44.

As this Court has explained, "[t]he settlement eliminates a substantial risk that the class would walk away empty-handed . . . .  More importantly, the Settlement calls for the prospective elimination of billing and payment practices detrimental to physicians." Aetna Approval Order at 5.  The results of the Health Net and Prudential settlements, in light of the case's substantial risks, thus strongly factor in favor of approval.

## C.    The Complexity, Expense, and Duration of the Litigation

This is one of the most complex cases ever prosecuted in this nation.  This litigation involves

15

the practices of multi-billion dollar defendants and the effect of those practices on hundreds of thousands of physicians. The litigation has been ongoing for more than five years and resulted in Class Counsel expending over 270,362.24 hours of time and over $20 million in costs to date in pursing this litigation. *See* Joint Dec. Ld. Cnsl. at ¶ 45.

This litigation has involved seven appeals to the Eleventh Circuit, one appeal to the United States Supreme Court, several other petitions for certiorari, and volumes of complex briefing on various issues at the District Court. Discovery in this litigation has been arduous and hard fought. Class Counsel have filed and defended numerous motions to compel and been involved in dozens of meet and confers. The end result has been the continued production and assimilation of tens of millions of pages of documents and the production of data from the computerized systems of each of the Defendants. Furthermore, Defendants have submitted extensive motions for summary judgment. Although Plaintiffs are confident in their positions with respect to these motions, they could be resolved in whole or in part in Defendants' favor without a trial, as was the capitation issue. Consideration of this factor heavily weighs towards the approval of this settlement. *See* Joint Dec. Ld. Cnsl. at ¶ 46.

**D.** **The Substance and Amount of Opposition to the Settlement**

Objection to the settlements is extraordinarily light given the fact that the class consists of hundreds of thousands of individuals. For the Health Net settlement, only three objections have been filed in this nationwide class action. As for the Prudential settlement, only four objections have been submitted. At the same time, endorsement of these settlements by the medical community has been substantial. The settlements have been endorsed by 18 signatory associations and medical societies. The widespread acceptance of the settlements, and their thin opposition, weigh strongly in favor of

16

their approval. *See* Joint Dec. Ld. Cnsl. at ¶ 47.

**E.     The Stage of Proceedings at Which Settlement was Achieved**

These settlements were achieved only after years of hard-fought litigation, after merits discovery had already concluded.  By this point in the litigation, Class Counsel had assimilated enough information about Health Net's and Prudential's practices to meaningfully and appropriately reach the agreement.  In contrast, the likelihood of completing the litigation through trial and post-verdict appeals was still potentially years away.  As such, the settlement discussions reached a point where Class Counsel could fully evaluate the terms, and could also accelerate by a significant amount of time the implementation of benefits to the Class.  As in the Aetna settlement, "the terms of the Settlement make it clear that the process by which the settlement was achieved was fair." Aetna Approval Order at 9.  This factor thus strongly supports the approval of the settlements. *See* Joint Dec. Ld. Cnsl. at ¶ 48.

**F.     The Notice Program Approved by the Court was Effectuated**

Class Counsel met all of their obligations with regard to notice as set forth in this Court's Orders of Preliminary Approval.  Under the notice provisions, every physician licensed to practice medicine in the United States has received a notice by mail.  In addition, five law firms representing the Plaintiff Class were required to post information about the settlements on their websites.  Class counsel have answered thousands of telephone calls made to Miami, New York, and Birmingham. Class counsel have also responded to thousands of emails.  Numerous medical associations have also posted information about the settlements on their websites.   The settlements have received widespread publicity. *See* Joint Dec. Ld. Cnsl. at ¶ 49.

Under the program approved by the Court and carried out by the parties, the notices given

17

were the best means of notice that were practicable under the circumstances. As the Court ruled both in the Orders of Preliminary Approval and the Aetna and Cigna Approval Orders, that notice was sufficient. *See* Joint Dec. Ld. Cnsl. at ¶ 50.

### III. CLASS COUNSEL'S FEE REQUEST SHOULD BE APPROVED.

Class Counsel request that the Court award attorneys' fees and expenses based upon the common fund created through its efforts in settling the Class's claims against Health Net. The attorneys' fee requested is $20 million, inclusive of expenses. The fee request amounts to 4.1% of the value of the settlement, which is conservatively estimated to be worth at least $486 million. In support of this valuation, Plaintiffs have provided the Expert Report of Paul McConnell. As the Report describes more fully, Mr. McConnell used economic models to calculate the value to the Class of the Health Net injunctive relief. *See* McConnell's Expert Report.

