UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

**MDL NO. 1334**
**Master File No. 00-1334-MD-MORENO**

---

**IN RE: MANAGED CARE LITIGATION**

_____/

**THIS DOCUMENT RELATES ONLY TO THE**
**FOLLOWING PROVIDER TRACK CASES:**

_____/

**CASE NO. 03-22804-CIV-MORENO**

DR. JEFFREY SOLOMON, et al.,

                                             Plaintiffs,

        v.

ANTHEM, INC., et al.,

                                   Defendants.

_____/

**CASE NO. 04-20143-CIV-MORENO**

SCOTT J. ASHTON, D.P.M., et al.,

                                   Plaintiffs,

        v.

ANTHEM, INC., et al.

                                   Defendants.

_____/

**MOTION AND MEMORANDUM SUPPORTING FINAL APPROVAL OF
SETTLEMENT BETWEEN HEALTHCARE PROVIDERS AND HUMANA
PETITION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES
AND FOR AWARD OF PLAINTIFFS' INCENTIVE AWARD**

**I.      SUMMARY OF THE SETTLEMENT**

Plaintiffs and Class Counsel in the above-captioned cases respectfully request that the
Court grant final approval of their joint settlement with Humana,[1] award Class Counsel
reasonable attorneys' fees and reimbursement of expenses, and award incentive payments to the
Plaintiffs.  This Settlement is an excellent achievement on behalf of all Healthcare Providers
("HCPs")[2] and provides the Class with a conservatively estimated settlement value of more than
$20 million in settlement benefits, including:

- $3.58 million, including interest accrued, for cash relief to Class Members,
  attorneys' fees and expenses;[3]

---

[1]      All capitalized terms have the same meaning as given them in the Settlement Agreement
By Among Humana Inc. and Humana Health Plan, Inc., the Representative Plaintiffs, the
Association Plaintiffs and Class Counsel (the "Settlement Agreement" or "Settlement" or
"Agreement").

[2]      HCPs are defined in the Settlement to include professional healthcare providers who
provide covered services but who are not medical doctors or doctors of osteopathy.  By way of
example, the types of providers included are chiropractors, psychologists, counselors, podiatrists,
acupuncturists, optometrists, physical and occupational therapists, nurse midwives, nurse
practitioners, nurse anesthetists, nutritionists, orthotists, prosthetists, audiologists and speech and
hearing therapists.

[3]      As part of its settlement obligation, on August 25, 2006, Humana placed $3.5 million into
an interest bearing account for the benefit of the Class.  Settlement Agreement at §8.3.  This
Settlement Fund is earning 4.0% interest per anum (guaranteed).  Declaration of JoBeth Halper
in Support of Final Approval of Settlement Between Healthcare Providers and Humana, Petition
for Award of Attorneys' Fees and Expenses and for Award of Plaintiff Incentive Award, Exhibit
A hereto ("Ex. A") at ¶25.  Assuming Plaintiffs' requested attorneys' fees and expenses are paid

- Approximately $879,300 in additional reimbursement to Class Members from now until the termination of Settlement benefits (approximately 3 years) directly resulting from Humana's agreement to discontinue reducing reimbursement to HCP Class Members by more than one co-payment charge per office visit;[4]

- A comprehensive Notice Program and Settlement Administration program costing approximately $950,000;[5] and

- $15 million attributed to Humana's payment practice agreements and prospective relief designed to provide greater transparency and communication in the claims adjudication process, and a more interactive claims adjudication program with HCPs.[6]

Through much effort and coordination of their skills and resources, Plaintiffs and Class Counsel achieved this Settlement notwithstanding the Court's decision to grant summary judgment in favor of certain defendants in MDL 1334. Because this Settlement is fair, adequate and reasonable it should be approved by this Court, and reasonable attorneys' fees and expenses and Plaintiff incentives should be awarded.

## II.   HISTORY OF HCP SETTLEMENT WITH HUMANA

### A.   The *Solomon* and *Ashton* MDL Litigation.

In 2003, national and state HCP Associations and individual HCPs, none of whose claims were included in the MD-only *Shane* litigation, sought to bring claims in order to redress claims

---

shortly after the Final Approval Hearing, the accumulation of this account will reach at least $3.58 million by the time Settlement claims are paid to Class Members. *Id.*

[4]   *See* Declaration of Anthony T. Lo Sasso Under Penalty of Perjury, Ex. B hereto ("Ex. B") at 4.

[5]   Ex. A ¶25.

[6]   Settlement Agreement §7.31.

3

practices similar to those alleged in *Shane* against the same managed care defendants.[7]  Ex. A ¶4. In addition to the misconduct alleged in *Shane*, the HCPs suffered additional claims adjudication misconduct at the hands of the Managed Care companies and sought to include those claims in the *Solomon* litigation.  These national and state HCP Associations and individual HCPs retained JoBeth Halper Litigation Group, P.C. ("JHLG") and Bonnett Friedman, Fairborn and Balint, P.C. ("BFFB"), and in October 2003, brought *Solomon v. Humana*, Case No. 03-22804-CIV-MORENO, on behalf of all HCPs.  *Id.*  *Solomon* was transferred to this Court by the MDL Panel as a tag-along to *Shane,* and immediately placed in suspense and stayed.  *Id.*

Shortly thereafter, additional individual HCP Plaintiffs retained the firms of Dodge and Associates, P.C. ("Dodge") and Reich and Binstock ("R&B"), both of whom were counsel in *Kaiser v. Cigna*, No. 03-CV-20531 (transferred as a tag-along to MDL 1334 from Illinois), and on January 20, 2004 filed *Ashton v. Cigna, et al.*, Case No. 04-20143-CIV-MORENO, asserting similar claims against these same Defendants.  *Id. Ashton* also was transferred to this Court by the MDL panel as a tag-along action and similarly was stayed and placed in civil suspense.  *Id.*

Between October 2003 and December 2005, Plaintiffs in *Solomon* and *Ashton* jointly briefed and argued in favor of lifting the stay and reinstating their cases, emphasizing their strong desire to begin litigation against Defendants, including Humana, for claims not being pursued in *Shane*.  The Court did not relieve Plaintiffs of the stay, but assured Counsel in both cases that

---

[7]    *"Shane"* refers to the Provider Track Litigation in MDL 1334, *In re Managed Care Litigation*.  The original *Shane* defendants included Cigna, Humana, Anthem, Inc., Health Net, Inc., Wellpoint Health Networks, Inc., Aetna, Inc., Aetna-USHC, Inc., Prudential Insurance Company of America, Coventry Healthcare, Inc., Pacificare Health Systems, Inc., United Health Group, and United Health Care.

they would have an opportunity to litigate their claims after pretrial efforts had concluded in *Shane*.   *Id. at* ¶5; *see* also, Order Denying Motion to Restore Case to Active Docket dated March 15, 2004; Omnibus Order Denying Plaintiffs' Motion to Restore Case to Active Docket, Lift Stay, and Permit Access to Relevant Discovery dated September 28, 2004.

On October 17, 2005, the medical doctors in *Shane* resolved their claims with Humana, extinguishing further obligation by Humana to expend resources on *Shane*, but leaving it obligated to defend against aggressive litigation in *Solomon* and *Ashton* immediately upon the lifting of the stay.   Shortly thereafter, on November 9, 2005, Humana initiated settlement discussions with counsel in *Solomon* and *Ashton*, notwithstanding the stay.   Ex. A at ¶6. Humana insisted that the parties determine quickly whether or not they could come to resolution so that it could administer any HCP Settlement contemporaneous to the *Shane* settlement.   *Id.* at ¶8.   However, because Plaintiffs' case against Humana had been stayed *ab initio,* Class Counsel required due diligence discovery prior to agreeing on settlement terms, to assure that all HCP claims against Humana would be reasonably resolved.   *Id.* at ¶9.   To meet Humana's time constraints, Plaintiffs were required to quickly respond, devoting full efforts of their firms to the due diligence and settlement effort.   *Id.* at ¶10.

