UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-MD-1334-MORENO

CHARLES B. SHANE, M.D., *et al.*,

       Plaintiffs,

vs.

HUMANA, INC., *et al.*,

       Defendants,

TIMOTHY N. KAISER, M.D., *et al.*,

       Plaintiffs,

vs.

CIGNA CORP., *et al.*

       Defendants
_____/

**REPORT AND RECOMMENDATION ON SETTLING
DEFENDANT CIGNA'S MOTIONS TO ENFORCE INJUNCTION**

This matter is before the Court on Settling Defendant CIGNA Heath Care's ("CIGNA") Motion to Enforce Injunction Against the American Medical Association, *et al.*[1] [D.E. 5974], Motion to Enforce Injunction Against Susan J. Shiring, LCSW [D.E.

---

[1] The Medical Society of New Jersey, Medical Society of the State of New York, Connecticut State Medical Society, Texas Medical Association, North Carolina Medical Society, individual doctors James N. Gardner, M.D. and Darrick E. Antell. M.D., as well as Pain Management & Surgery Center of Southern Indiana, Inc.

5972], and Motion to Enforce Injunction Against Brian Mullins, M.S., P.T., *et al.*[2] [D.E. 6006].[3] The Court has considered the motions, the consolidated response, the individual responses, the replies, and the pertinent portions of the record. For the reasons discussed below, this Court recommends that CIGNA's Motions should be Granted.

## I. BACKGROUND

On April 17, 2000, the Judicial Panel on Multidistrict Litigation ("MDL Panel") ordered the creation of *In re Managed Care Litigation*, Case No. 1:00-MDL-1334. This MDL case concerned, among other things, reimbursement for health care services by managed care companies and was divided into two tracks: one involving broad claims by health care providers and the other involving broad claims by subscribers to health care plans. The provider track was a class action brought on behalf of all providers who submitted claims to health care companies, including CIGNA, for the provision of medical services. This class included both physicians and non-physician health care providers, as well as providers with contracts with CIGNA and those without contracts.

The providers alleged that health insurance companies engaged in a conspiracy to inflate profits by systematically denying, delaying, and diminishing payments due

---

[2] Maldonado Medical LLC, Carmen Kavali, M.D., Tennessee Medical Association, California Medical Association, Medical Association of Georgia, Florida Medical Association, Washington State Medical Association, El Paso County Medical Society, American Podiatric Medical Association, and New Jersey Psychological Association.

[3] These motions were referred for a Report and Recommendation by the Honorable Federico A. Moreno pursuant to 28 U.S.C. § 636(b)(1) and the Magistrate Rules of the Local Rules of the Southern District of Florida. [D.E. 6010 & 6016].

to them. The HMOs allegedly effected this scheme through the manipulation of computerized billing programs. Throughout the pendency of this complex class-action litigation, settlements have been reached between numerous providers and several of the insurers. On September 3, 2003, CIGNA reached one such settlement agreement with the physician providers ("Physician Provider Settlement Agreement"), which the Court approved on February 2, 2004[4] [D.E. 2900]. In addition, on December 9, 2004, CIGNA reached another settlement agreement with the non-physician health care providers ("Non-Physician Provider Settlement Agreement"), which the Court approved on April 26, 2005[5] [D.E. 3988].

Both Final Approval Orders enjoined class members from filing new lawsuits in which "Released Claims" are asserted against "Released Parties:"

> The Releasing Parties are permanently enjoined from: (a) filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise) or receiving any benefits from any lawsuit, administrative or regulatory proceeding or order in any jurisdiction based on any or all Released Claims against one or more Released Persons, and (b) instituting, organizing class members in, joining with class members in, amending a pleading in or soliciting the participation of class

---

[4] The Final Approval Order of the Physician Provider Settlement Agreement was issued on February 2, 2004, but "Final Approval" as defined in the Settlement Agreement did not occur until April 22, 2004, when the Court of Appeals dismissed the relevant appeals. *See* Physician Provider Settlement Agreement § 1.59 [D.E. 5975-3]; and *In re Managed Care Litigation*, Case No. 1:00-MDL-1334, Order of Dismissal from USCA [D.E. 3249].

