UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-MD-1334-MORENO

KATHY TISKO, P.T., *et al.*,

    Plaintiffs,

vs.

CIGNA CORP., *et al.*,

    Defendants,

_____/

**REPORT AND RECOMMENDATION ON SETTLING
DEFENDANT CIGNA'S MOTION TO ENFORCE INJUNCTION**

    This matter is before the Court on Settling Defendant CIGNA Heath Care's ("CIGNA") Motion to Enforce Injunction Against Stephanie Higashi, D.C. [D.E. 6000], The Court has considered the motion, the response, the reply, and the pertinent portions of the record. For the reasons discussed below, this Court recommends that CIGNA's motion should be Granted.

    **I.    BACKGROUND**

    On April 17, 2000, the Judicial Panel on Multidistrict Litigation ("MDL Panel") ordered the creation of *In re Managed Care Litigation*, Case No. 1:00-MDL-1334. This MDL case concerned, among other things, reimbursement for health care services by managed care companies and was divided into two tracks: one involving broad claims by health care providers and the other involving broad claims by subscribers to health

care plans. The provider track was a class action brought on behalf of all providers who submitted claims to health care companies, including CIGNA, for the provision of medical services. This class included both physicians and non-physician health care providers, as well as providers with contracts with CIGNA and those without contracts.

The providers alleged that health insurance companies engaged in a conspiracy to inflate profits by systematically denying, delaying, and diminishing payments due to them. The HMOs allegedly effected this scheme through the manipulation of computerized billing programs. Throughout the pendency of this complex class-action litigation, settlements have been reached between numerous providers and several of the insurers. On December 9, 2004, CIGNA reached a settlement agreement with the non-physician health care providers ("Non-Physician Provider Settlement Agreement"), which the Court approved on April 26, 2005[1] [D.E. 3988].

The Final Approval Order enjoined class members from filing new lawsuits in which "Released Claims" are asserted against "Released Parties:"

> The Releasing Parties are permanently enjoined from: (a) filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise) or receiving any benefits from any lawsuit, administrative or regulatory proceeding or order in any jurisdiction based on any or all Released Claims against one or more Released Persons, and (b) instituting, organizing class members in, joining with class members in, amending a pleading in or soliciting the participation of class members in, any action, including but not limited to a purported class

---

[1] The Final Approval Order of the Non-Physician Provider Settlement Agreement was issued on April 26, 2005, but "Final Approval" as defined in the Settlement Agreement did not occur until May 27, 2005, when time to appeal to the Court of Appeals had expired. *See* Non-Physician Provider Settlement Agreement § 1.47 [D.E. 5973-2]; and *In re Managed Care Litigation*, Case No. 1:00-MDL-1334, Order Approving Settlement Among Cigna Healthcare and Healthcare Providers [D.E. 3988].

>   action, in any court against one or more Released Persons based on, involving, or incorporating, directly or indirectly, any or all Released Claims.

*See* Final Approval Order at 11 [D.E. 3988].[2]

On June 17, 2009, Plaintiff Stephanie Higashi, D.C. filed a class action complaint against CIGNA entities in the Central District of California asserting two causes of action: (i) claim for violations of RICO; and (ii) claim for violation of § 1 of the Sherman Antitrust Act. *See* California Class Action Complaint ¶¶ 1532-244 [D.E. 6001-2] ("California Action," "California Complaint" or "Complaint").

