**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Master File No.: 00-1334-MD-MORENO-O'SULLIVAN**

**MDL NO.: 1334**

**IN RE: MANAGED CARE LITIGATION**

_____

**MOTION TO ENFORCE SETTLEMENT AGREEMENT**
**AND TO COMPEL AN ACCOUNTING**

Cigna Healthcare ("CIGNA") as a party to this MDL proceeding and a party to the Settlement Agreement with the Class members, moves to enforce the class action settlement agreement approved by this Court at Docket Entry 2900 (the "Settlement Agreement"), and to compel Managed Care Advisory Group, LLC ("MCAG") to provide an accounting for all funds MCAG received from CIGNA for distribution to class members pursuant to the Settlement Agreement. This Court has enforced this settlement agreement many times and must do so now.

## <u>INTRODUCTION</u>

In 2004, this Court approved a comprehensive class settlement agreement that (in part) called for a claim review process and cash payments to a class of medical providers who were CIGNA's customers. In 2005, CIGNA, began making those class settlement payments, which were received by MCAG, purportedly as an agent of class members, for prompt distribution to the class members. CIGNA has paid $25 million to MCAG in class settlement funds since 2005. This Motion seeks an accounting of the receipt and disposition of those funds, based upon MCAG's admissions in sworn affidavits, pleadings, discovery responses, and in open Court. MCAG's position appears to be that it can do whatever it wants with the class settlement funds, without oversight from anybody, because MCAG argues that "there is no part of the agreement that discusses what MCAG should, or should not, do with the payment upon receipt." (MCAG Feb. 3, 2017 Brief in Arbitration, attached as **Exhibit 1**, p. 9).

In open Court on February 22, 2017, in response to the Court's question, "How much money is left, more or less?", MCAG admitted[1] that only approximately $4 million of the $25 million in class settlement funds remains.[2] However, MCAG claimed in a September 23, 2016 affidavit made under penalty of perjury that it had not distributed "any net payments to the class members". (Sep. 23, 2016 Aff. of D. Perry, MCAG CFO, attached as **Exhibit 2**, ¶ 11). Then, a few weeks later, MCAG claimed in an October 14, 2016 affidavit that, of the $25 million in class

---

[1] Per the rough transcript of the February 22, 2017 hearing. CIGNA will supplement this motion with the final transcript of the February 22, 2017 hearing as soon as that transcript is available.

[2] MCAG previously asserted a red herring argument that it has not received $25 million "in the arbitration". But, it is undisputed that MCAG received from CIGNA $25 million in class settlement funds. MCAG has stated in a sworn affidavit that it received $25 million in class settlement funds from CIGNA ($11 million prior to Arbitration, $14 million after the Arbitration commenced). (Ex. 3, Oct. 14, 2016 Aff. of D. Perry, ¶¶ 7-8). Further, CIGNA has tax records demonstrating that MCAG has received $25,505,196.96 in CIGNA class settlement funds since 2005.

settlement funds, MCAG distributed $11 million and was retaining the remaining $14 million for eventual distribution to the class members.  (Oct. 14, 2016 Aff. of D. Perry, MCAG CFO, attached as **Exhibit 3**, ¶¶ 7-8).  Yet, when addressing the Court on February 22nd, MCAG stated that $4 million remains for distribution, but MCAG deliberately did not state whether it had distributed the rest of the settlement funds.  That is the critical question:  *Why* is there only $4 million left, and *what happened* to the other $21 million?

Forgetting for a moment the inconsistency of what MCAG claims it did not distribute, and assuming it is true that MCAG distributed $11 million from the $25 million it received, then *that should leave $14 million (plus interest) for distribution to class members*.  But according to MCAG's latest representation to the Court, *only $4 million remains* — meaning that $10 million in class settlement funds has gone somewhere.  Of course, neither CIGNA nor this Court can take MCAG at its ever-changing word as to what happened to class action settlement funds. The purpose of this motion is to enforce the Settlement Agreement by finding out what happened to the settlement funds that class members should have received but did not.

The Settlement Agreement clearly and unequivocally required all approved claims to be paid to class members.  (Settlement Agreement, attached as **Exhibit 4**, p. 84) (funds established "for payment of claims to Class Members").  This Court's notice to class members of the class settlement advised all class members that they would be getting paid on approved claims. (Notice, attached as **Exhibit 5**, p. 6) ("Under the proposed settlement, CIGNA HealthCare will pay two separate types of compensation to members of the Class").  Now CIGNA and the Court are faced with the stark reality that only $4 million of the $25 million provided by CIGNA to MCAG is left for distribution. CIGNA is a party to the Settlement Agreement and has an absolute right to enforce its terms, including but not limited to the payment of class action settlement funds to class members – who are CIGNA's customers.  *See*, *e.g.*, *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 19 (D.D.C. 2010) ("The Settlement Agreement is unquestionably a contract. . . .  Individuals who are parties to a contract have standing to enforce the terms of that contract . . ..").

There is no reason to await any action by the Arbitrator, particularly because MCAG is attempting to prevent the Arbitrator from even considering the question of what happened to the class settlement funds.  This Court has a fiduciary obligation to protect absent class members,

which necessitates ordering an accounting with the underlying documents to determine what has happened to the unaccounted for class action settlement funds.

MCAG's admissions should spur this Court's action.  MCAG admits that it never distributed at least $14 million of the $25 million in class settlement funds that it received.[3] MCAG admits that it never even told the class members that CIGNA had paid their claims but that MCAG was keeping the money.  MCAG admits commingling the class settlement funds into its own operating accounts.  MCAG admits taking at least $1.8 million of those class settlement funds for itself and its partner.  MCAG admits not accounting for the class settlement funds or the interest on them.

