## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Miami Division

### MDL NO.: 1334

### IN RE: MANAGED CARE LITIGATION

| | |
|---|---|
| Managed Care Advisory Group LLC, | ) |
| Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| CIGNA Healthcare, Respondent | ) |

---

### CIGNA'S WRITTEN CLOSING ARGUMENT WITH REQUESTED CHARTS AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION TO ENFORCE SETTLEMENT

In accordance with the Court's instructions at the evidentiary hearing held on January 13 and 14, 2025, Cigna Healthcare ("Cigna") hereby submits its Written Closing Argument[1].  Given the twenty-five year history and voluminous record presented by this case, Cigna believes a proposed findings of fact and conclusions of law is appropriate in accordance with Local Rule 16.1(k)[2] because it would assist the Court.  Therefore, Cigna has included its Proposed Findings of Fact and Conclusions of Law at **Exhibit A** hereto for the Court's convenience.  The majority of the factual and legal basis supporting Cigna's positions are contained in the Findings of Fact and Conclusions of Law.  In addition, the Court requested each party to prepare certain charts demonstrating the disposition of class/ERISA funds Cigna paid MCAG on behalf of its client class-

---

[1]      Records of these proceedings are cited herein by Docket Entry ("D.E.") number.  The transcripts of the January 13 and 14, 2025, evidentiary hearing before Judge Moreno are in the record as D.E. 7004 and D.E. 7005 respectively.  Exhibits entered into evidence at that hearing are also cited herein as "Trial Ex.___".

[2]      "At the close of the evidence . . . counsel may submit . . . where appropriate, proposed findings of fact and conclusions of law to the Court, with copies to all other counsel."  S.D. Fla. Local R. 16.1(k).

members.  Those charts are included at **Exhibit B** hereto.  Finally, for the Court's convenience, Cigna has attached excerpts of the January 13 and 14, 2025 evidentiary hearing transcripts by issue and by witness at **Exhibit C** hereto.

## Overview of the Evidentiary Hearing

As the Court stated at the outset of the evidentiary hearing, "The question is:  Were the Cigna funds paid to your clients; how was the money used AND who gave permission; or did you assume – that's the issue seems to me."  Counsel for the Managed Care Advisory Group LLC ("MCAG") then agreed that "Yes" "that's the issue."  1/13/25 Hrg. Tr. at 20:16-23.  Cigna also agrees.  The two days of testimony and evidence confirmed the answers to those questions—and more.

*First* and foremost, MCAG failed to comply with Rule 23 and the law, never seeking or obtaining approval from this Court for its purported Physician Agreements, which MCAG claims permits it to take money from class-action settlement funds.  The only result must be declaring those agreements *void ab initio*.  *Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 1985-2 Trade Cases ¶ 66,830, 1985 WL 25746 (D.D.C. Oct. 18, 1985); Manual on Complex Litigation, Fourth, § 21.662.  Courts also consistently hold that agreements with class members that were not presented to, and approved by, the class court are void and not enforceable.   In *Alexander v. Chi. Park Dist.*, 927 F.2d 1014 (7th Cir. 1991) (cited with approval in *Managed Care Advisory Grp. v. CIGNA Healthcare Inc.,* 939 F. 3d at 1162 (11th Cir. 2019)).  Should MCAG be able to rely on such non-approved agreements to take monies from class funds, it will be a precedent to encourage others to ignore the law—and this Court.  MCAG offered no factual or legal defense to this unalterable requirement of the law.  *See* Findings of Fact and Conclusions of Law at 59-65.

*Second, none* of the $14.2 million in Cigna payments for Category Two claims were *ever* paid to MCAG's clients.  MCAG instead comingled the funds into its own accounts, kept the

interest, then used the money to pay a multi-million dollar settlement in another case and paid millions to its own principals, for its own expenses, and to its "partners" and lien-holders. *See* Findings of Fact and Conclusions of Law at 11-13.

*Third*, even the void Physician Agreements do not permit MCAG to keep anything other than its so-called retainage fee, which for the many Category A claims was between $12 and $18 per claim, and for Category Two claims was a very specific percentage, depending upon what the Class Members qualified for. MCAG never established that the so-called retainage fee it took was tied to any of the fees identified in the Physician Agreements. *See* Findings of Fact and Conclusions of Law, at 41-45. **Moreover, despite promising to put on class members who would testify that they approved MCAG's use of funds, MCAG presented no such class member.** *See* Findings of Fact and Conclusions of Law 13-14; 50-52. Ms. Parm, a retired office manager for Florida Eye Clinic, was not a class member, and testified that MCAG never advised or informed her what it was actually doing with the funds. She also acknowledged that she was not advised of the receipt or specific expenditures of MCAG and she did not approve them. [D.E. 7004, at 205-09]. Of course, and importantly, the *Court* also never gave permission for MCAG to collect or use the funds in *any* way.

*MCAG presented recently created and false "defenses" to it taking every last cent of class funds to mislead this Court.* When confronted with the proposition, its original expert agreed that the so-called Physician Agreements did not support MCAG taking class funds to pay for legal fees, compensation of principals or for other MCAG expenses such as liens and leases. MCAG relied on the subterfuge of an alleged indemnity claim against its own clients as the basis for taking every cent other than the so-called retainage.

**Mr. Schmidt's sworn testimony at the January 10, 2018 Pre-Final Evidentiary Hearing before Arbitrator Schultz under questioning by MCAG's own attorney, Mr. Greenberg, makes clear that this indemnity subterfuge was MCAG's only defense to its keeping all of the Cigna class-member settlement payments:**

21   BY MR. GREENBERG:
22      Q.   When you say that
23   it's contractually -- you were allowed to do
24   that contractually, what provision of the
25   contract do you interpret as allowing that?

0519
1      A.   At the bottom of the warranties
2   section of the contracts, there is a flat
3   statement that we included in all the
4   contracts:
5         The client agrees to indemnify MCAG
6      for any losses or liabilities incurred as
7      a result of the inaccuracy or veracity of
8      claims data submitted by client to MCAG
9      for review.
10         Here, Cigna is the one who argues
11      about the veracity and inaccuracy of the
12      data provided, and so --
13         ARBITRATOR SCHULTZ:  By what means?
14         THE WITNESS:  By refusing to pay
15      claims that have been submitted with
16      complete data.

