**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 00-01334-MD-MORENO/GOODMAN

IN RE: MANAGED CARE LITIGATION

_____/

<u>**MCAG'S CLOSING ARGUMENT**</u>

Approximately 20 years ago, Managed Care Advisory Group, Inc. was recruited by the American Medical Association based on the AMA's harsh experience with a similar nationwide settlement with a large insurance company that left many of its members essentially empty-handed. To ensure that its members would not similarly struggle to obtain compensation under the Settlement Agreement with CIGNA in this case, the AMA realized that MCAG could help its members gather and submit timely and valid claims for compensation in the days before electronic recordkeeping, digital medical databases, and cloud computing were commonplace. In short, without MCAG's assistance, MCAG's class-member clients would have had little hope of receiving any compensation in the first instance.

Thus, for the past two decades, MCAG has remained devoted to helping the class members recover the funds they are owed under individual "physician agreements" with each of its clients. *See, e.g.*, DE 6520-1. The physician agreements are not all identical, but generally comprise simple two-page contracts that impose basic obligations on the class member and MCAG to work together to submit claims under the settlement. The physician agreements also provide for MCAG to deduct its retention fees (ranging from 25 to 30%)—which includes deductions for attorneys' fees, arbitration fees, and other arbitration costs in accordance with the approval of class members, class-member representatives, arbitrators, and magistrate judges—before distributing any "net recoveries" to the clients. *Id.* ("MCAG cannot warrant or guarantee the dollar amount returned

to Client through the Settlement process"; "Client will pay MCAG for services rendered according to the fee schedule . . . regardless of the ultimate recovery obtained by Client from the Settlement").

Because CIGNA was so surprised by the effectiveness of MCAG's assistance and the number of claims for reimbursement that MCAG's clients were capable of submitting, CIGNA made a business decision to abandon the settlement agreement's claims-processing procedures and payment terms and challenged the class members to fight for what they were owed. CIGNA's scorched-earth litigation tactics required MCAG to endure exhaustive adversary arbitral proceedings that spanned three separate arbitrators; several rounds of disputed re-processing exercises conducted by two settlement administrators; two contested accountings by a special accounting master; a myriad of strident motions including competing motions to vacate or modify the Final Award before this Court; and three appeals to the Eleventh Circuit.

Accordingly, while MCAG reasonably constrained its expenditures on behalf of the class members, the unavoidable costs that it was forced to incur in response to CIGNA's unreasonable tactics throughout the 20-year course of proceedings comprised over $9,095,120 in legal fees; $588,670 in arbitrator fees; $2,311,667 in expert witness and other third-party vendor fees; and $326,049 for the Special Accounting Master, totaling **$12,321,506** (excluding unpaid accrued invoices). Those reasonable expenses, along with all other aspects of the accounting ordered by the Eleventh Circuit, are detailed in the expert analyses by Jeffrey Buchakjian that are attached as exhibits hereto, reviewed in narrative form below, and summarized in the following flow chart requested by this Court on the record at the evidentiary hearing:[1]

---

[1] Based on a calculation of retention on a class member-by-class member basis, MCAG's retention on Post-Arbitration claim payments by CIGNA totaled $4,057,268, or approximately 28.6%. For purposes of this accumulation of cash activity, the 28.6% average retention rate for Post-Arbitration claims is applied to each of the CIGNA payments, as the timing of payments by CIGNA differs from the timing of the actual approval of claims. The determination of the approved

| Description | CIGNA Payments | MCAG Retention | Legal Costs | Arbitrator and Mediator Costs | Expert, Third Party, and SAM Costs | RNP Disbursed | RNP Replenished | Payments to Class Members | Cash Remaining |
|---|---|---|---|---|---|---|---|---|---|
| **"Pre-Arbitration"** | | | | | | | | | |
| YE 2005 | $ 11,565,540 | $ (3,497,450) | - | - | - | - | - | $ (5,878,124) | $ 2,189,966 |
| YE 2006 | 132 | - | - | - | - | - | - | (2,188,627) | 1,471 |
| YE 2007 | - | - | - | - | - | - | - | (1,471) | - |
| **Total** | **$ 11,565,672** | **$ (3,497,450)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (8,068,222)** | **$ -** |
| **"Post-Arbitration"** | | | | | | | | | |
| YE 2005 | 7,500,000 | (2,144,575) | (237,312) | - | - | - | - | - | 5,118,113 |
| YE 2006 | - | - | (252,888) | (14,396) | (30,862) | - | - | - | 4,819,966 |
| YE 2007 | - | - | (488,058) | (22,781) | (4,131) | - | - | - | 4,304,996 |
| YE 2008 | - | - | (548,971) | (41,397) | (3,773) | - | - | - | 3,710,855 |
| YE 2009 | - | - | (343,721) | (3,566) | (3,500) | - | - | - | 3,360,068 |
| YE 2010 | 3,051,445 | (872,540) | (370,070) | (21,641) | (11,650) | - | - | - | 5,135,611 |
| YE 2011 | - | - | (168,921) | - | - | - | - | - | 4,966,691 |
| YE 2012 | - | - | (257,317) | (74,115) | - | (4,800,000) | 4,800,000 | - | 4,635,259 |
| YE 2013 | 646,630 | (184,900) | (376,312) | (46,644) | (58,085) | - | - | - | 4,615,949 |
| YE 2014 | 2,990,990 | (855,254) | (323,046) | (20,223) | (10,000) | - | - | - | 6,398,416 |
| YE 2015 | - | - | (171,595) | - | - | - | - | - | 6,226,822 |
| YE 2016 | - | - | (244,223) | (43,616) | - | - | - | - | 5,938,982 |
| YE 2017 | - | - | (489,020) | (46,841) | (41,449) | - | - | - | 5,361,672 |
| YE 2018 | - | - | (557,902) | (95,722) | (16,756) | - | - | - | 4,691,292 |
| YE 2019 | - | - | (705,877) | (27,603) | (195,826) | - | - | - | 3,761,985 |
| YE 2020 | - | - | (1,401,227) | (50,624) | (739,050) | - | - | - | 1,571,084 |
| YE 2021 | - | - | (1,055,946) | - | (994,680) | - | - | - | (479,542) |
| YE 2022 | - | - | (685,202) | (69,500) | (387,865) | - | - | - | (1,622,110) |
| YE 2023 | - | - | (96,940) | - | (52,123) | - | - | - | (1,771,173) |
| YE 2024 | - | - | (320,572) | (10,000) | (87,965) | - | - | - | (2,189,709) |
| **Total** | **$ 14,189,065** | **$ (4,057,268)** | **$ (9,095,120)** | **$ (588,670)** | **$ (2,637,716)** | **$ (4,800,000)** | **4,800,000** | **$ -** | **$ (2,189,709)** |

## **BACKGROUND, OVERVIEW, AND INTRODUCTION**

With the approval of the class members, class member representatives, arbitrators, and this Court, MCAG reasonably utilized portions of the partial recovery it was able to extract from CIGNA over time to fund its pursuit of a full recovery on behalf of the class members. An "accounting of all funds CIGNA previously paid to MCAG" reflects that those funds were properly expended "for the benefit of the class members" absent any of the malfeasance or irregularities that CIGNA imagined, ultimately squandering several additional years and several additional millions of dollars on yet another ancillary adversarial diversion that CIGNA initiated in an effort

---

claim amount and corresponding retention amount for each class member is provided separately. Legal costs include both fees charged and expenses for attorneys. The detail of attorney expenses is separately addressed. Legal, arbitrator, mediator, expert, third party, and SAM costs do not include recent invoiced amounts that are unpaid.

to deprive the class members of the funds to which they are entitled. *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1163 (11th Cir. 2019).

**A.** **CIGNA, Not MCAG, Interfered with this Court's Fiduciary Obligation to Ensure that the Class Members Received that to Which They Were Entitled Under the Settlement Agreement**

MCAG devoted substantial time, resources, and risk to complete and submit class-member claims far in excess of expectations. To be sure, MCAG would have preferred for CIGNA to have immediately paid the class members what they were owed under the Settlement Agreement without any disruption or delay in 2005. If that had been the case, MCAG would have preferred to distribute over $10 million to the class members, rather than pay the attorneys, accountants, arbitrators, and other professionals that proved to be necessary to extract the funds that CIGNA resisted paying the class members for 20 years.

By the same token, after a hard-fought 20-year arbitration, MCAG would have preferred for this Court to either (a) refrain from vacating Final Award crystallizing three arbitrators' findings that CIGNA short-changed the class members by at least $16 million, or (b) modify the Final Award and enter additional relief flowing naturally from that Final Award that would have resulted in the class members receiving an additional $24 million.

In short, MCAG would have preferred for the class members to have received *all* of the funds that they were entitled to collect under the Settlement Agreement without interference, in addition to the millions of dollars that MCAG has already distributed to the class members to date. But MCAG is not to blame for any shortfall based on any purported accounting irregularities or for any other reason.

**B.**     **MCAG Was Authorized to Utilize Funds from CIGNA to Pursue a Full Recovery on Behalf of the Class Members**

In 2005, MCAG successfully recovered $11.6 million for so-called "Category One Claims," distributed approximately $8.1 million to its class-member clients, and retained $3.5 million as its fee, which was the first revenue MCAG received after two full years of work, including signing up clients and working together with them to gather, review, submit claims and pursue payment under the procedures in the Settlement Agreement. In total, MCAG's submission of Category A, Category 1, and Category 2 claims resulted in CIGNA making $11.6 million in payments. Those payments were made in 2005, and MCAG promptly paid all of its clients their share of the proceeds.

By August 2005, however, MCAG learned that CIGNA intended to flout its obligation to process and pay so-called "Category Two Claims," which would wrongfully deny tens of thousands of class members reimbursement for claims worth nearly $100 million. DE 4330. Consequently, MCAG was permitted—if not obligated—under its physician agreements with its clients to pursue the settlement funds that CIGNA wrongfully withheld, which in turn required an expenditure of resources to pay the necessary lawyers, accountants, arbitrators, and other professionals.

And there was no applicable restriction or prohibition against MCAG using the funds it negotiated or compelled CIGNA to pay along the way in order to pursue a full recovery on behalf of the class members. *See* DE 6520-1 (sampling of physician agreements stating that "Client will pay MCAG for services rendered according to the fee schedule . . . regardless of the ultimate recovery obtained by Client from the Settlement" and that MCAG will "return [any] net recoveries to Client").

Take, for example, the first $7.5 million that CIGNA paid in connection with the disputed "Category Two Claims" potentially valued at $94 million. The key provision of the parties' Supplemental Arbitration Agreement provided, in pertinent part, as follows:

> MCAG contends that it submitted unpaid Category Two Claims to the Settlement Administrator that it values at no more than $94 million. MCAG reserves the right to seek an award no greater than $94 million from the Arbitrator. However, in the event that MCAG receives an award that is greater than $67 million, MCAG agrees that it will accept $67 million as payment in full on that award. However, in the event that the Arbitrator awards MCAG less than $7.5 million, CIGNA HealthCare agrees that it will pay MCAG $7.5 million. This payment will constitute a full settlement of all Category Two Claims submitted by MCAG.

DE 6787-19.

Tellingly, neither CIGNA nor any other individual, entity, or tribunal has ever questioned, challenged, or complained about the fact that CIGNA negotiated an upper boundary of the amount it would be required to pay MCAG's class-member clients that could forego as much as $27 million, representing the difference between the $94 million sought and the $67 million cap.

As to the low of $7.5 million, rather than waiting until the end of the arbitration to pay the $7.5 million, CIGNA agreed to pay it, and did pay it, within 15 days of November 15, 2005. This $7.5 million was not "class member funds" when paid nor is it "class member funds" now. The $7.5 million was not related in any way to any single claim that was submitted by any of MCAG's clients. It was not related to any claim that was processed by CIGNA or by the Settlement Administrator. Rather, it was a payment to MCAG in the event MCAG lost the Arbitration—a typical high-low agreement.