Class Counsel further request that the Court award attorneys' fees and expenses based upon the common fund created through its efforts in settling the Class's claims against Prudential. The attorney's fee requested for that settlement is $5 million, inclusive of expenses. The fee request amounts to less than 18.5% of the value of the settlement, which is $27,050,000.

These requests are well within the range of percentages recognized as appropriate by the Eleventh Circuit under *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). In both cases, the fee award would be over and above the common fund created and would in no way reduce the compensation provided to the Class. For the reasons set forth below, Class Counsel submit that the requested fee awards are appropriate, fair and reasonable under the applicable law.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 I Phone 305.372.1800 I Fax 305.372.3508 I kttlaw.com

A.  **The Law Awards Class Counsel Fees from the Common Fund Created Through their Efforts.**

It is well established that when a representative party has conferred a substantial benefit upon a class, class counsel is entitled to an allowance of attorneys' fees based upon the benefit obtained. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Camden I*, 946 F.2d at 771.

The substantial benefit doctrine is an exception to the general rule that each party must bear its own litigation costs. The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.*, 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted). *See also Reiser v. Del Monte Properties Co.*, 605 F.2d 1135, 1139 (9th Cir. 1979). The doctrine is based on the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *See Van Gemert*, 444 U.S. at 478. The Supreme Court, the Eleventh Circuit, and courts in this District have thus all noted that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001) (citing *Boeing Co. v. Van Gemert*, 100 S. Ct. 745 (1980)). *See also Camden I*, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").

Courts also have recognized that appropriate awards of attorneys' fees in cases such as this encourage redress for wrongs caused to entire classes of persons, as well as discourage future

19

misconduct of a similar nature:

> [C]ourts . . . have acknowledged the economic reality that in order to encourage 'private attorney general' class actions brought to enforce . . . laws on behalf of persons with small individual losses, a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid.

*Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988). *See also Deposit Guaranty National Bank v. Rope*, 445 U.S. 326, 338-339 (1980). Adequate compensation promotes the availability of counsel for plaintiffs:

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . . We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law. It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit. It is an experience in which few of us have participated. The dimensions of the undertaking are awesome.

*Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985) (awarding requested 35% fee).

In the Eleventh Circuit, class counsel are awarded a percentage of the funds generated through a class action settlement. In *Camden I* – the controlling authority in this circuit dealing with the issue of attorneys' fees in common-fund class-action cases – the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774. Class Counsel may receive a percentage of the common fund they have generated

20

for the class, regardless of the applicability of any fee shifting statute.  The common fund in such instances includes the amount paid by the defendant to extinguish exposure for statutory fees.  *See, e.g., Brytus v. Spang & Co.*, 203 F.3d 238 (3d Cir. 2000); *Florin v. Nationsbank*, 34 F.3d 560 (7th Cir. 1994); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 583 (3d Cir. 1984).

The Court has substantial discretion in determining the appropriate fee percentage awarded to counsel.  "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774).  Nevertheless, "[t]he majority of common fund fee awards fall between 20% to 30% of the fund," although "an upper limit of 50% of the fund may be stated as a general rule." *Id.* (quoting *Camden I,* 946 F.2d at 774-75).  Significantly, the Eleventh Circuit has found that "district courts are beginning to view the median of this 20% to 30% range, *i.e.,* 25% as a 'bench mark' percentage fee award which may be adjusted in accordance with the individual circumstances of each case . . . ." *Id.* (quoting *Camden I*, 946 F.2d at 775).  *See also Waters v. Intern. Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (approving fee award where the district court determined that the benchmark should be 30% and then adjusted the fee award higher based on the circumstances of the case); *Walco Inv., Inc. v. Thenen*, 975 F. Supp. 1468, 1470 (S.D. Fla. 1997) (quoting *Camden I* and explaining 25% of the common fund is the benchmark).

### B.     The Eleventh Circuit's *Camden I* Factors Support Class Counsel's Requested Fee.

The Eleventh Circuit has provided a set of factors the Court should use to determine a reasonable percentage to award class-action counsel.  These factors are:

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 I Phone 305.372.1800 I Fax 305.372.3508 I kttlaw.com

(1) the time and labor required;
(2) the novelty and difficulty of the questions involved;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the 'undesirability' of the case;
(11) the nature and the length of the professional relationship with the client;
(12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are not exclusive. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 775). Furthermore, these factors are merely guidelines. The Eleventh Circuit has also "encouraged the lower courts to consider additional factors unique to the particular case." *Id.* (quoting *Walco Investments, Inc. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997)).

Applied here, the *Camden I* factors establish that the Court should award counsel the full $20 million in fees they have requested for the Health Net settlement, and the full $5 million in fees they have requested for the Prudential settlement.