**B.    Due Diligence**

Plaintiffs conducted their due diligence intending to gather sufficient information concerning Humana's claims practices relating to HCPs.  Because Plaintiffs desired to properly resolve HCP claims as expediently as possible to meet Defendants' time management needs, Plaintiffs essentially conducted an abbreviated and expedited version of the discovery that would

have been conducted during litigation, facilitated by Humana's cooperation. *Id.* Plaintiffs first investigated and confirmed the concerns and complaints of many national and state Associations representing HCPs relating to Humana's claims practices. Plaintiffs met with Associations and individual HCP Class representatives to ensure that the settlement best addressed the claims raised in the Complaint. *Id.* at ¶11. Plaintiffs also reviewed Humana's claims and medical policy-making practices evidenced in the discovery taken in *Shane,* including a review of deposition transcripts and exhibits from twelve (12) Humana employees. *Id.* at ¶12. Humana produced over 94,000 relevant documents from the *Shane* litigation relating to its claims processing techniques. To review these documents efficiently and expeditiously to ensure the best settlement, Plaintiffs developed a computerized review system that could be accessed remotely by each law firm. The system, developed by BFFB, was designed to allow attorneys to sort PDF documents by word searches, in order to focus on the most important documents. *Id.* at ¶13. Plaintiffs also traveled to Louisville, Kentucky (Humana's headquarters), to review forty-five boxes of HCP provider complaint/appeals files and exemplar contracts between HCPs and Humana. This effort permitted Plaintiffs to confirm allegations and identify the most problematic HCP issues. *Id.* at ¶14. Next, Plaintiffs, along with their experts, analyzed approximately 229,981,961 lines of fee-for-service claims data previously produced by Humana in *Shane,* and an additional 134,351,270 lines of more recent claims data specifically relating to HCPs, to gain a clear understanding of the economic impact of Humana's claims processing practices challenged by Plaintiffs. *Id.* at ¶15. Finally, Humana produced for interview at their headquarters in Kentucky several high-level contracting, billing review, and medical policy

personnel and allowed Plaintiffs extensive interviews to probe issues of concern suggested by prior documents reviewed, the HCP Associations, and the claims data review.  Unlike litigation discovery, which often is frustrated by disagreements between the parties on the scope of discovery, this process allowed Plaintiffs to understand Humana's claims processing and medical policy practices in a relatively short time, and make concrete proposals to resolve their disputes with Humana.  *Id.* at ¶16.

### C.     Risk of Litigation and the Decision to Settle.

It is beyond dispute that this litigation is of a particularly complex nature in terms of both the facts and legal issues presented.  Aside from the assured battle likely to ensue in any case concerning these claims, the attorneys representing these goliath Defendants are a veritable "who's who" of law firms.  Humana is represented by the well respected international firm of O'Melveny & Myers, LLP, and a long, expensive battle over the claims presented was assured absent settlement.[8]  Moreover, even where the *Shane* litigation had met with success (*Shane* plaintiffs prevailed on the defendants' Motions to Dismiss, Motions to Compel Arbitration and on Plaintiffs' Motion for Class Certification), there was no guarantee of success on these or other battlegrounds for the HCP Class.  Ultimately, the risk of litigation was amplified after the Court granted summary judgment in *Shane* in favor of Pacificare, and then United Healthcare and Coventry.  These rulings affected this settlement so gravely that Humana threatened to abandon settlement discussions all together.  The above factors, and the lengthy delay of the case under

---

[8]     Indeed, the cost bills filed by United Healthcare, Coventry and Pacificare in *Shane* evidence the battle that was to be fought by Class Counsel in this case if they had proceeded to trial.

the Court's stay, weighed heavily in favor of settlement if appropriate terms could be reached by discovery and negotiation.

    **D.**    **Settlement Negotiations.**

    The *Solomon and Ashton* Plaintiffs relied on their HCP settlement with Cigna reached in April of 2005, and the *Shane* settlement with Humana in October, 2005, as a starting point to frame this Settlement. Ex. A. at ¶17. While Plaintiffs were obligated to negotiate even to extract agreement over certain terms Humana already offered the MDs in the *Shane* settlement, most negotiations focused on the Settlement Fund and Humana's practices affecting HCPs.

    Because Humana's plan benefits do not cover as extensive of HCP care as other managed care companies, the number of claims Humana receives from HCPs is substantially smaller than others companies, reducing the total damage to the HCP Class. There were many negotiations and flare-ups over the amount of the Settlement Fund. *Id.* at ¶17. Ultimately the fund agreed upon will provide valuable relief to Class Members who were harmed by Humana's practices.

    Much of Plaintiffs' negotiations focused on practices that exclusively affected HCPs and were unresolved in prior *Shane* settlements. For instance, Plaintiffs discovered during their due diligence effort that Humana's claims processing system automatically deducted two co-payments from its reimbursement payment to HCPs for a single office visit with the same provider, where the HCP provided two different "types" of treatment during the same visit. *Id.* at ¶18. Humana's system automatically categorized treatments by a single provider that often would be performed by different provider specialties (i.e. chiropracty and physical therapy) as being performed by two different "providers" instead of one. As a result, Human charged

8

against the provider's reimbursement a patient co-payment for each *type* of treatment provided, despite that it was performed by one provider in a single visit.[9]   *Id.*  On information and belief, this duplicative co-payment charge is not assessed against an MD who provides more than one "type" of service.  After lengthy negotiations, Humana agreed, as part of the Settlement, that the practice will be discontinued except in the limited circumstance where an employer's plan *expressly* requires Humana to charge multiple co-payments for a single office visit to a single provider.  Plaintiffs estimate that this practice, now prohibited, will return more than $879,300 to HCPs during the settlement benefit period alone, and more assuming Humana never reinstates this practice.  *Id.;* see also Ex. B.

Plaintiffs also found that when Humana's Claim Edit Review Team ("CERT") reviewed claims processing edits to determine whether they were justified in reducing provider reimbursements, Humana failed to consider the practices of HCP practitioners, or the recommendations of HCP Associations on what types of treatments are appropriate.  Similarly, Humana's team charged with setting HCP medical policy (including what is medically necessary, experimental or investigational), called the Technology Assessment Forum ("TAF"), was not obligated to gather or consider the opinions and recommendations of HCP practitioners or national Associations regarding medical policy for HCP treatments.  Ex. A at ¶19.  The parties

---

[9]   For example, where a patient would seek treatment from a chiropractor, and would receive in a single visit both spinal manipulation (a treatment typically provided by a chiropractor) and some physical therapy (which both chiropractors and physical therapists are qualified to administer) for a single injury, in paying the provider's reimbursement Humana would omit a patient co-payment for the "chiropractor" treatment and a second co-payment for the "physical therapist" treatment despite that it was all provided by a single healthcare provider.

debated the need for HCP involvement in medical necessity denials.  Ultimately, the Settlement obligates Humana to change this practice and require CERT and TAF to make a reasonable effort to obtain guidance from any discipline's national Association or society during the decision making process.  *Id.*

Plaintiffs also determined that Humana permitted HCP claims to be denied by personnel who lacked experience or training in the modalities and treatments offered by HCPs.  *Id.* at ¶20.  As was true for TAF and CERT, Plaintiffs felt that someone with knowledge and experience in the relevant condition, diagnosis and treatment should determine whether the acts of a particular HCP were appropriate and compensable.  As a result, throughout the review process, only HCPs from the same discipline or medical doctors (with sufficient knowledge, training, and expertise in the relevant clinical condition or treatment under review) may now deny HCP claims.  This issue, along with others, was won after hard-fought negotiations with Humana. *Id.*