[5] The Final Approval Order of the Non-Physician Provider Settlement Agreement was issued on April 26, 2005, but "Final Approval" as defined in the Settlement Agreement did not occur until May 27, 2005, when time to appeal to the Court of Appeals had expired. *See* Non-Physician Provider Settlement Agreement § 1.47 [D.E. 5973-2]; and *In re Managed Care Litigation*, Case No. 1:00-MDL-1334, Order Approving Settlement Among Cigna Healthcare and Healthcare Providers [D.E. 3988].

> members in, any action, including but not limited to a purported class action, in any court against one or more Released Persons based on, involving, or incorporating, directly or indirectly, any or all Released Claims.

*See* Final Approval Order of the Physician Provider Settlement Agreement at 10 [D.E. 2900] & Final Approval Order of the Non-Physician Provider Settlement Agreement at 11 [D.E. 3988].[6]

On February 9, 2009, the American Medical Association ("AMA") along with five other medical associations and two individual doctors filed a class action complaint against CIGNA entities in the District of New Jersey asserting seven causes of action: (i) claim for breach of plan provision for benefits in violation of ERISA § 502(A)(1)(B); (ii) claim for declaratory relief relating to CIGNA's violation of ERISA; (iii) claim for violation of fiduciary duties of loyalty and due care in violation of § 404 of ERISA; (iv) claim for violations of RICO, 18 U.S.C. § 1961(c); (v) claim for violations of § 664 of RICO; (vi) claim for declaratory and injunctive relief under RICO; and (vii) claim for violation of § 1 of the Sherman Act. *See* AMA Class Action Complaint ¶¶ 152-249 [D.E. 5975-1]. In the same judicial district, on April 17, 2009, Susan J. Shiring, LCSW, also filed a class action against CIGNA asserting nearly identical claims as the AMA action.[7] *See* Shiring Class Action Complaint ¶¶ 84-181 [D.E. 5973-1].

Meanwhile, on April 14, 2009, the Pain Management & Surgery Center of

---

[6] The Eleventh Circuit has affirmed our previous orders enforcing such settlement agreements as this one entered in the MDL. *See, e.g.*, *Thomas v. Blue Cross and Blue Shield Ass'n*, No. 08-15395, 2009 WL 1483522 (11th Cir. May 28, 2009); *Klay v. All Defendants*, No. 08-12906, 2009 WL 179617 (11th Cir. Jan. 27, 2009).

[7] The Shiring Class Action Complaint did not include the two declaratory claims asserted in the AMA action.

Southern Indiana, Inc., ("PMSC") filed a class action complaint of its own against CIGNA entities in the Southern District of Indiana. PMSC's class action complaint essentially mirrored the February 9, 2009 AMA class action complaint filed in New Jersey, asserting identical seven claims. *See* PMSC Class Action Complaint ¶¶ 104-194 [D.E. 5975-2].

On August 14, 2009, pursuant to a court order, the AMA and the Shiring actions were consolidated with other pending actions. The consolidated case was styled *Franco et al. v. CIGNA Gen. Life Insur. Co.*, 07-cv-6039 (D.N.J.). The *Franco* Amended Consolidate Class Action Complaint ("CAC") named additional provider and medical association plaintiffs that where not named in the AMA and Shiring complaints.[8]  *See* CAC at 1-2 [D.E. 6007-1]. In addition to newly-named plaintiffs, the CAC revised the class period for which the providers are seeking damages. The new class period for Provider Plaintiffs' RICO and antitrust claims runs from February 9, 2005 through the date of class certification in *Franco*. *Id*. ¶ 362. The CAC defines separate ERISA subclasses for Physician and Non-Physician Healthcare Provider Plaintiffs. The Physician ERISA subclass runs from February 3, 2004 through the date of certification and the Non-Physician Provider subclass runs from May 26, 2005 through the date of certification. *Id*. ¶ 363.

The 147-page CAC alleges twelve causes of action: (i) breach of plan provisions for benefits in violation of ERISA § 502(A)(1)(B); (ii) declaratory relief relating to CIGNA's violation of ERISA; (iii) vilation of fiduciary duties of loyalty and due care in

---

[8]  The newly asserted plaintiffs are all subject of CIGNA's Motion to Enforce Injunction Against Brian Mullins, M.S., P.T., *et al.* [D.E. 6006].

violation of § 404 of ERISA; (iv) failure to provide full and fair review; (v) failure to comply with federal claims regulations; (vi) failure to provide an accurate SPD and required disclosure; (vii) violation of New Jersey Regulation for small plan members; (viii) violations of RICO on behalf of subscriber plaintiffs; (ix) violations of RICO in ERISA and non-ERISA plans; (x) declaratory and injunctive relief under RICO; (xi) violations of RICO on behalf of all plaintiffs; (xii) and violation of Section 1 of the Sherman Act. *See id.* ¶¶ 375-570.