Both causes of action in the California Action stem from CIGNA's alleged failure to reimburse the non-participating providers the contractually obligated "usual, customary and reasonable" ("UCR") amount for the services rendered by them. *See id.* ¶ 1, 4. According to the Complaint, CIGNA allegedly utilized database called Ingenix in order to calculate the inaccurate and improper UCR amounts due to Plaintiff. The allegations further state that CIGNA used and continues to use the Ingenix database as the primary source of data upon which it bases its UCR determinations, even though CIGNA knows that it cannot and should not be used for that purpose. *See id.* ¶ 18, 32-33. The Complaint also alleges that CIGNA committed, and conspired to commit, with its direct competitors numerous violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* These antitrust violations allegedly stem from CIGNA's price-fixing with regard to paying reasonable and customary rate for non-party transactions

---

[2] The Eleventh Circuit has affirmed our previous orders enforcing such settlement agreements as this one entered in the MDL. *See, e.g.*, *Thomas v. Blue Cross and Blue Shield Ass'n*, No. 08-15395, 2009 WL 1483522 (11th Cir. May 28, 2009); *Klay v. All Defendants*, No. 08-12906, 2009 WL 179617 (11th Cir. Jan. 27, 2009).

and from manipulating the Data Market in order to create below-market UCRs.

In light of the Final Approval Order and the undisputed fact that Dr. Higashi did not opt out of the class, CIGNA moves this Court to enforce the injunction against the California Plaintiff and compel withdrawal of the California Complaint. CIGNA argues that the RICO and antitrust causes of action asserted in the California Complaint arose prior to the date of the Final Approval Order and are, therefore, barred by the settlement agreements. Plaintiff responded to the pending motion opposing the enforcement of the judgment. Plaintiff contends that the RICO and antitrust claims are not Released Claims because they arose after the MDL settlement was final. Namely, Plaintiff argues that because the California Complaint alleges a series of new injuries occurring after the effective date of the Final Approval Order, the alleged antitrust and RICO violations arose only after 2005 and were not released by the settlement. Plaintiff also contends that she is a non-party to the Release because the Class Settlement Notice did not provide her and other Class Members with "a truly meaningful opportunity to opt out."

## II.   ANALYSIS

The language of the Court's Final Approval Orders clearly prohibits Class members from initiating lawsuits against Released Parties for any claims released by the Settlement. This Court, therefore, must grant Settling Defendant's motions if three conditions exist: (i) Plaintiff is a class member; (ii) CIGNA is a Released Party under the Settlement; and (iii) the claims at issue in the California Complaint are Released Claims.

### A. *Plaintiff is a Class Member*

The Final Approval Order of the Non-Physician Provider Settlement Agreement permanently certified a settlement class composed of the following members:

> "Class" means any and all Heathcare Providers, Healthcare Provider Groups and Healthcare Provider Organizations (and all Persons claiming by or through them) who or which provided Covered Services to any CIGNA HealthCare Member or any individual enrolled in or covered by a plan offered or administered by any Persons named as defendants in the *Knecht* Action and *Solomon* Action or by any of their respective current or former Subsidiaries from January 1, 1990 through the date of the entry of the Preliminary Approval Order . . . .

*See* Final Approval Order of the Non-Physician Provider Settlement Agreement at 6. It is undisputed that Plaintiff did not opt out of the settlement, and is therefore a class member bound by the terms of the Final Approval Order.

Plaintiff, however, contends that she is a non-party to the Settlement Agreement because the Class Settlement Notice did not provide her and other Class Members with "a truly meaningful opportunity to opt out, in violation of Due Process." *See* Pl.'s Mem. in Opp'n to Def.'s Mot. to Enforce Inj. at 6. Plaintiff points out that the Class Notice indicated that "the gravemen" of the MDL were determinations of "medical necessity," rather than UCR "reasonableness." Therefore, according to Plaintiff, the Class Members had insufficient notice that their claims based on UCR "reasonableness" calculations were within the scope of the MDL litigation. *Id.* at 8.

"[C]lass actions, as other cases, are subject to the requirements of due process." *Twigg v. Sears & Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998). "The essence of due process is that deprivation of life, liberty, or property by adjudication by preceded by notice and opportunity for a hearing appropriate to the nature of the case."