Had a Settlement Agreement been presented to CIGNA and this Court that called for CIGNA to pay tens of millions of dollars to a non-party, that the non-party would not distribute those funds to the class members for over 11 years, that the non-party would take class settlement funds for its own benefit, that the class settlement funds would be commingled into the non-party's own business accounts, that the non-party would never account for this money or interest on it, and that the class members would never receive notice about any of this, then CIGNA never would have agreed to, and this Court never would have approved, that settlement.

This Court carefully approved the terms of this Settlement Agreement as fair and equitable to the Class.  This Court also approved notices to class members that advised the class members that they would be paid for all approved claims.  The expectations created by the Settlement Agreement and the class notice now have been eviscerated by MCAG's conduct, and a full and detailed accounting is the only manner in which the Court can enforce the Settlement Agreement and ensure that the promise to the Class Members will be realized.

## ARGUMENT

### I.     FACTUAL BACKGROUND

#### A.   *The Class Action and Settlement to Repair Relations with CIGNA Customers*

Starting in 1999, several class action lawsuits were filed by medical providers against managed care insurance companies alleging that the managed care companies improperly

---

[3] In prior in the Arbitration between CIGNA and MCAG, MCAG has admitted it never distributed any of the $25 million CIGNA paid as class settlement funds. (MCAG Opp. to Motion to Compel Accounting filed in Arbitration, attached as **Exhibit 6**, pp. 14-15).  But, at a minimum, there are $10 million in missing class settlement funds.

processed and rejected certain claims for payment. CIGNA was one of the many managed care companies named as a defendant in these actions. In 2000, these lawsuits were consolidated into MDL 1334 before this Court. The class of claimants (doctors) was represented by class counsel. MCAG was not a party, class member, or class counsel in any of the lawsuits consolidated into this MDL, or in the MDL itself.

After extensive litigation, the medical providers and CIGNA reached a comprehensive class action settlement on September 4, 2003. CIGNA did not admit liability. This Court approved the notice to the class, held a fairness hearing, certified the settlement class, and approved the Settlement Agreement that required any approved claims payments promptly go to class members. (Order dated Feb. 3, 2004, [D.E. 2900]). The Court retained jurisdiction for all matters relating to "the interpretation, administration, and consummation of the [Settlement] Agreement . . .." (*Id.* at 14).

The Settlement Agreement resolved the litigation, and CIGNA agreed to many monetary and non-monetary obligations. For a category of claims referred to as "Category 2 claims", the class members would submit their medical reimbursement claim(s) to CIGNA. If CIGNA determined that a medical reimbursement claim was payable, then CIGNA would pay the claim. If CIGNA determined that the claim was not payable, then the claim would be reviewed by an independent settlement administrator or medical claims reviewer (the "Reviewers"). The Reviewers would review these denied claims and make the final, independent adjudication as to whether or not the claims were payable. Once claims were deemed payable, CIGNA sent the money to the settlement administrator for distribution, and the class member was to receive this distribution promptly. (Ex. 4, Settlement Agreement, pp. 110-111). MCAG submitted hundreds of thousands of class members claims through this process, claiming to be an agent of the class members.6 For MCAG's purported "clients", if the claims were deemed payable under the Settlement Agreement, the settlement administrator then sent the class members' class settlement funds to MCAG for prompt distribution to the class members.

One significant reason CIGNA settled this otherwise very defensible matter is that the claimants were CIGNA's customers. CIGNA settled in part to mend relations with the physicians that are CIGNA's customer base. In doing so, CIGNA agreed to over 53 pages of prospective and remedial business measures, (Ex. 4, Settlement Agreement, pp. 30-83), which were estimated to have cost CIGNA $400 million (*id.* at 82). CIGNA also agreed to set up a

4

foundation to promote high quality health care and to contribute an initial $15 million to fund the foundation.  (*Id.* at 85).  CIGNA also agreed to pay the class counsel's fee separate from the compensation paid to class members, (*id.* at 130-31), and this Court approved a $55 million attorneys fee (Feb. 3, 2004 Order Approving Settlement, [D.E. 2900], pp. 11-12).

Of course, CIGNA also promised to pay the class members for their approved claims for reimbursement.  CIGNA paid millions to the class, including the $25 million in class settlement funds that CIGNA paid to MCAG since 2005 for distribution to the class members.  But, the class members have not been paid, and as discussed below, MCAG has not even informed the class that CIGNA has paid their claims.  So, the class members who CIGNA settled with in order to repair relations likely think that CIGNA has failed to pay their claims.

### B.   MCAG Appears in the MDL for the First Time and Arbitration Commences

Two years after the Settlement Agreement was reached, MCAG appeared in the MDL for the first time in a motion to enforce the settlement filed on behalf of class member Texas Children's Pediatric Associates.  ([D.E. 4330]).

In that Motion to Enforce Settlement, MCAG represented that it was appearing "on behalf of Texas Children's and the other Class Members MCAG represents . . ." (*id.* at 4), and sought requested the enforcement of the Settlement Agreement.  Before the MDL Court ruled, CIGNA and MCAG agreed to binding arbitration of that motion.  That Arbitration is still proceeding 11 years later.

### C.   The Known Facts of MCAG's Handling the Class Settlement Money

The full facts surrounding MCAG's handling of the class members' settlement money are known only to MCAG.  Only a detailed accounting with supporting documentation would reveal the truth of MCAG's handling of the class members' settlement money over the past 11 years – including determining how much of the settlement funds still remain and how MCAG utilized the settlement funds.  However, certain dispositive facts are undisputed.