21        ARBITRATOR SCHULTZ:  So you're
22     claiming that on claims that you
23     submitted, the client gave you the wrong
24     information?
25        THE WITNESS:  No.  I'm saying that

0527
1     Cigna alleged and argued that it was the
2     wrong information, and then, therefore,
3     caused us --
4        ARBITRATOR SCHULTZ:  So because Cigna
5     alleged that, that provision gives you the
6     right to deduct the salaries and
7     compensation that relates to that matter
8     based on an estimate by you; is that
9     correct?
10        THE WITNESS:  So we incurred --
11        ARBITRATOR SCHULTZ:  Is that correct?
12        THE WITNESS:  Could you read that
13     back.  I think it is, Your Honor, but let
14     me just hear -- I think you stated it very
15     well.
16        (Whereupon, the requested portion of
17        the record was read by the reporter
18     as above recorded.)
19        THE WITNESS:  That's correct.

*See* 1/10/2018 Pre-Final Evidentiary Hearing, at 493:10-496:10, 518:21-527:23, 553:4-14 & 556:

24-559:21 [D.E. 6685-11].

**No fact or expert witness for MCAG testified to justify this false "indemnity" defense.**

D.E. 7004, at 204 Lindsay Questioning Parm

1        THE WITNESS: I guess the question is, did MCAG ever
2        tell me that they were pursuing indemnity against Florida Eye
3        Clinic?
5        THE WITNESS: No.

*Id.,* at 239 Steinberg Questioning Pollack

> 22   Q. Mr. Pollack, did you, in MCAG's records, find any records at
> 23   all supporting their so-called indemnity claim?
> 24   A. No, I did not.|

And, despite MCAG's historic records and basic accounting principles requiring all MCAG

expenses to be paid by MCAG—not the class—MCAG suddenly claimed that it could use the

Cigna settlement funds to pay its principals and other operating expenses and profits.  Cigna Trial

Ex. 21.  Yet, no witness, including MCAG's latest accounting expert, supported the proposition

that MCAG expenses should be paid with class funds.  *See* Findings of Fact and Conclusions of

Law, at 29-33.

> D.E. 7004, at 231-32  Steinberg Questioning Pollack
>
> 20   Q. So just to be clear, the expenses that have now been taken
> 21   out of the class members' money, MCAG's historic records showed
> 22   that they charged those expenses to themselves, correct?
> 23   A. Yes.
> 24   Q. And how would that affect how we're viewing things today or
> 25   how the Judge would review it?
>
> 1    A. It just shows the inconsistency where they're making up a
> 2    summary chart and they're saying that this money goes against
> 3    class money and in their own financial records, they're showing
> 4    it as an expense.
> 5    Q. And from an accounting standpoint, how should those expenses
> 6    have been billed or charged?
> 7    A. Well, I don't see how that money should be charged against
> 8    class money. So, you know, it should be -- it should be an
> 9    expense of the company, and I don't see how it could be charged
> 10   against or taken against class settlement money.

MCAG also claimed it was permitted to "keep" the initial prepayment for approved claims

that Cigna paid to MCAG of $7.5 million, despite the arbitrator previously denying that claim.

Even MCAG's expert could not support this proposition.   *See* Findings of Fact and Conclusions

of Law, at 4-6.

D.E. 7005, at 39 Steinberg Questioning Buchakjian

4     Q. Are you coming to any accounting conclusion that MCAG was
5     entitled to the 7.5 million it was paid in November of 2005, and
6     is also entitled to a second $7.5 million to distribute to class
7     members? Do you conclude that in any way?
11    A. I am not offering an accounting opinion on that, no. I
12    understand there's a legal position regarding those amounts.

*Id.* at 44-45

14    Q. So there's no doubt in your mind that the 7.5 million was
15    applied to claims that were approved, correct?
16    A. In this scenario, no, there's no doubt.
24    Q. Do you deny that the $7.5 million paid in November of 2005,
25    was applied to approved claims?

1     A. No, I do not deny that.

MCAG also admittedly possessed key financial documents, such as QuickBooks and produced them in another case in 2011, but did not produce them here. MCAG provided no explanation for these missing records that exacerbated the difficulty in accounting for the disposition of Cigna settlement funds. *See* Findings of Fact and Conclusions of Law, at 21-24, 38, 44, 70-71 & 88-97.

D.E. 7004, at 230 Steinberg Questioning Pollack

7     Q. And you said the other reason you looked at the RNP case was
8     to look at records that you had not been provided in this case,
9     correct?
10    A. Correct.
11    Q. Was the special accounting master provided with the records
12    that MCAG provided in the RNP case?
13    A. No.
14    Q. Now, with respect to those records that were provided in the
15    RNP case, one such record would be QuickBooks, correct?
16    A. Yes.
Page 231
20    Q. So just to be clear, the expenses that have now been taken

21     out of the class members' money, MCAG's historic records showed
22     that they charged those expenses to themselves, correct?
23     A. Yes.

The following will first briefly review the Physician Agreements—although those agreements by law should be deemed *void ab initio*.  Following that is a summary of the testimony presented by each witness during the evidentiary hearing on January 13 and 14, 2025, then a conclusion comparing what each party promised in opening statements versus what the evidence actually showed.

## MCAG Physicians Agreements

Of the purportedly "thousands" of MCAG clients, the contracts, or "Physician Agreements," with two of those client class-members, Florida Eye Clinic and Texas Children's Pediatric Associates, were used at the evidentiary hearing.  *See* Cigna Trial Exs. 72 (Texas Children's Pediatric) and 82 (Florida Eye Clinic).

Both contracts are identical in all material respects.  In each, the physician practice group "secures the services of MCAG as outlined below for assisting Client in Client's participation under the CIGNA Physician Settlement" and "authorizes MCAG to . . . submit claims eligible under the terms of the CIGNA Settlement directly to the Settlement Administrator on Client's behalf."  *Id.* at 1.

Both contracts provide that MCAG will use its "best efforts" to "help the Client" collect historical claims data and "submit those claims for reimbursement . . . and *to collect and distribute the funds that may be due Client from the Settlement*."  *Id.* (emphasis added).  The contracts then specifies that "MCAG will . . . determine eligible claims, submit those claims, collect the returns, and *distribute the net payments to the Client after extracting the service fees outlined below."  Id.* (emphasis added).  MCAG further "warrants" that it will use its "best efforts" to "help Client

maximize the return available to him/her under the Settlement." *Id.* Here, there was no "return" to the clients. The Physician Agreements also stated that the physician clients will pay MCAG for "services rendered according to the fee schedule outlined below, both fixed fees and the appropriate recovery fee generated from recoveries, regardless of the ultimate recovery obtained." *Id.* Again, the Court never approved these fees coming to of class funds.