Thus, under the terms of the high-low agreement, MCAG would keep the $7.5 million if CIGNA was correct that all such claims had "already been paid, and that the remaining Category Two Claims are not compensable under the terms of the Settlement Agreement." This Court held that "the Court agrees with Cigna that the Arbitrator Matthews should not have decided the

compensability of those claims in arbitration." *In re Managed Care Litig.,* No. 00-01334-MD, 2023 WL 7545315, at *7–8 (S.D. Fla. Nov. 14, 2023). Accordingly, since this Court vacated the Final Award, specifically agreeing with CIGNA that all of the Category Two Claims had already been paid, then MCAG is entitled to retain the entire $7.5 million as per the express terms of the Supplemental Arbitration Agreement. In other words, the Final Award, once vacated, did not result in any claims to be paid to class members for which this $7.5 million could be applied.[2]

No provision in the Supplemental Arbitration Agreement placed any restrictions on MCAG's use of these funds. To the contrary, requiring the $7.5 million to be distributed to any class members for any claims would have been nonsensical given CIGNA's explicit position at the time, in which it insisted that all of "MCAG's valid Category Two Claims have already been paid," meaning "that the remaining Category Two Claims are not compensable under the terms of the Settlement Agreement." DE 4360 at 4. Nor was it feasible to distribute those funds for 15 years or more, while they remained subject to reallocations and clawbacks by the Settlement Administrator. In fact, even "in the event that the Arbitrator awards MCAG less than $7.5 million"—indicating that no class member is entitled to any additional payment for any claim— then CIGNA still "agree[d] that it will pay MCAG $7.5 million [as] a full settlement of all Category

_____

[2] Moreover, the parties had an additional agreement concerning that $7.5 million payment, and this Court again adopted that agreement:

> No court or other tribunal including the United States District Court for the Southern District of Florida, shall have jurisdiction over any issue arising out of this Agreement, except the United States Court for the Southern District of Florida has jurisdiction to confirm, modify and/or vacate any award in accordance with the FAA and the parties' Arbitration Agreement.

This provision, as agreed by the parties and adopted and entered as an order by this Court, obviously means that this Court by the parties' own agreement and the Court's own Order adopting that Supplemental Arbitration Agreement, does not have any jurisdiction over any issue relating to the payment of the $7.5 million under the Supplemental Arbitration Agreement.

Two Claims submitted by MCAG," which would not have to be returned to CIGNA for any reason. DE 6787-19.

Accordingly, beginning in 2005, MCAG used portions of the $7.5 million including as its share of the proceeds (since it would be entitled to 30% under any circumstance) as well as to pay the lawyers pursuing the Arbitration, and to pay the arbitrator as well. And MCAG continued using these funds to pay the lawyers and the arbitrator through 2011 (and thereafter).

In 2010, however, the Settlement Administrator ordered CIGNA to pay $3,051,445 in claims it had processed. CIGNA refused and instead argued that MCAG had to pay those claims out of the $7.5 million that CIGNA had paid to it five years earlier.

But that position, which CIGNA maintains to this day, represents an abrupt about-face from the position it had advanced for several years that MCAG's clients had not submitted any valid claims for reimbursement at all or were tied in any way to any claims submitted by any particular class member. And it is an argument that CIGNA also makes with dubious standing. In contrast to the class members and various class member representatives whose interests are aligned with MCAG in pursuing a full recovery, CIGNA has a glaring tactical motivation to capitalize on a litigation ploy in its 20-year battle to resist making any payments under the Settlement Agreement.

Thus, Arbitrator Schultz rejected CIGNAs argument out of hand, ruling: "**the Supplemental Agreement establishes that the $7.5 million is a 'low,' rather than a prepayment, that is to be applied to any final award by this Arbitrator, not to pending claims**." Order, Sept. 9, 2011 (emphasis added). Of course, CIGNA refused to relent, refused to pay the claims EPIQ had told it to pay, and continued litigating what became known as the

"$7.5 million" issue for many years to come, including years of discovery on what MCAG had done with the $7.5 million.

By 2014, MCAG obtained favorable orders after nine years of grueling arbitration—not only to repeatedly require CIGNA to re-process the claims according to the Settlement Agreement, but also to repeatedly require CIGNA to pay claims that had been approved for payment—resulting in an additional recovery of $14.2 million. But many more claims worth tens of millions of additional dollars remained unprocessed, or had already been approved but remained unpaid by CIGNA, requiring additional litigation that has persisted to this day, and requiring additional funding, as reflected in MCAG's accounting records.

Predictably, CIGNA repeated its objection, and Arbitrator Schultz repeated his holding, rejecting CIGNA's request to restrict use of any CIGNA funds to pay for the arbitration and instead specifically authorized MCAG to continue "payments to third parties for historically paid costs and expenses of this Arbitration proceeding[.]" Order, June 26, 2018.

CIGNA also repeated its objection here, asking this Court to restrict MCAG from using any of the funds paid by CIGNA to prosecute the arbitration. On February 4, 2020, Magistrate Judge O'Sullivan entered an order stating that it is: "ORDERED AND ADJUDGED that Cigna Healthcare's Expedited Motion … to Restrict Any Further Use of Class Settlement Funds (DE # 6620, 12/16/19) is DENIED." DE 6641.

The use of CIGNA payments to pay for the expenses of the arbitration was supported not just by the Arbitrator and this Court, but also by the class members, the American Medical Society, the State Medical Societies, and the Physicians Advocacy Institute. *See* DE 6724-2-6; 6730-1; 6730-2; and 6767-1 (sworn declarations supporting "MCAG's use of any partial payments CIGNA

has made to pay its lawyers and experts and the arbitrator to pursue the total recovery against CIGNA.").

For example, Mr. Matthew Katz was initially employed by the American Medical Association and then served as the President of the Connecticut State Medical Society while also serving as a Board Member for the Physician's Advocacy Institute. When he was asked "were you ever told by MCAG what they were using the funds for," Mr. Katz answered "yes, originally, as I mentioned earlier, for legal costs and legal challenges to CIGNA is what I was told originally, that is correct."  Asked whether he agreed with MCAG using CIGNA payments to fund the arbitration, Mr. Katz responded that he believed MCAG "should use the full value of the funding to fight for everything that the class members were due," that he communicated with class members who wholeheartedly supported "utilizing the funds to fight in court against Cigna for the full value of their claims."[3]

---

[3] Mr. Katz testified as follows:

**Q.**     And were you ever told by MCAG what they were using the funds for?
**A.**     [Y]es, originally, as I mentioned earlier, for legal costs and legal challenges to Cigna is what I was told originally, that is correct.

**Q.**     Did you ever come to learn from MCAG that they were using any of the Cigna money, the initial money or later money, to fund this arbitration?
**A.**     Yes.
**Q.**     And did you ever raise any objections or did you agree with that?
**A.**     No objections and felt that -- personally felt that they should use the full value of the funding to fight for everything that the class members were due.

**Q.**     And did you communicate that to others at the PAI and your state medical society?
**A.**     Yes, or it was communicated to me by the class members that they wanted everything due to them.

**Q.**     So all the class member you spoke to supported MCAG using any funds it recovered from Cigna to pay the lawyers and arbitrators and experts to seek a recovery?

Likewise, Ms. Genevieve Parm, former CEO of MCAG client Florida Eye Clinic (a class member with one of the largest claims for payment), testified that MCAG kept the FEC updated on the status of the arbitration, and that the FEC fully supported MCAG's use of CIGNA's payments to fund its litigation efforts.  When CIGNA's counsel asked Ms. Parm: "And you would not expect that they would use the funds aside from that retainage, that 25 or 30 percent, to pay for other things. You'd expect that money would go to the clients, right?" She responded: "I believe they needed to pay the fees that seemed to be ongoing forever to their own attorneys and to their own personnel to just be able to continue this lawsuit."  Ms. Parm also testified that MCAG kept her "up-to-date on a regular basis about the status of the arbitration over the years," and that her company never objected to "MCAG spending money on lawyers and arbitrators" because "litigation is expensive."  And when asked to explain "If there's a recovery, how will the attorneys fees impact the Florida Eye Clinic's recovery?" She answered: "I believe the attorneys' fees will be paid and then there will be a portion that's appropriated to the Florida Eye Clinic from which MCAG will deduct its portion, according to the contract, and the rest would go to the Florida Eye Clinic to do an internal accounting for the funds."

## C.   MCAG Properly Accounted for All Funds from CIGNA Which Were Reasonably Expended to Pursue a Full Recovery on Behalf of the Class Members

In 2021, after another seven years of arbitration, including a 19-day final evidentiary hearing that resembled a trial, the dispute appeared to have been essentially resolved in a manner that vindicated MCAG's position all along, and would go a long way to providing the class members the funds they were entitled to under the Settlement Agreement. Specifically, MCAG

---

**A.**   We didn't get into that level of detail. It was utilizing the funds to fight in court against Cigna for the full value of their claims.

-11-

obtained a Final Award for another $16 million, bringing the total amount recovered at that time to **$42 million**. And that was not all that MCAG expected to ultimately recover.

For instance, as this Court remarked following the arbitration, the $16 million Final Award reflected an impermissible split-the-baby compromise that necessarily deprived the class members of an additional $8 million they were owed as a matter of course under the logic of the Final Award itself. Plus, the Final Award urged this Court to compel the Settlement Administrator to conduct a proper Final Accounting, which was likely to result in an additional $16 million being paid. All told, the Final Award and the additional amounts flowing naturally from the Final Award, including a proper Final Accounting, would have brought the total recovery obtained by MCAG on behalf of the class members to **$67 million**.

To be sure, this Court's recent Order—which is the subject of a pending appeal—vacated the favorable arbitral award that MCAG had obtained on behalf of the class members and either delayed or called into question the prospect of the class members' ability to recover the additional compensation that they deserve under the settlement for all practical purposes. *See* DE 6945. But that Order was particularly unexpected in light of this Court endorsement of the parties' agreement to submit to a final resolution of their disputes in arbitration. *See* DE 6677. And in all events, this Court's Order never questioned the factual finding reached by the arbitrator—or, more accurately, the factual finding reached by *all three arbitrators*—that CIGNA had deprived MCAG's class-member clients of tens of millions of dollars owed under the settlement.

Thus, although CIGNA may have succeeded in frustrating the class members' rights under the Settlement Agreement, there is no cause to question the accounting of the funds CIGNA paid to MCAG or the expenditure of funds relating to the disputed "Category Two Claims." While CIGNA complains that those funds were not "segregated," they remain easily traceable and subject

to transactions that are readily explicable, as demonstrated by the evidence and articulated by the testimony presented over the course of the two-day evidentiary hearing.

The thorough accounting reflected in the attached exhibits and evidentiary hearing testimony provided by Jeff Buchakjian detail the flow of funds. Indeed, Arbitrator Joe Matthews, who presided over the three-week final evidentiary hearing in this matter, lauded Mr. Buchakjian's "precise and candid work," and "accurate" and "reliable" reports, noting that Mr. Buchakjian had even alerted him to a "duplication of payments" in his initial draft award, "even though it reduced the total amount of the Final Award" to MCAG's detriment. DE 6922 at 6. In accordance with Mr. Buchakjian's analysis, there is no merit to CIGNA's contention that any accounting irregularities or improprieties diminished the class members' recovery.

For instance, CIGNA's attempt to put a nefarious spin on MCAG's use of funds received from CIGNA to pay a settlement in the RNP litigation falls flat. While it may be true that MCAG did not always segregate funds between its different cases and combined cash from different matters, it recorded and tracked the specific amounts that CIGNA had paid and accounted for expenses related to the litigation (e.g., legal fees and experts) which did not fully deplete the amounts received from CIGNA, even after considering retention amounts owed to MCAG on paid claims.

Thus, in May 2012, through a series of transfers through its own accounts, MCAG transferred $4.8 million from an account designated as a CIGNA Settlement Account (Waterford Bank 8767) to another MCAG account (Waterford Bank 2244), which ultimately provided the funds to a third account to settle a $6.2 million dispute involving another entity named RNP Investments Managed Care. But MCAG never reduced or disregarded its obligation to class members at the time of transfer or any time after the transfer.

Instead, by December 2012, to borrow the terminology employed by Special Accounting Master Kapila, MCAG had "replenished" the same CIGNA Settlement Account by transferring $4.8 million into the account from which the same amount was previously disbursed, using funds that unquestionably belonged to MCAG as its retention fee from a $114 million settlement payment in another matter. *See* September 24, 2020 Kapila Report, ¶ 25.