### 1.    The Case Required Substantial Time and Labor.

There can be no doubt this case has demanded substantial time and labor, including arduous

22

briefing and extensive settlement negotiations.  As Class Co-Lead Counsel's declarations establish, 270,362.24 hours have been expended in aggregate by the 26 law firms who constitute the Class Counsel in this litigation, including 120,555.56 hours since the CIGNA Settlement.  *See* Joint Dec. Ld. Cnsl. at ¶ 60, Ex. A.  The Plaintiffs' lawyers have spent tens of thousands of hours investigating and analyzing the facts of this case and in briefing and arguing the legal issues in this Court and in the multiple appeals.  Counsel also spent thousands of hours in these settlement negotiations, which took place over a year and a half and dozens of meetings.

The substantial amount of time and labor spent on the case was necessary, given the breadth and complexity of the case's allegations.  To uncover the Defendants' improper practices such as bundling and downcoding has required Class Counsel to acquire, assimilate, and analyze millions of pages of documentary evidence.  The discovery battles alone were substantial.  Beyond discovery, the motions to dismiss, motions regarding arbitration, motion for class certification, motions for summary judgment, and appeals at every opportunity demanded extraordinary amounts of time and effort.  *See id.* at ¶ 61; Declaration of Thomas Scott at ¶ 14; Declaration of Roberto Martinez at ¶ 12.

### 2. The Issues Are Novel, Difficult, and Require the Exceptional Skill of a Highly Talented Group of Attorneys.

It is beyond dispute that this litigation is of a particularly complex nature, involving complicated and novel issues of law and fact.  This case has to date involved seven appeals to the Eleventh Circuit Court of Appeals and an appeal to the United States Supreme Court, as well as numerous petitions for certiorari.  Yet the considerable appellate work reflects a mere fraction of the complex motion practice and discovery efforts ongoing in this Court.  The record before the Court

23

establishes that this case involved novel and difficult issues surrounding every phase of the litigation. *See* Joint Dec. Ld. Cnsl. at ¶ 62; Hanzman Affidavit at ¶ 17; Scott Dec. at ¶ 15; Martinez Dec. at ¶ 13.

To litigate a case such as this requires counsel highly trained in class action matters and in the specialized issues the case presents. The skill of counsel must be commensurate with the novelty and complexity of the issues in this case, as well as the skill of the opposing counsel. *See Walco*, 975 F. Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"). The attorneys that compose the Plaintiffs' Class Counsel have the specialized skills to handle this litigation. As this Court has previously noted in another case in which several of the firms in this case participated, the "experience and competency" of counsel was "evident in both their pleadings and oral presentations to the Court." *Walco v. Thenen*, 168 F.R.D. 315, 327 (S.D. Fla. 1996). Each of the lawyers on the Provider Plaintiffs' Steering Committee has extensive experience in complex litigation. The records and accomplishments detailed in their resumes speak for themselves. *See* Joint Dec. Ld. Cnsl. at ¶ 64; Scott Dec. at ¶ 21; Martinez Dec. at ¶ 19.

In assessing the quality of representation by the Plaintiffs' Counsel, the Court also should consider the quality of the opposition. *See, e.g., Camden I*, 946 F.2d at 772 n.3; *Johnson*, 488 F.2d at 718; *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992). The excellent quality of that opposition has been no less apparent, and has demanded the best possible performance of Plaintiffs' counsel. *See* Joint Dec. Ld. Cnsl. at ¶ 64; Scott Dec. at ¶ 21; Martinez Dec. at ¶ 19.

24

### 3. The Case Against Health Net and Prudential Was Expensive and Risky, and Thus Undesirable.

By any reasonable view, this case was extremely risky. The issues are complex; the legal hurdles are many and substantial; the opponents are powerful, wealthy, and ably defended; the time and expense demands daunting. *See* Joint Dec. Ld. Cnsl. at ¶ 71. Such circumstances justify a generous fee award. "A court's consideration of this factor recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk. Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'" *In re Sunbeam*, 176 F. Supp. 2d at 1336.

Courts have also made clear that if, by their skill and determined efforts, plaintiffs' counsel ultimately secure a settlement, that fact is not relevant to assessing the risk they assumed at the case's inception. *See Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989) ("The point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them."); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473. "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit, and not retroactively with the benefit of hindsight.

The term "undesirable" certainly applies to this case, as it originally came to Class Counsel. As Michael Hanzman, an experienced counsel in class litigation, has explained:

> When Class Counsel undertook representation in this action, they were facing the following: (1) alleging and, at some point, proving a

25

> complex RICO action against the ten largest managed care companies
> in the United States; (2) litigating against some of the best defense
> firms in the country for years to come; (3) the inevitable motions to
> dismiss and summary judgment motions in connection with pleading
> and proving a RICO claim; (4) statute of limitations defenses; (5)
> arbitration provisions; (6) McCarran-Ferguson reverse pre-emption
> issues; (7) significant choice of law concerns; (8) abstention
> arguments typically asserted by regulated industries; and (9) the task
> of preparing an acceptable damage model. . . . To put it simply,
> Class Counsel had to clear multiple hurdles in order to succeed in this
> case, and a failure to clear *any* one of them could have (and in many
> cases - such as class certification - would have) resulted in a total
> loss.