The above-described relief as well as the other prospective relief and monetary relief contained in the Settlement Agreement resulted from extensive, arms-length negotiations between the parties occurring over nine months, during which time the parties met on three occasions, conducted numerous negotiation sessions via telephone, and exchanged multiple settlement drafts and proposals.  *Id.* at ¶22.  Class Counsel met and conferred repeatedly with their clients, many of whom are HCP Associations beholden both to their memberships (all Class Members) and their boards of directors, to ensure satisfaction with the Settlement terms.  *Id.* at 21.  Plaintiffs' Counsel's relationships with the diverse group of state and national Associations greatly contributed to their ability to identify and to adequately negotiate terms responsive to the

needs of various types of HCPs.  The substantial knowledge, skills and resources committed by both *Solomon* and *Ashton* Counsel resulted in an effective negotiating team whose joint efforts culminated in the Settlement Agreement presented to the Court on August 3, 2006.  *Id.*

Notably, mid-way into the settlement negotiations, the Court's orders granting summary judgment in favor of Pacificare, Coventry and United Healthcare in the *Shane* case resulted in a significant impediment to settlement.  Although the Court limited its decisions to a finding that the *Shane* plaintiffs lacked sufficient circumstantial evidence of a conspiracy by United Healthcare, Pacificare and Coventry to violate RICO, Humana nonetheless took the position that Plaintiffs' claims against Humana in these cases no longer were viable.  *Id.* at ¶22.  This damaged the strength of Plaintiffs' case for settlement as Humana no longer believed in a real threat of protracted litigation or ultimate success by these Plaintiffs.  In short, at that point Humana threatened to discontinue settlement negotiations altogether.  However, after consultation, further negotiation and compromise with *Solomon* and *Ashton* Counsel, Humana ultimately agreed to proceed with settlement and to provide valuable settlement benefits to the HCP Class.  *Id.* at 22.

## III.  THE SETTLEMENT TERMS

The Settlement Agreement with Humana provides substantial value to Class Members, estimated at more than $20 million.  The Settlement provides two principal components intended to redress previous harm and ensure modification of practices to prevent harm in the future.

### A.    The Settlement Claim Fund.

On August 23, 2006, Humana placed $3.5 million into an interest bearing account to establish a Settlement Fund bearing interest guaranteed at the rate of 4% per annum.   This will result in a Settlement Fund of approximately $3.58 million to pay Class Member claims, attorneys' fees, expenses, and plaintiff incentive awards.  *See* Settlement Agreement §8.3; Ex. A at ¶25.  The ultimate amount of the Settlement Fund reflects the fact that Humana processes substantially fewer claims by HCPs than do other Managed Care companies.  *Id.* at ¶17.  The claim payment portion of the Settlement Fund will redress Class Members for past improper claims coding and bundling edits, unwarranted denials of claims on medical necessity grounds, and charges against reimbursement payments for more than one co-payment.  Each member of the Class will be entitled to payments from the Settlement Fund in accordance with the formula set forth in §8.1 of the Settlement Agreement.  These formulas take into account the total amount (in dollars) of claims that each claimant submitted to Humana during the Class Period, and divides the claims fund proportionately among claiming Class Members.  Class Members may elect to contribute their claim benefit to one of several listed HCP Societies.  None of the Settlement Fund will revert to Humana; the entire Fund will be paid to providers and HCP Associations.  Settlement Agreement at §8.

### B.    Double Co-payment Relief.

Humana has agreed to discontinue its practice of deducting more than one co-payment when computing reimbursement for services rendered by the same HCP on the same day, where two different types of services were provided, except where the plan member's health plan

12

specifically requires Humana to deduct multiple co-payments.  Settlement Agreement §7.29(q).

The value of this benefit to Class Members will be an immediate increase in their

reimbursements.  The total benefit anticipated by this change in Humana's practice is a minimum

of $879,300.  Ex. B at 4.

### C.   Business Practice Initiatives.

The primary goal of the Settlement Agreement is to modify Humana's business practices

and improve HCP claim payment practices and disclosures.  Plaintiffs believe that HCP interests

and the interests of their patients are best served by improving future Managed Care processes.

The changes provided through this Settlement eliminate many of what HCPs believe are

improper practices by Humana, and require Humana to engage in a level of disclosure and

transparency designed to create fairness in the relationship between the Class and Humana.

Humana values these practice changes at a minimum of $15 million during the benefit period

alone.  Settlement Agreement at §7.31.

1.   <u>Prospective Relief Unique to the HCP Settlement</u>.

The following additional remedies are not present in any MD settlement in *Shane*, and

are specific to HCPs, addressing claims and concerns unique to HCPs:

### HCP Participation in HCP Medical Necessity Determinations

Humana will use a definition of medical necessity in its contracts with HCPs basing

medical necessity determinations on generally accepted standards of medical practice and

standards of HCP specialty societies.  Settlement Agreement §7.16(a).

13

**HCP Participation in HCP Clinical Guideline Determinations**

In determining what constitutes "credible scientific evidence" for purposes of establishing HCP clinical guidelines, Humana will consider HCP specialty society recommendations, the views of physicians and HCPs practicing in the relevant clinical areas, and other relevant factors. Settlement Agreement §7.11(b)(iv).

**Inclusion of HCP Association Views in CERT and TAF Process**

Humana has agreed that both CERT, charged with establishing justifications for claims processing edits, and TAF, charged with medical policy, will consider the views of the HCP associations when an HCP policy or edit is addressed. Settlement Agreement §7.29(r), (s).

**Specialty-Educated Review of HCP Claims**

Humana will not permit a disputed claim to be denied based on medical necessity except by a physician or a HCP with knowledge of the applicable health care specialty, or experience with the relevant condition or treatment under review. Similarly, any appeal or external review may only be rejected by a provider with the same level of training relating to the treatment or condition. Settlement Agreement §7.11(a).

**HCPs Specialty-Educated External Review Processes**

Humana will provide HCPs, HCP Groups, and HCP Organizations access to Humana's medical necessity external review process, in which any appeals will be determined only by a HCP who practices in the same or similar discipline or specialty, or by a physician in the same specialty as the referring physician, or with sufficient knowledge, experience or information about the condition or treatment under review. Settlement Agreement §7.11(b).

2.      Additional Prospective Relief.

Humana has undertaken to extend similar benefits to HCPs as those afforded to the MDs in the Humana settlement, and to MDs and HCPs alike in other settlements previously reached (i.e., the *Shane* settlements and the *Solomon/Ashton* HCP settlement with CIGNA), for example Humana has undertaken to:

- establish an independent, billing dispute external review process for resolving disputes with HCPs, HCP Groups, and HCP Organizations concerning many common billing disputes;

- continue to pursue initiatives designed to facilitate the automated adjudication of claims submitted by HCPs, HCP Groups, and HCP Organizations, and thereby reduce the average time taken by Humana to pay valid HCP claims;

- fund initiatives to reduce the percentage of claims resubmitted;

- discontinue automatically (i.e., without first requesting review of clinical information) reducing the intensity coding of evaluation and management codes billed for certain covered services;

- refrain from routinely requiring submission of clinical information before or after payment of claims and disclose on its website those limited categories for which clinical information must be submitted;

- identify services or supplies for which pre-certification is routinely required and undertake efforts to standardize the services and supplies for which pre-certification is required;

- disclose payment rules and make consistent its bundling and other computerized editing rules as specified in the Agreement;

- establish a HCP Advisory Committee to discuss and make recommendations to Humana on issues of nationwide scope affecting HCPs that will include members who are HCPs in different healthcare specialties or disciplines;

15

- refrain from including "gag clauses" in its contracts with HCPs, HCP Groups, or HCP Organizations;

- devote resources to improve accuracy of information about eligibility of plan members;

- ensure the payment of valid claims submitted in paper format or in electronic format within thirty (30) and fifteen (15) calendar days, respectively, and pay simple interest on the balance due at six percent (6%) per annum where it fails to meet such deadlines, where all necessary information is available to Humana;

- provide HCPs, HCP Groups, or HCP Organizations with the ability to view applicable fee schedule amounts for billing codes related to their practice;

- establish a compliance dispute resolution mechanism to address disputes regarding Humana's compliance with the Agreement;

- disclose additional information about its claim administration policies and procedures on its existing Internet website;

- continue to make investments, to enhance the ability of HCPs, via the internet or clearinghouses, or via facsimile, to register referrals, pre-certify procedures, submit claims for Covered Services, check Plan Member eligibility for Covered Services, and to check the status of claims for Covered Services;

- Make reasonable efforts to obtain input from the appropriate HCP discipline's national Association when addressing clinical edits or medical policy that will affect such HCP disciplines.