All causes of action, in both the CAC and the PMSC complaints, stem from CIGNA's alleged failure to reimburse the non-participating providers the contractually obligated "usual, customary and reasonable" ("UCR") amount for the services rendered by them. *See* CAC ¶ 6 and PMSC Complaint ¶ 6. According to both complaints, CIGNA allegedly utilized database called Ingenix in order to calculate the inaccurate and improper UCR amounts due to Plaintiffs. The allegations further state that CIGNA used and continues to use the Ingenix database as the primary source of data upon which it bases its UCR determinations, even though CIGNA knows that it cannot and should not be used for that purpose. *See* CAC ¶ 210 and PMSC Complaint ¶ 48. Both complaints also allege that CIGNA committed, and conspired to commit, with its direct competitors numerous violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq*. These antitrust violations allegedly stem from CIGNA's price-fixing with regard to paying reasonable and customary rate for non-party transactions and from manipulating the Data Market in order to create below-market UCRs.

In light of both Final Approval Orders, and the undisputed fact that all named individual provider plaintiffs in both the *Franco* and PMSC actions did not opt out of

the class, CIGNA moves this Court to enforce the settlement against these Provider Plaintiffs and compel the withdrawal of the RICO and antitrust claims from both actions.[9] CIGNA argues that the RICO and antitrust causes of action in both actions arose prior to the date of both Final Approval Orders and are, therefore, barred by the settlement agreements. Both the *Franco* and PMSC Plaintiffs responded to the pending motions opposing the enforcement of the judgment. Plaintiffs contend that the RICO and antitrust claims are not Released Claims because they arose after the MDL settlements were final. Namely, Plaintiffs argue that: (i) because both complaints allege a series of new injuries occurring after the effective date of the Final Approval Orders, the alleged antitrust and RICO violations arose only after 2004 and where not released by either settlement and (ii) CIGNA's invocation of general release to prospectively bar a private antitrust action arising from post-release violations is against public policy.

## II.   ANALYSIS

The language of the Court's Final Approval Orders clearly prohibits Class members from initiating lawsuits against Released Parties for any claims released by the Settlement. This Court, therefore, must grant Settling Defendant's motions if three conditions exist: (i) the Provider Plaintiffs are class members; (ii) CIGNA is a Released Party under the Settlement; and (iii) the claims at issue in the *Franco* and PMSC complaints are Released Claims.

---

[9] CIGNA apparently does not challenge Provider Plaintiffs' ERISA claims so long that these claims are premised on the individual claims regarding their requests for payment from CIGNA after the date of Final Approval Orders. *See* CIGNA's Mem. in Supp. to Enforce Inj. Against Susan J. Shiring at 6 n.5 [D.E. 5973].

### A. *Provider Plaintiffs are Class Members*

The Final Approval Order of the Physician Provider Settlement Agreement permanently certified a settlement class composed of the following members:

> Any and all Physicians, Physicians Groups and Physicians Organizations (and all Persons claiming by or through them, such as Physicians' Assistants and Advanced Practice Registered Nurses), who or which provided Covered Services to any CIGNA HealthCare member or any individual enrolled in or covered by a plan offered or administered by any Person named as a defendant in the *Shane* complaint or by any of their respective current or former Subsidiaries from August 4, 1990 through the date of the entry of the Preliminary Approval Order . . . .

*See* Final Approval Order of the Physician Provider Settlement Agreement at 4.

Likewise, the Final Approval Order of the Non-Physician Provider Settlement Agreement permanently certified a settlement class composed of the following members:

> "Class" means any and all Heathcare Providers, Healthcare Provider Groups and Healthcare Provider Organizations (and all Persons claiming by or through them) who or which provided Covered Services to any CIGNA HealthCare Member or any individual enrolled in or covered by a plan offered or administered by any Persons named as defendants in the *Knecht* Action and *Solomon* Action or by any of their respective current or former Subsidiaries from January 1, 1990 through the date of the entry of the Preliminary Approval Order . . . .