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1103 (5th Cir. 1977). Therefore, the notice sent to class members must inform them, *inter alia*, whether "claims like [theirs] were litigated in the [earlier] action. *Twigg*, 153, F.3d at 1228. In addition, the class members' "substantive claims must be adequately described [and] the notice must also contain information reasonably necessary to make a decision to remain a class members and be bound by the final judgment." *Nissan*, 552 F.2d at 1104-05.

After a careful review of the Notice of Proposed Settlement of Class Action Among CIGNA Healthcare and Certain Healthcare Providers, we find that the notice sufficiently informed the Class Members that their claims based on "reasonableness" calculations of the UCRs were within the scope of the settlement. Contrary to Plaintiff's assertion, the Notice explicitly stated that the litigation concerned, in part, CIGNA's determination of "payments due to non-Participating Healthcare Providers based on usual and customary rates." Therefore, we find that the notice provided Plaintiff with adequate information to put her on alert that her claims based on improper UCR calculations would be bound by the settlement. Furthermore, in *Klay v. Cook, et al.*, 295 Fed. Appx. 956 (11th Cir. 2008) (per curiam), the Eleventh Circuit affirmed enforcement of our injunction against a practitioner of chiropractic medicine and held that notice of the Settlement Agreement "amply satisfied the requirements of due process."

### B. *Defendant is a Released Party*

It is also undisputed that the Final Approval Order includes CIGNA as a Released Party.

### C. *Plaintiff's RICO and Antitrust Claims are Released Claims*

A litigation release of claims is a contract, thus it is construed according to the normal rules of contract interpretation. *See, e.g., V & M Erectors, Inc. v. Middlesex Corp.*, 867 So. 2d 1252, 1253-54 (Fla. 4th DCA 2004). When interpreting a contract under Florida law,[3] the Court is guided first by the language of the documents itself. *See Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. 4th DCA 2003). Where the terms of a contract are clear and unambiguous, the Court may not consider parol evidence but instead must determine the intent of the parties from the four corners of the document. *Id*. Furthermore, when the terms are unambiguous, the language itself is the best evidence of the parties' intent and its plain meaning controls. *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. 3d DCA 1989).

The language of the Court's Final Approval Order and the Settlement Agreement clearly prohibits Class members from initiating claims against "Released Parties" which arise out of "or in any way [are] related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referred to in the litigation." *See* Non-Physician Final Approval Order at 8-9. The Settlement Agreement defines "Released Claims" as:

> any and all claims that have been or could have been asserted by or on

---

[3]   The Settlement Agreement contains a Florida Choice-of-Law provision. *See* Non-Physician Provider Settlement Agreement at 107 [D.E. 5973-2].

> behalf of any or all Class Members against the Released Persons, or any of them, and which arise prior to Final Approval by reason of, arising out of, or *in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referred to in the Litigation*, except as otherwise provided for by this Agreement.  This includes, without limitation and as to Released Persons only, any aspect of any Fee for Service Claim submitted by any Class Member to CIGNA HealthCare, and claims *based upon a capitation agreement with CIGNA HealthCare, and any allegations that Defendants and/or CIGNA HeathCare have conspired with, aided and abetted, or otherwise acted in concert with other managed care organizations, other heath insurance companies, and/or other third parties with regard to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referred to in the Litigation* or with regard to CIGNA HealthCare's liability for any other demands for payment submitted by any Class member to such other managed care organizations, health insurance companies, and/or third parties . . . .

*See* Non-Physician Provider Settlement Agreement at 17-18 (emphasis added). Because the terms of the settlement agreement prohibit the Provider Plaintiffs from filing these "Released Claims," we need to determine if the claims are "in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters" that was subject of the prior litigation.