CIGNA has paid MCAG over $25 million in class settlement funds, solely for distribution to the class members' for their payable claims.  (MCAG Opp. to Motion to Strike, [D.E. 6517], p. 17).  MCAG admits that it has not distributed to any class member any of the class settlement money that MCAG has obtained during the Arbitration since 2005.  (*Id.* at 16-17).  MCAG admits that it has not distributed at least $14 million from class members during the 11-year course of the Arbitration.  (*Id.* at 17).  This is despite MCAG's admission in open court

that it was bound to distribute the settlement funds to class members "shortly after receiving" it. (Dec. 16th Hrg. Tr., attached as **Exhibit 7**, 17:13-17).  Yet, MCAG told the Court on February 22, 2017 that only $4 million remains.

MCAG also admits that it took $1.8 million of the class members' settlement money for itself and its partner, Misys.  (MCAG Jan. 29, 2013 Interrogatory Responses, attached as **Exhibit 8**, p. 4).  MCAG took this "self-payment" despite failing to distribute anything to the class members.

MCAG admits that it commingled the class settlement funds into MCAG's own business operating accounts, where it could be used by MCAG as if it were its own money.  (MCAG Nov. 4, 2013 Supp. Interrogatory Responses, attached as **Exhibit 9**, pp. 2-3).

MCAG disclosed only two sparse bank records[4], and those few records show MCAG holding considerably less than the amount of class settlement funds that CIGNA paid.  In a prior dispute regarding MCAG's argument that CIGNA owed pre-judgment interest, MCAG produced a November 2005 bank account statement showing a balance of only $1.3 million.  (MCAG Jan. 29, 2013 Interrogatory Responses, attached as **Exhibit 8**, p. 13).  But, by that time, CIGNA had paid MCAG over $18 million in class settlement funds.   The only other bank statement that MCAG has produced (during the same pre-judgment interest dispute) was a January 2013 money market account statement showing a $5.7 million balance remaining.  (*Id.* at 15).  But, by that time, CIGNA had already paid MCAG over $22 million in class settlement funds.  The question remains:  if MCAG did not distribute the class settlement money to the class members and that money is not in MCAG's accounts, then what happened to those millions of class settlement dollars?  How much remains of the $25 million?

During the same pre-judgment interest dispute, MCAG also provided a self-made chart stating that MCAG has earned $863,570.71 in interest since 2005, on just a small portion of the settlement funds paid by CIGNA.  (MCAG Nov. 4, 2013 Supp. Interrogatory Responses, attached as **Exhibit 9**, p. 8).  However, that interest appears not to have been reinvested for the benefit of the class members, but instead removed from the account as it was earned.  (*Id.*).

---

[4] After receiving MCAG's two bank records in the Arbitration, CIGNA sought additional discovery about MCAG's disposition of settlement funds.  MCAG strenuously objected and CIGNA's request for discovery was denied by the Arbitrator based on MCAG's argument that the dispute in Arbitration at the time involved only the narrow issue of MCAG's argument regarding pre-judgment interest.

What happened to that interest?  What happened to all the interest that MCAG earned or should have earned for the class members' benefit on all $25 million over the course of 11 years?

MCAG admits that it has not told class members whose claims CIGNA paid that MCAG has been holding their money for over a decade.  (MCAG's Dec. 19, 2016 Answers to First Set of Interrogatories, attached as **Exhibit 10**,, p. 10).  CIGNA asked MCAG what notice it had given to class members whose claims CIGNA has paid, and MCAG responded only that "[n]otices were sent to individual class members when those class members were sent checks from money paid through the settlement . . .." (*Id.*) (emphasis added).  This obtuse response can only mean that *the class members who MCAG admits not paying, never even knew — and still do not know — that CIGNA paid their claims*.

MCAG admits that it has an obligation to account to the class members.  (Ex. 6, MCAG Opp. to Motion to Compel Accounting, filed in Arbitration, p. 2) ("MCAG has no obligation to provide an account of disbursements of class funds to anyone, *other than to the class members*.") (emphasis added).  But, MCAG steadfastly argues that it has no obligation to account to this Court for anything.  (MCAG Opp. to Motion to Strike, [D.E. 6517], pp. 12-13).  Nevertheless, it is undisputed that MCAG has not accounted to class members or anyone else for the $25 million in settlement funds and any interest that was earned on that money.

MCAG also does not dispute that its website communications to class members fail to mention that MCAG has received millions of dollars in class settlement funds.  To the contrary, MCAG's website implies that MCAG has not received any settlement funds, thus obfuscating the fact that MCAG has received millions in class settlement funds for the class members' benefit.  In 2012, MCAG's website posted an update about the CIGNA settlement that stated, "Although MCAG has been fighting for claims to be paid for the past 5 years, we are cautiously optimistic that there will be positive movement in the future."  (MCAG Website Archive, attached as **Exhibit 11**,).  By *that point, CIGNA had paid MCAG nearly $22 million for distribution to class members*, but MCAG did not tell the class members.  Even today, MCAG's website remains silent about CIGNA paying and MCAG receiving tens of millions in class settlement funds.  *See* https://www.mcaginc.com/services/cigna-settlement-management.

### D.  At Least $10 Million in Class Settlement Funds is Missing

MCAG's various admissions and pleadings reflect that *at least $10 million in class settlement funds is missing*.

7

MCAG received $25 million in class settlement funds from CIGNA since 2005.  MCAG initially stated that it had distributed none of those funds.  (Ex. 6, MCAG Opp. to Motion to Compel Accounting filed in Arbitration, pp. 14-15).  Then, in an October 14, 2016 affidavit, MCAG claimed that it has distributed to class members only $11 million:

> CIGNA paid **approximately $11 million** to MCAG prior to the Arbitration in connection with other types of claims.  **Those moneys were disbursed to class members.  The remaining $14 million has been paid in connection with this Arbitration**.  Based on the variability of potential payments on claims, that the Arbitration has not concluded, and that a lump sum settlement of remaining claims is possible, MCAG is appropriately **waiting until the conclusion of the Arbitration to disburse any net payments to the class members** in compliance with its contracts with the providers.