The agreements also warrant that the clients will "indemnify MCAG for any losses or liabilities incurred *as a result of the inaccuracy or veracity of claims data submitted by Client for MCAG for review.*" *Id.* (emphasis added). MCAG's CEO and corporate representative, Mr. Schmidt, testified that MCAG took the majority of Cigna settlement funds based on this indemnity language. *See*, *infra,* at 3-6. *See also* Findings of Fact and Conclusions of Law, at 29-32. No evidence was presented to support any such indemnity claim and the evidence established that no such claims could be justified.

D.E. 7004, at 204 Lindsay Questioning Parm

1    THE WITNESS: I guess the question is, did MCAG ever
2    tell me that they were pursuing indemnity against Florida Eye
3    Clinic?
5    THE WITNESS: No.

*Id.* at 239 Steinberg Questioning Pollack

22    Q. Mr. Pollack, did you, in MCAG's records, find any records at
23    all supporting their so-called indemnity claim?
24    A. No, I did not.

MCAG did not even mention indemnity at the evidentiary hearing, nor did they call Mr. Schmidt at the hearing despite his being in attendance and MCAG counsel's repeated promises to do so. Moreover, notwithstanding the fact that the so-called indemnity purportedly was the basis for taking the majority of class funds, MCAG's expert did not even address the subject.

D.E. 7005, at139 Steinberg Questioning Buchakjian

16    Q. Okay. So my follow-up question is, did you perform any
17    accounting services to determine whether or not there was any
20    support for this indemnity claim of MCAG's?
21    A. No.

Finally, the Physicians Agreements provide the "fee schedule outlined below," which shows both "fixed fees" for Category A claims (either $12 or $18 dollars), and the "recovery fees generated from recoveries" as a percentage, either 25%, 29% or 30% of the total recovery, depending on whether the client was a "State/County <u>OR</u> AMA" member or "Members of State/County <u>AND</u> AMA," or "Non-Members." *Id.* at 2. No other fees or deductions are permitted. *Id.* Simply put, there is no permissible deductions for legal fees, compensation to principals, payments for MCAG's liens, leases, etc. MCAG's purported retainage fees, were never tied to any specific fees permitted by the Physician Agreements. *See* Findings of Fact and Conclusions of Law, at 9-10, 13 & 41-43.

Cigna now reviews the testimony presented at the evidentiary hearing.

### <u>Special Accounting Master ("SAM"), Soneet Kapila</u>

Mr. Kapila began by confirming he was the Court-appointed Special Accounting Master (sometimes referred to as the "SAM") and that his report of September 24, 2020, would be consistent with his testimony here today. 1/13/25 Hrg. Tr. at 37:14-38:10 [D.E. 7004]. He also confirmed his resume that demonstrates exceptional qualifications for this work. *Id.* at 38:18-24; Cigna Ex. 121. MCAG supported his appointment to the role of SAM. D.E. 7004 at 75:4-12.

On cross-examination by MCAG, the SAM confirmed that MCAG was acting as a fiduciary for its clients:

> 1      So I believe, yes, they have a fiduciary role. They
> 2  take on funds which are held in trust effectively for other
> 3  parties, not for their own benefit, and they have a contractual
> 4  arrangement to make a fee from it.
> 5  Q. So you assume that it was a fiduciary?
> 6  A. I believe it is a fiduciary.

> 15  Q. So you made an assumption that MCAG was a fiduciary; is that
> 16  right?
> 17  A. My position is that MCAG by the nature of their business of
> 18  disbursing sizable funds for settlement funds, holds those
> 19  when it receives them for the benefit, in this case for
> 20  claimants or whoever the beneficiaries may be overall in their
> 21  business, and I think that lends itself to an expectation that
> 22  those funds would be held segregated. They would be managed
> 23  appropriately and preserved, and to the extent they belong to
> 24  these parties, they would be interest bearing and that equates
> 25  into a fiduciary responsibility.

*Id.* at 73:17-74:6 (Kapila) (emphasis added). MCAG did not impeach or contradict this testimony in any way. Moreover, there can be no dispute that MCAG as an agent of the class members, holding class and ERISA funds for such beneficiaries, was a fiduciary. *Hollingsworth*, 570 U.S. at 713; *The Fla. Bar v. Adorno*, 60 So. 3d 1016, 1027–28 (Fla. 2011) (holding that a person administering class settlement funds owes fiduciary duties to class members). As an agent, MCAG must act in the best interests of its principals and owes fiduciary duties to the class

members.  *JDI Holdings, LLC v. Jet Mgmt., Inc.*, 732 F. Supp. 2d 1205, 1231 (N.D. Fla. 2010).  It is indisputable that MCAG was an agent, fiduciary and ERISA fiduciary.  *See* Finding of Fact and Conclusions of Law, at 15-16, 26-27, 37, 52-53, 55-58 & 68-73.

As to the approximately $11.5 million pre-Arbitration funds Cigna paid to MCAG, MCAG took $3.5 million as its "fee," despite filing an affidavit with this Court stating that MCAG had distributed to class members the *entire* $11.5 million.   As the 11th Circuit noted, this was false. *See* Findings of Fact and Conclusions of Law, at 7-9.

With regard to the $8 million (post "fees") in pre-Arbitration funds that MCAG then claimed to have actually paid to the class members, neither Mr. Kapila nor Mr. Pollack could locate any contemptuous records (such as cancelled checks) to verify that class members received such funds.  MCAG presented no testimony on this subject except the speculation of its expert, presumably utilizing records not provided to the SAM or Mr. Pollack—or even attached to his declaration.  Of course, if Mr. Buchakjian had records that were not produced to the SAM, that would be a violation of this Court's Accounting Order.  *See* Dec. of Jeffrey Buchakjian, CPA/CFF, dated 11/23/20, at 11 ¶¶ 22 (" I supplemented the information . . . by requesting from MCAG system generated reports that provide additional check numbers . . . . I understand the SAM Report did not have this information.").

Mr. Kapila explained that he did not receive documentation to demonstrate that the class members had been paid with the pre-Arbitration funds, although he "did ask MCAG several times, and they said, we've given you everything we have.  We can't offer you anything else."  D.E. 7004 at 50.  *See* Findings of Fact and Conclusions of Law, at 7-9.

In addition, MCAG did nothing rebut any of Mr. Kapila's report or sworn testimony with respect to the $14.2 million post-Arbitration Category Two funds.  As Mr. Kapila again confirmed,

MCAG "conceded they did not" disburse the "14.2 million, to the claimants." *Id.* at 9-10, 13, 34, 66-67.