While both Mr. Kapila and Mr. Pollack acknowledge this "replenishment," neither one fully represents the nature of these funds. In February 2012, MCAG received $114 million into First Republic account 6581 (a UHC Settlement Account) for an unrelated settlement involving UHC. MCAG then transferred approximately $26.5 million into First Republic account 2888, which the Kapila Report identifies as a "UHC Retention" account (*see* September 24, 2020 Kapila Report, Exhibit B.1 and Exhibit 2B.6). MCAG had secured a $114 million settlement payment in the UHC matter and was entitled to a retention payment for its efforts in that matter. Upon earning the retention amounts, MCAG had the right to use those funds as it saw fit, a portion of which were used to "replenish" the original $4.8 million of CIGNA settlement funds. In other words, MCAG used a portion of the retention amounts it earned on the UHC matter to ensure that the CIGNA Settlement Account received the same $4.8 million that had been disbursed earlier in the year. With this replenishment, the $4.8 million remained available to class members (subject to incurring additional expenses as part of the litigation). *See e.g.*, Evid. Hr'g Tr. Day 2 at 68:8-16.

### ANALYSIS OF THE FUNDS THAT MCAG PROPERLY OBTAINED AND REASONABLY EXPENDED FOR THE BENEFIT OF THE CLASS MEMBERS

To put it in clear terms: MCAG properly accounted for the proceeds which it obtained from CIGNA, and did not steal class member funds for its own benefit, but rather was forced into a decades-long dispute that required expending over $12 million in litigation-related costs to obtain a full recovery on behalf of the class members, which it did with appropriate support and approval

-14-

of the AMA, the State Medical Societies, the Physicians Advocacy Institute, and the class members, as well as the Arbitrator and this Court. In all, MCAG acted appropriately under the circumstances in devoting partial settlement proceeds to fund the pursuit of the compensation that the class members were owed and potentially valued to be $94 million.

1.   **MCAG Properly Accounted for the Proceeds It Obtained from CIGNA and Expended to Pursue a Full Recovery from 2005 to 2007 ("Process 1")**

This Court approved a class action settlement agreement that was expressly designed to require a certain type of claim known as "Category Two Claims" to be resolved within the span of about a month—not years or decades. In short, when MCAG filed over 600,000 Category Two Claims with an approximate value of $94 million, they were to be processed by a settlement administrator within 14 days, and then forwarded to CIGNA for approval or denial of payment. If 30 days elapsed in which CIGNA either took no action or failed to provide an independent review entity with its "Review File"—a defined term that essentially includes all the documentation CIGNA reviewed to reach a denial decision—then the claim would be "deemed approved." *See generally* DE 4330 (citing, *inter alia*, SA §§ 8.3.c(2)(g)(iii), 8.3.c(2)(h)(ii)).

As of mid-2005, however, hundreds of thousands of claims sat unprocessed—neither approved nor denied—and barely any Category Two Claim had been paid to MCAG's class-member clients. In this period, counsel for MCAG was already investigating the delays and lack of payments, all while negotiating with CIGNA in an attempt to get the class members' claims processed and paid as the settlement agreement required. DE 4330 at 4. Meanwhile, class counsel, Nicholas B. Roth, wrote to CIGNA's counsel to express his concern that CIGNA was instructing the Settlement Administrator "to apply a set of rules that virtually guarantees the rejection or defection of a huge volume of claims that should have the benefit of the actual process outlined in the agreement." DE 4330 at 47-48; *id.* at 48. Voicing similar concerns that approximately 700,000

class member claims remained unprocessed, the Compliance Work Group complained about the "lack of a reliable schedule for payment, denials of all claims on a single claim cover sheet containing any defective claims, inaccurate or inconsistent interpretation of modifier-exempt claims and other similar issues." DE 4330 at 37.

Finally, on July 14, 2005, MCAG's counsel, Michael Hanzman, representing one of MCAG's class-member clients, Texas Children's Pediatric Associates, filed a Motion for Enforcement of the Settlement Agreement. That motion reported that CIGNA had "intentionally obstruct[ed] the claims process for all other Class Members," including by "order[ing] the Settlement Administrator to 'put a hold on MCAG's claims.'" DE 4330. Notably, CIGNA opposed the motion, arguing that "[a]ll of the claims submitted by MCAG have been processed," and that the "Settlement Administrator has determined that the remainder of the claims are invalid." DE 4360 at 4. Ultimately, CIGNA's representations turned out to be false, as proven over the course of arbitration proceedings that lasted several years, including the two years that elapsed until the first arbitrator, former Chief Judge Edward Davis, compelled CIGNA to process the claims submitted by MCAG's clients for the first time.

Because MCAG still reasonably expected a prompt resolution as of November 2005, it agreed to CIGNA's proposal to "submit the dispute to a single arbitrator for final resolution of all issues relating to whether the claims for Category Two Compensation under the Settlement Agreement Among CIGNA HealthCare and Physicians submitted by MCAG on behalf of Class Members are payable pursuant to that agreement." DE 6110-1. And, because the parties reasonably estimated the value of the class members' unpaid—and as-yet-unprocessed—claims to reach nearly $100 million, the parties negotiated a "high-low arrangement." In exchange for submitting to arbitration and setting a $67-million cap on the amount of any award, the parties agreed that

CIGNA would immediately deliver to MCAG a partial payment of $7.5 million before the arbitration.

The key provision of the parties' supplemental arbitration agreement provided, in pertinent part, as follows:

> MCAG contends that it submitted unpaid Category Two Claims to the Settlement Administrator that it values at no more than $94 million. MCAG reserves the right to seek an award no greater than $94 million from the Arbitrator. However, in the event that MCAG receives an award that is greater than $67 million, MCAG agrees that it will accept $67 million as payment in full on that award. However, in the event that the Arbitrator awards MCAG less than $7.5 million, CIGNA HealthCare agrees that it will pay MCAG $7.5 million. This payment will constitute a full settlement of all Category Two Claims submitted by MCAG.

DE 6787-19.

In accordance with the parties' high-low arrangement which "establishe[d] that the $7.5 million is a 'low,' rather than a prepayment, that is to be applied to any final award by this Arbitrator, not to pending claims," Order, Sept. 9, 2011; and, in accordance with CIGNA's position at the time that the $7.5 million could not be tied or earmarked to any particular claims by any particular class member, MCAG responsibly devoted those funds—including the 25-30% share that MCAG would be permitted to retain as its fee under any circumstance—to pursue a full recovery on behalf of the class members. *See, e.g.*, DE 4360 at 4.

But, before doing so, MCAG notified class members and class-member representatives who approved of that course of action. *See* DE 6724-2-6; 6730-1; 6730-2; and 6767-1 (MCAG clients' sworn declarations stating that "MCAG advised" them that "MCAG retained a portion of that $7.5 million as its fees, and used the remainder of that $7.5 million to pay the lawyers and the arbitrators who were prosecuting and hearing the claims made against CIGNA, as well as other costs of the arbitration."). For instance, Mr. Matthew Katz was initially employed by the American Medical Association and then served as the President of the Connecticut State Medical Society

-17-

while also serving as a Board Member for the Physician's Advocacy Institute. He expressed his unequivocal belief that MCAG "should use the full value of the funding to fight for everything that the class members were due," and communicated with class members who wholeheartedly supported "utilizing the funds to fight in court against Cigna for the full value of their claims."

Another representative of a class member with one of the largest claims for payment echoed Mr. Katz's sentiments, explaining how MCAG kept her updated on the progress of the proceedings, and that she understood that "the attorneys' fees will be paid and then there will be a portion that's appropriated to the" class members because "litigation is expensive" and it was necessary and appropriate for MCAG to compel CIGNA's compliance under the Settlement Agreement.

Particularly against this backdrop of approval, MCAG reasonably expended $815,408 of the $7.5-million payment it received from CIGNA to fund the initial, fruitful efforts to enforce the settlement agreement during "Process 1" between 2005 and 2007.

For example, between December 2005 and February 2006, the parties prepared and submitted their initial arbitral briefs to Judge Davis, who then ordered additional briefing on certain terms of the Settlement Agreement relating to proper claim processing. CIGNA reiterated its false assertion that all of MCAG's claims had already been fully and properly processed and that none were valid. MCAG argued that CIGNA had not processed the claims at all, let alone properly. MCAG's brief, submitted on March 21, 2007, was supported by an affidavit from the Class Counsel, Nicholas B. Roth, dated March 20, 2007.

On May 23, 2007, Judge Davis entered an order compelling CIGNA to process the claims submitted by MCAG: "MCAG's claims have undergone just the first of many well-defined steps in an elaborate procedure to which the parties have agreed in the Settlement Agreement for the

processing of Category Two Claims. To ensure that MCAG's claims are processed as the parties intended and as expeditiously as possible, the Arbitrator hereby orders the parties to reprocess the claims according to the terms of the Settlement Agreement as interpreted below by the Arbitrator." (Order, May 23, 2007, at 3, 13.)

Judge Davis emphasized that the External Review of any claims CIGNA might chose to deny required CIGNA to assemble and to submit a "Review File" to the Settlement Administrator with its denials (*id.*). As Judge Davis noted in May 2007, "significant time ha[d] passed since the initial submission of MCAG's claims to the Settlement Administrator" (*id.* at 13), and but for MCAG's efforts in litigation, the claims would not have been ordered reprocessed and would have been left entirely unpaid by CIGNA.

* * *

In summary, MCAG properly accounted for the fees and costs totaling **$815,408** that it expended in pursuit of a full recovery on behalf of its class-member clients in "Process 1" from 2005 to 2007. The following chart of key events and summary of costs further shows the reasonableness of MCAG's expenditures during that time:

| May 2005 onwards | Counsel for MCAG engaged in investigations and negotiations over delays in the processing and payment of claims that MCAG timely submitted on behalf of Class Members within the Claims Period ending on February 18, 2005 (600,000 Category Two claims then worth $94 million). MCAG was not alone in sounding the alarm. |
|---|---|
| July 14, 2005 | MCAG and Texas Children's Motion for Enforcement of the Settlement Agreement for lack of processing and payment (DE 4330). |
| July 29, 2005 | CIGNA's Response to Motion for Enforcement of the Settlement Agreement (DE 4360). |
| Nov. 15, 2005 | MCAG, on behalf of the Class Members for whom it submitted claims, and CIGNA entered into a Binding Arbitration Agreement. |
| Nov. 15, 2005 | Supplemental Agreement to Binding Arbitration Agreement. |
| Nov. 16, 2005 | Withdrawal of MCAG and Texas Children's Motion for Enforcement of the Settlement Agreement in consideration of the parties agreeing to binding arbitration (DE 4603). |

| Dec. 2005 – Feb. 2006 | Arbitration Briefing by the parties, as required under the Binding Arbitration Agreement submitted to the Arbitrator, Judge Davis. |
|---|---|
| Apr. 20, 2006 | Depo. of Kathleen McLeod, CIGNA, Senior Director of Project Management, in Hartford, CT. |
| May 3, 2006 | Depo. of Doug Perry, MCAG, CFO, in Miami, FL |
| May 4, 2006 | Depo. of Shaunna Kennedy, Oklahoma Sports, Science & Orthopaedics, Front Office Supervisor (Class Member), in Dallas, TX. |
| May 4, 2006 | Depo. Timothy Schmidt, MCAG, President & CEO, in Miami, FL. |
| May 8, 2006 | Depo. of James Buford Reeder, Redstone Financial Services, President, in Dallas, TX. |
| May 9, 2006 | Depo. of Leonard H. Bubis, Redstone Financial Services, CFO, in Dallas, TX. |
| May 11, 2006 | Depo. of James Edwardson, Urology Associates, Administrator in charge of entire office (Class Member), in Dallas, TX. |
| Aug. 1, 2006 | Depo. of Genevieve Parm, Florida Eye Clinic, Administrator & CEO (Class Member), in Orlando, FL. |
| Aug. 2, 2006 | Depo. of Thomas Martin Archer, Texas Children's Pediatric Associates, Director (Class Member), in Houston, TX. |
| Feb. 23, 2007 | Additional Briefing ordered by Judge Davis on the provisions of the Settlement Agreement relating to processing of Category Two Claims. |
| Mar. 21, 2007 | MCAG and CIGNA submit additional briefing as ordered. Class Counsel provides declaration in support of MCAG. |
| May 23, 2007 | Judge Davis Order rejecting CIGNA's argument that all claims had been processed and that it owed nothing; ordering the Category Two claims to be reprocessed in accordance with the Settlement Agreement's requirements. |

| Description | | Process 1 |
|---|---|---|
| MCAG Legal Fees | $ | 723,801 |
| MCAG Costs | | 91,607 |
| Total | $ | 815,408 |
| | | |
| **Legal Fees Breakdown** | | |
| Total Attorney Hours (Reported With Fees) | | 1,867 |
| Avg. Hourly Rate | $ | 292 |
| | | |
| **Costs Breakdown** | | |
| Arbitrator and Mediator Costs | $ | 26,626 |
| Expert Costs | | - |
| Third Party Vendor Costs | | 35,131 |
| SAM Costs | | - |
| Filing and Service Fees | | 756 |
| Deposition Costs | | 3,681 |
| Court Reporter Fees/Transcripts | | - |
| Travel/Hotel/Food | | 17,110 |
| Photocopies | | 3,931 |
| Other | | 4,373 |
| Total | $ | 91,607 |

## II.   MCAG Properly Accounted for the Proceeds It Obtained from CIGNA and Expended to Pursue a Full Recovery from 2007 to 2008 ("Process 2")

As a consequence of CIGNA's continued resistance to comply with the claims-processing procedures and pay claims as required under the Settlement Agreement—and with no changed circumstances to warrant changing its course—MCAG reasonably expended an additional $567,975 to fund the proceedings necessary to secure a meaningful recovery for its class-member clients between 2007 and 2008.