Hanzman Aff. at ¶ 17. Although Mr. Hanzman himself had an opportunity to take this case, he rejected it, because he "concluded that it would likely take years, perhaps even a decade, to resolve the case, with a substantial risk of never recouping time or expenses, both of which would be enormous." *Id.* at ¶ 18. *See also* Scott Dec. at ¶ 22; Martinez Dec. at ¶ 20.

This case has been expensive, risky, and so undesirable. Class counsel are entitled to be compensated for accepting the risks associated with undertaking such a case.

### 4. Class Counsel Assumed Substantial Risk and Litigated this Case on a Pure Contingency Basis.

This action was prosecuted by counsel on an entirely contingent fee basis. In undertaking to prosecute this complex action on that basis, counsel assumed a significant risk of nonpayment or underpayment. That risk warrants an appropriate fee. *See* Joint Dec. Ld. Cnsl. at ¶ 68.

Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award. "A contingency fee arrangement often justifies an increase in the award of attorneys' fees." *In re Sunbeam*, 176 F. Supp. 2d at 1335 (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990)). *See also In re Continental*

26

*Illinois Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel *must* be compensated adequately for the risk of non-payment).

> As this Court has noted:
>
> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer.
>  . . .
> A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

This case is a highly risky contingency case, which factors heavily in favor of awarding the requested fee. The case has been risky and difficult, with several potential legal pitfalls that could have led to no recovery at all. Thus, the contingency risk in this case was substantial. This factor favors awarding Class Counsel their requested fees. *See* Scott Dec. at ¶ 18; Martinez Dec. at ¶ 16.

### 5.      Counsel Have Achieved Excellent Results.

Counsel have achieved a Health Net settlement valued at $486 million, and a Prudential settlement valued at over $27 million. The settlements are monumental achievements. Instead of facing additional years of costly litigation, class members will profit now from significant business practice changes, substantial settlement funds, and a foundation created for their benefit. These results have been hailed by physicians and associations throughout the country, including 18

27

signatory professional associations. *See* Joint Dec. Ld. Cnsl. at ¶ 70; Scott Dec. at ¶ 20; Martinez Dec. at ¶ 18.

When determining the total value of a class action settlement for purposes of calculating the attorneys' fee award, the court should consider both the direct compensatory relief and the economic value of any prospective injunctive relief obtained for the class. *See Camden* I, 946 F.2d at 775; *Sheppard v. Consolidated Edison Co.*, 2002 WL 2003206, at *7 (E.D. N.Y. 2002) (in valuing total settlement for percentage-based attorneys' fee award, court included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief"); *Steiner v. Williams*, 2001 WL 604035, at *4 (S.D.N.Y. 2001) ("Although the settlement in this action did not involve the payment of money by the defendants, counsel may nonetheless recover a fee if the settlement conferred a substantial non-monetary benefit.").[1]

As the Supreme Court has recognized, the rationale of the common-fund doctrine "must logically extend, not only to litigation that confers a monetary benefit on others, but also to litigation 'which corrects or prevents an abuse which would be prejudicial to the rights and interests' of those others." *Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396 (1970)). *See also, Kaplan v. Rand*, 192 F.3d 60, 70 (2d Cir. 1999) (noting "'well-established

---

[1] *See also Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69, 71 (2d Cir. 1995) (attorneys' fees may be awarded based on non-pecuniary benefit obtained for class); *Smith v. Tower Loan of Mississippi, Inc.*, 216 F.R.D. 338, 368 n.10 (S.D. Miss. 2003); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 199 (S.D. N.Y. 1997) (in determining fee award in employment discrimination case, court considered value of prospective wage increases and defendants' costs of initiating and maintaining internal civil rights task force); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (in justifying fee award of 33.8%, court noted that "class counsel's efforts may reasonably be expected to have created a benefit beyond the immediate settlement proposed"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) ("[i]ncidental or non-monetary benefits conferred by the litigation are a relevant circumstance" in evaluating the reasonableness of attorneys' fees); *Shaw v. Toslba America Information Systems, Inc.*, 91 F. Supp. 2d 942, 971 (E.D. Tex. 2000) ("When considering the quality of the proposed Settlement Agreement, this Court considered both the monetary and the non-monetary benefits the class is to receive.").