16

**D.      Notice Program and Settlement Administration.**[10]

In addition to the payment for all prospective relief, injunctive relief and the Settlement Fund, Humana has agreed to bear the substantial costs of a comprehensive Notice Program designed to provide the best notice practicable to all potential members of the Class.  In addition, Humana is obligated to pay for all Settlement Administration costs.  Settlement Agreement §5, 6. The benefit to the Class because the Defendant was willing to bear the cost of these programs, rather than the Class, is approximately $950,000.  Ex. A at ¶25.

1.      Notice Program.

The Notice Program for these RICO-based cases is substantial, as the Class includes not only providers under contract with a particular Defendant, but any provider who filed a claim with any defendant in MDL 1334, based on the conspiracy allegation.  As a result, notice, to the greatest extent possible, had to be sent to all HCP disciplines nationwide.  To accomplish this, a comprehensive notice package was prepared and direct mailed to HCPs through provider lists obtained by InfoUSA.  Ex. A at ¶25.  The notice package includes the full form of notice, the claim form, and a question and answer brochure.  The notice package was mailed to over 590,000 Class Members.  *Id.*  In addition, a form of summary notice approved by the Court was placed over three (3) consecutive weeks in USA Today and the Wall Street Journal, and also

---

[10]      The information provided here, and in Ex. A, concerning the Notice Program and Settlement Administration were reported by Neil Manning, Account Executive for Poorman-Douglas Corporation, who serves as the Settlement Administrator in this case.  The Settlement Administrator will submit a declaration supporting the statements made concerning the Notice Program and Settlement Administration results and its obligations, along with the costs and opt-out information, as part of Defendant's submission in support of Final Approval.

17

published in a variety of HCP Trade Journals, a list of which is attached hereto as Exhibit C.
The Settlement Administrator also established a website (www.humanaprovidersettlement.com)
to provide the full notice and information about the Settlement and answer frequently asked
questions for the Class Members. *Id.* Providers can file claims directly on the website as well.
Finally, Counsel secured the notice distribution networks of many state and national HCP
Associations.

2.   <u>Settlement Administration</u>.

The Settlement Administrator is obligated to manage all Settlement Administration to
ensure a smooth experience for Class Members. *Id.* The Administrator provides prerecorded
settlement information and live telephonic operators to relay settlement information to Class
Members who contact the Administrator. In addition, the Administrator receives and tabulates
claim forms, provides claim form corrective services, acts as fund manager, distributes claim
payment to either individual Class Members or the Associations to which they direct their claim
fund share, and gathers and tabulates all requests for exclusion. These are necessary pieces of
the Settlement, without which the Class would be unable to ask questions, process their claims
(by mail or on-line), and receive payment for their claims. *Id.*

**IV.    THE SETTLEMENT SHOULD BE APPROVED BY THE COURT**

By any measure, the HCP Settlement Agreement with Humana is a significant success.
The Settlement Agreement achieves excellent prospective relief and establishes a Settlement
Fund to provide compensation for all valid claims, and attorneys' fees and expenses. It provides
substantial immediate benefits to Plaintiffs and the Class and eliminates the potential risk of non-

recovery. Instead of facing additional years of costly litigation, or the fate of the MDs in *Shane* against United Healthcare, Class Members will benefit from significant business practice changes and a valuable Settlement Fund.

There is a well-settled policy favoring the settlement of cases. It is axiomatic that "[c]ompromises of disputed claims are favored by the Courts." *Williams v. First Nat'l Bank,* 216 U.S. 582, 585 (1910). This policy applies with particular force to class-action lawsuits, the complexity and expenses of which impose special burdens on both the judicial system and litigants. *See In re U.S. Oil and Gas Litig.,* 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement.").

Rule 23(e) of the Federal Rules of Civil Procedure requires that before the parties settle, the Court "must find the settlement is fair, adequate and reasonable, and not the product of collusion between the parties." *Cotton,* 559 F.2d at 1330. In reaching this determination, the "inquiry should focus upon the terms of the settlement," together with "an analysis of the facts and the law relevant to the proposed compromise." *Id.* Specifically, the settlement terms should be compared "with the likely rewards the class would have received following a successful trial of the case," subject to the following four qualifications. *Id.*

First, the courts, including those in this Circuit, have continuously stressed that it should not "be forgotten that compromise is the essence of settlement." *Cotton,* 559 F.2d at 1330. As a result, in evaluating the terms of the compromise in relation to the likely benefits of a successful

trial, "the trial judge ought not try the case in the settlement hearings," nor should the Court "make a proponent of a proposed settlement justify each term of the settlement against a hypothetical or speculative measure of what concessions might have been gained . . . ." *Id.* To the contrary, "the Court must be mindful that inherent in compromise is a yielding of absolutes and an abandonment of highest hopes." *Ruiz v. McKaskle,* 724 F.2d 1149 (5th Cir. 1984). *See also Young v. Katz,* 447 F.2d 432 (5th Cir. 1971) (explaining that a mini-trial on the underlying merits for purposes of approving a settlement "would emasculate the very purpose for which settlements are made.")

Second, courts have consistently stressed that in evaluating a settlement in light of the risk of continued litigation, the district court "is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton,* 559 F.2d at 1330. *See also Behrens v. Wometco Enterp.,* 118 F.R.D. 534, 539 (S.D. Fla. 1988), *aff'd,* 899 F.2d 21 (11th Cir. 1990) ("The Court can rely upon the judgment of experienced counsel and, absent fraud, should be hesitant to substitute its own judgment for that of counsel."). "Courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching." *In re King Res. Co. Sec. Litig.,* 420 F. Supp. 610, 625 (D. Colo. 1976).

Third, the courts have also stressed that "litigants should be encouraged to determine their respective rights between themselves," and that "there is an overriding public interest in favor of settlement." *Cotton,* 559 F.2d at 1331. This principle is particularly compelling in class-action lawsuits which "have a well deserved reputation as being most complex." *Id.* As the Eleventh Circuit has emphasized:

> Public policy strongly favors the pretrial settlement of class action lawsuits. Complex litigation – like the instant case – can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.

*In re U.S. Oil and Gas,* 967 F.2d at 493 (internal citation omitted). *See also Miller v. Republic Nat'l Life Ins. Co.,* 559 F.2d 426 (5th Cir. 1977) ("Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits.").

Fourth and finally, in considering the merits of the proposed Settlement, the Court should take into account practical considerations of this case. Two of those practical considerations are the vagaries of litigation and the benefits of an immediate recovery, as compared "to the mere possibility of relief in the future, after protracted and expensive litigation." *In re King Resources,* 420 F. Supp. at 625. In this respect, "it has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.*

This case differs from other Managed Care cases (including the CIGNA HCP cases) that previously have settled. First, while this case was not actively litigated, the threat of real litigation was clear as evidenced by Plaintiffs' repeated efforts to lift the stay and begin prosecution. Furthermore, Humana was well aware of these same Counsels' aggressive litigation efforts against the Blue Cross and Blue Shield defendants in *Solomon v. Blue Cross and Blue Shield Association,* which has been voraciously litigated for the past two years. Second, Humana was forthcoming in due diligence discovery, allowing a clear view into Humana's claims processing practices. Finally, after the Court issued its summary judgment decisions in *Shane*

and despite five months of settlement negotiations in this case, Humana no longer had incentive to settle.  Based on these facts, this Settlement is the best result this Class could hope to achieve. Indeed, it would be imprudent to abandon this Settlement in favor of litigation based on the relief provided by the Settlement, the size of the Class, the risks of success in litigation, and the likelihood that Humana would proceed to trial or seek summary judgment.  There simply is no better scenario for the Class at this juncture.  As a result, the factors outlined by the Eleventh Circuit to determine whether a class settlement is fair, adequate and reasonable militate in favor of settlement in this case at this time.[11]  *See Bennett v. Behring Corp.,* 737 F.2d 982 (11th Cir. 1984).  Finally, the Settlement includes a right to opt out.  Any HCP, group or organization may elect not to participate, and thereby be free to pursue its claims through other means.