*See* Final Approval Order of the Non-Physician Provider Settlement Agreement at 6. It is undisputed that none of the Plaintiffs opted out of any of the two settlements, and are therefore class members bound by the terms of the Final Approval Orders. Furthermore, neither of the Plaintiffs, both individual and associational, disputes that they are subject to the settlement agreements.

### B. *Defendant is a Released Party*

It is also undisputed that the Final Approval Orders include CIGNA as a Released Party.

### C. *Plaintiffs' RICO and Antitrust Claims are Released Claims*

A litigation release of claims is a contract, thus it is construed according to the normal rules of contract interpretation. *See, e.g., V & M Erectors, Inc. v. Middlesex Corp.*, 867 So. 2d 1252, 1253-54 (Fla. 4th DCA 2004). When interpreting a contract under Florida law,[10] the Court is guided first by the language of the documents itself. *See Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. 4th DCA 2003). Where the terms of a contract are clear and unambiguous, the Court may not consider parol evidence but instead must determine the intent of the parties from the four corners of the document. *Id.* Furthermore, when the terms are unambiguous, the language itself is the best evidence of the parties' intent and its plain meaning controls. *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. 3d DCA 1989).

The language of the Court's Final Approval Orders and the Settlement Agreements clearly prohibits Class members from initiating claims against "Released Parties" which arise out of "or in any way [are] related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referred to in the litigation." *See* Physician Final Approval Order at 8 and Non-Physician Final Approval Order at 8-9. Both Settlement

---

[10] Both Settlement Agreements contain a Florida Choice-of-Law provision. *See* Non-Physician Provider Settlement Agreement at 107 [D.E. 5973-2] and Physician Provider Settlement Agreement at 148 [D.E. 5975-3].

Agreements define "Released Claims" as:

> any and all claims that have been or could have been asserted by or on behalf of any or all Class Members against the Released Persons, or any of them, and which arise prior to Final Approval by reason of, arising out of, or *in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referred to in the Litigation*, except as otherwise provided for by this Agreement. This includes, without limitation and as to Released Persons only, any aspect of any Fee for Service Claim submitted by any Class Member to CIGNA HealthCare, and claims *based upon a capitation agreement with CIGNA HealthCare, and any allegations that Defendants and/or CIGNA HeathCare have conspired with, aided and abetted, or otherwise acted in concert with other managed care organizations, other heath insurance companies, and/or other third parties with regard to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referred to in the Litigation* or with regard to CIGNA HealthCare's liability for any other demands for payment submitted by any Class member to such other managed care organizations, health insurance companies, and/or third parties . . . .

*See* Non-Physician Provider Settlement Agreement at 17-18 and Physician Provider Settlement Agreement at 22 (emphasis added). Because the terms of the respective settlement agreements prohibit the Provider Plaintiffs from filing these "Released Claims," we need to determine if the claims are "in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters" that was subject of the prior litigation.

As Defendant correctly points out, both Complaints assert RICO and antitrust claims based on a purported conspiracy in which CIGNA allegedly agreed with other health insurers to use a third-party database to determine the UCR. As in the MDL, Plaintiffs allege in their respective Complaints that the conspiracy enabled CIGNA and its purported Co-Conspirators to systematically under-compensate non-participating providers for medical services they rendered. Namely, Plaintiffs claim that CIGNA

and its Co-Conspirators rely on a database maintained by a third party, Ingenix, Inc., which Plaintiffs allege does not accurately or properly determine UCR:

> 241. In October 1998, the members of HIAA [Health Insurance Association of America] (including CIGNA) *agreed* to sell the PHCS to Ingenix for an undisclosed amount. This was part of a plan by Ingenix to acquire a dominant position in the market for the provision of date [sic] services used to calculate UCR that included over 50 acquisitions.
>
> 245. Ingenix, upon purchasing the PHCS, also entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (*i.e.*, Defendants and Co-Conspirators in this action) that had or would submit information for use in the database.
>
> 247. This chain of events serves to demonstrate how Defendants, through HIAA, *conspired and agreed* to create, expand, continue, promote and use the Ingenix Database to control and set UCR rates among and between CIGNA and its purported horizontal competitors with the ultimate aim of setting ONET [out-of-network] reimbursements at below-market levels.
>
> 264. CIGNA and its Co-Conspirators' scheme to manipulate UCR rates for the purpose of under-reimbursing for ONET is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from the Plaintiffs and their respective Classes. As a result, CIGNA and its Co-Conspirators actively conceal the true UCR rates from Provider and Subscriber Plaintiffs and their respective Classes, knowing the success of the scheme will be jeopardized if any one of them discloses the true UCR rates.
>
> 556. From at least June 3, 2003, CIGNA conspired with UHG, Ingenix and other Co-Conspirators to conduct or participate, directly or indirectly, in the conduct of the affairs of the CIGNA-Ingenix Enterprise, described above, through a pattern of racketeering activity as described above in violation of 18 U.S.C. § 1962(d). This *conspiracy* to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

*See Franco* Complaint ¶¶ 241, 245, 247, 264, and 556; *see also* PMSC Complaint ¶¶ 21, 73-77, 82, and 175.

Clearly, a careful analysis of the allegations raised in both the *Franco* and PMSC Complaints suggests that RICO and antitrust claims clearly fall under the scope

of Released Claims under both the Physician and Non-Physician Final Approval Orders because they all relate to CIGNA's conspiracy to systematically under-compensate the non-participating providers. Furthermore, all of Plaintiffs' RICO and antitrust claims are based on allegations that CIGNA "conspired with, aided and abetted, or otherwise acted in concert with other managed care organizations, other heath insurance companies, and/or other third parties" to underpay reimbursements due to non-participating providers.

Plaintiffs essentially do not dispute that their claims are "related to" or "based on" the "facts, acts, events, transactions, occurrences" that were subject of the MDL. Citing to the above quoted language of the Settlement Agreements, however, Plaintiffs argue that the RICO and anti-trust claims did not "arise prior to Final Approval [Orders]" were issued by the Court. According to Plaintiffs, because both Complaints allege a continuing antitrust conspiracy, a separate cause of action arises each time the plaintiff is injured. Therefore, because Plaintiffs' claims are only for injuries that occurred after their respective Final Approval Dates, those claims did not arise until after that Date, and no injunction is warranted. Likewise, under the "separate accrual" doctrine, a separate RICO claim accrues separately for each new and independent injury to his business or property caused by violation of RICO. In turn, because Plaintiffs did not suffer compensable injury from CIGNA's commission of the predicate acts alleged in both Complaints before the Final Approval Dates, these RICO claims did not accrue until after the Final Approval Dates. Therefore, these claims were not released by the settlement agreements in the MDL Litigation.

We, however, disagree and find these arguments to be totally misplaced as they

ignore the material terms of the broad release language found in the MDL Settlement Agreements.

In support of their arguments, Plaintiffs rely on two tolling principles; the "continuing violation" and "separate accrual" doctrines. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statue of limitations runs from the commission of the act."); *Pilkington v. United Airlines*, 112 F.3d 1532, 1535 (11th Cir. 1997) ("[U]nder the accrual rule announced by this court in *Bivens*, a new RICO claim would begin to accrue when the plaintiffs knew, or should have known, about a new and independent injury and that the new and independent injury was the result of a pattern of racketeering activity."). But contrary to Plaintiffs' contention, these doctrines only pertain to the tolling of statute of limitations for both RICO and antitrust claims and are clearly inapplicable to the current analysis. In other words, whether a plaintiff filed a given action within the required statutory period is a wholly different and unrelated question from whether a plaintiff contractually released his right to bring a given claim at all.

Plaintiffs do not dispute that they were aware well before entering into the two MDL Settlement Agreements about CIGNA's utilization of the Ingenix Database in order to allegedly engage in their industry-wide conspiracy to underpay providers. Instead of opting out of the Class and deciding to pursue their claims individually, the

Provider Plaintiffs decided to agree to broadly release their claims. In exchange, Provider Plaintiffs received substantial payments from CIGNA and changes to its business practices on a prospective basis. These measures were expected to cost CIGNA over eight hundred million dollars. *See* Physician Settlement Agreement § 7.31 and Non-Physician Settlement Agreement § 7.31. If it is Plaintiffs' position that CIGNA has not complied with any of the terms of the settlement agreements, Plaintiffs have at their disposal both agreements' very detailed and specific enforcement mechanisms. *See* Physician Settlement Agreement § 15 and Non-Physician Settlement Agreement § 15. Plaintiffs may not, however, get another bite at a very devoured apple if they are not happy with consideration they received in exchange for their broad release.