As Defendant correctly points out, the California Complaint asserts RICO and antitrust claims based on a purported conspiracy in which CIGNA allegedly agreed with other health insurers to use a third-party database to determine the UCR. As in the MDL, Plaintiff alleges in her California Complaint that the conspiracy enabled CIGNA and its purported co-conspirators to systematically under-compensate non-participating providers for medical services they rendered. Namely, Plaintiff claims that CIGNA and its Co-Conspirators rely on a database maintained by a third party,

Ingenix, Inc., which Plaintiff alleges does not accurately or properly determine UCR:

> 70. In addition to using the Ingenix Databases for making UCR determinations despite knowing that they are invalid for that purpose, CIGNA also affirmatively manipulates the data it contributes to Ingenix so as to further ensure that the Ingenix Databases reported invalid and unreasonably low charges.
>
> 106. The antitrust claim concerns a *conspiracy* between CIGNA, Ingenix and the largest health insurers in America to use the Ingenix database to depress reimbursements for out of network services to plan members. This *conspiracy* used the tremendous collective market power of Ingenix and the insurance companies that contribute data to Ingenix. This *conspiracy* has fixed the prices for such reimbursements and resulted in significant financial damages to the members of the class.
>
> 107. Other health insurance companies, not named as defendants, have participated in the alleged *unlawful conspiratorial activity* of federal and state law. Such violations include, *inter alia*, knowingly providing flawed and misleading data to Ingenix for use in determining UCR rates; knowingly acquiescing to flawed and improper manipulation of data provided by Ingenix; and knowingly using artificially low UCR rates produced by Ingenix in determining reimbursements for ONS.
>
> 114. Defendants and their co-conspirators have ample opportunities to communicate among themselves concerning the *conspiracy alleged herein*, including the collection and dissemination of data used to establish the UCR rates for calculating reimbursement of ONS.
>
> 122. To create the Ingenix Database, Ingenix collects and compiles billed charge data contributed by health insurers who are horizontal competitors, including CIGNA, United Health and others. Thus, the discretion for determining UCR rates was by the end of 1998, in the hands of Ingenix. This concentration facilitated the industry-wide collection of claims data from United Health, CIGNA and their co-conspirators into Ingenix and further facilitated the dissemination of artificially law UCR rates used in ONS reimbursements. CIGNA and United Health, as well as their co-conspirators, are significant contributors of data to Ingenix.
>
> 134. At all relevant times, and as described in this Complaint, CIGNA carried out its underpayment scheme to CIGNA Members in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of CIGNA and Ingenix (the

"CIGNA-Ingenix Enterprise" or the "Enterprise").

*See* California Complaint ¶¶ 70, 106-07, 114, 122 and 134 (emphasis added).

Clearly, a careful analysis of the allegations raised in the California Complaint suggests that RICO and antitrust claims clearly fall under the scope of Released Claims under the Non-Physician Final Approval Order because they all relate to CIGNA's conspiracy to systematically under-compensate the non-participating providers. Furthermore, all of Plaintiff's RICO and antitrust claims are based on allegations that CIGNA "conspired with, aided and abetted, or otherwise acted in concert with other managed care organizations, other heath insurance companies, and/or other third parties" to underpay reimbursements due to non-participating providers.

Plaintiff essentially does not dispute that her claims are "related to" or "based on" the "facts, acts, events, transactions, occurrences" that were subject of the MDL. Citing to the above quoted language of the Settlement Agreement, however, Plaintiff argues that the RICO and anti-trust claims did not "arise prior to Final Approval [Order]" was issued by the Court. According to Plaintiff, because the California Complaint alleges a continuing antitrust conspiracy, a separate cause of action arises each time the plaintiff is injured. Therefore, because Plaintiff's claims are only for injuries that occurred after the Final Approval Date, these claims did not arise until after that Date, and no injunction is warranted. Likewise, under the "separate accrual" doctrine, a separate RICO claim accrues separately for each new and independent injury to his business or property caused by violation of RICO. In turn,

because Plaintiff did not suffer compensable injury from CIGNA's commission of the predicate acts alleged in the California Complaint before the Final Approval Date, RICO claims did not accrue until after the Final Approval Date. Therefore, these claims were not released by the settlement agreement in the MDL Litigation.