(Ex. 3. Oct. 14, 2016 Aff. of D. Perry, ¶¶ 7-8) (emphasis added).  MCAG has failed to provide any records of its alleged $11 million distribution.  But even taking MCAG at its word (which this Court should not), MCAG's claim that it distributed only $11 million of the total $25 million in settlement funds would leave $14 million to be distributed to class members.  But, MCAG's counsel admitted in open Court that only $4 million of the class settlement funds remains for distribution.  (February 22, 2017 Hearing Transcript to be provided when available).  That means at least $10 million in class settlement funds is missing that should have gone to class members, but apparently has not.  And, MCAG's changing story raises more questions that demand an accounting.

### E.  *MCAG Cannot Justify Failing to Distribute the Class Members' Money*

There is no legitimate justification for MCAG not to have distributed and accounted for the class members' settlement money to the class members.  MCAG's position appears to be that it can take class settlement funds for over a decade and do whatever it wants with them – pay itself, pay its partner, commingle them, retain any interest earned – and then pay the class members whatever is left at the end of the Arbitration.

MCAG has had the class settlement funds for 11 years and counting.  MCAG was able to pay itself and its partner Misys at least $1.8 million from that money.  It makes little sense that MCAG can pay itself and Misys before the end of the Arbitration, but that MCAG refuses to pay the class members.  Nothing in the Settlement Agreement or the arbitration agreement permits MCAG to await the end of the Arbitration to distribute funds to class members.  In fact, the

Settlement Agreement contemplates prompt payment of claims to class members.   (Ex. 4, Settlement Agreement, p. 110).

Withholding class settlement money for 11 years makes no sense.  The claims being paid are not pro-rata portions of a fixed settlement fund, as MCAG admits:  "MCAG is submitting claims based on each individual class member's claim.  The class members in this case are not competing for a pro-rata share of any fund, because the amount CIGNA is required to pay has no cap."  (MCAG Opp. to Motion to Strike, [D.E. 6517], p. 14).

The class members' claims that were paid were reimbursement claims from medical providers for set amounts.   So, when CIGNA paid an approved medical reimbursement settlement claim, it was paying a specific amount to go to a specific class member.  Each class member's paid claim for reimbursement is independent of any other claim, and when CIGNA pays that class member's claim to MCAG, it can and should be immediately distributed to the class member.   Nothing prevents MCAG from distributing that class member's money, and nothing permits MCAG to refuse to distribute that money.   Judge O'Sullivan even chastised MCAG for failing to distribute these class settlement funds, calling MCAG's conduct "very suspicious".  (Ex. 7, Dec. 16th Hrg. Tr., 25:13-18).

MCAG's position further fails because MCAG admitted that it has to promptly distribute the class settlement funds.  At the December 16th Hearing, Judge O'Sullivan asked MCAG's counsel: "Did you bind yourself to a course of conduct with your clients and distribute the funds as soon as receiving them, or shortly after receiving them?"  (*Id.* at 17:13-17).  MCAG's counsel replied: "I think that's an accurate statement, yes, distributing shortly after receiving."  (*Id.*).  So, MCAG's own admission contradicts its position that it can simply wait until it decides to distribute the class settlement funds.

MCAG's purported contracts with class members also require MCAG to distribute the settlement funds to the class member.  (Sample Contract, attached as **Exhibit 12**, p. 1).[5]  Even though these purported contracts are only two pages long, they say four times that MCAG has to pay the settlement funds to the class members.   Page one of the contracts state: "Client authorizes MCAG to file claims, collect recoveries through a secure Lock Box, extract the service fees outlined below from the recoveries, *and return net recoveries to Client*."  (*Id.*)

---

[5] MCAG produced for the first time a few "sample" signed contracts as an attachment to a September 23, 2016 brief filed in the Arbitration.

(emphasis added).  Also on page 1, the contracts state, "MCAG will submit the claims, collect the returns, ***and distribute the net payments to Client*** after extracting the service fees outlined below." (*Id.*) (emphasis added).  Yet again, on page 1, the contracts state "MCAG will utilize its best efforts . . . to collect ***and distribute*** the funds that may be due Client from the Settlement." (*Id.*) (emphasis added).  And, for a fourth time on page one of the contracts, they state that MCAG "warrants that it will use its best efforts to help Client maximize the return available to him/her under the Settlement."   Despite these unambiguous requirements, the class settlement funds that MCAG obtained through the arbitration did not go to anybody other than MCAG and its partner Misys.

### *F.   MCAG Admits Using "Automatic Enrollment" in this MDL*

There is a serious question as to whether MCAG ever was authorized by the class members to represent them.  MCAG has a documented pattern and history, even in this MDL, of improperly purporting to submit settlement claims and act on behalf of class members without authority from those class members.  MCAG calls its practice an "automatic enrollment" or "opt-out" program.  A federal Judge in New York called it something else — "something wrong".

MCAG's "automatic enrollment" practice first came to public light in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, Case No.: 1:05-md-01720-MKB-JO (E.D.N.Y. 2013), (relevant transcript excerpts attached as **Exhibits 13**).  In that case, MCAG and other claims processors purported to act on behalf of class members for the purpose of submitting settlement claims, but without the authority of those class members.  The class consisted of merchants who accepted credit card payments.  Instead of contacting class members, MCAG contacted credit card processors and obtained the identities of the merchant-class members who could submit class settlement claims.  (T. Schmidt Aff., attached as **Exhibit 14**, at ¶ 7).  MCAG then sent a notice to thousands of these merchant class members saying that MCAG would unilaterally file claims on the merchant class member's behalf, while collecting a hefty contingent fee for itself, unless the merchant "opted out".  (*Id.*).