Regarding the interest on the $14.2 million, calculated by Mr. Kapila to be $1.4 million, MCAG's only "defense" was that the SAM should have not calculated interest on the so-called "retention" of MCAG. But, why would he? MCAG kept *everything*, thus had full use of the funds and the interest thereon. Moreover, MCAG itself calculated interest on these Cigna settlement funds as of 2016 to be $1.2 million and had another analysis showing interest of $1.6 million. MCAG's expert ignored these admissions. *See* Findings of Fact and Conclusions of Law, at 11-13.

Both Mr. Kapila and Mr. Pollack confirmed that they traced $4.8 million of Cigna's settlement funds and found they were used by MCAG to pay an unrelated litigation settlement (the RNP matter). *See* Findings of Fact and Conclusions of Law at 27-28

D.E. 7004, at 103 Steinberg Questioning SAM

```
1        Q. And the so-called settlement of that case, which I believe
2        was $6.2 million, both you and Mr. Pollack have traced $4.8
3        million of Cigna's settlement funds to go to that unrelated
4        settlement, correct?
5        A. That is correct.
```

Incredibly, just as with the large amount supposedly taken under the "indemnity" provision of the Physician's Agreements, MCAG's expert did no analysis of these RNP settlement payments, other than to admit that his reference to $4.8 million of Cigna funds as "nominal" was erroneous. Thus, as to the largest portions of Cigna class settlement funds (the $4.8-6.2 million used to pay a settlement in an unrelated case, and all funds MCAG took in addition to the so-called retainage (approximately 75% of the Cigna settlement funds), MCAG's expert purposefully ignored, performed no analysis of, and offered no opinions as to these issues.

D.E. 7005, at 67 Steinberg Questioning Buchakjian

21    Q. All right. Now, when you say a nominal amount, do you
22    consider $4.8 million nominal?
23    A. I am reading that actually and I believe that $4.8 million
24    is not a small amount and I am wondering why that term was used,
25    assuming it relates to this RNP litigation. But I do not
Page 68
1     consider $4.8 million to be a small amount, no.
Page 68
17    Q. Mr. Buchakjian, did you do anything to trace the use of
18    Cigna settlement funds to pay for this unrelated settlement in
19    the RNP case?
20    A. I wasn't aware of it until -- I wasn't aware of any of these
21    accounting issues until I was asked to consider Mr. Kapila's
22    report. I did analyze it in the context of Mr. Kapila's
23    opinions. So I see that Mr. Kapila has that opinion, and I have
24    no reason to dispute that finding, if that answers your
25    question.

As to MCAG's latest argument that the first payment of $7.5 million was for it to keep, Mr. Kapila was aware of no agreement that permitted MCAG to keep and "receive 7.5 million twice." D.E. 7004, at 104.

Moreover, both as a litigant and a fiduciary, Mr. Kapila testified that MCAG should have maintained "records that would reflect the receipt and disposition of Cigna settlement funds it received," but did not. *Id.* at 105-06.

Importantly, Mr. Kapila also testified about the summary chart previously prepared by MCAG allegedly showing where the funds were actually spent (*see* Cigna Trial Exhibit 21 (summary chart)), and Cigna Trial Ex. 3, at 31, Table 1 (SAM Report discussing summary chart)). Mr. Kapila confirmed the falsity of that made-up chart by confirming that it: (1) did not reflect the $4.8 million of Cigna settlement funds that were used to pay the settlement in the unrelated RNP litigation (*id.* at 106); (2) did not reflect liens that MCAG used settlement funds to pay (*id.*

at 107); (3) did not reflect any lines of credit that Cigna settlement funds were used to pay (*id.*); and (4) did not reflect any indemnity claim by MCAG that it previously relied on to explain why it took the majority of those funds (*id.*). Even if accurate—which it is not—the summary chart is an admission that MCAG used the client funds for its own purposes. *Id.* Mr. Pollack concurred that the MCAG Charts were false. Pollack Report, Cigna Trial Ex. 4, at 17-18; 1/12/18 Pre-Evidentiary Hr. Tr. 1214-15 (Pollack) [D.E. 6685-7]. *See* Findings of Fact and Conclusions of Law, at 19-21.

The SAM then testified that MCAG had in excess of *fifty* operating accounts in which it comingled the Cigna settlement funds. *Id.* at 110:2-4 (Q. "Mr. Kapila, along that line, MCAG had about 50 of its own operating accounts that it put this money in, right?" A. "I believe it was more than that, but yes."). *See* Findings of Fact and Conclusions of Law, at 18-19 & 53-54.

### Richard Pollack

Cigna's expert, Richard Pollack, then testified. He confirmed the veracity of his expert report made through declaration, as well as his extensive resume. *Id.* at 126-27. He then confirmed that he "agreed with Mr. Kapila's findings." *Id.* at 131.

MCAG's counsel focused its cross-examination again on the distraction of whether its previous data dump of 44 Excel spreadsheets could somehow be used to trace the pre-Arbitration payments without the canceled checks, but as the Court asked, "What's the relevance?" *Id.* at 134-36.

MCAG did not and could not dispute that it used at least $4.8 million of Cigna's $14.2 million Post-Arbitration funds to settle with RNP in an unrelated case brought against MCAG and its principals.

D.E. 7004, at 229 Steinberg Questioning Pollack

11      Q. Did you review bank records where you traced $4.8 million of

12      Cigna settlement funds to pay the settlement in that unrelated
13      case?
14      A. Yes, I did.

To "independently verify" Mr. Kapila's expert report, Mr. Pollack confirmed that he "looked at the [previously unproduced] QuickBooks . . . the financial statements that were produced . . . his report . . inconsistencies in the records . . . liability accounts that did not tie out . . . evidence of non-descriptive subscriptions for account balances . . . and the records.  *Id.* at 144-46.  His testimony only cemented the fact that MCAG took the Cigna settlement funds, commingled them, and used them for its own purposes like the "RNP litigation," all of which, as the Court stated, "is troubling."  *Id.* at 146-47.