These expenditures were necessary because CIGNA continued to seek out new ways to frustrate Judge Davis's orders to delay and derail the reprocessing of the class members' claims even after Judge Davis required CIGNA to comply with the requirements of the Settlement Agreement. For its part, MCAG incurred additional time and expense to satisfy Judge Davis's

instruction to re-submit the class members' claims with an annotation listing the specific subsection of the Settlement Agreement under which the claims were being made, above and beyond the original submission requirements under the Settlement Agreement. CIGNA, by contrast, made it impossible for the Settlement Administrator to complete the ministerial task of reviewing the claims for procedural adequacy of documentation before forwarding them to CIGNA for its substantive review.

For example, on June 21, 2007, CIGNA filed a motion styled as one for clarification of the May 23, 2007 Order, but which was really one for reconsideration. CIGNA simply reasserted its already-rejected argument that the Settlement Administrator ought to make substantive determinations eliminating claims at the outset instead of only reviewing the claim submissions for adequacy of documentation at that initial stage. MCAG opposed the motion and Judge Davis presided over a hearing on the motion on August 1, 2007. In his Order dated August 6, 2007, Judge Davis rejected those parts of CIGNA's motion that sought to enlarge the Settlement Administrator's ministerial functions at the initial stage of the processing, reiterating that the "Settlement Administrator, in its initial 'gatekeeping' function, shall review claims to determine whether the class member has submitted the documentation specified in the Settlement Agreement, not whether it is substantively valid." (Order, Aug. 6, 2007, at 2-3 (emphasis added).)

Then, after unsuccessfully attempting to interfere with the Settlement Administrator's ministerial functions, CIGNA proceeded to derail the next stage of the reprocessing ordered by Judge Davis in multiple ways. For one thing, under the Settlement Agreement, CIGNA only had two options—either to approve or to deny a claim. But CIGNA purported to bestow itself with the additional power to "reject" claims that it unilaterally decided were not worthy of being processed,

requiring MCAG to undertake yet another time-consuming and expensive battle to simply enforce the Settlement Agreement as written.

Likewise, in another time-consuming and expensive diversion, CIGNA purported to "deny" certain other claims, but without providing the "Review File" that was a prerequisite to sustain any denial. In short, if CIGNA denied any claim for reimbursement, the procedure for External Review of CIGNA's denial required that CIGNA assemble and submit a "Review File" supporting its denial within 30 days, and, if it failed to do so, required that the Settlement Administrator deem the claim approved. DE 2308, Ex. 2 (Settlement Agreement) at §§ 8.3.c(2)(h), 8.3.c(2)(h)(i)-(ii)). A "Review File" is a term of art under the Settlement Agreement, consisting "at minimum, of (i) copies of all records documenting prior CIGNA HealthCare payments on the Fee for Service Claim(s) for which the Class Member submitted a Proof of Claim; (ii) copies of all other documents prepared or obtained by CIGNA HealthCare in its initial review of the Proof of Claim Form . . . ." *Id.* at § 8.3.c(2)(h)(i).

By December 2007, however, the Administrator Weekly Reports issued by the Settlement Administrator reflected that CIGNA had denied the majority of claims as "Administrative" denials, requiring an External Review by the Settlement Administrator to determine within 30 days whether the denial was nevertheless based on a claim coding and bundling edit. *Id.* at § 8.3.c(2)(h)(iv)(E) ("All Category Two Compensation Proofs of Claim denied for reasons other than Claim Coding and Bundling Edits shall be subject to External Review by the Settlement Administrator").

But, without CIGNA's Review Files containing all records documenting its prior payments, among other records to be assembled and submitted by CIGNA, the Settlement Administrator could not possibly complete its External Review. *Id.* ("[T]he Settlement Administrator shall determine whether the Proof of Claim and Review File establish this ground

for denial."). The following image from CIGNA's Payment System is reproduced to illustrate how the screenshots ensured that the information was reliably sourced directly from CIGNA's internal records and contained all of the information that the Settlement Administrator needed to conduct the "External Review" required by the Settlement Agreement:



PMHS – Page 1 (CLTx-000039 at Slide 27) (patient name, SSN, and service dates redacted for privacy).[4]

Accordingly, EPIQ training slides contained a "No Screenshot" Rule which stated that CIGNA's denial of any Category Two Claim must be overturned if the amount paid was less than the amount charged and CIGNA failed to provide a screenshot from its Payment System to support the denial:

_____

[4] MCAG presented this, and the following exhibits during the Final Arbitration Hearing before Arbitrator Matthews. MCAG can submit a copy of these exhibits to this Court, upon this Court's request.

*See* CLTx-000039 at Slide 20.

As a result of EPIQ enforcing the "Review File" requirement – including by properly applying the "No Screenshot Rule" – a majority (53%) of CIGNA's denials were overturned by EPIQ. *See* CLTx - 000070 (EPIQ weekly reports 2007-2008). When the "No Screenshot" rule (which required CIGNA to provide its payment records per the Review File requirement) resulted in too many of CIGNA's denials being overturned, CIGNA instead sought to eliminate the "No Screenshot Rule." It urged EPIQ to uphold denials based on incomplete documentation, including a combination of MCAG's Proof of Claim Forms and its own corresponding "Return Files" in lieu of the Review Files required by the Settlement Agreement. *See, e.g.*, (CLTx-000048, Email from Kathy McLeod (CIGNA) to Mary Falbo (IRE), cc'ing Neil Manning (EPIQ), dated Oct. 23, 2007).

Similarly, CIGNA also sought to fulfill the Review File requirement by submitting its own "Index Cards" – i.e., Word Files that CIGNA generated based solely on the information in the proof of claim, and not based on any CIGNA's own records. But these "Index Cards" were merely brief Microsoft Word documents containing CIGNA's conclusory recommendation (e.g., "Do Not Pay – Administrative"), along with a CIGNA Administrative Denial Code (e.g., "AD2 – CLAIM

PAID CORRECTLY-NO ERRORS FOUND), without providing any of the substantive information or source documentation that would have been necessary for the Settlement Administrator or IRE to conduct an independent evaluation of CIGNA's denial determination:



(CLTx - 000601 - MCAGPROD-100669, Oct. 24, 2007.) In Process 2, CIGNA submitted 46,269 Index Cards to support its denials (CLTx 664 at ¶¶ 86-94 (pp. 36-40)).

CIGNA's persistent refusal to abide by the Settlement Agreement—including by purporting to "reject" claims instead of denying them and purporting to deny claims without "Review Files"—required MCAG to file another Emergency Motion to Enforce the Settlement Agreement and Arbitrator's Orders on January 4, 2008, as well as Reply to CIGNA's response on February 14, 2008. On March 19, 2008, the Arbitrator held an all-day hearing regarding the serious issues raised in MCAG's Emergency Motion. Teva Mattingly and Kathleen McLeod, witnesses from CIGNA, were examined by the parties.

At the evidentiary hearing held on March 19, 2008, Judge Davis questioned CIGNA's corporate representative (Ms. Mattingly) regarding the Index Card that CIGNA submitted in support of its denial of Claimette 227002340-0034 (Turner). *See* CLTx - 000013, March 19, 2008 Hr'g Tr. at pp.179-80. Based on the Index Card, not even Ms. Mattingly could explain CIGNA's support for its contention that CIGNA paid the claim correctly; she could only conjecture that it

"could have been denied" for various reasons. At the conclusion of the March 19, 2008 hearing, the Court ordered post-hearing briefing, which MCAG and CIGNA submitted on April 21, 2008.

On May 7, 2008, the Court held another hearing to address concerns with respect to $16,384,106.74 in claims that the Settlement Administrator had approved as of December 2007 (even as it was excusing CIGNA from meeting its burdens under the Settlement Agreement) and which CIGNA had not paid. After extensive briefing, two hearings, including examinations of witnesses and oral arguments, on June 18, 2008, Judge Davis entered another order confirming that CIGNA continued to frustrate the proper implementation of the Settlement Agreement in Process 2, and thus ordered yet another reprocessing of Category Two Claims to take place consistent with the terms of the Settlement Agreement ("Process 3").

Thus, Judge Davis ordered CIGNA (again) to assemble and to forward a Review File on each claim it denied. He also required CIGNA to certify to the Settlement Administrator that every Review File it forwarded contained "all existing, reasonably accessible records and documents specified in Section 8.3(c)(2)(h)(i) of the Settlement Agreement that are in CIGNA's possession at the time of its review of MCAG's claims." (Order, June 18, 2008 at 13.)

Judge Davis also held that CIGNA's "rejections" of claims upended the External Review process and usurped the Settlement Administrator and IRE's roles in their External Review of CIGNA's denials:

> CIGNA is an adversary in the claims processing procedure, and cannot be accorded the authority unilaterally and ultimately to determine the validity of any claims. Indeed, the Settlement Agreement has elaborate procedure ensuring the ultimate "external" review of claims by either the Settlement Administrator or the Independent Review Entity. Therefore, CIGNA improperly "rejected" claims. (Order, June 18, 2008, at 13.)

Rather than either approving or denying claims as required under the Settlement Agreement (§§ 8.3.c(2)(g)-(h))), CIGNA had "rejected" claims as invalid, insisting that these were not denials.

Thus, Judge Davis ordered that the tens of thousands of claims that CIGNA had "rejected" be "immediately reclassified as either 'defected' or 'denied.'" (Order, June 18, 2008 at 13). Claims reclassified as "denied" would have to be supported by a Review File consistent with the rest of the Order. Claims reclassified by CIGNA as "defected" had to be returned to MCAG with a right to cure (the term "defected" had come to be used in reference to the Settlement Administrator's initial review of the adequacy of the documentation for a claim submission, and, here, CIGNA convinced Judge Davis that some of the claim submissions had errors in the social security numbers (or other patient identifiers) such that CIGNA should be permitted to "defect").

Under the Settlement Agreement, both CIGNA's "rejections" – i.e., its failure to either "approve or deny" a claim and CIGNA's failure to provide Review Files were supposed to have resulted in the claims being deemed approved (SA § 8.3.c(2)(g)(iii) and § 8.3.c(2)(h)(ii)), but Judge Davis did not enforce these provisions but instead gave CIGNA yet another chance when he ordered Process 3.

In addition, as of June 18, 2008, Judge Davis confirmed with the Settlement Administrator that $2,637,996.80 for 27,876 allowed codes had long been ready for payment. Judge Davis found that there was "no justification whatsoever for [CIGNA's] failure to pay immediately upon undisputed claims" and ordered that payment be made to MCAG on these uncontested claims. (Order, June 18, 2008, at 17.).

Judge Davis also confirmed that as of December 2007 the Settlement Administrator had determined $16,384.106.74 of allowed codes. When, however, CIGNA objected to the approvals

and/or amounts, the Settlement Administrator took no further action on these claims, which sat in abeyance. Judge Davis deferred addressing or otherwise ruling on the $16,384,106.74 of then-approved claims, which remained at issue as the parties proceeded to Process 3. (*Id.* at 16-17.)