Kozyak Tropin & Throckmorton, P.A.

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

[rule] that non-monetary benefits, such as . . . deterring future misconduct by management may support a fee award") (quoting *Koppel v. Wien*, 743 F.2d 129, 134-35 (2d Cir. 1984)); *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975) ("[A]s the Supreme Court has developed the 'common fund' rationale for awarding attorneys fees, assessment of such fees . . . may be predicated on the conferral of benefits which are neither monetary in nature nor explicitly sought on behalf of the entire group").

Health Net's agreement to business practice initiatives, including an independent external review process, is the type of substantial non-monetary benefit justifying attorney compensation. If plaintiffs had received no monetary damages in these settlements, Class Counsel would still be entitled to substantial attorneys' fees for those benefits alone. *See Steiner*, 2001 WL 604035, at *4. *Cf., City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) ("Congress made clear that it intended that the amount of fees awarded under [the Civil Rights Act] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature.") (internal quotations omitted; emphasis in original).

This case was not exclusively, nor even primarily, instituted to recover compensatory relief for past conduct. While the monetary damages plaintiffs claimed in this case were significant, the elimination of Health Net's coding practices was more important. Therefore, any calculation of the true value of the settlements to plaintiffs, and the appropriate percentage to be applied, must account for this substantial injunctive relief. Courts should consider the value of the injunctive relief in determining what percentage of the fund should be awarded. *See Staton v. Boeing, Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("courts should consider the value of the injunctive relief obtained as a

29

relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees") (internal quotation and citation omitted).

By any measure, the Health Net settlement is a success. The settlement achieves the relief the physicians wanted from the most onerous managed care practices, and establishes a settlement fund to provide compensation for all valid claims and a charitable Foundation as well. The successful results in this case are a powerful factor weighing in favor of Class Counsel's fee request.

The Prudential settlement is a similar success, and its value goes beyond the $22 million submitted to the Compliance Fund. Prudential no longer operates in the managed care industry, and the agreement, therefore, contains no business practice initiatives. Prudential's operations, however, were acquired by Aetna, which agreed to substantial business practice initiatives in a previous settlement reached with Class Counsel. The results of the Prudential settlement, therefore, also weigh in favor of Class Counsel's fee request.

### 6.    Counsel's Fee Request Comports with Customary Fees and Awards in Similar Cases.

The fee requested here is well within customary charges and the experience of similar cases. *See* Scott Aff. at ¶ 24; Martinez Aff. at ¶ 22. The requested fee of $20 million amounts to less than 4.1% of the value of the Health Net settlement. The $5 million fee request in the Prudential settlement amounts to 18.5% of the settlement's value. A fee award equal to 30% of a common fund remains well within the range of what may be considered customary. *See, e.g., In re Sunbeam*, 176 F. Supp. 2d at 1333-34. In fact, many recent decisions in this Circuit have routinely awarded attorneys' fees up to and at times in excess of thirty percent, which further confirms the fairness and

30

reasonableness of the fee requested here.[2]   Counsel's fee request comports with the standard contingent fee amount found in the marketplace. *See, e.g., In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco, Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94,268 (S.D.N.Y. 1992) ("what should govern [fee] awards is . . . what the market pays in similar cases . . . ."). *See also Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'") (emphasis in original). The requested fee is consistent with practice in the private marketplace where contingent fee arrangements ranging from 30% to 40% are customary. As Justices Brennan and Marshall observed in one concurring opinion: "In tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery." *Blum v. Stenson*, 465 U.S. 886, 904 (1984); *see also Kirchoff*, 786 F.2d at 323, 325 n.5 (observing that "40% is the customary fee in tort litigation"); *In re Public Service Co.*, Fed. Sec. L. Rep. (CCH) ¶ 96,988 at 94, 291-92 (S.D. Cal. 1992) ("If this were a non-representative litigation, the customary fee arrangement would be contingent on a percentage basis, and in the range of 30% to 40% of the recovery.").