## V.   THE NOTICE PROGRAM APPROVED BY THE COURT MORE THAN SATISFIES THE REQUIREMENTS OF DUE PROCESS

As the Court's Preliminary Approval Order required, notice of this Settlement was disseminated to the Class via direct mail, traditional publication in newspapers and trade journals, and via the Internet.  Mailed notice was provided to over 590,000 members of the Class, and traditional publication notice was posted in 16 different publications and HCP Association journals.  Ex. A at ¶25.  Class Counsel has been successful in obtaining the

---

[11]   As this Court is aware, having presided over a multitude of settlements in these Managed Care cases, the factors to consider are: (a) the likelihood of success at trial; (b) the range of possible recovery; (c) the point at or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (d) the complexity, expense, and duration of the litigation; (e) the substance and amount of opposition to the settlement; and (f) the stage of proceedings at which the settlement is achieved.  *Bennett,* 737 F. 2d at 987; *Behrens,* 118 F.R.D. at 538-39.

agreement of several HCP Associations to link the Settlement site to their websites, which are routinely visited by their membership.[12]   The Settlement has received widespread publicity. Under the program approved by the Court and carried out by the parties, the notice given was the best means of notice that was practicable under the circumstances.  As the Court ruled in the Order of Preliminary Approval, the notice provided satisfied the requirements of Due Process.

## VI.   REQUEST FOR ATTORNEYS' FEES AND EXPENSES

Plaintiffs seek an award of $972,673 for their attorneys' fees, plus $101,327.11 to reimburse their expenses incurred in prosecution and settlement of this case.[13]   The fee request represents 27% of the Settlement Fund.[14]  Plaintiffs did not reach agreement with Humana for a fee separate from the Settlement Fund.  Humana only was willing to offer a single "lump" sum for both the Class and attorneys' fees, leaving Class Counsel to divide the Fund between themselves and the Class.  Ex. A at ¶24.  As a result, because Class Counsel was unwilling to determine the portions of that Fund appropriate for the Class and for attorneys' fees, Counsel negotiated for the highest total settlement amount possible from Humana, and now asks the Court to divide the Settlement Fund.  *Id.*

---

[12]   *See, e.g.,*  American Psychological Association website at www.apa.org, American Orthotic and Prosthetic Association website at www.aopanet.org, American Ambulance Association, American Chiropractic Association and American Podiatric Medical Association.

[13]   Plaintiffs have notified the Class that they would not seek attorneys' fees and expenses in excess of 30% of the Settlement Fund.  *See* Notice §VIII.

[14]   The amount requested is only 21.5% of the Settlement Fund taking into account the Settlement Fund of $3.58 million and the benefit of the $950,000 Notice Program and Settlement Administration paid for by Humana, and only 18% when considering the $879,300 in cash benefit accruing to Class Members from the prohibition on double co-payment charges.

Class counsel is entitled to an allowance of attorneys' fees based upon the benefit obtained in a settlement or judgment. *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 771 (11th Cir. 1991); *Ramey v. Cincinnati Enquirer, Inc,* 508 F.2d 1188, 1194-95 (6th Cir. 1974). The Supreme Court, the Eleventh Circuit, and the courts in this District have all noted that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole." *See In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001) (citing *Boeing Co. v. Van Gemert,* 100 S. Ct. 745 (1980)); *see also Camden I,* 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval."); *Allapattah Services, Inc. v. Exxon Corp.*, No. 91-0986-CIV-GOLD/SIMONTON, 2006 U.S. Dist. LEXIS 45702, at *44 (S.D. Fla. July 6, 2006) (citations omitted).  The doctrine is based on the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Van Gemert,* 444 U.S. at 478; *Mills v. Elec. Auto-Lite, Co.,* 396 U.S. 375, 392 (1970). Courts also recognize that appropriate awards of attorneys' fees in cases such as this encourage redress for wrongs caused to entire classes of persons, as well as discourage future misconduct of a similar nature and that adequate compensation promotes the availability of counsel for plaintiffs. *Mashburn v. National Healthcare, Inc.,* 684 F. Supp. 679, 687 (M.D. Ala. 1988); *see Deposit Guaranty National Bank v. Rope,* 445 U.S. 326, 338-39 (1980); *Muehler v. Land O'Lakes, Inc.,* 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).  The Eleventh Circuit requires that fees in a common fund case be determined as a percentage of the funds generated through a class

action settlement, rather than the lodestar approach. "Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I,* 946 F.2d at 774.

 To determine the fees most appropriate in this case, Plaintiffs and Class Counsel ask the Court to consider: (a) the total benefit of settlement to the class, and specifically the cash benefit to the class and the cash equivalent of the relief prohibiting Humana from charging "double-co-payments" prospectively; (b) Class Counsel's lodestar, which far exceeds the fee request; (c) the views of the Class concerning Plaintiffs' fee request; (d) the percentage of the claim fund typically awarded by this Court in settlements in MDL 1334; and (e) the benchmark set by the 11th Circuit. *Camden I* remains the standard for evaluating common fund awards in the Eleventh Circuit. *Allapattah,* 2006 U.S. Dist. LEXIS 45702, at *48-49; see also *In re Managed Care Litigation Class Plaintiffs v. Aetna, Inc.,* MDL No. 1334, 2003 U.S. Dist. LEXIS 27228, at *16 (S.D. Fla. Oct. 24, 2003) ("*Aetna* Final Approval Order"). The Court must weigh each of the twelve "*Johnson* factors" described in *Camden I,* to determine whether to apply the benchmark for the Eleventh Circuit in this case, and in considering any adjustments upward or downward. *Camden I* at 775; *Allapattah,* 2006 U.S. Dist. LEXIS 45702, at *49-50. Plaintiffs have addressed each "Johnson factor" throughout this Motion. These factors mitigate in favor of a fair fee in this case. Considering all factors enumerated in *Camden I,* the fee requested is appropriate in this case.

A.   **The Settlement Provides Over $20 Million in Benefits Including $3.58 Million in Cash, Approximately $879,300 in Cash Benefit from the Double Co-Payment Relief and Almost $1 Million from the Notice Program and Settlement Administration.**

This Court long has recognized that the value of the settlement, for purposes of an attorneys' fee award, should consider not only the monetary relief to the class, but the non-monetary relief as well.   In each of the MDL 1334 settlements, the Court considered the value of the settlement as a whole, including non-cash relief, in determining the appropriate fee award for class counsel.   The Southern District of Florida also has reaffirmed this principal in *Allapattah*, 2006 U.S. Dist. LEXIS 45702, at *59 (quoting *Johnson*, 488 F.2d at 718), and the Eleventh Circuit recognized this obligation in *Camden I. Camden I*, 946 F.2d at 775.[15]

This Settlement provides over $20 million in benefits.   Based on this value, Plaintiffs seek less than 5% of the benefit to the Class as fees in this case.   Most of the value of this Settlement to Class Members comes from a more advantageous claims process, the transparency created in the claims processing system, Humana's disclosure obligations, increased interface between Humana and HCPs, and significant changes that Humana has agreed to make in its HCP