The fact that both Complaints expressly state that "Provider Plaintiffs do not include any claim of any kind based on services rendered to CIGNA members" prior to the effective dates of the respective Settlement Agreements does not alter our conclusion. Rather, taken as a whole, the allegations listed in both Complaints clearly relate to the alleged conspiracy of CIGNA and other managed care institutions to underpay providers for their services. Therefore, as we previously stated, claims based on such allegations fall within the scope of the Released Claims under both Settlement Agreements.

A recent antitrust case arising in a different factual context illustrates the point. In *Madison Square Garden, L.P. v. National Hockey League*, No. 07-CV-8455(LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008), the court barred antitrust claims that plaintiff argued arose from post-Release conduct. In that case, the owner of the New

York Rangers professional hockey club claimed that the National Hockey League had become an illegal cartel that prevented members clubs from competing for sponsors and fans.  The court dismissed a large portion of plaintiff's case against the league because it found the claims to be barred by a 2005 consent agreement in which the company promised not to sue the NHL or related entities for antitrust violations.  The Release in that case provided that MSG "forever releases and discharges" the league "from any and all claims . . . upon any legal or equitable theory" which "exist as of the date of execution . . . relating to, or arising from, any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game . . . ."  *Id*. at *6.  The court found that although the MSG allegations characterized its claims as being based on post-Release conduct, the Complaint itself contained no allegations of post-2005 conduct apart from (1) the enforcement of pre-existing policies and (2) the 2006 extension of the licensing agreement that had been in place since 1994.  *Id*.  The court reasoned that "because this very antitrust 'claim' 'exist[ed]' at the time of the release, and because the only allegations in the Complaint demonstrate[d] that the League continued its enforcement of pre-existing policies," it had "little trouble concluding that the Release evidence[d] that the 'parties had in mind a general settlement of all accounts up to that time.'" *Id*.

Lastly, Plaintiffs contend that CIGNA seeks to use a general release to bar prospectively a private antitrust action arising from subsequent antitrust violations.  On its face, however, the Release does not attempt to release claims for future violations; it expressly discharges only the claims that Plaintiffs may have against

CIGNA "or could have been asserted by or on behalf of any or all Class Members" against CIGNA "which arise prior to Final Approval" of the respective Settlement Agreements. In other words, the Release only applies to claims that relate to the course of conduct that originated before the date of Final Approval by the Court of the Settlement Agreements. In no way does the Release immunize CIGNA from liability against new RICO or antitrust violations that arise from a brand new set of events and course of conduct than the one settled in the MDL Litigation. The Release in the present case is different, for example, from the release in *Lawlor v. Nat'l Chrysler-Plymouth, Inc.*, 349 U.S. 322 (1955), where the Supreme Court refused to give a previous settlement agreement *res judicata* effect when it would have forever extinguished the plaintiffs' future antitrust claims for *disparate types of anti-competitive conduct* that were not contemplated by the parties' settlement in the earlier antitrust litigation. *Id.* at 324-28; *see also Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F. Supp. 1019, 1021-23 (S.D. Tex. 1972) (release could "not bar the assertion . . . of any post-release causes of actions" challenging "renewed monopolistic activities by the defendants" but also noting that "[n]o one would reasonably expect the consequences of pre-release conduct to cease as of the day of the release, and such damages must certainly have been contemplated by the parties.").

The problem that Plaintiffs have in this case is that the claims at issue being prosecuted in Indiana and New Jersey are based on conspiratorial conduct and "chain of events" that took place long before the execution and approval of these settlement agreements. A different result must thus follow here. As Judge Preska points out in

her *National Hockey League* decision, considerable caselaw stands for the proposition that public policy considerations differ when the only "prospective" application of the release in question is the continued adherence to a pre-release restraint on trade. *See also MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (taking a functional approach to the question of enforceability, the court found that the conduct "clearly based" on pre-release conduct and thus enforced the release, while acknowledging that "new, post-release agreement" in restraint of trade may be actionable, but mere "continued adherence" to an alleged pre-released agreement" in restraint of trade could not give rise to a viable claim); *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479, U.S. Dist. LEXIS 10906, at *19-21 (N.D.N.Y. Mar. 11, 1999) (release barred a claim challenging ongoing practices that had "not been altered materially since the parties executed [a release]"); *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (enforcing a release of an antitrust claim because "all of the harm alleged *flows from and is related to the terms of conditions* [of the relese]" and was merely the "continuing effect" of pre-release conduct) (emphasis added).