We, however, disagree and find Plaintiff's arguments to be misplaced because they ignore the material terms of the broad release language found in the MDL Settlement Agreement.

In support of her arguments, Plaintiff relies on two tolling principles; the "continuing violation" and "separate accrual" doctrines. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statue of limitations runs from the commission of the act."); *Pilkington v. United Airlines*, 112 F.3d 1532, 1535 (11th Cir. 1997) ("[U]nder the accrual rule announced by this court in *Bivens*, a new RICO claim would begin to accrue when the plaintiffs knew, or should have known, about a new and independent injury and that the new and independent injury was the result of a pattern of racketeering activity."). But contrary to Plaintiff's contention, these doctrines only pertain to the tolling of statute of limitations for both RICO and antitrust claims and are clearly inapplicable to the current analysis. In other words, whether a plaintiff filed a given action within the required statutory period is a wholly

different and unrelated question from whether a plaintiff contractually released his right to bring a given claim at all.

Plaintiff does not dispute that she was aware well before entering into the MDL Settlement Agreement about CIGNA's utilization of the Ingenix Database in order to allegedly engage in its industry-wide conspiracy to underpay providers. Instead of opting out of the Class and deciding to pursue their claims individually, the majority of the Provider Plaintiffs, such as Dr. Higashi, decided to agree to broadly release their claims. In exchange, Provider Plaintiffs received substantial payments from CIGNA and changes to its business practices on a prospective basis. These measures were expected to cost CIGNA over four hundred million dollars. *See* Non-Physician Settlement Agreement § 7.31. If it is Plaintiff's position that CIGNA has not complied with any of the terms of the settlement agreement, Plaintiff has at her disposal agreement's very detailed and specific enforcement mechanism. *See* Non-Physician Settlement Agreement § 15. Plaintiff may not, however, get another bite at a very devoured apple if she is not happy with consideration she received in exchange for her broad release.

The fact that the California Complaint defines the Plaintiff Class as one commencing from January 1, 2005 through the present, thus expressly covering only those services that Provider Plaintiffs rendered after the Date of the Final Approval Order, does not change our analysis. Rather, taken as a whole, the allegations listed in the Complaint clearly relate to the alleged conspiracy of CIGNA and other managed care institutions to underpay providers for their services.

A recent antitrust case arising in a different factual context illustrates the point. In *Madison Square Garden, L.P. v. National Hockey League*, No. 07-CV-8455(LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008), the court barred antitrust claims that plaintiff argued arose from post-Release conduct. In that case, the owner of the New York Rangers professional hockey club claimed that the National Hockey League had become an illegal cartel that prevented members clubs from competing for sponsors and fans. The court dismissed a large portion of plaintiff's case against the league because it found the claims to be barred by a 2005 consent agreement in which the company promised not to sue the NHL or related entities for antitrust violations. The Release in that case provided that MSG "forever releases and discharges" the league "from any and all claims . . . upon any legal or equitable theory" which "exist as of the date of execution . . . relating to, or arising from, any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game . . . ." *Id*. at *6. The court found that although the MSG allegations characterized its claims as being based on post-Release conduct, the Complaint itself contained no allegations of post-2005 conduct apart from (1) the enforcement of pre-existing policies and (2) the 2006 extension of the licensing agreement that had been in place since 1994. *Id*. The court reasoned that "because this very antitrust 'claim' 'exist[ed]' at the time of the release, and because the only allegations in the Complaint demonstrate[d] that the League continued its enforcement of pre-existing policies," it had "little trouble concluding that the Release evidence[d] that the 'parties had in mind a general settlement of all accounts up to that

time.'" *Id*.