The United States District Court for the Eastern District of New York issued an order to show cause and ultimately enjoined MCAG to cease its auto-enrollment and opt-out activities.  As Judge Gleeson phrased it, MCAG's attempt to proceed on behalf of class members without any authority from those class members, and to take a percentage of those class members' recoveries without express permission, "falls into the, 'What do you think you're doing?'

category." (*See* Ex. 13, transcript excerpt).  In ordering MCAG to immediately cease, Judge Gleeson appropriately summarized that "I think your clients have done something wrong." (*Id.*).

MCAG sought to justify its behavior in the Eastern District of New York by explaining to that court that MCAG routinely uses "opt-out" or "auto-enrollment" programs to automatically enroll members of classes subject to settlement, and then to take a contingent fee from the settlement amount.  (*See* MCAG Response To Order To Show Cause, attached as **Exhibit 15**,, at pp. 4-7).  In fact, MCAG's Chief Executive Officer Timothy Schmidt admitted under oath that, MCAG acted without authority on behalf "a significant percentage" of settlement classes in at least five of the cases ***in this very multi-district litigation – MDL 1334***.  (*See* Ex. 14, Schmidt Aff.).  Although MCAG has claimed that it did not use auto-enrollment for any of the CIGNA class members, neither CIGNA nor the Court has any way of knowing if MCAG's statement is true, because MCAG refuses to reveal how it acquired thousands of class members as purported clients.  Significantly, the few contracts MCAG have provided state that MCAG could get the data for claims submission directly from Misys (MCAG's "partner") — just like MCAG obtaining merchants' claim data in E.D.N.Y., prior to being enjoined by that court.  (*See* Ex. 12, Sample Contract, p. 1).  Therefore, MCAG's claimed agency may not even exist.

## II.      THE COURT HAS AN OBLIGATION TO PROTECT CLASS MEMBERS

Separate from the pending Arbitration and MCAG's motion to compel arbitral summons, the Court has an independent fiduciary duty to protect absent class members.  A judge cannot delegate that duty.  *See Culver v. City of Milwaukee*, 277 F.3d 908, 915 (7th Cir. 2002) ("Rule 23(e) should therefore be understood as imposing a duty on the district judge that is nondelegable, he being himself a fiduciary of the class.").  MCAG's admissions and un-refuted record evidence trigger this Court's nondelegable duty.  That duty obligates the Court to compel MCAG to produce a detailed accounting, replete with bank records, to demonstrate what MCAG did with the absent class members' tens of millions of dollars and how much is left.  *Accord id.*

Newberg on Class Actions is the preeminent treatise on class actions, and it contains a section titled "Fiduciary Role of Court".  *See* § 13:40, Fiduciary role of court, NEWBERG ON CLASS ACTIONS § 13:40 (5th ed.).  The treatise summarizes the law and states that: "So central is the protection of absent class members' rights that the court is said to have a fiduciary duty toward absent class members . . .."  *Id.*  The section goes on to state that "***the court's role as fiduciary is primarily to ensure that the class's own agents*** – its class representatives and class

11

counsel – ***have not sold out its interests*** . . .." *Id.* (emphasis added).  Here, the Court's fiduciary duty is to protect the class from its purported representative, MCAG, who appears to have "sold out" the class members' interests by not distributing their money for over a decade.

 It is fundamental to class actions that "the court has a duty to protect absent class members . . .." *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 730 (11th Cir. 1988).  After all, "[t]he reason the court is called on to review a settlement is to protect the rights of the many absent class members . . .." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir. 1981).  That also is why the Court is tasked with the obligation to appoint class counsel to represent the absent class members.  *See* Fed. R. Civ. P. 23(g).  The Court did not appoint MCAG to do anything.  The Court did not approve a settlement that gave the class members' settlement funds to MCAG to keep for itself for 11 years (and counting), not distribute, take portions of for itself, and not account for.

When approving this class settlement, the Court retained jurisdiction for all matters relating to "the interpretation, administration, and consummation of the [Settlement] Agreement . . .."  (Order dated Feb. 3, 2004, [D.E. 2900]).  That jurisdiction certainly authorizes the Court to demand an accounting from MCAG, an entity which interjected itself into the settlement process to receive, hold, and fail to distribute or account for tens of millions of dollars in absent class members' settlement funds for over a decade.

In addition to the Court's fiduciary duty, the Court must enforce the Settlement Agreement.  The Court has consistently enforced settlement agreements arising from this MDL. *See*, *e.g.*, *In Re Managed Care Litig.*, 00-MD-1334-MORENO, 2010 WL 6532985, at *12 (S.D. Fla. Aug. 15, 2010), *report and recommendation adopted sub nom. In re Managed Care Litig.*, 00-01334-MD-MORENO, 2011 WL 1522560 (S.D. Fla. Mar. 8, 2011).  As the Court stated, "[t]he Southern District of Florida has made it clear that public policy strongly favors the enforcement of settlement agreement in all types of litigation." *Id.*  As a result, the Court granted the defendant Wellpoint's motion to enforce a 2006 class settlement agreement. *Id.*  And for the very same reason, the Court has repeatedly granted CIGNA's prior motions to enforce this Settlement Agreement and enjoin others from violating the Settlement Agreement.  *E.g.*, *Shane v. Humana, Inc.*, 00-MD1334-MORENO, 2009 WL 7848518 (S.D. Fla. Nov. 5, 2009), *report and recommendation adopted sub nom. In re Managed Care Litig.*, 00-1334-CV-MORENO, 2009 WL 7848638 (S.D. Fla. Dec. 1, 2009).