All that was left for Mr. Pollack's cross was MCAG's attempt to reprise its phony summary charts discussed at paragraph 34 of Mr. Pollack's report in a deceptive effort to show that MCAG's available "Cash Balance" at Year End 2017 was greater than what was shown as the "Cash Needed to Pay Claims."

| | Cash Needed to Pay Clients | Cash Balance at 12/31 |
|---|---|---|
| YE 2005 | 4,979,617.73 | 8,103,455 |
| YE 2006 | 4,533,898.00 | 15,373,156 |
| YE 2007 | 3,909,592.14 | 10,951,574 |
| YE 2008 | 3,207,597.16 | 11,333,192 |
| YE 2009 | 2,741,316.47 | 15,165,910 |
| YE 2010 | 4,374,120.19 | 11,111,631 |
| YE 2011 | 4,081,592.61 | 6,604,546 |
| YE 2012 | 3,405,800.80 | 13,509,448 |
| YE 2013 | 3,192,377.72 | 9,832,336 |
| YE 2014 | 4,829,712.60 | 12,267,914 |
| YE 2015 | 4,518,960.61 | 10,276,036 |
| YE 2016 | 4,097,508.08 | 5,442,516 |
| YE 2017 ( 4 months ) | 3,804,109.09 | 4,451,561 |

MCAG's Summary Ledger as exhibited in paragraph 34 of Mr. Pollack's
Expert Report.

As Mr. Pollack correctly responded, that "is misleading" because, among other things, the chart does not reflect the $4.8 million of Cigna's payments that MCAG used for the RNP litigation,

nor does it include interest.  *Id.* at 150-52.  The fundamental flaw in that chart, however, is the false claim that only $3,804,109.09 was all that was needed to pay clients as of YE 2017.  This is part of the same fraudulent misrepresentations that MCAG presented in its phony "CIGNA Arbitration Funds" summary chart.  *See* Kapila Report, Cigna Trial Ex.3; and Cigna Trial Ex. 21.

As Mr. Pollack's Report shows, the "contemporaneous financial documents demonstrate that MCAG's summary chart is false, because it now re-characterizes MCAG's salaries, benefits and expenses as those of the class, and universally allocates compensation in all years for Douglas Perry (25%), Timothy Schmidt (10%), Donald Obertzacz (25%) and Peter Schmidt (10%) to Class Members – without any support."  In other words, the "Cash Needed to Pay Clients" was not $3,804,109.09, because that wrongfully assumed that MCAG was allowed to deduct those costs *in excess of the agreed retainage* from the amounts it owed its clients—and because it ignored the many other financial obligations MCAG had.  *See id.*

**Managed Care Advisory Group, LLC**
**CIGNA Arbitration Funds**
**at 04/27/2017**

| | CIGNA Payments | MCAG Retention | Partners Retention | Legal Fees | Salaries & Benefits | Other Expenses | Remaining Client Funds | Cash Needed to Pay Clients | Cash Balance at 12/31 |
|---|---|---|---|---|---|---|---|---|---|
| YE 2005 | $ 7,500,000 | $ (1,410,000) | $ (735,000) | $ (237,312) | $ (138,070) | $ - | 4,979,818 | 4,979,817.73 | 8,103,455 |
| YE 2006 | - | - | - | (298,146) | (116,711.46) | (30,862) | (445,720) | 4,533,898.00 | 15,373,156 |
| YE 2007 | - | - | - | (514,970) | (105,204.55) | (4,131) | (624,306) | 3,900,502.14 | 10,951,574 |
| YE 2008 | - | - | - | (594,141) | (104,080.47) | (3,773) | (701,995) | 3,207,597.18 | 11,333,192 |
| YE 2009 | - | - | - | (350,787) | (111,993.55) | (3,500) | (466,281) | 2,741,316.47 | 15,165,910 |
| YE 2010 | 3,051,445 | (573,672) | (299,042) | (301,711) | (142,556.82) | (11,650) | 1,632,804 | 4,374,120.19 | 11,111,631 |
| YE 2011 | - | - | - | (168,821) | (123,666.93) | - | (292,528) | 4,081,592.81 | 6,604,546 |
| YE 2012 | - | - | - | (331,887) | (343,904.96) | - | (675,792) | 3,405,800.83 | 13,509,448 |
| YE 2013 | 648,630 | (121,866) | (63,370) | (481,040) | (135,991.69) | (58,085) | (213,423) | 3,192,377.72 | 9,832,336 |
| YE 2014 | 2,900,990 | (562,306) | (293,117) | (353,269) | (134,982.96) | (10,000) | 1,637,338 | 4,829,712.63 | 12,767,914 |
| YE 2015 | - | - | - | (171,595) | (139,157.13) | - | (310,752) | 4,519,960.61 | 18,278,036 |
| YE 2016 | - | - | - | (287,839) | (133,613.09) | - | (421,453) | 4,097,508.08 | 5,442,516 |
| YE 2017 ( 4 months ) | - | - | - | (248,399) | (45,000.00) | - | (293,399) | 3,804,109.09 | 4,451,561 |
| Total | $ 14,189,066 | $ (2,667,544) | $ (1,390,528) | $ (4,430,018) | $ (1,774,864) | $ (122,002) | $ 3,804,109 | | |

MCAG's Summary Chart as exhibited at page 35 of Mr. Pollack's report

Moreover, as Mr. Pollack sworn report confirmed, MCAG had "total liabilities in excess of $22 million, nearly $18 million more than the amount showed on the 'Summary Ledger' as

being owed to Class Members."  Pollack Report, Cigna Trial Ex. 4, at 20.   *See* Findings of Fact and Conclusions of Law, at 19-24.

## Genevieve Parm

MCAG presented its first witness, Genevieve Parm.  Ms. Parm testified that she had worked from 1986 through 2013 at the Florida Eye Clinic but had retired.  D.E. 7004, at 187.  She testified that she was the person with most knowledge at Florida Eye Clinic regarding the Cigna settlement and Arbitration.  *Id.* at 188.  Ms. Parm acknowledged that she was not a class member, nor did she represent the class.  *Id.* at 199.

Ms. Parm, who is not a doctor or lawyer, acknowledged that MCAG could have "a lot more" than 3,000 other clients.  *Id.*  She admitted that she was "never in contact with those other class members" (*id.*), and that MCAG never provided her or the Florida Eye Clinic with a copy of the Settlement Agreement, never told her that the Court found against MCAG on the Category Two claims (*id.* at 203), and never informed her that it was seeking indemnity from the Florida Eye Clinic.  *Id.*

Moreover, MCAG never advised her that Cigna had paid the $14.2 million for class members, or that it was not paying any of those funds to its clients.  *Id.* at 204-05.  MCAG never advised her how it was using the funds or that it was using them to pay unrelated litigation settlements (*id.* at 205-06), or pay its owner partners.  *Id.* ("I don't know how they spent their money.").

She also admitted that she expected that if there was interest earned on the money, "[t]hat portion that was not theirs . . . should go to Florida Eye Clinic."  *Id.* at 209.  Then she acknowledged that the Florida Eye Clinic did not receive any of the $14.2 million, and no one from MCAG ever told her that they "spent the class money on their own compensation, salaries, leases, lines of credit and operational expenses," or sought any "approval or agreement" to do so.  *Id.* at 211.