* * *

In summary, MCAG properly accounted for the fees and costs totaling **$567,975** that it expended in pursuit of a full recovery on behalf of its class-member clients in "Process 2" from 2007 to 2008. The following chart of key events and summary of costs further shows the reasonableness of MCAG's expenditures during that time:

| | |
|---|---|
| May – June, 2007 | MCAG resubmits its Class Member's claims. EPIQ replaced Poorman Douglas as the Settlement Administrator. |
| June 21, 2007 | CIGNA's Motion for Clarification of the May 23, 2007 Order. |
| July 6, 2007 | MCAG's Opposition to CIGNA's Motion for Clarification. |
| Aug. 1, 2007 | Hearing on CIGNA's Motion for Clarification. |
| Aug. 6, 2007 | Order, August 6, 2007, on CIGNA's Motion for Clarification. |
| Aug. 7, 2007 | Settlement Administrator's Letter to the Parties. |
| Aug. 10, 2007 | MCAG's Counsel attends meeting at EPIQ. |
| Aug. 16, 2007 | MCAG's Response to Settlement Administrator's Letter. |
| Jan. 4, 2008 | MCAG's Emergency Motion to Enforce Settlement Agreement and Arbitrator's Orders and Request for Oral Argument. |
| Jan. 23, 2008 | CIGNA's Opposition to MCAG's Emergency Motion to Enforce Settlement Agreement and Arbitrator's Orders. |
| Feb. 14, 2008 | MCAG's Reply in Support of Emergency Motion. |
| Mar. 19, 2008 | Arbitration Hearing on MCAG's Emergency Motion, including examination of witnesses Teva Mattingly, CIGNA, Claim Director of Research and Reconciliation and Kathleen McLeod, CIGNA, Senior Director of Project Management, and oral argument. |
| Apr. 21, 2008 | MCAG's Post-Hearing Brief in Support of Emergency Motion to Enforce Settlement Agreement and Arbitrator's Orders. |
| Apr. 21, 2008 | CIGNA's Post-Hearing Brief. |
| May 7, 2008 | Arbitration Hearing addressing concerns with respect to allegations that CIGNA had not paid claims already "approved" and designated for payment by the Settlement Administrator. |
| May 16, 2008 | CIGNA Letter regarding payment of already approved claims (telling the Arbitrator to speak directly to the Settlement Administrator). |
| May 28, 2008 | MCAG Letter regarding payment of already approved claims. |
| June 18, 2008 | Order on MCAG's Emergency Motion, ordering yet another reprocessing due to CIGNA's failure to adhere to the Settlement Agreement's procedures and that undisputed approved claims be paid. |

| Description | | Process 2 |
|---|---|---|
| MCAG Legal Fees | $ | 503,009 |
| MCAG Costs | | 64,966 |
| Total | $ | 567,975 |
| | | |
| **Legal Fees Breakdown** | | |
| Total Attorney Hours (Reported With Fees) | | 2,076 |
| Avg. Hourly Rate | $ | 266 |
| | | |
| **Costs Breakdown** | | |
| Arbitrator and Mediator Costs | $ | 36,421 |
| Expert Costs | | - |
| Third Party Vendor Costs | | 6,067 |
| SAM Costs | | - |
| Filing and Service Fees | | - |
| Deposition Costs | | 1,302 |
| Court Reporter Fees/Transcripts | | 1,317 |
| Travel/Hotel/Food | | 17,855 |
| Photocopies | | 1,582 |
| Other | | 423 |
| Total | $ | 64,966 |

## III.   MCAG Properly Accounted for the Proceeds It Obtained from CIGNA and Expended to Pursue a Full Recovery from 2008 to 2010 ("Process 3")

As Process 3 began, the claims that CIGNA had already "denied" were supposed to have been "immediately subject to external review." (Order, June 18, 2008, at 16). But that External Review did not happen immediately—because CIGNA took the position that it should have the right to supplement the Review Files for the claims it had already "denied." Judge Davis's June 18, 2008 Order, nowhere stated that CIGNA could *supplement* Review Files it had already submitted. Accordingly, MCAG was forced to reasonably incur an additional $1,015,336 in fees and costs necessary to fund Process 3 from 2008 to 2010, in order to vindicate the class members' entitlement to have their claims worth tens of millions of dollars processed and paid under the Settlement Agreement.

For instance, on July 25, 2008, MCAG was forced to file a Motion for Clarification of the June 18, 2008 Order. After receiving CIGNA's Opposition, MCAG's Reply, and CIGNA's Sur-Reply, Judge Davis issued an Order dated September 26, 2008 on MCAG's motion. Judge Davis wrote, "MCAG is correct, in theory, that CIGNA should not have two bites at the apple – that is, that CIGNA had the opportunity to compile a 'Review File' for claims that it had previously and firmly 'denied,' and should have to live by whatever it supplied." (Order, Sept. 26, 2008, at 3.) Judge Davis, however, went on to allow CIGNA yet another chance to comply with the Settlement Agreement, ruling that CIGNA could now supplement its prior Review Files, while he warned that after this, "CIGNA has no right to supplement these denials further." (*Id.* at 6.)

In an attempt to address the obvious prejudice to MCAG of allowing CIGNA to supplement its Review Files for already-denied claims, Judge Davis ordered that MCAG could now supplement its claim submissions as to those previously denied claims, and allowed MCAG to seek an enlargement of time to do so, if needed, which it ended up needing. (*Id.* at 5-6.) But the obvious effect of the order was to embolden CIGNA to keep violating its obligations under the Settlement Agreement and to cause further delay in the resolution of class member's claims.

Process 3, per the June 18, 2008, Order, also required that CIGNA reclassify all of the claims it had "rejected"—because, as the Arbitrator found, CIGNA had no authority to "reject" claims. CIGNA was to complete the reclassification on or before July 18, 2008, but it failed to do so. On October 10, 2008, CIGNA sent a letter to the Arbitrator seeking a reprieve from its failure timely to reclassify the claims it had improperly "rejected," alleging that certain project files had incorrectly been transmitted to the Settlement Administrator and blaming the Settlement Administrator in part for allegedly failing to identify the claims CIGNA had "rejected." MCAG responded to CIGNA's letter, and Judge Davis issued an Order on November 3, 2008, in which he

found that "CIGNA's conduct in this arbitration is becoming increasingly suspect," but nevertheless gave CIGNA another chance and allowed it belatedly to reclassify the claims it had improperly "rejected."

By mid-2009, Process 3 was completely broken. The majority of claims denied by CIGNA had not been processed on External Review at all, and those that had gone to External Review were subjected to procedures contrary to the Settlement Agreement. MCAG learned that CIGNA, among other actions interfering with the processing, had prevented the Settlement Administrator from overturning CIGNA's denials when CIGNA failed to provide *any* documentation to support its denials; that the Settlement Administrator had changed its processing of claim level versus code level payment information to CIGNA's benefit and Class Member's detriment; and, further, that CIGNA had demanded that where it gave the reason for its denials as "Administrative," the External Review should go to the IRE as opposed to the Settlement Administrator. As to this last issue, whereas in Process 1 and Process 2, no denials based on "Administrative" reasons had gone to the IRE, now hundreds of thousands of "Administrative" denials inundated the IRE, which was never intended to review anything other than denials based on Claim Coding and Bundling Edits. DE 2308, Ex. 2 (Settlement Agreement) at § 8.3.c(2)(h)(iv)(E) ("All Category Two Compensation Proofs of Claim denied for reasons other than Claim Coding and Bundling Edits shall be subject to External Review by the Settlement Administrator.").)

In light of these and other serious claim processing issues, on August 25, 2009, MCAG filed its Motion for Order on Proper Processing of the Claims, requiring additional extensive proceedings before Judge Davis issued an Interim Order on MCAG's motion on December 22, 2009. Judge Davis rejected CIGNA's argument that he lacked authority to consider MCAG's motion: "this arbitration would be effectively meaningless if I cannot ensure that the ultimate

decisions are being made in accordance with my rulings." (*Id.* at 2.) Judge Davis held that "additional discovery is necessary to determine the issues raised in MCAG's Motion." (*Id.*) He ordered MCAG and CIGNA to serve "interrogatories, requests for production, and/or requests for admission on the Settlement Administrator and the Independent Review Entity within ten (10) calendar days of the date of []his Order, with responses due within 30 days of the date of service." (*Id.* at 3.)

Following Judge Davis's Interim Order ordering discovery in light of the claim processing issues raised by MCAG's Motion for Order on Proper Processing of the Claims, the parties began a period of formal written discovery. Discovery disputes arose and as of January 29, 2010, Judge Davis stayed MCAG's discovery with respect to the Settlement Administrator and IRE pending a further order from him as to CIGNA's objections to MCAG's discovery requests.

On April 9, 2010, Judge Davis issued an Omnibus Order on Pending Matters. He began the Order by reviewing the "extensive briefing" on MCAG's Motion for Order on Proper Processing of the Claims, including CIGNA's Sur-Reply to MCAG's Reply, and the submission by Class Counsel of a Memorandum dated November 23, 2009, and CIGNA's Reply to Class Counsel's Memorandum on December 9, 2009.

Judge Davis's Omnibus Order overruled almost all of CIGNA's objections to MCAG's discovery to the Settlement Administrator and IRE, lifting the stay previously imposed on this discovery. (Omnibus Order, Dec. 9, 2009, at 3-8.) Judge Davis, however, still did not rule on MCAG's Motion for Order on Proper Processing because, as he had previously ordered, he needed discovery before ruling on MCAG's motion. Thus, the serious processing issues that MCAG had raised in its motion remained pending at this time.

In the Omnibus Order, Judge Davis also addressed CIGNA's complete non-payment of certain approved Multiple Procedure Logic ("MPL") claims, an issue that MCAG had raised in a separate submission on January 23, 2010. CIGNA, which argued that it was entitled to deduct alleged prior partial payments it had made on MPL claims, nevertheless agreed that it still owed something on these claims under the agreed upon Medicare Fee Schedule—yet it had utterly failed to pay anything. At the time, Judge Davis and the parties referred to this as the "Calculation Issue."

While Judge Davis allowed that CIGNA could deduct prior partial payments, he was again "troubled" that CIGNA had not paid immediately on the amounts it did not dispute: "[A]s I have expressed before, I am troubled by the apparent fact that CIGNA has delayed making payments which even it acknowledged have long been undisputed and due in the course of arbitration." (*Id.* at 11.) He held that "CIGNA's failure to make the undisputed payments while disputing additional amounts" violated the Settlement Agreement and ordered CIGNA to pay interest for its delayed payments. (*Id.* at 12.) The Omnibus Order also ordered the parties to file any motions for reconsideration of the Order within 7 days, which both MCAG and CIGNA did, leading to yet more briefing.

At this point, over five years had passed since MCAG had first submitted Class Members' Category Two Claims, the vast majority of claims had not been processed, let alone paid. As of 2010, only four payment batches from the Settlement Administrator had resulted in the Settlement Administrator recording any payments made by CIGNA. The first was in mid-2008 (Payment Batch 1), the second and third in 2009 (Payment Batches 2 & 3), and the fourth in 2010 (Payment Batch 4).

These payment batches, however, did not reflect final determinations of the underlying claim populations being paid—because the Settlement Administrator allowed itself to clawback

amounts paid on previously approved claims as it re-allocated payment amounts from prior batches to subsequent ones. An example of this lack of finality is reflected in the Settlement Administrator's "Reconciliation Report" in 2010, where the Settlement Administrator took back $966,975.70 paid in Batches 1-3 and applied this amount towards the payment of claims approved in Batch 4. *See* Evid. Hr'g Tr., Jan. 14, 2025 (testimony of Jeff Buchakjian) at 44:5-13; Evid. Hr'g Jan. 13-14, 2025, MCAG Ex. 66 (EPIQ Payment Reconciliation Report).

Thus, as exemplified above, the claim population for the payments made at any given time was not stable—it was in flux and subject to clawbacks and reallocations by the Settlement Administrator until all of the claims were processed. The lack of finality in the claim population actually paid prior to the conclusion of the entire claim processing also accords with the terms of the Settlement Agreement, which expressly required the Settlement Administrator to provide a Final Accounting when the claim processing is final. (SA § 9.9.) Here, the Settlement Administrator would not tender its Final Accounting until 2021, over a decade later, as part of the eventual proceedings before Arbitrator Matthews.

Judge Davis ultimately never ruled on MCAG's Motion for Order on Proper Processing of the Claims because in May 2010 he passed away. MCAG had to redouble its efforts to get Class Member's claims processed and paid as CIGNA continued to undermine the claim processing, along with the payment of approved claims, at every turn.