---

[2] *See, e.g., Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (awarding 33 1/3%); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323 (S.D. Fla. 2001) (awarding 25%); *Diaz v. Hillsborough County Hosp. Authority*, 2000 WL 1682918 (M.D. Fla. Aug. 7, 2000) (awarding 30%); *Tapken v. Brown*, Case No. 90-0691-CIV-Marcus (S.D. Fla. 1995) (awarding 33%); *In re Int'l Recovery Corp. Sec. Litig.*, Case No. 92-1474-CIV-Atkins (S.D. Fla. 1994) (fee award represented 30% of class benefit); *In re Sound Advice, Inc. Sec. Litig.*, Case No. 92-6457-CIV-Ungaro-Benages (S.D. Fla. 1994) (awarding 30%); *In re Belmac Corp. Sec. Litig.*, Case No. 92-1814-CIV-T-23-(C) (M.D. Fla. 1994) (awarding 31%); *Holloway v. Chapnick*, Consol. Case No. 89-6572-CIV-Paine (S.D. Fla. 1994) (awarding 30%); *In re Perfumania, Inc. Sec. Litig.*, Case No. 92-1490-CIV-Marcus (S.D. Fla. 1993) (awarding 30%); *In re Royce Lab., Inc. Sec. Litig.*, Case No. 92-0923-CIV-Moore (S.D. Fla. 1993) (awarding 30%); *Kaser v. Swann*, Case No. 90-607-CIV-Orl-3A18 (M.D. Fla. 1993) (awarding 30%); *In re Home Shopping Network Sec. Litig.*, Case No. 87-428-T-13(A) (M.D. Fla. 1991) (awarding 33%).

Kozyak Tropin & Throckmorton, P.A.

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

In fact, the fees requested here are clearly reasonable when compared with fees awarded in other large class action cases. For instance, in the *Worldcom* litigation, the court approved a $155 million award of fees and costs. Other courts have also awarded significant attorneys fees, equaling much larger percentages of the common fund than the fees requested here. *See, e.g., In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000) (fee award of 30% of a common fund of $111 million); *In re Sumitomo Copper Litig.*, 74 F. Supp.2d 393, 400 (S.D.N.Y. 1999) (fee award of $32 million, equaling 27.5% of $116 million common fund); *Kurzweil v. Philip Morris Co.*, 1999 WL 1076105, at *3 (S.D.N.Y. Nov. 30, 1999) (fee award of $37.1 million, equaling 30% of $123.8 million common fund); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 448 (S.D. Tex. 1999) (fee award of $46.7 million, equaling 25% of $190 million common fund); *In re Combusion Inc.*, 968 F. Supp. 1116, 1142 (W.D. La. 1997) (fee award of $46 million, equaling 36% of common fund of $127 million). It is important to note that, in the cases mentioned here, the fees were taken from the common fund, and therefore reduced recovery to the class. In the present case, however, any fees awarded would be over and above the Class's recovery and would not reduce it at all. Accordingly, the fee requested here is well within the range of customary fee awards in similar cases.

The record here well establishes that Class Counsel's fee request is customary and comports with those in similar cases. Three leading advocates in complex commercial and class action cases – Thomas Scott, a former federal judge; Roberto Martinez, a former U.S. Attorney; and Michael Hanzman, a preeminent class action attorney – are providing declarations attesting to the reasonableness of the fee in this case. Class Counsel's fee requests comport with custom and experience in the complex class action setting.

32

7.    **The Remaining *Camden I* Factors Also Favor Approving**
         **Class Counsel's Fee Request.**

The remaining *Camden I* factors also weigh in favor of allowing Class Counsel the fees they request. First, the burdens of this litigation have precluded the pursuit of other cases by the Class Counsel.  Given the relatively small size of the firms representing Plaintiffs and the major commitment involved with accepting this representation, this case undoubtedly precluded the firms from working on other matters and accepting certain other representations. *See* Joint Dec. Ld. Cnsl. at ¶ 65.

The time limitations imposed by the case also weigh in favor of approving the fee request. This case has proceeded at an aggressive pace.  Furthermore, the Eleventh Circuit Court of Appeals stayed this action for more than one full year as it considered the arbitration appeal, thus accelerating the proceedings when the case was not stayed.  Therefore, the pace of this litigation warrants consideration in the approval of the requested fees. *See id.* at ¶ 69.

That the case's settlements took years, including hard-fought negotiation in dozens of meetings, also weighs in favor of allowing the requested fees.  It is important to recall that the benefits to the class were addressed before the fee issue. *See id.* at ¶ 31.  This is not a case where the class was given meaningless relief in a quick settlement to benefit counsel.  While some objections have been filed, the number of objections is minuscule in proportion to the thousands of members in the class.  At the same time, favor for the settlements is overwhelming, with 18 associations endorsing their terms.

Finally, Class Counsel's fee request is firmly rooted in "the economics involved in prosecuting a class action." *In re Sunbeam*, 176 F. Supp. 2d at 1333.  Without adequate

33

compensation and financial reward, cases such as this – highly risky, costly, massive and meritorious litigation, aimed at creating real societal change – could not be pursued.