---

[15]      *Accord, Sheppard v. Consolidated Edison Co. of N.Y., Inc.*, No. 94-CV-0403 (JG), 2002 U.S. Dist. LEXIS 16314, at *24 (E.D. N.Y. Aug. 11, 2002) (in valuing total settlement for percentage-based attorneys' fee award, court included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief"); *Steiner v. Williams*, No. 99 Civ. 10186 (JSM), 2001 U.S. Dist. LEXIS 7097, at *12 (S.D. N.Y. May 31, 2001) ("Although the settlement in this action did not involve the payment of money by the defendants, counsel may nonetheless recover a fee if the settlement conferred a substantial non-monetary benefit.").   Even the Supreme Court has recognized that the rationale of the common-fund doctrine "must logically extend, not only to litigation that confers a monetary benefit on others, but also litigation 'which corrects or prevents an abuse which would be prejudicial to the rights and interests' of those others." *Hall v. Cole*, 412 U.S. 1, 5 n. 7 (1973) (quoting *Mills*, 396 U.S. at 396).

claim editing practices.  These changes will make the process of seeking payment for treatment of Humana subscribers easier and cheaper for HCPs, and increase the amount of payment and likelihood of payment to HCPs in a more streamlined process.  Experts both in the HCP settlement with CIGNA and the MD settlements in *Shane* have provided the Court with significant data on the value of these types of benefits.  Humana itself values the prospective relief benefits in the Settlement Agreement at $15 million.  Settlement Agreement at §7.31. Many of these non-cash benefits were secured by Class Counsel here as unique resolutions to the HCP claims against Humana, benefits first created in the *Kaiser v. Cigna* litigation, or in the *Ashton/ Solomon* HCP settlement with CIGNA.  These benefits must be considered by the Court in valuing the Settlement for purposes of determining fees.  *Elkins v. Equitable Life Ins. Co.*, Civil Action No. 96-296-CV-T-17B, 1998 U.S. Dist. LEXIS 1557, at *93-94 (M.D. Fla. Jan. 28, 1998) (court included non-monetary benefits in valuing a common fund); *Varcallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 250 (D.N.J. 2005) (same); *In re Mfrs. Life Ins. Co. Premium Litig.*, MDL No. 1109, Master File No. 96-CV-230 BTM (AJB), 1998 U.S. Dist. LEXIS 23217 (S.D. Cal. Dec. 21, 1998) (same); *Wilfong v. Rent-A-Center*, Cause No. 00-680-DRH, 2002 U.S. Dist. LEXIS 28016, at *22, 29 (S.D. Ill. Oct. 4, 2002) (same); *Carnegie v. Mut. Sav. Life Ins. Co.*, CV-99-S-3292-NE, 2004 U.S. Dist. LEXIS 29404, at *136-37 (N.D. Ala. Nov. 23, 2004) (court included the requested attorneys' fees, expenses and costs in valuing class action settlement fund).

Moreover, the cash benefits of this Settlement, standing alone, support the award sought in this case.  First, Humana already has provided $3.5 million in cash to the Class by depositing

it into an interest bearing account. By the time that Settlement Fund is distributed, it will be approximately $3.58 million. Ex. A at ¶25. Moreover, the double co-payment relief will result in immediate cash increases to Class Members directly benefiting them by approximately $879,300 during the settlement benefit period alone. Ex. B. Finally, the comprehensive Notice Program and Settlement Administration, often borne by the Class from the common fund, are entirely paid by Humana as an additional benefit, the cost of which is $950,000. Ex. A at ¶25. These cash benefits, totaling $5,530,000 alone, justify a fee of just 17.8% or $972,673, plus expenses of $101,327.11.

**B.    Class Counsel's Lodestar and Experience Justify the Requested Fee Award.**

Section II.B. of this Motion details the work required to fairly and fully settle this case. Efforts to resolve claims against Humana began in 2003 when the HCP individuals and Associations first retained Class Counsel to pursue their claims, the complaint was drafted, and the MDL panel transferred the action. During the ensuing three years, these firms prepared several motions to lift the stay and reinstate the cases, and principals from all four firms traveled to Miami for hearings on their own motions and for Court-ordered status conferences. Finally, once settlement discussions began, all four firms actively participated in the due diligence and settlement efforts resulting in the benefits presented to the Class and Court. These firms divided the due diligence effort and preparation for settlement, to most efficiently complete these efforts. Principals of all four firms also attended multiple settlement negotiations around the country, and worked with experts and raw claims data to protect their individual clients and the Class. Because of the urgency which Humana placed on settlement due diligence and negotiations,

Class Counsel were required to focus their time and energy on Humana during the ensuing months, to meet the schedule demanded by that Defendant.  The lodestar commitment required for this effort thus far is $1.65 million.[16]  Ex. A at ¶27, 29, 30; *see also,* Declaration of Andrew S. Friedman in Support of Final Approval of Settlement Between Healthcare Providers and Humana, Petition for Award of Attorneys' Fees and Expenses and for Award of Plaintiff Incentive Award, Exhibit D hereto ("Ex. D") at ¶4; Declaration of Debra Hayes in Support of Final Approval of Settlement Between Healthcare Providers and Humana, Petition for Award of Attorneys' Fees and Expenses and for Award of Plaintiff Incentive Award, Exhibit E hereto ("Ex. E") at 3; Declaration of Michael Dodge in Support of Final Approval of Settlement Between Healthcare Providers and Humana, Petition for Award of Attorneys' Fees and Expenses and for Award of Plaintiff Incentive Award, Exhibit F hereto ("Ex. F") at ¶5; Declaration of Alan H. Rolnick in Support of Final Approval of Settlement Between Healthcare Providers and Humana, Petition for Award of Attorneys' Fees and Expenses and for Award of Plaintiff Incentive Award, Exhibit G hereto ("Ex. G") at ¶3.  This does not take into account review of Defendants' Motion in Support of Final Approval, responding to any objections that may be received (none have been received to date), preparing for and attending the Final Approval Hearing, responding to Class Member inquiries, and assisting after final approval with

---

[16]    Plaintiffs expended approximately 4400 hours of legal services.  Most work performed on settlement negotiations, witness interviews, and hearings relating to the motion to lift the stay and reactivate the case, and relating to preliminary and final approval were by partners from the various firms, who charged an average rate of $473.00/hour.  Most work relating to document review and legal research was performed by associates, with an average rate of $387/hour.  Finally, paralegals were used where appropriate rather than attorneys.

Settlement Administration, all of which likely will result in an additional $100,000 in time and expense for these firms.  In addition, Class Counsel incurred $101,327.11 in expenses resulting from travel for meetings, witness interviews and hearings, expert expenses to evaluate the Settlement Fund and prospective relief, copying, filing, phone contact and electronic service. Ex. A at ¶28, 31; Ex. D at ¶5; Ex. E at 3; Ex. F at ¶6; Ex. G at ¶4.

Counsel used their best efforts to try to ensure that none of their time spent in this case was duplicative or unnecessary.  Class Counsel took care to monitor the level of skill of each attorney and their role in the process.  For instance, during due diligence, Class Counsel divided document review between firms by assigning specific subjects relevant to the discovery and settlement process, to avoid duplication of document review efforts.  Ex. A at ¶26.  Because of Humana's urgency to resolve the HCP claims, to stay on track with its *Shane* settlement, Class Counsel were obligated to allocate several lawyers in a short period, to complete their work. Only in meetings with Humana did counsel join together, to ensure strong and well-thought out negotiations, yet each firm took on specific roles throughout the negotiations (i.e., the Dodge Firm focused on claims data and class-wide damage elements, JBHL focused on  much of the Association interface and detailed language and negotiating specific issues from the Settlement Agreement.)  *Id.*  This Court recognized the appropriateness of larger fees to compensate a group of attorneys joining together to litigate against a goliath defendant in the first *Shane* settlement on behalf of MDs against Aetna, Inc.  *See Aetna* Final Approval Order at *15 ("Although a figure of $43.5 million may appear on its face as exorbitant, an analysis of the work done by 152 attorneys from 26 law firms nationwide renders the fee reasonable.")