Furthermore, public policy strongly favors the pretrial settlement of class action lawsuits. MDL complex class action litigation, like the *In re Managed Care Litig.*, "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992). "The Southern District of Florida has made it clear that public policy strongly favors the enforcement of settlement

agreement in all types of litigation." *Baratta v. Homeland Housewares, LLC*, No. 05-cv-0187, 2007 WL 2668585, at *2-3 (S.D. Fla. June 14, 2007) (citing *Sea-Land Serv., Inc. v. Sellan*, 64 F. Supp. 2d 1255, 1259 (S.D. Fla. 1999)). Accordingly, any "consideration[] of a settlement agreement must commence with an understanding that compromise of disputed claims is favored by the Court and will be enforced if at all possible." *Id.* (citing *Reed By & Reed Through Reed v. United States*, 717 F. Supp. 1511, 1515 (S.D. Fla. 1988); *Cia Anon Venezolana de Navegacion v. Harris*, 374 F.2d 33, 35 (5th Cir. 1967)).

Therefore, we conclude that, because Provider Plaintiffs' RICO and antitrust claims in *Franco* and PMSC Complaints are related to claims settled by the Settlement Agreements that arose prior to the entry of this Court's Final Approval Orders, they are Released Claims and Plaintiffs should be enjoined from prosecuting them in the New Jersey and Indiana Courts.

### III.   CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that:

1. CIGNA's Motion to Enforce Injunction Against Susan J. Shring, LCSW [D.E. 5972] should be **GRANTED**.

2. CIGNA's Motion to Enforce Injunction Against the American Medical Association, *et al.* [D.E. 5974] should be **GRANTED**.

3. CIGNA's Motion to Enforce Injunction Against Brian Mullins, M.S., P.T., *et al.* [D.E. 6006] should be **GRANTED**.

4. Plaintiffs the American Medical Association, Medical Society of New Jersey, Medical Society of the State of New York, Connecticut State Medical Society,

Texas Medical Association, North Carolina Medical Society, Tennessee Medical Association, California Medical Association, Medical Association of Georgia, Florida Medical Association, Washington State Medical Association, El Paso County Medical Society, American Podiatric Medical Association, New Jersey Psychological Association, as well as Maldonado Medical LLC and individual doctors James N. Gardner, M.D., Darrick E. Antell. M.D., Brian Mullins, M.S., P.T. and Carmen Kavali, M.D. should have twenty (20) days from the date of the Court's final Order to withdraw the following counts from the *Franco* Class Action Complaint:

(a) Count VIII(B) - Violations of RICO - as much as this claim is brought on behalf of the Provider/Association Plaintiffs.

(b) Count IX(B) - Violations of RICO Based on Violations of Section 664 - as much as this claim is brought on behalf of the Provider/Association Plaintiffs.

(c) Count X - Declaratory and Injunctive Relief under RICO - as much as this claim is brought on behalf of the Provider/Association Plaintiffs.

(d) Count XI - Violations of RICO - as much as this claim is brought on behalf of the Provider/Association Plaintiffs.

(e) Count XII - Violations of Section One of the Sherman Act - as much as this claim is brought on behalf of the Provider/Association Plaintiffs.

5. Plaintiff Pain Management & Surgery Center of Southern Indiana, Inc. should have twenty (20) days from the date of the Court's final Order to withdraw the

following counts from its Indiana Class Action Complaint:

      (a)    Count IV - Violations of RICO 18 U.S.C. 1961(c).

      (b)    Count V - Violations of Section 664 of RICO.

      (c)    Count VI - Declaratory and Injunctive Relief Under RICO.

      (d)    Count VII - Violations of Section One of the Sherman Act.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of November, 2009.

                        */s/ Edwin G. Torres*
                        EDWIN G. TORRES
                        United States Magistrate Judge