Here, the Release in question does not bar prospectively a private antitrust action arising from subsequent antitrust violations. In other words, the Release does not attempt to release claims for future violations; it expressly discharges only the claims that Plaintiffs may have against CIGNA "or could have been asserted by or on behalf of any or all Class Members" against CIGNA "which arise prior to Final Approval" of the respective Settlement Agreements. Therefore, the Release only applies to claims that relate to the course of conduct that originated before the date of Final Approval by the Court of the Settlement Agreements. In no way does the Release immunize CIGNA from liability against new RICO or antitrust violations that arise from a brand new set of events and course of conduct than the one settled in the MDL Litigation. The Release in the present case is different, for example, from the release in *Lawlor v. Nat'l Chrysler-Plymouth, Inc.*, 349 U.S. 322 (1955), where the Supreme Court refused to give a previous settlement agreement *res judicata* effect when it would have forever extinguished the plaintiffs' future antitrust claims for *disparate types of anti-competitive conduct* that were not contemplated by the parties' settlement in the earlier antitrust litigation. *Id*. at 324-28; *see also Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F. Supp. 1019, 1021-23 (S.D. Tex. 1972) (release could "not bar the assertion . . . of any post-release causes of actions" challenging "renewed monopolistic activities by the defendants" but also noting that "[n]o one would reasonably expect the consequences of pre-release conduct to cease as of the day of the release, and such damages must certainly have been contemplated by

the parties.").

The problem that Plaintiff has in this case is that the claims at issue being prosecuted in California are based on conspiratorial conduct and a "chain of events" that took place long before the execution and approval of the settlement agreement. A different result must thus follow here. As Judge Preska points out in her *National Hockey League* decision, considerable caselaw stands for the proposition that public policy considerations differ when the only "prospective" application of the release in question is the continued adherence to a pre-release restraint on trade. *See also MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (taking a functional approach to the question of enforceability, the court found that the conduct "clearly based" on pre-release conduct and thus enforced the release, while acknowledging that "new, post-release agreement" in restraint of trade may be actionable, but mere "continued adherence" to an alleged pre-released agreement" in restraint of trade could not give rise to a viable claim); *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479, U.S. Dist. LEXIS 10906, at *19-21 (N.D.N.Y. Mar. 11, 1999) (release barred a claim challenging ongoing practices that had "not been altered materially since the parties executed [a release]"); *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (enforcing a release of an antitrust claim because "all of the harm alleged *flows from and is related to the terms of conditions* [of the relese]" and was merely the "continuing effect" of pre-release conduct) (emphasis added).

Furthermore, public policy strongly favors the pretrial settlement of class action lawsuits. MDL complex class action litigation, like the *In re Managed Care Litig.*, "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992). "The Southern District of Florida has made it clear that public policy strongly favors the enforcement of settlement agreement in all types of litigation." *Baratta v. Homeland Housewares, LLC*, No. 05-cv-0187, 2007 WL 2668585, at *2-3 (S.D. Fla. June 14, 2007) (citing *Sea-Land Serv., Inc. v. Sellan*, 64 F. Supp. 2d 1255, 1259 (S.D. Fla. 1999)). Accordingly, any "consideration[] of a settlement agreement must commence with an understanding that compromise of disputed claims is favored by the Court and will be enforced if at all possible." *Id.* (citing *Reed By & Reed Through Reed v. United States*, 717 F. Supp. 1511, 1515 (S.D. Fla. 1988); *Cia Anon Venezolana de Navegacion v. Harris*, 374 F.2d 33, 35 (5th Cir. 1967)).

Therefore, as we previously stated, claims based on such allegations fall within the scope of the Released Claims under both Settlement Agreements.

### III.   CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that:

1.   Settling Defendant CIGNA's Motion to Enforce Injunction Against Stephanie Higashi, D.C. be **GRANTED**.

2.   Plaintiff Stephanie Higashi, D.C. should have twenty (20) days from the date of the Court's final Order to withdraw the California Complaint.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of November, 2009.

>    */s/ Edwin G. Torres*
>    EDWIN G. TORRES
>    United States Magistrate Judge