Here, enforcing the Settlement Agreement and the administration thereof requires an accounting so that CIGNA and the Court can determine what happened to the class settlement funds.  Courts have regularly approved motions to compel accountings and supporting documentation of settlement funds.  For example, in *In re Lease Oil Antitrust Litig. (No. II)*, 2007 WL 4377835, *25 (S.D. Tex. Dec. 12, 2007), the court ordered the settlement administrator to provide an accounting, post-settlement and after the settlement funds were to have been distributed to the class members.  The accounting was required to include "all accounts in which any Settlement funds are held."  Here, we need an accounting of the settlement funds and all disbursements therefrom for all accounts in which any settlement funds are held or were held.

### III.    MCAG HAS A DUTY TO ACCOUNT FOR CLASS SETTLEMENT FUNDS

It is well-established that a person or entity holding class settlement funds[6] has an obligation to account for those funds and to promptly distribute those settlement funds to the class members.  *See, e.g.*, *The Florida Bar v. Adorno*, 60 So. 3d 1016 (Fla. 2011); *Kentucky Bar Ass'n v. Mills*, 318 S.W.3d 89, 92–93 (Ky. 2010)  *Kentucky Bar Ass'n v. Bamberger*, 354 S.W.3d 576, 580 (Ky. 2011); *Michel v. WM Healthcare Solutions, Inc.*, 2014 WL 497031, *26 (S.D. Ohio Feb. 7, 2014); *Everson v. Bunch*, 2016 WL 3255023, *5 (M.D. La. Jun. 13, 2016); *Attorney Grievance Com'n of Md. v. Smith*, 443 Md. 351, 369 (Md. 2015).

In fact, the Settlement Agreement itself contemplates an accounting, because it requires that the settlement administrator provide a final accounting at the conclusion of the settlement process.  (Ex. 4, Settlement Agreement, p. 125).  MCAG has sought and accepted the class settlement proceeds for distribution to the class members that MCAG claims to represent.  As a result, MCAG is bound to perform that function, and that performance includes a prompt accounting for, the class settlement funds.  *See id.*

MCAG admits that it is obligated to account to the class members for the class settlement funds.  (Ex. 6, MCAG Opp. to Motion to Compel Accounting, filed in Arbitration, p. 2).  This motion merely asks the Court to compel MCAG to comply with that obligation and to produce that accounting to CIGNA and the Court.  But, an "accounting" is not taking MCAG or its counsel's word for it, particularly here where MCAG's word keeps changing.  "An 'accounting'

---

[6] MCAG has tried to avoid these issues by feigning ignorance about what a "holder of class funds" is.  (MCAG Opp. to Motion to Strike, [D.E. 6517], p. 6).  But "holder of class funds" is not a term requiring any definition.  MCAG's linguistic games should not render it immune to the requirements imposed on persons holding class settlement funds.

is designed to require a person in possession of financial records to produce them, demonstrate how money was expended, and return pilfered funds in his or her possession."  1 Am. Jur. 2d Accounts and Accounting § 50; *see also Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1316 (11th Cir. 2014).  Compelling an accounting would not burden MCAG, because as a holder of class settlement funds, MCAG is required to maintain records related to class settlement funds' receipt and disposition.  The Court should compel MCAG submit those records and provide an accounting to CIGNA and the Court.

Courts have regularly approved motions to compel accountings and supporting documentation of settlement funds.  For example, in *General Insurance Co. of America v. The Walter E. Campbell Company, Inc.*, CV WMN-12-3307, 2016 WL 3147482, at *3 (D. Md. 2016), the Walter E. Campbell Company, Inc. ("WECCO") was a construction company that worked in the asbestos industry.  Over the years, WECCO acquired millions of dollars of insurance coverage to pay asbestos claims for injured people, and that money was put into the WECCO Qualified Settlement Fund.  WECCO was supposed to distribute those insurance funds to the injured persons.  In that regard, WECCO is akin to MCAG, because MCAG purportedly is collecting settlement funds from CIGNA for distribution to the class members.

WECCO then sued its insurer, General Insurance Company, claiming that the insurance company owed WECCO more than it paid into the settlement fund.  WECCO somewhat mirrors MCAG, because each is seeking additional settlement compensation from the insurer, except MCAG is seeking it from CIGNA with whom MCAG has no contractual relationship.

In the *Gen. Ins. Co. of Am.* case, because WECCO sought additional settlement funds, the insurer sought discovery about "deposits and disbursements of funds into or out of the WECCO QSF".  *Id.* at 2.  Like MCAG, WECCO refused to provide any detail about what funds it actually distributed.  *Id.*  But, WECCO was seeking additional payments for settlement funds that were supposed to have been distributed to the claimants.  The court ordered WECCO to produce an accounting of the settlement fund's distributions.

Another example is *Abbot v. Chesley*, 413 S.W.3d 589, 590 (Ky. 2013), where class counsel entered into a settlement without informing their clients of the terms of the settlement and took an excessive fee.  Once class members discovered the unfavorable terms and the attorneys' fee amount, they sued class counsel and sought an accounting and disgorgement of the misappropriated settlement funds.  The court found for the class members and held that it was

14

improper for class counsel to retain a fee from funds that should have gone to the class, like MCAG did here.  The court held that the defendants breached their fiduciary duties by not assuring that its clients got all of the settlement disbursements required.  Whereas *Abbot* was brought by class members, here there is no indication that the class members know that CIGNA paid $25 million, that MCGA took $1.8 million from the class settlement funds for itself and its partner, or that MCAG commingled the class settlement funds into MCAG's business accounts and has not accounted for the interest earned on the settlement funds.