### Richard Pollack (conclusion)

The conclusion of Mr. Pollack's testimony (bifurcated for Ms. Parm's travel schedule) followed with Mr. Pollack testifying that there is no explanation for "how they would be allowed to use funds other than the retention for their legal fees" or "other expenses" and that he did not "see any support for that." *Id.* 215-16.  *See* Findings of Fact and Conclusions of Law, at 20-21.

Mr. Pollack then confirmed that he had reviewed the Settlement Agreement and all the records produced by MCAG.  D.E. 7004, at 229.  He determined that MCAG used the $4.8 million "of money that Cigna had paid" to settle the RNP case.  *Id.* at 230.  *See* Findings of Fact and Conclusions of Law, at 27-28.

Then he confirmed that he had received MCAG's QuickBooks general ledger accounting program that was not produced here, but was produced in the RNP action, while this case was pending.  D.E. 7004, at 230-31.  He testified that those records showed that, previously, MCAG would be responsible for expenses such as legal fees, salaries, benefits, and would not charge the class members for these expenses.  *Id.  See* Findings of Fact and Conclusions of Law, at 21-24.

He testified that each separate Physician Agreement had various categories of fees, but that MCAG produced no records that tie the retention it took to any of those categories of fees.  D.E. 7004, at 237.  He also found no records "at all" supporting MCAG's "so-called indemnity claim." *Id.* at 239.  *See* Findings of Fact and Conclusions of Law, at 29-32.  Mr. Pollack concluded by testifying that MCAG was "double-dipping" because "it's taking the retention for [itself] and then [it's] also paying a fee to [itself].  D.E. 7004, at 240.

### Jeffery Buchakjian

MCAG then presented its expert, Jeffery Buchakjian, who confirmed his report and a supplement without change but had nothing more to add on direct.  *Id.* at 241-42.

On cross the next day, Mr. Buchakjian first admitted that he did not even consider the prior testimony by MCAG's previous expert, Mr. Bernstein, despite the fact they were "at the same firm." 1/14/25 Hrg. Tr., at 5-6, 8-9 [D.E. 7005].

Mr. Buchakjian was then asked about his supplemental affidavit dated April 18, 2023, which was issued in response to the Order (MCAG Trial Ex. 16) requiring a "a more detailed explanation as to MCAG's position that 'it obtained permission from clients to use these funds in connection with supporting the ongoing arbitration between Cigna and MCAG.'" *Id.* at 10.  He admitted that in responding to that Order, he did not contact any clients of MCAG, or communicate with them in any way. *Id.* at 11.  What he did do was "explain to the Court that this was MCAG's position and that it was a legal position" and "I'm not offering an opinion because I don't believe I, or any of the other accounting experts in this case, are qualified to offer an opinion on that . . . but I provide context associated with the assumption of liability." *Id.* at 12.

After avoiding the question as to whether he had seen any records produced by MCAG that contain permission by a class member to spend class funds, Mr. Buchakjian testified that other "than the declarations from class members [that were never presented as evidence or subject to cross-examination], the indemnity clause in the Physician Agreements, and the order by Arbitrator Schultz" he is not "aware of any other document that MCAG has produced related to the permissions that you're discussing." *Id.* at 13-15.

Remarkably for an accounting "expert," he testified that he was not aware of a rule where, when an entity or person is holding another person's funds, they are required to make full disclosure to their principals. *Id.* at 18.  *See also* Findings of Facts and Conclusions of Law, at 25, 27, 47, 50, 68-71, 74, 77 & 94.

MCAG's expert was also conveniently unaware of the previous testimony of his client's CEO, Mr. Schmidt, and still could not answer whether, if Mr. Schmidt admitted that MCAG was an "agent" for its class members, or whether MCAG had a "duty to account for the funds they receive"? D.E. 7005, at 20.  He just did not "know in all aspects when disclosure would be required in the universe of accounting rules."  *Id.* at 21.

MCAG's expert even testified that he was not opining on the right of MCAG to take or keep any of the class funds.  He made clear that "I'm not offering a legal opinion on MCAG's legal right to retain those funds, but I understand it is MCAG's position under the terms of these Physician Agreements that it was entitled to those funds."  *Id.* at 26.  When presented with one of those Physician Agreements, Cigna Trial Ex. 82, Mr. Buchakjian could not provide any information about the number of Category A claims there were that only permitted a fee of $12 to $18 (*id.* at 34), and with respect to the other categories of fees, he finally did concede that "a specific percentage would apply to each Physician Agreement."  *Id.* at 36.

He also offered no opinion as to whether MCAG was entitled to keep the first $7.5 of the $14.2 million paid on the Category Two claims, nor had he reviewed Arbitrator Schultz's 2014 order denying that position taken by MCAG.  *Id.* at 39.  He was presented with Cigna Exhibit 125, an email between Epiq and MCAG's lawyers, and asked about the statement in that email that "after *applying the remaining funds* from the $7.5 million *deposit* and reconciling payment batches 1 through 3, the wire payment to MCAG will be $2,719,735.64."  *Id.* at 43.  He admitted that there was "no doubt" that this indicated that the $7.5 million was applied against approved claims (as opposed to being MCAG's money).  *Id.* at 44-45 (emphasis added).

Although he wrote in his report that he understood "that MCAG kept the AMA and Physicians Advocacy Institute and their steering committees apprised of the use of the funds to

pay legal expenses associated with obtaining a full recovery from Cigna," he stated that this understanding came from the declaration of Mr. Katz, but that he did not review Mr. Katz' previous testimony (where numerous admissions were made during cross-examination contrary to this claim) or even ask for it. *Id.* at 45-46. He did not "know" whether that would have been important to know before parroting Mr. Katz declaration prepared by MCAG lawyers. *Id.* at 46.

With regard to the Order from Arbitrator Schultz he purportedly relied upon and was interpreting as allowing legal fees to be paid to MCAG's lawyers, the witness was shown the Order (Cigna Trial Ex. 122). *Id.* at 48-49. He agreed that the Order, as it stated, was the result of the "disappointing inadequacy of MCAG's financial disclosures and the absence of competent source business records necessary to provide the functional equivalent of an accounting." *Id.* He interpreted the Order's admonition that "[o]ther than payments to **third parties** for historically paid costs and expenses of this Arbitration proceeding, future diminution of CMC funds by MCAG payments to itself for executive salaries and unrelating operating costs will be viewed with disfavor as this arbitration proceeds to conclusion" (emphasis added) as *carte blanche* permission for MCAG to use its clients' funds to pay all legal fees without agreement from the clients. *Id.* at 50; *see also* Cigna Trial Ex. 122. But he admitted that the Order does not specifically refer to MCAG's attorney's fees, and that MCAG was not a "third-party."