* * *

In summary, MCAG properly accounted for the fees and costs totaling **$1,015,336** that it expended in pursuit of a full recovery on behalf of its class-member clients in "Process 3" from 2008 to 2010. The following chart of key events and summary of costs further shows the reasonableness of MCAG's expenditures during that time:

| | |
|---|---|
| July 25, 2008 | MCAG's Motion for Clarification of June 18, 2008 Order. |
| Aug. 1, 2008 | CIGNA's Opposition to MCAG's Motion for Clarification. |
| Aug. 15, 2008 | MCAG's Reply in Support of Motion for Clarification. |
| Aug. 27, 2008 | CIGNA's Sur-Reply to MCAG's Motion for Clarification. |
| Sept. 26, 2008 | Order on MCAG's Motion for Clarification of June 18, Order. |
| Oct. 27, 2008 | MCAG's Unopposed Motion for Enlargement of Time Under September 26, 2008 Order. |
| Nov. 3, 2008 | Order on Pending Matters. |
| Aug. 25, 2009 | MCAG's Motion for Order on Proper Processing of Certain Claims. |
| Sept. 18, 2009 | CIGNA's Opposition to MCAG's Motion for Order on Proper Processing of Certain Claims. |
| Oct. 30, 2009 | MCAG's Reply for Order on Proper Processing of Certain Claims |
| Nov. 18, 2009 | CIGNA's Sur-Reply to MCAG's Motion for Order on Proper Processing of Certain Claims. |
| Nov. 23, 2009 | Memorandum of Class Counsel. |
| Dec. 9, 2009 | CIGNA's Response to Memorandum of Class Counsel. |
| Dec. 22, 2009 | Interim Order on MCAG's Motion for Order on Proper Processing of Certain Claims. |
| Jan. 8, 2010 | CIGNA Discovery Requests to EPIQ. |
| Jan. 8, 2010 | CIGNA Discovery Requests to the IRE. |
| Jan. 8, 2010 | MCAG's Discovery Requests to EPIQ. |
| Jan. 8, 2010 | MCAG's Discovery Requests to the IRE. |
| Jan. 22, 2010 | CIGNA's Objections to MCAG's Discovery Requests to EPIQ. |
| Jan. 22, 2010 | CIGNA's Objections to MCAG's Discovery Requests to IRE. |
| Jan. 29, 2010 | Interim Order re Discovery and Hearing on Calculation Issue. |
| Feb. 23, 2010 | MCAG's Responses to CIGNA's Objections to MCAG's Discovery Requests. |
| Feb. 23, 2010 | MCAG's Submission on CIGNA's Failure to Pay Claims Approved for Payment. |
| Apr. 9, 2010 | Omnibus Order on Pending Matters. |
| Apr. 23, 2010 | MCAG's Motion to Reconsider Omnibus Order on Calculation Issue. |
| Apr. 23, 2010 | CIGNA's Motion for Reconsideration and Clarification of Omnibus Order. |
| May 12, 2010 | MCAG's Opposition to CIGNA's Motion for Reconsideration and Clarification. |
| May 12, 2010 | CIGNA's Opposition to MCAG's Motion to Reconsider Order on the Calculation Issue. |

| Description | | Process 3 |
|---|---|---|
| MCAG Legal Fees | $ | 951,115 |
| MCAG Costs | | 64,221 |
| Total | $ | 1,015,336 |
| | | |
| **Legal Fees Breakdown** | | |
| Total Attorney Hours (Reported With Fees) | | 3,001 |
| Avg. Hourly Rate | $ | 274 |
| | | |
| **Costs Breakdown** | | |
| Arbitrator and Mediator Costs | $ | 40,735 |
| Expert Costs | | - |
| Third Party Vendor Costs | | 12,719 |
| SAM Costs | | - |
| Filing and Service Fees | | 221 |
| Deposition Costs | | - |
| Court Reporter Fees/Transcripts | | - |
| Travel/Hotel/Food | | 6,940 |
| Photocopies | | 2,669 |
| Other | | 938 |
| Total | $ | 64,221 |

## IV.   MCAG Properly Accounted for the Proceeds It Obtained from CIGNA and Expended to Pursue a Full Recovery from 2010 to 2019 ("Continued Pursuit")

Following Judge Davis's passing, MCAG and CIGNA could not agree on the appointment of a new arbitrator. Ultimately, after intervention from this Court, Arbitrator Thomas G. Schultz entered his appearance as the Arbitrator, DE 6187, which was both a cause and a source of further expense and delay. Thus, during the "Continued Pursuit" of a meaningful recovery for the class members between 2010 and 2019, MCAG expended an additional $3,041,786 of fees and costs.

For instance, in order to bring Arbitrator Schultz up to speed, MCAG prepared and submitted a status statement on March 7, 2011. The status statement summarized the outstanding issues from Process 3 and requested resolution on the pending Motions for Reconsideration filed by both CIGNA and MCAG before Judge Davis's passing.

Following a hearing held on June 2, 2011, Arbitrator Schultz issued a ruling on MCAG's Motion to Reconsider Order on Calculation Issue and CIGNA's Motion for Reconsideration and Clarification. (Order, Sept. 9, 2011.) Arbitrator Schultz denied both MCAG's and CIGNA's motions for reconsideration. In denying the motions for reconsideration, Arbitrator Schultz ordered CIGNA to make appropriate payment on approved claims consistent with his September 9, 2011 Order and Judge Davis's April 9, 2010 Order and certify payment on those claims.

Despite this clear instruction, on October 10, 2011 CIGNA submitted a certification *only* in compliance with Judge Davis's April 9, 2010 Order, and did not certify any additional payments owed after that. In what would become emblematic of its conduct during this time period, CIGNA's failure to ensure and certify payment of the appropriate amounts, forced MCAG to file objections and submissions regarding why CIGNA was responsible for additional payments and the amount of interest owed on all payments to date.

CIGNA's interference with the payment process necessitated the submission of multiple

briefs and additional hearings in 2011 and 2012. On January 31, 2012, Arbitrator Schultz held a hearing addressing: 1) the amount of interest CIGNA was to pay MCAG pursuant to Judge Davis's April 9, 2010 order; 2) how to characterize the $7.5 million payment in calculating amounts owed by CIGNA going forward; 3) the claim/code level issue; 4) the deductibility of prior payments from Non-MPL claims; and 5) the status and scope of discovery moving forward.

The hearing did not result in a resolution of these issues. Rather, the result of CIGNA failing to follow Judge Davis's April 9, 2010 order led to a ripple effect necessitating separate briefing on nearly all of the above issues between 2012 and 2013. (*See* Omnibus Order on Pending Issues Raised at the January 31, 2012 hearing, April 16, 2012; MCAG's Supplemental Brief Regarding Claim Code Level Issue, June 5, 2012; CIGNA's Brief Related to EPIQ not Approving Claims Subject to Claim Code Level, June 5, 2012; MCAG's Supplemental Brief Regarding Non-MPL Claims, June 11, 2012; CIGNA's Brief on Non-Multiple Procedure Logic Claims, June 11, 2012; CIGNA's Motion to Enforce Supplemental Arbitration Agreement, July 20, 2012; MCAG's Opposition to Motion to Enforce Supplemental Agreement, August 27, 2012; CIGNA's Compilation of Prior Arguments Regarding Application of All Prior Payments to any Claims and Codes, January 7, 2013; MCAG's Response to CIGNA's Compilation of Arguments regarding Prior Payments, February 6, 2013; CIGNA's Reply to MCAG's Compilation of Prior Arguments Regarding Application of all Prior Payments, April 4, 2013.)

The discovery that began in Process 3, outlined above, continued in fits and starts in this subsequent period. While simultaneously fighting CIGNA to pay and process the claims, MCAG was engaged in a concurrent discovery battle with EPIQ and the IRE regarding CIGNA's denial and improper influence of the claims review process. (*See* MCAG's Motion to Compel EPIQ System's Responses to Discovery, May 16, 2012 & MCAG's Motion to Compel IRE Responses

to Discovery, May 16, 2012.) In the discovery disputes, CIGNA was not a mere bystander but actively tried to prevent MCAG from obtaining responses by submitting briefing related to MCAG's Motions to Compel and interfering in MCAG's efforts to obtain discovery. (*See* CIGNA's Motion to Allow Discovery Related to MCAG's Communications with Reviewers, May 29, 2013; MCAG's Opposition to CIGNA's Motion to Allow Discovery Related to MCAG's Communications with the Reviewers, July 15, 2013.)

Even when MCAG was successful in resolving an issue, CIGNA's refusal to comply with Arbitrator Schultz's order resulted in MCAG having to expend additional resources chasing the payments CIGNA was ordered to make. On April 5, 2013 Arbitrator Schultz issued an order siding with MCAG on the claim level/code level issue finding that the lack of code level payment information did not support CIGNA's position that $3.6 million worth of claims at issue were denied. CIGNA was ordered to furnish EPIQ with adequate proof of prior payments and EPIQ was ordered to remit payment to MCAG in the amount of $3.6 million minus the amount of prior payments. (Order on Claim Level/Code Level Issue, April 5, 2013.)

On May 6, 2013, EPIQ wired to MCAG payment in the amount of $646,630.24. This payment indicated that CIGNA had deducted $2,990,990.02 from the ordered payment, ostensibly because it had submitted proof of prior payments in that amount to EPIQ. The deduction was seemingly based on three Excel spreadsheets that did not appear to contain actual prior payment information. When MCAG requested the basis for the prior payment information, it was met with stonewalling from CIGNA, again requiring multiple rounds of briefing. (*See* MCAG's Motion to Enforce Compliance with April 5, 2013 Order, May 10, 2013; CIGNA's Response in Opposition to MCAG' s Motion to Require Compliance with April 5, 2013 Order, May 29, 2012; Response in Opposition to MCAG_s Motion to Require Compliance with April 5, 2013 Order, May 31,

2013.) Arbitrator Schultz agreed with MCAG, ordering CIGNA to submit to both MCAG and the Arbitrator a copy of documents evidencing prior payments that were submitted to EPIQ. Arbitrator Schultz recognized CIGNA's stonewalling, stating: "**It was not contemplated by the Arbitrator in entering the April 5, 2023 Order that such documents would only be submitted to EPIQ.**" (Order on MCAG's Motion to Require Compliance with April 5, 2013 Order, June 27, 2013.)

Despite this Order, CIGNA again refused to comply with the Arbitrator's Order, forcing MCAG to file a Motion to Require Payment and for Contempt, Monetary & Evidentiary Sanctions on September 26, 2013. During 2013 MCAG and CIGNA also exchanged multiple briefs related to the Non-MPL claims and treatment of the $7.5 million payment.

This briefing culminated in a two-day evidentiary hearing held on January 7, 2014 through January 9, 2014 in Miami Florida, following which MCAG was required to submit post-hearing briefs. After extensive briefing, Arbitrator Schultz did not issue an order addressing the totality of the pending issues, but on April 7, 2014 issued an order clarifying that prior payments made at the code level were eligible for deduction. The Arbitrator found that since CIGNA could not submit to EPIQ adequate proof with respect to code level payments, CIGNA was ordered to authorize EPIQ to remit to MCAG the amount of $3,637,620.26 within 30 days of the date of the Order. Following this ruling, in May 2014 CIGNA finally paid $2,990.990.02 that it had improperly deducted from the $3.6 million it owed on the claim level/code level ruling against it. Following this payment, Arbitrator Schultz set a hearing on the treatment of the $7.5 million payments, and having the full Supplemental Agreement, permitted the parties to submit additional briefing on the treatment of this payment.

In September of 2014 MCAG and CIGNA prepared for and attended mediation but were not able to resolve the dispute.

On November 21, 2014, Arbitrator Schulz issued an order finding that based on the parties' course of conduct and available discovery, evidence satisfactorily established that the fund created by the $7.5 million CIGNA payment was utilized (by way of credit) as compensation for approved claims, as well as payment of an undetermined portion of MCAG's attorneys' fees. (Order on MCAG's Objection to CIGNA's Certification of Payment, November 21, 2014.)

Following the mediation, MCAG resumed its efforts to obtain interest on the payments made and continued to battle CIGNA for the proper processing of claims. (*See* MCAG's Motion for Interest on Claim Level Claims, November 14, 2014; CIGNA's Response To MCAG'S Motion for Interest On Claim Level Claims, December 18, 2014; MCAG's Reply for Motion for Interest on Claim Level Claims, January 1, 2015; CIGNA's Motion for Clarification of Interest Obligation April 8, 2015; MCAG's Response re. Clarification of Interest, May 29, 2015; Cigna's Reply in Support of Motion for Clarification of Interest Obligation, July 17, 2015.)