### C. The Requested Fee Is Also Reasonable When Cross Checked Against the "Lodestar" Approach.

Some courts use the lodestar method as a cross-check of the percentage of the fund approach. *In re Sunbeam*, 176 F. Supp. 2d at 1336 (citing *Ressler*, 149 F.R.D. at 653 n.4). Applied here, the lodestar method shows Class Counsel's fee request easily passes muster. In this case Class Counsel have expended 270,362.24 hours worth $89,749,189.25 in billable time and $20,371,953.53 in out-of-pocket expenses through May 31, 2005, totaling $110,121,142.78. Since approval of the CIGNA settlement, Class Counsel have expended 120,555.56 hours at a value of over $40 million, and costs of over $12 million. Considering the Aetna and CIGNA awards, the total compensation to Class Counsel if the requested fees are awarded would be $130 million, so the lodestar multiplier is less than 1.45. *See* Joint Dec. Ld. Cnsl. at ¶ 72, Exh. A.

If the lodestar approach is applied here, undoubtedly this case would justify a multiplier significantly greater than 2. In a pre-*Camden I* case, the Court performed both methods of analysis and gathered cases on the range of fee awards under either method and noted that lodestar multiples "in large and complicated class actions" range from 2.26 to 4.5, while "three appears to be the average." *Behrens v. Wometco Enter., Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988). In many cases, including cases in this jurisdiction, multiples much higher than three have been approved. *See, e.g.*, *Weiss v. Mercedes-Benz of North America, Inc.*, 1995 U.S. Dist. LEXIS 14708 (D.N.J. 1995) (multiple of 9.3 times lodestar); *In re RJR Nabisco, Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 96,984 (S.D.N.Y. 1992) (multiple of 6 times lodestar); *Cosgrove v. Sullivan*, 759 F. Supp. 166

34

(S.D.N.Y. 1991) (multiple of 8.74); *Glendora Comm. Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465 (1984) (multiple of 12 times lodestar); *Grimshawe v. New York Life Insurance Co.*, Case No. 96-0746-Civ-Nesbitt (S.D. Fla. 1996) (percentage-based fee award equivalent to a multiple of 8.5). Empirical data shows that the average lodestar multiplier is 3.89, and the average lodestar in cases with a range of recovery greater than $100 million is 4.50. Stuart J. Logan et al., *Attorney Fee Awards in Common Fund Class Action*, 24 Class Action Prep. 169 (2003). Considering that a multiplier would surely be justified in this case, Class Counsel's fee request easily satisfies the cross-check using the lodestar method.[3]

The lodestar multipliers applied in other large class action cases reveals that the lodestar cross-check here strongly supports awarding the requested fees. In *In re Cendant Corp. Litig.*, 243 F. Supp.2d 166, 173-74 (D.N.J. 2003), the district court approved a fee award of $55 million where class counsel had expended only 35,000 hours in time. Assuming a very high average billing rate of $350, the $55 million would equate to a multiplier of nearly 5. *See also In re Ikon*, 194 F.R.D. at 195 (multiplier of 2.7); *In re Sumitomo*, 74 F. Supp.2d at 399 (multiplier of 2.5); *Kurzweil*, 1999 WL 1076105, at *2-3 (multiplier of 2.46); *In re Combustion*, 968 F. Supp. at 1141 (multiplier of 2.99). Accordingly, when cross-checked against the lodestar, the fee requested here is more than

---

[3] As the Court aware, that the Provider Plaintiffs reached a settlement agreement with Wellpoint, Inc. on July 11, 2005, which this Court preliminarily approved on that same day. The Wellpoint Settlement provides for changes in Wellpoint's business practices, the establishment of a charitable foundation, and a settlement fund of $135 million. Our preliminary estimates are that this settlement will be valued at over $2.5 billion. Class Counsel will request a $58 million fee in relation to the Wellpoint Settlement. Even if no time were expended by Class Counsel in the two months between finalization of the settlements at issue here and the Wellpoint settlement, – which is certainly not the case, as substantial time has been expended – the lodestar multiplier would only be 2.1 for the total $188 million, encompassing all fee requests. As discussed above, this is a very small multiplier for such a complex and risky case. *See* Joint Dec. Ld. Cnsl. at ¶ 74.

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

reasonable.

Finally, it is important to recognize that the lodestar method is a cross-check only. As Judge Posner of the Seventh Circuit has explained, "the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). "In fine, the market pays for the result achieved." *In re: Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995). The results here are excellent, as shown by the sparsity of objections from the sizeable class of physicians. In light of those results, Class Counsel are entitled to the full award of their requests.

## IV. CONCLUSION

The Health Net and Prudential Settlements are arms-length compromises wrought from years of litigation and negotiation, providing compensation for all valid claims and wide-ranging changes to Health Net's business practices – changes exceeding the plaintiffs' possible relief following trial. The settlements are not merely reasonable; they are extraordinary. Unquestionably the Health Net and Prudential Settlements should be approved.