Fortunately, the Plaintiffs' negotiation efforts were not in vain. The terms of the Settlement build on prior agreements by HCPs and MDs, but these Plaintiffs attempted to ensure all previous settlement benefits were included in this Agreement, along with additional benefits that increase the value of the Settlement and focus relief on HCP specific claims. While some benefits achieved here also were the cornerstone of prior MD settlements and the HCP settlement with Cigna, they were not a *fait accompli* here. Despite adoption of these benefits by several defendants willing to settle their cases, Class Counsel must re-negotiate all provisions for each defendant. Ex. A at ¶17. For HCPs, often the defendants are not interested in offering many of the benefits they were willing to confer on MDs, and Class Counsel must spend many hours, days, and months arguing to justify application of similar benefits to the HCP Class Members. *Id.* These benefits result in fundamental changes not available to the HCP Class absent this Agreement. Notably, Humana (for instance) could have expanded the Class and applied the MD settlement benefits to the HCP Class. However, it elected not to do so unless it was able to reach global resolution of its claims in *Solomon* and *Ashton*. The fact that Humana was under no obligation, and indeed would not, offer such benefits absent this Settlement is clear when the Court considers that Aetna, Prudential, Health Net, Wellpoint, and Anthem have long since settled with the MDs in *Shane,* but have not offered any similar benefits to the HCPs.

Class Counsel's skills and reputations in class action litigation warrant their hourly rates, which are appropriate based on the market in which they practice. Collectively, these firms and their principals have practiced for decades, and these attorneys have been involved in and served as Class and Lead Counsel in class action cases for more than twenty years. *See, e.g.,* Exs. A,

31

and firm resume attached as Exhibit 1 thereto, and Exs. D, E, F and G, and Firm Resumes attached thereto. Many have worked side-by-side with, or as partners with, many of the *Shane* Lead Counsel, for over a decade. These attorneys seek an hourly rate commensurate with their practice skills and experience, the types of fees typically paid to both defense counsel and plaintiffs' firms in similar types of sophisticated cases, and which they receive both for their plaintiffs' work and when they are paid hourly.[17] Ex. A at ¶32. Moreover, Class Counsels' lodestar comports with the standard fee amount found in the marketplace for nationwide class actions of this nature. *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco, Inc. Sec. Litig.,* Fed. Sec. L. Rep. (CCH) ¶ 94, 268 (S.D.N.Y. 1992) ("what should govern [fee] awards is . . . what the market pays in similar cases . . . .") Plaintiffs' lodestar here would result in a lower fee than a private individual contingency fee agreement, where the attorney likely would receive 30%-40% of the value of the recovery, including any injunctive relief. *See,* e.g., *Blum v. Stenson,* 465 U.S. 886, 904 (1984); *Kirchoff v. Flynn,* 786 F.2d 323, 325 n.5 (7th Cir. 1986); *In re Public Service Co.,* Fed. Sec. L. Rep. (CCH) ¶ 96,988 at 94, 291-92 (S.D. Cal. 1992). In fact, the defendant firms against which these Counsel litigate daily in the

---

[17]     Notably, the hourly rates sought by these attorneys is equal to or less than the hourly rates accepted by the Court for counsel for *Shane* plaintiffs, excellent attorneys all of whom have equivalent experience to the firms representing the HCPs. For instance, Lead and Liaison Counsel in MDL 1334 all command an hourly rate between $550-660 per hour, based on similar legal experience (Edith Kallas has been practicing since 1987, Archie Lamb 1988, Nicholas Roth 1980, Joe Whatley 1978 and Harley Tropin 1977).

MDL cases command higher hourly rates than those sought by the *Solomon* and *Ashton* counsel.[18]

It undoubtedly was in large part the skill of these attorneys that instigated this Settlement. During the last three years, Counsel has provided every indication that absent settlement, litigation would be voracious once the Court lifted the stay. Unlike any other "tag-along" cases, Plaintiffs in these cases repeatedly sought relief from the Court's stay to begin litigation, leaving no doubt for Humana that these Plaintiffs intended to litigate these cases. Second, *Solomon* counsel (BFFB and JHLG) and certain *Ashton* counsel (Dodge) have been involved in a protracted battle on behalf of HCPs against all nationwide Blue Cross and Blue Shield entities in *Solomon v. Blue Cross and Blue Shield Association, et al.*, 03-CIV-22935, demonstrating their resolve and skill in litigating the present issues. Finally, Humana had assurance that settlement in this case was possible, as Plaintiffs in *Solomon* and *Ashton* already resolved their claims against CIGNA Healthcare, providing benefits to approximately 200,000 HCP Class Members nationwide.

Class Counsel bore all risk in this litigation, and have not been compensated for their lodestar or expenses incurred against Humana throughout the three year period. Ex. A at ¶33. Moreover, they worked in the best interests of the Class without even the promise of compensation, contrasted by defense counsel who are paid by their clients regularly. *Id.* As this Court long ago recognized,

---

[18] *See, e.g., The National Law Journal*, Vol. 28, No. 15, Dec. 12, 2005, "Firm-by-Firm Sampling of Billing Rates Nationwide".

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer.
>
> . . .
>
> A contingency fee arrangement often justifies an increase in the award of attorneys' fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens,* 118 F.R.D. at 548 (citations omitted).[19] Counsel nonetheless seeks an award of *less than their actual lodestar,* voluntarily abandoning *40%* of their fee in favor of the Class to maximize the Settlement Fund for the Class. Plaintiffs' lodestar more than supports a fee award in line with the benchmark fee awards by this Court in this massive MDL, and the Eleventh Circuit benchmarks for fee awards.

### C.     The Class Is Widely In Favor of A Fair Fee for Class Counsel.

The concerns or support of the Class for Plaintiffs' fees should be a factor for the Court to consider in determining Class Counsels' fee award. Needless to say, any award to Class Counsel reduces the Settlement Fund to the Class, and incites Class Members' general negativity to attorneys' fees. However, in this case, several national Associations, including the American Podiatric Medical Association and the American Psychological Association, have filed

---

[19]     *See also In re Sunbeam,* 176 F. Supp. 2d at 1335 ("A contingency fee arrangement often justifies an increase in the award of attorneys' fees." (quoting *Behren,* 118 F.R.D. at 548)); *In re Continental Illinois Sec. Litig.,* 962 F. 2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, Plaintiffs' counsel *must* be compensated adequately for the risk of non-payment); *Ressler v. Jacobson,* 149 F.R.D. 651, 656 (M.D. Fla. 1992) ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award."); *Walters v. Atlanta,* 652 F. Supp. 755, 759 (N.D. Ga. 1985), *modified,* 803 F.2d 1135 (11th Cir. 1986); *York v. Alabama State Bd. of Educ.,* 631 F. Supp. 78, 86 (M.D. Ala. 1986).

declarations on behalf of their membership supporting a fee award of 25-30% of the Settlement Fund. *See,* e.g., Declaration of Michael J. King on Behalf of the American Podiatric Medical Association Concerning the Solomon/Ashton v. Humana Settlement Exhibit H hereto; Declaration of Russell Newman on Behalf of the American Psychological Association Practice Organization Concerning the Solomon/Ashton v. Humana Settlement Exhibit I hereto and Declaration of Allan Nessman on Behalf of the American Psychological Association Practice Organization Concerning the Solomon/Ashton v. Humana Settlement Exhibit J hereto. While certainly these Associations, beholden to hundreds of thousands of Class Members, desire to maximize the Settlement Fund for all Class Members, they also recognize the efforts of Class Counsel that resulted in this Settlement, and the need to compensate Class Counsel in the same way they seek compensation from the Managed Care industry for their membership. The approval of this fee by Associations representing more than 46% of the entire Class demonstrates overall Class approval with a fair fee in this case.

> **D.      This Court Historically Has Awarded Attorneys' Fees that are 30-33% of the Total Cash Portion of the Settlement as Fees and Costs in the Managed Care Cases.**

Although this case is a common fund case, rather than a "fee on top" case, there really is no difference in the Court's determination of a fair fee. Indeed, in the Court's Order approving the *Shane* settlement with Aetna, Inc., the Court analyzed the fee award sought by the *Shane* plaintiffs under the common fund approach, and found the $50 million award (inclusive of expenses) reasonable based on the *Camden I* factors. *See Aetna* Final Approval Order at *15-16.