Lastly, there are many cases where persons holding settlement funds have been sanctioned for not providing a prompt accounting and distribution of settlement funds.  For example, each of the three attorneys in the *Abbot* case was disbarred for retaining settlement funds and "failing to turn over to his clients' funds to which they were entitled and failing to provide . . . an accounting of the distribution of the total settlement as well as the individual client's settlement distribution."  *Kentucky Bar Ass'n v. Mills*, 318 S.W.3d 89, 92-93 (Ky. 2010). In fact, the law gives such significant protection to absent class members that even the judge who approved the *Abbot* attorneys' fee was disbarred for his role in the case, including his "fail[ure] to review any documentation of the allocation of settlement funds."  *Kentucky Bar Ass'n v. Bamberger*, 354 S.W.3d 576, 580 (Ky. 2011).

In *The Florida Bar v. Adorno*, 60 So. 3d 1016 (Fla. 2011), and *Masztal v City of Miami*, 971 So. 2d 803 (Fla. 3rd DCA 2008), lawyers settled a putative class action and did not disclose the distributions it made to both itself and only a few select class members.  The class members did not get distributions or an accounting.  The court held that a person handling settlement funds has a fiduciary duty to those he represents and breaches that duty when he does not disclose facts about the settlement, its distribution, or its accounting.  ***Significantly, the court held that it was not the attorney-client relationship that was paramount, but the fiduciary duty owed to members of the class with respect to settlement funds.***  The court found such a fiduciary relationship exists between one who accepts and administers settlement funds and the clients who were supposed to receive those funds.  Such a relationship exists between MCAG and the class members here.

## IV.    MCAG IS NO LONGER PERMITTED TO HOLD SETTLEMENT FUNDS

MCAG's only basis for holding class settlement funds is MCAG's claimed status as an agent of the class members.  But, that agency was terminated long ago due to MCAG's admitted misconduct in handling those class settlement funds.

It is black-letter law that "[u]nless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal."  *Int'l Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 421 (7th Cir. 2006).  In *Remenchik v. Whittington*, 757 S.W.2d 836, 839 (Tex. App. 1988), the court put it best: "[W]here an agent binds himself to a course of conduct antagonistic to the interests of his principal, ***such breach of duty, ipso facto, terminates the agency*** unless condoned by the principal with full knowledge of the facts." (emphasis added).  That likely is why the Magistrate Judge asked MCAG's counsel if MCAG bound itself to a course of conduct to promptly distribute class settlement funds, which MCAG' counsel agreed was its obligation. (Ex. 7, Dec. 16th Hrg. Tr., 17:13-17)

MCAG has admitted five breaches of fiduciary duty.  First, failing to disclose to the class members that his or her claim has been paid by Cigna, is just such a breach.  Second, MCAG's decision to pay itself and not the class members is an absolute violation of its fiduciary duties.  Third, MCAG's failure to earn and preserve interest on these tens of millions of dollars for the class members is a breach.  Fourth, MCAG's decision to commingle the class settlement funds into its own operating accounts where they can be used as if they were MCAG's funds is such a breach.  And, ultimately, MCAG's failure to pay settlement funds to class members is just such a breach.  Each fiduciary breach terminated any agency relationship MCAG had with the class members.

There is no factual dispute whether MCAG breached its fiduciary obligations to the class members.  For instance, in sworn interrogatory responses, MCAG admitted that the class settlement funds "were commingled with other operating funds . . ." (Ex. 9, MCAG Nov. 4, 2013 Supp. Interrogatory Responses, pp. 2-3).  MCAG's commingling of the settlement funds is itself a breach of fiduciary duty to the class members.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (holding that the defendant's "commingling of funds was not only an *indication* of a breach of fiduciary duty — it was, in and of itself, a breach.").

## V.     THE COURT SHOULD NOT DEFER TO THE ARBITRATOR

### A.   *The Court Has a Different Purpose and Obligation to Compel an Accounting than the Arbitrator*

There are different reasons that an accounting is necessary in this Court, as opposed to the Arbitration, and there are different grounds underlying CIGNA's request for an accounting in each forum.

Unique to this Court is the fact that this is a class action settlement that this Court approved.  That imbues the Court with a fiduciary duty to the class members to oversee the settlement and to protect the absent class members.  *See*, Sect. II, *supra*.  This Court's duty to protect those class members is non-delegable.  *See Culver v. City of Milwaukee*, 277 F.3d 908, 915 (7th Cir. 2002).  Therefore, the Court cannot defer its fiduciary duty to protect the absent class members to the Arbitrator.  Moreover, this Court is the forum for enforcing the Settlement Agreement.

Further, the basis for an accounting in the Arbitration is distinct from the issues in this forum.  In the Arbitration, CIGNA has counterclaims and affirmative defenses that are based in part on MCAG's handling of the class settlement funds that CIGNA paid.  CIGNA is entitled to discovery in the Arbitration in support of those claims and defenses.  But those claims and defenses are not being presented in this Court, so those discovery issues are confined to the Arbitration.

### B.   *MCAG Takes the Contradictory Position that the Arbitrator Lacks Jurisdiction to Compel an Accounting*

MCAG has taken the incredible position that this Court has no authority to compel an accounting, by arguing that the Court must defer to the Arbitrator on that issue.  But, at the very same time, MCAG is arguing to the Arbitrator that he does not have authority to order an accounting.  Under MCAG's contradictory arguments, the Court should defer to the Arbitrator and the Arbitrator should defer to the Court.  MCAG's apparent tactic is to try to avoid any forum from looking into what MCAG has done with the class members' settlement funds, and how much remains.

This is what MCAG told this Court in its brief in opposition to CIGNA's motion to strike:

- MCAG said that it would be improper for the Court to make a determination on MCAG's standing, "because to do so would amount to interference with the

17

procedures of the Arbitration".  (MCAG Opp. to Motion to Strike, [D.E. 6517], pp 8-9).