When asked whether he performed a formal accounting of the receipt and disposition of Cigna's settlement funds by MCAG, Mr. Buchakjian feigned a lack of knowledge as to what is a "formal accounting." *Id.* at 51-52 & 54-55. He dodged questions about whether he did an accounting as to the actual use of the $14.2 million. *Id.* at 53-54. But he finally admitted that "there was no analysis of the disbursement of those funds because they were not disbursed to the

class members." *Id.* at 53.  He simply did not "do an independent analysis of the cash that was received and used at the time." *Id.* at 54.

With regard to the fact that the Cigna settlement funds were "commingled in many, many MCAG operating accounts," Mr. Buchakjian was "aware of the commingling issue, yes." *Id.* at 59.  As to paragraph 58 of Mr. Pollack's Report, "regarding all the uses to which Cigna settlement funds were put," Mr. Buchakjian confirmed that "I do not dispute that these types of expenses were identified in these commingled accounts." *Id.* at 62.

He further confirmed that the $14.2 million in "funds were not paid to class members," they were not "segregated" ("I'm aware of the commingling issue and am not disputing that"), and—in his words—he was "not disputing that funds were used to pay operating expenses." *Id.* at 65.  He did not dispute that MCAG paid what his report described as a "nominal" amount in "an unrelated litigation settlement." *Id.* at 66.  But he agreed:  "$4.8 million is not a small amount and I am wondering why that term was used [in his report], assuming it relates to this RNP litigation. But I do not consider $4.8 million to be a small amount, no." *Id.* at 67-68.

Although he tried to justify taking the $4.8 million by testifying that it was "replenished," Mr. Buchakjian had no "reason to dispute" Mr. Kapila's finding that Cigna's settlement funds were used to pay the "unrelated settlement in the RNP case." *Id.* at 68.  On questioning by the Court, MCAG's counsel represented that the so-called "replenishment" of the $4.8 million into the MCAG operating account within the calendar year came from "revenue from other businesses" and agreed that they have "no disagreement with Mr. Kapila's report and what he said about that." *Id.* at 73.

Upon continued questioning by counsel for Cigna, Mr. Buchakjian admitted that "Mr. Kapila characterized it [the "replenishment"] as "a payment from another class settlement." *Id.* at

76.  Further, he admitted that despite the "replenishment," there is "no dispute" that MCAG "did not distribute to class members the $14.2 million." *Id*. at 77.  Finally, Mr. Buchakjian admitted on the Court's questioning that "nothing is available, no money is available" of the "14.2, that's correct." *Id.* at 80.  That is, the so-called "replenishment" went to MCAG, not to the class members.

Thus, MCAG's expert performed no Accounting, did not even examine or opine on the majority of mis-uses of class funds, such as the $4.8-6.2 million used by MCAG to settle an unrelated case or the approximately 75% of the funds MCA took under its false indemnity claim. Such purposeful refusal to even examine these and many other key issues make his testimony totally unreliable.

## Matthew Katz

MCAG's closing witness was Matthew Katz.  Mr. Katz had a role with a group called the "Physicians Advocacy Institute," or "PAI."  *Id.* at 142.  His expectation was that MCAG's recovery should "go to the class and then MCAG based on their agreements with the class members."  *Id.*

On cross-examination by Cigna, Mr. Katz confirmed he is neither a doctor nor a lawyer. *Id* at 145.  He is not a class member and does not represent the class members in any capacity and is not testifying as an expert in any capacity.  Nor did he receive approval from class counsel, the AMA or any individual class member to testify.  *Id.*  He confirmed that the PAI is *not* the Physicians Advocacy Committee ("PAC") named as a watchdog in the Settlement Agreement.  *Id.* at 146-47.  Accordingly, he admitted that he would be "troubled and disappointed" if MCAG "misappropriated funds."  *Id.*

He confirmed that there were no agreements with himself, the AMA, or the PAI whereby any of those entities he was associated with "would distribute notices or information regarding these proceedings to MCAG's class member clients."  *Id.* at 149-50.  It is "correct" that neither he

nor the PAI have done anything to determine whether MCAG disclosed to the class members the amounts Cigna paid and the amounts "MCAG has paid to the class members." *Id.* at 151.

He never sent a notice, or letter to the class members, but "can't recall" whether there "may have been an email or two," although "definitely not a blast fax kind of thing, that's correct." *Id.* at 153. He did not even have a list of the class members that MCAG represented "[o]utside of Connecticut." *Id.* at 153-54. So he "can't say that all the class members were given notice that MCAG received the 1[4].2 million from Cigna." *Id.* at 154.

He then admitted that in reality, he only learned of the "specific amounts that Cigna had paid for approved Category 2 claims" at his "last deposition" in "either 2020 or 2021."[3] *Id.* at 154-55. Mr. Katz admitted that it would not be "fair" for MCAG to use those funds to pay other settlements in other unrelated litigation. *Id.* at 156.

Upon showing him Cigna Trial Ex. 21, the chart MCAG created, he believes "this was the document I was shown in 2018." *Id.* at 157-62. That is, he did not have any information prior to 2018 and the charts he received in 2018 were inaccurate, as confirmed by Mr. Pollack. That said, he was not aware of any accounting that shows that the funds were actually used for the purposes indicated in the chart, and he was not "commenting on what the Physicians Agreements required." *Id.*

He did agree that "if there's interest, which I believe there should be, that would be given to MCAG and the clients based upon whatever the contractual breakdown was." *Id.* at 163. He

---

[3]    Cigna paid almost half of the $14.2 million to MCAG in November of 2005. It paid the remainder of the $14.2 million as of 2010 (except for a small amount paid later in 2014). Given that the last payment Cigna made to MCAG relating to the $14.2 million "post-Arbitration" funds was in 2014, coupled with the more than $9 million in net losses in 2014 and 2015 and the fact that only $68,000 of Cigna funds remained as of December 31, 2015, the Cigna settlement funds paid to MCAG were fully depleted no later than early 2016.

further confirmed that he was never provided with the SAM Report, nor the MCAG calculation of interest (Cigna Trial Ex. 58). *Id.* He was not aware of any role the PAI had involving the Cigna settlement or "if it ever had any role with regard to Cigna." *Id.* at 166-67.