Pursuant to Arbitrator Schultz's order, on January 8, 2016, MCAG filed an updated written Arbitration Demand setting forth its allegations of CIGNA's improper processing of the claims. After responding to the Arbitration Demand, CIGNA continued its modus operandi of fighting MCAG at every step by objecting to and filing briefings seeking to prevent MCAG from obtaining summons and subpoenas to EPIQ and IRE employees. CIGNA also filed superfluous motions demanding MCAG explain its positions regarding the Arbitrator's authority to reprocess claims, evidence of CIGNA's undue influence and identification of MCAG's direct claims. (*See* CIGNA's Motion to Compel Compliance with Arbitrator's Request, July 6, 2016; MCAG's Response Opposing CIGNA's Motion to Compel Compliance with Arbitrator's Requests, July 25, 2016; CIGNA's Reply in Support of Motion to Compel Compliance with Arbitrator's Requests, July 26, 2016.) Concurrently, and without obtaining the leave of the Arbitrator, CIGNA also propounded

additional discovery on MCAG, leading to additional discovery motion practice. (*See* CIGNA's Interrogatories to MCAG and CIGNA's Request for Production to MCAG dated July 29, 2016.) In its efforts to enforce summons and subpoenas from EPIQ and the IRE, MCAG sought an Order from this Court to compel compliance with four summonses issues by the Arbitrator (DE 6493). CIGNA propounded additional interrogatories to MCAG in November of 2016, leading to the need for additional discovery motions.

In August 2016, for the first time in over ten years, CIGNA raised the issue of MCAG's accounting and submitted to Arbitrator Schultz a Motion to Compel MCAG to Provide An Accounting and Evidence of Distributions to Class Members, leading to significant briefing on the issue.

CIGNA's Motion to Compel an Accounting raised jurisdictional issues, which were briefed for both the Arbitrator and this Court. (*See* MCAG's Brief Regarding Jurisdiction, February 2, 2017; CIGNA's Brief Regarding Jurisdiction, February 2, 2017; CIGNA's Motion to Compel An Accounting and Enforce Settlement Agreement, D.E. 6545.) Following a hearing held on March 2, 2017, rather than ordering an accounting, Arbitrator Schultz in an effort to avoid the time and expense involved in the appointment of a forensic expert, ordered MCAG to provide disclosures that would provide the functional equivalent of an accounting. (*See* Omnibus Order Regarding CIGNA's Motion to Compel MCAG to Provide an Accounting, March 30, 2017 and Omnibus Order on Motion for Clarification, April 6, 2017.) On April 27, 2027, MCAG made the required disclosures, but CIGNA made additional submissions regarding the alleged deficiencies of MCAG's disclosures.

On July 26, 2017, the District Court issued an order denying CIGNA's Motion to Compel An Accounting and Enforce Settlement Agreement. CIGNA appealed this order to the Eleventh

Circuit. On August 25, 2017, MCAG requested a stay of the Pre-Final Evidentiary pending resolution of the appeal, but this request was denied by Arbitrator Schultz. Thus, MCAG began to prepare for the Pre-Final Evidentiary hearing, which included fact and expert discovery, the preparation of witness and exhibit lists, and pre-hearing motions.

The Pre-Final Evidentiary Hearing was held from January 9 through 12, 2018. On June 26, 2018, Arbitrator Schultz issued a partial interim order, approving MCAG's use of funds to pay for legal fees and costs in the Arbitration:

> *Other than payments to third parties for historically paid costs and expenses of this Arbitration proceeding*, future diminution of CMC funds by MCAG payments to itself for executive salaries and unrelated operating costs will be viewed with disfavor as this Arbitration proceeds to conclusion.

(MCAG Ex. 56 (Order, June 25, 2018) admitted at Evid. Hr'gs Jan. 13-14, 2025).)

In that same Order, Arbitrator Schultz also ordered that an independent third-party certified public accountant perform a full accounting. Following candidate submissions by both parties, on August 21, 2018, Arbitrator Schultz appointed CIGNA's candidate Soneet Kapila ("Mr. Kapila") as the Special Accounting Master.

On October 17, 2019, the Eleventh Circuit reversed and remanded this Court's Order denying CIGNA's Motion to Compel An Accounting and Enforce Settlement Agreement, ruling that "the district court should require an expeditious accounting of all funds CIGNA previously paid to MCAG for the benefit of class members." *Managed Care*, 939 F.3d 1145, at 1163.

* * *

In summary, MCAG properly accounted for the fees and costs totaling **$3,041,786** that it expended in pursuit of a full recovery on behalf of its class-member clients in the "Continued Pursuit" of a recovery for the class members from 2010 to 2019. The following chart of key events and summary of costs further shows the reasonableness of MCAG's expenditures during that time:

| Sept. 9, 2011 | Order on Pending Motions for Reconsideration |
|---|---|
| Oct.10, 2011 | CIGNA Certification Regarding Payment |
| Oct. 14, 2011 | MCAG's Objection to CIGNA's Certification Regarding Payment |
| Oct. 20, 2011 | MCAG Submission Regarding Interest Amount due by CIGNA |
| May 16, 2012 | MCAG's Motion to Compel EPIQ Systems' Responses to Discovery |
| May 16, 2012 | Managed Care Advisory Group's Motion to Compel the Independent Review Entity's (IRE) Responses to Discovery |
| June 5, 2012 | CIGNA's Brief Related to EPIQ not Approving Claims Subject to Claim Code Level |
| June 5, 2012 | MCAG's Supplemental Brief Regarding Claim Code Level Issue. |
| June 11, 2012 | CIGNA's Brief on Non-Multiple Procedure Logic Claims, June 11, 2012 |
| June 11, 2012 | MCAG's Supplemental Brief Regarding Non-MPL Claims |
| July 20, 2012 | CIGNA's Motion to Enforce Supplemental Arbitration Agreement |
| Aug. 27, 2012 | MCAG's Opposition to Motion to Enforce Supplemental Agreement |
| Jan. 7, 2013 | CIGNA'S Compilation of Prior Arguments Regarding Application of All Prior Payments to any Claims and Codes |
| Feb, 6, 2013 | MCAG's Response to CIGNA's Compilation of Arguments regarding Prior Payments |
| Jan. 9, 2013 | MCAG's Reply to Epiq and IRE's Responses to Motions to Compel. |
| Feb. 6, 2013 | MCAG's Response to CIGNA's Compilation of Arguments regarding Prior Payments |
| April 5, 2013 | Order on Claim Level-Code Level Issue |
| May 10, 2013 | MCAG's Motion to Enforce Compliance with April 5, 2013 Order |
| June 27, 2013 | Order on MCAG's Motion to Require Compliance with April 5, 2013 Order |
| July 23, 2013 | MCAG's Opposition to CIGNA's Motion Submit Depo. Transcripts |
| July 23, 2013 | MCAG's Submission Regarding "$7.5 Million Issue." |
| July 23, 2013 | MCAG's Supplemental Brief Regarding Application of Prior Payment Deductions on Non-MPL Claims with Exhibits A – F. |
| Jan. 7-9, 2014 | Evidentiary hearing re: claims that had been approved but not paid |
| Feb. 4, 2014 | MCAG's Post-Closing Brief in Support of its Motion to Require Compliance with April 5, 2013 Order |
| June 12, 2014 | Hearing re: $7.5M issue |
| Sept. 2014 | Mediation |
| Nov.14, 2014 | MCAG's Motion for Interest on Claim Level Claims |
| Dec. 18, 2014 | CIGNA'S Response To MCAG'S Motion for Interest On Claim Level Claims |
| Jan 1, 2015 | MCAG's Reply for Motion for Interest on Claim Level Claims |
| Apr. 8, 2015 | CIGNA's Motion for Clarification of Interest Obligation |
| May 29, 2015 | MCAG's Response re. Clarification of Interest |

| July 17, 2015 | CIGNA's Reply in Support of Motion for Clarification of Interest Obligation |
|---|---|
| Jan. 8, 2016 | Arbitration Demand |
| Aug. 19, 2016 | CIGNA's Motion to Compel MCAG to Provide an Accounting and Evidence of Distributions to Class Members |
| Sept. 19, 2016 | MCAG's Response to Cigna Healthcare's Motion to Compel MCAG to Provide an Accounting and Evidence of Distributions to Class Members |
| Feb. 27, 2017 | CIGNA's Motion to Compel An Accounting and Enforce Settlement Agreement in S.D. of Florida |
| Mar. 30, 2017 | Omnibus Order Regarding Cigna's Motion to Compel MCAG to Provide an Accounting and Evidence of Distributions to Class Members (Motion to Compel); Compliance with Outstanding Discovery and Possible Evidentiary Hearing |
| July 26, 2017 | Court Denied CIGNA's Motion to Compel an Accounting |
| Jan. 9-12, 2018 | Pre-Final Evidentiary Hearing |
| June 26, 2018 | Partial Interim Order authorizing MCAG to use funds to pay for its legal fees and costs in the Arbitration and Requiring an Accounting |
| Aug. 21, 2018 | Soneet Kapila Appointed as Special Accounting Master |
| Oct. 17, 2019 | 11th Circuit reversed and remanded Order Denying CIGNA's Motion to Compel and Accounting and Enforce Settlement Agreement |

| Description | | Cont. Pursuit |
|---|---|---|
| MCAG Legal Fees | $ | 2,449,945 |
| MCAG Costs | | 591,841 |
| Total | $ | 3,041,786 |
| | | |
| **Legal Fees Breakdown** | | |
| Total Attorney Hours (Reported With Fees) | | 5,916 |
| Avg. Hourly Rate | $ | 410 |
| | | |
| **Costs Breakdown** | | |
| Arbitrator and Mediator Costs | $ | 327,161 |
| Expert Costs | | 58,205 |
| Third Party Vendor Costs | | 68,085 |
| SAM Costs | | - |
| Filing and Service Fees | | 2,233 |
| Deposition Costs | | 2,368 |
| Court Reporter Fees/Transcripts | | 77,650 |
| Travel/Hotel/Food | | 44,442 |
| Photocopies | | 5,204 |
| Other | | 6,493 |
| Total | $ | 591,841 |

## V. MCAG Properly Accounted for the Proceeds It Obtained from CIGNA and Expended to Pursue a Full Recovery from 2019 to Date ("Arbitral Trial and Award")

By 2019, two separate arbitrators had repeatedly concluded that CIGNA had not fulfilled its obligations under the Settlement Agreement and had been wrongfully withholding tens of millions of dollars of class member funds. Accordingly, MCAG pressed to advance the proceedings to a conclusion in the form of an Arbitral Trial and Award, which cost an additional $6,881,002 in fees and costs between 2019 to date.

On September 18, 2019, the Eleventh Circuit had issued an opinion directing this Court to require an accounting of all funds CIGNA paid MCAG. *See* DE 6601. CIGNA filed a motion for the appointment of Mr. Kapila as a Special Accounting Master since Mr. Kapila had already completed an entire accounting of the Category Two claims payments in the arbitration. The only difference in scope would be expanding it to include an accounting of the $11 million in Category One claims paid prior to the arbitration. CIGNA estimated the expanded accounting would cost

only $25,000, and the Court ordered Mr. Kapila to complete an "expeditious accounting" within 30 days. DE 6618. This "expeditious accounting" ballooned into a ten-month ordeal with Mr. Kapila charging MCAG $329,712.60, more than 13 times greater than CIGNA's estimate.

CIGNA filed a motion seeking to prevent MCAG from using any funds CIGNA had paid to prosecute the Arbitration against CIGNA. *See* DE 6603. This was a motion CIGNA had already made in the Arbitration, and lost there, and MCAG had to quickly oppose this motion and argue the issue before Magistrate Judge O'Sullivan, who denied CIGNA's request. *See* DE 6641.

In a matter of days, between late October and early November 2020, CIGNA filed no less than five motions, including a motion to enforce the settlement agreement [DE 6685], two motions for sanctions [DE 6686 & 6687], a motion to declare the arbitration waived [DE 6691], and a motion to stay the arbitration [DE 6695].

MCAG responded to each of these motions (*see, e.g.,* DE 6723, DE 6724, DE 6742, DE 6757, DE 6758, and DE 6909). In addition, MCAG filed its objections to Mr. Kapila's accounting report [DE 6712], engaged in third-party discovery disputes [DE 6649], and prepared for the final arbitration hearing. In December 2020, MCAG filed multiple briefs, including oppositions to CIGNA's motions to stay arbitration [DE 6724] and to declare the arbitration waived [DE 6742]. In addition, as Magistrate O'Sullivan recommended that this Court deny CIGNA's motion to stay [DE 6739] and to declare the arbitration waived/terminated [DE 6748], CIGNA lodged objections to Magistrate O'Sullivan's R&Rs, forcing MCAG to prepare and file responses [DE 6757 & 6758].