The Court should also approve class counsel's fee requests, which are fair and reasonable. The fee requests satisfy the guidelines of *Camden I*, especially in light of the complicated nature of the case, the time, effort, and skill required to litigate the case and reach the settlement with Health Net and Prudential, and the outstanding result Class Counsel have obtained. Accordingly, the Plaintiffs respectfully request that this Court approve the Health Net and Prudential Settlements, grant Class Counsel's fee requests, and enter the proposed Orders and Final Judgments.

36

Respectfully submitted this 2nd day of September, 2005.

Archie C. Lamb, Jr. (Fla. Bar No. 742597)
LAW OFFICES OF ARCHIE LAMB
2017 - 2nd Ave. North, Birmingham, AL 35203
Co-Lead Counsel for Provider Plaintiffs

Aaron S. Podhurst
PODHURST ORSECK
25 W. Flagler St., Ste 800, Miami, FL 33130
Liaison Counsel for Plaintiffs

Nicholas B. Roth
EYSTER KEY TUBB WEAVER & ROTH
402 E. Moulton Street, Decatur, AL 35601

James B. Tilghman
STEWART TILGHMAN FOX & BIANCHI
1 SE 3rd Avenue, Ste 3000
Miami, FL 33131-1764

Edith M. Kallas / Joseph P. Gugliemo
MILBERG WEISS BERSHAD & SCHULMAN
One Pennsylvania Plaza, New York, NY 10119

Robert Foote
FOOTE & MEYERS
416 S. 2nd Street, Geneve, IL 60134

Jeffery A. Mobley
LOWE MOBLEY & LOWE
1210 - 21st Street, Haleyville, AL 35565

Mark Gray
GRAY & WEISS
1200 PNC Plaza / 500 West Jefferson
Louisville, KY 40202

Harley S. Tropin (Fla. Bar No. 241253)
Janet L. Humphreys (Fla. Bar No. 607258)
Thomas A. Tucker Ronzetti (Fla. Bar No. 965723)
John Gravante (Fla Bar No. 617113)
KOZYAK TROPIN & THROCKMORTON
2525 Ponce de Leon, 9th Fl, Coral Gables, FL 33134
T: 305-372-1800 / F: 305-372-3508
Co-Lead Counsel for the Provider Plaintiffs

Dennis G. Pantazis
WIGGINS CHILDS QUINN & PANTAZIS
301 - 19 Street North, Birmingham, AL 35203

Joe R. Whatley, Jr.
WHATLEY DRAKE
2323 2nd Avenue North, Birmingham, AL 35203

Kenneth S. Canfield
DOFFERMYRE SHIELDS CANFIELD
KNOWLES & DEVINE
1355 Peachtree St., Ste 1600, Atlanta, GA 30309

J. Mark White
WHITE ARNOLD ANDREWS & DOWD
2025 - 3rd Avenue North, Ste 600
Birmingham, AL 35203

Guido Saveri / Cadio Zirpoli
SAVERI & SAVERI
111 Pine Street, Ste 1700, San Francisco, CA 94111

James E. Hartley, Jr.
DRUBNER HARTLEY & O'CONNOR
500 Chase Parkway, 4th Fl.,Waterbury, CT 06708

======================================================================

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 2nd day of September, 2005, a true copy of the
foregoing was served via overnight courier to: Edward Soto, Esq., Weil Gotshal & Manges,

37

LLP, 1395 Brickell Avenue, 12th Floor, Miami, FL 33131 (Defense Liaison Counsel); and via e-mail on all parties of record on the 2/08/05 Service List; and via Overnight Delivery/Federal Express to the following Objectors of record:

David L. Merideth, M.D., J.D., MBA
407 - B West Parkway Place
Ridgeland, Mississippi 39157
(Counsel for John Bagnato, M.D.)

Steven N. Williams, Esquire
Steven N. Williams, P.C.
3509 E. Park Blvd., Suite 180-110
Plano, TX 75074
(Counsel for Forrest E. Lumpkin, Jr., M.D.)

Leonard P. Smolin, M.D.
2568 Arboretum Circle
Sarasota, Fla. 34232

Paul S. Rothstein, Esq.
626 N.E. First Street
Gainesville, Fla. 32602
-and-
Scott W. Browne
Browne & Browne
2380 Easter Freeway
Beaumont, TX 77703
(Counsel for Russell Stovall, M.D.)

Jayne A. Goldstein, Esq.
Mager & Goldstein, LLP
2825 N. University Drive, Suite 350
Coral Springs, FL 33065
 - and -
Seth R. Lesser, Esq.
Locks Law Firm, PLLC
110 E. 55th Street, 12 Floor
New York, NY 10022
(Counsel for Stanley R. Silverman, M.D.
And Scott Calig, M.D.)

By:_____

38