35

In the Managed Care settlements, the Court typically has awarded as attorneys' fees and costs 30% or more of the total cash paid in the settlement.  For instance, in the *Shane* settlement with Humana, the settlement provided an estimated value of $75 million for prospective relief, $40 million in cash relief to the Class, and an additional $18 million in fees.  The "fee to total value" ratio was 13.5%[20], but the fee was 31% of the total cash available for benefits ($40 million in settlement fund plus $18 million in fees).  *See* Order Approving Settlement Among Humana Inc. and Humana Health Plan, Inc. and Physicians, Physician Groups, Physician Organizations, Certifying Class and Directing Entry of Final Judgment dated March 14, 2006.  In the *Shane* settlement with Anthem and Wellpoint, the total cash available for benefits was $193 million,[21] $58 million of which were attorneys' fees, or 30 percent.  *See* Amended Order Approving Settlement Among Wellpoint, Inc. and Physicians, Physicians Groups and Physician Organizations, Certifying Class and Directing Entry of Final Judgment dated December 31, 2005.  In the *Shane* settlement with Health Net, the total cash available was $60 million, $20 million of which were attorneys' fees, or 33%.  *See* Order Approving Settlement Among Health Net and Physicians, Physician Groups and Physician Organizations, Certifying Class and Directing Entry of Final Judgment dated September 26, 2005.  By comparison, the fee sought in this case is only 27% of the total Settlement Fund, 21.7% of the Settlement Fund plus the Notice Program and Settlement Administration, and 17.8% of that if including $879,300 in double co-

---

[20]    In this case the total benefit to fee ratio would be only 4.8%, modest by any standard.

[21]    An additional $5 million was paid to the Foundation established for the *Shane* settlements.  Including this cash fund, the percentage attorneys' fees to cash in the settlement in Wellpoint/Anthem is 29%.

payment relief.  Most notably, Plaintiffs seek attorneys' fees of only 4.8% of the total Settlement value.

### E.       The Eleventh Circuit's Benchmark Fee Percentage is 25-30%.

The Court has substantial discretion in determining the appropriate fee percentage awarded to Class Counsel.  "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case."  *In re Sunbeam,* 176 F. Supp. 2d at 1333 (quoting *Camden I,* 946 F.2d at 774).  Nevertheless, "[t]he majority of common fund fee awards fall between 20% to 30% of the fund," although "an upper limit of 50% of the fund may be stated as a general rule."  *Id.* (quoting *Camden I,* 946 F.2d at 774-75).  Significantly, the Eleventh Circuit has found that "district courts are beginning to view the median of this 20% to 30% range, *i.e.,* 25% as a 'bench mark' percentage fee award which may be adjusted in accordance with the individual circumstances of each case . . . ." *Id.* (quoting *Camden I,* 946 F.2d at 775); *see also Waters v. Intern. Precious Metals Corp.,* 190 F.3d 1291 (11th Cir. 1999) (approving fee award where the district court determined that the benchmark should be 30% and then adjusted the fee award higher based on the circumstances of the case); *Walco Inv., Inc. v. Thenen,* 975 F. Supp. 1468, 1470 (S.D. Fla. 1997) (quoting *Camden I* and explaining 25% of the common fund is the benchmark); *Allapattah,* 2006 U.S. Dist. LEXIS 45702, at *167 (applying a benchmark of 25% and adjusting it upwards to 33.3% of the common fund upon consideration of the relevant *Camden/Johnson* factors.)

Because of the benefits achieved, the time and skill provided by Class Counsel and the favorable response of the Class, the fee of $972,673, and expenses of $101,327.11 should be approved by the Court.

## VII.   THE APPLICATION FOR PLAINTIFF INCENTIVE AWARDS SHOULD BE GRANTED

Class Counsel also respectfully request that this Court award each individual and Association Plaintiff a modest incentive award of $2,500. As demonstrated in the Declaration of Class Counsel, the assistance of the Plaintiffs was invaluable to Class Counsel in achieving the substantial benefits provided by the Settlement Agreement. Ex. A at ¶34. Such incentive awards are common in class litigation, and serve the laudable goal of compensating those individuals who took the time, and had the courage, to prosecute claims not only on behalf of themselves, but also on behalf of many others harmed by the same wrongful conduct. *Staton v. Boeing Co.*, 327 F.3d 938, 976-77 (9th Cir. 2003); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 571. The incentives sought here are substantially less than the other MDL 1334 requests, because this case had been stayed for the duration of the litigation and discovery demands were not placed on these Plaintiffs. Nonetheless, the Plaintiffs (many of whom are state and national HCP Associations with staff and expenses) had been called upon at the inception of the litigation and in settlement to work with Class Counsel to ensure the greatest understanding of the allegations against Humana and the best practicable resolution of those claims. *Id.*

## VIII.   CONCLUSION

The Settlement Agreement is an arms-length compromise resulting from Humana's desire to resolve its disputes with its providers, the skills and aggressive litigation efforts by Class Counsel, and the landscape of the case following the summary judgment orders in *Shane*. The Settlement provides valuable compensation for all valid claims and wide-ranging changes to Humana's business practices.   The Settlement is not merely reasonable; it is extraordinary under the circumstances.   The HCP Settlement Agreement with Humana should be approved.   The Court also should award a reasonable fee of $972,673.   This is 4.8% of the total benefit to the Class including prospective relief, 17.8% of all relief other than prospective relief, and 27% of the Settlement Fund.   In addition, the Court should award Plaintiffs' expenses incurred in this litigation, totaling $101,327.11.   Finally, the Court should approve the named Plaintiff incentive awards of $2,500 as fair and reasonable.

Respectfully submitted this 20th day of October, 2006.

Respectfully submitted,

JOBETH HALPER (C.A. #167729)
jobeth@halperlitigation.com
JENNIFER MACPHERSON
jenn@halperlitigation.com
JOBETH HALPER LITIGATION GROUP, P.C.
160 Chesterfield Dr., Suite 2
Cardiff by the Sea, CA 92007
(760) 632-1101 Phone
(760) 632-1131 Fax

39

ANDREW W. FRIEDMAN
afriedman@bffb.com
FRANCIS J. BALINT
KIMBERLY PAGE
BONNET, FAIRBORN, FRIEDMAN & BALINT, P.C.
2901 N. Central Avenue, Suite 1100
Phoenix, AZ 85012-3311
(602) 274-1100 Phone
(602) 274-1199 Fax

ALAN H. ROLNICK (F.L. # 715085)
arolnick@sacherzelman.com
SACHER, ZELMAN, VAN SANT, PAUL
BEILEY, HARTMAN, ROLNICK
& WALDMAN, P.A.
1401 Brickell Avenue, Suite 700
Miami, FL 33131
(305) 371-8797 Phone
(305) 374-2605 Fax

*Counsel for Solomon Plaintiffs*

MICHAEL C. DODGE
miked@texasatty.com
DAVID W. DODGE
CHRISTINA HERRERA
DODGE & ASSOCIATES, P.C.
Regency Plaza
3710 Rawlins Avenue, #1600
Dallas, Texas 75219
(214) 273-3280 Phone
(214) 273-3281 Fax

DEBRA BREWER-HAYES
dhayes@reichandbinstock.com
DENNIS C. REICH
REICH & BINSTOCK
4265 San Felipe, Ste. 1000
Houston, Texas 77027
(713) 622-7271 Phone
(713) 623-8724 Fax

Mark Raymond (F.L. # 373397)
mraymond@broadandcassel.com
Cynthia Morales (F.L. # 534951)
Broad and Cassel
One Biscayne Tower, 21st Floor
2 South Biscayne Blvd
Miami, FL  33131
 (305) 373-9425  Phone
 (305) 99506385  Fax

*Counsel for Ashton Plaintiffs*

41