- MCAG said that the Court should not address standing, because "[t]he issue of standing is already in front of the Arbitrator."  (*Id.* at 9-10).

- MCAG said that the Court should not order an accounting, because the accounting "is a matter already pending in the arbitration" (*Id.* at 2).

- MCAG told the Court to defer to the Arbitrator on ordering an accounting, because that issue "is currently set for a hearing before the Arbitrator later this month."  (*Id.* at 2).

- MCAG argued that ordering an accounting would "amount to interference with the procedures of the Arbitration." (*Id.* at 8-9).

MCAG continued this theme at the hearing before Judge O'Sullivan on December 16th, stating that standing and an accounting "would be an issue, at best for the arbitrator."  (Ex. 7, Dec. 16th Hrg. Tr., 14:2).  Relying on MCAG's repeated arguments that the issue belonged in Arbitration, Judge O'Sullivan denied an accounting, saying that the issue of an accounting can be addressed by the Arbitrator.  (*Id.* at 26:12-16).

But MCAG simultaneously is telling the Arbitrator that he lacks jurisdiction to even consider the question of an accounting.  In briefing in the Arbitration on the issue of an accounting, which has not yet been determined by the Arbitrator, MCAG is arguing that:

- MCAG's standing and MCAG's distributions to class members – or the lack thereof – are outside the scope of the arbitration. (Ex. 6, MCAG Opp. to Motion to Compel Accounting, filed in Arbitration, p. 2).

- MCAG then told the arbitrator that the Arbitration "does not involve questions of standing."  (*Id.* at 6).

Most egregious is what MCAG told the Arbitrator after prevailing in front of Judge O'Sullivan.  After MCAG convinced Judge O'Sullivan on December 16th to defer to the Arbitrator on the issue of an accounting, MCAG told the Arbitrator on February 3rd that the Arbitrator lacked the jurisdiction to compel an accounting.  In other words, MCAG convinced Judge O'Sullivan to defer to the Arbitrator and then changed its position to attack the Arbitrator's authority to consider the issue of an accounting.  Specifically, MCAG argues that:

- "[T]here is no jurisdiction to entertain CIGNA's motion to compel accounting in this arbitration."  (Ex. 1, MCAG Feb. 3, 2017 Brief in Arbitration, p. 1).

- MCAG argues that to "seek an accounting would exceed the scope of the Arbitrator's authority."  (*Id.*).

- MCAG told that Arbitrator that "CIGNA waived its ability to arbitrate" the issue of standing, merely by raising it in the court. (*Id.* at 3).

- MCAG argues that "the Arbitrator should find that CIGNA has waived proceeding with its motion to compel accounting in the Arbitration." (*Id.* at 7).

- MCAG argues that "[t]he Arbitrator has no jurisdiction over CIGNA's motion to Compel Accounting". (*Id.* at 7).  To be clear, MCAG's position is not simply that the Arbitrator should not order an accounting, but that the Arbitrator lacks the jurisdiction to even consider the question of whether to do so.

- MCAG tells the Arbitrator that the relief of an accounting "is far beyond the scope of the Arbitrator's authority." (*Id.* at 9).

- Finally, MCAG asks that "the Arbitrator should decline to entertain CIGNA's motion to compel accounting in light of CIGNA's waiver of arbitration on the issue and the lack of jurisdiction on the underlying issue." (*Id.* at 10).

The Arbitrator apparently is considering MCAG's arguments, because the Arbitrator has asked for oral argument on his jurisdiction to consider whether to order an accounting.

Regardless of these contradictory positions, the Arbitrator did not certify a class and approve the settlement for fairness or notify the class that they would get paid; this Court did. The law is clear that this Court has an independent duty to protect the class members and enforce the Settlement Agreement.  *See* § 13:40.  Fiduciary role of court, NEWBERG ON CLASS ACTIONS § 13:40 (5th ed.).  That duty cannot be delegated to the Arbitrator or to anybody else.  *Culver v. City of Milwaukee*, 277 F.3d 908, 915 (7th Cir. 2002).  CIGNA respectfully submits that the Court has the duty and authority to compel MCAG to account for the class members' settlement funds.  *See Cox*, 847 F.2d at 730.  Therefore, the Court should exercise that duty independent of whatever the Arbitrator deems appropriate for discovery in the matter before him.

## CONCLUSION

WHEREFORE, CIGNA respectfully requests that the Court order MCAG to produce an accounting with documentary support to CIGNA and this Court, of all class settlement funds paid to MCAG by CIGNA for benefit of the class and the disposition of such funds.  CIGNA requests that such accounting be conducted by an independent forensic examiner.  CIGNA further requests that the accounting include the requirement that MCAG disclose to the forensic examiner and CIGNA all communications and correspondence with class members regarding settlement funds and the disposition thereof, and also to produce any class members' contracts with MCAG and solicitation materials sent by MCAG.

19

## <u>CERTIFICATE OF GOOD FAITH PRE-FILING CONFERENCE</u>

Pursuant to Southern District of Florida Local Rule 7(a)(3), the undersigned confirms that counsel for CIGNA has conferred with counsel for MCAG in a good faith effort to resolve the issues raised in the motion without the need for Court intervention, but the parties have been unable to do so.


Dated: February 27, 2017


Respectfully submitted

**HOGAN LOVELLS US LLP**

By <u>*/s/  Marty Steinberg*</u>
Marty Steinberg, Esq.
Florida Bar No. 187293
marty.steinberg@hoganlovells.com
Justin Brenner, Esq.
Florida Bar No. 94216
justin.brenner@hoganlovells.com
600 Brickell Avenue, Suite 2700
Miami, Florida 33131
305-459-6500 Telephone

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 27, 2017, I electronically filed the forgoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


*/s/   Marty Steinberg*
Marty Steinberg