Mr. Katz admitted that he "didn't inform any of them (class members) of the [$14.2 million] . . . because [he] didn't know." *Id.* at 168. He admitted that he could not recall ever sending to anyone "documents telling them what MCAG was doing with the [$14.2 million]." *Id.* Finally, he admitted that the PAI is not a class member, does not represent any class members, and does not monitor compliance with the Cigna Settlement Agreement. *Id.* at 168-69.

### Conclusion:  What was Promised, and What was Proven

The evidence confirmed that Cigna proved everything it said it would. Cigna promised in its opening statement that the evidence will show that MCAG received the $14.2 million, kept the $14.2 million of class/ERISA funds and the interest, and never paid its clients. Further, there would be no evidence "of MCAG being entitled to indemnification." 1/13/25 Hrg. Tr., at 8 [D.E. 7004]. In addition, Cigna advised the Court that the evidence would show that MCAG used at least $4.8 million of Cigna settlement funds to pay a settlement in an unrelated case. Moreover, "[t]here would be no evidence any MCAG client received notice that the claims had been paid by Cigna, that MCAG kept the money for themselves, or what MCAG did with the funds." *Id.* In reality, as Cigna represented, none of the clients had been paid, MCAG took all of the Cigna settlement funds, and the class funds were used for MCAG's purposes.

MCAG, on the other hand, proved nothing. MCAG's counsel represented in its opening statement that "the way MCAG would communicate with all of its clients, because there were a couple thousand, is they would talk to the State medical societies and the Physicians Advocacy Institute, and they would disburse the news that way." *Id.* at 22. In fact, Mr. Katz, the only witness with a connection both to a state medical society (Connecticut's) and the unrelated PAI, confirmed

that he did not communicate with "all of" MCAG's clients.  Counsel promised that "you're going to hear from Mr. Schmidt that MCAG has expended 13 and a half million dollars on lawyers' fees and arbitrator fees and expert fees.  So MCAG has not kept a penny of Cigna monies."  *Id.* at 24. Although Mr. Schmidt (MCAG's CEO) attended both days of the hearing, and MCAG counsel repeatedly promised to put him on the stand, he did not testify and absolutely no evidence was presented as to the costs of legal or arbitrator fees, the "indemnity" defense, the payment of at least $4.8 million to settle an unrelated case, and/or MCAG's use of class/ERISA funds.

MCAG's major premise was that it had no duty to pay its clients the money.  "[Y]ou're going to hear from Mr. Kapila and Mr. Pollack that their entire report is based upon MCAG being a fiduciary, but MCAG is not a fiduciary in any way, shape, or form here," counsel represented. *Id.* at 25.  "They're a contracting party providing a service, and you're going to hear that from Ms. Parm as well, that they're just a service provider."  *Id.*

This is a theory of wishful thinking.  The law is clear that any agent that holds money, and those holding class/ERISA funds for another, has a fiduciary duty to safeguard, make full disclosures, and pay those funds to the beneficiaries.  *See also*  Statement of Facts and Conclusions of Law, at 15-16, 52-58.

Thus, MCAG's bald opening statement that "Ms. Parm will testify not only there was no fiduciary duty, but she doesn't believe Cigna has any standing to interfere in her contract with MCAG" (*id.* at 26) was not only unproven, but Ms. Parm testified to nothing of the sort.  She provided no testimony or evidence whatsoever on either fiduciary duties or Cigna's standing.

Finally, MCAG's counsel promised at the outset that:  "I am going to put on witnesses. They're going to tell you that the $7.5 million was not restricted in any way and was used appropriately to pay the lawyers and the arbitrators and to pursue the case, and then when the

additional funds came in, there's no way to distribute those until the end because you need to know how much the fees are to deduct." *Id.* at 32-33. Again, there was no evidence that the first payment of $7.5 was for MCAG rather than its clients—and all the evidence presented demonstrated that this initial portion of the $14.2 million that was never paid to MCAG's clients, was accounted for by MCAG as though they *were* client funds. *See* Findings of Fact and Conclusions of Law, at 4-6.

As Cigna stated in its opening: "this is pure theft, pure and simple." D.E. 7004, at 12-13. And that is exactly what was proven.[4]

## **REMEDIES**

For the foregoing reasons, Cigna requests the following remedies, which are more thoroughly discussed, along with the Court's authority to impose such remedies, in the Proposed Findings of Fact and Conclusions of Law, at 72-99 (Ex. A hereto):

1. Removing MCAG and its counsel from representing class members and/or continuing their attempt to obtain additional class settlement funds from Cigna;

2. Providing restitution and disgorgement by MCAG of all funds and interest thereon that MCAG received from the Cigna settlement, both pre- and post-Arbitration, to class members. If such class members are not identifiable or cannot be located or if specific amounts cannot be determined to be returned to specific class members, MCAG nevertheless must pay such funds into to registry of the Court. Under the terms of the Settlement Agreement such funds were to revert to Cigna. Cigna, however, has waived its right of reverter and instead agrees to donate such funds for which entitled class members cannot be located to a reputable charity.

3. The Court should permit briefing on the issue of MCAG's payment of Cigna's attorney fees and costs, as well as the Special Accounting Master's current fees and costs.

---

[4] Please see Cigna's Proposed Findings of Facts and Conclusions of Law, which contains a more complete factual and legal analysis of the undisputed facts and the unchallenged legal propositions in this matter.

4. Interest based on the formula presented by Mr. Pollack's firm, which followed the SAM analysis where possible, should be awarded pursuant to the chart below:

|  | **$11,565,671**<br><br>**Pre-Arbitration Transfers**<br><br>**By CIGNA to MCAG** | **$14,189,066**<br><br>**Arbitration Transfers by CIGNA to MCAG** | **Total** |
|---|---|---|---|
| **Judgement Interest** | $3,676,442.26 | $3,190,208.84 | $6,866,651.10 |

5. The Court should refer this matter to the Department of Justice to determine whether criminal conduct took place.

Dated:  February 27, 2025.

Respectfully submitted

**HOGAN LOVELLS US LLP**

By */s/  Marty Steinberg*
Marty Steinberg
Florida Bar No. 187293
marty.steinberg@hoganlovells.com
Alvin Lindsay
Alvin.lindsay@hoganlovells.com
600 Brickell Avenue, Suite 2700
Miami, Florida 33131
305-459-6500

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on February 27, 2025, I electronically filed the forgoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By <u>*/s/  Marty Steinberg*_____</u>
　　　Marty Steinberg