MCAG prevailed on all of CIGNA's motions.

In January 2021, CIGNA escalated its tactics, filing two "emergency" motions seeking expedited hearings on previously denied motions. *See* DE 6747 & 6756. This Court, however,

rejected CIGNA's flawed attempts to derail the arbitration, ordering the final hearing to proceed as scheduled. *See* DE 6773.

Even on the eve of the final arbitration hearing, CIGNA filed yet another motion to enforce the settlement agreement and sought, once again, to enjoin MCAG's arbitration claims. *See* DE 6776. After this Court denied this motion [DE 6778], CIGNA filed an interlocutory appeal [DE 6779], prompting MCAG to draft a motion to dismiss and an appellate brief—both of which demanded substantial resources.

To be sure, preparing for the final hearing itself required extraordinary effort. MCAG's lawyers prepared examination outlines for 13 witnesses, coordinated expert analyses, and refined complex claims processing data for presentation during the final hearing (efforts that received high praises from the Arbitrator).

Arbitrator Matthews also requested that MCAG prepare and submit trial briefs on its case-in-chief, as well as on CIGNA's counterclaims, which required further legal analysis conducted by MCAG's legal team. The final arbitration hearing spanned 19 days, included testimony from 13 witnesses, and resulted in nearly 300 exhibits being entered into evidence.

| WITNESS | DATE(S) WITNESS TESTIFIED |
|---|---|
| Matthew Katz | January 25-26, 2021 |
| Genevieve Parm | January 26, 2021 |
| William Allen Holbrecht | January 26, 2021 |
| Val Vorisek | January 26, 2021 |
| Doug Perry | January 27, 2021; January 29, 2021; February 18, 2021 |
| Timothy Lee Schmidt | January 27-28, 2021 |
| Don Obertacz | January 29, 2021 |
| Sharon Nicka | February 1, 2021; February 19, 2021; March 5, 2021 |
| Jeff Buchakjian | February 1-2, 2021; February 18-19, 2021; March 5, 2021 |
| Scott Bouchner | February 3-4, 2021; February 18, 2021; March 5, 2021; March 11, 2021 |

| Treva Mattingly | February 4, 2021; February 16, 2021; March 5, 2021; |
|---|---|
| Richard Pollack | February 19, 2021 |
| Edward Lyle Clark, III | March 11, 2021 |

Following the hearing, Mr. Matthews directed both sides to submit proposed findings of fact and conclusions of law. This process required MCAG to meticulously review hundreds of exhibits and hours of witness testimony—work essential to ensuring Arbitrator Matthews had the necessary context to issue a fair final award. MCAG also commented on at least two drafts of the final arbitration award before its issuance.

On August 4, 2021, Arbitrator Matthews awarded MCAG clients $16,281,051.19 in compensation.

Following Mr. Matthews' final award, CIGNA filed a motion for vacatur, triggering another round of briefing [DE 6820]. MCAG simultaneously filed its own motion to confirm the award in part and vacate it in part, as part of MCAG's efforts to increase client recoveries [DE 6821]. As CIGNA continued to contest the award, MCAG filed a motion to compel Epiq to conduct a final accounting to ensure that all its clients would receive full payment from CIGNA [DE 6836].

And even after this Court vacated Mr. Matthews' final arbitration award, MCAG's commitment to its clients did not waver. Rather, MCAG doubled down on its efforts to secure the recoveries its clients deserve, by filing an appeal to overturn the vacatur. *See* DE 6954. MCAG's post-award litigation efforts were undertaken not for MCAG's benefit, but to ensure its clients receive the compensation they deserve.

\* \* \*

In summary, MCAG properly accounted for the fees and costs totaling **$6,881,002** that it expended in pursuit of a full recovery on behalf of its class-member clients in the "Arbitral Trial

-50-

and Award" phase of the proceedings from 2019 to the present date. The following chart of key events and summary of costs further shows the reasonableness of MCAG's expenditures during that time:

| Description | | Arbitral Trial |
|---|---|---|
| MCAG Legal Fees | $ | 4,219,947 |
| MCAG Costs | | 2,661,055 |
| Total | $ | 6,881,002 |
| | | |
| **Legal Fees Breakdown** | | |
| Total Attorney Hours (Reported With Fees) | | 10,225 |
| Avg. Hourly Rate | $ | 386 |
| | | |
| **Costs Breakdown** | | |
| Arbitrator and Mediator Costs | $ | 157,728 |
| Expert Costs | | 2,046,609 |
| Third Party Vendor Costs | | 84,852 |
| SAM Costs | | 326,049 |
| Filing and Service Fees | | 4,176 |
| Deposition Costs | | 456 |
| Court Reporter Fees/Transcripts | | 14,482 |
| Travel/Hotel/Food | | 21,197 |
| Photocopies | | 1,238 |
| Other | | 4,268 |
| Total | $ | 2,661,055 |

## CONCLUSION

Given that MCAG at all times operated in the best interests of the class members, it is purely an academic question of whether it was—or was not—technically a fiduciary to the class members or whether it was bound by any other contractual or common-law duty of care. To be sure, in ordering an accounting the Eleventh Circuit underscored *this Court's* "'role as a fiduciary'" to "ensure the class members receive that to which they are entitled under the Settlement Agreement." *Managed Care*, 939 F.3d 1145, at 1162. But it would be a mistake to conclude that the Eleventh Circuit's opinion would "make[ ] no sense at all" without applying "the same principle" to impose the same "fiduciary obligation [on MCAG] as well." Jan. 13, 2025 Evid. Hr'g

Tr. at 246. To the contrary, the Eleventh Circuit's opinion does not require this Court to transform MCAG's contractual relationship with certain class members into a fiduciary relationship and, in all events, doing so would not make any practical difference, for reasons that MCAG has already explained in multiple briefs which it incorporates here by reference. *See, e.g.*, DE 6933, 6938.

This Court's role as a fiduciary stems from its duty to first "guard against settlements that" may not adequately benefit "unrepresented[,] absent class members," and to then "see that any settlement" is not rendered a mere empty "promise to pay the relief to which [the] class members are entitled." *Managed Care*, 939 F.3d at 1162 (cleaned up). In other words, the Eleventh Circuit did not impose a fiduciary obligation on MCAG—or on CIGNA, for that matter. Rather, the Eleventh Circuit merely crystallized this Court's fiduciary obligation to supervise the operation of the settlement for the benefit of the class members. And it has always been CIGNA, not MCAG, which presents the most persistent impediment to this Court's ability to fulfill its fiduciary role.

Particularly because this case does not involve any absent or unrepresented class members, but rather class members who entered into contracts with MCAG, this Court can fulfill its fiduciary obligation to the class members by following the Eleventh Circuit's directive to "an expeditious accounting of all funds CIGNA previously paid to MCAG for the benefit of the class members." *Managed Care*, 939 F.3d at 1163. To be sure, the physician agreements by which the class members retained MCAG to pursue settlement claims on their behalf did not impose a fiduciary duty of care. But, in all events, MCAG acted diligently and admirably on the class members' behalf in the face of CIGNA's persistent efforts to evade its obligations under the Settlement Agreement, consistent with any purported fiduciary duty.

In light of the multiple processing and reprocessing of claims (claims were approved, and then denied, and then reapproved), multiple briefs, full blown discovery, dozens of hearings, and

evidentiary hearings, and pre-final hearings, and a 19-day final arbitration hearing, the costs MCAG incurred with pursuing payment from CIGNA—legal fees, expert witness fees, arbitrator fees, and all other arbitration expenses—were reasonable. And the record fully establishes that MCAG's clients understood, accepted, and expressly supported—consistent with the approvals issued by other class-member representatives, arbitrators, and the Court—MCAG's use of CIGNA funds to cover these costs, as provided in their written agreements with MCAG, which also permitted MCAG to deduct its retention fees (ranging from 25 to 30%) before distributing any "net recoveries" to the class members.

Mr. Jeffrey Buchakjian—who analyzed all MCAG's agreements with its clients, reviewed MCAG's bank and accounting records, and examined, in detail, all claims MCAG submitted in arbitration—testified that MCAG consistently sought to meet its contractual obligations to class members while navigating the complexities of a very contentious, long-lasting arbitration. Evid. Hr'g Tr. Day 2 at 78:18-21 ("MCAG has attempted to . . . calculate what its obligations are at different points in time to the class members and has shown that they've had sufficient funds to meet those obligations.").

However, as Mr. Buchakjian testified, due to the prolonged and uncertain nature of the claims pending in arbitration, MCAG faced the challenge of determining exactly what would be available for distribution, while bearing all arbitration costs, and using the funds it received from CIGNA to advance class members' claims rather than for any improper purpose.

> [T]here was no finality to this dispute, there was never an understanding as to what was ultimately owed to the class members, and that's because, one, the arbitration was ongoing and claims were either getting approved, and then denied, and then reapproved, but also these fees, to the extent that MCAG is correct, these fees could be deducted, there was never a final answer as to what would be available to distribute.

More importantly, while Mr. Buchakjian acknowledged that MCAG's bookkeeping was not flawless and that some commingling of funds did occur, he also testified that there is no evidence of fraud or improper use of funds by MCAG:

> **A**. . . . That's really the crux of the opinions that we haven't gotten to yet in your questioning is that there's no evidence of fraud here. There's just documents that weren't provided and documents that are not reconciling, but I understand -- what I'm stating here is that these things were not disputed and that there's no establishment of malfeasance on the part of MCAG.
>
> **A**. . . . As I have stated, and again there is no dispute over this I can say with absolute certainty, MCAG did not distribute to class members the 14.2 million. It was ultimately spent pursuing these claims.
> **Q**. So the so-called replenishment went back to MCAG, not to class members, right?
> **A**. No, it didn't go back to MCAG. It was spent on legal fees, arbitrator fees, expert fees.
>
> **A**. . . . I am not here, Your Honor, to defend the commingled funds. That happened before I was involved in this case. But ultimately, funds were spent on legal fees and funds were retained under the terms of the Physician Agreement. So once you get into this commingled situation, it's difficult because money is fungible. We all agree with that. It's difficult to say this was a Cigna dollar or this was a non-Cigna dollar that went to these different expenditures. What MCAG has attempted to do is calculate what its obligations are at different points in time to the class members and has shown that they've had sufficient funds to meet those obligations. So I've analyzed that, but because of this commingling issue, sir, it's difficult to say this Cigna dollar went to this issue as opposed to that issue.

Thus, regardless of whether the Court departs from the Eleventh Circuit's holding by imposing an additional fiduciary obligation on MCAG, the result of that accounting will remain unchanged. Specifically, with the support of class members, their representatives, the arbitrators and the Court, and armed with the best information available to it at the time, MCAG responsibly spent partial settlement proceeds to overcome CIGNA's scorched-earth litigation tactics and pursue a full recovery on behalf of the class members. The heat-of-battle decisions made by MCAG about how to best counter CIGNA's refusal to comply with the Settlement Agreement are

only arguably questionable with the benefit of extraordinary hindsight, following this Court's vacatur of the Final Award reflecting the findings of three separate arbitrators.

It may be true that this Court's Order—if it is not overturned on appeal—may make it difficult or impossible for the class members to recover the funds that they are owed under the Settlement Agreement as a practical matter. But this Court's Order did not—and could not—call into question the substantive merits of the arbitrators' core findings that CIGNA had failed to meet its obligations under the Settlement Agreement and to this day continues to wrongfully withhold at least $16 million—and likely tens of millions of dollars more—that the class members would be entitled to collect if the Settlement Agreement were properly interpreted and enforced according to its terms. Particularly given the possibility that MCAG could prevail on appeal and the possibility that MCAG's class-member clients could build on MCAG's work to find other avenues of relief, MCAG did not violate any duty of care to the class members through its accounting or use of any proceeds it obtained in these proceedings and invested in obtaining a substantial recovery on the class members' behalf.

Respectfully Submitted,

**AXS LAW GROUP, PLLC**
**2121 NW 2nd Avenue, Suite 201**
**Miami, FL 33127**

_By: /s/ Jeffrey W. Gutchess_
JEFFREY W. GUTCHESS
Florida Bar No. 702641
jeff@axslawgroup.com
Tel: 305.297.1878

_Counsel for MCAG_

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on February 27, 2025, a true and correct copy of the foregoing

was served on all counsel of record via CM/ECF.

By: <u>*/s/ Jeffrey W. Gutchess*</u>
Jeffrey W. Gutchess